# Exhibit L

FILED: NEW YORK COUNTY CLERK 12/19/2013

NYSCEF DOC. NO. 1

INDEX NO. 654361/2013

RECEIVED NYSCEF: 12/19/2013

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK – Commercial Division**

| | |
|---|---|
| **TRI-COUNTY MALL INVESTORS, LLC,** | **Date Filed:** |
| **Plaintiff,** | **Index No.:** |
| | **SUMMONS** |
| **-against-** | **Electronically Filed Document** |
| | Plaintiff designates New York County as the place of trial. |
| **FELIX SATER and DANIEL RIDLOFF,** | |
| **Defendants.** | The basis of venue is that residence of Defendant Ridloff is located in New York County. |

**TO THE ABOVE NAMED DEFENDANTS:**

    **YOU ARE HEREBY SUMMONED** to answer the Complaint of the Plaintiff, a copy of which is hereby served upon you and to serve a copy of your Answer on the undersigned attorneys for the Plaintiff, whose address is ROSABIANCA & ASSOCIATES, PLLC, 40 Wall Street, 30th Floor, New York, New York 10005, within twenty (20) days after service of this Summons and Complaint, exclusive of the day of service, or if service of this Summons and Complaint is made by any means other than by personal delivery to you, within thirty (30) days after such service is complete.

    In case of your failure to answer the Complaint of the Plaintiff, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated:    December 16, 2013
             New York, New York



EXHIBIT
PX 29
8/10/17

Very truly yours,

ROSABIANCA & ASSOCIATES, PLLC,

By: David C. Van Leeuwen, Esq.
Diane Artal, Esq.
*Attorneys for Plaintiff*
40 Wall Street, 30th Floor
New York, New York 10005
T: (212) 269-7722

To:   Felix Sater
130 Shore Road
Port Washington, NY 11050

Felix Sater
c/o Moses & Singer LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

Daniel Ridloff
403 East 62nd Street, Apt 9A
New York, NY 10065

Daniel Ridloff
c/o Edward V. Sapone, LLC
40 Fulton St, 23rd Floor
New York, NY 10038

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – Commercial Division

TRI-COUNTY MALL INVESTORS, LLC,

                Plaintiff,

      -against-

FELIX SATER and DANIEL RIDLOFF,

              Defendants.

Index No.:

**VERIFIED COMPLAINT**

**Electronically Filed Document**

Plaintiff, TRI-COUNTY MALL INVESTORS, LLC, complaining of Defendants by and through its attorneys, ROSABIANCA & ASSOCIATES, PLLC, respectfully shows to this court and alleges:

### THE PARTIES, JURISDICTION AND VENUE

1. The Plaintiff, Tri-County Mall Investors, LLC, (hereinafter "Tri-County" or "Plaintiff"), is a foreign limited liability company, organized under and existing pursuant to the laws of the State of Delaware, with a business address in care of Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, and duly authorized to do business in the State of New York.

2. Upon information and belief, the defendant Felix Sater (hereinafter "Defendant Sater") is an individual with an address at 130 Shore Road, Port Washington, NY 11050.

3. Upon information and belief, the defendant Daniel Ridloff ("Defendant Ridloff"), is an individual with an address at 403 East 62nd Street, Apt 9A, New York, NY 10065.

4. Accordingly, venue is proper in New York County pursuant to CPLR 503(a), based upon the residence of one of the parties at the time of commencement of the present action.

## BACKGROUND
## TRI-COUNTY MALL INVESTORS, LLC

5. The Plaintiff was formed for the sole purpose of conducting real estate transactions in connection with the Tri-County Mall located at 11700 Princeton Pike, Cincinnati, Ohio 45246.

6. The sole member of the Plaintiff is Triadou SPV S.A., a Luxemburgish corporation, having its principal business address at 15, Rue du Fort Bourbon, L-1249, Luxembourg ("Triadou"), represented by its President, Nicolas Bourg.

7. Pursuant to the Operating Agreement of Tri-County dated as of April 22, 2013 (the "Operating Agreement"), Defendant Ridloff was appointed as manager of Tri-County.

8. Upon information and belief, Defendant Ridloff, in his capacity as manager of Tri-County, authorized and/or appointed Defendant Sater to act as co-manager and officer of Tri-County.

## THE LOAN SALE AGREEMENT

9. On or about April 23, 2013, Tri-County purchased for $30,000,000.00 the assignment and assumed any and all rights and obligations of Wells Fargo Bank N.A. in connection with a loan and related documents securing several parcels of

2

property in Hamilton County, Ohio, to be foreclosed (hereinafter collectively the "Foreclosure Properties").

10. On or about July 18, 2013, the Sheriff of Hamilton County, Ohio, (the "Sheriff") sold at a public sale the Foreclosure Properties to American Pacific International Capital Co. Ltd. ("APIC") for $45,000.000.00.

11. By order dated August 29, 2013 (the "Order"), the Court of Common Pleas of Hamilton County, Ohio, directed that the Sheriff distribute the $45,000,000.00 proceeds as follows:

- $813,292.80 to the Clerk of the Court;
- $791,177.65 to the treasurer of Hamilton County, Ohio for the real property taxes;
- The remaining balance of $43,395,529.55 to the Plaintiff.

12. Upon information and belief, the Sheriff withhold a poundage fee of $675,000.00 on the $43,395,529.55 payable to the Plaintiff.

13. Upon information and belief, according to said August 29, 2013 Order, the Sheriff sent by wire transfer the remaining balance of $42,720,529.55 (the "Sale Proceeds") to a bank account opened by Defendants Ridloff and Sater on behalf of Plaintiff, in Plaintiff's name, at JP Morgan Chase Bank in New York.

## DEFENDANTS' WRONGDOING

14. Upon information and belief, Defendants Daniel Ridloff and Felix Sater (hereinafter collectively the "Defendants") both acted on behalf of the Plaintiff to close the aforesaid Tri-County transaction.

3

15. In contravention of their duties as manager, officer and/or co-manager of Tri-County, and contrary to the direction of the sole member of Tri-County, Defendants unlawfully and without the consent of the Plaintiff, did transfer and deliver the entirety of the Sale Proceeds from Plaintiff's account at JP Morgan Chase to another bank account under the exclusive control of Defendants, and to the exclusion of Plaintiff.

16. As a result thereof, the entirety of the Sale Proceeds have been improperly diverted, converted, and/or made unavailable to the Plaintiff. Plaintiff has not even been provided with information or documentation as to the location of the Sale Proceeds.

17. To date, Defendants have not delivered any of the Sale Proceeds to Plaintiff despite due demand therefore.

18. Plaintiff has repeatedly requested copies of all financial records and an accounting concerning the Sale Proceeds from Defendants. Yet, the Plaintiff was not provided with any of said requested documents.

19. Plaintiff retained the firm, Rosabianca & Associates, PLLC, to attempt, without success, to recover the sums owed and resolve the matter currently before the Court.

20. Plaintiff had no other means of protecting its interest in the Sale Proceeds than to commence this action.

21. At this time, Plaintiff's representatives are simultaneously pursuing the filing of a criminal complaint with Federal and/or State authorities against Defendants for the conversion, misappropriation and theft of the aforesaid sums.

4

## AS AND FOR A FIRST CAUSE OF ACTION

22. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "21" as though fully set forth herein.

