UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
CITY OF ALMATY, KAZAKHSTAN, et al.,

                Plaintiffs,                              19 Civ. 2645 (DAB)

    v.

FELIX SATER, DANIEL RIDLOFF, et al.,

                Defendants.
------------------------------------------------------X


# MEMORANDUM OF LAW

### IN SUPPORT OF PROPOSED INTERVENOR
### FREDERICK M. OBERLANDER'S

### MOTION
### TO INTERVENE
### AND
### FOR AN ORDER DENYING PLAINTIFFS' MOTION TO FILE UNDER SEAL

**I. P**ROSPECTIVE **I**NTERVENOR **H**AS **S**TANDING TO **I**NTERVENE

Courts have long recognized that the public enjoys both presumptive, qualified rights of access to judicial proceedings and documents afforded by the federal common law and the First Amendment as well as the standing to vindicate those rights by intervening for that purpose. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 609 n.25 (1982) ("[T]he press and general public must be given an opportunity to be heard on the question of their exclusion [from judicial proceedings.")

Motions to intervene are proper mechanisms for the public to challenge sealing in civil and criminal matters. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126–27 (CA2 2006) (affirming right to intervene to access sealed documents, adding that holding an "intervention motion in abeyance" in a civil case "was a delay that was effectively a denial of any right to contemporaneous access").

Thus, movant's request to intervene for the limited purpose of asserting the public's right of access to records which Plaintiffs have moved to seal must be granted.

**II. A**RGUMENT

There exists a "presumption in favor of public access to judicial documents," *Collado v. City of New York*, 193 F.Supp.3d 286, 288 (SDNY 2016), which are those "'relevant to the performance of…judicial function and useful in…judicial process." *Lugosch* 435 F.3d at 119. It is "based on the need for courts to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (CA2 1995).

Motions to seal must be "carefully and skeptically review[ed] … to insure there is an extraordinary circumstance or compelling need" to seal them from public inspection, *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (CA2 1994), a review, the Supreme Court says, "best left to the sound discretion of the trial court …

1

to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 599 (1978).

A motion to seal documents which are, or support, a dispositive motion such as a motion to dismiss, for summary judgment, or as here for default judgment, must be ruled on expeditiously, apart from the underlying motion they're made in connection with, *Lugosch*, 435 F.3d at 120-121, as they are distinct from the merits of the underlying action. *Doe v. Lerner*, 688 F. App'x 49, 50 (CA2 2017)). There are "two related but distinct presumptive rights of public access to court proceedings and records:" "[a] slightly weaker form based in federal common law" and a "strong form rooted in the First Amendment." *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 163 (CA2 2013).

**A. Common Law Presumption**

"In *Lugosch*, the Second Circuit set a three-step inquiry "to be used by district courts prior to permitting judicial documents to be [sealed] from public view." *Collado*, 193 F. Supp. 3d at 288. First, it must decide if "the documents … are judicial to which a presumption of access attaches. *Lugosch*, 435 F.3d at 119. If so, it must decide the weight of presumption. *Id.* Last, it must "balance competing considerations against it," such as "the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Lugosch*, 435 F.3d at 120.

*1. Judicial Documents*

To tell if a document is judicial, courts evaluate "the degree of judicial reliance on [it]"; the "relevance of [its] contents to the nature of the proceeding"; and if "access "would materially assist the public in understanding" "issues before the … court" and "evaluating the fairness and integrity" of the proceedings. *Newsday*, 730 F.3d at 166-67. "[O]nce documents filed to support or oppose a motion] come to the attention of the judge," they're assumed to play a role in deliberation." *Lugosch*, 435 F.3d at 123.

2

"Documents filed for consideration … in summary judgment motions are "as a matter of law judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." *Id.* at 121. Those filed to decide motions to dismiss are also those "to which a presumption of immediate public access attaches under both the common law and the First Amendment." *Id.* at 126.

Motions for default are also adjudications, "formal acts of government" "the basis of which should, absent exceptional circumstances" be open to public view. *Joy v. North*, 692 F.2d 880, 893 (CA2 1982). By filing them, Plaintiffs ask the court to consider them in resolving its motion for default, to adjudicate by relying on the very documents they <u>seek</u> to shield from the public view. Accordingly, they are "judicial documents" under Second Circuit doctrine.

