# Exhibit 11

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CITY OF ALMATY, KAZAKHSTAN,
et al.,

             Plaintiffs,

        v.                              15 Civ. 5345 (AJN)(KHP)

MUKHTAR ABLYAZOV, et al.,

             Defendants.                Conference
------------------------------x
                                        New York, N.Y.
                                        August  , 2019
                                        10:  a.m.

Before:

               HON. KATHARINE H. PARKER,

                                  U.S. Magistrate Judge


                      APPEARANCES

BOIES SCHILLER FLEXNER LLP
     Attorneys for Plaintiffs
BY:  PETER M. SKINNER
     MATTHEW L. SCHWARTZ
     CRAIG A. WENNER
     ALEXANDRA JUMPER

SOLOMON & CRAMER LLP
     Attorneys for Khrapunov defendants
BY:  ANDREW T. SOLOMON

BLANK ROME LLP
     Attorneys for Defendant Triadou
BY:  ALEX HASSID
     DEBORAH A. SKAKEL
     ROBYN MICHAELSON
ALSO PRESENT:  SERGEY SHESTAKOV, Interpreter (Russian)
```

1    A.   Right.
2    Q.   Did you receive it from Mr. Wolf?
3    A.   I did.
4    Q.   At the time you received it, did you speak with him about
5    any of its terms?
6    A.   Yes.
7    Q.   Did you speak with him to learn anything you could about
8    Litco, including its owner?
9    A.   No.  My memory is he gave it to me because he was having
10   trouble getting paid, getting reimbursed for some expenses, and
11   wanted to enlist my help with my clients.
12           THE COURT:  So, to be clear, in mid-2017 you did not
13   ask Wolf about who owned Litco?
14           THE WITNESS:  Correct.  To be clear, Robert Wolf and I
15   had -- never had that conversation until we had a form of it
16   the day before Felix Sater's deposition.
17   Q.   Your testimony is, to make sure I understand, you never
18   spoke with Robert Wolf about who owned Litco until the day
19   before Mr. Sater's first deposition?
20   A.   Correct.
21   Q.   That was the September 13.  The date was September 13,
22   2018, so the day before would be September 12?
23   A.   Correct.
24   Q.   At that time you -- well, can you turn to DX-6.  That's a
25   letter that you signed that Boies Schiller sent to Litco,

1   correct?
2   A.   Correct.
3   Q.   And specifically, it was sent to Robert Wolf?
4   A.   Correct.
5   Q.   So you sent this after Mr. Sater's deposition in which it
6   was revealed that he was the sole owner and member of Litco,
7   correct?
8   A.   Correct.
9   Q.   If you turn to the second page of this letter, you say in
10  the top paragraph, "We are informed that on numerous occasions
11  you personally," referring to Mr. Wolf, "Represented to the
12  Kazakh entities or its agents that you did not know who the
13  member or members of Litco were, including to me as recently as
14  the day before Mr. Sater's deposition and/or that Felix Sater
15  was not a member of Litco."
16              Do you see that?
17  A.   Yes.
18  Q.   You wrote that?
19  A.   I did.
20  Q.   OK.  There are sort of two competing ideas going on in this
21  sentence.  Did Mr. Wolf say to you in your meeting the day
22  before that he didn't know the owners and members of Litco and
23  that Mr. Sater didn't own it, or just one of the two?
24  A.   What he said to me was that he had no idea who owned Litco.
25  He said that he didn't -- I hadn't asked him that question

1    directly, and I can explain if you want, but I'm mindful of
2    your time.  He had explained to me that his firm didn't
3    incorporate Litco.  They weren't privy to that information.
4    Q.  The letter also seems to imply that you learned -- or that
5    BSF learned that Mr. Wolf represented on other occasions to
6    either your clients, the Kazakh entities, or to their agents
7    something along the same lines as what he told you.
8            What did you learn, briefly, that he said to other
9    people, just sort of what's summarized in that paragraph.
10           MR. WENNER:  Objection, your Honor.  I just want to be
11   careful with attorney-client communications.  We also have
12   witnesses from the Kazakh entities that can testify to their
13   own interactions.
14           THE COURT:  Can you repeat the question, Mr. Hassid.
15           MR. HASSID:  Yes, I can strike it and move on.  We can
16   get it from others.
17           THE COURT:  OK.
18   BY MR. HASSID:
19   Q.  So you knew about Litco when you received this CAA in
20   mid-2017 -- I'm sorry.  You learned the name Litco at that
21   point?
22   A.  Or shortly beforehand, I think.
23   Q.  In March of 2018, Kevin Meyer produced a document in this
24   litigation that we've referred to as the Litco email.  Can you
25   turn to DX-10.

