**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                    Plaintiffs,

       -against-

FELIX SATER, DANIEL RIDLOFF, BAYROCK
GROUP INC., GLOBAL HABITAT SOLUTIONS,
INC., RRMI-DR LLC, FERRARI HOLDINGS LLC,
and MEM ENERGY PARTNERS LLC,

                  Defendants.

19 Civ. 2645 (AJN) (KHP)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT FELIX SATER'S MOTION FOR A STAY PENDING ARBITRATION

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

*Attorneys for Plaintiffs*
*City of Almaty, Kazakhstan and*
*BTA Bank JSC*

## <u>TABLE OF CONTENTS</u>

<u>PRELIMINARY STATEMENT</u> ...................................................................................... **1**

<u>FACTUAL BACKGROUND</u> ......................................................................................... **2**

   1.  The Kazakh Entities and Litco Entered into a Confidential Assistance Agreement in 2015.............................................................................................................................. 2

   2.  Sater First Revealed His Ownership of Litco When He Was Deposed in September 2018.............................................................................................................................. 4

   3.  Following Sater's Deposition, the Kazakh Entities Declared Litco in Breach of the CAA, and Litco Responded by Initiating an Arbitration. ................................................. 6

   4.  Hearings in the Arbitration Will Not Be Held Until May 2020 at the Earliest. ................ 8

<u>LEGAL STANDARD</u> .................................................................................................. **10**

<u>ARGUMENT</u> .............................................................................................................. **12**

   I.  SATER IS NOT ENTITLED TO A STAY UNDER THE FAA..................................... 12

      A.  As a Non-Party to the CAA Who Undisputedly Has No Right to Arbitrate His Defense, Sater Is Not Entitled to a Stay. .................................................................. 12

      B.  Sater Is Not Entitled to Invoke Equitable Estoppel.................................................. 14

   II.  SATER IS NOT ENTITLED TO A STAY UNDER THE COURT'S INHERENT AUTHORITY. ..................................................................................................... 17

      A.  Sater's Rights Are Not Properly Subject to Arbitration............................................ 18

      B.  Sater's Rights Will Not Be Finally Determined by the Arbitration. ......................... 20

      C.  The Arbitration Will Not Be Resolved Within a Reasonable Time in Relation to This Litigation. ..................................................................................................... 21

   III.  THERE IS NO BASIS TO STAY CLAIMS AGAINST OTHER DEFENDANTS. ....... 22

<u>CONCLUSION</u> ........................................................................................................... **23**

Plaintiffs City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA," and together with Almaty, "Plaintiffs" or the "Kazakh Entities") respectfully submit this memorandum in opposition to defendant Felix Sater's motion to stay this action pending arbitration, or alternatively, to stay the claims asserted against him. [ECF Nos. 77 & 80.]

## PRELIMINARY STATEMENT

Sater's motion seeks to stay this case pending the outcome of an arbitration to which he is not a party, on the mistaken premise that his defense in this case is properly the subject of that arbitration. He is wrong: Sater's defense is not subject to arbitration. Sater is not a party to the Confidential Assistance Agreement ("CAA") between the Kazakh Entities and Litco LLC, which is the relevant arbitration agreement. The CAA and its arbitration clause never mention Sater. By its express terms, the Kazakh Entities agreed to arbitration only with the "Parties" to the CAA – a term that does not include Sater, who actively hid his association with Litco for years. Under long-settled Second Circuit law, a party is only entitled to a stay of arbitration under the Federal Arbitration Act where he or she has a right to compel arbitration. Sater has no such right, and notably does not seek to assert one.

Nor should this Court exercise its inherent authority to stay the case. At base, the arbitration has nothing to do with this case. Contrary to Sater's assertions, his purported right to a release is not "front and center" in the arbitration; it is not a "central issue" or "squarely" before the arbitrators. [ECF No. 80 (Sater's Memorandum of Law in Support of Motion to Stay, cited as "Br.") at 1, 5, 11.] The claims against Sater in this lawsuit and Sater's rights, if any, under the CAA release provision have no bearing on Litco's claim for fees and other compensation and thus are not properly before the arbitrators. In fact, at the June 4, 2019 conference in this case, Sater's counsel stated (correctly) that the release would *not* be the subject of the arbitration because the arbitration was focused on Litco's claim for fees and other compensation, and that

1

instead the release would be the subject of these proceedings. [Declaration of Matthew L. Schwartz ("Decl."), Ex. 10 at 11:20-13:9.] This Court should resolve the issues relating to Sater's rights, and the arbitrators should resolve the issues relating to Litco's claim for fees and other compensation. Sater's motion for a stay should be denied.

## FACTUAL BACKGROUND

This case arises out of the theft by Mukhtar Ablyazov and Viktor Khrapunov of billions of dollars in Kazakhstan, which they and their co-conspirators then laundered throughout the world. Having established Ablyazov's thefts, the courts of the United Kingdom in 2009 entered the extraordinary step of issuing a world-wide freezing order over Ablyazov's assets (regardless of whose name in which they were held) and appointing a receiver over those assets. As alleged in the Complaint, Felix Sater helped Ablyazov, his son-in-law Ilyas Khrapunov (who had day-to-day control over much of the intermingled stolen assets), and others launder the stolen money into the United States, in violation of the British orders.[1] [*See generally* ECF No. 83.]

The Kazakh Entities, in developing asset recovery cases and tracing the stolen funds, have sought the help of numerous witnesses, sources, governments, investigators, law firms, consultants, and experts. One such consultant was an entity named Litco LLC, which held itself out as an asset recovery specialist through its lawyer, Robert Wolf.

