# EXHIBIT A TO LEVI REPLY DECLARATION

J88HALMH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CITY OF ALMATY, KAZAKHSTAN,
    *et al.*,
4
                 Plaintiffs,
5
                      v.                    15 Civ. 5345 (AJN)(KHP)
6
    MUKHTAR ABLYAZOV, *et al.*,
7
                 Defendants.
8                                           Hearing
    ------------------------------x
9                                           New York, N.Y.
                                            August 8, 2019
10                                          10:08 a.m.

11  Before:

12                    HON. KATHARINE H. PARKER,

13                                          U.S. Magistrate Judge

14

15                            APPEARANCES

16  BOIES SCHILLER FLEXNER LLP
         Attorneys for Plaintiffs
17  BY:  PETER M. SKINNER
         MATTHEW L. SCHWARTZ
18       CRAIG A. WENNER
         ALEXANDRA JUMPER
19
    SOLOMON & CRAMER LLP
20       Attorneys for Khrapunov defendants
    BY:  ANDREW T. SOLOMON
21
    BLANK ROME LLP
22       Attorneys for Defendant Triadou
    BY:  ALEX HASSID
23       DEBORAH A. SKAKEL
         ROBYN MICHAELSON
24  ALSO PRESENT:  SERGEY SHESTAKOV, Interpreter (Russian)

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

J88HALMH                    Wolf - Direct

1   A.   Yes.

2   Q.   Do you remember speaking with Milt Miller?

3   A.   I don't believe I spoke to him, but I don't recall.

4   Schindler, I remember.  His name I recall.

5   Q.   Do you remember what Mr. Schindler's role was in connection

6   with the California litigation?

7   A.   I believe he was lead counsel.

8   Q.   Do you remember specifically talking about the ethical

9   implications or potential issues with respect to the

10  confidential assistance agreement with Mr. Schindler?

11  A.   I remember it being discussed heavily.  We had ethics

12  counsel from both firms.  We ultimately identified Felix Sater

13  to them as the sole member of Litco so it could be really

14  considered because the terms of the confidential assistance

15  agreement indicated that, first of all, there was the

16  concern -- and the most important concern was to keep Felix

17  Sater out of it, and he certainly wasn't going to be proffered

18  or, you know, produced as a witness by Litco in any way, shape,

19  or form.  It was quite clear.  The agreement was already in

20  draft form and had, you know, similar provisions to the

21  ultimate agreement, and that's what we were trying to get

22  around because, you know, Sater was not going to be offered as

23  a witness but Litco was.  But he was the sole member of Litco

24  which was identified.  In fact, he signed the agreement with

25  Latham & Watkins, a nondisclosure agreement, as the sole member

J88HALMH                    Wolf - Direct

1    of Litco, and it was -- you know, it was discussed --

2    Q.   OK.   So just to be clear --

3    A.   -- at length.

4    Q.   Just to be clear, you or someone from your firm disclosed

5    to Latham & Watkins that Mr. Sater owned Litco, correct?

6    A.   I believe it was the sole member of Litco.   In fact, he

7    signed on behalf of Litco a nondisclosure agreement with Latham

8    & Watkins.

9    Q.   And Latham & Watkins was aware of the confidential

10   assistance agreement, correct?

11   A.   There wasn't one signed at that point yet, but it was being

12   negotiated, and drafts were going back and forth of the

13   confidential -- of a confidential assistance agreement.

14   Q.   OK.   Thank you.

15            THE COURT:   Just to clarify, was it in or about 2015

16   that you informed someone at Latham & Watkins that Mr. Sater

17   was a principal of Litco?

18            THE WITNESS:   Yes, yes.

19            THE COURT:   And it was prior to the confidential

20   assistance agreement being finalized?

21            THE WITNESS:   Correct, yes.

22   BY MR. SOLOMON:

23   Q.   Mr. Wolf, if you'd look at Exhibit 24 for a moment.   Again,

24   I'm specifically speaking asking you to focus on BTA0396508.

25            You see your time entry on June 2, 2015?

J88HALMH                 Wolf - Direct

1  not something that I really had in my mind.  I mean, he was

2  Litco.

3          THE COURT:  But you were billing Felix Sater under a

4  Litco matter.

5          THE WITNESS:  Your Honor, he was Litco.  There was no

6  question about it.  I think it was a more specific question

7  about the nature of his -- you know, I just -- that was my --

8  at the moment he asked me, I think that was my recollection.

9  But, I mean, there's no issue.  I think it was really more of a

10 corporate type of what was the -- you know, how his ownership

11 interest was described, whatever.  It was -- seemed a little

12 more detailed as I recall it now, and that's one thing I wanted

13 to look into.

14         And if you're asking me did I know that he was Litco?

15 Of course he was Litco.  There is no other person, you know,

16 who's Litco.  Litco is an entity which is, you know, Felix

17 Sater's entity.

18         THE COURT:  Did you convey to Boies Schiller prior to

19 the day before Mr. Sater's deposition that Sater owned Litco?

20         THE WITNESS:  Yes.

21         THE COURT:  When did you convey that?

22         THE WITNESS:  I believe it was right before the

23 deposition.  Day before, or whatever.  I think, yes, before.

24         THE COURT:  Is that the first time you conveyed to

25 Boies Schiller, to anyone at Boies Schiller, that Sater was

J88HALMH                    Wolf - Direct

1    owner and involved in Litco?

2           THE WITNESS:   It was the first time I was ever asked,

3    and I think that's the first time I ever provided that

4    information.  It was never asked before.

5           THE COURT:  And yet at that time you also were aware

6    of the nondisclosure agreement that Litco was a party to, were

7    you not?

8           THE WITNESS:   The nondisclosure agreement with?

9           THE COURT:   That Litco had with Arcanum.

10          THE WITNESS:  Yes, of course I was, but --

11          THE COURT:  But you nevertheless disclosed that, the

12   identity of Litco's owner, to Boies Schiller?

13          THE WITNESS:   Well, we were working together.  We had

14   the common interest agreement and Arcanum was involved as well,

15   and it was discussed to share information and prepare them, of

16   course.

17          THE COURT:  OK.  Go ahead.

18          MR. SOLOMON:  I'm almost done, your Honor.

19   BY MR. SOLOMON:

20   Q.  Were you present or party to or witness to any

21   communications that you believe would have notified Arcanum

22   that Mr. Sater was the owner and the beneficiary of Litco?

23   A.  Yes.

24   Q.  Can you describe some of those communications generally or

25   specifically.

J88HALMH

1  A.   Oh, while we are going back and forth with Latham, and I

2  believe right up until June 2, since there had not been a

3  resolution and the issue was still being considered by counsel,

4  whether it be Milt Miller or otherwise, I got a call from, it's

5  my recollection, Peder Garske who was impatient with the

6  process.  And he said to me:  You know, we don't need to wait

7  for Latham & Watkins to resolve this.  You know, we can do it

8  directly with, you know, Arcanum, and I'll come to your office

9  and meet with you.

10           MR. SOLOMON:  Your Honor, I have no further questions.

11           THE COURT:  All right.  Any other questions of

12  Mr. Wolf?

13           MR. SKINNER:  Oh, yes, we have some questions, your

14  Honor.  One moment, your Honor.

15           THE COURT:  I want to ask one more question.

16           On Exhibit 26, DX-26, it's document BTA4396520, and

17  the top of the document is an email from Felix Sater to Peder

18  Garske.  It's dated September 9, 2015.  Do you see that?

19           THE WITNESS:  Yes.

20           THE COURT:  The text of the email states:  "We

21  discussed this in person in front of Robert, and you agreed

22  that we could keep Moses & Singer actively involved in helping

23  manage all of the efforts and parts."

