# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

    Plaintiffs,        19 Civ. 2645 (AJN) (KHP)

  -against-

FELIX SATER, DANIEL RIDLOFF, BAYROCK
GROUP INC., GLOBAL HABITAT SOLUTIONS,
INC., RRMI-DR LLC, FERRARI HOLDINGS LLC,
and MEM ENERGY PARTNERS LLC,

    Defendants.

## FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

THE PARTIES.................................................................................................................... 2

JURISDICTION AND VENUE............................................................................................ 3

FACTUAL BACKGROUND............................................................................................... 3

    A.   Mukhtar Ablyazov Founded BTA Bank, Lost Control of It After Being Convicted of Corruption, Fled to Russia, and Then Retook It After Murdering His Former Partner...... 4

    B.   After Retaking Control of BTA, Ablyazov Looted Its Assets, Caused the Bank to Collapse, Fled to London, and Then Was Held in Criminal Contempt by the U.K. Courts. ................................................................................................................ 6

    C.   Facing Worldwide Freezing and Receivership Orders, Ablyazov Turned to His Son-In-Law, Ilyas Khrapunov, to Help Him Launder His Stolen Assets. ............................... 11

    D.   Aided by Ablyazov, the Khrapunov Family Embezzled and Laundered Millions........... 12

    E.   The Khrapunov Family Was Itself Subject to Asset Freezes. ........................................ 14

    F.   Ablyazov Conspires with Ilyas Khrapunov to Launder Stolen Funds Traceable to BTA's Investment in Zhaikmunai LLP. ...................................................................... 15

    G.   Ilyas Khrapunov Turned to Felix Sater, a Long-Time Associate of the Khrapunov Family, to Help Launder the Stolen Funds. ................................................................. 19

    H.   Sater Assisted Ilyas Khrapunov in Laundering the Stolen Funds Through at Least Five Separate Schemes in the United States. ................................................................ 27

        i.   The World Health Networks Scheme ....................................................... 27

        ii.   The Trump SoHo Scheme ........................................................................ 35

        iii.   The PCS Scheme ...................................................................................... 37

        iv.   The Syracuse Center Scheme ................................................................... 39

        v.   The Tri-County Mall Scheme.................................................................... 40

            1.   *Sater and Ridloff Laundered More Than $30 Million into the Tri-County Mall, Quickly Sold It for a Big Profit, and Paid Themselves and Others Handsomely*.................................................................. 40

            2.   *Sater and Ridloff Turned on Ilyas, Tried to Steal $45 Million, and Got Away with at Least $20 Million in Stolen Funds.* ............................... 52

I.   In Summary, the Defendants, with Sater as Their Ringleader, Laundered and
     Ultimately Retained Millions in Stolen Funds.................................................................. 54

**RELEVANT FOREIGN LAW** .................................................................................................. 55

**FIRST CAUSE OF ACTION** ................................................................................................... 56

**SECOND CAUSE OF ACTION** ............................................................................................... 58

**THIRD CAUSE OF ACTION** .................................................................................................. 60

**FOURTH CAUSE OF ACTION** .............................................................................................. 63

**FIFTH CAUSE OF ACTION** .................................................................................................. 64

**DEMAND FOR JURY TRIAL** ................................................................................................ 69

**DEMAND FOR RELIEF** ......................................................................................................... 70

Plaintiffs City of Almaty ("Almaty") and BTA Bank ("BTA" or "the Bank," and together with Almaty, the "Plaintiffs"), by and through their undersigned counsel, for the Plaintiffs' claims against Defendants Felix Sater, Daniel Ridloff, Bayrock Group Inc., Global Habitat Solutions, Inc., RRMI-DR LLC, Ferrari Holdings LLC, and MeM Energy Partners LLC (collectively, the "Defendants") allege as follows:

## INTRODUCTION

1.     While it has often been said that "there is honor among thieves,"[1] the Defendants in this case make that idiom hard to credit. This case is about some seriously dishonorable thieves.

2.     Felix Sater is a notorious New York "businessman" and two-time felon who, along with wanted criminals Mukhtar Ablyazov and Ilyas Khrapunov, and others known and unknown, participated in an international criminal conspiracy to launder and conceal at least $440 million that was stolen from the Plaintiffs in Kazakhstan, and to evade lawful asset freezing and receivership orders issued by the courts of the United Kingdom.

3.     Sater helped Ablyazov, Khrapunov, and others launder tens of millions of dollars in those stolen funds into the United States, where they were invested in real estate and used to procure immigration status for Khrapunov's sister.  Sater also tried to help them stash some of the stolen money overseas, including in real estate in Moscow.  Sater then turned on his criminal confederates and stole at least $40 million of the money he had laundered into the United States for his own personal benefit and the benefit of his associate, Daniel Ridloff.

---

[1]     In *Don Quixote*, Cervantes observed, "The old proverb still holds good, Thieves are never rogues among themselves." *See also* Cicero*, Three Books of Offices or Moral Duties* (Cyrus R. Edmonds trans., 1863) ("For among those who thieve in company, if any one of them cheat or rob another he is turned out of the gang; and the captain of the band himself, unless he should distribute the spoils impartially, would either be murdered or deserted by his fellows. Indeed robbers are even said to have their laws, `which they obey and observe.").

## THE PARTIES

4.     BTA is a Joint Stock Company organized under the laws of the Republic of Kazakhstan ("Kazakhstan") with its headquarters in Almaty, Kazakhstan.  From 2009 until in or about September 2014, BTA was majority owned and controlled by the Republic of Kazakhstan, through its sovereign welfare fund Samruk-Kazyna, which had bailed out BTA following the revelation in or about 2009 that the Bank's former Chairman, Mukhtar Ablyazov, had looted it of billions of dollars.  Since in or about September 2014, BTA has been privately held.

5.     Plaintiff Almaty is a legal subdivision of the Republic of Kazakhstan.  Almaty is the former capital of the country and continues to be the largest city in Kazakhstan.

6.     Defendant Felix Sater is an individual. Sater is domiciled in New York, New York.

7.     Defendant Daniel Ridloff is an individual and a former  business associate of Sater. Ridloff is domiciled in New York, New York, and does business at 850 Third Avenue, New York, New York.

8.     Defendant Bayrock Group Inc. ("Bayrock Inc") is an entity incorporated and licensed to do business in the State of Delaware. Bayrock Inc is wholly owned and controlled by Sater.

9.     Defendant Global Habitat Solutions, Inc. ("GHS") is an entity incorporated and licensed to do business in New York State. GHS is wholly owned and controlled by Sater.

10.     Defendant RRMI-DR LLC is an entity incorporated and licensed to do business in New York. RRMI-DR LLC is wholly owned and controlled by Ridloff.

11.     Defendant Ferrari Holdings LLC is an entity incorporated and licensed to do business in New Jersey.

12.     Defendant MeM Energy Partners LLC is an entity incorporated in Delaware, with its principal place of business at 405 Lexington Avenue, 26th floor, New York, New York. MeM

2

Energy Partners LLC is owned and controlled by Mendel Mochkin, an individual domiciled in the State of New York.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because (i) there is complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

14.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Plaintiffs' claims occurred in this District. Among other things, and as set forth more fully below, relevant meetings between Sater, Ridloff, and their co-conspirators took place in New York, and the negotiation, investment, and subsequent transfers of the funds for the Tri-County Mall investment and the incorporation of the relevant shell companies took place in New York.

15.     This Court has personal jurisdiction over Defendants because each of them is domiciled in the State of New York, and/or because each of them knowingly  committed acts in New York that form the basis of this action, directed or conspired with  others to commit acts in New York, and/or purposely availed themselves of the privileges  of doing business in New York, as fully set forth herein.

## FACTUAL BACKGROUND

16.     Mukhtar Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009. During that time, he looted billions of dollars from BTA, in part through a complex scheme directing billions of dollars in sham loans from BTA to valueless entities that Ablyazov himself secretly owned, which were then obscured by transfers among different shell corporations, and never repaid. After years of litigation in the courts of the United Kingdom, BTA was granted billions of dollars in judgments against Ablyazov.

**A.      Mukhtar Ablyazov Founded BTA Bank, Lost Control of It After Being Convicted of Corruption, Fled to Russia, and Then Retook It After Murdering His Former Partner.**

17.      In or about 1998, Ablyazov acquired BTA Bank along with his nominee and sometime business partner, Yerzhan (sometimes transliterated as Erzhan) Tatishev, through the merger of two smaller banks operating in Kazakhstan at that time.

18.      Shortly thereafter, Ablyazov passed day-to-day control of BTA to Tatishev in order to become Kazakhstan's Minister of Energy, Industry, and Trade. While Minister, Ablyazov retained a plurality interest in BTA.

19.      In 1999, Kazakhstan law enforcement authorities opened an investigation into Ablyazov's conduct while Minister, based on allegations that he had abused his position for personal gain. Ablyazov was ultimately tried and convicted of political corruption and sentenced to six years' incarceration, although he was released after less than nine months in prison.

20.      After his release in 2003, Ablyazov left Kazakhstan and took up residence in Russia, while Tatishev remained the Chairman and public face of BTA. During Ablyazov's self-imposed exile in Russia, however, Tatishev also acted as Ablyazov's nominee and held a substantial share of BTA's equity on Ablyazov's behalf.  In effect, Ablyazov – through Tatishev – maintained his position as controlling shareholder of BTA.

21.      In 2005, Tatishev was killed, and Ablyazov returned to Kazakhstan and resumed his position as Chairman of BTA, overseeing its day-to-day operations.

22.      The circumstances of Tatishev's death were highly suspicious: though reported as an accident, Tatishev was shot in the head by a business associate, Muratkhan Toqmadi, while riding in a car on a purported wolf hunting excursion.

23.      As revealed in U.S. diplomatic cables, Ablyazov was immediately seen as the prime beneficiary of Tatishev's death.  For example, on January 4, 2005, the consulate in Almaty,

Kazakhstan reported in a confidential cable that

> [t]he alleged circumstances of the accident – passing a loaded shotgun while driving a jeep – are close to incomprehensible, particularly in light of Tatishev's renown as a hunter.  The fate of BTA and of Tatishev's 24% share will, most likely, prove the best explanation to his untimely death.

24.     In a subsequent cable dated February 23, 2005 (roughly two months after Tatishev's death), sources in Kazakhstan reported to U.S. diplomatic representatives that

> Ablyazov [was] angling for the 24% stake in Bank TuranAlem (BTA) that became available when BTA president Erzhan Tatishev was killed on December 19 in a suspicious hunting accident (Ref C). [A witness] told POEC chief that Tatishev and Ablyazov had long-standing financial ties; Tatishev had helped Ablyazov liquidate his assets and move them offshore after his arrest.

25.     While Tatishev's death was initially ruled a hunting accident, subsequent criminal and forensic investigation determined that Tatishev was deliberately shot. At the request of Tatishev's decedents, U.S.-based forensic experts conducted an examination of the purported accident and determined that the killing could not have been accidental and must have been deliberate.

26.     Subsequent investigation also revealed that Ablyazov's stake in BTA, which had been held by Tatishev on his behalf, had steadily diminished during the time of his exile in Russia. This was because Tatishev had used his position as Chairman of BTA to issue tranches of new equity in the Bank, and then purchased many of these new shares using shell companies he controlled through BTA. This scheme increased Tatishev's effective stake in BTA, while diluting Ablyazov's. As a result, at the time of Tatishev's death, Tatishev had steadily secured control of the Bank and a plurality of its shares through shell companies, while Ablyazov's position had been diminished significantly.

27.     Upon Tatishev's death, however, Ablyazov rapidly acquired control of Tatishev's

interest in BTA and was able to reestablish complete dominion over the Bank.

28.     In or about November 2017, Toqmadi finally pleaded guilty to murdering Tatishev and testified that he did so at Ablyazov's instruction.  Toqmadi was sentenced to ten and a half years in prison.  In or about November 2018, Ablyazov was convicted of ordering Tatishev's death and sentenced in absentia to life in prison.

**B.    After Retaking Control of BTA, Ablyazov Looted Its Assets, Caused the Bank to Collapse, Fled to London, and Then Was Held in Criminal Contempt by the U.K. Courts.**

29.     As the U.K. courts have found, after replacing Tatishev as Chairman of BTA Bank in 2005, Ablyazov exercised virtually unfettered control over the Bank's operations while hiding that control from Kazakhstan banking regulators, and used this influence to treat BTA's assets as his own. As Justice Teare of the High Court of England and Wales ultimately found:

> [P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted to owning over 75% of the shares in the Bank. Those shares were not held by Mr. Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In January 2009, shortly before the nationalisation of the Bank, the AFN requested Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank. He replied on 19 January 2009 that he did not own directly or indirectly more than 10% of the shares in the Bank. That statement was untrue.

> *       *       *

> Banks in Kazakhstan tend to be operated in a different manner from that in which they are typically operated in the West. It is common for banks to be owned by a single shareholder who is both chairman of the board of directors and also closely involved in the management of the bank. He therefore has considerable influence over the operation of the bank. Mr. Ablyazov's relationship with the Bank conformed with this general description of Kazakh banking practice. Thus Mr. Talvitie, the independent member of the Board of Directors of the Bank from East Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov had already made the decisions. He described the other members of the board as "straw men". Others in the Bank, below board level, had the same impression. Thus Ms.

Tleukulova (a member of the Credit Committee) gave evidence in Russia in 2012 that "all top managers of the bank, including Board Members, have to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr. Ablyazov was "the main" person in the Bank who controlled the granting of the largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated by his issue of an order ("the Ablyazov Order") whereby he, as Chairman, amended certain procedural rules governing the grant of loans.

*     *     *

[O]fficers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov, when being crossexamined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

30.     Ablyazov's fraudulent schemes were exposed in the wake of the 2008 global financial crisis. As a result of Ablyazov's siphoning billions out of the Bank, in 2009 BTA defaulted on billions of dollars of debt held by investors, including Credit Suisse Group AG, HSBC Holdings Plc, JPMorgan Chase & Co., and Royal Bank of Scotland Group Plc.

31.     BTA's collapse was international news. As *The New York Times* reported in November 2009:

From 2003 to 2008, the likes of Credit Suisse, Morgan Stanley, Royal Bank of Scotland, ING and others funneled more than $10 billion in loans into Kazakhstan's largest bank, Bank Turalem, as the large Central Asian country enjoyed a growth boom spurred by its rich deposits of oil and natural gas.

So many of these loans are now bust that many foreign banks are facing write-offs of as much as 80 percent of their value, prompting investigations into why the loans went so bad so fast, according to officials at Bank Turalem, which was taken over by the government earlier this year. Hoping to become the dominant bank in the region, BTA, as the bank is known, cast its eye well beyond Kazakhstan and

lent billions of dollars to finance vast real estate projects in Russia and Ukraine, as well as offshore companies with vague business plans and no trading histories to speak of, according to executives at BTA who did not want to be identified because of the sensitivity of the matter. The money went to companies with names like Best Catch Trading and Sandown Holding, based in places as diverse as the Seychelles, the British Virgin Islands and England, that offered up little in the way of collateral, according to these executives.