23. Defendants owed Plaintiff a fiduciary duty to perform their duties as managers and/or officers, in good faith, and with that degree of care and loyalty an ordinarily prudent person in a like position would use under similar circumstances.

24. Upon information and belief, according to the August 29, 2013 Order, the Sheriff sent by wire transfer the remaining balance of $42,720,529.55 to a bank account opened by Defendants on behalf of Plaintiff, in the name of Plaintiff, at JP Morgan Chase Bank in New York.

25. In contravention of their duties as managers and/or officers of Tri-County, and contrary to the direction of the sole member of Tri-County, Defendants unlawfully and without the consent of the Plaintiff, did transfer and deliver the entirety of the Sale Proceeds from Plaintiff's account at JP Morgan Chase to another bank account under the exclusive control of Defendants.

26. As a result thereof, the entirety of the Sale Proceeds have been improperly diverted, converted, and/or made unavailable to the Plaintiff.

27. Despite repeated demands, Plaintiff has not even been provided with information or documentation as to the location of the Sale Proceeds.

5

28. Defendants' actions constitute a breach of their duties by misappropriating the entirety of the Sale Proceeds, and by unlawfully delivering them to another bank account under the exclusive control of Defendants, to the exclusion of Plaintiff.

29. As a result of the foregoing actions on the part of Defendants, Plaintiff respectfully requests that the court direct Defendants to turn over all records relating to Plaintiff, and enter judgment in a sum to be determined by the court, but in no event less than Forty Five Million ($45,000,000.00) Dollars.

## AS AND FOR A SECOND CAUSE OF ACTION

30. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "29" as though fully set forth herein.

31. The Sale Proceeds are the sole property of Plaintiff. The Sale Proceeds were unlawfully and, contrary to the direction of Plaintiff, delivered, misappropriated, and converted by Defendants and placed in another bank account under the sole and exclusive control of Defendants, to the exclusion of Plaintiff.

32. Despite Plaintiff's demand to Defendants to return the Sale Proceeds, which belong to Plaintiff, Defendants continue to withhold them from Plaintiff, and have thereby improperly exercised dominion or a right of ownership over the Sale Proceeds.

33. As a result, Plaintiff respectfully requests judgment on behalf of Plaintiff and against Defendants in a sum to be determined by the court, but in no event less than Forty Five Million ($45,000,000.00) Dollars.

## AS AND FOR A THIRD CAUSE OF ACTION

34. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "33" as though fully set forth herein.

35. From August 29, 2013 to present, Plaintiff has been excluded from all dealings in connection with the Sale Proceeds.

36. Plaintiff has repeatedly requested that Defendants provide copies of all of the documents relating to the Sale Proceeds together with an accounting. Yet this request has been consistently denied.

37. Accordingly, Plaintiff respectfully requests that this Court direct Defendants to provide a full and immediate accounting of the Sale Proceeds, including, but not limited to, all information relating to any dealings with the Sale Proceeds from April 2013 to date.

## AS AND FOR A FOURTH CAUSE OF ACTION

38. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "37" as though fully set forth herein.

39. Defendants in their capacity as managers and/or employees of Tri-County entered into an agreement with Plaintiff to hold and preserve the Sale Proceeds in a bank account in Tri-County's name.

40. Defendants breached this agreement by unlawfully delivering, misappropriating and converting the Sale Proceeds to another bank account under the exclusive control of Defendants, and to the exclusion of Plaintiff.

41. Plaintiff has been damaged by Defendants' breach of this agreement.

7

42. As a result, Plaintiff requests judgment in a sum to be determined by the court, but in no event less than Forty Five Million ($45,000,000.00) Dollars.

## AS AND FOR A FIFTH CAUSE OF ACTION

43. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "42" as though fully set forth herein.

44. Defendants have been unjustly enriched in the sum of $42,720,529.55 by unlawfully, and contrary to the direction of Plaintiff, delivering, misappropriating and converting the Sale Proceeds to another bank account under the exclusive control of Defendants, and to the exclusion of Plaintiff.

45. As a result, Plaintiff respectfully requests judgment in a sum to be determined by the court, but in no event less than Forty Five Million ($45,000,000.00) Dollars.

## AS AND FOR A SIXTH CAUSE OF ACTION

46. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "45" as though fully set forth herein.

47. As pleaded above, Defendants, by virtue of their unlawful and improper actions, came into receipt, possession and use of the Sale Proceeds in an amount of at least $42,720,529.55, which belong to Plaintiff.

48. Defendants, while not entitled to said Sale Proceeds, derived and received a benefit from these monies to the detriment of Plaintiff.

49. Equity and good conscience requires that Defendants be required and compelled to repay such Sale Proceeds to Plaintiff.

8

50. As a result, Plaintiff respectfully requests judgment in a sum to be determined by the court, but in no event less than Forty Five Million ($45,000,000.00) Dollars.

## AS AND FOR A SEVENTH CAUSE OF ACTION

51. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "50" as though fully set forth herein.

52. The Sale Proceeds are the sole property of Plaintiff. The Sale Proceeds were unlawfully and contrary to the direction of Plaintiff, delivered, misappropriated, and converted to another bank account under the exclusive control of Defendants, and to the exclusion of Plaintiff.

53. Defendants continue to withhold the Sale Proceeds and have thereby improperly exercised dominion or right of ownership over the Sale Proceeds, which belong to Plaintiff.

54. Upon information and belief, Defendants agreed and conspired to convert the Sale Proceeds to their own use, and to the exclusion of Plaintiff.

55. Defendants took the overt action of delivering, misappropriating, and converting the Sale Proceeds to a bank account under their exclusive control and to the exclusion of Plaintiff, pursuant to their agreement to conspire.

56. Defendants intentionally participated and acted together in furtherance of the aforesaid agreement to conspire.

57. Plaintiff has been damaged as a result of Defendants' actions.

58. As a result, Plaintiff requests judgment in a sum to be determined by the court, but in no event less than Forty Five Million ($45,000,000.00) Dollars.

9

## AS AND FOR A EIGHTH CAUSE OF ACTION

59. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "58" as though fully set forth herein.

60. Given Defendants' actions in unlawfully delivering the Sales Proceeds, which are the sole property of Plaintiff, to another bank account under the exclusive control of Defendants, to the exclusion of Plaintiff, Plaintiff respectfully requests an injunction preventing Defendants from transferring, selling or disposing of any assets of Plaintiff, including but not limited to the Sale Proceeds.

61. By reason of the foregoing, Plaintiff demands that the Court permanently enjoin Defendants from transferring, selling or disposing of any assets of Plaintiff, or any affiliate, subsidiary or division thereof, including, but not limited to, the Sale Proceeds.

**WHEREFORE**, Plaintiff, demands judgment against Defendants as follows:

    a. On the first cause of action, judgment against Defendants in the sum of $45,000,000.00, with interest from August 29, 2013, together with the costs and disbursements in this action;

    b. On the second cause of action, judgment against Defendants in the sum of $45,000,000.00, with interest from August 29, 2013, together with the costs and disbursements in this action;

    c. On the third cause of action, judgment directing Defendants to render and file to Plaintiff an accounting of the Sale Proceeds, including, but not

10

limited to, all information relating to any dealings with the Sale Proceeds from April 2013 to date;

d. On the fourth cause of action, judgment against the Defendants in the sum of $45,000,000.00, with interest from August 29, 2013, together with the costs and disbursements in this action

e. On the fifth cause of action, judgment against Defendants in the sum of $45,000,000.00, with interest from August 29, 2013, together with the costs and disbursements in this action;

f. On the sixth cause of action, judgment against Defendants in the sum of $45,000,000.00, with interest from August 29, 2013, together with the costs and disbursements in this action;

g. On the seventh cause of action, judgment against Defendants in the sum of $45,000,000.00, with interest from August 29, 2013, together with the costs and disbursements in this action;

h. On the eighth cause of action, permanently enjoining Defendants from withdrawing and/or disposing of any money, property or other assets of Plaintiff or any affiliate, subsidiary or division thereof, including, but not limited to, the Sale Proceeds; and

i. For such further relief as the Court deems equitable and proper.