### 2. Weight of Presumption

Once a document is found judicial and a presumption of access attaches, a court must decide its weight, <u>Lugosch</u>, 435 F.3d at 119, measuring the "role of the material … in the exercise of Article III judicial power" and the "value of such information to those monitoring the federal courts." <u>Id.</u> at 119–20. (Also note subsequent section D, *infra*, for relation of that concept to this case.) The issue is whether a document "is [filed in court] to invoke its powers or affect its decisions." *Amodeo*, 71 F.3d at 1050, evaluating where its information lies "on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." <u>Lugosch</u>, 435 F.3d at 119. For instance, documents passed between parties in discovery, as with some of the documents at issue here, are beyond the presumption's reach, and "stand on a different footing than a motion filed by a party seeking action by the court, or … any other document … presented to the court to invoke its powers or affect its decisions." *Amodeo,* 71 F.3d at 1050. *But this is no longer so if they're filed to influence adjudication; they're judicial documents*, and:

3

- The "presumptive right to 'public observation' is at its apogee with respect to documents relating to matters that directly affect an adjudication." *Gambale v. Deutsche Bank*, 377 F.3d 133, 140 (CA2 2004).

- As to the weight of presumption to be given such filings, it "is of the highest [for] 'documents used by parties moving for, or opposing, summary judgment [which] should not remain under seal absent the most compelling reasons.'" *Lugosch*, 435 F.3d at 123.

The test focuses not on whether the document *was* used by a court but whether *meant* to be. If a party files a document as part of adjudication, "the presumption of public access given the document is entitled to great weight." United States v. Sattar, 471 F. Supp. 2d 380, 386 (SDNY 2006). When a court decides a motion, the public should see documents it relied on. Lugosch, 435 F.3d at 123 ("rationale behind access is to allow the public an opportunity to access the correctness of the judge's decision"). Here, "the documents comprise a significant proportion of the … record" and pertain to matters that 'directly affect'… adjudication." Collado, 193 F. Supp. 3d at 289. Thus, the "weight of the presumption" favoring access is great.

### *3. Countervailing Factors*

"A party may overcome the presumption" by showing that sealing will further other substantial interests." Under Seal, 273 F. Supp. 3d at 467–68. But the "burden of showing" "a document … should be sealed rests on the party seeking such action." DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 826 (CA2 1997). Plaintiffs have failed to meet it. Collado, 193 F. Supp. 3d at 289 ("Against this strong presumption of public access, [they] fail to articulate a compelling countervailing rationale for filing … under seal."). They simply say that the parties meant to keep the documents confidential. They cite no law for this proposition or its application as a countervailing factor. Courts have long held that bargained-for confidentiality does not overcome a presumption of access. Wells Fargo Bank, N.A. v. Wales LLC, 993 F. Supp. 2d 409,

4

414 (SDNY 2014) (that agreement "contains a confidentiality clause is not binding here, given the public's right of access to 'judicial documents.'"). *Wolinsky v. Scholastic Inc.,* 900 F. Supp. 2d 332, 338 (SDNY 2012) ("'[P] resumption of public access would become virtually meaningless if it could be overcome by the mutual interest of the parties in keeping their settlement private.'").

As Plaintiffs have not presented compelling countervailing factors overcoming a presumption of public access to the documents, a common law right of access exists.

### B. First Amendment

If the Court agrees Plaintiffs aren't entitled to seal the documents under the common law standard, it needn't decide if they're subject to a First Amendment presumption. *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d at 621 n.5 (EDNY 2011). Still, the court may note that a First Amendment right of access *has* attached. As does common law, the First Amendment protects access to judicial documents if they're "necessary to understand the merits" of the proceeding. *Newsday LLC*, 730 F.3d at 164. The presumption may be overcome only if the court makes "specific, on the record findings … that closure is essential to preserve higher values and narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120; *Press–Enter. Co. v. Superior Court of Cal., Riverside Cty.,* 464 U.S. 501, 510 (1984) ("The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."). "Broad and general findings" or "conclusory assertion[s]" are insufficient to bar access. *In re New York Times Co.*, 828 F.2d at 116.

Plaintiffs haven't come close to rebutting this presumption, haven't articulated what higher values are at stake, or how sealing is narrowly tailored to achieve them. Thus, the documents are also entitled to a First Amendment presumption of access.