```
 1   Latham's client was at that time?
 2   A.  I knew exactly who their client was.  It was a pending
 3   litigation in California federal court because, as I recall, we
 4   sought out Latham because Litco wanted to provide assistance.
 5   And I think, initially, we had looked to contact Hogan Lovells.
 6   They were representing BTA worldwide, and I don't believe they
 7   were responsive.
 8            THE COURT:  I just want to ask a question.
 9            THE WITNESS:  Sure.
10            THE COURT:  You said that you -- I think what I heard
11   you say is you sought out Latham when you learned that they
12   were pursuing the litigation in California on behalf of Litco
13   because you thought maybe you could help them.  Is that right?
14            THE WITNESS:  I believe so.  I believe that's how we
15   got in touch, yeah.
16            THE COURT:  And Litco --
17            THE WITNESS:  It's four years ago, your Honor.
18            THE COURT:  I understand.  But Litco is a matter under
19   your client Felix Sater, is that right?
20            THE WITNESS:  Correct.
21            THE COURT:  Then what I thought I also heard you say
22   is that you didn't remember whether Sater had an ownership in
23   Litco on the day prior to his deposition.  Is that your
24   testimony?
25            THE WITNESS:  Yes, your Honor.  At that moment it was
```

1   not something that I really had in my mind. I mean, he was
2   Litco.
3           THE COURT: But you were billing Felix Sater under a
4   Litco matter.
5           THE WITNESS: Your Honor, he was Litco. There was no
6   question about it. I think it was a more specific question
7   about the nature of his -- you know, I just -- that was my --
8   at the moment he asked me, I think that was my recollection.
9   But, I mean, there's no issue. I think it was really more of a
10  corporate type of what was the -- you know, how his ownership
11  interest was described, whatever. It was -- seemed a little
12  more detailed as I recall it now, and that's one thing I wanted
13  to look into.
14          And if you're asking me did I know that he was Litco?
15  Of course he was Litco. There is no other person, you know,
16  who's Litco. Litco is an entity which is, you know, Felix
17  Sater's entity.
18          THE COURT: Did you convey to Boies Schiller prior to
19  the day before Mr. Sater's deposition that Sater owned Litco?
20          THE WITNESS: Yes.
21          THE COURT: When did you convey that?
22          THE WITNESS: I believe it was right before the
23  deposition. Day before, or whatever. I think, yes, before.
24          THE COURT: Is that the first time you conveyed to
25  Boies Schiller, to anyone at Boies Schiller, that Sater was

1   Q.  Mr. Kam is identified in the agreement as a director of
2   Litco, is that right?
3   A.  Yes.
4   Q.  Is Mr. Kam, in fact, a director of Litco?
5   A.  Yes.
6   Q.  As the sole member of Litco, did you appoint him director?
7   A.  Yes, I did.
8   Q.  When did you do that?
9   A.  I'm sorry.  I cannot remember the exact time that I did
10  that.
11  Q.  Did you do that in writing?
12  A.  I don't remember.  I may not have or I may have.  I'm
13  sorry, I don't remember.
14  Q.  You don't recall if one of your several law firms drafted
15  an appointment of directors for Litco?
16  A.  I don't remember.  I would have to ask my attorney.
17  Q.  If that was in writing, would that have been something
18  drafted by Ms. Levi's law firm?
19          MR. WOLF:  Your Honor, beyond the scope.  This is like
20  arbitration discovery here because that's their arbitration
21  claim.
22          THE COURT:  I think that is beyond the scope.
23          MR. WOLF:  Thank you.
24  Q.  When the Litco agreement was signed, you did not want your
25  identity disclosed to anyone, true?

```
 1              MR. WOLF:  Your Honor, I would ask that he be allowed
 2   to answer the question however he can.
 3              THE COURT:  I'm going to allow the witness to answer.
 4              MR. WOLF:  Please.  Thank you.  Thank you, your Honor.
 5   Q.  I'll let you elaborate in a second.  Can I first get a
 6   yes-or-no question?
 7              THE COURT:  Can you repeat the question.
 8              MR. SCHWARTZ:  Yes, I can.
 9   Q.  Isn't it true that you didn't trust the Kazakhs because
10   Ilyas Khrapunov on numerous occasions told you that they had
11   spies in the prosecutor's office, in BTA, City of Almaty,
12   people that worked with his father, and you did not want your
13   name to be disclosed to them and for the Khrapunovs or the
14   Ablyazovs to find out about you in any way, shape, or form?
15   A.  Partially correct.
16   Q.  OK.  Is any part of that incorrect?
17   A.  No, it is not.
18   Q.  So that's totally correct, but that's not the only reason
19   that you have privacy concerns?
20   A.  No, that's not what I said.
21   Q.  What I read to you a moment ago is totally correct, isn't
22   it?
23   A.  Yes.
24   Q.  OK.  That's all I needed to know.
25              Now let's talk about who knew what when.  OK.  You did
```

Case 1:19-cv-02645-AJN-KHP   Document 89-11   Filed 09/11/19   Page 10 of 20    149
J88HALMH                    Sater - Cross