## 1. The Kazakh Entities and Litco Entered into a Confidential Assistance Agreement in 2015.

On or about June 12, 2015 – long after Sater committed the acts giving rise to Plaintiffs' claims in this case – the Kazakh Entities entered into a Confidential Assistance Agreement ("CAA") with Litco LLC. [Decl., Ex. 2.] Under the terms of the CAA, Litco agreed to "provide

---

[1]    As the Court is aware, Ablyazov and Viktor and Ilyas Khrapunov are defendants in a related case, *City of Almaty, Kazakhstan, et ano. v. Mukhtar Ablyazov, et al.*, No. 15 Civ. 5345 (S.D.N.Y.) (the "Related Case").

information, assistance and cooperation" in locating and recovering assets, including by, among other things, identifying witnesses with information about the Kazakh Entities' stolen funds and who could potentially testify in legal proceedings. [Decl., Ex. 2 at §§ B, 6(e).] In exchange, Litco was to be paid a monthly fee and percentage of any recovery that Litco helped to obtain. [Decl., Ex. 2 at § 2.] As an important element of the CAA, Litco made a contractual representation that "[n]o potential witness which Litco identifies and produces . . . in connection with assistance to be provided under this Agreement shall have any ownership interest in Litco or in the Monthly Fees or Recoveries Consideration payable to Litco under this Agreement." [Decl., Ex. 2 at § 6(e).]

The CAA provides for the release of certain claims against Litco and its officers, directors, shareholders, and others. However, the release does "not apply under any circumstances or in any way to any of the Khrapunov Entities or Ablyyazov [sic] Entities," as those terms are broadly defined in the CAA. [Decl., Ex. 2 at § 10.][2]

Finally, the CAA also provides for the arbitration of disputes "arising out of or relating to" the agreement, and specifies that any award issued in arbitration "shall be conclusive and binding upon the Parties." [Decl., Ex. 2 at § 14.] For purposes of the CAA, the "Parties" are the Plaintiffs here (*i.e.*, BTA Bank and the City of Almaty), the Republic of Kazakhstan, an investigative firm called Arcanum (Asia) Limited, and Litco. [Decl., Ex. 2 at p. 1 (introductory

---

[2]     Sater's quotation of the CAA's release language notably omits this sentence. [Br. 4; *see also* ECF No. 78 (Sater Aff.) at ¶ 8.] That is presumably because, even if the CAA and its release are otherwise valid, the release does not apply to Sater, who – through his relationship with Ablyazov, the Khrapunovs, and their entities including but not limited to the Swiss Promotion Group – falls within this essential carve-out from the CAA's release language, which was obviously intended to ensure that wrongdoers such as Sater could not benefit from the CAA's release.

paragraph).] The CAA does not mention Sater at all: he is not listed in the release language, he is not mentioned in the arbitration clause, he is not identified as having any relationship to Litco, and he did not sign the CAA. Instead, the CAA was signed on behalf of Litco by Kalsom Kam, whose title is listed on the CAA as "director" of Litco. [Decl., Ex. 2 at p. 9.][3]

## 2.   Sater First Revealed His Ownership of Litco When He Was Deposed in September 2018.

Shortly after the CAA was signed in mid-2015, Litco introduced Felix Sater to Arcanum as a witness and source of information. ███████████████████████[4] ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

At his deposition in the Related Case in September 2018, Sater testified that he was then, and had always been, the sole owner of Litco. [Decl., Ex. 1, Day 1 at 31:23-32:3.] This revelation blind-sided the Kazakh Entities, who had never dealt directly with Litco or its counsel, and who had no idea that Sater owned Litco. [Decl., Ex. 11 at 215:22-216:5; 235:1-3.][5]

---

[3]     It is not clear whether Kam was ever actually appointed a director of Litco, and whether he actually had authority to enter into the CAA. Sater recently testified that he did not know when or how Kam was ever appointed Litco's director. [Decl., Ex. 11 at 146:8-16.]

[4]     Sater had no involvement in the negotiation of the CAA, and was not introduced to the Kazakh Entities or their representatives, including Arcanum, prior to its execution. Even Sater could not dispute this fact. [Decl., Ex. 11 at 158:23-159:13.]

[5]     On August 8, 2019, Magistrate Judge Parker held an evidentiary hearing in the Related Case on sanctions motions against the Kazakh Entities. (The defendants in the Related Case allege improper payments to a witness, *i.e.*, Sater, that he received – unbeknownst to the Kazakh Entities – via his interest in Litco.) In opposition to the motions, the Kazakh Entities submitted declarations from two Arcanum employees attesting that neither Sater nor anyone else ever disclosed to them that Sater owned Litco, and that they did not become aware of this fact until they were informed of it after Sater's September 2018 deposition. [Decl., Exs. 5 & 6.] At the

Arcanum, which had been the primary point of contact with Litco, likewise had no idea that Sater owned Litco. [Decl., Exs. 5, 6, & 11 at 183:13-184:18.] Nor did counsel for the Kazakh Entities. [Decl., Ex. 11 at 15:17-17:3.] Indeed, Litco's counsel Robert Wolf – who was the primary point of contact for Litco – recently admitted that he told counsel for the Kazakh Entities *the day before Sater's deposition* that he did not know who owned Litco, [Decl., Ex. 11 at 86:21-87:13], even though he well knew that Sater owned it, [*id.* at 87:14-17].

To the contrary, the Kazakh Entities had every reason to believe that Sater – like other witnesses and sources of information that Litco claims credit for – had no such interest. Sater had not signed the CAA and is not mentioned in it, and no one ever disclosed his ownership interest to the Kazakh Entities. Moreover, Sater's apparent ownership of Litco was directly at odds with Litco's contractual representations in the CAA that no witness produced by Litco would have a direct or indirect economic interest in the fees paid to Litco. [*See* Decl., Ex. 2 at § 6(e).] Indeed, Sater himself confirmed at his September 2018 deposition that ████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

---

hearing, representatives of Arcanum, BTA Bank, the City of Almaty, and their (undersigned) counsel likewise testified that they had no knowledge of Sater's ownership of Litco prior to his deposition. [Decl., Ex. 11 at 183:13-184:18 (Arcanum); 215:22-216:5 (BTA); 235:1-3 (Almaty); and 15:17-17:3 (counsel).]