24           Do you see that?

25           THE WITNESS:  Yes, of course.

J88HALMH

1        THE COURT:  Is my assumption correct that as of
2   September 9, 2015, Peder Garske, who was representing Arcanum,
3   was aware that Felix Sater was involved or an owner of Litco?
4        THE WITNESS:  Yes.  It was discussed with me before
5   this.  I mean, that's how Mr. Garske came to my office.  And,
6   you know, it had been discussed what was the process -- or he
7   knew the process of what was holding things up at Latham.  I
8   think there was some assistance in Cyprus that was mentioned,
9   and it was a fluid situation.  And, really, the focus was
10  getting the asset recovery efforts going, and he called and
11  came to my office, suggesting that the agreement didn't have to
12  be done with Almaty.  I think because the prior drafts said
13  Almaty as the counterparty in the confidential assistance
14  agreement, and this agreement that exists now put Arcanum in
15  its place, you know, and then added the others.  But it was --
16  the prior versions had Almaty as, I think, the --
17        THE COURT:  OK.
18        THE WITNESS:  -- contracting party.
19        THE COURT:  If we turn to Exhibit 9 in the plaintiffs'
20  exhibit book, which is the confidentiality and nondisclosure
21  agreement --
22        THE WITNESS:  Yes.
23        THE COURT:  -- this is a document that is dated
24  June 12, 2015, BTA0252994.
25        THE WITNESS:  Yes.

J88HALMH

1        THE COURT:  Did you have a role in negotiating this

2   agreement on behalf of Litco?

3        THE WITNESS:  Yes.  And I could share with your Honor

4   that it's actually very much a continuation of and in many

5   respects identical to the prior drafts that went back and forth

6   with Latham & Watkins.

7        THE COURT:  Was there a decision made by you on behalf

8   of -- was there a conscious decision made to have Mr. Kam,

9   Kalsom Kam, sign the document on behalf of Litco rather than

10  have Felix Sater sign the document on behalf of Litco?

11       THE WITNESS:  Yes, because in this agreement, this is

12  the nondisclosure agreement -- oh, on this particular

13  agreement?

14       THE COURT:  Yes.

15       THE WITNESS:  I'm sorry.  I was thinking --

16       THE COURT:  Was there a conscious decision?

17       THE WITNESS:  I apologize, your Honor.  I think my

18  answer stands as to this was similar to the nondisclosure

19  agreement in many terms with Latham & Watkins.  I was thinking

20  of the assistance agreement.

21       But was there a conscious decision to have Kalsom Kam

22  sign this?  That I don't recall, no.  The assistance agreement,

23  yes, because that was going to be signed by Almaty and BTA and

24  others.

25       THE COURT:  So there was a conscious agreement to have

J88HALMH

1   that signed by Kalsom Kam, not Sater?

2           THE WITNESS:  Not have Sater's name on it, because

3   Sater's name was to be kept confidential among those parties,

4   and since they were signing the confidential assistance

5   agreement as well, his name couldn't be the signatory as it was

6   previously with the NDA agreement with Latham & Watkins.

7           Do you understand?

8           THE COURT:  Yes.  And at the time --

9           THE WITNESS:  For that, there was a particular purpose

10  to make sure that Felix Sater was not the signatory on an

11  agreement that was also signed by and obviously could be seen

12  by BTA -- the actual Kazakh parties, BTA and Almaty.

13          THE COURT:  And you learned in or about June of 2015

14  that Almaty was retaining Boies Schiller Flexner to represent

15  it in contention with this action, did you not?

16          THE WITNESS:  Yes.  I don't know who the actual client

17  was.  But, yes, I knew that Boies Schiller was getting -- yeah,

18  and I learned that, you know, from Arcanum when -- from Peder

19  Garske.

20          THE COURT:  And did you understand that the Exhibit 9

21  precluded Litco from disclosing Sater's relationship to Litco

22  to Boies Schiller Flexner?

23          MR. HASSID:  Your Honor, if I may, without objecting

24  to your question, I think it may be reversed in terms of what

25  the NDA precluded or didn't preclude.

J88HALMH

1        THE COURT:  OK.  What was your understanding of what,

2    if anything, Litco or Arcanum could disclose about Sater's

3    interest in Litco to Boies Schiller?

4        THE WITNESS:  You know, whatever the agreement says,

5    your Honor.  I could just tell you that the point of these

6    agreements, or this agreement in particular, the main point

7    really focused on keeping Felix Sater as far away as possible

8    in name and otherwise because he wasn't going to be offered as

9    a witness by Litco, you know, under the terms of the agreement,

10   you know, which were critical in the back and forth on the

11   ethical issues.  So this was another way to make sure that his

12   name didn't get thrown into the mix by others even though, you

13   know, there wasn't -- I think when this was signed, I don't

14   think there was anything pending, but that was one of the

15   reasons.

16       I think another reason was -- I believe there was some

17   sense, I think it was shared by Arcanum or Peder as well, that

18   the targets of the assistance, Ablyazov and Khrapunov, had

19   contacts within the government as well, and that was another

20   issue, I think, that came up as to both safety and keeping, you

21   know, Felix Sater's name confidential and away from all that as

22   well.

23       THE COURT:  OK.  Go ahead.  You can ask some

24   questions.

25       MR. SKINNER:  Thank you, your Honor.

J88HALMH                    Wolf - Cross

1  information, all the information they could, sharing

2  information.  And I believe both firms -- you know, that was

3  also part of the process.  I wasn't really involved in that.

4  Each firm had their respective counsel.  I don't think

5  Schindler was involved either.  He would have his counsel and

6  then we would put them in touch with each other, and this is --

7  I'm summarizing what went on, I think, for maybe even two

8  months or less, you know, better part of two months.  But --

9  and I think I negotiated with Schindler on, you know, the terms

10  of the confidential assistance agreement.

11  Q.  So you were passing this agreement back and forth, correct?

12  A.  There was a draft that went back and forth, I recall, yes,

13  several.

14  Q.  And was this largely the same as -- in the same form as the

15  confidential assistance agreement that was ultimately executed

16  in June?

17  A.  I believe very similar.  But they're in existence, so they

18  can be compared.

19  Q.  Was Litco going to be a party to the confidential

20  assistance agreement, the one that you were exchanging back and

21  forth with Latham?

22  A.  I believe so, yes.  I believe Litco's on there.

23  Q.  You testified earlier that you told Latham that Mr. Sater

24  owned Litco, is that right?

25  A.  At a point in time when that -- there was a nondisclosure

J88HALMH            Wolf - Cross

1    agreement signed with Latham & Watkins, OK, which was the
2    vehicle to disclose Felix Sater's ownership in Litco and then
3    he signed -- he actually signed on behalf of Litco that
4    nondisclosure agreement with Latham & Watkins.  As well as I
5    know there's an email communication where his name was
6    mentioned thereafter, after that was signed, as the owner of
7    Litco or the --
8    Q.  So that --
9    A.  -- sole member or something like that.
10   Q.  So that nondisclosure agreement was an agreement between
11   whom?
12   A.  Litco and Latham & Watkins.
13   Q.  Was Arcanum a party to that agreement?
14   A.  No, not that I recall.
15   Q.  Who was Latham & Watkins permitted to disclose the fact
16   that Mr. Sater owned Litco under that nondisclosure?
17   A.  I don't recall, but the agreement spells it out very
18   carefully.
19   Q.  Could they tell anyone, or was that the purpose of the very
20   agreement, to keep it secret?
21   A.  The agreement says what it says.  I can't -- I'm not going
22   to --
23   Q.  We don't have the agreement in front of us, Mr. Wolf, so
24   can you just tell us your best recollection of who Latham was
25   permitted to disclose the fact that Mr. Sater owned Litco?