Among other things, prosecutors in Kazakhstan and a team of international lawyers and accountants hired by Bank Turalem are investigating whether the foreign banks may have unwittingly financed a scheme by BTA's former chairman, Mukhtar Ablyazov, to direct between $8 billion and $12 billion worth of BTA loans – about half of the bank's loan book – to companies that he secretly controlled, according to lawyers representing BTA as well as prosecutors in Kazakhstan.

32.     Following BTA's collapse, Kazakhstan's sovereign wealth fund, Samruk-Kazyna, was forced to bail out and take control of the Bank.

33.     At or about the same time, Ablyazov fled to London.

34.     After Ablyazov's flight, BTA commenced a series of lawsuits against Ablyazov in the United Kingdom, alleging that he misappropriated billions of dollars through these and other fraudulent schemes while in control of BTA.

35.     BTA ultimately commenced eleven proceedings against Ablyazov and his lieutenants for defrauding BTA of in excess of $6 billion.

36.     On or about November 12, 2009, shortly after the filing of BTA's first action against Ablyazov in London, the U.K. courts took the nearly-unprecedented legal step of granting BTA a worldwide freezing order against Ablyazov's assets. This order was periodically amended and supplemented as the scope of Ablyazov's network of nominees and offshore companies was uncovered (collectively, the "Worldwide Freezing Orders").

37.     From November 2009 onwards, the Worldwide Freezing Orders explicitly prevented Ablyazov from diminishing or alienating any of his assets without the prior notification

and consent of BTA's counsel and the U.K. courts. This prohibition included any assets held by

Ablyazov's nominees, agents, or shell companies on his behalf or for his benefit:

> 3.   Until further order herein, the Respondent [Ablyazov] must not,
>       except with the prior written consent of the Applicant's [BTA's]
>       solicitors
>
>       a.   In any way dispose of, deal with or diminish the value of
>            any of his assets in England and Wales; or
>
>       b.   In any way dispose of, deal with or diminish the value of
>            any of his assets outside England and Wales.
>
> 4.   Paragraph 3 applies to all the Respondent's assets whether or
>       not they are in his own name and whether they are solely or
>       jointly owned and whether or not the Respondent asserts a
>       beneficial interest in them. For the purpose of this Order the
>       Respondent's assets include any asset which he has the power,
>       directly or indirectly, to dispose of or deal with as if it were his
>       own. The Respondent is to be regarded as having such power if
>       a third party holds or controls the asset in accordance with his
>       direct or indirect instructions.

38.   Other than a designated monthly living stipend, the only exception to this order

was that Ablyazov could expend funds on his legal defense, but only so long as he disclosed to

BTA's counsel the sources of any and all funds he wished to transfer to his solicitors.

39.   To ensure compliance with the Worldwide Freezing Orders, Ablyazov was

obligated to truthfully disclose his assets, and ordered to surrender his passport to his U.K.

counsel and remain in England and Wales unless given permission by the court to travel abroad.

40.   The Worldwide Freezing Orders similarly prohibited any third parties from aiding

Ablyazov in violating their terms, stating:

> It is a contempt of court for any person notified of this Order
> knowingly to assist in or permit a breach of this Order. Any person
> doing so may be imprisoned, fined or have their assets seized.

41.   The Worldwide Freezing Orders specifically prevented the disposal or dissipation

of any assets traceable to an entity named "Tradestock Inc" ("Tradestock").

42.     Ablyazov repeatedly and willfully defied the Worldwide Freezing Orders and his court-ordered disclosure obligations, leading the U.K. courts to grant a series of search and disclosure orders to identify Ablyazov's assets and police his compliance with these orders.

43.      In response to Ablyazov's failure to abide by the Worldwide Freezing Orders, in August 2010 the U.K. courts took the additional step of ordering Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Orders").  The Receivership Orders empowered certain identified receivers at KPMG (the "Receivers") to take control of and recover Ablyazov's network of hundreds of offshore entities used to launder billions of dollars.

44.     Ablyazov nonetheless continued to flout both the Worldwide Freezing Orders and Receivership Orders, disobeying them so often and so egregiously that after an extensive evidentiary hearing, he was ultimately held in criminal contempt and sentenced to 22 months' incarceration in the United Kingdom.

45.     In plain violation of the Worldwide Freezing Orders, Ablyazov fled the United Kingdom shortly before his contempt hearing in February 2012, despite having promised the court his attendance.  At the time that he fled, Ablyazov knew that the court was going to hold him in contempt and sentence him to jail.

46.     Ablyazov remained in hiding for over a year before he was ultimately apprehended in France in mid-2013 on Russian and Ukrainian arrest warrants.

47.     In light of Ablyazov's criminal contempt and violation of the Worldwide Freezing Orders, his defenses in the U.K. proceedings were struck out, and BTA was awarded more than $4 billion in judgments by the U.K. courts, with interest continuing to accrue.

48.     On November 6, 2012, the U.K. Court of Appeal unanimously upheld the contempt orders against Ablyazov.  Concurring in this judgment, Lord Justice Maurice Kay stated

that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."

49.     Separately, in late 2017, Ablyazov was tried and convicted in Kazakhstan for embezzlement, abuse of office, and organizing a criminal group in connection with his multi-billion dollar theft from BTA.  For these crimes, Ablyazov was sentenced in absentia to 20 years' imprisonment.

## C.     Facing Worldwide Freezing and Receivership Orders, Ablyazov Turned to His Son-In-Law, Ilyas Khrapunov, to Help Him Launder His Stolen Assets.

50.     From 2009 onward, the Worldwide Freezing Orders dramatically limited Ablyazov's ability to liquidate and launder the assets he had embezzled from BTA Bank. Complicating matters for Ablyazov, the Worldwide Freezing Orders explicitly forbade any of Ablyazov's nominees or agents from helping him move or launder assets, on pain of civil and criminal liability. In addition, many of his co-conspirators and nominees lacked his ability to fund a global legal defense with billions in ill-gotten wealth, and thus, many pleaded guilty in criminal proceedings or cooperated in civil proceedings related to Ablyazov's theft from BTA.

51.     Facing global freezing and receivership orders, and with increasingly few allies, Ablyazov turned to his son-in-law, Ilyas Khrapunov, to help him monetize and launder key assets that had not then been discovered by BTA or the Receivers.

52.     Ablyazov's reliance on Ilyas was based on more than just the marriage between Ilyas and Ablyazov's daughter, Madina; Ablyazov had worked with Ilyas's parents, Viktor Khrapunov and Leila Khrapunova (along with Ilyas, the "Khrapunov Family") for more than a decade to enrich themselves through a range of wrongful schemes.

**D.      Aided by Ablyazov, the Khrapunov Family Embezzled and Laundered Millions.**

53.      Viktor Khrapunov became "akim" (mayor) of the City of Almaty in or about June 1997 and remained in that position until approximately December 2004. Prior to becoming mayor of Almaty, Viktor had been Kazakhstan's Minister of Energy.

54.      At the time  Viktor took office as mayor, Almaty was the nation's former capital and largest city and held enormous public assets that were to be privatized as part of Kazakhstan's transition from a state-run communist model. Responsibility for overseeing this privatization program in Almaty was vested in the office of the mayor.

55.      Before Viktor Khrapunov assumed the office of the mayor of Almaty, he took an oath of office to obey the constitution and laws of Kazakhstan.  Among other things, he expressly and impliedly promised that he would  uphold his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to the City of Almaty for his own use or that of his family, friends, or associates.

56.      In reality, working with his family members and Ablyazov, Viktor almost immediately began a multi-year scheme to enrich himself and his family through the abuse of his position as mayor.

57.      Viktor repeatedly and systemically used the powers of the office of the mayor to transfer public assets to his family and, in particular, to shell companies controlled by his wife Leila, for prices that were a fraction of their fair value.  Viktor and Leila then laundered the proceeds of these frauds with the aid of Ablyazov, through his control of BTA Bank and his vast network of nominees and shell companies.

58.      As just one example, in or about mid-2003, Viktor abused his position as mayor to sell, or direct the sale of, three separate pieces of property belonging to the City of Almaty to companies owned by Leila for less than fair market value. While Viktor directed the sale of these

properties to Leila's companies for a combined value of approximately $1.1 million,[2] they were promptly resold by Leila to companies controlled by Ablyazov for more than $14 million, and then in turn used by Ablyazov to defraud BTA of approximately $100 million.

59.     Once obtained from the City of Almaty, these properties were transferred through shell companies to Leila directly, and then contributed by Leila to an entity she controlled named "Building Services Company" ("BSC"). Once assigned to BSC, this wrongfully obtained property was sold for approximately $14.1 million to "Stroytekh Company LLP" ("Stroytekh").

60.     Stroytekh was owned and controlled by Ablyazov through his nominee, E.K. Suankulov, who served as Stroytekh's director acting at Ablyazov's instruction. Stroytekh then transferred this property to "Bask Invest LLP," an entity also controlled by Ablyazov.  Despite having no apparent assets other than these three parcels of land wrongfully obtained from Almaty, Bask Invest was then subdivided among two other shell companies named "Dudar Capital Limited" and "Eseke Limited" (sometimes transliterated as "Yesseke Limited"), again controlled by Ablyazov's nominees, each of which used their ownership share of Bask Invest as collateral to obtain loans from BTA Bank of $50.1 million and $50 million, respectively. These loans were purportedly to improve these same three plots of wrongfully obtained property. Ablyazov used his control of BTA to ensure these loans were granted, but the loaned funds from BTA were never used to improve the properties and were instead spirited away by the conspirators without ever being repaid.

61.     Thus, in just one complex scheme, three plots of land were purchased by the Khrapunov Family for just over $1 million, re-sold to Ablyazov for $14 million, and then pledged as collateral to defraud BTA Bank of more than $100 million.

---

[2]     As converted from Kazakh tenge to U.S. dollars at then-prevailing rates.

62.     Because of these and other prior illicit dealings, Ablyazov knew he could conspire with the Khrapunov Family to evade the Worldwide Freezing Orders without fear of discovery or betrayal.

**E.     The Khrapunov Family Was Itself Subject to Asset Freezes.**

63.     In addition, members of the Khrapunov Family were themselves subject to asset freezing restrictions, which further incentivized them to conspire with Ablyazov by combining their own stolen assets with those of Ablyazov and laundering the commingled funds.

64.     In late 2007, Viktor Khrapunov was tipped off that Kazakhstan law enforcement authorities had begun investigating his financial dealings.  In anticipation of possible criminal charges, on or about November 9, 2007, Viktor and Leila boarded a private jet and fled Kazakhstan for Switzerland. Ultimately, two criminal cases were filed against Viktor in Kazakhstan for abuse of power and  fraudulent acts, and on or about July 21, 2011, a court-ordered arrest warrant was issued for  Viktor.  Throughout 2011 and 2012, additional charges were brought in  Kazakhstan against members of the Khrapunov Family arising from the theft of public  property and the laundering of resulting funds during Viktor's tenure as mayor.

65.     Subsequently, in mid-2012, the Public Prosecutor of  Geneva opened an investigation into the Khrapunov Family on suspicion of violating  Swiss money laundering laws. The Public Prosecutor of Geneva seized  financial and banking documents and ordered the freezing of the Khrapunov Family's Swiss assets, including accounts held at Swiss banks.  This investigation by the Swiss authorities is ongoing.

**F.**     **Ablyazov Conspires with Ilyas Khrapunov to Launder Stolen Funds Traceable to BTA's Investment in Zhaikmunai LLP.**

66.     In or about late 2009 – just after Ablyazov had fled to London, and the courts there had issued the Worldwide Freezing Orders – Ablyazov and Ilyas met in the United Kingdom and agreed on a scheme to violate the Worldwide Freezing Orders by disposing of certain key assets beneficially owned by Ablyazov.

67.     As Judge Waksman of the U.K. court later found when he handed down judgment against Ilyas for his role in this very same conspiracy,[3] Ilyas had

> conspired with Mr Ablyazov to break the terms of an original freezing order and a receivership order granted against Mr Ablyazov by effecting or assisting the removal or transfer of a number of funds so as to take those funds out of the reach of the freezing order against Mr Ablyazov and thus to assist him in evading and breaking clear court orders.

68.     One asset Ilyas and Ablyazov conspired to monetize and launder was approximately $440 million traceable to Ablyazov's wrongfully obtained interest in a massively profitable petroleum company named "Zhaikmunai," and which is now known as "Nostrum Oil and Gas PLC."

69.     When Ablyazov became Chairman of BTA in 2005 after Tatishev's death, he assumed control of a range of investments made with BTA's funds and which were thus duly owing to BTA. This included an investment of more than $100 million of BTA's funds in Zhaikmunai LLP, a partnership that owned the rights to an enormous oil and gas field in eastern Kazakhstan (the "Zhaikmunai Investment"). As Zhaikmunai's then-CEO publicly admitted to the

---

[3]     This action was brought in 2015 in the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (QBD), and captioned *JSC BTA Bank v. Ilyas Khrapunov*, Claim No. CL-2015-000549.  The judgment quoted above was handed down in or about August 2018.

Organized Crime and Corruption Reporting Project (the "OCCRP"), the Zhaikmunai Investment was made during Tatishev's period of control of BTA, but after Tatishev's death, Ablyazov assumed control of the Zhaikmunai Investment along with the rest of BTA.

70.    BTA's internal accounting records confirm that the Zhaikmunai Investment was funded by BTA through a series of shell companies, including Tradestock. At least $103 million of BTA's money was transferred through Tradestock in 2004 to Zhaikmunai's parent company, Thyler Holdings Limited, in order to fund the Zhaikmunai Investment.

71.    After the first of the Worldwide Freezing Orders was imposed in late 2009, Ablyazov tasked his agent and co-conspirator Ilyas with monetizing the Zhaikmunai Investment. Ablyazov directed Ilyas to ensure that the proceeds of this investment were paid to Ablyazov personally, instead of back to BTA, which had funded the investment.

72.    At no time did Ablyazov disclose his interest in the Zhaikmunai Investment to BTA or its counsel, or to the Receivers at KPMG.

73.    As reported by the OCCRP, between 2011 and 2012, Ilyas monetized Ablyazov's interest in the Zhaikmunai Investment with the aid of Zhaikmunai's CEO, ultimately extracting approximately $440 million as recoupment of the Zhaikmunai Investment (hereinafter, the "Stolen Funds").