Dated:   December 16, 2013
         New York, New York

11

Very truly yours,

ROSABIANCA & ASSOCIATES, PLLC,

By: David C. Van Leeuwen, Esq.
Diane Artal, Esq.
*Attorneys for Plaintiff*
40 Wall Street, 30th Floor
New York, New York 10005
(212) 269-7722

12

**VERIFICATION**

COUNTRY OF NEW YORK )
                    ) ss.:
CITY OF NEW YORK    )

NICOLAS BOURG being duly sworn, deposes and says:

1. Deponent is the President of the sole member of Tri-County Mall Investors LLC, a Delaware Limited Liability Company and the Plaintiff in the within proceeding.

2. Deponent has read the foregoing Summons and Complaint and has knowledge of the contents thereof; and said contents are true to Deponent's own knowledge, except as to the matter therein stated to be alleged upon information and belief, and as to those matters, Deponent believes them to be true.

3. This Verification is made by Deponent because Tri-County Mall Investors LLC. is a limited liability company and Deponent is the President of the sole member thereof.

Tri-County Mall Investors, LLC
By: Nicolas Bourg, President of Sole Member
Tenrou SPV S.A.

Sworn to before me this
16th day of December 2013

NOTARY PUBLIC

LUIGI ROSABIANCA
NOTARY PUBLIC-STATE OF NEW YORK
No. 02RO6247137
Qualified in New York County
My Commission Expires August 22, 2015

13

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK – Commercial Division**          **INDEX #**

---

TRI-COUNTY MALL INVESTORS, LLC,

                    Plaintiff,

      -against-

FELIX SATER and DANIEL RIDLOFF,

                    Defendants.

---

### SUMMONS AND COMPLAINT

---

**ROSABIANCA & ASSOCIATES, PLLC**
**Attorneys for Plaintiff**
**40 Wall Street, 30th Floor**
**New York, New York 10005**
**(212) 269-7722**

---

Pursuant to 22 NYCRR 130-1.1, the undersigned an attorney admitted to practice in the courts of New York State, certifies upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.

Dated:                              Signature _____

FILED: NEW YORK COUNTY CLERK 12/19/2013

NYSCEF DOC. NO. 4

INDEX NO. 654361/2013

RECEIVED NYSCEF: 12/19/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – Commercial Division

TRI-COUNTY MALL INVESTORS, LLC,      Index No.:

               Plaintiff,

   -against-

                              Electronically Filed
                              Document.

FELIX SATER and DANIEL RIDLOFF,

               Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S ORDER TO SHOW CAUSE

David C. Van Leeuwen, Esq.
Diane Artal, Esq.
Rosabianca & Associates, PLLC
40 Wall Street, 30th Floor
New York, New York 10005
(212) 269-7722
david@rosabiancalaw.com
diane@rosabiancalaw.com

## STATEMENT OF FACTS

For a more complete recitation of the facts, the Court is directed to the Affidavit of Nicolas Bourg, who is the President of the sole member, and authorized representative of Plaintiff, submitted together with this Order to Show Cause and sworn to on the 16th day of December 2013.

**ARGUMENT**

A.    **PLAINTIFF HAS DEMONSTRATED ENTITLEMENT TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION RELATING TO THE CONVERSION OF NEARLY FORTY THREE (43) MILLION DOLLARS .**

It is well established that a party seeking a temporary restraining order or a preliminary injunction must demonstrate the probability of success on the merits, danger of irreparable harm in the absence of an injunction, and a balance of the equities in his or her favor. Aetna Ins. Co v. Capasso, 75 NY2d 860, 862 (1990); Doe v. Axelrod, 73 NY2d 748, 750 (1988); Diner Club Corp. v. Hamlet On Olde Oyster Bay Homeowners Associates, Inc. 21 A.D.3d 777 (1st Dept. 2005); Sheffield Towers Rehabilitation and Health Care Ctr. v. Novasso, 293 AD2d 182, 185 (2nd Dept. 2002); Neos v. Lacey, 291 AD2d 434, 435 (2002); State v. Premier Color of NY, Inc. 285 AD2d 544 (2nd Dept. 2001); State v. Sour Mountain Realty, Inc., 276 AD2d 8, 15 (2nd Dept. 2000).

I.    **INJUNCTIVE RELIEF IS THE APPROPRIATE REMEDY FOR THE CONVERSION OF IDENTIFIABLE PROCEEDS**

The courts hold that "injunctive relief is appropriate to remedy the conversion of identifiable proceeds". Amity Loans, Inc. v. Sterling National Bank & Trust Company of New York, 177 A.D.2d 277 (1st Dept. 1991);

In the language of CPLR § 6301, "subject of the action" means a specific res in which the Plaintiff has a preexisting interest. Dinner Club Corp. v. Hamlet on Olde Oyster Bay Homeowners Ass'n, Inc. 21 A.D.3d 777 (1st Dept. 2005).

"Where the suit involves the plaintiff's claims to a specific fund, that fund is the 'the subject of the action' and a preliminary injunction is appropriate under the express wording of CPLR § 6301". Dinner Club Corp. v. Hamlet on Olde Oyster Bay Homeowners Ass'n, Inc. 21 A.D.3d 777 (1st Dept. 2005), citing Credit Agricole Indosuez et al., v. Rossiyskiy Kredit Bank et. al., 94 NY2d 541 (2000).

Moreover, the courts have found that temporary restraining orders and even orders of attachment are appropriate in cases involving conversion of monies. Banco National Ultramarion, S.A. v. Chan 139 Misc.2d 182, (New York Co. 1996);  It should also be noted that Plaintiff need only plead and establish that Defendants used Plaintiff's property without right thereto, intent of the conversion is irrelevant for tort purposes. Id.

This matter could not be more analogous to the circumstances contemplated by the case law and CPLR § 6301 as demonstrated below and Plaintiff has clearly shown that Defendants have converted and absconded with the specific funds of the Plaintiff without the right thereto.

Tri-County purchased the assignment and assumption of any and all rights and obligations of Wells Fargo Bank N.A. in connection with the loan and related documents securing several parcels of property in Hamilton County, Ohio, to be foreclosed (hereinafter collectively the "Foreclosure Properties"). (Bourg Affd. ¶4)

At all relevant times, pursuant to the Operating Agreement of Tri-County dated as of April 22, 2013 (the "Operating Agreement"), Defendant Ridloff was appointed as manager of Tri-County. (Bourg Affd. ¶5) Upon information and

belief, Defendant Ridloff, in his capacity as manager of Tri-County, authorized
and/or appointed Defendant Sater to act as co-manager and/or officer of Tri-
County. Id.

On or about July 18, 2013, the Sheriff of Hamilton County, Ohio, (the
"Sheriff") sold at a public sale the Foreclosure Properties to American Pacific
International Capital Co. Ltd. ("APIC") for $45,000.000.00. (Bourg Affd. ¶6).