### C. The Public, and Above All His Victims, Deserve to Know Why Felix Sater's Sentence Was no More Than a Comma.

Although general interest suffices and access can't turn on whether a court thinks there's actual interest, though situational brevity prevents full explanation, I related this case to the proposition that public access facilitates public supervision over the courts.

The real finality of gymnastics team doctor Larry Nassar's trial wasn't the verdict, but his victims' confrontations with him, who'd done so much to them for so long. Woman after woman rose to revile him, sending attention where it belonged, not to the sniveling man sitting silently in court, but to themselves, failed by a system meant to protect them.[i]

Jeffrey Epstein's death too now has finality, but not in any such redemption. It's a finality of escape, not only from the ramifications barreling inexorably toward him, but also from searing visuals he deserved, and we needed. Photographs in stories about him depict privilege personified, reminding us what let him order girls like room service, that if you're connected and protected, your sentence is unlikely to be more than a comma: his 2008 punishment for raping girls let him out of prison 12 hours a day on "work release."

We needed images of the rest of the story: to see Epstein, like Nassar, brought low by a judicial system at long last holding him accountable, hollowed and haggard, trapped in his seat as a procession of women told what he'd made them do as girls, proving that they weren't the lying opportunists trying to ruin a rich man his attorneys implied, but children promised legitimate training as massage therapists only to be surrendered over to a man demanding that they service him three times a day. He, and we, needed to hear them say, one after another, that they weren't having fun, they were being traumatized, and not by a playboy, but by a predator passing them around to his pals.

He mustn't be remembered as a man who lent his plane to President Clinton and socialized with President Trump. The trappings of his fame must be mere footnotes on his Wikipedia page, the rest of it the story of every single victim detailing every single thing he did to her behind closed doors with the help of his enablers.

6

But there's only so much railing that can be done against a dead man. Mere hours after his death, we're moving from what the story should be to conspiracy theories. *Jeffrey Epstein doesn't deserve to be a conspiracy theory*. When you do what he did, you don't deserve to be anything but paralyzed in your courtroom seat, as the world watches you go from powerful to pathetic, your victims showing that your connections were in the end incidental, that those you hurt were the real heroes and the real story all along, together with the shame and disgrace yet due those who were charged to protect them, but did not.

*Sater doesn't deserve to be a conspiracy theory, either*. When you do what he did, defraud Holocaust survivors of millions of dollars using the Mafia, you too don't deserve to be anything but paralyzed in your court seat, as the world watches you go from powerful to pathetic, your victims showing that they were the real heroes the real story all along, with the shame and disgrace yet due those who were charged to protect them, but did not.

Like Epstein, Sater has a long history of crime, in his case defrauding investors in business ventures.  In 1998, he pled guilty to participating in a "pump-and dump" stock-trading scheme that bilked investors out of over $40 million.  That should have signaled the end of his career and the possibility of restitution for the victims of his crimes.  Not so.  His entire criminal case was hidden, leaving past victims and third parties unaware of his conviction, and it would be eleven years, until late 2009, before he was sentenced.

He wasted no time in resuming his old tricks and defrauding new victims.  By 2002, he'd infiltrated Bayrock, a real estate venture by which he partnered with Donald Trump, and by the time he was sentenced for that securities fraud in 2009, he'd used Bayrock to launder tens of millions of dollars, skim millions more in cash, defrauding investors and partners by hiding his conviction. All this has been described in filings from district courts to the Supreme Court, and widely reported. What hasn't been widely reported is that the secrecy preventing us from learning the truth about him was barely, if at all, lawful. In part that's because no one's turned up a sealing order but also because the sentencing

judge has said, most recently in documents made public this year, that *the sentencing was held in open court, no one asked for it to be sealed*, yet as the transcript, judgment and commitment order, and other documents show no restitution was ordered and no victims told of the sentencing and afforded rights to be heard and to sue for their rights, including the right to be heard and the right to demand restitution, which is *ultra vires*.

To be clear: As of its 2004 effective date, the Crime Victims Rights Act made it law that, *inter alia*, federal crime victims are to be treated fairly and with respect; consulted by the government about the case; and, importantly, to be notified of every open-court proceeding involving the crime and allowed to be heard at sentencing and to either be given restitution or the right to sue in the sentencing court to get it.