```
 1   not ever tell anyone at BTA Bank that you owned Litco, correct?
 2   A.  I never met with anyone directly from BTA Bank.
 3   Q.  That was my next question.
 4           You have never met nor, in fact, communicated directly
 5   with anyone at BTA, true?
 6   A.  So that means I never told them.  Yes, obviously.  I never
 7   met them, so I never told them, no.
 8   Q.  And you never communicated with them in any way, shape, or
 9   form, true?
10   A.  Not directly.
11   Q.  And it's also true that you did not tell anyone at the City
12   of Almaty that you owned Litco, correct?
13   A.  Cannot answer yes or no.
14   Q.  Well, isn't true that other than Viktor Khrapunov when he
15   was mayor of Almaty, you haven't communicated directly with the
16   City of Almaty?
17   A.  Not true.
18   Q.  Isn't it true that you haven't communicated with any
19   representative of the City of Almaty, direct representative,
20   since, let's say, early 2015?
21   A.  Not true.
22   Q.  When was the last time you were in direct contact with
23   someone at the City of Almaty?
24   A.  I think about a month ago.
25   Q.  And did you talk to them about Litco?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.   Yes.
2    Q.   Prior to that, prior to your deposition in September 2018,
3    had you spoken to anyone from the City of Almaty between, let's
4    say, the beginning of 2015 and your deposition in September of
5    2018?
6    A.   I can't answer yes or no.
7    Q.   You can't answer yes or no the question of whether you
8    spoke to any representative of the City of Almaty between
9    January 2015 and September 2018?
10   A.   Actually, I can answer, yeah.  The answer is yes, I did.
11   Q.   Who did you speak to?
12   A.   Over the last five years, I've entertained various groups
13   from Kazakhstan for one reason or another, and in some cases,
14   people who were in the city -- who were involved with the City
15   of Almaty and their government were involved in those
16   delegations and those meetings, and I can't be specific as to
17   who I did and did not meet from the City of Almaty.  The only
18   reason I'm answering that is because I met four different
19   groups within the last three months from Kazakhstan.
20   Q.   That's fine.  Between January 2015 and your deposition in
21   September 2018, did you discuss Litco with anyone from the City
22   of Almaty?
23   A.   I don't believe I discussed Litco, no.
24   Q.   You also did not tell any lawyers representing BTA Bank or
25   the City of Almaty that you owned Litco, correct?

1   A.  I don't remember if any of the meetings with Arcanum
2   included the attorneys specifically for the City of Almaty or
3   BTA, because there were always more than just a few people in
4   the room.  So I don't know if their attorneys were there or
5   not.
6   Q.  Well, let's break it down.
7   A.  Sure.
8   Q.  The only lawyers that you've ever met with on behalf of
9   City of Almaty or BTA Bank have been lawyers from my law firm,
10  Boies Schiller, true?
11  A.  No, I can't answer that because, as I said, when I had
12  meetings at Arcanum, they had various people present, and it
13  was always meetings about the asset recovery and the assets,
14  and I don't know if certain of the people that were there were
15  representatives of the City of Almaty.  Arcanum was, and
16  whether the City of Almaty -- if you're asking if in New York
17  City I ever met with any lawyers that were representing them in
18  this case, you were the only law firm that I ever met that
19  represented them in this case.
20  Q.  My question was to your knowledge, not some unnamed person
21  wearing a name tag.
22          To your knowledge, have you ever met with any lawyers
23  acting on behalf of BTA or the City of Almaty, other than
24  lawyers for my law firm?
25  A.  I don't believe so.