████████████████████████████████████████████████████████

████████████████████████████████████

**3. Following Sater's Deposition, the Kazakh Entities Declared Litco in Breach of the CAA, and Litco Responded by Initiating an Arbitration.**

On October 9, 2018, soon after Sater's revelation, the Kazakh Entities declared Litco in breach of the CAA and demanded the return of all consideration paid to Litco. [Decl., Ex. 4.] Among other things, the Kazakh Entities noted that Litco had breached the CAA by "ma[king] false representations in the Agreement" that "caused money to be paid to witnesses in violation of the express terms of the Agreement." [Decl., Ex. 4 at 1.] In addition, the Kazakh Entities declared Litco in breach because Sater admitted that █████████████████████████

███████████████████████████████████████████

██████████████████████████████████████, [Decl., Ex. 4 at 1-2; ████████████████

███████████████████████████████████████████

████████████████████████████████████████████████, [Decl., Ex. 4 at 2; ██████████████████████████].

Three days later, on October 12, 2018, Litco responded by preemptively filing a demand for arbitration with the American Arbitration Association ("AAA"). [Decl., Ex. 7.] In its demand, Litco claimed $9.5 million in fees and other compensation purportedly owed to it. [Decl., Ex. 7 at 1.] Litco's demand named all of the signatories to the CAA as respondents. [Decl., Ex. 7 at 1 & 3.] Sater is not and has never been a party to the arbitration.

In February 2019, Sater was deposed again in the Related Case. At his continued deposition, after the Kazakh Entities had declared Litco in breach of the CAA and with Litco's arbitration pending, Sater altered much of his testimony regarding Litco. Whereas Sater previously testified that █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████

      Following the February 2019 deposition, and after the Kazakh Entities developed

sufficient non-confidential evidence of Sater's role in profiting from the money-laundering

scheme, the Kazakh Entities filed this action against Sater and his co-conspirators for conduct

that predated the existence of Litco and the CAA. Following the initiation of this lawsuit, at

testimony in an evidentiary hearing in the Related Case in August 2019, Sater changed his

testimony yet again. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████, Sater testified after being sued by the Kazakh Entities that "Peder

Garske asked me, are you sure there's no one else involved in Litco? And I told him, absolutely

---

[6]     Garske, who died in early January 2016, negotiated the CAA on behalf of Arcanum, the Kazakh Entities, and the Republic of Kazakhstan, and the Confidentiality and Non-Disclosure Agreement on behalf of Arcanum. [*See* Case No. 15 Civ. 5345, ECF No. 993 at 4 & 6; *see also infra* note 7.]

not. I'm the sole owner." [Decl., Ex. 11 at 159:19-21 ("Q: Your testimony is that you told Peder

Garske the words 'I am the sole owner of Litco'? A:  I believe so, yes." *Id.* at 159:22-24.).] Sater,

of course, knew that Garske is deceased, leaving Sater an opportunity to make uncontradicted

assertions about his dealings with Garske. Even so, Sater was necessarily consistent throughout

that he had never disclosed his ownership of Litco to BTA, Almaty, or their counsel, knowing

that otherwise he would be contradicted. [Decl., Ex. 11 at 148:25-149:7; 150:20-151:5.][7]

### 4.   Hearings in the Arbitration Will Not Be Held Until May 2020 at the Earliest.

---

[7]      As a result of the fact that the Kazakh Entities themselves and their counsel undisputedly
never learned of Sater's ownership of Litco, even if a fact-finder were ultimately to (erroneously)
find that Garske and/or Arcanum knew about it, such knowledge would not be imputed to
Plaintiffs. Indeed, on or about July 8, 2015, shortly after executing the CAA – and without
informing the Kazakh Entities – Litco and Arcanum executed a Confidentiality and Non-
Disclosure Agreement ("CNDA"). [Decl., Ex. 3.] Litco, according to the CNDA, "desire[d] to
keep the identities of its members, or other persons having ownership interests in it,
confidential." [Decl., Ex. 3 at p. 1.] The CNDA provides that "*to the extent*" that Arcanum
learned the identities of Litco's members or others having ownership interests in Litco, Arcanum
would not disclose that information to the Kazakh Entities, their lawyers, or anyone else. [Decl.,
Ex. 3 at § 1 (emphasis added).] As with the CAA, Kam signed the CNDA on behalf of Litco.
[Decl., Ex. 3 at p. 3.] Thus, although Arcanum in fact never learned that Sater owned Litco, it
would have been precluded from sharing that information with the Kazakh Entities or their
counsel by the CNDA. (Sater has explained that █████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████ )

        Under settled principles of agency law, therefore, any knowledge by Arcanum about
Litco's ownership could not be imputed to the Plaintiffs. Although information that an agent
knows is imputed to the principal, there is a well-established exception: an agent's knowledge is
not imputed to the principal when the agent "is subject to a duty to another not to disclose the
fact to the principal." Restatement (Third) of Agency § 5.03 (Am. L. Inst. 2006); *see also Ceja v.
Scribner*, No. LA CV 07-00606-VBF-KES, 2016 WL 4035665, at *7 (C.D. Cal. Mar. 3, 2016)
(recognizing this exception); *TTT Stevedores of Tex., Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135,
1139 n.1 (5th Cir. 1983) ("There is apparently universal agreement to the effect that where an
agent's duties to others prevent him from disclosing facts to the principal . . . the principal is not
bound because of the agent's knowledge."). Because the CNDA imposed on Arcanum a duty to
Litco not to disclose any information that it might have known or later learned regarding Litco's
ownership to either the Kazakh Entities or their counsel, [Decl., Ex. 3 at §§ 1-2], any such
information cannot be imputed to the Kazakh Entities.