J88HALMH                    Wolf - Cross

1    A.   The agreement says what it says.   I don't -- I can't -- you

2    know, I can't tell you, but the agreement could be, you know,

3    gotten.   I would assume you would have the agreement.   Latham &

4    Watkins --

5    Q.   I don't know why you would assume that, but that's neither

6    here nor there, Mr. Wolf.

7    A.   OK.

8    Q.   Was Latham a party to this agreement as counsel to Arcanum

9    or -- I'm sorry, as counsel to Almaty, the party it was already

10   representing in the California litigation, or was it a party to

11   the agreement as Latham, the law firm?

12   A.   You know, the agreement says what it says.   It was a

13   nondisclosure agreement to keep Felix Sater's name out from

14   being disclosed as an owner of Litco while they considered the,

15   you know, ethical issues.   It was to give his name -- put his

16   name in the mix so they could consider it.   That I can tell you

17   was the purpose of it.   It was for that very purpose, so that

18   ethics counsel from both could have as much information as

19   possible and they could know exactly who -- his identity was.

20   That was something that they wanted.   And to -- again, to keep

21   the owner of Litco confidential, you know, meaning Felix Sater,

22   that was the purpose of that agreement.   But, you know, my

23   understanding was or my recollection -- the agreement speaks

24   for itself -- was for purposes of dealing with that issue.

25   Q.   OK.   So the purpose of the nondisclosure agreement was to

J88HALMH                    Wolf - Cross

1   permit Latham to assess the ethical implications of entering
2   into a cooperation agreement with a company, Litco, that it
3   knew was owned by Felix Sater who was going to be one of the
4   witnesses that was being provided as part of that cooperation
5   agreement.  Is that a fair summary?
6   A.  No, that's not because --
7   Q.  What did I get wrong there?
8   A.  Felix Sater was not going to be provided as a witness.
9   That's the part you're not getting.
10  Q.  Oh, you told Latham Felix Sater would not be available as a
11  witness?
12  A.  Felix Sater would not be provided as a witness, and the
13  asset recoveries that were being offered, other witnesses would
14  be recruited, and that's how Litco would be providing its
15  assistance.  But it wouldn't be offering Felix Sater as a
16  witness.
17  Q.  And you said that to Latham?
18  A.  Of course.
19  Q.  Well, the ethical issue was whether a witness could be paid
20  for their testimony, correct?  That's what everybody was
21  worried about, right?
22  A.  You know, whatever the, you know, details of it was was
23  being dealt with by ethics counsel.  But for clarity purpose,
24  Felix Sater was not going to be offered by a witness -- offered
25  as a witness at any time by Litco, and the asset recovery and

J88HALMH                    Wolf - Cross

1   the assistance was going to be done around that and to avoid

2   that because Felix Sater and -- Litco was not going to offer

3   Felix Sater as a witness, and he shouldn't be -- and he wasn't

4   going to be offered to testify in any matter.  He was the owner

5   of Litco, and as the owner, he was going to coordinate -- or

6   Litco was going to coordinate asset recovery assistance in

7   various forms, as it ultimately did.  And it produced

8   witnesses, several witnesses, who did testify, who provided

9   information directly to Arcanum, you know, and then ultimately

10  to the general prosecutor's office of Kazakhstan and testified.

11  Every witness, in fact, offered by Litco did that, went through

12  exactly the same process, but not Felix Sater.

13          THE COURT:  Mr. Wolf, did you understand whether or

14  not Almaty was going to call Felix Sater as a witness at the

15  commencement of the relationship between Litco and --

16          THE WITNESS:  Absolutely not.

17          THE COURT:   -- Almaty?

18          THE WITNESS:  No, the whole purpose was to not be

19  called as a witness at all.  Of course not.  He couldn't be

20  offered as a witness.  The terms of the confidential assistance

21  agreement had a provision that said Litco will not offer any

22  witnesses who have ownership interests, and --

23          THE COURT:  I understand that --

24          THE WITNESS:  -- at the time the language was in

25  there, he was identified as the owner.

J88HALMH                    Wolf - Cross

1  Q.  And did you share that information with Mr. Garske that you
2  were sharing with Latham?
3  A.  Did I share the information with Garske?  Yes, they knew at
4  the end that Felix Sater was, you know, the person at Litco and
5  that was what was slowing the process to finalize things with
6  Latham & Watkins.  And they never did get finalized because
7  Peder -- because Peder called me and said, you know, we don't
8  need to wait for Latham & Watkins.  We can do this directly,
9  and he came to my office the next day, I believe it was, and
10  said deal directly with Arcanum.
11  Q.  But the purpose of the nondisclosure agreement was so that
12  Latham couldn't disclose what it knew, right?
13  A.  Correct.
14  Q.  And at the time you gave the nondisclosure agreement to
15  Latham, you didn't share that information with Arcanum, right?
16  A.  No.
17  Q.  So you're saying you did that at some later time?
18  A.  Yes, when we were up and running with Arcanum.  I mean, you
19  know, he knew it was Felix Sater.
20  Q.  All right.  Now we get to, say, the beginning of June.
21  Direct your attention to that period of time.
22  A.  Yes.
23  Q.  The confidential assistance agreement, which is Plaintiffs'
24  Exhibit 9, is executed on June 12, correct?
25  A.  I believe so, yes.  Whatever the dates say at the

J88HALMH                        Wolf - Cross

1    Q.   Do you have any reason to dispute that?

2    A.   No.

3    Q.   Do you see Boies Schiller at any earlier point in June

4    prior to the execution of the confidential assistance

5    agreement?

6    A.   No.   I can say without hesitation I don't recall Boies

7    Schiller being involved at all prior to that point, whether

8    it's in the billing records or not.

9    Q.   All right.   Now, after the confidential assistance

10   agreement was executed, there was another nondisclosure

11   agreement entered into, correct?

12   A.   Correct.

13   Q.   This is the one that we have marked in your plaintiffs'

14   binder as Exhibit 9.   I direct your attention to that.

15   A.   I see it.

16   Q.   This one, if you look at the first page, is dated July 8 of

17   2015, correct?

18   A.   I see that, yes.

19   Q.   So this was entered into a couple of weeks after the

20   confidential assistance agreement was entered into, right?

21   A.   July 8 to -- that's the date it's signed -- to whatever the

22   other date was, three weeks.

23   Q.   So a few weeks after, right, Mr. Wolf?

24   A.   Correct.

25   Q.   This is the agreement between Litco and Arcanum that

J88HALMH                    Wolf - Cross

1   prohibits Arcanum from disclosing to anyone, including their
2   clients, who the owner of Litco was if they were to learn that
3   information, is that fair to say?
4   A.   The agreement says what it says, of course.
5   Q.   Do you agree with that?  Am I getting it right or am I
6   missing something?
7   A.   The agreement speaks for itself, sir.  I'm not going to --
8   getting it right, I don't really understand your question.
9   Q.   Well, you participated in the drafting of this agreement,
10  right?
11  A.   This agreement, I think, is pretty much similar to the one
12  that was done with Latham & Watkins.  And the terms were
13  changed, but I didn't do the drafting.  I had a corporate
14  partner involved in drafting it.
15  Q.   It was pursuant to this agreement that you disclosed, if
16  you actually did.  But it was pursuant to this agreement that
17  disclosures were made to Mr. Garske about the owner of Litco?
18  A.   My recollection is by that point Garske already knew about
19  Sater.
20  Q.   That's your recollection?
21  A.   That's my recollection.
22  Q.   When did you tell him?  Give me a date.
23  A.   As when Garske came to us and said he was impatient with
24  Latham & Watkins and just wanted to go forward without them.
25  Q.   Was that --

J88HALMH                    Wolf - Cross

1   A.   That's my recollection.

2   Q.   Was that before or after the confidential assistance

3   agreement was executed on June 12?