74.    As reported by the OCCRP, the Stolen Funds were wired from two shell companies controlled by Zhaikmunai's CEO, "Sartfield Ltd" and "Claremont Ltd," to accounts at FBME Bank ("FBME") in the name of "Northern Seas Waterage" ("NSW"), which was a

Seychelles-incorporated shell company controlled by Ilyas Khrapunov.[4]

75.    At the time of these transfers of the Stolen Funds, FBME had long been known as a financial institution catering to money launderers and international criminals. In 2014, FBME was designated a "foreign financial institution of primary money laundering concern" and effectively banned from the legitimate international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury, a decision subsequently described by FBME as a "death sentence."

76.    The Stolen Funds were then moved through a series of shell company accounts inside of FBME by a Dubai-based financial adviser to the conspirators, Eesh Aggarwal. Once washed through this chain of shell companies, the Stolen Funds were divvied up and wired out of FBME to be laundered across several jurisdictions, including the United States. Public reporting by the OCCRP revealed key parts of this laundering process:

---

[4]    As set forth in paragraph 67 above, Ilyas Khrapunov has already been found liable for his role in this conspiracy, and BTA has been awarded judgment against him in the U.K. courts. BTA is seeking to domesticate this judgment in related proceedings.  Ilyas, Viktor Khrapunov, and Mukhtar Ablyazov are also currently defendants in *City of Almaty, et ano v. Ablyazov, et al.*, No. 15-cv-5345 (S.D.N.Y.) (Nathan, J.).



77.     The Stolen Funds were then partially commingled with those of the Khrapunov

Family, in particular through a Panamanian offshore company named "VILDER Company"

("VILDER"). VILDER was controlled by Ilyas and owned by members of the Khrapunov Family.

78.     VILDER received at least $95.8 million in Stolen Funds from NSW in transfers between accounts held by each entity at FBME Bank.

79.     To effect the transfer of the Stolen Funds outside of the Worldwide Freezing Orders, and to avoid the asset freezes against his own family, Ilyas moved the Stolen Funds through accounts at FBME in the name of Gennady Petelin, another relation-by-marriage of the Ablyazov and Khrapunov clans.  (Petelin's step-son, Dimitri Kudryashov, had married Ilyas Khrapunov's sister, Elvira.)  At all times, however, Ilyas himself retained control of the Stolen Funds, acting at Ablyazov's direction.

80.     Petelin had been secretary to Viktor Chernomyrdin, the former prime minister of the Russian Federation, and was widely implicated in acts of corruption in the Russian government. Unlike Ablyazov and the Khrapunov Family, however, Petelin was not subject to any asset freezes at the time, and thus was Ilyas's best option for laundering the Stolen Funds.

**G.     Ilyas Khrapunov Turned to Felix Sater, a Long-Time Associate of the Khrapunov Family, to Help Launder the Stolen Funds.**

81.     After successfully monetizing the Zhaikmunai Investment, Ilyas needed to launder the nearly $440 million in Stolen Funds out of FBME, without alerting BTA or the court-appointed Receivers, all while Ablyazov remained subject to the Worldwide Freezing Orders and Ilyas's own family was subject to asset freezes in Switzerland.

82.     To do so, Ilyas turned to a longtime friend of the Khrapunov Family who had extensive experience with organized crime and money laundering:  Felix Sater.

83.     Felix Sater was born in the Soviet Union on March 2, 1966.  When Sater was eight years old, his family left the Soviet Union and moved to Brighton Beach in Brooklyn, New York.

84.     After settling in the United States, Sater's father, Mikhail Sheferovsky, reportedly worked for notorious crime boss Semion Mogilevich of the Russian Mafia. In 2000, Sheferovsky

pleaded guilty to extorting money from a number of small businesses in Brighton Beach.

85.     In the 1980s, Sater dropped out of Pace University to work as a cold-caller at the Bear Stearns investment firm.  Sater subsequently worked at a number of Wall Street brokerage firms, and according to a longtime associate, Sal Lauria, Sater developed a reputation as a sly salesman and regular attendee of celebrity parties.

86.     In 1991, Sater ran afoul of the law for the first time when he assaulted a rival commodities broker at the El Rio Grande bar and restaurant in Midtown Manhattan.  While arguing with the broker, Sater broke off the top of a margarita glass and thrust the jagged stem into the broker's face; the victim received over 100 stitches and suffered lasting nerve damage. Sater was convicted of assault and served fifteen months in prison.  As a result of the conviction, the National Association of Securities Dealers rescinded Sater's brokerage license and effectively banned him from selling securities.

87.     Following his release from prison in 1995, Sater went to work for State Street Capital Partners, where he, Lauria, and their partners immediately launched an illicit pump-and-dump scheme that defrauded unsuspecting investors of more than $40 million.  During this time, Sater and his associates reportedly relied on their contacts in organized crime to provide protection and settle disputes with other organized crime groups running similar pump-and-dump schemes.

88.     In 1998, law enforcement officials searched a unit rented by Sater at a Manhattan Mini Storage in SoHo after Sater failed to pay rent.  In the locker, law enforcement found firearms and documents detailing the pump-and-dump stock scheme, as well as information on a range of offshore accounts held by Sater and his co-conspirators in the scheme. Soon thereafter, Sater pleaded guilty to racketeering and agreed to serve as a government informant in exchange for

leniency, reportedly providing information on his co-conspirators in the pump-and-dump scheme and a broad range of intelligence culled from his network of criminal contacts. As a consequence of his cooperation, Sater's sentencing for the racketeering conviction was delayed for nearly a decade, and the entire docket for his criminal conviction remained sealed.

89.    In 1999, barred from selling securities and with two felony convictions, Sater shifted his focus to real estate. By 2003, he had joined Bayrock Group LLC ("Bayrock LLC"), a real estate development company founded by Tevfik Arif. Arif had previously worked as a Soviet economist and, after the end of the Cold War, built several luxury hotels in Turkey and Kazakhstan.

90.    Throughout the mid-2000s, Bayrock LLC continued to develop real estate projects across the United States. One unsuccessful venture in Arizona led to a civil lawsuit filed in 2007 against Bayrock LLC. In that suit, Ernest Mennes, owner of Camelback Plaza Development, alleged that Sater had threatened to "electrically shock [Mennes's] testicles, cut off [Mennes's] legs, and leave [Mennes] dead in the trunk of his car." The suit was subsequently settled.

91.    In this same time period, Arif introduced Sater to Viktor Khrapunov, who was then the mayor of Almaty, and his wife Leila. Not long after, Sater also met their son, Ilyas. Sater and the Khrapunov Family started to explore potential business opportunities between Bayrock LLC and the Khrapunov Family.

92.    As reported by McClatchyDC, Sater and the Khrapunov Family enlisted the help of a major U.S. law firm to jointly establish an entity named KazBay B.V. ("KazBay"). KazBay was a joint venture between Bayrock LLC and Helvetic Capital S.A., a Swiss entity controlled by the Khrapunov Family. According to McClatchyDC, KazBay was a vehicle for Sater and the Khrapunov family to pursue resource-extraction investments while Viktor was the Governor of

Eastern Kazakhstan, a resource-rich but lightly-populated region of the Kazakh Steppe, and subsequently, while he was Kazakhstan's Minister for Emergency Situations.

93.     During Viktor's tenure in government, Sater and the Khrapunov Family engaged in multiple resource investments in Kazakhstan, including coal extraction and oil drilling ventures.

94.     Neither Viktor nor Leila reported any of these investments or assets to Kazakhstan tax and regulatory authorities, despite Viktor's ethical and legal obligations to do so.

95.     In fact, during the time of his business dealings with Sater, Viktor developed a reputation for corruption and incompetence as a public official, reportedly saved only by his wife's social connections. As reported in a diplomatic cable from the U.S. embassy dated January 16, 2007, regarding Viktor's transfer from the position of Governor of Eastern Kazakhstan to Minister of Emergency Situations:

> Given that the Ministry of Emergency Situations is seen as a political backwater, Khrapunov's latest appointment is likely a sign that his performance has not improved.  Many observers are puzzled as to how Khrapunov, who is known to be quite corrupt (industry sources tell post that as [mayor] he directly solicited a bribe from a distributor in Ust-Kamenogorsk), has managed to stay in government.  His wife's reported close friendship with Dariga Nazarbayeva [the daughter of Kazakhstan's former President] may be one explanation.

96.     In September 2007, Sater met Ablyazov at the wedding of Ilyas Khrapunov and Madina Ablyazova, Ablyazov's daughter.  At the wedding or shortly thereafter, Sater became aware of Ablyazov's multibillion-dollar scheme to defraud BTA.

97.     In December 2007, *The New York Times* published an article detailing Sater's checkered past, namely his 1993 assault conviction, and re-surfacing Sater's involvement in the illegal pump-and-dump stock scheme and his extensive ties to organized crime.

98.     With his involvement in Bayrock LLC tainted by negative publicity, Sater stepped

up his business dealings with the Khrapunov Family, who by then had fled to Switzerland after investigations of Viktor's abuse of his offices were initiated by Kazakhstan law enforcement authorities.

99.     Shortly thereafter, in 2008, Bayrock LLC announced a partnership with the Swiss Development Group S.A. ("SDG"), a Swiss real estate entity owned and controlled by Ilyas, and funded by Ablyazov and the Khrapunov Family.  Bayrock LLC and SDG partnered to develop the Hotel Du Parc in Montreux, Switzerland, and announced that the two companies planned to redevelop the site into luxury residences (the "Hotel Du Parc project").  Sater and the Khrapunov Family had in fact begun seeding the project around 2006 or 2007, when they began negotiating the acquisition of the site and other details.

100.     Ilyas participated in these unlawful schemes between the Khrapunov Family, Sater, and Bayrock LLC.  The website DCReport.org reported in 2017 that it had

> obtained an audio recording in which three of Bayrock's top four executives can be heard discussing coal and oil projects involving Bayrock and Sater, in which the name "Khrapunov" and "his son" are mentioned.  The recording was made in Bayrock's offices in the Trump Tower in 2008. In all likelihood, the references are to Viktor Khrapunov and his son Ilyas.

101.     By this time, however, the Swiss press had begun to investigate the dubious origins of the millions of dollars that Sater and the Khrapunov Family used to fund SDG, the Hotel Du Parc project, and other Khrapunov Family investments. According to public news reports in late 2009, Viktor Khrapunov was one of the richest people in Switzerland at the time, with a fortune of over $300 million.  Similarly, in 2012,  Viktor Khrapunov was listed among Switzerland's 300 richest people, with a  fortune estimated at $324 to $432 million. The Swiss press also reported the allegations that the Khrapunov Family had stolen these funds from Almaty.

102.     Based on the prior ventures between Sater and the Khrapunov Family, by no later than in or around late 2011, Ilyas asked Sater to help him launder the Stolen Funds. Sater agreed, and in doing so, knowingly joined the existing conspiracy between Ablyazov and Ilyas to breach the Worldwide Freezing Orders.

103.     Through this initial discussion, and at all times subsequent, Sater was aware of two key facts: first, that the Stolen Funds were the rightful property of the Kazakh Entities and principally consisted of Ablyazov's assets, commingled with those of the Khrapunov Family, whose members were subject to asset freezing orders; and second, that the Worldwide Freezing Orders forbade any dissipation of Ablyazov's assets. On numerous occasions, Ilyas told Sater and others that the source of the Stolen Funds was his father-in-law, Ablyazov, and that Ilyas was in regular communication with Ablyazov about these investments.

104.     Sater and Ilyas negotiated the terms of Sater's involvement, including his compensation for helping launder the Stolen Funds. In or about early 2012, Sater executed a consulting agreement with the Swiss Promotion Group ("SPG"), a company owned and controlled by Ilyas and used to launder the Stolen Funds.

105.     Upon negotiating the consulting agreement and at all times subsequent, Sater was acutely aware of his essential role in the conspiracy to launder the Stolen Funds. As one measure of this awareness, Sater frequently communicated with Ilyas and his co-conspirators throughout 2012 and 2013 regarding various investments to launder the Stolen Funds. For example, in late May 2012, Ridloff emailed Sater to ask for "any due diligence materials" because potential business partners were "having a tough time getting comfortable with the swiss rpm entity and the source of the investor." Sater then forwarded Ridloff's email, copying Ridloff, to Ilyas and other co-conspirators, writing, "Iliyas suggested you send him the SDG shareholders CV's and help

craft a structure" to "get over the compliance hurdle" with the potential business partners. This pattern continued. In May 2013, in connection with the Tri-County Mall Scheme discussed below, Ridloff emailed Sater, Ilyas, and other co-conspirators asking for "ownership proof of sdg capital ASAP that shows mr Glatz as majority owner" in response to know-your-customer inquiries from a potential lender. Glatz by that point had become Ilyas's straw owner of SDG.

106.    Once Ilyas had enlisted Sater's aid, he sought to launder the Stolen Funds through real estate investments in, among other places, the United States. Ilyas chose to do so based on Sater's proclaimed expertise in U.S. real estate markets.

107.    For example, in or about 2005, Bayrock LLC and the Trump Organization had partnered to build the Trump SoHo, a forty-six-story hotel and condominium in Manhattan, New York.  During construction of the Trump SoHo, Bayrock LLC maintained offices at Trump Tower in Midtown Manhattan.  Also in 2005, the Trump Organization had entered into a one-year agreement with Bayrock LLC that gave it the exclusive right to construct a Trump International Hotel and Tower in Moscow, Russia.  Before the agreement lapsed, Sater traveled to Russia on a scouting trip related to the project.

108.    In or about 2010 and 2011, when Ilyas and Sater began to discuss laundering the Stolen Funds, Sater still had offices in Trump Tower and held himself out as a "Senior Advisor to Donald Trump," and regularly handed out business cards carrying this title and address:



This, among other things, reinforced the impression that Sater was an expert in U.S. real estate investment.

109.    Sater also had access to numerous key individuals in the New York real estate business community, and used these contacts in furtherance of the conspiracy to launder the Stolen Funds in violation of the Worldwide Freezing Orders.

110.    Sater and Ilyas would meet often in New York to discuss details of their laundering schemes. Among other places, these meetings between Ilyas and Sater would occur in Sater's offices. Sater not only met with Ilyas Khrapunov in Trump Tower to discuss laundering the Stolen Funds, but he also personally arranged meetings between Ilyas and Donald J. Trump to discuss possible investments.  (There is no suggestion that either Ilyas or Sater disclosed to Mr. Trump the illicit origin of the Stolen Funds, or that Mr. Trump engaged in any impropriety whatsoever in connection with Ilyas Khrapunov.)

111.    Among other proposed investments, Sater conspired with Ilyas to invest the Stolen Funds to develop a Trump Tower project in Russia, which Sater has claimed would have been a "high-rise, high-end development that could make a significant amount of money."