By order dated August 29, 2013 ("Order"), the Court of Common Pleas of
Hamilton County, Ohio directed that the Sheriff distribute the $45,000,000.00
proceeds as follows:

- $813,292.80 to the Clerk of the Court;
- $791,177.65 to the treasurer of Hamilton County, Ohio for the real
  property taxes;
- The remaining balance of $43,395,529.55 to the Plaintiff.

(Bourg Affd. ¶7)

According to the August 29, 2013 Order, the Sheriff sent by wire transfer
the remaining balance of USD $42,720,529.55 ("Sale Proceeds") to a bank
account opened by Defendant Ridloff and Defendant Sater on behalf of Plaintiff,
in Plaintiff's name, at JP Morgan Chase Bank. (Bourg Affd. ¶8; Exhibits A and
B).

In contravention of their duties as managers and/or officers of Tri-County
and contrary to the direction of the sole member of Tri-County, Defendants Sater
and Ridloff unlawfully and without the consent of the Plaintiff, did transfer,
misappropriate and/or deliver the entirety of the Sale Proceeds from Plaintiff's
account at JP Morgan Chase to another bank account under the exclusive
control of Defendants Sater and Ridloff, and to the exclusion of Plaintiff. (Bourg

Affd. ¶9)  It should be noted that Defendants' confirmed the receipt of the wire transfer from the Sheriff via email to Plaintiff's attorneys in the transaction. (Bourg Affd. ¶9; Exhibit C).

As a result thereof, the entirety of the Sale Proceeds have been improperly diverted, converted, and/or made unavailable to the Plaintiff.  Plaintiff has not even been provided with information or documentation as to the location of the Sale Proceeds. (Bourg Affd. ¶10).

To date, Defendants have not delivered any of the Sale Proceeds to Plaintiff despite due demand therefore.  (Bourg Affd. ¶11).

Plaintiff has repeatedly requested copies of all financial records and an accounting concerning the Sale Proceeds from Defendants, but to date no such documentation has been provided. (Bourg Affd. ¶12)

There is no question that Tri-County had a specific, identifiable and pre-existing interest in the monies from the Sale Proceeds.  It is uncontroverted that the entirety of the Sale Process have been diverted, converted, misappropriated and/or made unavailable to the Plaintiff by Defendants.  (Bour Affd. ¶13). Despite repeated demand therefore, Defendants have not returned the converted funds to Plaintiff.  Id.  The only possible, yet completely unsatisfactory explanation for these illegal and improper actions by Defendants is that a commission in the sum of at most One Million Six Hundred Thousand ($1,600,000.00) Dollars would have been payable to Defendant Sater.  Id.  Yet, this does not excuse or justify the conversion and misappropriation of the entirety of the Sale Proceeds, including Forty One Million One Hundred Twenty

Thousand Five Hundred Twenty Nine ($41,120,529.55) Dollars, on which Defendant Sater has <u>no</u> legitimate claim to. <u>Id</u>.

At this time, Plaintiff's representatives are pursuing the filing of a criminal complaint with Federal and/or State prosecutor against Defendants for the conversion, theft, and/or misappropriation and theft of the aforesaid sums. (Bourg Affd. ¶14).

Moreover, upon information and belief, Defendant Sater is currently outside the jurisdiction of the United States, in Israel. (Bourg Affd. ¶15). Defendant Sater has given no indication that he will return, despite demand for his return to account for the converted and misappropriated sums. <u>Id</u>. Upon information and belief, Defendant Sater is not intending to return as he fears that the aforesaid improper and illegal conduct will subject him to criminal prosecution, and intends to transfer the absconded sums outside the jurisdiction of the United States. <u>Id</u>.

Defendant Sater has a history of criminal behavior, including but not limited to his actions that lead to a Federal criminal indictment in 1998 relating to a Forty Million ($40,000,000.00) Dollar money laundering scheme and stock manipulation, *United States v. Felix Sater*, 98-cr-1101. (Bourg Affd. ¶16; <u>Exhibit D</u>). .

As such, the court must issue a temporary restraining order and a preliminary injunction in favor of Plaintiff and against Defendants to preserve the status of the converted specific funds of Plaintiff.

## II.    PROBABILITY OF SUCCESS ON THE MERITS

It has clearly been demonstrated that Defendants have unlawfully

converted and misappropriated the specific property of the Plaintiff.

In addition to the Federal and State criminal statutes that Defendants

certainly have been violated, the Defendants also owed the Plaintiff fiduciary

duties, including but not limited to a duty of loyalty as managers and/or officers of

the Plaintiff, a Delaware Limited Liability Company.  Auriga Capital Corporation v.

Gatz Properties, LLC, 40. A.3d. 839 (Del. Ch. 2011).

By Defendants' unlawful and improper actions in converting the Sale

Proceeds of Plaintiff, Defendants have clearly violated their fiduciary duties and

are guilty of conversion.  Manufactures Hanover Trust Co. v. Chemical Bank, 160

A.D.2d 113 (1st Dept. 1990).

Based on these actions, as detailed above, it is clear that Plaintiffs have

demonstrated a likelihood of success on the merits that the Defendants have

unlawfully converted the specific sums of the Plaintiff and breached their fiduciary

duties.

As such, Plaintiff's application for a temporary restraining order and

preliminary injunction must be granted in its entirety.


## III.    IRREPARABLE INJURY

Although seeking recovery for money damages may otherwise preclude

the applicability of injunctive relief, the courts have carved out an exception for

preliminary injunctions relating to specific funds.  Amity Loans, Inc. v. Sterling

PX 29 PAGE 24 OF 49

8

National Bank & Trust Company of New York, 177 A.D.2d 277 (1st Dept. 1991);
Hamlet On Olde Oyster Bay Homeowners Associates, Inc. 21 A.D.3d 777 (1st
Dept. 2005), citing Credit Agricole Indosuez et al., v. Rossiyskiy Kredit Bank et.
al., 94 NY2d 541 (2000).

As set forth in detail above, Plaintiff has a specific interest in the monies
converted by Defendants.  Furthermore, since Defendants have not provided
Plaintiff with or otherwise accounted for the location of the funds, Plaintiff cannot
seek attachment of the funds until the specific location of the funds can be
obtained through discovery of the Defendants and/or third parties.   Moreover, an
uncontrolled disposition of the Sale Proceeds by Defendants would threaten to
render a judgment ineffectual, and is certainly a substantial risk here, especially
considering the criminal actions that gave rise to this action and the criminal
history of Defendant Sater.  Zonghetti v. Jeromack, 150 A.D.2d 561 (2nd Dept.
1989).

Therefore, Plaintiff's application must be granted in its entirety.

## IV.      BALANCE OF EQUITIES

It is clear that the balance of equities favors the Plaintiff as Defendants
have converted, delivered and/or misappropriated nearly forty three (43) million
dollars in funds that were delivered to Plaintiff, in a bank account opened by
Defendants in their capacities as managers and/or officers, in the name of the
Plaintiff.

Defendants cannot claim any equities in their favor whatsoever.
Defendants conduct is criminal and unlawful as they have abused their roles as

managers and/or officers and embezzled and converted the entirety of the Sale Proceeds that were wired into the Plaintiff's account at JP Morgan Chase.