Indeed, but a year ago, in *Federal Insurance Co. v. United States*, No. 16-2967, 24, 33 (CA2 2018), the Second Circuit held that a judge's failure to ensure victims are notified of the sentencing and allowed to be heard is an unlawful refusal to obey binding statute for which writ will be granted within days:

> Where [the Crime Victims Rights Act] provides a crime victim the right to be heard at a sentencing … *the district court has no discretion to deny that right*. If the right is arbitrarily denied, immediate resort to the court of appeals for prompt resolution is appropriate to ensure that the victim who has the right to be heard can be heard before the defendant has been sentenced … [Emph. Add.]

*Sater's stock fraud victims were deprived of their rights, not only to restitution, but to the catharsis of confrontation, rights the government was required to give them, the sentencing court was required to force the government to give them, rights the circuit court has held must be afforded them or the district court acts without lawful authority. And we were deprived of watching his victims' vindication – or much of anything else.*

On February 21, 2019, Judge Kenneth Marra (SDFL) held that the government violated the CVRA in the Epstein case in its concealment[s] from the victims:

8

> Particularly problematic was the government's decision to conceal the existence of the [non-prosecution deal] and mislead the victims to believe that federal prosecution was still a possibility … When the government gives information to victims, it cannot be misleading.

The government violates the CVRA when it hides material information from victims. So, how does one conclude what happened in the Sater case that as we now know, its record was published in 2004 into the National Archives as an unsealed file; according to an order of the sentencing court then-Solicitor General Verrilli and then-U.S. Attorney Lynch filed ex parte with the U.S. Supreme Court to dissuade it from granting cert about the Sater concealment, the sentencing was in open court; according to government filings, the sentencing indeed was in open court under an assumed name, but according to the sentencing transcript, Sater's real name was used throughout; and, most recently, according to a recently revealed transcript of an ex parte conferences between the sentencing court, Sater, his counsel, and the government, no one moved to seal the sentencing when it was over (not that it could have been granted ). *Transcript of conference April 27, 2011,* 1101 ECF 225 at 16-17:

> When … [AUSA] Sach first filed [this case] under seal … I had no doubt there was an order that I must have issued in some form under some circumstances and when you turned it up … I had no knowledge it ever existed which is why I made that statement on the record … I couldn't find any order directing that anything be sealed. Given 30 years of having responded and said "so ordered" I don't know how many times, at the end of the plea, except you forgot to make that request at the sentencing, the government or defense counsel always says "Judge, I would like to make an application that this proceeding be sealed," and invariably I would say "so ordered,"

If all this is true, Sater was sentenced in open court in every possible sense of the term. What do we say then about why victims weren't told, but were excluded,

and were again deprived of confrontation and other rights, including restitution, by the concealment of the case from them despite its public provenance at sentencing?

Whatever we do say is not for this document. But note that in Sater's sentencing transcript are statements of FBI agents handling him, and EDNY AUSAs, about his fantastic cooperation, but not one statement about any crimes he committed while cooperating. And as his cooperation covers 1998 through 2009; his time at Bayrock Group, so his partnership with Trump there, covers 2002 through 2010, and the time covered by suit here covers 2002 through 2013, it makes on wonder, if allegations in this and the related cases prove true, *how was he flying all over Eurasia laundering millions of dollars while under surveillance and control by the DOJ and probation? Did none of them know his criminal activity as alleged? Did none know his cooperation agreement expressly forbad him from committing crimes while cooperating?*

To any who would say that this is old news, given what we see as an aftermath of the Epstein cover-up, I but say that if their view (if it exists) is that of the public…

We learn nothing.

## I. PROSPECTIVE INTERVENOR HAS STANDING TO INTERVENE

Prospective Intervenor asks his limited-purpose intervention be granted, Plaintiffs' motion to seal be denied, and the court grant such other relief it deems just and proper.

He also attests under penalty of perjury, 28 U.S.C. § 1746, that all evidentiary statements herein are true and correct to his best knowledge. This document is in Century Schoolbook 12 point, double (24 point) spaced.

August 14, 2019
Montauk, New York

/s/ Frederick M. Oberlander

---

[i] Text in this and the following five paragraphs was copied or extensively adapted from Hesse, "Jeffrey Epstein Doesn't Deserve to Be a Conspiracy Theory," *The Washington Post*, August 11, 2019.