1    A.   Yes.
2    Q.   Negotiating strategy?
3    A.   Yes.
4    Q.   Litigation strategy?
5    A.   Yes.
6    Q.   They were about the underlying facts of the case?
7    A.   Yes.
8    Q.   Your involvement and personal knowledge in some of these
9    deals?
10   A.   Yes.
11   Q.   They were about reimbursement of expenses?
12   A.   Yes.
13   Q.   But the contracts were negotiated by Mr. Wolf?
14   A.   Again, of course they were negotiated by Mr. Wolf, but I
15   had an involvement in all parts of everything that was going on
16   here.
17   Q.   Through Mr. Wolf?  I don't want to --
18   A.   Either through Mr. Wolf or directly with Mr. Garske.
19   Q.   But you did not negotiate the agreement with Mr. Garske,
20   right, the agreement that's in front of you, the Litco
21   agreement?
22   A.   The text of the agreement, I did not negotiate, no.
23   Q.   Isn't it true that you didn't interact directly with anyone
24   at Arcanum until July or August of 2015?
25   A.   I don't remember the exact dates that I started interacting

1   with them.  I'm sorry.
2   Q.  Isn't it true that you didn't interact directly with anyone
3   at Arcanum until after that agreement was signed?
4   A.  I don't remember if I interacted with them before or right
5   after.  I'm sorry.  I don't remember the dates.  I don't
6   have -- I don't have the dates of our meetings.
7   Q.  Well, you suggested a moment ago that you may have
8   negotiated the substance, if not the text of those
9   agreements -- that agreement, excuse me, with Mr. Garske.  But
10  isn't it true that you had no contact with him until after that
11  agreement was signed?
12  A.  I don't know that to be the truth or not the truth.  I
13  don't remember the dates of my first meetings with him.
14  Q.  Isn't it true that you never mentioned the word "Litco"
15  when you talked to Arcanum?
16  A.  Not true.
17  Q.  Are you absolutely certain that you disclosed your
18  ownership of Litco to Arcanum?
19  A.  Peder Garske asked me -- I'm answering you -- Peder Garske
20  asked me, are you sure there's no one else involved in Litco?
21  And I told him, absolutely not.  I'm the sole owner.
22  Q.  Your testimony is that you told Peder Garske the words "I
23  am the sole owner of Litco"?
24  A.  I believe so, yes.
25  Q.  Now, previously you testified that you only believed that

```
 1   Intelligence where my primary responsibility was oversight of
 2   human intelligence activities, counterintelligence activities,
 3   and the general defense intelligence program budget.
 4   Q.   How long did you serve in that role in the House
 5   Intelligence Committee?
 6   A.   From 1987 until 1998.
 7   Q.   Can you please describe your educational background.
 8   A.   I have a bachelor's degree from Bradley University, a law
 9   degree from Georgetown University, and a certificate of
10   completion of a course in national security and international
11   affairs from Harvard University John F. Kennedy School of
12   Government.
13   Q.   Mr. Humphrey, turning now to Litco, prior to September of
14   2018, did you know that Felix Sater owned Litco?
15   A.   No.
16   Q.   To your knowledge, prior to September of 2018, did anyone
17   at Arcanum know that Mr. Sater owned Litco?
18            MR. SOLOMON:  Objection. Foundation.
19   Q.   Mr. Humphrey, in preparing for your testimony today, have
20   you investigated whether anyone at Arcanum knew that Mr. Sater
21   owned Litco prior to September of 2018?
22   A.   Yes, I have.
23   Q.   You've spoken to colleagues at Arcanum?
24   A.   I've spoken to -- reached out to and spoken to colleagues
25   and to other people that may not be with the firm now that
```

```
 1   had -- that engaged on this project.  Everybody that I talked
 2   to has informed me that they did not know.
 3   Q.  Specifically, have you spoken to colleagues at Arcanum who
 4   worked directly with Mr. Garske?
 5   A.  Yes.
 6   Q.  Have you reviewed documents in connection with your
 7   investigation?
 8   A.  Yes, I've reviewed documents, and I found nothing that
 9   indicates knowledge.
10   Q.  Did Mr. Wolf ever reveal to you that Mr. Sater owned Litco
11   before September of 2018?
12   A.  No.
13   Q.  Did Felix Sater ever reveal to you that he owned Litco
14   before his deposition in September of 2018?
15   A.  No.
16   Q.  Was Mr. Sater's ownership of Litco ever revealed to you in
17   any discussions that you had with Latham & Watkins?
18   A.  No.
19   Q.  Mr. Humphrey, you were asked some questions by counsel
20   about Moses & Singer invoices, specifically Defendants'
21   Exhibit 21.
22   A.  Yes.
23   Q.  Do you recall counsel's questions about that exhibit?
24   A.  Yes.
25   Q.  Could you please explain how such invoices would have been
```

```
 1    A.   No.
 2    Q.   Did you ever apologize to Mr. Wolf for the fact that Felix
 3    Sater was being produced as a witness?
 4    A.   No.  I mean, I always thought he was a witness from the
 5    first moment that I got involved.
 6    Q.   And why did you believe that he was a witness?
 7    A.   He was someone that had information.  He personally was
 8    involved with the Khrapunovs, with SDG, with Joseph Chetrit,
 9    and he was providing information to us.
10    Q.   Have you seen any document indicating that Mr. Sater was
11    not to be produced by Litco as a witness?
12    A.   No, I have not.
13    Q.   Mr. Humphrey, if I could direct your attention to
14    Defendants' Exhibit 26.  Do you recall counsel's questions
15    about this document?
16    A.   Yes, I do.
17    Q.   Were you a recipient of any of these emails?
18    A.   No.
19    Q.   Other than in the context of this litigation, have you seen
20    any of these emails before?
21    A.   No.
22    Q.   If I could now direct your attention to Defendants'
23    Exhibit 22.  Do you recall counsel's questions about this
24    exhibit?
25    A.   Yes, I do.
```