As discussed above, Litco initiated its arbitration against the Kazakh Entities on October 12, 2018, seeking $9.5 million in allegedly unpaid fees under the CAA. On July 2, 2019, the arbitration panel conducted its very first procedural hearing, and explained that the arbitrators would not be available to begin hearing evidence until May 2020 at the earliest. In a procedural order dated July 23, 2019, the panel stated that, upon receipt of the parties' Statement of Claim, Answering Statements, and, if necessary, Response to Counterclaims, it would "issue a procedural order governing the conduct of the balance of this proceeding," including whether it would hear liability and damages evidence in one hearing, or would bifurcate the evidence. [Decl., Ex. 8 at § 4.] The initial procedural order does not address the timing of hearings.

On August 19, 2019, Litco submitted its Statement of Claim in the arbitration, a week ahead of the August 26, 2019 deadline set by the panel. [Decl., Ex. 8 at § 1.] The same day, Sater filed his motion to stay this action. [ECF Nos. 77 & 80.] In its Statement of Claim, Litco raised claims that purport to seek declaratory relief finding that Plaintiffs' claims in this case have been released (Litco's Third Claim) and monetary damages for Sater's legal fees in this action, for which Litco purportedly has agreed to indemnify him (Litco's Fourth Claim). [Decl., Ex. 9 at 19-20.] By contrast, Litco's initial demand for arbitration – which was made before this case was filed, but after the Kazakh Entities had sent Litco a breach letter, [*compare* Decl., Ex. 4, *with* ECF No. 1] – made no reference to the release provision. [*See* Decl., Ex. 7.] Further, at the initial conference in this action, Sater's counsel represented that the issue of the release would be submitted to this Court, not the arbitrators. [Decl., Ex. 10 at 11:20-24 ("MR. ROSENBERG: Finally, there will be a motion to dismiss based on a release signed by the plaintiffs in this case . . . only on behalf of defendant Felix Sater, who is the beneficiary of that release.").] In so doing, Sater's counsel described how the focus of the arbitration differs from this action, stating that

"[t]he arbitration proceeding was commenced in order to collect fees owed to Mr. Sater under [the CAA]." [Decl., Ex. 10 at 12:5-7; *see also id.* at 12:11-15 ("MR. ROSENBERG: I'm not sure if there's a dispute about the enforceability of the release. There may be a dispute about the enforceability of the fees owed to Mr. Sater, obviously, which is why the arbitration proceeding was commenced.").]

Under the arbitrators' initial procedural order, the Kazakh Entities' Answering Statement is due on September 30, 2019. [Decl., Ex. 8 at § 2.] The Kazakh Entities will object to the Third and Fourth Claims for Relief by arguing, among other things, that the question of whether the CAA's release provision applies to or is enforceable as to Sater is not properly before the panel, because Sater is not a party to the arbitration. The Kazakh Entities also will argue that the CAA is void *ab initio* because Litco fraudulently induced the Kazakh Entities to enter into the agreement by concealing Sater's dual status as both a witness and the sole owner of Litco, and by concealing his receipt of more than $20 million of the Kazakh Entities' stolen funds.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") generally provides that litigation should be stayed when the claims in that litigation are in fact arbitrable and the parties to the lawsuit have agreed to arbitrate under a valid and enforceable agreement. *See* 9 U.S.C. § 3. Where the parties to the lawsuit have not agreed to arbitrate, however, no stay is warranted under the FAA. *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d Cir. 1964) ("Granting of the stay cannot be justified under the terms of the [Federal] Arbitration Act. Defendants are not parties to the arbitration agreement. The issues of the present action are not referable to arbitration between the parties."); *accord Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991). Although the FAA "allows parties to an arbitration to obtain a stay of federal proceedings regarding the claims that they are arbitrating," "[n]on-parties to an arbitration do not have this

right" under the Act. *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499,

501 (S.D.N.Y. 1995). Put differently, a party with "no present right to compel arbitration" under 9

U.S.C. § 4 of the FAA "is not entitled to a stay under Section 3" of the Act. *Downing v. Merrill*

*Lynch, Pierce, Fenner & Smith, Inc.*, 725 F.2d 192, 195 (2d Cir. 1984).

   With no entitlement to a stay under the FAA, a non-party to an arbitration may only

"petition a federal court to grant a stay pursuant to its inherent power to control its docket." *Am.*

*Shipping Line*, 885 F. Supp. at 501. Under a court's inherent authority, it is appropriate to grant a

stay only "where the pending proceeding is an arbitration in which issues involved in the case

may be determined." *Sierra Rutile*, 937 F.2d at 750 (quoting *Nederlandse*, 339 F.2d at 441).

"There are two questions involved in this test. First, whether there are issues common to the

arbitration and the court proceeding, and second, whether those issues will be finally determined

by the arbitration." *Am. Shipping Line*, 885 F. Supp. at 502 (citing *Sierra Rutile*, 937 F.2d at 750).