4   A.   I think he came to my office on the 3rd of June, I believe

5   it was, or early in June.  So --

6   Q.   You think it was at that meeting?

7   A.   You know, I don't recall.  This is just my recollection

8   back then, but that's how it got to Arcanum was that Peder

9   contacted me and said, you know, he was tired of waiting for

10  Latham & Watkins to resolve that issue.  Even on emails they

11  were -- I don't really know the extent of their relationship at

12  that point because it was all, you know, fast to us, but he

13  seemed to be quite aware, and he didn't want to wait for

14  Latham & Watkins and the counsel to continue to go back and

15  forth to see if there would be a resolution.  He said I'll come

16  to your office and I'll discuss how we can go forward.  You

17  know, I have an idea to go forward.  We don't need them, as I

18  recall, something like that.

19  Q.   All right.  But you're confident that you had that

20  conversation before you entered into the July 8, 2015,

21  nondisclosure agreement?

22  A.   Which?

23  Q.   The one with Mr. Garske where you told Mr. Garske that

24  Mr. Sater owned Litco.

25  A.   You know, I just recall it being discussed.  Who told who,

J88HALMH               Wolf - Cross

1   you know, I just recall that was the point in time that was the

2   issue with Latham and there were communications and Arcanum was

3   also involved because there was some Cyprus assistance that

4   needed to be provided.

5           THE COURT:  OK.  Mr. Wolf, let me -- I just want to

6   make sure my understanding is correct.  You on behalf of Litco

7   and Peder Garske on behalf of Arcanum were talking with Latham

8   about assistance that Litco might be able to provide.  There

9   were some ethical issues that came up.  This was slowing the

10  process down.  So Arcanum, through Peder Garske, said we can

11  resolve this between Arcanum and Litco.  At that point, Peder

12  Garske knew Sater owned Litco, and you thereafter negotiated

13  and finalized the nondisclosure agreement that's at Exhibit 9.

14  Is that basically the order of things?

15          THE WITNESS:  That's my recollection.

16          THE COURT:  OK.

17  Q.  What was the point of the nondisclosure agreement?

18  A.  I can just tell you from where I sit, you know, it was a

19  process that was going on.  It's easy to sit here today and

20  take today's issue and insert it into events at that time.  I

21  can tell you I think very much, from what I recall, there was

22  one component being dealt with by the ethics issue between the

23  firms and then there was the desire to get asset recovery

24  efforts going, and I think that's what Garske was coming from.

25  And there was a Cyprus -- there were accounts in Cyprus and

J88HALMH                    Wolf - Cross

1    witnesses that were going to be provided.  So it was just a
2    very fluid situation.
3            THE COURT:  Who was concerned with keeping Sater out
4    of the picture?
5            THE WITNESS:  Litco, Sater, of course.
6            THE COURT:  Sater and Litco?
7            THE WITNESS:  Of course.
8            THE COURT:  So Sater was most concerned about keeping
9    himself anonymous, is that correct?
10           THE WITNESS:  That's correct, for the reasons I said,
11   of course.  Of course.
12           THE COURT:  And you were protecting Sater's interests
13   in that regard, is that right?
14           THE WITNESS:  Well, Litco's interest, you know, under
15   the agreement, you know.
16           THE COURT:  I understand.
17           THE WITNESS:  I mean, they were part and parcel, of
18   course, because Sater was the owner of Litco, and Litco
19   couldn't offer an owner as a witness.
20           THE COURT:  So you were attempting to be as careful as
21   possible to ensure that Sater's identity remained as anonymous
22   as possible to anyone involved with Almaty?
23           THE WITNESS:  To help facilitate keeping his name,
24   yes, out of, you know, being even considered as a witness
25   because --

J88HALMH                    Wolf - Cross

1          THE COURT:  Did that include keeping him anonymous to

2     litigators who were litigating on behalf of Almaty in

3     California?

4          THE WITNESS:  You know, that didn't -- that part

5     didn't involve our side.  You know, we weren't -- we didn't

6     deal with litigators.  We only dealt with Arcanum.  We never

7     dealt with, you know, Boies Schiller.  We weren't involved

8     with -- or actively involved with the litigation.

9          THE COURT:  Was one of your client's concerns that his

10    anonymity with respect to his being a director of Litco be kept

11    from -- be maintained so that Latham and Boies Schiller did not

12    realize that he was an owner?  Is that one of his objectives?

13         THE WITNESS:  No, the anonymity was not to keep it

14    from law firms for that reason.  It was really we were being --

15    the purpose was related to the Litco confidential assistance

16    agreement, that Litco wouldn't offer the representation, didn't

17    offer, if I get the agreement out, and that was the same

18    provision, I believe, went back and forth with Latham &

19    Watkins.

20         THE COURT:  Then why in Exhibit 9, paragraph 2, does

21    the document say that Arcanum will not disclose confidential

22    information, i.e., Sater's ownership in Litco, to any person or

23    entity including, without limitation, Kazakhstan, Almaty, BTA,

24    and their respective counsel?

25         THE WITNESS:  I think that was to really facilitate,

J88HALMH                    Wolf - Cross

1    you know, which is to help facilitate keeping Sater out of it.

2              THE COURT:  So then why did you answer my question

3    saying that that wasn't a point, to keep his ownership of Litco

4    secret from plaintiffs' counsel?

5              THE WITNESS:  Maybe I misunderstood, I think, the way

6    you characterized it, and I apologize if I misunderstood.

7              Yes, the whole point was to keep Sater at the furthest

8    distance and to help keeping at the furthest distance --

9              THE COURT:  Including from plaintiffs' counsel,

10   because that's what item one in paragraph --

11             THE WITNESS:  Yes.

12             THE COURT:  Is that right?

13             THE WITNESS:  From sharing it with those parties.

14   Unless it was done -- I'll add one more.  I recall being

15   contacted by Calvin Humphrey after Boies Schiller had disclosed

16   Sater's name, you know, and with tremendous, I think, dismay

17   and surprise, you know, by telling me, you know, as if they had

18   nothing to do with it, but -- because we were never consulted

19   about whether Sater would -- name would be involved in

20   anything.  And all of a sudden, I remember getting a call from

21   Calvin after the fact, you know, I think with tremendous -- you

22   know, he wasn't happy about it and, you know, apparently had

23   not been consulted about it, obviously, because it would have

24   been discussed, I believe, in the nondisclosure.  There's a

25   notice requirement that if information is needed to be shared,

Case 1:19-cv-02645-AJN-KHP  Document 93-1  Filed 09/24/19  Page 25 of 50

J88HALMH            Wolf - Cross

1  it would be disclosed to the other party as I read it, you
2  know, after the fact, but --

3          THE COURT:  So it was a surprise to you when Felix
4  Sater was named as a witness by plaintiffs in this case?

5          THE WITNESS:  Yes, completely.

6          THE COURT:  OK.

7          THE WITNESS:  OK.  In fact, I think a month before
8  that I think there were -- since I had been looking at
9  communications, there was a Financial Times article that came
10 out identifying Sater as providing assistance to Kazakhstan in
11 this matter and speaking about his, in general terms, I think
12 his settlement previously with the Khrapunovs and also
13 indicating -- again, it was a quick read.  I'm talking about
14 what's in the article -- talking about that Sater was
15 getting -- would get rewarded handsomely for his assistance.
16 And I immediately emailed Calvin Humphrey and Anya Golden, who
17 was then at the time lead counsel for Arcanum in house, where
18 could that possibly come from?  How could Sater's name come out
19 there?  Seems like it came from someone on our side.