112.    On information and belief, this project in Russia was the proposed Trump Tower Moscow. As Sater recently stated to BuzzFeed News, "[m]y idea was to give a $50 million penthouse to Putin and charge $250 million more for the rest of the units. All the oligarchs would line up to live in the same building as Putin."

113.    As part of their frequent discussions about the investment of the Stolen Funds, Sater and Ilyas regularly discussed the Worldwide Freezing Orders, as well as other asset freezing orders against Ablyazov and the Khrapunov Family.

114.    Sater has admitted his awareness of the Worldwide Freezing Orders, and to having

regular discussions with Ilyas Khrapunov about the conspirators' efforts to evade the Worldwide Freezing Orders and other asset freezes.

115.    Not only was Sater consciously aware that under the Worldwide Freezing Orders Ablyazov's assets could not be dissipated, but Sater also actively assisted Ilyas Khrapunov in moving Ablyazov's assets to evade the Worldwide Freezing Orders.

116.    For example, in or about 2013, Sater traveled to Moscow upon Ilyas's request to scout locations for investments of the Stolen Funds and to gather information for disposing of a number of substantial real estate assets in Moscow that were beneficially owned by Ablyazov and subject to the Worldwide Freezing Orders.

117.    Sater has admitted that the explicit purpose of this trip to Moscow was to aid Ilyas and Ablyazov in dissipating assets in breach of the Worldwide Freezing Orders.

118.    Sater has also admitted that he and Ilyas also regularly discussed the use of "shills," to hide and move assets subject to the Worldwide Freezing Orders.  These shills included Petelin, and other associates of Ilyas.

**H.    Sater Assisted Ilyas Khrapunov in Laundering the Stolen Funds Through at Least Five Separate Schemes in the United States.**

119.    Once Sater had agreed to help Ilyas launder the Stolen Funds in breach of the Worldwide Freezing Orders, the pair planned and executed a series of schemes through which the Stolen Funds could be moved out of FBME Bank and into investments that could be monetized or used for other co-conspirators' purposes.  These laundering schemes included (1) The World Health Networks Scheme; (2) The Trump SoHo Scheme; (3) The PCS Scheme; (4) The Syracuse Center Scheme; and (5) The Tri-County Mall Scheme.

*i.    The World Health Networks Scheme*

120.    The earliest scheme through which Sater and Ilyas invested the Stolen Funds in the

United States was through a company named World Health Networks ("WHN").

121.    The WHN Scheme relied on a series of shell companies, all controlled by Ilyas or by Sater and/or Ridloff working at Ilyas's direction.

122.    A number of these entities were incorporated or represented by Sater's longtime corporate counsel based, like Sater, in Port Washington, New York (the "Local Counsel").

123.    These entities included:

a.    The Swiss Promotion Group: SPG was a Swiss entity beneficially owned and controlled by Ilyas Khrapunov. In or about 2012, SPG stated that it was changing its name to "Swiss RPM" and executed numerous documents reflecting this purported change.

b.    RPM USA: RPM USA was a New York entity incorporated by the Local Counsel. RPM USA was wholly-owned by SPG, which was itself beneficially owned and controlled by Ilyas. RPM USA had bank accounts at JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), in New York. Sater and Ridloff were managers of RPM USA and had control over RPM USA's accounts at JPMorgan Chase.

c.    RPM Maro ("Maro"): Maro was a New York entity incorporated by the Local Counsel. Maro was initially owned 51% by Maro Enterprises (an entity purportedly owned by Elvira Kudryashova, Ilyas's sister) and 49% by RPM USA. Maro had bank accounts at JPMorgan Chase, in New York. Sater and Ridloff were directors of Maro and had control over Maro's accounts at JPMorgan Chase.

d.    Crownway Ltd ("Crownway"): Crownway was a Belize-incorporated entity, administered by Eesh Aggarwal at the direction of Ilyas and Ablyazov. Crownway was controlled by Ilyas, and held accounts at FBME Bank funded by the Stolen Funds.

e.    ADLUX: ADLUX was a Swiss entity beneficially owned and controlled by Ilyas. ADLUX was funded from, among other sources, the Stolen Funds.

124.    While WHN was held out as a legitimate investment in a medical start-up company, in fact, it was primarily intended to commit fraud on the United States and to provide cover to move the Stolen Funds out of FBME and into the United States, where the Stolen Funds could be spent by the conspirators, including Sater and Ridloff.

125.    WHN (and its earlier incarnation Health Station Networks International) purported

28

to be a start-up aimed at installing medical testing devices in airports. In reality, WHN was part of a visa fraud scheme executed by Sater, Ridloff, and the Khrapunov Family to buy U.S. residency for members of the conspiracy using the Stolen Funds (the "WHN Scheme").

126. The visa fraud scheme through WHN was executed by holding out Elvira Kudryashova, Ilyas's sister, as the funder and controlling owner of WHN. As the purported owner and source of funds for these companies, Kudryashova was submitted for an investor visa.

127. As reported in McClatchyDC, "[t]he real aim of Khrapunov's investment [in WHN] was obtaining US residency for at least one member of the family; the company submitted, with the help of the onetime Trump associates [Sater and Ridloff], at least three requests to obtain visas for foreign workers."

128. According to McClatchyDC, "Sater installed Ridloff as the company's chief operating officer," and Ridloff then submitted three visa applications for "highly skilled workers" on the company's behalf, all seeking visas for the purposes of hiring foreign individuals connected to the Khrapunov Family.

129. In doing so, by no later than in or about mid-2012, Ridloff joined Sater, Ilyas Khrapunov, and Ablyazov in the extant conspiracy to breach the Worldwide Freezing Orders.

130. Ridloff – whom Sater described as his "right hand" –  was aware of his essential role in the conspiracy to launder the Stolen Funds in violation of the Worldwide Freezing Orders forbidding the dissipation of Ablyazov's assets. As one measure of Ridloff's awareness of his role, he frequently communicated with Ilyas and his co-conspirators throughout 2012 and 2013 regarding various investments to launder the Stolen Funds, at times providing in-depth analysis of said investments directly to Ilyas and seeking Ilyas's help in concealing Ilyas's own involvement. As described more fully in paragraph 105, on various occasions Ridloff asked Sater for due

diligence materials to give to potential business partners to assuage their concerns about Ilyas's front companies and the source of their funds.

131.    McClatchyDC's reporting is confirmed by a January 2014 letter from Kudryashova to Sater thanking him for his work securing her visa.

132.    In fact, Ilyas, Sater, and Ridloff controlled WHN and the shell companies that funded it in every respect. WHN was funded by the Stolen Funds, which were assets of Ablyazov and subject to the Worldwide Freezing Orders, and not those of Kudryashova.

133.    This was an act of fraud on United States immigration authorities. At all times, Sater, Ridloff, and Ilyas controlled and operated WHN, and knew that Kudryashova was merely a figurehead. The conspirators, including Sater and Ridloff, knowingly misrepresented Kudryashova's involvement in WHN in order to secure her an investor visa, which permitted her to remain in the United States.

134.    Sater knowingly misrepresented that Kudryashova was the source of funds for WHN, when at all relevant times, Sater knew that Kudryashova was neither the beneficial owner nor funder of WHN.

135.    For example, on July 17, 2012, Sater e-mailed the conspirators' Dubai-based accountant and offshore administrator, Aggarwal, requesting a wire transfer of "the sum of $3,000,000.00 (Three Million Dollars)" and "a letter on letterhead of a reputable law firm or accounting firm attesting that these funds belong to Mrs. Kudryashova."

136.    At the time of this communication, Sater knew that the Stolen Funds did not "belong" to Kudryashova and instead belonged to Ablyazov. Sater nonetheless requested this false document in order to enable the transfer of the Stolen Funds out of FBME Bank and into the United States.

137.     As requested, on August 27, 2012, Aggarwal emailed the Local Counsel with a letter from UK Chartered Accountants confirming that Kudryashova was the beneficial owner of Crownway, which had transferred $3 million to Maro on or about July 20, 2012. Aggarwal added that he would courier the original copy of the letter as Sater had advised him to do.

138.     In addition to misrepresenting Kudryashova's involvement in WHN to U.S. immigration authorities, Sater also took steps to disguise or restrict information about his own involvement in WHN.

139.     For example, Sater explicitly conditioned the funding of WHN on a pledge of secrecy regarding both his own criminal past and that of the Khrapunov Family.  On or about August 17, 2012, Sater required that the Chief Executive Officer and President of WHN, respectively, execute an "Acknowledgment," which stated that they had "done full due diligence on Felix's background and that of Ilyas and Elvira" and that "an Internet search also turns up articles regarding allegations concerning Ilyas Khrapunov and his father," Viktor, but that "[i]n the event of any future dispute, [WHN] agrees not to use information regarding the past of Sater and/or the Khrapunovs to undermine their credibility or to use their past to extract a settlement, or use their past as evidence of their bad character."

140.     With Sater and Ridloff's knowing aid, the conspirators transferred at least $7,274,047 in Stolen Funds into the United States through the WHN Scheme, including:

    a.     A wire transfer of approximately $999,900 from the attorney escrow account of Chabrier Avocats ("Chabrier"), Ilyas's Swiss counsel, to RPM USA on or about June 20, 2012;[5]

    b.     A wire transfer of $3,000,000 from Crownway's account at FBME to Maro on or about July 20, 2012;

    c.     A wire transfer of $1,274,147.08 from VILDER's account at FBME to RPM USA

---

[5]     This escrow account had been funded by funds transferred from VILDER's accounts at FBME, consisting of the Stolen Funds.

on or about November 7, 2012;

d.     A wire transfer of $1,000,000 from VILDER's account at FBME to Maro on or about January 9, 2013;

e.     A wire transfer of $300,000 from VILDER's account at FBME to RPM USA on or about February 28, 2013; and

f.     A wire transfer of $700,000 from VILDER's account at FBME to RPM USA on or about March 1, 2013.

141.     Each of the just-listed transfers was purportedly an investment into WHN. Instead, as set forth in more detail below, much of this money personally benefited Sater, Ridloff, and other conspirators.

142.     In return for assisting in the visa fraud scheme, Sater, Ridloff, and WHN's executives were allowed to spend lavishly from the Stolen Funds transferred into the United States under the cover of the WHN Scheme.

143.     Sater and Ridloff extracted millions in bogus consulting fees from these Stolen Funds and spent WHN funds on personal expenditures including expensive dinners, personal travel, gifts, and millions of dollars in non-business related expenses.

144.     Sater in particular was enriched for helping Ilyas launder the Stolen Funds through the WHN Scheme. Between 2012 and 2013, Sater, and/or Ridloff acting at Sater's direction, transferred hundreds of thousands of dollars in Stolen Funds to GHS, Sater's wholly-owned and controlled entity.

145.     GHS received at least 24 transfers of Stolen Funds, totaling at least $1,285,300. These payments included:

a.     A transfer of $130,000 from ADLUX on or about March 19, 2012;

b.     A transfer of $53,500 from ADLUX on or about May 8, 2012;

c.     A transfer of $43,000 from ADLUX on or about June 6, 2012;

d.   A transfer of $43,000 from ADLUX on or about July 13, 2012;

e.   A transfer of $43,000 from ADLUX on or about August 2, 2012;

f.   A transfer of $15,300 from ADLUX on or about August 9, 2012;

g.   A transfer of $73,500 from ADLUX on or about August 29, 2012;

h.   A transfer of $30,000 from RPM USA on or about September 6, 2012;

i.   A transfer of $180,000 from RPM USA on or about September 19, 2012;

j.   A transfer of $32,500 from RPM USA on or about October 4, 2012;

k.   A transfer of $30,000 from RPM USA on or about October 5, 2012;

l.   A transfer of $32,500 from RPM USA on or about December 31, 2012;

m.  A transfer of $30,000 from RPM USA on or about January 4, 2013;

n.   A transfer of $50,000 from RPM USA on or about January 18, 2013;

o.   A transfer of $32,500 from RPM USA on or about February 11, 2013;

p.   A transfer of $33,000 from RPM USA on or about March 5, 2013;

q.   A transfer of $70,000 from RPM USA on or about April 2, 2013;

r.   A transfer of $27,500 from RPM USA on or about April 2, 2013;

s.   A transfer of $33,000 from RPM USA on or about May 3, 2013;

t.   A transfer of $180,000 from RPM USA on or about June 3, 2013;

u.   A transfer of $30,000 from RPM USA on or about June 3, 2013;

v.   A transfer of $30,000 from RPM USA on or about July 11, 2013; and

w.  A transfer of $30,000 from RPM USA on or about July 29, 2013.

146.   An August 8, 2014 balance sheet for RPM USA disclosed more than $800,000 paid to GHS in purported consulting fees in under two years, from that one entity.

147.   GHS is wholly-owned and controlled by Sater. As such, Sater's knowledge of the

corrupt nature of the Stolen Funds is imputed to GHS.

148.   GHS continues to hold some or all of the Stolen Funds.

149.   GHS's use of the Stolen Funds remains unclear, but public reports indicate that GHS was partnered or did business with a range of entities, including with Titan Atlas Manufacturing ("Titan Atlas"), as a reseller for Titan Atlas. In sworn testimony, Sater acknowledged that there was a relationship between GHS and Titan Atlas, and that GHS may have made payments to Titan Atlas.

150.   In addition to the transfers to Sater's entity GHS, Sater, or Ridloff at Sater's direction, distributed more than $200,000 in Stolen Funds from RPM USA to pay Sater's personal expenses purportedly in connection with WHN, including:

a.    A December 26, 2012 transfer of $15,000 from the RPM USA account to pay Sater's American Express;

b.   A March 5, 2013 transfer of $15,000 from the RPM USA account to pay Sater's American Express;

c.   A June 17, 2013 transfer of $100,000 from the RPM USA account to pay Sater's American Express;

d.   An October 1, 2013 transfer of $50,000 from the RPM USA account to pay Sater's American Express; and

e.   A November 4, 2013 transfer of $38,462 from the Maro account to pay Sater's American Express.

151.   While the conspirators, including Sater and Ridloff, transferred more than $7 million of the Stolen Funds out of FBME and into the United States under the guise of investment in WHN, in fact, the conspirators themselves knew and acknowledged that the WHN investment itself was worth barely more than $1,000,000.  According to an internal RPM USA balance sheet maintained by the Local Counsel, as of December 31, 2013, RPM USA valued the WHN investment at $1,070,970.51.

152.   The same internal balance sheet disclosed $768,054.28 in consulting fees to

Sater's entity GHS from RPM USA in 2013 alone, and $1,326,374.50 in other unexplained wire transfers.

153.    The reason for the vast discrepancy between the amount of the Stolen Funds transferred into the United States as part of the WHN Scheme and the purported value of the WHN investment is because WHN was a cover for unrelated and illegitimate funds transfers. The WHN Scheme was a conduit for laundering Stolen Funds, either by routing these Stolen Funds through the United States and then back overseas, or by allowing the conspirators to spend the Stolen Funds freely in the United States.