The Defendants have acted in an illegal and improper manner and have made decisions, which have been detrimental to Plaintiff. Should a temporary restraining order and preliminary injunction not be granted, there is a strong likelihood that the Sale Proceeds will leave the jurisdiction, rendering any attempt to attach the specific funds unsuccessful.

The balance of equities therefore requires this Court to grant the temporary restraining order and preliminary injunction sought in the Order to Show Cause in order to maintain the status quo while this litigation is pending.

As such, Plaintiff's application must be granted in its entirety.

## V.     CONCLUSION

Plaintiff has successfully demonstrated all elements necessary for the Court to grant the temporary restraining order and preliminary injunction in its favor. Therefore, Plaintiff respectfully requests that the Court grant a Temporary Restraining Order and Preliminary Injunction (i) that the Defendants be restrained and enjoined from disposing, hiding, transferring, selling or removing any of the assets or bank funds, which were converted, misappropriated and/or transferred by Defendants from the Plaintiff's bank account at JP Morgan Chase Bank in New York in their capacities as managers and/or officers of the Plaintiff, and (ii) that the Defendants be restrained and enjoined from disposing, hiding, transferring, selling or removing any of the assets or bank funds outside the jurisdiction of the United States, which were converted, misappropriated and/or

transferred by Defendants from the Plaintiff's bank account in their capacities as managers and/or officers of the Plaintiff.

In addition, the preliminary injunction shall also direct the Defendants to deposit into Court the assets or bank funds, which were converted, misappropriated and/or transferred by Defendants from the Plaintiff's account in their capacities as managers and/or officers of the Plaintiff.

No prior application has been made for the relief requested herein.


Dated: New York, New York
       December 18, 2013

                                   Respectfully submitted,

                                   ROSABIANCA & ASSOCIATES, PLLC

                                   By: _____
                                       David C. Van Leeuwen, Esq.
                                       Diane Artal, Esq.
                                       *Attorneys for Plaintiff*
                                       40 Wall Street, 30th Floor
                                       New York, New York 10005
                                       (212) 269-7722

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK – Commercial Division**          **INDEX #**

TRI-COUNTY MALL INVESTORS, LLC,

                    Plaintiff,

          -against-

FELIX SATER and DANIEL RIDLOFF,

                    Defendants.

**MEMORANDUM OF LAW**

**ROSABIANCA & ASSOCIATES, PLLC**
**Attorneys for Plaintiff**
**40 Wall Street, 30th Floor**
**New York, New York 10005**
**(212) 269-7722**

Pursuant to 22 NYCRR 130-1.1, the undersigned an attorney admitted to practice in the courts of New York State, certifies upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.

Dated:                    Signature_____

FILED: NEW YORK COUNTY CLERK 12/19/2013

NYSCEF DOC. NO. 5

INDEX NO. 654361/2013

RECEIVED NYSCEF: 12/19/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – Commercial Division

TRI-COUNTY MALL INVESTORS, LLC,                    Index No.:

**AFFIDAVIT IN SUPPORT**
**OF THE ORDER**
Plaintiff,                    **TO SHOW CAUSE**

-against-

FELIX SATER and DANIEL RIDLOFF,

Defendants.

STATE OF NEW YORK     )
                      )ss.:
COUNTY OF NEW YORK )

Nicolas Bourg, being duly sworn deposes and says:

1. I am the president of the sole member of Plaintiff, Tri-County Mall

Investors, LLC, in the above captioned action (hereinafter "Tri-County" or

"Plaintiff"), which is an action for conversion, breach of fiduciary duty, money had

and received, breach of contract, unjust enrichment, civil conspiracy and for a

preliminary and permanent injunction. As such, I am fully familiar with the facts

and the circumstances of the case and submit this affidavit in support of Plaintiff's

Order to Show Cause seeking a Temporary Restraining Order and Preliminary

Injunction and for an order granting the following relief:

(a)    That the Defendants be restrained and enjoined from

disposing, hiding, transferring, selling or removing any of the

assets or bank funds, which were converted,

misappropriated and/or transferred by Defendants from the

Plaintiff's bank account at JP Morgan Chase Bank in New

York in their capacities as managers and/or officers of the
Plaintiff;

(b)     That the Defendants be restrained and enjoined from
disposing, hiding, transferring, selling or removing any of the
assets or bank funds outside the jurisdiction of the United
States, which were converted, misappropriated and/or
transferred by Defendants from the Plaintiff's bank account
in their capacities as managers and/or officers of the
Plaintiff;

(c)     Directing that the Defendants deposit into Court the assets
or bank funds, which were converted, misappropriated
and/or transferred by Defendants from the Plaintiff's bank
account in their capacities as managers and/or officers of the
Plaintiff; and

(d)     Such other and further relief as the Court may determine to
be just and proper.

2.  This Order to Show Cause is being filed because Defendants, in their
capacities as managers and/or officers of the Plaintiff, have converted nearly
Forty Three Million ($43,000,000.00) Dollars of the Plaintiff's specific monies.

3.  Based on the following, the Plaintiff's application must be granted in its
entirety.

## BACKGROUND FACTS

4.  Tri-County purchased the assignment and assumption of any and all
rights and obligations of Wells Fargo Bank N.A. in connection with the loan and

related documents securing several parcels of property in Hamilton County, Ohio, to be foreclosed (hereinafter collectively the "Foreclosure Properties").

5.  At all relevant times, pursuant to the Operating Agreement of Tri-County dated as of April 22, 2013 (the "Operating Agreement"), Defendant Ridloff was appointed as manager of Tri-County.  Upon information and belief, Defendant Ridloff, in his capacity as manager of Tri-County, authorized and/or appointed Defendant Sater to act as co-manager and/or officer of Tri-County.

6.  On or about July 18, 2013, the Sheriff of Hamilton County, Ohio, (the "Sheriff") sold at a public sale the Foreclosure Properties to American Pacific International Capital Co. Ltd. ("APIC") for $45,000.000.00.

7.  By order dated August 29, 2013 ("Order"), the Court of Common Pleas of Hamilton County, Ohio directed that the Sheriff distribute the $45,000,000.00 proceeds as follows:

- $813,292.80 to the Clerk of the Court;
- $791,177.65 to the treasurer of Hamilton County, Ohio for the real property taxes;
- The remaining balance of $43,395,529.55 to the Plaintiff.

8.  According to the August 29, 2013 Order, the Sheriff sent by wire transfer the remaining balance of $42,720,529.55 ("Sale Proceeds") to a bank account opened by Defendant Ridloff and Defendant Sater on behalf of Plaintiff, in Plaintiff's name, at JP Morgan Chase Bank.  A copy of the August 29, 2013 Order, and wiring information from Tri-County's transactional attorney are attached hereto and made a part hereof as **Exhibits A and B**, respectively.

9.  In contravention of their duties as managers and/or officers of Tri-County and contrary to the direction of the sole member of Tri-County,

Defendants Sater and Ridloff unlawfully and without the consent of the Plaintiff, did transfer, misappropriate and/or deliver the entirety of the Sale Proceeds from Plaintiff's account at JP Morgan Chase to another bank account under the exclusive control of Defendants Sater and Ridloff, and to the exclusion of Plaintiff. It should be noted that Defendants' confirmed the receipt of the wire transfer from the Sheriff via email to Plaintiff's attorneys in the transaction. A copy of an email correspondence relating to the confirmation is annexed hereto as **Exhibit C**.