1   Q.  OK.  All right.  Let's go back to the confidential
2   assistance agreement, which is DX-1.  I'm going to refer to
3   that for shorthand as the Litco agreement.  Is that OK with
4   you?
5   A.  Yes.
6   Q.  And, again, you may not know the answer to this question,
7   but do you know whether or not, in connection with the
8   negotiation and the signing of this agreement, BTA was retained
9   by any lawyer?
10  A.  Could you repeat.
11  Q.  BTA retained any lawyer -- in connection with the Litco
12  agreement, did BTA -- were they represented by counsel when
13  they negotiated and signed the Litco agreement?
14          MR. WENNER:  Objection.  Foundation.
15  Q.  If you know.
16  A.  Sorry, but I'm not aware about this.
17  Q.  Very good.  As part of your investigation to prepare for
18  today, what, if anything, did you undertake to learn regarding
19  BTA's entry into the Litco agreement?
20  A.  Could you repeat, please.  Sorry.
21  Q.  Yeah, let's go at it this way.
22          Do you have any idea, before BTA signed the Litco
23  agreement, whether it knew who owned Litco?
24  A.  BTA never knew who was the owner of company Litco.
25  Q.  And how did you come to find this out?

1  A.  Actually, I have done my investigation that I have checked
2  for all communications of BTA Bank with Litco, Felix Sater, and
3  his representatives, and actually only time when BTA became
4  known that Felix Sater owned Litco, it was deposition of Felix
5  Sater which took place on 13 September 2018.
6  Q.  When you say you checked all the communications, sir, what
7  is it that you checked?
8  A.  I have checked -- I have requested for information from
9  chancery department, from accountants department, from
10 securities service, and from legal department.
11 Q.  And the communication --
12 A.  And IT department.  Sorry.
13 Q.  And the?
14 A.  IT department.
15 Q.  So it's fair to say that the communications that you
16 investigated were written communications?
17 A.  All communications -- all written communications.
18 Q.  Right.  Written communications?
19 A.  Yes.
20 Q.  So if this information was passed on to someone at BTA Bank
21 orally, you would not know whether that occurred, correct?
22 A.  Yes.
23 Q.  Thank you.
24         Now, if you look at the second paragraph of the Litco
25 agreement, sir, would you agree with me that BTA, along with

```
J88HALMH                   Darmanbekov - Redirect
```

1  Q.  Prior to September 2018, were you aware of who the owner of
2  Litco was?
3  A.  No, we were not aware of that.
4          MR. WENNER:  Nothing further, your Honor.  Thank you.
5          THE COURT:  OK.  Go ahead.
6  REDIRECT EXAMINATION
7  BY MS. MICHAELSON:
8  Q.  Sir, I think I just heard you testify that you first saw
9  the confidential assistance agreement in 2018, is that right?
10 A.  No, actually, I was present at the signing of this
11 agreement in 2015.
12 Q.  OK.  At that time in June 2015, did you see a translated
13 copy of the confidential assistance agreement?
14 A.  No, there was no translation of that document.
15 Q.  Then did you have any opportunity to review the terms of
16 the agreement?
17 A.  Well, it so happened that we signed off on the document and
18 we passed the original on, and after that we did not have it at
19 our disposal.
20 Q.  You didn't have the original signed copy at your disposal?
21 A.  This is correct.
22 Q.  Am I correct that you don't read English?
23 A.  This is correct, I do not read English.
24 Q.  To your knowledge, did anyone at BTA who could understand
25 the terms of the document review it before Almaty signed it?

SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300