"If this test is met, the moving party has the burden of showing that the non-arbitrating party will

not hinder the arbitration, that the arbitration will be resolved within a reasonable time, and that

such delay that may occur will not cause undue hardship to the non-moving parties." *Id.* "[T]he

movant bears a heavy burden of showing necessity for the stay." *Sierra Rutile*, 937 F.2d at 750

(citing *Nederlandse*, 339 F.2d at 442). "Only in rare circumstances will a litigant in one cause be

compelled to stand aside while a litigant in another settles the rule of law that will define the

rights of both." *Nederlandse*, 339 F.2d at 442 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255

(1936) (Cardozo, *J.*)).[8]

---

[8]   The foregoing standard, drawn from cases that specifically considered the question of whether a court should use its inherent powers to stay an action pending an arbitral ruling, should govern this motion. *See Sierra Rutile*, 937 F.2d at 750; *Am. Shipping Line*, 885 F. Supp. at 501-02. The five-factor test for the exercise of this Court's inherent authority that Sater cites is

## ARGUMENT

**I.      SATER IS NOT ENTITLED TO A STAY UNDER THE FAA.**

Sater is absolutely not entitled to a stay under Section 3 of the FAA, which is simply not applicable to non-parties to an arbitration. Indeed, the fact that Sater has no right to compel arbitration himself – and certainly has not asserted any such right – is dispositive under settled Second Circuit law. Sater's reliance on the doctrine of equitable estoppel is likewise misplaced. Unlike cases in which that doctrine applies, the parties to the CAA did not treat Sater as a known non-signatory affiliate or successor to Litco; rather, Sater actively concealed his true relationship with Litco and "was a third-party wrongdoer." *Ross v. Am. Express Co.*, 547 F.3d 137, 145 (2d Cir. 2008); *see also id.* at 144-45 (collecting cases).

**A.    As a Non-Party to the CAA Who Undisputedly Has No Right to Arbitrate His Defense, Sater Is Not Entitled to a Stay.**

The Second Circuit has repeatedly held that non-parties to an arbitration do not have the right to a stay of litigation pending arbitration under Section 3 of the FAA. *See Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d Cir. 1964); *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991); *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 501 (S.D.N.Y. 1995); *accord Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*, 943 F.2d 220, 224-25 (2d Cir. 1991) (affirming the district court's ruling that

---

inapplicable here. [Br. 16.] Specifically, in the single case that Sater cites, *Credit Suisse Securities (USA) LLC v. Laver*, 2019 WL 2325609, at *1 (S.D.N.Y. May 29, 2019), Judge Torres agreed to stay Credit Suisse's petition to compel arbitration of an employment dispute pending a decision from the Ninth Circuit on whether to affirm the dismissal of a suit by the same employee on grounds that it was subject to arbitration. In other words, the issue in *Credit Suisse* was whether Judge Torres should decide the arbitrability of the employment dispute when that very issue was before the Ninth Circuit; concerns of judicial economy dominated that case. *See id.* at *3 ("[A]lthough the relief Credit Suisse seeks in this case differs from that sought in the California Action, both actions raise the same question: whether Laver's claims are subject to arbitration.").

the defendant, "a nonparty to the agreement herein that provided for arbitration, was not entitled to a section 3 stay," and rejecting "a 'commonsense reading' of section 3 [that] would call for a stay 'if there is a federal action "upon" an "issue referable to arbitration,"' apparently whether or not the movant seeking the stay was a party to the pertinent arbitration agreement" (citations omitted)). Under these precedents, the fact that Sater is not a signatory to the CAA – the arbitration agreement – nor a party to the Litco arbitration is conclusive and warrants denial of his request for a Section 3 stay.

Second Circuit precedent in fact forecloses Sater's reliance on the FAA. Under settled Circuit law, a party with "no present right to compel arbitration" under Section 4 of the FAA "is not entitled to a stay under Section 3" of the Act. *Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 725 F.2d 192, 195 (2d Cir. 1984). Here, Sater does not claim a right to compel arbitration, has not moved to dismiss this case in favor of arbitration, [*see* ECF Nos. 65 & 67], and is not a party to the existing Litco arbitration. Because he has "no present right to compel [the] arbitration" of his defense under Section 4 of the FAA, Sater "is not entitled to a stay under Section 3" of the FAA. *Downing*, 725 F.2d at 195.

Sater cannot satisfy the first step of the four-part test that he urges the Court to apply: "whether the parties agreed to arbitrate." [Br. 8.] A party simply cannot be required to arbitrate a dispute that it has not agreed to arbitrate. "It is black letter law that an obligation to arbitrate can be based only on consent." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358 (2d Cir. 2008). The Kazakh Entities never agreed to arbitrate anything *with Sater*. Sater is a non-signatory to the CAA, has no contractual relationship with the Kazakh Entities, fails to present any other indicia of a relationship with the Kazakh Entities sufficient to compel arbitration, and,

tellingly, has not sought to compel arbitration.[9] His motion to stay under Section 3 of the FAA should therefore be denied.

**B. Sater Is Not Entitled to Invoke Equitable Estoppel.**

In an attempt to evade the clear law of this Circuit, Sater invokes the doctrine of equitable estoppel, but that doctrine does not apply here. Even under the doctrine of equitable estoppel, to be entitled to a Section 3 stay, Sater would have to have a present right to compel arbitration himself. He does not.

It is well established that just because "a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them" does not mean that "that party will be estopped from refusing to arbitrate." *Sokol*, 542 F.3d at 359. "[T]he further necessary circumstance [i]s a relationship among the parties which either support[s] the conclusion that [the signatory] had consented to extend its agreement to arbitrate to [the non-signatory], or, otherwise put, made it inequitable for [the signatory] to refuse to arbitrate on the ground that it had made no agreement with [the non-signatory]." *Id.* at 361. Applying these standards, courts in this District have compelled arbitration with non-parties under the doctrine of equitable estoppel where the signatories to an arbitration agreement conducted themselves as if the non-signatory was also party to that agreement. Such cases involve (1) the signatories treating a non-signatory corporate affiliate or successor as a party performing the contract for one of the signatories, and (2) the signatories all

---

[9]     In the cases that Sater cites, none of the parties to the litigation disputed that there was a valid arbitration agreement between the relevant parties. [*See* Br. 8 (citing *Lipford v. N.Y. Life Ins. Co.*, 2003 WL 21313193, at *5 (S.D.N.Y. June 9, 2003); *Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 76 (2d Cir. 1998); *Louis Berger Grp., Inc. v. State Bank of India*, 802 F. Supp. 2d 482, 489 (S.D.N.Y. 2011); and *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).] Accordingly, in contrast to the cases that Sater cites, the Court here need not reach the remaining three factors in the test that Sater proposes.

dealing directly with a known non-signatory affiliate or successor. *See Ross*, 547 F.3d at 144-45 (collecting cases).