20         THE COURT:  Litco didn't identify Sater as a witness?

21         THE WITNESS:  To who?

22         THE COURT:  To plaintiffs in this action.

23         THE WITNESS:  No, we never had direct dealings with
24 Boies Schiller about Felix Sater, no.

25         THE COURT:  How was it that Felix Sater was in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J88HALMH                    Wolf - Cross

1     meetings with Boies Schiller in connection with this matter?

2                THE WITNESS:  On behalf of Litco at all times.

3                THE COURT:  How did they get Sater's name?

4                THE WITNESS:  How did they get his name?

5                THE COURT:  Yes.

6                THE WITNESS:  I can't answer that question.  We didn't

7     give it to him.  He participated in meetings coordinating

8     assistance.  He participated in help of the meeting with

9     Chetrit for evaluations, but on behalf of Litco through

10    Arcanum, every step of the way.  There was never anything

11    directly with Boies Schiller that wasn't coordinated by

12    Arcanum.  So he was there providing -- he was coordinator for

13    Litco, and that's what his participation was.  And other

14    witnesses would be produced, and Boies Schiller would meet with

15    those witnesses.  Witnesses would be asked to sign affidavits,

16    you know, for Arcanum and Boies Schiller, the witnesses did,

17    and Sater on behalf of Litco facilitated and coordinated that.

18    He was coordinating the asset recovery assistance not as a

19    witness.

20                THE COURT:  Go ahead.

21    BY MR. SKINNER:

22    Q.   Why didn't the confidential assistance agreement just say,

23    "Felix Sater cannot be called as a witness because he owns

24    Litco"?  Why isn't that in there?

25    A.   I didn't draft those terms.  I mean, that was -- what was

J88HALMH                    Sater - Direct

1   A.   Initially, it was Peder Garske, and after Peder Garske

2   passed away, it was Calvin Humphrey, but there was also quite a

3   number of interactions with Ron Wahid, the owner of Arcanum.

4   Q.   Who were Litco's main points of contact for Arcanum?

5   A.   I'm sorry?

6   Q.   In other words, if Arcanum wanted to contact Litco, who

7   would they be talking to?

8   A.   Robert Wolf.

9   Q.   Only Robert Wolf?

10  A.   Or myself.

11  Q.   But only you and Robert Wolf?

12  A.   They never communicated with -- regarding Litco, there was

13  no communication with anyone other than myself or Robert Wolf.

14  Q.   You previously testified in your deposition in February

15  that your identity as Litco's owner and member was disclosed to

16  Arcanum on numerous occasions beginning from the first time you

17  met with Arcanum.  Do you recall that testimony?

18  A.   Yes, I do.

19  Q.   You stand by that testimony?

20  A.   Yes, I do.

21  Q.   Can you turn to DX-5 in the big binder in front of you.

22  It's the numbered 5 tab.

23          MR. WOLF:  Can we have one more copy of that, one more

24  binder, extra binder?  We have the small one, but not the --

25  A.   I'm sorry.

J88HALMH                          Sater - Direct

1    Q.   The big binder.

2    A.   They're numbered.

3    Q.   Sir, just tab 5.

4    A.   Oh, tab 5.

5    Q.   Yeah.

6    A.   OK.

7    Q.   This is a chart of meetings that I showed you at your last

8    deposition that you had with either Arcanum or Boies Schiller.

9    Do you remember when we discussed this document?

10   A.   I don't remember our discussion.

11   Q.   OK.  If you look down at the document, the first meeting is

12   July 15, 2015, in London.  Do you see that?

13   A.   Yes, I do.

14   Q.   And it shows that you, Mr. Wolf, and Peder Garske attended?

15   A.   Yes.

16   Q.   Is it your testimony that as of the date of this meeting,

17   your identity as Litco's owner had been disclosed to Arcanum?

18   A.   Yes.

19   Q.   So you also testified -- actually, so let me back up.

20           Did you ever discuss your ownership of Litco with

21   Calvin Humphrey?

22   A.   I'm sorry.  I don't remember if it was specifically

23   discussed, but I -- yes, I believe -- I believe it was known,

24   yes.

25   Q.   OK.

J88HALMH                    Sater - Direct

1    A.    I'm not sure I understand if I had specifically discussed.

2    Q.    OK.   Can you turn to -- well, you testified previously in

3    February that Arcanum knew you were Litco's owner because you

4    were the one who was speaking with Peder Garske about a host of

5    different subjects, and there was no one else he was speaking

6    about.   Do you recall that testimony?

7    A.    The answer is I believe I remember it.   Again, nobody ever

8    discussed anything with anyone about Litco if it wasn't with

9    me, not just Peder Garske.

10   Q.    Can you turn to tab 33 in your book.

11   A.    Yes.

12   Q.    This is an email dated August 7, 2015.   Is that your email

13   address at the top, felix@regency.net?

14   A.    Yes.

15   Q.    This is to Robert Wolf with a copy to Peder Garske.   Do you

16   see that?

17   A.    Yes.

18   Q.    Do you recall sending this email?

19   A.    No, I do not.

20   Q.    Any reason to doubt you sent it?

21   A.    No.

22   Q.    If you look -- if you could just briefly look through the

23   top portion, your top email dated August 7, is it fair to state

24   that you were talking with Mr. Wolf and Mr. Garske about

25   strategy for recovering assets from Joe Chetrit?

J88HALMH                        Sater - Direct

1    reimbursed for travel expenses and legal fees, is that

2    accurate?

3    A.   Part of, yes.

4    Q.   So fair to say that your testimony is you spoke with

5    Mr. Garske about those things as Litco?

6    A.   It -- all my interaction with Peder Garske, all my

7    interactions with everyone at Arcanum, all of my interactions

8    with Boies Schiller was as Litco.

9    Q.   Looking at what is DX-26, this is an email chain between

10   you and Mr. Garske dated September 8 and 9 of 2015, with the

11   subject LITCO, in all caps, Invoices.  Do you see that?

12   A.   Yes.

13   Q.   You remember the chain?

14   A.   One second.

15   Q.   Of course.

16   A.   Yes.

17   Q.   First email from you, which is actually forwarding

18   something that you got from Mr. Wolf, says:  "These are the

19   Moses & Singer invoices.  Please include with the September

20   payment."

21        That was the September payment to Litco?

22   A.   Yes.

23   Q.   And Mr. Garske responds on the 8th:  "This isn't provided

24   for in the agreement.  However, I'm in favor of paying at least

25   a substantial portion, but you will have to give mean" -- I

J88HALMH                           Sater - Direct

1    his hand"?

2    A.   Yes.

3    Q.   Can you flip the page, please.  You say:  I have hired a

4    forensic accounting firm and I have hired -- I have two

5    industry professionals on standby waiting to be retained.  All

6    of the necessary work, legal demand letters, forensics, and

7    investigations can be performed by this group on a daily basis.

8    A.   Yes.

9    Q.   Is that Litco?

10   A.   That --

11   Q.   Was Litco going to be the head of that group?

12   A.   Litco would have coordinated all of the activities between

13   all of the various professionals mentioned, yes.

14   Q.   And you hired them?

15   A.   Yes, hired or intended to hire and had on standby to be

16   hired.

17   Q.   Can you go to the last paragraph, please.

18   A.   Yes.  In summary?

19   Q.   Yes.

20   A.   OK.

21   Q.   "In summary, I am prepared to put everything else aside and

22   work on our project for the next eight weeks to help achieve

23   the monetization results that Kazakhstan, Arcanum, and Litco so

24   badly want and deserve by year's end.  I'm also prepared to

25   fund my team out of my own pocket, assuming we are given the

J88HALMH                    Sater - Cross

1    authorization by you to act.  I hope this yet again shows that

2    Litco has been a great partner and will help bring this deal

3    home by year's end."