154.    The knowing transfer and receipt of at least $7,269,900 in Stolen Funds from the accounts of VILDER, Crownway, and Chabrier to those of RPM USA and Maro was a knowing violation of the Worldwide Freezing Orders by Sater and Ridloff and their co-conspirators.

### ii.    The Trump SoHo Scheme

155.    At the same time Ilyas was laundering the Stolen Funds with Sater through the WHN Scheme, he also was laundering more than $3 million in Stolen Funds through the Trump SoHo project in New York, developed by Sater and Bayrock LLC.

156.    Sater was a partner in Bayrock LLC and held at least a fifty percent profit interest in the company and its subsidiaries.

157.    At Ilyas's direction, over $5 million in Stolen Funds was transferred from Crownway's account at FBME to Elvira Kudryashova's personal bank account at Wells Fargo on or about April 4, 2013.

158.    Ilyas and Sater were concerned that their transfers of Stolen Funds into the United States would be delayed or halted by intermediary banks due to red flags for money laundering. This fear was based on the fact that other transfers from FBME consisting of Stolen Funds had been previously rejected by intermediary banks.

159.     As one example, on or about November 7, 2012, a shell company named Telford International Ltd. ("Telford"), with accounts at FBME, attempted to transfer over $10 million to accounts in Luxembourg at Rothschild bank in the name of Triadou SPV S.A. ("Triadou").

160.     As reported by the OCCRP, Telford was one of the shell companies that received a portion of the Stolen Funds that were transferred into NSW's accounts at FBME.

161.     Triadou was another shell company controlled by Ilyas, and a subsidiary of Ilyas's company SDG. The wire from Telford was rejected by the intermediary bank for compliance reasons, and the conspirators were forced to find other means by which to transfer these funds.

162.     As Triadou's former director testified in 2016:

> Although I was the sole director of Triadou, Ilyas was in charge of Triadou's operations and investments. I would research investment opportunities, Ilyas would select which deals to invest in, and then he would negotiate the deal and organize payment.
>
> *       *       *
>
> From Ilyas, I learned that attempts to transfer funds [ ] from Telford to Triadou, to then be sent to [a business partner], were unsuccessful, and that correspondent banks in Luxembourg refused to accept funds from Telford's accounts.

163.     To evade compliance and anti-money laundering checks like those that had frustrated the transfers to Triadou in late 2012, conspirators mischaracterized transfers from Crownway to Kudryashova as personal loans. The transfers were not loans and were never intended to be repaid. The conspirators falsely represented the nature of these transfers to FBME and correspondent banks, including Deutsche Bank Trust Company of the Americas.

164.     The purported loan from Crownway was never repaid and was, in fact, written off in late 2013 after Ablyazov was arrested in France, along with hundreds of millions of dollars in similarly-fraudulent loans.

165.     On or about April 16, 2013, Ilyas transferred just over $300,000 from his sister's

account to the escrow account of Jajan PLLC, a New York real estate law firm which reportedly handled the majority of purchases in the Trump SoHo development and worked closely with Sater and Bayrock LLC. This transfer represented the down payment on three units in the Trump SoHo development (the "Trump SoHo units").

166.    Shortly afterwards, on April 25, 2013, the conspirators transferred close to $3 million from Kudryashova's account to the same escrow account of Jajan PLLC, representing full payment on the Trump SoHo units.

167.    As the holder of at least a fifty percent profit interest in Bayrock LLC, Sater was entitled to and received a portion of the Stolen Funds used to purchase the Trump SoHo units. Due to his close relationship with Ilyas and the Khrapunov Family, as well as his regular discussions with Ilyas regarding the Worldwide Freezing Orders, Sater knew that these funds were tainted.

168.    The transfer and receipt of over $5 million in Stolen Funds from Crownway's FBME account into Kudryashova's personal bank account in the United States was a knowing violation of the Worldwide Freezing Orders by Sater, Ridloff, and their co-conspirators.

### iii.    The PCS Scheme

169.    In another scheme to launder the Stolen Funds, Sater, Ridloff, and Ilyas conspired to use the New York-based entity RPM USA to purchase an interest in a payment card processing business named Creacard S.A. (the "PCS scheme").  As set forth above, RPM USA was beneficially owned by Ilyas (through SPG) and was controlled by its directors, Sater and Ridloff.

170.    In late 2012, RPM USA agreed to purchase a majority interest in Creacard S.A., a French corporation, for €5.5 million. At Sater's direction, Ridloff signed this agreement as RPM USA's manager.

171.    The Local Counsel's escrow account was designated by the conspirators as the

method of payment, and on or about November 7, 2012, $1,274,147.08 was wired from the accounts of VILDER at FBME, "on behalf of Swiss RPM," to RPM USA's account at JPMorgan Chase.  At all relevant times, the RPM USA account was controlled by Sater and Ridloff.

172.    As set forth above, "Swiss RPM" was another name for SPG, the parent company of RPM USA.

173.    VILDER's funding consisted of more than $90 million of the Stolen Funds and other wrongfully-obtained funds of Ablyazov and the Khrapunov Family.

174.    One week later, on or about November 13, 2012, $1,200,000 was transferred from the RPM USA account to the Local Counsel's escrow account.

175.    In sworn testimony, Sater has admitted that Ilyas informed him that the Creacard investment was funded and controlled by Ablyazov.

176.    Ridloff, as RPM USA's manager who had signed the agreement with Creacard, was likewise aware that the investment was funded and controlled by Ablyazov.

177.    As the Creacard investment neared closing, and after more than $1.2 million had been transferred into the United States to purportedly fund the investment, Ilyas requested that the purchaser of Creacard be falsely identified as Lloyd LaMarca, an associate of Ilyas. Sater agreed to present LaMarca as the buyer, while knowing that LaMarca was simply a straw purchaser used to conceal Ilyas and Ablyazov's role in the transaction from French banking and regulatory authorities.

178.    In sworn testimony, Sater confirmed his knowledge that Ilyas used LaMarca as a shill for the Creacard investment, and that Ilyas and Ablyazov concealed their role in the investment from French banking and regulatory authorities.

179.    On or about April 17, 2013, Ilyas e-mailed Aggarwal from a pseudonymous e-mail

38

account, directing that Aggarwal transfer an additional €10,000,000 of the Stolen Funds to "Techvest S.A.," an entity in LaMarca's name, to complete the Creacard transaction. In the same e-mail, Ilyas admitted that, while €10 million was to be transferred to Techvest under the cover of the Creacard S.A. transaction, the actual purchase price would be closer to €5 million.

180.     The transfer and receipt of $1,274,147.08 in Stolen Funds from VILDER's FBME account to RPM USA's account was a knowing violation of the Worldwide Freezing Orders by Sater and Ridloff and their co-conspirators.

181.     The transfer of $1,200,000 in Stolen Funds from RPM USA's account to the Local Counsel's escrow account was also a knowing violation of the Worldwide Freezing Orders by Sater and Ridloff and their co-conspirators.

### iv.     *The Syracuse Center Scheme*

182.     Sater and Ridloff also conspired with Ilyas and Ablyazov to launder nearly two million dollars in Stolen Funds through a real estate investment in Syracuse, New York.

183.     In April 2013, Sater purchased a disused mental health facility in Syracuse on behalf of an unnamed investor for $1,200,000.

184.     As reported by McClatchyDC, Sater made the deposit on the investment by wiring $250,000 the day after the sale. McClatchyDC reported that the memorandum of sale was signed by Sater's rabbi on his behalf.  According to someone involved in the deal, however, "I can't tell you who the partners were, but I can tell you it was an organization with no rabbis."

185.     When the deal ultimately closed, the recorded owner of the property was a New York incorporated entity, Syracuse Center LLC ("Syracuse Center").  Syracuse Center was a subsidiary of Triadou, which in turn was a subsidiary of Ilyas's Swiss company SDG.

186.     Syracuse Center's principal place of business was 14 Vanderventer Avenue, Suite 255, Port Washington, New York.

187.     Sater and Ridloff were each managers of Syracuse Center, as set forth in an operating agreement dated July 1, 2013, and each exercised control over Syracuse Center and its investments.

188.     The Syracuse Center acquisition was funded by $1,900,000 transferred on or about July 10, 2013 from ADLUX's accounts at Compagnie Privée de Conseils et d'Investissements S.A. ("CPCI"), a Swiss private bank controlled by an associate of Ilyas, to the attorney escrow account of Moses & Singer LLP, one of Sater's longtime law firms. Sater's longtime counsel, including for his numerous criminal matters, is a well-known and prominent partner at Moses & Singer and head of the firm's white-collar practice.

189.     In sworn testimony, Sater admitted that he personally sourced the Syracuse Center acquisition, and that the funding for the investment came solely from "the Khrapunov group of companies."

190.     The transfer and receipt of $1,900,000 in Stolen Funds from ADLUX's CPCI account was a knowing violation of the Worldwide Freezing Orders by Sater, Ridloff, and their co-conspirators.

### *v.     The Tri-County Mall Scheme*

191.     The single largest investment of the Stolen Funds by Sater and Ridloff was the Tri-County Mall Scheme, executed in mid-2013.

192.     In this scheme, the conspirators, including Sater, Ridloff, and Ilyas, laundered approximately $30 million in Stolen Funds from Telford's FBME account through the purchase and rapid resale of debt on the Tri-County Mall, a shopping mall located in Cincinnati, Ohio.

> **1.     Sater and Ridloff Laundered More Than $30 Million into the Tri-County Mall, Quickly Sold It for a Big Profit, and Paid Themselves and Others Handsomely.**

193.     The Tri-County Mall is a shopping mall in or around Cincinnati, Ohio.  In early

2013, a note on the Tri-County Mall (the "Note") was held by a third-party lender (the "Noteholder").

194.    Due to business difficulties, the Noteholder sought to sell the Note to the highest bidder. For this purpose, the Noteholder's loan servicer retained a highly-respected real estate advisory firm (the "Real Estate Advisor") to conduct a bidding process for the sale of the Note.

195.    The conspirators, including Sater and Ridloff, conspired to launder part of the Stolen Funds by purchasing and reselling the Note. By purchasing the Note with Stolen Funds, and then reselling the Note and directing the resulting sale proceeds into the legitimate financial system, the conspirators hoped to launder a significant portion of the Stolen Funds in one deal, resulting in a substantial amount of money that they could claim originated from a real estate transaction and was therefore untainted.

196.    To execute this scheme, at the direction of Sater and Ridloff, the Local Counsel created a shell company for the Note acquisition named Tri-County Mall Investors LLC ("TCMI"), on or about April 22, 2013.  TCMI was a subsidiary of Triadou, which in turn was a subsidiary of Ilyas's Swiss company SDG.

197.    TCMI's principal place of business was 630 Fifth Avenue, New York, New York.

198.    At all relevant times, Ridloff acted at Sater's direction and made statements on Sater's behalf and/or at Sater's direction in connection with the Tri-County Mall Scheme. In doing so, Ridloff helped hide Sater's involvement in the Tri-County Mall Scheme because Sater's notorious criminal background would have raised a red flag to counterparties in a deal of this magnitude. To this end, neither Sater, Ilyas, nor Ablyazov are mentioned anywhere in TCMI's operating agreement.

199.    For this reason, Ridloff was made manager of TCMI, despite his subordinate

position to Sater in the conspiracy.

200.     While Sater was neither an officer nor director of TCMI, he was given a power of

attorney over TCMI on or about June 23, 2013.

201.     On or about the same date, Ridloff also was given power of attorney over TCMI.

202.     On or about April 16, 2013, Ridloff, on behalf of TCMI and at Sater's direction,

submitted by e-mail a bid package for the purchase of the Note to the Real Estate Advisor (the

"Bid Package").

203.     The Bid Package was materially false and misleading in multiple respects:

a.     The Bid Package was submitted by Ridloff purportedly on behalf of the "SDG
       Investment Fund." In truth, no such entity existed, and Ridloff was acting on
       behalf of TCMI.

b.     On pages 1 and 5 of a brochure included in the Bid Package, the SDG Investment
       Fund was described as a "Luxembourg SIF," or specialized investment fund.  In
       truth, there was no SDG Investment Fund authorized under the laws of
       Luxembourg to operate as a specialized investment fund, nor was the real SDG
       ever a specialized investment fund.

c.     The Bid Package included a letter from TCMI's director that stated that the "SDG
       Investment Fund" had sufficient investment capacity to enable it to invest up to
       $1.5 billion. In truth, no more than $440 million was available to invest, in the
       form of the Stolen Funds, and all investments were owned by shell companies of
       SDG, as there was no such fund authorized under the laws of Luxembourg.

d.     Pages 5 and 7 of the same brochure included in the Bid Package stated that the
       "Fund's activities will be led by CEO Nicolas Bourg" and others. In truth, all
       investment activities of the conspirators, including through TCMI, were led by
       conspirators Ilyas Khrapunov, Sater, and Ridloff, operating in concert with
       Mukhtar Ablyazov in order to breach the Worldwide Freezing Orders. This was
       not disclosed in the Bid Package.

e.     Page 10 the same brochure described a "management process" and stated that all
       investment decisions were made by an "SDG IF Investment Committee." In truth,
       there was neither a management process nor an investment committee, and all
       investment decisions were made by Ablyazov and Ilyas Khrapunov.

f.     Pages 16 to 17 of the same brochure described a supporting fund investment
       called "Igloo." In truth, the "Igloo" investment was an asset acquired by a
       subsidiary of SDG using a portion of the Stolen Funds. This was not disclosed in

the Bid Package.

g.      Pages 18 to 19 of the same brochure described a supporting fund investment called "Nikki Beach." In truth, the "Nikki Beach" investment was an asset acquired by a subsidiary of SDG using a portion of the Stolen Funds. This was not disclosed in the Bid Package.

h.      Pages 20 to 21 of the same brochure described a fund investment called "Flatotel." In truth, the "Flatotel" investment was an asset acquired by a subsidiary of SDG using a portion of the Stolen Funds. This was not disclosed in the Bid Package.

i.      Contrary to the representations in the brochure included in the Bid Package, the SDG Investment Fund did not develop the Flatotel; rather, the project was led by a local New York real estate developer. A subsidiary of SDG acquired a minority ownership interest in a Flatotel holding company, using a portion of the Stolen Funds. This was not disclosed in the Bid Package.

j.      The brochure included in the Bid Package stated that SDG Investment Fund's investment in the Flatotel was "290,5 million." In truth, Telford had invested approximately $35 million in Stolen Funds in the Flatotel project through Triadou, SDG's subsidiary.  Although Triadou's internal financials valued its stake in the Flatotel at significantly more than the $35 million invested, Triadou never valued its stake in the Flatotel at anything remotely close to $290.5 million. This was not disclosed in the Bid Package.

k.      Pages 22 to 23 of the brochure included in the Bid Package described the SDG Investment Fund as "established in Luxembourg," regulated by "the Commission for the Surveilance of the Financial Sector ('CSSF')," and a "specialized investment fund" that can provide investors "tax rates as low as 0.01%." In truth, there was no "SDG Investment Fund" SIF established in Luxembourg at that time, nor was such a fund regulated by the CSSF as of the date of the Bid Package. As set forth above, SDG itself was not a SIF, either.  This was not disclosed in the Bid Package.

l.      Page 24 of the brochure included in the Bid Package stated that the SDG Investment Fund was funded by outside investors. In truth, there were no such investors, and all assets were those of Ablyazov and his conspirators, including the Stolen Funds. This was not disclosed in the Bid Package.

m.     Nowhere did the Bid Package disclose that the Stolen Funds to be invested were subject to the Worldwide Freezing Orders.

n.      Nowhere did the Bid Package disclose that Ablyazov's assets, including the Stolen Funds, were subject to the Receivership Orders.

o.      Nowhere did the Bid Package disclose that, pursuant to the Worldwide Freezing Orders and Receivership Orders, BTA Bank's affirmative consent was required

for any transfer, disposal, or dissipation of any of Ablyazov's assets, including the Stolen Funds.