10. As a result thereof, the entirety of the Sale Proceeds have been improperly diverted, converted, and/or made unavailable to the Plaintiff. Plaintiff has not even been provided with information or documentation as to the location of the Sale Proceeds.

11. To date, Defendants have not delivered any of the Sale Proceeds to Plaintiff despite due demand therefore.

12. Plaintiff has repeatedly requested copies of all financial records and an accounting concerning the Sale Proceeds from Defendants, but to date no such documentation has been provided.

13. There is no question that Tri-County had a specific, identifiable and pre-existing interest in the monies from the Sale Proceeds. It is uncontroverted that the entirety of the Sale Process have been diverted, converted, misappropriated and/or made unavailable to the Plaintiff by Defendants. Despite repeated demands therefore, Defendants have not returned the converted funds to Plaintiff. The only possible, yet completely unsatisfactory explanation for these

illegal and improper actions by Defendants is that a commission in the sum of at most One Million Six Hundred Thousand ($1,600,000.00) Dollars would have been payable to Defendant Sater for the work he performed in connection with the sale of the Foreclosure Properties. Yet, this does not excuse or justify the conversion and misappropriation of the entirety of the Sale Proceeds, including Forty One Million One Hundred Twenty Thousand Five Hundred Twenty Nine ($41,120,529.55) Dollars, on which Defendant Sater has no legitimate claim to.

14. At this time, Plaintiff's representatives are pursuing the filing of a criminal complaint with Federal and/or State prosecutor against Defendants for the conversion, theft, and/or misappropriation and theft of the Sale Proceeds.

15. Moreover, upon information and belief, Defendant Sater is currently outside of the jurisdiction of the United States, in Israel. Defendant Sater has given no indication that he will return, despite demand for his return to account for the converted and misappropriated sums. Upon information and belief, Defendant Sater is not intending to return as he fears that his aforesaid improper and illegal conduct will subject him to criminal prosecution, and intends to transfer the absconded sums outside the jurisdiction of the United States.

16. Defendant Sater has a history of criminal behavior, including but not limited to his actions that lead to a Federal criminal indictment in 1998 relating to a Forty Million ($40,000,000.00) Dollar money laundering scheme and stock manipulation, *United States v. Felix Sater*, 98-cr-1101. A copy of a New York Times article relating to the indictment is annexed hereto as **Exhibit D**.

17. I therefore respectfully request that this Court grant the Plaintiff's

Order to Show Cause in its entirety.

Nicolas Bourg

Sworn to before me this
16th day of December 2013

NOTARY PUBLIC

LUIGI ROSABIANCA
NOTARY PUBLIC-STATE OF NEW YORK
No. 02RO6247137
Qualified In New York County
My Commission Expires August 22, 2015

6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – Commercial Division         INDEX #

---

TRI-COUNTY MALL INVESTORS, LLC,

                    Plaintiff,

        -against-

FELIX SATER and DANIEL RIDLOFF,

                    Defendants.

---

## AFFIDAVIT

---

### ROSABIANCA & ASSOCIATES, PLLC
**Attorneys for Plaintiff**
**40 Wall Street, 30th Floor**
**New York, New York 10005**
**(212) 269-7722**

---

Pursuant to 22 NYCRR 130-1.1, the undersigned an attorney admitted to practice in the courts of New York State, certifies upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.

Dated:                          Signature

FILED: NEW YORK COUNTY CLERK 12/19/2013

NYSCEF DOC. NO. 6

INDEX NO. 654361/2013

RECEIVED NYSCEF: 12/19/2013

PX 29  PAGE 36 OF 49

EXHIBIT A

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

AUG 2 9 2013

WELLS FARGO BANK, N.A., AS           :           CASE NO.: A1202738
TRUSTEE for the Registered Holders of :
Credit Suisse First Boston Mortgage  :
Securities Corp., Commercial Mortgage :         JUDGE STEVEN MARTIN
Pass-Through Certificates, Series 2005- :      MAGISTRATE MICHAEL BACHMAN
C2                                   :
                                     :        SECOND AMENDED NUNC PRO
c/o CWCapital Asset Management, LLC,  :        TUNC ORDER TO PAY PURCHASE
                                     :        PRICE, DISTRIBUTE PROCEEDS,
              Plaintiff,             :           ORDER DEED, AND
                                     :        ASSIGNMENT AND DISCHARGE
              vs.                    :               OF LIENS
                                     :
TRI COUNTY MALL LLC, et al.,          :
                                     :
              Defendants.            :

        This cause came to be heard on the Motion of Substitute Plaintiff Tri-County Mall

Investors, LLC ("Substitute Plaintiff") to Pay Purchase Price, Distribute Proceeds, Order

Deed and Assignment and Discharge of Liens.

        The Court finds as follows: On May 1, 2013, this Court granted Wells Fargo Bank,

N.A., as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage

Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2005-C2,

through its special servicer CWCapital Asset Management, a judgment in the amount of

$204,649,647.54, plus interest at the Default Rate of 10.6559%, plus costs and expenses,

including reasonable attorneys' fees, incurred in pursuing this action in the amount of

$272,198.97 (the "Judgment"). The Judgment was subsequently assigned to Substitute

Plaintiff.

        On July 18, 2013, the Sheriff of Hamilton County, Ohio (the "Sheriff") at a public

sale sold Hamilton County, Ohio Auditor's parcel numbers 599-0010-0007-00, 599-

0010-0018-01, 599-0010-0018-02, 599-0010-0018-03, 599-0010-0210-00, 599-0010-0213-00, and 599-0010-0220-00 (the "Property") that are more particularly described in Exhibit A attached hereto and incorporated herein to American Pacific International Capital, Inc. ("APIC") for $45,000,000.00 (the "Purchase Price"), a sum that was not less than two-thirds of its appraised value, that was the best bid obtained, and that is sufficient to pay all court costs and taxes on the Property. On July 19, 2013, APIC paid the Sheriff $5,250,000 on account of the Purchase Price.

On July 29, 2013, this Court confirmed the sale of the Property.

The Court orders as follows:

(i) APIC shall pay the $39,750,000 balance of the Purchase Price due on APIC's purchase of the Property;

(ii) the Sheriff shall convey to APIC that portion of the Property consisting of Hamilton County, Ohio Auditor's parcel numbers 599-0010-0007-00, 599-0010-0018-01, 599-0010-0018-02, 599-0010-0018-03, and 599-0010-0220-00 (the "Fee Property") and described in Exhibit A as Tracts 1 and 3 by Sheriff's Deed and that portion of the Property consisting of Hamilton County, Ohio Auditor's parcel numbers 599-0010-0210-00 and 599-0010-0213-00 (the "Leasehold Property") and identified in Exhibit A as Tracts 2 and 3, by Sheriff's Assignment, at such time as APIC has paid such $39,750,000 balance of the Purchase Price for the Property to the Sheriff and the Sheriff has distributed the entire $45,000,000 Purchase Price in accordance with this order;

(iii) the Sheriff shall distribute the $45,000,000 proceeds of the Purchase Price in the Sheriff's hands as follows:

First to the Clerk of this Court, the amount of $813,292.80;

13743107.1

Second to the Treasurer of Hamilton County, Ohio, the amount of $791,177.65 as the amount of real property taxes that have accrued with regard to the Property for the period January 1, 2013 through July 29, 2013 that such Treasurer has determined as shown in Exhibit B attached hereto and incorporated herein;

Third to Substitute Plaintiff, the remaining balance of the Purchase Price in the amount of $43,395,529.55 in partial satisfaction of the Judgment.