No such necessary circumstances are present in this case. Sater is not mentioned in the CAA, ██████████████████████████████████████████ ████████████████████ In fact, Sater is not only a non-signatory to the CAA, but he actively concealed his relationship to Litco from the Kazakh Entities – with Litco even going so far as to require Plaintiffs' investigators to sign a non-disclosure agreement prohibiting them from telling BTA, Almaty, or their counsel who owned Litco, in the event the investigators ever learned that fact (which they did not). [Decl., Ex. 3 at §§ 1-2.] On these facts, the Plaintiffs here certainly did not treat Sater and Litco as interchangeable or otherwise treat Sater as if he were a party to the CAA. To the contrary, the Kazakh Entities believed that Sater was a witness produced by Litco, and therefore (per Litco's contractual representations) could not have had any interest in Litco itself. [*See* Decl., Ex. 2 at § 6(e); *id.*, Ex. 11 at 187:4-5 (representative from Arcanum testifying that he "always thought [Sater] was a witness from the first moment that [the representative] got involved").]

In *Ross v. American Express Co.*, the Second Circuit held that plaintiffs-signatories could not be compelled to arbitrate a dispute with a non-signatory defendant under the theory of equitable estoppel where the non-signatory was not mentioned anywhere in the agreement containing the arbitration provision, had no disclosed role in the formation of the agreement, and its only relation to the agreement "was as a third party allegedly attempting to subvert the integrity" of the agreement. 547 F.3d at 146. District courts in this Circuit similarly have recognized that estoppel is inappropriate where a signatory was unaware that by signing an agreement it entered into a relationship with the non-signatory that is subsequently seeking to

compel arbitration – relief that Sater has not even sought. *See, e.g.*, *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 480 (S.D.N.Y. 2013) (Nathan, *J.*) (applying equitable estoppel where plaintiffs-signatories "cannot claim that they were unaware that by signing onto the Agreement they were entering into a relationship with" the non-signatories, and plaintiffs-signatories had failed to argue "that they were anything but aware of this fact").

As in *Ross*, Sater's only relation to the CAA "was as a third-party wrongdoer" who, together with Litco, deceived the Kazakh Entities and other signatories regarding his dual status as a witness and the sole owner of Litco, thereby subverting the integrity of the agreement. 547 F.3d at 145 (citing *Sokol*, 542 F.3d at 362 (holding that a signatory "in no way consented to extend" an agreement to arbitrate to a non-signatory entity "which tortiously subverted his rights under the agreement")). Unlike in *A2P SMS Antitrust Litigation*, the Kazakh Entities were unaware that by signing the CAA they were entering into any sort of relationship with Sater (who did not sign the CAA, is not mentioned anywhere within it, ███████████████████ ████████████████████████████████████, and had no known role in the performance of the CAA other than as a witness expressly not permitted to benefit under the agreement). [*See* ███████████████████; *id.*, Ex. 2 at § 6(e).] It is undisputed that the Kazakh Entities and their agents had no interaction with Sater prior to the formation of the CAA. [Decl., Ex. 11 at 158:23-159:13.] In addition, Sater took repeated steps – most notably by causing Litco's attorney to arrange for execution of a Confidentiality and Non-Disclosure Agreement ("CNDA") – in order to conceal from the Kazakh Entities his identity as sole owner of Litco, just in case their investigators were to learn that fact. [Decl., Ex. 3; *see also supra* note 7.]

In light of these facts, Sater is not entitled to invoke equitable estoppel in order to compel arbitration of his personal defenses. And because Sater cannot compel arbitration under the CAA pursuant to Section 4 of the FAA, he is by definition not entitled to a stay under Section 3. *See Downing*, 725 F.2d at 195 (a party with "no present right to compel arbitration . . . is not entitled to a stay under Section 3").[10]

## II.   SATER IS NOT ENTITLED TO A STAY UNDER THE COURT'S INHERENT AUTHORITY.

A stay is also not warranted under this Court's inherent authority. While there is no doubt that the Court has the discretion in appropriate cases to stay litigation pending arbitration even where Section 3 does not apply, Sater fails to meet the "heavy burden of showing necessity for [a] stay" that would warrant the Court's use of its inherent powers. *Sierra Rutile*, 937 F.2d at 750; *see also Am. Shipping Line*, 885 F. Supp. at 502 (describing movant's burden).