4            Fair to say you were basically confirming your

5    ownership of Litco right there?

6            MR. SCHWARTZ:  Objection.

7    A.   No.

8    Q.   Withdrawn.

9    A.   No, I didn't need to confirm my ownership of Litco.  It was

10   obvious I was Litco prior to this email.

11           MR. HASSID:  Your Honor, I'm going to reserve the

12   remaining of my time for redirect.

13           THE COURT:  Very good.

14   CROSS-EXAMINATION

15   BY MR. SCHWARTZ:

16   Q.   Good afternoon, Mr. Sater.

17   A.   How are you?

18   Q.   Good.  So my time is limited today.  I'm going to try to

19   ask all of my questions in a way that calls for a yes-or-no

20   answer.  If for some reason you can't answer a question yes or

21   no, just say, "I can't answer that yes or no," and then I'll

22   decide what to do next.  OK?

23   A.   Sure.

24   Q.   Now, when we talked about the confidential assistance

25   agreement, that is the agreement between Litco and my clients

J88HALMH                    Sater - Cross

1   A.  Yes, I do.

2   Q.  And you, more than most, understand what it means to commit

3   a felony, true?

4           MR. WOLF:   Objection.

5   A.  I think you more than most understand it's a felony to lie.

6           THE COURT:   If you're going to cross-examine him with

7   some deposition testimony, show him the deposition testimony.

8           MR. SCHWARTZ:  Can we play clip 14.

9           (Video played)

10  BY MR. SCHWARTZ:

11  Q.  That was you, correct?

12  A.  That was my testimony, yes.  That was me.

13  Q.  Now let's talk about Arcanum.  It's your testimony today

14  that you disclosed to Arcanum that you owned Litco.  Is that

15  your position?

16  A.  Yes.

17  Q.  Now, the Litco agreement that's in front of you, that was

18  negotiated on Litco's behalf by Litco's lawyer Robert Wolf,

19  true?

20  A.  Yes.

21  Q.  And the other agreements that Litco entered into,

22  nondisclosure agreements, common interest agreements, whatever

23  it is, that was all handled by Robert Wolf, true?

24          MR. HASSID:   Just going to object to the extent that

25  the question mischaracterizes the record on the common interest

J88HALMH                     Sater - Cross

1   agreement, but on the NDA, it's fine.

2              MR. WOLF:  Your Honor, just going to --

3              THE COURT:  Rephrase the question.

4   Q.  The other agreements that Litco entered into, whether a

5   common interest agreement or a nondisclosure agreement, they

6   were negotiated on behalf of Litco by its attorney Robert Wolf,

7   true?

8              MR. WOLF:  Your Honor --

9              MR. HASSID:  Same objection, your Honor.  It is not

10  established that the common --

11             MR. SCHWARTZ:  I'm asking a question.

12             MR. HASSID:  Right, but you're characterizing the

13  record and asking to character -- I'm saying lack of

14  foundation.

15             MR. WOLF:  Your Honor, can I just assert one more

16  thing?

17             THE COURT:  OK.  I understand the objection.  Litco is

18  not identified as a party in the confidentiality and common

19  interest agreement, which is tab 8 of plaintiffs' binder.  So

20  your question is whether Mr. Wolf negotiated agreements on

21  behalf of Litco?

22  BY MR. SCHWARTZ:

23  Q.  My question is, wasn't Mr. Wolf the person who negotiated

24  agreements on behalf of Litco?

25             MR. WOLF:  Your Honor, just if I could --

```
      J88HALMH                    Sater - Cross
```

 1          THE COURT:  OK.  I'm going to let the witness answer.

 2          MR. WOLF:  Just the basis of his information is --

 3  what was shared by counsel, that would be privileged.  If he

 4  has a separate basis to be --

 5          THE COURT:  No, it's not privileged that you

 6  represented Litco in negotiating agreements.

 7          MR. WOLF:  No.

 8          THE COURT:  I think that's the question, is that

 9  correct?

10          MR. WOLF:  Generally, OK.

11          THE COURT:  Is that correct, Mr. Sater?

12          THE WITNESS:  I'm sorry.  I don't understand.

13          THE COURT:  Did your lawyer, Mr. Wolf, and did Litco's

14  lawyer, Mr. Wolf, negotiate agreements on behalf of Litco as a

15  general matter?

16          THE WITNESS:  Yes.

17          MR. WOLF:  That's fine.

18  BY MR. SCHWARTZ:

19  Q.  And the payments to Litco went, depending upon whether they

20  were fee payments or reimbursements, they went either to

21  Mr. Wolf's firm or to Ms. Levi's firm, is that true?

22  A.  There may have been -- most of the time they either went to

23  Ms. Levi's firm or Mr. Wolf's firm.  There may have been a time

24  where there may have been a payment direct.  I don't remember.

25  I'd have to check the invoices.

J88HALMH                    Sater - Cross

1   Q.  You can't identify any payment that went directly to Litco?

2   A.  To Litco?

3   Q.  I'd have to check the invoices.

4   A.  I don't remember.

5   Q.  Does Litco have a bank account?

6   A.  Not anymore.

7   Q.  At what point did it have a bank account?

8   A.  It may not have had a bank account.  I don't remember.

9   You're asking me.  The answer is yes, most payments went to

10  Ms. Levi's firm and Mr. Wolf's firm.  I don't understand the

11  rest of the question.

12  Q.  To your knowledge, all payments went to one of the two law

13  firms, true?

14  A.  I believe so, yes.

15  Q.  OK.  So you recall you testified to Mr. Hassid's question

16  that all conversations with Litco were either with Mr. Wolf or

17  yourself, true?

18  A.  I'm sorry, that all conversations with Litco?

19  Q.  Between Arcanum and Litco were either with Mr. Wolf or

20  yourself, correct?

21  A.  Yes, I believe so.

22  Q.  Am I right that the conversations that you had with Arcanum

23  were about asset recovery?

24  A.  Yes.

25  Q.  They were about strategy?

J88HALMH                          Sater - Cross

1   A.   Yes.

2   Q.   Negotiating strategy?

3   A.   Yes.

4   Q.   Litigation strategy?

5   A.   Yes.

6   Q.   They were about the underlying facts of the case?

7   A.   Yes.

8   Q.   Your involvement and personal knowledge in some of these

9   deals?

10  A.   Yes.

11  Q.   They were about reimbursement of expenses?

12  A.   Yes.

13  Q.   But the contracts were negotiated by Mr. Wolf?

14  A.   Again, of course they were negotiated by Mr. Wolf, but I

15  had an involvement in all parts of everything that was going on

16  here.

17  Q.   Through Mr. Wolf?  I don't want to --

18  A.   Either through Mr. Wolf or directly with Mr. Garske.

19  Q.   But you did not negotiate the agreement with Mr. Garske,

20  right, the agreement that's in front of you, the Litco

21  agreement?

22  A.   The text of the agreement, I did not negotiate, no.

23  Q.   Isn't it true that you didn't interact directly with anyone

24  at Arcanum until July or August of 2015?

25  A.   I don't remember the exact dates that I started interacting

J88HALMH                    Sater - Cross

1    with them.  I'm sorry.

2    Q.  Isn't it true that you didn't interact directly with anyone

3    at Arcanum until after that agreement was signed?

4    A.  I don't remember if I interacted with them before or right

5    after.  I'm sorry.  I don't remember the dates.  I don't

6    have -- I don't have the dates of our meetings.