204.    At all relevant times, Sater and Ridloff knew that the Bid Package contained materially false and misleading statements, and omissions that rendered the Bid Package materially false and misleading.

205.    The Real Estate Advisor relied on the Bid Package in critical respects: the Real Estate Advisor was obligated to, and did, conduct due diligence on TCMI's proposal, including the Bid Package, which included investigating and contacting sources as appropriate. Had the Bid Package truthfully disclosed that Sater and Ridloff were investing the Stolen Funds on behalf of Ablyazov, who was subject to the Worldwide Freezing Orders and whose assets could be transferred only with BTA's consent, the Real Estate Advisors would reasonably have contacted BTA and/or the Receivers to determine whether BTA had consented to this use of the Stolen Funds. Otherwise, they would not have accepted TCMI's proposal.

206.    Sater and Ridloff drafted the Bid Package in a manner specifically designed not to arouse the suspicions of the Kazakh Entities or a class of persons including them. Sater and Ridloff knew that the Kazakh Entities were actively investigating the Khrapunovs' and Ablyazov's investment activities.

207.    On or about April 22, 2013, TCMI won the bidding process on the Note and was obligated to fully fund the deal within approximately one month (the "Tri-County Deal"). Apparently surprised that the fraudulent Bid Package had not been exposed, Ridloff e-mailed Sater and the Local Counsel that same day, stating "Now what . . . we won . . . ."

208.    The next day, Sater forwarded Ridloff's email to Ilyas, informing him that their bid had won and asking him to arrange the transfer of the $2.8 million deposit needed to secure the deal. Ilyas arranged for the payment to be made from Telford's account at FBME.

209.    Also on or about April 23, 2013, TCMI authorized Ridloff to negotiate the terms of the Note acquisition.

210.    Sater and Ridloff immediately began working with a mortgage broker (the "Mortgage Broker") to obtain financing for the deal.

211.    As part of the effort to obtain financing, the Mortgage Broker commissioned a background investigation of TCMI and its owners.

212.    Through May 21, 2013, the Mortgage Broker was actively working with Sater and Ridloff on obtaining a third-party loan for the Note acquisition.

213.    The Mortgage Broker's role in helping TCMI obtain financing abruptly ended on May 22, 2013, when the Mortgage Broker received the background investigation report that it had commissioned on TCMI and its parent companies and ultimate beneficial owners and therefore ended its involvement with the deal.

214.    Sater has testified that the background investigation report revealed the "fronts for [Ilyas] Khrapunov," including Philippe Glatz, the purported owner of two front companies, Triadou and SDG Capital SA.

215.    The investigation also unearthed various news reports and Internet articles linking SDG Capital and SDG to the Khrapunov Family, and noted that the Khrapunov Family was reportedly implicated in and subject to ongoing investigations in connection with money laundering.

216.    TCMI would lose its deposit and its right to acquire the Note if it did not fund the Real Estate Law Firm's escrow account by May 22, 2013. With a third-party loan no longer possible once the Mortgage Broker abruptly ended its involvement after receiving the background investigation report, Ilyas immediately sought a bridge loan from FBME, secured by his shares in

Apple Inc. Ultimately, however, the Note acquisition was funded directly from Telford's account at FBME.

217.    In an email to Sater in early June 2013, Ridloff opined that the results of the background investigation were "[n]ot very positive."

218.    In sworn testimony, Sater confirmed that he shared the background investigation report with Ilyas.

219.    The minutes from a May 23, 2013 meeting involving participants from SDG and Chabrier even reveal that the participants considered whether to change Triadou's name, although they ultimately decided not to do so, deeming it "not necessary." The participants considered this name change because they were concerned that they might lose the Tri-County Deal and other investments if counterparties or partners could link Triadou to SDG, SDG Capital, and ultimately the Khrapunovs and Ablyazov.

220.    Sater and Ridloff also submitted false documents to the law firm representing TCMI in the Tri-County Deal (the "Real Estate Law Firm") in order to move nearly $30 million in Stolen Funds into the Real Estate Law Firm's escrow account for the purchase of the Note.

221.    Ridloff, at Sater's direction, provided copies of the same Bid Package, or a substantially similar document including the same misrepresentations and omissions, to the Real Estate Law Firm.

222.    In order to fund the Tri-County Deal, the conspirators, including Sater and Ridloff, directed two wire transfers to the Real Estate Law Firm's escrow account to purchase the Note:

a.    On April 24, 2013, Telford transferred $2,800,045.23 in Stolen Funds from its account at FBME to the escrow account of the Real Estate Law Firm for the Tri-County Deal; and

b.    On May 22, 2013, Telford transferred $28,000,000 in Stolen Funds from its account at FBME to the escrow account of the Real Estate Law Firm for the Tri-County Deal.

46

223.     Sater has admitted in sworn testimony that he knew at all relevant times that Telford was a shell company owned and controlled by his co-conspirators, Ilyas and Ablyazov.

224.     Ridloff also knew at all relevant times that Telford was a shell company owned and controlled by his co-conspirators, Ilyas and Ablyazov.

225.     In addition to corresponding with Ilyas to arrange the $2.8 million deposit payment, Sater and Ridloff also corresponded with Ilyas regarding the $28 million payment for the balance of the Tri-County Deal. As with the deposit, Ilyas arranged for the $28 million payment to be made from Telford's account at FBME.

226.     In sworn testimony, Sater admitted that Ilyas specifically told him that Ablyazov's money funded the Tri-County Mall Scheme.

227.     On or about April 24, 2013, RPM USA also transferred $35,000 from the RPM USA account to the escrow account of the Real Estate Law Firm to fund the Tri-County Deal.

228.     The Real Estate Law Firm would not have accepted the wire transfers from Telford or RPM USA to fund the Tri-County Deal if the conspirators had disclosed the true nature of the Stolen Funds, including that the transfers were a knowing breach of the Worldwide Freezing Orders.

229.     Immediately after the Tri-County Deal was funded, Sater and Ridloff engaged in another act of self-dealing intended to obscure their knowing receipt of the Stolen Funds in breach of the Worldwide Freezing Orders.

230.     On or about May 23, 2013, just a day after the Real Estate Law Firm had received the $28,000,000 transfer from Telford's account at FBME, the Real Estate Law Firm transferred $1,080,000 in Stolen Funds at Ridloff's direction from the Real Estate Law Firm's escrow to an account at Capital One Bank in the name of Ferrari Holdings LLC ("Ferrari") as a purported

finders' fee.

231.     The next day, Ferrari transferred exactly half of the purported finders' fee, $540,000, to a JPMorgan Chase account in the name of RRMI-DR LLC ("RRMI").

232.     RRMI was, at all relevant times, wholly-owned and controlled by Ridloff, and thus Ridloff's knowledge of the provenance of the Stolen Funds and the existence of the Worldwide Freezing Orders is imputed to RRMI.

233.     Within a week of RRMI receiving $540,000 from Ferrari, on or about May 30, 2013, RRMI executed a check for $345,000 to Bayrock Inc.

234.     Bayrock Inc is wholly owned and controlled by Sater, and other than Sater's involvement, appears to have no relationship to Bayrock LLC, the real estate development company. As such, Sater's knowledge of the provenance of the Stolen Funds and the existence of the Worldwide Freezing Orders is imputed to Bayrock Inc.

235.     Bayrock Inc continues to hold some or all of these Stolen Funds.

236.     There was no legitimate business reason for Ridloff to transfer over $1 million in Stolen Funds to Ferrari, only for half of those Stolen Funds to be immediately transferred back to a shell company controlled by Ridloff, and nearly two-thirds of those funds to be transferred promptly to an entity owned by Sater. The only plausible reason for this apparent kickback scheme was to hide the knowing receipt of Stolen Funds by Sater and Ridloff by using Ferrari as a straw man.

237.     To this end, Ferrari was not involved in any communication with the Real Estate Advisor concerning the Tri-County Mall. A representative of the Real Estate Advisor testified that he did not recognize the name Ferrari Holdings LLC. Rather, it was Ridloff who personally communicated with the Real Estate Advisor and submitted TCMI's bid.

238.    Ferrari was not involved in the negotiation of the terms of the Note acquisition or TCMI's attempts to obtain financing. There is no written agreement between Ferrari and Triadou or TCMI concerning brokerage services provided by Ferrari in connection with the Tri-County Deal.

239.    In the Loan Sale Agreement for Tri-County Mall between the seller and TCMI, each party represented to the other that they had "not dealt with any real estate broker, agent or finder, expect that Seller has engaged [the Real Estate Advisor], as its broker [], and the fee due Seller's Broker in connection with this transaction shall be payable from the Buyer's Premium to a separate written agreement between Seller and Seller's Broker." TCMI did not identify its own broker in the Loan Sale Agreement.

240.    Likewise, the Final Settlement Statement for the Tri-County Mall acquisition identified fees owed to the Real Estate Advisor, as the seller's broker. Ferrari was not listed as a broker in the Final Settlement Statement.

241.    After Ferrari retained $540,000 in Stolen Funds for its role in the Tri-County Mall Scheme, in April 2014, Richard Ferrari acted as broker for the sale of a condominium unit in the Trump SoHo Hotel. The unit was sold for over $1.4 million by an entity called Soho 3310 LLC. As publicly reported, Soho 3310 LLC is an entity controlled by the Khrapunovs. Richard Ferrari, who brokered the sale, is a relative of at least one member of Ferrari Holdings LLC.

242.    Ferrari Holdings LLC was aware of its essential role in the conspiracy to launder the Stolen Funds, which Ferrari knew were the rightful property of BTA and Almaty. Ferrari worked closely both with the Khrapunovs and with Sater and Ridloff to hide the true nature of transactions that served to dissipate Ablyazov's assets in violation of the Worldwide Freezing Orders.

243. Ferrari continues to hold these Stolen Funds.

244. On or about May 23, 2013, the Tri-County Deal closed.

245. According to public court filings made by TCMI in the Supreme Court of the State of New York, New York County, within 60 days of the closing, on or about July 18, 2013, the Note was resold at auction to a third party for $45,000,000.

246. According to publicly-filed financial reports of TCMI's parent company, this resale represented a profit of $15,423,000 for TCMI and a 52% return on investment in less than 90 days.

247. Importantly for the conspirators, the funds from the resale of the Note were to be paid by the county sheriff that auctioned the Note into an account designated by TCMI. This arrangement effectively laundered nearly $30 million in Stolen Funds, with a 50% profit.

248. After the sale was closed, on August 29, 2013, $42,720,529.55 was transferred into an account in the name of TCMI at JPMorgan Chase (the "TCMI Account"), representing the proceeds of the sale, minus sale costs.

249. Sater, and/or Ridloff acting at Sater's direction, had control over the TCMI Account.

250. Sater, and/or Ridloff acting at Sater's direction, immediately disbursed more than $5 million to Sater's entities and the conspirators' allies.

251. On or about August 30, 2013, Sater, and/or Ridloff acting at Sater's direction, transferred $2,250,000 from the TCMI Account to an entity named MeM Energy Partners LLC ("MeM").

252. According to public sources and filings with the U.S. Securities and Exchange Commission, MeM is owned and/or controlled by an individual named Mendel Mochkin.

253.     Mochkin was informed by Sater that the Stolen Funds for the Tri-County Deal belonged to Ablyazov, and constituted a breach of the Worldwide Freezing Orders.

254.     Mochkin also knew that the Stolen Funds were the rightful property of BTA and Almaty, and was aware of MeM's essential role in the conspiracy to launder the Stolen Funds.

255.     In sworn testimony, Sater admitted that he may have told Mochkin that Ablyazov was connected to the Tri-County Deal.

256.     Sater described the payment to MeM as a finders' fee to the Local Counsel. In reality, however, Mochkin had done work on behalf of Ablyazov to generate negative publicity about the Republic of Kazakhstan and to improve Ablyazov's public image after his flight from justice in the United Kingdom and sentence for criminal contempt. The $2,250,000 payment to MeM was actually intended to compensate Mochkin for that work.

257.     Specifically, in an email on June 9, 2013, Mochkin told Sater that he could "arrange an interview for your people with a very respected Italian journalist." Sater then forwarded Mochkin's email to Ilyas, describing Mochkin as "a very close friend of mine" who "can guarantee a positive (to you) story." That same day, Ilyas instructed an associate to contact the journalist.

258.     On or about August 30, 2013, Sater, and/or Ridloff acting at Sater's direction, transferred $2,586,382 in Stolen Funds from the TCMI Account to an account at Wells Fargo in the name of Bayrock Inc (the "Bayrock Account").

259.     On or about September 24, 2013, Sater, and/or Ridloff acting at Sater's direction, transferred an additional $866,320 from the TCMI Account to the Bayrock Account.

260.     The Bayrock Account was controlled by Sater, and/or Ridloff acting at Sater's direction.

261.   Bayrock Inc continues to hold some or all of these Stolen Funds.

**2.   Sater and Ridloff Turned on Ilyas, Tried to Steal $45 Million, and Got Away with at Least $20 Million in Stolen Funds.**

262.   Shortly after the resale of the Note, Sater and Ilyas Khrapunov had a falling out.

263.   On or about October 10, 2013, the Local Counsel wrote to TCMI's director, Nicolas Bourg, stating that a dispute over money had arisen between Sater and TCMI, and disclosing the $2.25 million payment to MeM. Based on his longstanding relationship with Sater, the Local Counsel requested a waiver of any conflict of interest in continuing to represent TCMI relating to the dispute.