(iv) APIC is subrogated to the rights of Substitute Plaintiff and all other parties to this action in the Property to the extent necessary for the protection of its title to the Property.

(v) that any liens arising after the *lis pendens* date of April 16, 2012 are forever barred as to the Property.

IT IS SO ORDERED.

_____ 8-29-13 _____
Dated

_____
JUDGE STEVEN E. MARTIN

13743107.1

FILED: NEW YORK COUNTY CLERK 12/19/2013

NYSCEF DOC. NO. 7

INDEX NO. 654361/2013

RECEIVED NYSCEF: 12/19/2013

PX 29  PAGE 40 OF 49

**EXHIBIT B**

| | |
|---|---|
| **From:** | Pieczonka, Nicholas [npieczonka@taftlaw.com] |
| **Sent:** | Thursday, August 29, 2013 6:34 PM |
| **To:** | cbernard@sheriff.hamilton-co.org |
| **Subject:** | RE: TriCounty wiring instructions |

Connie – these are <u>new</u> wiring instructions.  Please use these.  Apparently, there was some confusion on our client's end.  Unless you email me letting me know that you received this, I will call you in the morning to confirm.   Thanks.

Tri-county mall investors, LLC

JP Morgan chase bank

Account #: 259366228
Aba #:      021000021

# Taft /

**Nicholas Pieczonka** / Attorney
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Tel: 513.381.2838 • Fax: 513.381.0205
Direct: 513.357.9603
www.taftlaw.com / npieczonka@taftlaw.com

FILED: NEW YORK COUNTY CLERK 12/19/2013

NYSCEF DOC. NO. 8

INDEX NO. 654361/2013

RECEIVED NYSCEF: 12/19/2013

PX 29  PAGE 42 OF 49

**EXHIBIT C**

On July 19, 2013, the buyer paid the sheriff of Hamilton County, Ohio $5,250,000 by cashier's check. On August 27, 2013, the buyer paid the Sheriff $39,750,000 by cashier's check drawn on Bank of America.

On August 30, 2013, the Sheriff transferred the sum of $43,396, 878.65 to Tri-County Mall Investors, LLC in accordance with the following wire transfer instructions that Dan Ridloff had furnished:

Tri-county mall investors, LLC

JP Morgan chase bank

Account #: 259366228
Aba #:      021000021.

On August 30, 2013, at 9:45 a. m., we received an e-mail from Dan Ridloff confirming that the money had been received.

The Sheriff distributed the difference between $45,000,000 and $43,396, 878.65 as follows:

(i) $1,630.20 to pay court costs;

(ii) $791,246.65 to pay the Treasurer of Hamilton County, Ohio real property taxes with regard to the mall for the period January 1, 2013 through July 29, 2013;

(iii) $135,003.50 to the Auditor of Hamilton County, Ohio to pay the transfer tax on the sale; and

(iv) $675,241 to the Sheriff for the costs of the foreclosure sale, including the $675,000 poundage fee that we are contesting on behalf of Tri-County Mall Investors, LLC.

A copy of the Court's order for the distribution of those amounts is attached.

I look forward to working with you to conclude the outstanding matters related to the mall. Thank you for your attention to this matter.

Steve Griffith

# Taft /

**Stephen M. Griffith Jr.** / Partner
OSBA - Certified Specialist in Business, Commercial, and Industrial Real Property Law
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
Tel: 513.381.2838 • Fax: 513.381.0205
Direct: 513.357.9312
www.taftlaw.com / griffith@taftlaw.com

FILED: NEW YORK COUNTY CLERK 12/19/2013

NYSCEF DOC. NO. 9

INDEX NO. 654361/2013

RECEIVED NYSCEF: 12/19/2013

**EXHIBIT  D**



**December 17, 2007**

# Real Estate Executive With Hand in Trump Projects Rose From Tangled Past

**By CHARLES V. BAGLI**

It is a classic tale of reinvention, American style.

Born in the Soviet Union in 1966, Felix H. Sater immigrated with his family to Brighton Beach when he was 8 years old. At 24 he was a successful Wall Street broker, at 27 he was in prison after a bloody bar fight, and at 32 he was accused of conspiring with the Mafia to launder money and defraud investors.

Along the way he became embroiled in a plan to buy antiaircraft missiles on the black market for the Central Intelligence Agency in either Russia or Afghanistan, depending on which of his former associates is telling the story.

But in recent years Mr. Sater has resurfaced with a slightly different name and a new business card identifying him as a real estate executive based on Fifth Avenue. And although he may not be a household name, one of the people he is doing business with is: Donald J. Trump.

Mr. Sater — who now goes by the name Satter — has been jetting to Denver, Phoenix, Fort Lauderdale, Fla., and elsewhere since 2003, promoting potential projects in partnership with Mr. Trump and others. In New York, the company Mr. Sater works for, Bayrock Group, is a partner in the Trump SoHo, a sleek, 46-story glass tower condominium hotel under construction on a newly fashionable section of Spring Street.

But much remains unknown about Mr. Sater, 41, and determining the truth about his past is a bit like unraveling the plot of a spy novel: Almost every character tells a different tale.

A federal complaint brought against him in a 1998 money laundering and stock manipulation case was filed in secret and remains under seal. A subsequent indictment in March 2000 stemming from the same investigation described Mr. Sater as an "unindicted co-conspirator" and a key figure in a $40 million scheme involving 19 stockbrokers and organized crime figures from four Mafia families.

The indictment asserted that Mr. Sater helped create fraudulent stock brokerages that were used to defraud investors and launder money. Mr. Sater and his lawyer, Judd Burstein, repeatedly refused to discuss in detail his role in the stock scam.

But a onetime friend, Gennady Klotsman, who is known as Gene and who was accused with Mr. Sater as a co-conspirator, contends that they both pleaded guilty in 1998, and that Mr. Sater began cooperating with the authorities. Prosecutors are unwilling to discuss either the 1998 complaint or the 2000 indictment.

"I'm not proud of some of the things that happened in my 20s," Mr. Sater said in an interview. "I am proud of the things I'm doing now."

Mr. Sater, who has an untitled position at Bayrock, said he started spelling his name as Satter to "distance himself from a past" in an age when anyone can look up a name on Google. But he continues to use the name Sater on the deed to his house on Long Island.

Mr. Burstein added, "He does not hide his past, and difficulties he had, from anybody he does business with."

But Alex Sapir, president of the Sapir Organization, a partner in Trump SoHo, said he was "not happy" to have just learned of Mr. Sater's past on Thursday. "This is all news to me," he said.

Mr. Trump also said he was surprised to learn of Mr. Sater's past. "We never knew that," he said of Mr. Sater. "We do as much of a background check as we can on the principals. I didn't really know him very well."

Mr. Trump said that most of his dealings with Bayrock had been with its founder, Tevfik Arif, and that his son Donald and his daughter Ivanka were playing active roles in managing the project. Neither Bayrock nor Mr. Trump has been accused of wrongdoing.

Mr. Sater has generally kept a low profile on the Trump projects, although he mingled with guests and the owners at the September party introducing Trump SoHo. Mr. Trump and Mr. Sater were also together in Loveland, Colo., in 2005, where they were interviewed by a reporter for The Rocky Mountain News about potential development deals in nearby Denver. Mr. Trump said he did not recall Mr. Sater's being there.