A discretionary stay would be inappropriate here for multiple, independent reasons. *First*, a discretionary stay is not warranted because the arbitration, which Litco commenced in order to collect fees and other compensation under the CAA, does not address the claims and defenses in this action, which concern a money-laundering conspiracy and conduct that predated Litco and the CAA. [*See* Decl., Ex. 10 at 12:5-7.] *Second*, Sater has not established that any common issues will be finally determined in the arbitration because he is not a party to the arbitration and is not bound personally by any decision the arbitrators reach. *Third*, Sater cannot establish that the arbitration will be resolved within a reasonably expeditious time frame. Under the current

---

[10]     Further, Sater is not entitled to compel arbitration of the threshold question of arbitrability (that is, whether he may invoke the CAA's arbitration provision under the theory of equitable estoppel). The Second Circuit has held that, where an arbitration provision refers to the "Parties," as the CAA does in § 14, "it does not afford [a non-party] the right to have arbitrators rather than a court determine the arbitrability of disputes." *Republic of Iraq v. BNP Paribas USA*, 472 Fed. App'x 11, *1-2 (2d Cir. 2012). [*See also* Decl., Ex. 2 at § 14.]

schedule, it is almost certain that the arbitrators will not issue a final decision within a year after Sater filed this motion to stay; courts find that shorter delays are still too long.

### A.  Sater's Rights Are Not Properly Subject to Arbitration.

Contrary to Sater's assertions, application of the CAA's release provision to his personal defenses is not "front and center in the arbitration," and its enforceability is not "squarely before the arbitration panel." [Br. 1 & 5; *see also id.* at 11.] Sater's claimed rights under the release are not properly before the arbitrators because, among other things, Sater is not a party to the arbitration. *See Techcapital Corp. v. Amoco Corp.*, 2001 WL 267010, at *6-7 (S.D.N.Y. Mar. 19, 2001) (arbitrators exceed authority in ruling on rights of non-parties); *cf. Sierra Rutile*, 937 F.2d at 750-51 (holding that a court should decline to issue a stay pursuant to its inherent powers where the arbitration and the lawsuit involve different parties and claims and present only limited overlap of issues). By contrast, the inherent power to stay litigation pending arbitration should be exercised only where there is "substantial, if not complete, overlap in the claims that must proceed to arbitration and those that would be before th[e] [c]ourt." *See In re A2P SMS Antitrust, Litig.*, 972 F. Supp. 2d at 500.

In *Sierra Rutile*, 937 F.2d at 750, the Second Circuit held that a discretionary stay was inappropriate where "the difference between the parties and issues in the court action and the arbitration undermine[d] the rationale that the arbitration will have an effect on the stayed action," and the non-movant "ha[d] asserted additional, significant claims in the action at bar that [we]re not cognizable in arbitration," *id.* at 750-51. Likewise, in *American Shipping Line*, the district court declined to stay litigation pending arbitration pursuant to its inherent powers where, even though "the two proceedings [would] almost certainly have issues in common," "there [would] almost certainly be issues raised in the court proceeding that will not be raised in the arbitration." 885 F. Supp. at 502.

Here, there is virtually no overlap between the arbitration and this action. None of the defendants, Sater included, is a party to the arbitration. The arbitration concerns claims for damages as a result of purported breaches of the CAA, whereas this case alleges unrelated tortious and/or fraudulent conduct by the defendants. The only issue arguably in common is Sater's defense in this case that he was released in the CAA, which this Court is perfectly competent to adjudicate and which is not properly before the arbitrators anyway. Indeed, Sater and Litco have tried to create an artificial overlap of issues by including in Litco's Statement of Claim in the arbitration two claims that concern the rights of Sater, not Litco.[11] [*See* Decl., Ex. 9 at 19-20.] Significantly, Litco's earlier demand for arbitration made no reference to the enforceability of the CAA's release provision, [Decl., Ex. 7]; its other claims in the Statement of Claim do not implicate the release provision, [Decl., Ex. 9]; and Sater's counsel stated at the initial conference in this action that the issue of whether the release extends to Sater would be submitted to this Court, not the arbitrators, [Decl., Ex. 10 at 11:20-24].

Neither this Court nor the arbitrators should entertain the attempt by Sater and Litco to advance Sater's personal defenses in the arbitration. Sater is not a party to the arbitration and thus is not entitled to have the arbitrators rule on his rights. *See Techcapital*, 2001 WL 267010, at *6-7 ("[A]rbitrators exceed their authority when they determine the rights and obligations of one who is not a party to the arbitration proceeding," rendering any such award unenforceable.). Litco cannot be permitted to effectively make Sater a party to the arbitration, simply by unilaterally injecting the issue of Sater's rights into its Statement of Claim, in service of Sater's position on this motion.

---

[11]    Litco filed its Statement of Claim in the arbitration on the same day as Sater's motion – well before the August 26, 2019 deadline set by the arbitrators – so that Sater could cite the release-related claims in support of this motion. [*Compare* Decl., Ex. 8 at § 1, *with id.*, Ex. 9.]

Litco's maneuver is especially obvious because no other claims in its Statement of Claim implicate the release provision in any way. The dispute submitted to arbitration arises from Litco's claim to fees and other compensation purportedly owed to it under the terms of the CAA. In response, the Kazakh Entities will establish that the CAA is void *ab initio* as the result of fraud in the inducement (due to fraudulent concealment of Sater's ownership of Litco while he was also a witness with knowledge of facts relevant to the asset recovery litigation, as well as Litco's concealment of the fact that Sater had received more than $20 million of the Kazakh Entities' stolen money). The CAA's release provision has absolutely no relevance to the fee dispute submitted to arbitration.

Even if there were some overlap between the issues before this Court and those before the arbitrators, any such overlap would not warrant a stay and is merely the natural consequence of the fact that Litco is a party to the arbitration and Sater is not. *See Am. Shipping Line*, 885 F. Supp. at 502 ("Courts must act to enforce arbitration agreements protected by the [FAA], even though arbitration may sometimes result in 'piecemeal resolution' . . . ." (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 (1983) (recognizing that the "misfortune" of bifurcated proceedings results "because the relevant federal law [FAA] *requires* piecemeal resolution when necessary to give effect to an arbitration agreement"))).