7    Q.  Well, you suggested a moment ago that you may have

8    negotiated the substance, if not the text of those

9    agreements -- that agreement, excuse me, with Mr. Garske.  But

10   isn't it true that you had no contact with him until after that

11   agreement was signed?

12   A.  I don't know that to be the truth or not the truth.  I

13   don't remember the dates of my first meetings with him.

14   Q.  Isn't it true that you never mentioned the word "Litco"

15   when you talked to Arcanum?

16   A.  Not true.

17   Q.  Are you absolutely certain that you disclosed your

18   ownership of Litco to Arcanum?

19   A.  Peder Garske asked me -- I'm answering you -- Peder Garske

20   asked me, are you sure there's no one else involved in Litco?

21   And I told him, absolutely not.  I'm the sole owner.

22   Q.  Your testimony is that you told Peder Garske the words "I

23   am the sole owner of Litco"?

24   A.  I believe so, yes.

25   Q.  Now, previously you testified that you only believed that

J88HALMH                          Humphrey - Direct

1    paragraph 10.

2    A.   Yes.

3    Q.   Is it your testimony here today that Arcanum did not know

4    Mr. Sater owned Litco at the time it entered into this

5    agreement?

6    A.   That is correct.

7    Q.   So where the agreement says that it was releasing the

8    shareholders, members, interest holders, and partners of Litco,

9    Arcanum, and the Kazakh entities, it's your position they

10   didn't know who they were releasing, is that right?

11   A.   That is correct.

12   Q.   Did Arcanum do any diligence on Litco to attempt to learn

13   the identity of its owner?

14   A.   I don't know.  I did not.

15   Q.   Do you know if Mr. Garske or anyone at Arcanum ever did?

16   A.   I do not know.

17   Q.   You don't know anything about what may have been done at

18   the time this was signed?

19   A.   No, I do not.  I was not involved.

20   Q.   And you were not able to talk to anyone at Arcanum who was

21   involved?

22   A.   No.

23   Q.   Because your understanding is Mr. Garske did this on his

24   own?

25   A.   That is my understanding.

J88HALMH                    Humphrey - Direct

1   Q.   Can you please turn to tab 2 in your binder.  This is a
2   chart of payments that counsel for Almaty and BTA produced to
3   us that indicated payments going sometimes to Litco on the
4   dates the payments were made, the amounts, who paid it, and the
5   payee.  Have you seen this chart before?
6   A.   No, not to my knowledge.
7   Q.   Are you generally familiar with payments being made to
8   Litco, how they were made, or who they were made to?
9   A.   In general.
10  Q.   In Litco's -- sorry, in Litco being paid, would Arcanum
11  receive invoices from Litco for such payment?
12  A.   Yes.
13  Q.   Would Arcanum also receive invoices from Litco's lawyers
14  for reimbursement?
15  A.   Yes.
16  Q.   Would those invoices be reviewed before Arcanum or Almaty
17  or BTA would make a payment to Litco?
18  A.   They weren't really reviewed.  We served pretty much like a
19  clearinghouse to just get the invoices, do another invoice, and
20  pass it on to BTA.
21  Q.   So, to make sure I understand your testimony, BTA and
22  Almaty were paying hundreds of thousands of dollars or millions
23  of dollars to Litco, but Arcanum wasn't looking closely at the
24  bills it got from Litco and its lawyers?
25  A.   I don't believe it was millions of dollars, but what we

J88HALMH                          Humphrey - Direct

1   would do is we would review -- we would take a look at the

2   invoice, make another invoice, and pass it on to BTA.

3   Q.   Oh, you'd pass the invoices on to BTA as well?

4   A.   A new invoice.

5   Q.   A new invoice?

6   A.   Yes.

7   Q.   So you were shielding BTA from whatever the contents of the

8   invoice was?

9            MS. JUMPER:   Objection.

10           THE COURT:   What's the basis of the objection?

11           MS. JUMPER:   Form.

12           THE COURT:   I think you can answer the question.   Go

13   ahead.

14   A.   Could you repeat the question.

15   Q.   Sure.   I was saying, you were shielding BTA from whatever

16   the contents of the invoice were?

17           MS. JUMPER:   Objection to the word "shielding."

18   Q.   You were not passing along the full contents of the

19   invoices to BTA?

20   A.   That is correct.

21   Q.   But Arcanum received those invoices?

22   A.   Yes.

23   Q.   Can you please turn to DX-26, that's tab 26 in your binder.

24           Actually, before we get to that, you said before that

25   Arcanum retained Boies Schiller for this action, correct?

J88HALMH                    Tumabayev - Direct

1    Almaty, Republic of Kazakhstan, and Arcanum are each liable to

2    pay Litco $100,000 a month for at least 12 months?

3              MR. WENNER:  Objection.  Documents speaks for itself.

4              THE COURT:  I think, rather than go over what the

5    document says with this witness, it probably is going to be

6    more efficient to just ask the questions about his

7    investigation and what he learned.

8              MS. SKAKEL:  OK.

9              THE COURT:  I can read the text of the documents.

10             MS. SKAKEL:  OK.

11   Q.  But let's go to the tenth paragraph in this document, sir.

12   It's entitled "Release."  And if you notice there that this is

13   a release that BTA, among others, is giving to Litco.  And

14   you'll notice, sir, that it extends to Litco's shareholders,

15   members, and partners, and that's part of a larger group

16   defined as releasees.

17             Do you see that, sir?

18   A.  Yes, I see.

19   Q.  Is it fair to say that BTA did not, at the time that it

20   signed the Litco agreement, know who any of Litco's

21   shareholders, members, or partners were?

22   A.  At the time of signing this agreement, BTA doesn't knew who

23   was -- didn't know who was the owner of Litco company.

24   Q.  Likewise, if you look further down in the agreement to

25   paragraph 16, sir, it's what's called a "no admission of

J88HALMH                    Tumabayev - Cross

1    liability" provision.  Again, you'll see that the text of this,

2    it applies to Litco as well as its shareholders, members,

3    partners.

4         Do you see that, sir?

5    A.   Yes.

6    Q.   So it's fair to say that likewise for purposes of this

7    provision, paragraph 16, BTA did not know who any of Litco's

8    shareholders, members, or partners were before it gave this no

9    admission of liability agreement, correct?

10   A.   Correct.

11   Q.   Now, before BTA entered into this --

12        MR. WENNER:  Your Honor, before we go into a new

13   topic, I just want to note the time is above 22 and a half.

14        THE COURT:  Yes, I think we have to wrap it up.

15        MS. SKAKEL:  All right.  Thank you.  Thank you, sir.

16        THE WITNESS:  Thank you.

17        THE COURT:  Keep it brief, please.

18        MR. WENNER:  Yes, your Honor.

19   CROSS-EXAMINATION

20   BY MR. WENNER:

21   Q.   Mr. Tumabayev, I'm Craig Wenner, Boies Schiller Flexner,

22   for plaintiffs.

23        When you were asked to start your investigation, what

24   were you asked to do?