264.   On December 19, 2013, TCMI sued Sater and Ridloff, alleging that Sater had transferred the proceeds of the Tri-County sale into an account controlled only by Sater and Ridloff (that is, the TCMI Account), without the authorization of TCMI's director.

265.   The lawsuit also alleged, in an affidavit by TCMI's director, that Sater's reason for diverting and retaining the sale proceeds was a claim that he was owed unpaid money in the form of commissions, which TCMI alleged could not have been worth more than $1.6 million.

266.   TCMI's director also alleged that criminal charges were being pursued against Sater and Ridloff for their theft of the sale proceeds.

267.   Within days, however, TCMI's lawsuit against Sater and Ridloff was discontinued and settled on confidential terms (the "Tri-County Settlement").

268.   Despite the fact that TCMI had alleged that Sater and Ridloff were entitled to no more than $1.6 million, numerous public reports indicate that Sater and Ridloff received, or were permitted to retain, the majority of the proceeds of the Tri-County Deal:

a.   As reported by the OCCRP, "[a] legal dispute saw Sater withhold the Ohio mall sale money from the Khrapunovs. The impasse was only resolved after the Khrapunov firm behind the investment agreed to let him walk away with the

majority of the proceeds";

b.   The *New York Daily News* reported that Sater and Ridloff "pocketed at least $21.5 million" in the Tri-County Settlement; and

c.   DCReport.org fixed the Tri-County Settlement value as worth "roughly $20 million" for Sater and Ridloff.

269.   Beginning with the confidential Tri-County Settlement, Sater actively concealed from the Kazakh Entities the fact that Sater and Ridloff had received Stolen Funds. The Kazakh Entities did not learn that Sater and Ridloff had received Stolen Funds until the March 2017 deposition of Cesare Cerrito, one of Ilyas's co-conspirators. To the Kazakh Entities' surprise, Cerrito testified that Sater had instructed Ridloff to divert the revenue from the resale of the Note to one of Sater's personal bank accounts, and that Sater and Ridloff had retained approximately $20 million as part of the Tri-County Settlement.

270.   In sworn testimony, Sater admitted that he retained approximately $20 million as part of the Tri-County Settlement. He also confirmed that Ridloff received a portion of the proceeds of the Tri-County Mall Scheme.

271.   Sater also testified that he did not believe that he ever told an investigatory firm assisting the Kazakh Entities with their asset recovery efforts of the approximately $20 million that he retained pursuant to the Tri-County Settlement. Sater had been in communication with the investigatory firm since early 2015. Furthermore, he confirmed that he did not disclose this fact to Boies Schiller Flexner LLP ("BSF"), counsel for the Kazakh Entities. Sater had been in communication with BSF concerning Triadou's investments since late 2016. Sater likewise testified that he never provided the Tri-County Settlement to the investigatory firm or BSF.

272.   Sater and Ridloff continue to retain some or all of this estimated $20 million in Stolen Funds from the Tri-County Settlement.

I.      **In Summary, the Defendants, with Sater as Their Ringleader, Laundered and Ultimately Retained Millions in Stolen Funds.**

273.    By no later than in or around late 2011, Sater knowingly joined the existing conspiracy between Ablyazov and Ilyas to breach the Worldwide Freezing Orders.

274.    Sater played a central role in all five of the schemes detailed herein, and together with Ridloff, retained approximately $20 million for the Tri-County Mall Scheme alone.

275.    Specifically, Sater was instrumental in sourcing these U.S. investments, as well as in obscuring Ablyazov's and the Khrapunovs' role in these investments and thereby successfully laundering millions in Stolen Funds in a relatively short period of time. He also was responsible for bringing the other defendants into the existing conspiracy to breach the Worldwide Freezing Orders. Sater drew on his experience in the U.S. real estate market, as well as his past criminal experience, to launder the Stolen Funds, thereby concealing them from the Kazakh Entities.

276.    Likewise, by no later than in or about mid-2012, Ridloff joined Sater, Ilyas, and Ablyazov in the extant conspiracy to breach the Worldwide Freezing Orders. In acting as the public face for certain entities, such as TCMI, Ridloff was instrumental in obscuring Ablyazov's and the Khrapunovs' role in these U.S. investments and thereby successfully laundering millions in Stolen Funds, concealing them from the Kazakh Entities.

277.    GHS and Bayrock Inc, both wholly owned and controlled by Sater, were also instrumental in the conspiracy to breach the Worldwide Freezing Orders. Specifically, GHS facilitated Sater's receipt of Stolen Funds in exchange for his helping Ilyas to launder Stolen Funds through WHN and assistance with the visa fraud scheme. Bayrock Inc facilitated Sater's receipt of Stolen Funds laundered through the Tri-County Mall Scheme. Transfers to and from both entities further concealed the Stolen Funds from the Kazakh Entities.

278.    RRMI, wholly owned and controlled by Ridloff, likewise was instrumental in the

conspiracy to breach the Worldwide Freezing Orders. Specifically, RRMI facilitated Ridloff's receipt of Stolen Funds laundered through the Tri-County Mall Scheme. Transfers to and from RRMI further concealed the Stolen Funds from the Kazakh Entities.

279.   Ferrari too was instrumental in the conspiracy to breach the Worldwide Freezing Orders. Specifically, Ferrari played a key role in hiding the knowing receipt of Stolen Funds by Sater and Ridloff, in return for which it received over half a million dollars in Stolen Funds as a kickback. Transfers to and from Ferrari further concealed the Stolen Funds from the Kazakh Entities.

280.   Finally, MeM was instrumental in the conspiracy to breach the Worldwide Freezing Orders. Specifically, Mochkin's work on behalf of Ablyazov to generate negative publicity about the Republic of Kazakhstan and to improve Ablyazov's public image was aimed at facilitating the laundering of the Stolen Funds, thereby concealing them from the Kazakh Entities. For its key role in the conspiracy, MeM was compensated to the tune of over $2 million.

## RELEVANT FOREIGN LAW

281.   It is an actionable tort under English law to conspire to harm another through unlawful means.

282.   Under English law, an unlawful means conspiracy has four elements:

a.     A common agreement or understanding on a course of action between two or more parties;

b.     The intent to act unlawfully;

c.     An overt act by one or more of the parties in furtherance of that common agreement; and

d.     Damage to an innocent party.

283.   Under English law, a conspirator is liable for all damages suffered by the victim of the conspiracy from the time the conspirator joins the conspiracy.

284.   In *JSC BTA Bank v. Khrapunov*, [2018] UKSC 19 (Hillary Term), the U.K.

Supreme Court held that a conspirator's primary purpose need not be to injure the plaintiff, so

long as the means used to do so were unlawful:

> when conspirators intentionally injure the plaintiff and use unlawful
> means to do so, it is no defence for them to show that their primary
> purpose was to further or protect their own interests; it is sufficient
> to make their action tortious that the means used were unlawful.

285.   In the same case, the U.K. Supreme Court held that the unlawful means element of

this tort may be satisfied where the means used constituted violations of criminal law:

> The Appellate Committee held that a criminal offence could be a
> sufficient unlawful means for the purpose of the law of conspiracy,
> provided that it was objectively directed against the claimant, even if
> the predominant purpose was not to injure him.
>
> \*   \*   \*
>
> Addressing the character of the unlawfulness required, Lord Walker
> derived from the authorities the proposition that "unlawful means,
> both in the intentional harm tort and in the tort of conspiracy, include
> both crimes and torts (whether or not they include conduct lower on
> the scale of blameworthiness) . . . ."

286.   By this lawsuit, BTA Bank and the City of Almaty seek to hold the Defendants

responsible for their illegal conduct in the United States in violation of U.S. law.

## **FIRST CAUSE OF ACTION**

### **(UNJUST ENRICHMENT)**
### *Against All Defendants*

287.   The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 286

as if fully set forth herein.

288.   The Defendants were unjustly enriched at the expense of the City of Almaty and

BTA Bank when they knowingly accepted Stolen Funds. These include:

a.   Sater and Ridloff jointly received at least $20,000,000 in Stolen Funds from the
     Tri-County Mall Scheme, despite knowing that these funds were wrongfully

obtained and subject to the Worldwide Freezing Orders;

b. Bayrock Inc received, through wire transfers or checks, at least $3,797,202 in Stolen Funds, despite knowing through its controlling owners and/or directors that these funds were wrongfully obtained and subject to the Worldwide Freezing Orders;

c. GHS received at least 24 transfers of Stolen Funds, totaling at least $1,285,300, despite knowing through its controlling owners and/or directors that these funds were wrongfully obtained and subject to the Worldwide Freezing Orders;

d. Ferrari received at least $1,080,000 in Stolen Funds, despite knowing through its controlling owners and/or directors that these funds were wrongfully obtained and subject to the Worldwide Freezing Orders;

e. RRMI received at least $540,000 in Stolen Funds, despite knowing through its controlling owners and/or directors that these funds were wrongfully obtained and subject to the Worldwide Freezing Orders; and

f. MeM received at least $2,250,000 in Stolen Funds, despite knowing through its controlling owners and/or directors that these funds were wrongfully obtained and subject to the Worldwide Freezing Orders.

289. These transfers of the Stolen Funds were at Plaintiffs' expense and caused injury to Plaintiffs. By knowingly arranging and accepting these transfers of the Stolen Funds, the Defendants caused money that should rightfully have been restrained by the Worldwide Freezing Orders to instead be laundered and hidden from Plaintiffs, the Receivers, and the U.K. courts.

290. The Defendants knew that the Stolen Funds were the rightful property of BTA and Almaty, and were aware of their essential role in the conspiracy to launder the Stolen Funds.

291. It would be against equity and good conscience to permit the Defendants to retain money knowingly derived from the looting of assets rightfully belonging to Plaintiffs.

292. Furthermore, Sater's long and notorious criminal history evidences his utter contempt for the law.

293. Sater's conduct alleged here was not merely a civil wrong, but rises to the level of criminal conduct.

294.    Among other things, Sater violated Title 18, United States Code, Sections 371 (conspiracy against the United States), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (mail, wire, and bank fraud conspiracy), 1546 (immigration fraud), and 1956 and 1957 (money laundering), as detailed *infra*.

295.    Sater's knowing violation of criminal statutes establishes his contempt for the law and constitutes conduct having a high degree of moral culpability manifesting a conscious disregard of the rights of others.

296.    Sater's conduct alleged here was part of a pattern of illegal conduct throughout his adult life.

297.    Sater's conduct alleged here caused public harm in numerous ways, including by undermining the integrity of the U.S. immigration system, particularly its visa application processes, and hampering Almaty's efforts to recover the Stolen Funds and put them to use to benefit the people of Almaty.

## SECOND CAUSE OF ACTION

### (MONEY HAD AND RECEIVED)
### *Against All Defendants*

298.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 286 as if fully set forth herein.

299.    Each of the Defendants received and benefitted from the Stolen Funds rightfully belonging to Plaintiffs, in breach of the Worldwide Freezing Orders. These include, but are not limited to:

    a.    At least $20,000,000 received and retained by Sater and Ridloff jointly from the Tri-County Mall Scheme;

    b.    At least $3,797,202 received and retained by Bayrock Inc;

    c.    At least $1,285,300 received and retained by GHS;

d.      At least $195,000 received and retained by RRMI;

e.      At least $540,000 received and retained by Ferrari; and

f.       At least $2,250,000 received and retained by MeM.

300.    Each of the Defendants benefited from the use and enjoyment of these Stolen Funds.

301.    The Defendants knew that the Stolen Funds were the rightful property of BTA and Almaty, and were aware of their essential role in the conspiracy to launder the Stolen Funds.

302.    It would offend equity and good conscience to permit the Defendants to retain Stolen Funds accepted and received in knowing violation of the Worldwide Freezing Orders.

303.    Furthermore, Sater's long and notorious criminal history evidences his utter contempt for the law.

304.    Sater's conduct alleged here was not merely a civil wrong, but rises to the level of criminal conduct.

305.    Among other things, Sater violated Title 18, United States Code, Sections 371 (conspiracy against the United States), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (mail, wire, and bank fraud conspiracy), 1546 (immigration fraud), and 1956 and 1957 (money laundering), as detailed *infra*.

306.    Sater's knowing violation of criminal statutes establishes his contempt for the law and constitutes conduct having a high degree of moral culpability manifesting a conscious disregard of the rights of others.

307.    Sater's conduct alleged here was part of a pattern of illegal conduct throughout his adult life.

308.    Sater's conduct alleged here caused public harm in numerous ways, including by undermining the integrity of the U.S. immigration system, particularly its visa application

processes, and hampering Almaty's efforts to recover the Stolen Funds and put them to use to benefit the people of Almaty.

### THIRD CAUSE OF ACTION

#### (FRAUD)
#### *Against Defendants Sater and Ridloff*

309. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 286 as if fully set forth herein.

310. On or about April 16, 2013, Ridloff, at Sater's direction, caused the false and misleading Bid Package to be sent to the Real Estate Advisor.