"They seemed to get along just fine," said Justin Henderson, a Denver developer who worked with Mr. Trump and Mr. Sater on an ultimately unsuccessful deal to build the tallest towers in Colorado. "It seemed that Mr. Trump relied heavily on Mr. Sater's opinion on certain markets."

Mr. Sater's latest transformation could prove to be a cautionary tale for Mr. Trump, who has carefully molded his image into an international brand that has extended from real estate to bottled water, men's suits, steaks, vodka, a television show and, in his latest invention, the Trump Hotel Collection.

The hotel collection, a hotel management company, includes two projects with Bayrock: Trump SoHo and Trump International Hotel and Tower in Fort Lauderdale. A third joint project, in Phoenix, is also in the works.

"Trump is a name associated with a certain cachet and bravado, I suppose, that will attract certain kinds of people," said Rita Rodriguez, chief executive of the Brand Union, a corporate branding and identity agency.

"The brand is a strategic and financial asset," she said. "It has to be taken care of very similarly to any other asset you have on your balance sheet. Anything that would detract from that could jeopardize the brand impression the brand makes."

Mr. Sater was born in the Soviet Union, the son of Rachel and Mikhail Sater, according to public records, court testimony and the federal indictment. He has said his parents, who are Jewish, moved first to Israel, then to Baltimore and finally to New York in the early 1970s to escape "religious persecution."

Mr. Sater was born Haim Felix Sater, but he once testified in court that he "Americanized" his name to Felix Henry Sater in the early 1990s.

Mr. Sater took classes at Pace University but dropped out at 18 to work at Bear Stearns. Like Mr. Klotsman, he rose quickly, moving from firm to firm selling stock.

Mr. Sater's first brush with the law came in 1991. Mr. Sater and Mr. Klotsman were at El Rio Grande, a Midtown watering hole, celebrating with a friend and eventual co-conspirator, Salvatore Lauria, who had just passed his stockbroker's exam.

Mr. Sater later told a judge that he was in a good mood, having made a quick $3,000 in commissions that day. But he got into an argument with a commodities broker at the bar, and it quickly escalated. According to the trial transcript, Mr. Sater grabbed a large margarita glass, smashed it on the bar and plunged the stem into the right side of the broker's face. The man suffered nerve damage and required 110 stitches to close the laceration on his face.

"I got into a bar fight over a girl neither he nor I knew," Mr. Sater said in an interview. "My life spiraled out of control." Mr. Sater was convicted at trial in 1993, went to prison and was effectively barred from selling securities by the National Association of Securities Dealers.

But according to the 2000 federal indictment in the fraud case, Mr. Sater, Mr. Klotsman, Mr. Lauria and their partners gained control in 1993 of White Rock Partners, which later changed its name to State Street Capital Markets. Although the companies "held themselves out as legitimate brokerage firms," the indictment states, "they were in fact operated for the primary purpose of earning money through fraud involving the manipulation of the prices of securities."

The trio would secretly gain control of large blocks of stock and warrants in four companies through offshore accounts, the indictment said. In an illegal "pump and dump" scheme, they would inflate the value of the shares through under-the-table payoffs to brokers who sold the securities to unsuspecting investors by spreading false information about the companies. Brokers were prohibited from acting on sell orders from investors unless they found another buyer, the indictment said.

The partners would then sell large blocks of stock at a steep profit. Investors suffered substantial losses as share prices plummeted. Despite the prohibition against selling securities, a subsequent complaint by regulators at the N.A.S.D. recounted how Mr. Sater "cursed, yelled and screamed" at the firm's brokers in an attempt to motivate them. He also offered cash rewards to brokers who sold the largest block of house stocks.

At the same time, Mr. Sater, Mr. Lauria and others sought protection and help from members of the Mafia in resolving disputes with "pump and dump" firms operated by other organized crime groups. In 1995, for instance, Edward Garafola, a soldier in the Gambino crime family, sought to extort money from Mr. Sater. Mr. Sater, in turn, got Ernest Montevecchi, a soldier in the Genovese crime family, to persuade Mr. Garafola to back off, according to the indictment.

The denouement of Mr. Sater's career on Wall.Street began in 1998 at a locker at a Manhattan Mini Storage in SoHo, where investigators discovered two pistols, a shotgun and a gym bag stuffed with a trove of documents outlining the money laundering scheme and offshore accounts of Mr. Sater and his partners. According to a law enforcement official, as well as Mr. Klotsman and another defendant in the case, Mr.

Sater had rented the locker and then neglected to pay the rent. Mr. Sater denied having anything to do with the locker or the guns.

At the time investigators opened the storage locker, Mr. Sater and Mr. Klotsman had gone to Russia, where their wheeling and dealing continued, they said. Their most interesting stories, however, are hard to assess.

Mr. Sater and Mr. Klotsman tried to cut a deal with the C.I.A., according to a book co-written by Mr. Lauria, "The Scorpion and the Frog: High Times and High Crimes." In exchange for leniency, the book said, they offered to buy a dozen missiles that Osama bin Laden had placed on the black market. The deal later collapsed.

Mr. Lauria has since renounced his book, which also details the false stock brokerage scheme, calling it largely a work of fiction. He even tried unsuccessfully to block publication. However, his co-author, David S. Barry, said he documented all the stories in the book with records and other interviews.

Mr. Klotsman said that Mr. Sater did obtain information for the United States about another set of black-market missiles, and that those efforts "bought Felix his freedom" from prison.

Mr. Sater, Mr. Klotsman and Mr. Lauria eventually returned to New York. Mr. Klotsman and Mr. Lauria agreed to cooperate with the United States attorney's office in Brooklyn and pleaded guilty to racketeering charges in connection with the fraudulent stock brokerages, other defendants and lawyers in Mr. Sater's case said. The information they provided helped prosecutors obtain guilty pleas from all 19 of their former cohorts, including six with ties to the mob.

Mr. Klotsman and his lawyer assert that Mr. Sater also pleaded guilty and cooperated. "Felix was one of the significant participants in the fraud," the lawyer, Alexi M. Schacht, said.

Mr. Klotsman, who grew up with Mr. Sater, now lives in a $600-a-month apartment in Moscow. In an interview, he said he was paying the American government $625 a month in restitution for the $40 million lost by investors. He questioned whether Mr. Sater was paying a dime.

But Mr. Sater and his lawyer, Mr. Burstein, avoided many questions concerning his legal problems involving the Wall Street scam, including whether he pleaded guilty and cooperated. "I challenge you to find any official government document anywhere demonstrating his indictment or conviction for any crime other than the assault," Mr. Burstein said.

Mr. Sater said he joined Bayrock in 2003 at the urging of the company's founder, Mr. Arif. A neighbor of Mr. Sater's in Sands Point, on Long Island, Mr. Arif is a former economist for the Soviet government who built a chain of five luxury hotels in Turkey and Kazakhstan after the collapse of the Soviet Union.

Within a stone's throw of the Manhattan Mini Storage building, the Trump SoHo is rising rapidly at the corner of Spring and Varick Streets, another new glass tower amid the somewhat grubby industrial buildings of what had been the city's printing district. The tower has generated opposition from some local residents and preservationists.

It is, for Mr. Sater, an emblem of his new life. "I'm trying to lead an exemplary existence," he said. "Old, bad luggage is not something anyone wants to remember."

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | [ ] | First Look | Help | Contact Us | Work for Us | Site Map