**B. Sater's Rights Will Not Be Finally Determined by the Arbitration.**

In *American Shipping Line*, the court declined to issue a stay under its inherent powers because it was not clear that the moving parties, who were non-parties to the arbitration, would be bound by the arbitration award. 885 F. Supp. at 502. In so ruling, the court noted uncertainty as to whether the arbitration would have any preclusive effect on the litigation of non-arbitrable claims. *Id.* The court concluded that "[i]t ma[de] no sense to stay proceedings pending the end of

the arbitration when any outcomes of the arbitration with which the moving defendants disagree will have to be relitigated in the federal courts anyway." *Id.*

As in *American Shipping Line*, since Sater is not a party to the arbitration and the validity and scope of the release are not properly before the arbitrators, it is not clear that anyone will be bound by a finding by the arbitrators about the scope of the release as to Sater. Moreover, judicial efficiency is not served by a stay, since key aspects of the factual dispute between the Kazakh Entities and Litco will be resolved by this Court in any event, and long before the arbitral panel reaches any such question. Indeed, Judge Parker has already held an evidentiary hearing in the Related Case at which she took evidence on the issues related to Litco's concealment of Sater's ownership. [*See* Decl., Ex. 11; *see also* Case No. 15 Civ. 5345, ECF No. 1103.] In resolving the sanctions motions before her in that case, Judge Parker almost certainly will make factual findings about Litco's concealment of Sater's role and what, if anything, the Kazakh Entities knew about Litco's ownership prior to his revelation in September 2018 that he was its sole owner. Any such decision is likely to be further objected to and resolved by Your Honor, rendering any judicial efficiency from a stay non-existent.

**C. The Arbitration Will Not Be Resolved Within a Reasonable Time in Relation to This Litigation.**

The prejudice to the Kazakh Entities from a stay is particularly acute given its likely duration. The arbitrators have informed the parties that they cannot begin hearing evidence until May 2020 at the very earliest. After evidentiary hearings, there will almost surely be post-hearing briefing and closing arguments. Once submitted to the arbitrators, the CAA's arbitration provision calls for a written award setting forth findings of fact and conclusions of law, which may require months to prepare. [Decl., Ex. 2 at § 14.] Per the procedural order, the arbitrators may further decide to bifurcate hearings on liability and damages, given that bifurcation would

21

be the most efficient and cost-effective approach to the issues presented in the arbitration. [Decl.,

Ex. 8 at § 4.] If this case does not advance until after a final award is issued by the arbitrators, the

Kazakh Entities will be prejudiced by the substantial delay. Courts have held that shorter delays

render a stay unreasonable. *See Donjon Marine Co., Inc. v. Water Quality Ins. Syndicate*, 523 F.

App'x 738, 740 (2d Cir. 2013) (lack of arbitral decision nearly one year after motion rendered

time period unreasonable).[12]

## III.      THERE IS NO BASIS TO STAY CLAIMS AGAINST OTHER DEFENDANTS.

Even if this Court were to stay the claims against Sater, which it should not, the claims

against the other defendants should proceed. The other defendants, like Sater, are not parties to

the CAA or the arbitration. The claims against the remaining defendants have nothing to do with

the CAA, and none of the other defendants claim to be within the scope of the CAA's release or

otherwise to be able to rely on the CAA as a defense. The Kazakh Entities' claims against these

defendants, like the claims against Sater, are not subject to arbitration. *See also Hard Rock Cafe

Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 564 (S.D.N.Y. 2011).

Although it may in certain cases be appropriate to stay proceedings as to all parties, even

where some of them have nothing to do with any issue subject to arbitration, this is not such a

---

[12]      Sater accuses the Kazakh Entities of waiting two years to file this action, and of doing so
only to pressure Litco to drop the arbitration. [*See, e.g.*, Br. 5-6, 13.] This accusation is baseless.
As the Kazakh Entities have previously explained, [*see* Case No. 15 Civ. 5345, ECF No. 993],
although "Sater went from being witness to target" in 2017 after they learned that Sater had
pocketed more than $20 million in stolen funds, that fact was learned through confidential
discovery in the Related Case that, per the terms of the protective order in that case, could not be
used in other matters, [*see* Case No. 15 Civ. 5345, ECF No. 253]. The Kazakh Entities therefore
had to build a case against Sater and the other defendants based on their own investigation,
which took time. The allegation that this case was brought to pressure Litco to drop the
arbitration is totally baseless, and the Kazakh Entities have never asked Litco to withdraw its
arbitration. To the contrary, it was the Kazakh Entities who sent a breach letter to Litco and
likely would have initiated their own arbitration, [*see* Decl., Ex. 4], but Litco did so
preemptively.

case. *Lipford v. N.Y. Life Insurance Co.*, 2003 WL 21313193 (S.D.N.Y. June 9, 2003), the

primary case cited by Sater, is inapposite. [Br. 14.] That case concerned claims for

indemnification and contribution where the proportionate liability of multiple defendants was

directly at issue. In this case, however, each defendant is jointly and severally liable on the

claims against it. Furthermore, as five of the seven defendants in this action are represented by

the same counsel (and with one of the other two defaulting), they are unlikely to bring any cross-

claims against one another, which might otherwise complicate questions of liability between

them.

## <u>CONCLUSION</u>

Because the Kazakh Entities never consented to arbitration with Sater, and because Sater

has no right to arbitration of his personal defenses, this Court should deny in its entirety Sater's

motion to stay this action pending arbitration.

Dated:  New York, New York
        September 11, 2019

                                        Respectfully,

                                         /s/ Matthew L. Schwartz
                                        Matthew L. Schwartz
                                        Alexandra C. Jumper

                                        BOIES SCHILLER FLEXNER LLP
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Telephone:  (212) 446-2300
                                        Facsimile:  (212) 446-2350
                                        E-mail:  mlschwartz@bsfllp.com