25   A.   Sorry?

J88HALMH                    Tumabayev - Cross

1  | A.  Yes, I did.
2  | Q.  Whom did you speak with?
3  | A.  I spoke with Nurlan Nurgabylov.
4  | Q.  And in the course of your entire investigation, what did
5  | you conclude?
6  | A.  In the end of my investigation -- in the end of my
7  | investigation, I have found that BTA never knew that Felix
8  | Sater was the owner of Litco until the moment when he said it
9  | in his deposition.
10 |        MR. WENNER:  Thank you, your Honor.  No further
11 | questions.
12 |        THE COURT:  OK.  I think we're done with this witness,
13 | so thank you very much.
14 |        THE WITNESS:  Thank you.
15 |        THE COURT:  You may be excused.
16 |        (Witness excused)
17 |        THE COURT:  We're going to take a break, and I'm going
18 | to hear argument in the Nnaka v. Nigeria, et al., case and I
19 | would ask that the counsel for the parties provide the court
20 | reporter with the spelling of some of those names --
21 |        MR. WENNER:  We have, your Honor.
22 |        THE COURT:  -- so that she can get that correctly down
23 | in the transcript.  All right.
24 |        MR. SCHWARTZ:  Any particular time?
25 |        THE COURT:  I would say ten of 5:00.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
      J88HALMH                     Darmanbekov - Cross
```

 1    A.   I don't think I was deposed in that matter.

 2    Q.   In the New York litigation?

 3    A.   Not yet.

 4    Q.   In preparing for your testimony today, did you review any

 5    materials?

 6    A.   Yes, I did go through some materials.

 7    Q.   Did you review any of your own prior testimony before

 8    testifying today?

 9    A.   Yes, I did go through some of the depositions that I went

10    through, but they were not in court.

11    Q.   Thank you.

12         When did you first see the Litco agreement?

13    A.   I can't say for sure about the date, but probably at the

14    beginning of this year, maybe the very end of last year.

15    Q.   Were you present when the Litco agreement was signed by the

16    City of Almaty?

17    A.   Yes, I was present in that situation.

18    Q.   How did you -- can you explain the circumstances

19    surrounding when the City of Almaty signed that agreement?

20    A.   Yes, certainly.  I can actually remember the situation.

21    Q.   How did the City of Almaty sign the agreement?

22    A.   We were requested by the bank to be signatures to that

23    agreement.

24    Q.   Did that request come to you personally?

25    A.   Yes, I was the one who received that request.

J88HALMH                     Darmanbekov - Cross

1   Q.   And what did you do after receiving that request?

2   A.   We signed off on that agreement.

3   Q.   To be precise, who is the "we" that you are describing?

4   A.   It was A. Abdyradynova, who was at the time the head of the

5   finance department.

6   Q.   Would you have been authorized to sign?

7   A.   I had the authority at the time.

8   Q.   But you took it to your supervisor, is that right?

9   A.   Correct, yes.

10  Q.   After signing that agreement, did the City of Almaty have

11  any other communications regarding the Litco agreement prior to

12  September 2018?

13  A.   No, none.

14  Q.   Did you receive any communications regarding the Litco

15  agreement before September 2018?

16  A.   No, we did not.

17  Q.   Is there anybody else at the City of Almaty who might have?

18  A.   No.

19  Q.   What is your responsibility, generally, with regard to the

20  New York litigation?

21  A.   Would you specify what exactly you mean by my

22  responsibilities?  In this particular case?

23  Q.   Who at the City of Almaty communicates with their attorneys

24  regarding this matter?

25  A.   This is me.

J88HALMH                    Darmanbekov - Redirect

1   Q.  Prior to September 2018, were you aware of who the owner of
2   Litco was?
3   A.  No, we were not aware of that.
4            MR. WENNER:  Nothing further, your Honor.  Thank you.
5            THE COURT:  OK.  Go ahead.
6   REDIRECT EXAMINATION
7   BY MS. MICHAELSON:
8   Q.  Sir, I think I just heard you testify that you first saw
9   the confidential assistance agreement in 2018, is that right?
10  A.  No, actually, I was present at the signing of this
11  agreement in 2015.
12  Q.  OK.  At that time in June 2015, did you see a translated
13  copy of the confidential assistance agreement?
14  A.  No, there was no translation of that document.
15  Q.  Then did you have any opportunity to review the terms of
16  the agreement?
17  A.  Well, it so happened that we signed off on the document and
18  we passed the original on, and after that we did not have it at
19  our disposal.
20  Q.  You didn't have the original signed copy at your disposal?
21  A.  This is correct.
22  Q.  Am I correct that you don't read English?
23  A.  This is correct, I do not read English.
24  Q.  To your knowledge, did anyone at BTA who could understand
25  the terms of the document review it before Almaty signed it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J88HALMH                    Darmanbekov - Redirect

1    Sorry, did I say BTA?

2              THE INTERPRETER:  Yes.

3    Q.  Did anyone at Almaty who could understand English review

4    the document before it was signed?

5    A.  No one actually looked into the provisions of the document.

6    There may have been people who understood English, but no one

7    reviewed it.

8    Q.  To the best of your knowledge, did anybody at the City of

9    Almaty ask about the terms of the agreement?

10   A.  Well, we did inquire about the terms of the agreement.

11   Q.  To whom?

12   A.  We asked from the bank.

13   Q.  And what did you ask the bank?

14             MR. WENNER:  Objection.  Your Honor, the scope as well

15   as communications directly between parties who are

16   communicating about their understanding of the agreement.  And

17   also as to knowledge of Litco ownership, I'm not sure --

18             THE COURT:  Right.  I want to ask one question.

19             What was your understanding of the purpose of the

20   agreement when BTA gave it to you to sign or have your boss

21   sign?

22             THE WITNESS:  The explanation that we received was

23   that that would be conducive to returning the assets to

24   Kazakhstan.  That's why we signed off.

25             THE COURT:  OK.  All right.  Go ahead.

J88HALMH                    Darmanbekov - Direct

1   A.  Correction.  This specific position I've only been holding

2   for two, three months.

3   Q.  Thank you, sir.  I think you were about to preempt my next

4   question.

5        How long have you been working for the City of Almaty?

6   A.  I've been employed by the city government of Almaty over

7   ten years.  About 11 years now.

8   Q.  Sir, do you see the big binder in front of you?

9   A.  Yes, I do.

10  Q.  Would you please turn to the first tab.

11       I'll state for the record --

12       THE INTERPRETER:  Is this the DX-1 exhibit?

13       MS. MICHAELSON:  Yes, sir.

14       THE INTERPRETER:  All right.  It's clear now.

15  BY MS. MICHAELSON:

16  Q.  Sir, have you seen this document before?

17  A.  Yes, I'm familiar with this document.

18  Q.  This is the confidential assistance agreement, correct?

19  A.  Yes.

20  Q.  And the City of Almaty signed the confidential assistance

21  agreement?

22  A.  Yes.

23  Q.  This agreement is dated June 12, 2015, right?

24  A.  Yes, correct.

25  Q.  At the time that Almaty signed this agreement, it did not

J88HALMH                          Darmanbekov - Direct

1   know who owned Litco, did it?

2   A.   No, it was not aware.

3   Q.   At the time Almaty signed this document, it didn't take any

4   steps to determine who owned Litco, did it?

5   A.   No, no steps were taken.

6   Q.   Does Almaty understand that the agreement releases Litco

7   from any claims that Almaty might have against it?

8           MR. WENNER:  Objection.  Calls for legal conclusion.

9           THE COURT:  Well, I think the witness can answer as

10   his general understanding as a layperson as to what the import

11   of the agreement is.

12   A.   I'm not aware of that particular provision.

13   Q.   Would you turn to the sixth page of the document.  The

14   stamp on the bottom right corner should end with 983.

15           THE INTERPRETER:  What is the number at the bottom

16   again?

17           MS. MICHAELSON:  983.

18           THE INTERPRETER:  And it's tab 6, you say?

19           MS. MICHAELSON:  Tab 1, page 6.

20           THE INTERPRETER:  All right.

21   A.   Yes, we can see that.

22   Q.   Am I correct that the confidential assistance agreement is

23   the first time that -- well, withdrawn.

24           Almaty had never worked with Litco prior to this

25   confidential assistance agreement, is that right?