311. The Bid Package was sent from TCMI's principal place of business, 630 Fifth Avenue, Suite 2300, New York, New York.

312. The Bid Package was materially false and misleading, or contained material omissions that rendered the Bid Package false and misleading, in numerous respects, including:

a. The Bid Package was submitted by Ridloff purportedly on behalf of the "SDG Investment Fund." In truth, no such entity existed, and Ridloff was acting on behalf of TCMI.

b. On pages 1 and 5 of a brochure included in the Bid Package, the SDG Investment Fund was described as a "Luxembourg SIF," or specialized investment fund. In truth, there was no SDG Investment Fund authorized under the laws of Luxembourg to operate as a specialized investment fund, nor was the real SDG ever a specialized investment fund.

c. The Bid Package included a letter from TCMI's director that stated that the "SDG Investment Fund" had sufficient investment capacity to enable it to invest up to $1.5 billion. In truth, no more than $440 million was available to invest, in the form of the Stolen Funds, and all investments were owned by shell companies of SDG, as there was no such fund authorized under the laws of Luxembourg.

d. Pages 5 and 7 of the same brochure included in the Bid Package stated that the "Fund's activities will be led by CEO Nicolas Bourg" and others. In truth, all investment activities of the conspirators, including through TCMI, were led by conspirators Ilyas Khrapunov, Sater, and Ridloff, operating in concert with Mukhtar Ablyazov in order to breach the Worldwide Freezing Orders. This was not disclosed in the Bid Package.

e.  Page 10 the same brochure described a "management process" and stated that all investment decisions were made by an "SDG IF Investment Committee." In truth, there was neither a management process nor an investment committee, and all investment decisions were made by Ablyazov and Ilyas Khrapunov.

f.  Pages 16 to 17 of the same brochure described a supporting fund investment called "Igloo." In truth, the "Igloo" investment was an asset acquired by a subsidiary of SDG using a portion of the Stolen Funds. This was not disclosed in the Bid Package.

g.  Pages 18 to 19 of the same brochure described a supporting fund investment called "Nikki Beach." In truth, the "Nikki Beach" investment was an asset acquired by a subsidiary of SDG using a portion of the Stolen Funds. This was not disclosed in the Bid Package.

h.  Pages 20 to 21 of the same brochure described a fund investment called "Flatotel." In truth, the "Flatotel" investment was an asset acquired by a subsidiary of SDG using a portion of the Stolen Funds. This was not disclosed in the Bid Package.

i.  Contrary to the representations in the brochure included in the Bid Package, the SDG Investment Fund did not develop the Flatotel; rather, the project was led by a local New York real estate developer. A subsidiary of SDG acquired a minority ownership interest in a Flatotel holding company, using a portion of the Stolen Funds. This was not disclosed in the Bid Package.

j.  The brochure included in the Bid Package stated that SDG Investment Fund's investment in the Flatotel was "290,5 million." In truth, Telford had invested approximately $35 million in Stolen Funds in the Flatotel project through Triadou, SDG's subsidiary.  Although Triadou's internal financials valued its stake in the Flatotel at significantly more than the $35 million invested, Triadou never valued its stake in the Flatotel at anything remotely close to $290.5 million. This was not disclosed in the Bid Package.

k.  Pages 22 to 23 of the brochure included in the Bid Package described the SDG Investment Fund as "established in Luxembourg," regulated by "the Commission for the Surveilance of the Financial Sector ('CSSF')," and a "specialized investment fund" that can provide investors "tax rates as low as 0.01%." In truth, there was no "SDG Investment Fund" SIF established in Luxembourg at that time, nor was such a fund regulated by the CSSF as of the date of the Bid Package. As set forth above, SDG itself was not a SIF, either.  This was not disclosed in the Bid Package.

l.  Page 24 of the brochure included in the Bid Package stated that the SDG Investment Fund was funded by outside investors. In truth, there were no such investors, and all assets were those of Ablyazov and his conspirators, including the Stolen Funds. This was not disclosed in the Bid Package.

m.  Nowhere did the Bid Package disclose that the Stolen Funds to be invested were subject to the Worldwide Freezing Orders.

n.  Nowhere did the Bid Package disclose that Ablyazov's assets, including the Stolen Funds, were subject to the Receivership Orders.

o.  Nowhere did the Bid Package disclose that, pursuant to the Worldwide Freezing Orders and Receivership Orders, BTA Bank's affirmative consent was required for any transfer, disposal, or dissipation of any of Ablyazov's assets, including the Stolen Funds.

313.  Sater and Ridloff knew the Bid Package was materially false and misleading.

314.  The Real Estate Advisor relied on the fraudulent Bid Package, and Sater and Ridloff knew and intended that the materially false statements and omissions in the Bid Package would prevent the Real Estate Advisor from contacting either Plaintiffs or the court-appointed Receivers to determine whether BTA had consented for the Tri-County Deal to be funded from the Stolen Funds.

315.  Sater and Ridloff drafted the Bid Package in a manner specifically designed not to arouse the suspicions of the Kazakh Entities or a class of persons including them. Sater and Ridloff knew that the Kazakh Entities were actively investigating the Khrapunovs' and Ablyazov's investment activities.

316.  Plaintiffs were damaged as a result of this fraudulent Bid Package, as the Real Estate Advisor would not have selected TCMI's bid had the Bid Package truthfully disclosed involvement of the Stolen Funds, and at least $30,800,045 would not have been transferred in violation of the Worldwide Freezing Orders.

317.  Furthermore, Sater's long and notorious criminal history evidences his utter contempt for the law.

318.  Sater's conduct alleged here was not merely a civil wrong, but rises to the level of criminal conduct.

319.     Among other things, Sater violated Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (mail, wire, and bank fraud conspiracy), and 1956 and 1957 (money laundering), as detailed *infra*.

320.     Sater's knowing violation of criminal statutes establishes his contempt for the law and constitutes conduct having a high degree of moral culpability manifesting a conscious disregard of the rights of others.

321.     Sater's conduct alleged here was part of a pattern of illegal conduct throughout his adult life.

322.     Sater's conduct alleged here caused public harm in numerous ways, including by hampering Almaty's efforts to recover the Stolen Funds and put them to use to benefit the people of Almaty.

## FOURTH CAUSE OF ACTION

### (CONVERSION)
### *Against Defendants Sater and Ridloff*

323.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 286 as if fully set forth herein.

324.     Defendants Sater and Ridloff wrongfully exercised dominion and control over funds rightfully belonging to the City of Almaty and BTA Bank.

325.     Through the Tri-County Settlement, Sater and Ridloff reportedly obtained at least $20,000,000 in Stolen Funds, which they knew to be subject to the Worldwide Freezing Orders and rightfully the property of Plaintiffs.

326.     Neither Sater nor Ridloff had a superior interest to Plaintiffs in the Stolen Funds or any assets wrongfully obtained through the investment of the same. The Stolen Funds, and the assets they were used to purchase, are the rightful property of the Plaintiffs.

327.    Beginning with the confidential Tri-County Settlement, Sater actively concealed from the Kazakh Entities the fact that Sater and Ridloff had received Stolen Funds. The Kazakh Entities did not learn that Sater and Ridloff had received Stolen Funds until the March 2017 deposition of Cesare Cerrito, one of Ilyas's co-conspirators.

328.    Furthermore, Sater's long and notorious criminal history evidences his utter contempt for the law.

329.    Sater's conduct alleged here was not merely a civil wrong, but rises to the level of criminal conduct.

330.    Among other things, Sater violated Title 18, United States Code, Sections 371 (conspiracy against the United States), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (mail, wire, and bank fraud conspiracy), and 1956 and 1957 (money laundering), as detailed *infra*.

331.    Sater's knowing violation of criminal statutes establishes his contempt for the law and constitutes conduct having a high degree of moral culpability manifesting a conscious disregard of the rights of others.

332.    Sater's conduct alleged here was part of a pattern of illegal conduct throughout his adult life.

333.    Sater's conduct alleged here caused public harm in numerous ways, including by hampering Almaty's efforts to recover the Stolen Funds and put them to use to benefit the people of Almaty.

## FIFTH CAUSE OF ACTION

### (UNLAWFUL MEANS CONSPIRACY UNDER ENGLISH LAW)
*Against Defendants Sater and Ridloff*

334.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 286

as if fully set forth herein.

335.    Defendants Sater and Ridloff knowingly joined a conspiracy amongst Ablyazov and Ilyas Khrapunov, and others known and unknown, to injure BTA Bank through unlawful means by transferring and laundering the Stolen Funds in breach of the Worldwide Freezing Orders.

336.    Sater joined the conspiracy no later than early 2012, when he executed a purported consulting agreement with SPG.

337.    Ridloff joined the conspiracy no later than June 2012, when he was appointed manager of RPM USA.

338.    Sater, Ridloff, and their co-conspirators committed numerous overt acts in furtherance of this conspiracy, including numerous acts that were themselves unlawful.

339.    Under English law, unlawful means include knowing violations of a freezing order, such as the Worldwide Freezing Orders.

340.    Under English law, unlawful means also include violations of criminal law, in this case, U.S. federal criminal law.

341.    Among other unlawful means, Sater and Ridloff conspired to, and did, violate numerous U.S. federal criminal laws, including, but not limited to, statutes criminalizing wire fraud, mail fraud, making false statements to financial institutions, making false statements in connection with applications for a U.S. visa, money laundering, murder, and racketeering, in furtherance of the unlawful means conspiracy.

342.    18 U.S.C. § 1343 states

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

343.    18 U.S.C. § 1349 states that any person who attempts or conspires to violate 18 U.S.C. § 1343 "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

344.    Sater and Ridloff conspired to, and did, transmit through the wires the false and misleading Bid Package, for the purposes of laundering nearly $30 million in Stolen Funds though international wire transfers dated on or about April 24, 2013 and May 23, 2013, to obtain property, in the form of the Note.

345.    Sater and Ridloff did so for the purposes of interstate and foreign commerce, in the form of the Tri-County Deal.

346.    18 U.S.C. § 371 makes it a crime for any person to knowingly conspire to defraud the United States or any agency thereof.

347.    18 U.S.C. § 1546 makes it a crime for any person to knowingly make a materially false statement in connection with an application under U.S. immigration laws.

348.    As set forth above, Ridloff and Sater knowingly and falsely represented Kudryashova's interest and involvement in WHN to U.S. immigration authorities as part of the WHN Scheme.

349.    18 U.S.C. § 1956 makes it a crime for any person to knowingly engage in a financial transaction that involved the proceeds of "specified unlawful activity," as that term is defined in 18 U.S.C.§ 1956, in order "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  The same statute makes it a crime to engage in a cross-border financial transaction "with the intent to promote the

carrying on of specified unlawful activity."

350.   18 U.S.C. § 1957 makes it a crime for any person to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from "specified unlawful activity," as that term is defined in 18 U.S.C.§ 1956.

351.   18 U.S.C. § 1956(c)(7)(A) defines specified unlawful activity to include any sort of "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1), including mail fraud, wire fraud, and financial institution fraud.

352.   18 U.S.C. § 1956(c)(7)(B)(iii) also defines specified unlawful activity to include "fraud, or any scheme or attempt to defraud, by or against a foreign bank . . . ."

353.   18 U.S.C. §1956(c)(7)(D) also defines specified unlawful activity to include any offense under 18 U.S.C. § 656, which makes it a crime for any officer, director, agent, or employee of a bank, including a foreign bank, to "embezzle[], abstract[], purloin[] or willfully misappl[y] any of the moneys, funds or credits of such bank . . . ."

354.   18 U.S.C. §1956(c)(7)(D) and (c)(7)(A) also define specified unlawful activity to include any murder, both as that term is generally understood and as it is specifically defined under federal law in 18 U.S.C. § 1111.

355.   As set forth above, Ablyazov has already been convicted of arranging the murder of Tatishev, embezzlement, abuse of office, and organizing a criminal group in connection with his multi-billion dollar theft from BTA.  BTA has likewise secured in excess of $6 billion in judgments against Ablyazov as a result of his fraud and embezzlement from BTA.

356.   The Stolen Funds were the proceeds of specified unlawful activity, because the Stolen Funds were the proceeds of Ablyazov's fraud against BTA and wrongful misappropriation of BTA's assets, including but not limited to, the Zhaikmunai Investment.

357.    Sater and Ridloff knew that the Stolen Funds were the proceeds of Ablyazov's

fraud on BTA, commingled with those of the Khrapunov Family from its fraud upon the City of

Almaty.

358.    Sater and Ridloff conspired to, and did, engage in numerous monetary transactions

involving the Stolen Funds, including:

a.    A June 20, 2012 wire transfer of approximately $999,900 from the attorney escrow account of Chabrier, Ilyas's Swiss counsel, to RPM USA's account;

b.    A July 20, 2012 wire transfer of $3,000,000 from Crownway's account at FBME to Maro's account;

c.    A November 7, 2012 wire transfer of approximately $1,274,147.08 from VILDER's account at FBME to RPM USA's account;

d.    A January 9, 2013 wire transfer of $1,000,000 from VILDER's account at FBME to Maro's account;

e.    A February 28, 2013 wire transfer of $300,000 from VILDER's account at FBME to RPM USA's account;

f.    A March 1, 2013 wire transfer of $700,000 from VILDER's account at FBME to RPM USA's account;

g.    An April 24, 2013, wire transfer of $2,800,045.23 from Telford's account at FBME to the escrow account of the Real Estate Law Firm for the Tri-County Deal;

h.    An April 24, 2013, wire transfer of $35,000 from RPM USA's account to the escrow account of the Real Estate Law Firm for the Tri-County Deal;

i.    A May 23, 2013, wire transfer of $28,000,000 from Telford's account at FBME to the escrow account of the Real Estate Law Firm; and

j.    A July 10, 2013 wire transfer of $1,900,000 from ADLUX's CPCI account to the attorney escrow account of Moses & Singer LLP, Sater's law firm.

359.    Through these transfers, Sater, Ridloff, and their co-conspirators transferred at

least $40,009,092.30 in Stolen Funds in breach of the Worldwide Freezing Orders.

360.    Sater, Ridloff, and their co-conspirators intended to, and did, execute these

financial transactions in order to conceal the ownership and sources of the Stolen Funds in order

to circumvent the Worldwide Freezing Orders by, among other things, making the fraudulent representations in the Bid Package, representing that Gennady Petelin was the owner of the Stolen Funds, and offering false wire instructions for transfers of Stolen Funds into the United States.

361.   Plaintiffs were damaged by this conspiracy, including, but not limited to, through the transfer of $40,009,092.30 in Stolen Funds in violation of the Worldwide Freezing Orders.

362.   Furthermore, Sater's long and notorious criminal history evidences his utter contempt for the law.

363.   Sater's conduct alleged here was not merely a civil wrong, but rises to the level of criminal conduct.

364.   Among other things, Sater violated Title 18, United States Code, Sections 371 (conspiracy against the United States), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (mail, wire, and bank fraud conspiracy), 1546 (immigration fraud), and 1956 and 1957 (money laundering), as detailed herein.

365.   Sater's knowing violation of criminal statutes establishes his contempt for the law and constitutes conduct having a high degree of moral culpability manifesting a conscious disregard of the rights of others.

366.   Sater's conduct alleged here was part of a pattern of illegal conduct throughout his adult life.

367.   Sater's conduct alleged here caused public harm in numerous ways, including by undermining the integrity of the U.S. immigration system, particularly its visa application processes, and hampering Almaty's efforts to recover the Stolen Funds and put them to use to benefit the people of Almaty.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims for which trial by jury is available.

## DEMAND FOR RELIEF

WHEREFORE, Almaty and BTA Bank demand the Court enter judgment as follows:

A.     For compensatory damages in an amount to be determined at trial;

B.     For punitive damages against Sater at least equal to compensatory damages, in an

amount to be determined at trial;

C.     For pre-and-post judgment interest as appropriate;

D.     For all costs and fees incurred in prosecuting this Complaint;

E.     For such other and further relief as this Court deems just and proper.


Dated:  New York, New York
        August 30, 2019

                              Respectfully Submitted,

                              BOIES SCHILLER FLEXNER LLP

                    By:      /s/ Matthew L. Schwartz

                              Matthew L. Schwartz
                              Peter M. Skinner
                              Craig Wenner
                              Andrew L. Chesley
                              Alexandra C. Jumper

                              Boies Schiller Flexner LLP
                              55 Hudson Yards
                              New York, New York 10001
                              Telephone:  (212) 446-2300
                              Facsimile:  (212) 446-2350
                              E-mail:  mlschwartz@bsfllp.com

70