**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

CITY OF ALMATY, KAZAKHSTAN and

BTA BANK JSC,

Plaintiffs,

-against-

FELIX SATER, et al.,

Defendants.

----------------------------------------------------------------X

**19-CV-2645 (AJN) (KHP)**


<u>**OPINION & ORDER ON MOTION TO STAY**</u>

**KATHARINE H. PARKER, United States Magistrate Judge:**


      Defendant Felix Sater has moved for a stay of this action, Doc. No. 77, pending the conclusion of an arbitration proceeding brought by Litco LLC ("Litco"), a company owned by Sater, against Plaintiffs City of Almaty, Kazakhstan ("Almaty") and BTA Bank, JSC ("BTA Bank"). Litco also brought the arbitration (referred to herein as the "Litco arbitration") against two other entities, the Republic of Kazakhstan ("Kazakhstan") and Arcanum (Asia) Limited ("Arcanum"), neither of which is a party in this action. The arbitration is pending before the American Arbitration Association ("AAA"). If the Court deems a stay as to all defendants in this action unwarranted, Sater asks that the action be stayed just as to him.

      Sater is not a party to any arbitration agreement with Plaintiffs. Rather, in May 2015, Sater's company, Litco, entered into an agreement to provide investigative and litigation assistance to Plaintiffs, Kazakhstan, and Arcanum in connection with their quest to locate and recover over $6 billion stolen from Plaintiffs in the mid- to late-2000s. After Plaintiffs terminated the Litco agreement, Litco filed a demand for arbitration against Plaintiffs, Arcanum

1

and Kazakhstan pursuant to the arbitration provision in the Litco agreement.  Litco's principal

claim in the arbitration concerns monies due from Plaintiffs allegedly due under the Litco

agreement.

The Litco agreement also contains a broad release of claims against Litco and related

persons and entities.  Litco has asked the AAA arbitration panel to find that the release bars this

action against Sater and to award it its costs and the attorneys' fees incurred in connection with

Sater's defense of this action pursuant to an indemnification obligation Litco has to Sater.

Invoking Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, or, alternatively,

the Court's inherent power to stay, Sater argues that a stay of this action is warranted while the

arbitration panel determines whether the release in the Litco agreement bars the claims

against him in this action.  Although Sater does not style his motion as a motion to compel

arbitration in light of the fact that Litco already has raised the issue of the release in the

pending AAA arbitration, he argues that he has the right to compel Plaintiffs to arbitrate his

affirmative defense to their claims in this litigation and therefore is entitled to a stay.  Plaintiffs

oppose the stay and argue the arbitrator does not have authority to render a decision on

Sater's defense of waiver and release because they did not agree to arbitrate with Sater.

The Court has carefully considered the parties' briefing, their oral arguments on

November 18, 2019, and the supplemental briefing.  For the reasons set forth below, the

motion to stay is denied.[1]  In denying the motion, the Court makes no ruling or finding as to the

---

[1] A ruling on a motion to stay litigation pending arbitration is a non-case-dispositive motion properly before me under the Honorable Alison Nathan's general pretrial supervision referral under 28 U.S.C. § 636(b)(1).  *Powershare, Inc. v. Syntel, Inc.*, 597 F.3d 10 (1st Cir. 2010); *accord Marcus v. Collins*, No. 16CV4221GBDBCM, 2016 WL 8201629, at *1 n.1 (S.D.N.Y. Dec. 30, 2016).  "Although the Second Circuit has not yet addressed the issue, a number of well-

strength or validity of Sater's affirmative defense of release and waiver. That is an issue to be decided later in this litigation.

BACKGROUND

Plaintiffs bring this action against Sater, two companies he owns, Bayrock Group Inc. ("Bayrock Inc.") and Global Habitat Solutions, Inc. ("Global Habitat"), Daniel Ridloff, a former business associate of Sater's, RRMI-DR LLC, a company owned by Ridloff, Ferrari Holdings LLC, and MEM Energy Partners LLC ("MEM Energy"). Plaintiffs allege that Sater and Ridloff assisted Mukhtar Ablyazov, former chair of BTA Bank, JSC ("BTA"), and Viktor Khrapunov, former mayor of the City of Almaty, Kazakhstan, to launder money that Ablyazov and Khrapunov stole from Plaintiffs. They allege that the stolen funds were laundered through shell entities into various investments and that Sater and Ridloff, through the defendant entities they control, knowingly accepted and still possess millions of dollars of the stolen funds. Plaintiffs bring claims for unjust enrichment and money had and received against all defendants. They also assert claims for fraud, conversion, conspiracy under English law, and punitive damages against Sater and Ridloff individually.

The allegations in this action are intertwined with those in another action pending in this Court, captioned *City of Almaty, Kazakhstan, et al. v. Mukhtar Ablyazov, et al*., 15-cv-5345 (AJN)(KHP) (the "Ablyazov Action"). The resolution of the instant motion is in large part

---

reasoned District Court decisions within this Circuit have concluded that a motion to compel arbitration is non-dispositive, and therefore that a Magistrate Judge may decide the motion pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a) rather than issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)." *Marcus*, 2016 WL 8201629, at *1 n.1 (citing *Cumming v. Indep. Health Ass'n, Inc.*, 2014 WL 3533460, at *1 (W.D.N.Y. July 16, 2014); *Chen-Oster v. Goldman, Sachs & Co.*, 785 F. Supp. 2d 394, 399 n.1 (S.D.N.Y. 2011), *rev'd on other grounds sub nom. Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483 (2d Cir. 2013)).

dependent on the text of the relevant provisions in the agreement between Litco and Plaintiffs. However, the Court sets forth details of the allegations in this action and the Ablyazov Action for context.[2]  For purposes of the pending motion, the Court assumes the allegations in the Complaint are true.

### 1. *Mukhtar Ablyazov*

Plaintiffs have sued  Ablyazov in multiple lawsuits across the world as part of their efforts to recover their stolen funds.  *Id.* ¶ 35.  In late 2009, a court in the United Kingdom ("U.K.") issued a worldwide freezing order against all of Ablyazov's assets.  *Id.* ¶ 36-37.  That order, in its amended form, covers multiple entities and offshore companies controlled by Ablyazov and other affiliated individuals*.  Id.*; *see also City of Almaty, Kazakhstan v. Ablyazov,*15-cv-5345, 2019 WL 2324587 (S.D.N.Y. May 29, 2019) (permitting Plaintiffs to amend complaint to add claim for enforcement of judgment against Ilyas Khrapunov).  The freezing order prohibits Ablyazov from diminishing or alienating any of his assets, including any held by nominees, agents, or shell companies, without consent of the U.K. courts and BTA Bank's counsel.  *Id.* ¶ 37.  The freezing order also prohibits third parties from aiding Ablyazov to violate its terms. *Id.* ¶ 40.

---

[2] For additional background on the Ablyazov Action, see *City of Almaty, Kazakhstan v. Ablyazov*, 15-cv-5345, 2019 WL 4747654 (S.D.N.Y. Sept. 30, 2019); 2019 WL 4126445 (S.D.N.Y. Aug. 30, 2019); 2019 WL 1430155 (S.D.N.Y. March 29, 2019); 2018 WL 3579100 (S.D.N.Y. July 25, 2018); 2018 WL 1583293 (S.D.N.Y. March 27, 2018); 278 F. Supp. 3d 776 (S.D.N.Y. 2017); 226 F. Supp. 3d 272 (S.D.N.Y. 2016); 2016 WL 5945912 (S.D.N.Y. June 24, 2016).

Ablyazov violated the freezing order, leading to his being held in criminal contempt and sentenced to 22 months imprisonment in the U.K. *Id.* ¶¶ 43-44. Sometime later, a U.K. court issued a judgment against Ablyazov in favor of BTA Bank in the amount of $4 billion. *Id.* ¶ 47.

### 2. *Viktor and Ilyas Khrapunov*

Viktor Khrapunov (hereinafter, "Viktor") is accused of abusing the powers of his office as mayor of Almaty by transferring public assets to his family and affiliated shell companies. Plaintiffs claim that Viktor laundered Almaty's stolen assets through BTA Bank with the aid of Ablyazov when he was chair of BTA Bank. *Id.* ¶¶ 56-61. In late 2007, Viktor fled Kazakhstan for Switzerland to avoid criminal prosecution. Nonetheless, Kazakh authorities initiated criminal proceedings and, in 2011, an arrest warrant was issued for Viktor. *Id.* ¶ 64. In 2012, the Public Prosecutor of Geneva opened a money laundering investigation into the Khrapunov family (collectively, the "Khrapunovs") and ordered the freezing of the family's Swiss assets. This investigation is ongoing. *Id.* ¶ 65.

Viktor is related through marriage to Ablyazov. Viktor's son, Ilyas Khrapunov (hereinafter, "Ilyas"), is married to Ablyazov's daughter. Plaintiffs allege that Ablyazov sought help from Ilyas to assist in laundering and monetizing stolen assets not yet discovered by BTA Bank or governmental authorities. *Id.* ¶¶ 51-52, 61-62. And, in fact, a U.K. court found that Ilyas had conspired with Ablyazov by assisting in the removal and transfer of funds to keep them out of reach of that court's freezing order. *Id.* ¶ 67. In August 2018, a U.K. court issued a judgment against Ilyas in the amount of $424,110,000 plus interest. *See generally City of*

*Almaty,* 2019 WL 2324587 (permitting Plaintiffs to amend complaint to add claim for enforcement of judgment against Ilyas Khrapunov).

### 3. *Felix Sater*

Felix Sater met the Khrapunovs in the mid-2000s to discuss possible joint business opportunities while Sater was affiliated with an entity called Bayrock Group LLC ("Bayrock LLC"). *Id.* ¶¶ 89-95. He met Ablyazov in 2007 at Ilyas's wedding to Ablyazov's daughter. *Id.* ¶ 96. In 2008, shortly after the Khrapunovs fled to Switzerland, Bayrock LLC announced a partnership with Swiss Development Group S.A. ("SDG"), a Swiss entity owned and controlled by Ilyas and allegedly funded by Ablyazov and the Khrapunovs. *Id.* ¶ 99. Through this relationship, Sater became much more involved with Ablyazov and the Khrapunovs.

Plaintiffs assert that in or about 2011 Ilyas asked Sater to help launder funds that were subject to the U.K. court's freezing orders. *Id.* ¶¶ 102-03. As part of the scheme, Sater entered into a personal consulting agreement with Swiss Promotion Group ("SPG"), another company owned and controlled by Ilyas. *Id.* ¶¶ 104-05. As a consultant to SPG, Sater allegedly assisted Ablyazov and the Khrapunovs in funneling stolen funds into various U.S. investments. Plaintiffs allege that Sater not only profited from these investment schemes, but also that his companies, Bayrock Inc. (an entity with no relationship to Bayrock LLC) and Global Habitat, received and still possesses stolen funds. *Id.* ¶¶ 198-211. They also contend that Sater assisted a company called Triadou SPV S.A. ("Triadou"), a defendant in the Ablyazov Action allegedly controlled by the Khrapunovs, to launder some of the stolen funds into U.S. real estate investments. *City of*

*Almaty, Kazakhstan v. Ablyazov*, 15-cv-5345, 2019 WL 2865102, at *3–4 (S.D.N.Y. July 3, 2019) (describing Sater's interactions with Triadou).

Sater had a falling out with the Khrapunovs in or about 2013 in connection with an investment referred to as the Tri-County Mall investment, resulting in a lawsuit in which Sater was accused of improperly retaining funds. That suit was quickly settled, and Sater wound up with approximately $20 million in the settlement. Plaintiffs contend that the settlement money is also derived from their stolen funds.

In the spring of 2015, a dispute arose concerning another real estate investment on which Sater had advised and which led to the filing of the Ablyazov Action. According to the allegations in the Ablyazov Action, Triadou was seeking to recover an investment in the Flatotel (located in New York City), but when Plaintiffs learned of Triadou's attempts to recover its investment, they asserted rights over the money on the grounds that the investment money was derived from their stolen funds. By early July 2015, an interpleader action was filed in New York State Supreme Court to determine whether $21 million from the Flathotel investment should be discharged to Triadou or, alternatively, to Almaty. That action was removed to this Court in the form of the Ablyazov Action.

5. *Litco*

In the spring of 2015 (shortly before the Ablyazov Action commenced), Sater formed Litco to act as a consultant to parties in litigation. Robert Wolf of Moses & Singer LLP, counsel for Litco, contacted Plaintiffs to offer help in recovering their stolen assets. Doc. No. 78, Sater Aff. ¶¶ 2-3. Wolf indicated that Litco could provide useful information to Plaintiffs. In June

2015, Litco entered into a Confidential Assistance Agreement ("CAA" or the "Litco agreement") with Kazakhstan, Almaty, BTA Bank, and Arcanum, a private investigative firm hired by Plaintiffs. *Id.* ¶ 3 & Ex. 1, CAA. The CAA provided that Litco would provide information, assistance, and cooperation to Arcanum, including by identifying witnesses and locating Plaintiffs' stolen assets. In exchange, Kazakhstan, Arcanum, Almaty, and BTA Bank agreed to pay Litco a $100,000 monthly fee and give Litco 16% of the stolen assets recovered with Litco's assistance. *Id.* ¶ 5; *see* Sater Aff. Ex. B, AAA Statement of Claim; *City of Almaty,* 2019 WL 2865102, at *2 .

Arcanum negotiated the CAA on behalf of Kazakhstan, Almaty, and BTA Bank. *Id.* Sater did not directly negotiate on Litco's behalf. Rather, Wolf negotiated the terms of the CAA with Arcanum, keeping Sater's name and connection to Litco secret. Sater testified that he wanted to hide his affiliation with Litco because, among other things, he feared that Ablyazov and the Khrapunovs had spies and would learn that he was assisting Plaintiffs. Further, "in light of the well-known and wide spread corruption and violence in Kazakhstan, including the alleged murder of the former head of BTA [Bank] at the alleged direction of Ablyazov," he was concerned about harm that might befall him or his family. Sater Aff. Ex. B, AAA Statement of Claim ¶ 32; Doc. No. 89, Schwartz Decl. Ex. 1, Sater Dep. Tr., vol. 2, 143-44. Accordingly, Sater's name is not mentioned anywhere in the CAA, and Sater did not sign the CAA on behalf of Litco. A different individual named Kalsom Kam signed the CAA as a Director of Litco. The CAA expressly provides that Litco would not identify or produce to Arcanum any potential witness who has an ownership interest in Litco, a provision which Sater apparently believed would prevent him from becoming a witness in the Ablyazov Action. *See* Sater Aff. Ex. A, CAA ¶ 6(e).

To further prevent Plaintiffs from learning Sater's affiliation with Litco, Wolf negotiated a separate Non-Disclosure Agreement ("NDA") with Arcanum providing that if it learned the identity of Litco's owner, it would not reveal his identity to Plaintiffs or their attorneys. Sater Aff. Ex. B, AAA Statement of Claim ¶¶ 32-38; Schwartz Decl. Ex. 3 §§ 1-2. Wolf also included a provision in the NDA requiring Arcanum, at Litco's request, to return or destroy all materials reflecting the identity of Litco's owner. Schwartz Decl. Ex. 3 § 4.

Although Sater has acknowledged in sworn testimony that "the obligations under the [CAA] are between Litco and BTA [Bank] and City of Almaty, not myself personally," Schwartz Decl., Ex. 1, Sater Dep. Tr., vol. 1, 31, he contends that certain provisions in the CAA protect him personally, including the release provision and the arbitration provision.

The release provision in the CAA provides a waiver of claims by Plaintiffs against Litco and related entities and persons. Sater Aff. Ex. A, CAA ¶ 10. The provision is broad insofar as it purports to release Litco as well as Litco's "predecessors, successors, direct or indirect parent companies, direct and indirect subsidiary companies, and its past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers and representatives." *Id.* The waiver purports to release this broad group from

> "all known and/or unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses, and punitive damages, of any nature whatsoever, known or unknown, which such Releasors have, or may have had, against the [r]eleasees, whether or not apparent or yet to be discovered, or which may hereafter develop, for any acts or omissions related to or arising from this Agreement, the [r]eleasees' previous, current or future contractual obligations and any other matter between the Parties, and/or any other claims under applicable local, federal or ethical rules, regulations, statutes and laws."

*Id.*  The release expressly carves out and does not waive claims against "any of the Khrapunov Entities or Ablyazov Entities."  *Id.*  The Khrapunov Entities are defined as "Victor Khrapunov, members of his family and entities which they own or control."  *Id.*, Recital B.  The Ablyazov Entities are defined as "Mukhtar Ablyazov, members of his family and entities which they own or control."  *Id.*

The arbitration provision in the CAA is also broad.  It states that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be settled by final and binding arbitration, in New York, New York, administered by the American Arbitration Association ("AAA"), in accordance with its Commercial Arbitration Rules, and with the procedures required under New York law."  Sater Aff. Ex. A, CAA ¶ 14.  The provision requires that the arbitrator apply New York law when construing the CAA and disputes arising under it and states that the arbitrator's decision "shall be conclusive and binding upon the Parties."  *Id.*  "Parties" are defined as Litco LLC, Arcanum (Asia) Limited, Republic of Kazakhstan, The City of Almaty, Kazakhstan, and BTA Bank JSC.  *Id.*, Introductory Paragraph and signature pages.

Between 2015 and 2018, Litco identified various witnesses with knowledge about Plaintiffs' stolen assets to assist Plaintiffs in the Ablyazov Action.  Litco received approximately $2.7 million under the CAA during this period.  Sater Aff. Ex. B, AAA Statement of Claim ¶ 55.  Sater met personally with Plaintiffs' counsel in the Ablyazov Action to provide information about which he had personal knowledge to assist them in their prosecution of that action.  This

led Plaintiffs to name Sater as a witness in the Ablyazov Action.  At his deposition, Sater revealed that he was the owner of Litco and had received substantial sums from Plaintiffs under the CAA.  *Id*. ¶ 60.  Plaintiffs, claiming to have just learned that Sater owned Litco, then terminated their agreement with Litco.[3]  *Id*. ¶ 61.

### 6.      *Litco Commences Arbitration Against Plaintiffs*

In October 2018, less than a month after Plaintiffs terminated their agreement with Litco, Litco commenced the arbitration against Plaintiffs seeking payments due under the CAA.  Later, Litco added a claim seeking a declaratory judgment enforcing the release provision in the CAA and finding that Sater is a released party under that provision.  Sater Aff. ¶¶ 9-11 & Ex. 2, AAA Statement of Claim.   Litco also requests its costs and attorneys' fees for having to defend Sater in this litigation, claiming that it must indemnify Sater "for costs and expenses incurred and damages suffered as a result of the work Sater performed pursuant to the CAA, including for claims asserted [in this litigation] in violation of the Release in the CAA."  *Id*. ¶ 96.

Plaintiffs and the other Respondents in the Litco arbitration argue that Litco violated various provisions of the CAA by proffering Sater as a witness when it knew he had an ownership interest in Litco, by providing information in breach of a provisions in the consulting agreement Sater had with SPD, and by failing to timely provide information to Plaintiffs' counsel in connection with the Ablyazov Action.  Schwartz Decl. Ex. 4.  Plaintiffs also argue that the arbitration panel does not have jurisdiction to adjudicate Litco's claims pertaining to the

---

[3]  A sanctions motion is pending in the Ablyazov Action against Plaintiffs for, among other things, failing to disclose the CAA to the defendants and paying a fact witness (Sater) for testimony.  Plaintiffs contend that they did not know that Sater was affiliated with Litco.

release and that the CAA is void ab initio because Litco fraudulently induced the Plaintiffs to enter into the CAA by concealing Sater's receipt of more than $20 million of the stolen funds, as well as his dual status as a witness and the sole owner of Litco. Doc. No. 90, Pls.' Opp'n Br. at 10. The arbitration trial is anticipated to occur no later than the second quarter of 2020. Doc. No. 79, Levi Aff. ¶ 9. However, the timeline may be extended because the arbitration panel is currently considering whether to bifurcate the arbitration proceeding to first determine whether the CAA is void ab initio and then, only if needed, to determine other issues raised by the parties. *See* Oral Arg. Tr., 43:25-45:18, Nov. 18, 2019.

### 7. *Procedural History of this Action*

Plaintiffs commenced this action against Sater and the other defendants in March 2019. Sater asserts that Plaintiffs schemed to take advantage of Litco's assistance while building a case against him, then refused to pay Litco, and bullied him and Litco by filing this action. Sater Aff. ¶ 14.

Sater concedes that Plaintiffs' claims against him in this action are not subject to arbitration but has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12. His motion to dismiss argues that any claim for recovery of funds on Plaintiffs' unjust enrichment and conversion claims are time-barred, that Plaintiffs fail to state a claim of unjust enrichment insofar as Plaintiffs failed to allege that Sater and his companies had direct dealings or a quasi-contractual relationship with Plaintiffs, that Plaintiffs fail to state a claim of fraud because no misrepresentations are attributed to Sater and his companies, and that the other claims are not legally cognizable. *See* Doc. Nos. 66-67.

Notably, Sater does not raise the defense of waiver and release in his motion, though he initially told this Court that the defense would be included in the motion.  Rather, because the issue of the release has been raised in the arbitration by Litco, Sater seeks a stay of this action pending an arbitral ruling on the release, arguing that a favorable arbitral ruling for Litco will be binding on this Court and dispositive on the issue of his affirmative defense of waiver and release.  Sater asks the Court to resolve his motion to dismiss and, if that motion is denied or denied in part, to stay all discovery and other proceedings in this matter as to all defendants pending the outcome of the arbitration.  Alternatively, he asks that the stay be granted at least as to any claims remaining against him.

## LEGAL STANDARD

Section 2 of the FAA provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Supreme Court has directed courts to "rigorously enforce arbitration agreements according to their terms."  *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (citation and internal quotation marks omitted).  Section 3 of the FAA further provides that if any suit is brought in federal court "upon any issue referable to arbitration," the court, "upon being satisfied" that an issue involved in the suit is referable to arbitration, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  Whether parties agreed to arbitrate is determined by state law.  *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002).

The party moving to compel arbitration bears the initial burden of showing that an arbitration agreement exists by a preponderance of the credible evidence. *Fleming v. J. Crew*, No. 16-cv-2663 (GHW), 2016 WL 6208570, at *3 (S.D.N.Y. Oct. 21, 2016) (citing *Couch v. AT&T Servs., Inc.*, No. 13-cv-2004 (DRH) (GRB), 2014 WL 7424093, at *3 (E.D.N.Y. Dec. 31, 2014)); *see Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995). "A preponderance of the evidence means such evidence which, when considered and compared with that opposed to it, produces a belief that what is sought to be proved is more likely true than not." *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17CV04570LAKKHP, 2017 WL 7309893, at *2 (S.D.N.Y. Nov. 20, 2017) (citation omitted), *adopted by*, No. 17-CV-4570 (LAK), 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018), *aff'd*, 763 F. App'x 101 (2d Cir. 2019).

If the movant meets this prima facie showing, the burden shifts to the non-movant to show that: (i) it did not consent to arbitration, (ii) the arbitration agreement is invalid or unenforceable, or (iii) the arbitration agreement does not encompass the claims the movant wishes to arbitrate. *See Porcelli v. JetSmarter, Inc.*, No. 19 CIV. 2537 (PAE), 2019 WL 2371896, at *3 (S.D.N.Y. June 5, 2019) (citations omitted); *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342-43 (S.D.N.Y. 2014), (citing *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90-92 (2000), *aff'd*, 633 F. App'x 544 (2d Cir. 2015).

The standard for a stay considers the same factors but also evaluates whether all or only some of the claims are arbitrable. If only some of the claims are arbitrable, then the court must decide whether to stay the balance of proceedings pending arbitration. *Porcelli*, 2019 WL 2371896, at *3 (citing *Guyden v. Aetna. Inc.*, 544 F.3d 376, 382 (2d Cir. 2008)).

When deciding a motion to compel arbitration and stay all or part of a litigation pursuant to the FAA, the court applies a "standard similar to that applicable for a motion for summary judgment." *Myer v. Uber Techs., Inc.,* 868 F.3d 66, 74 (2d Cir. 2017) (*quoting Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 229 (2d Cir. 2016)).  Under this standard, the court considers all relevant, admissible evidence contained in the pleadings, admissions on file, and affidavits. *Id.* (citations omitted).  In the absence of a genuine issue of material fact regarding the formation of the arbitration agreement, the motion to compel and to stay the litigation (in whole or in part) must be granted if the dispute falls within the scope of the arbitration agreement.[4]  *Id.*

Courts also have the inherent power to issue a stay as a case management tool.  *Credit Suisse Securities (USA) LLC v. Laver*, 2019 WL 2325609, *2 (S.D.N.Y. May 29, 2019); *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991) ("[W]e have recognized that the district courts have 'inherent power' to grant stays in certain circumstances.").  Stays are appropriate when they promote judicial economy and avoid confusion and possibly inconsistent results.  *Louis Berger Grp., Inc. v. State Bank of India*, 802 F. Supp. 2d 482, 490 (S.D.N.Y. 2011).  Courts look to the prejudice to plaintiffs, the interests of and burdens on the defendants, the interest of the courts, the interest of persons not parties to the civil litigation, and the public interest.  *Id.* at 489 (citing *Guyden*, 544 F.3d at 382).

---

[4] Separate and apart from the issue of the formation of an arbitration agreement, the Court accepts as true the factual allegations in the complaint that relate to the underlying dispute between the parties for purposes of a motion to compel.  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012).

**DISCUSSION**

### 1. Whether This Motion is Properly Before this Court

The threshold issue of arbitrability "is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (alteration in original) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). The arbitration provision in the CAA purports to assign the issue of arbitrability to the arbitrator, but Sater is not a signatory to the CAA. Plaintiffs did not enter into any agreement with Sater. Additionally, Sater concedes he made efforts to hide his affiliation with Litco from Plaintiffs and insisted that Arcanum, Plaintiffs' investigative firm, enter into the NDA to shield his affiliation from Plaintiffs and their counsel. For these reasons, the Court concludes there is not a clear and unmistakable agreement between Plaintiffs and Sater to submit the question of the arbitrability of disputes between them to an arbitrator. *See Kwatinetz v. Mason*, 356 F. Supp. 3d 343, 347–48 (S.D.N.Y. 2018) (finding that there was not a clear and unmistakable agreement to arbitrate because parties seeking to enjoin arbitration were not signatories to the contract providing that the issue of arbitrability is for the arbitrator, and therefore, the issue of arbitrability was for the court to determine); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 466 (S.D.N.Y. 2018) (holding that "whether [the non-signatory] is to be a party to the [arbitration agreement] is an issue for judicial determination first").[5] Accordingly, the issue of arbitrability is properly before this

---

[5] The United States Supreme Court's recent decision in *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524 (2019), does not alter this conclusion because it concerned parties to an arbitration agreement who disputed whether a claim came within the scope of the agreement. The plaintiff argued that the defendant's position that the claim was arbitrable was "wholly groundless" based on the plain language of the agreement. *Id.* at 528. The parties, however, had agreed to submit the issue of arbitrability to the arbitrator. *Id.* The Supreme Court found

Court.  The parties have not argued otherwise, and Sater's counsel agreed at oral argument that this motion is properly before this Court.  Oral Arg. Tr. 35:17-36:5, Nov. 18, 2019.

## 2.  *Whether Sater, a Non-Party to the CAA, May Invoke Section 3 of the FAA*

Arbitration is a matter of contract.  *See, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010); *Kwatinetz*, 356 F. Supp. 3d 3 at 347.  The court has no authority to mandate arbitration when the parties have not agreed to arbitrate.  *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131–32 (2d Cir. 2003) (citing *United Steelworkers of Am. V. Warrior Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)); *see AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 648–49 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration"); *United Steelworkers,* 363 U.S. at 581 (noting that an arbitrator "has no general charter to administer justice for a community which transcends the parties" but rather is "part of a system of self-government created by and confined to the parties" (citation omitted)).  Thus, a court should not construe an arbitration agreement "so broadly [] as to encompass claims and parties that were not intended by the original contract."  *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995); *accord Kwatinetz*, 356 F. Supp. 3d at 347*; see also Manigault v. Macy's East, LLC,* 318 F. App'x 6, 7-8 (2d Cir. 2009) (summary order) ("It is 'well settled' under New York law that arbitration will not be compelled absent the parties' 'clear, explicit and unequivocal agreement to arbitrate.'" (quoting *Fiveco, Inc. v. Haber,*

---

there was no "wholly groundless" exception to arbitrability, and that even if a court thinks that the arbitrability claim is wholly groundless, it may not override the parties' agreement to submit the arbitrability issue to the arbitrator.  *Id. passim*.  In this case, Sater is not a party to the agreement to arbitrate and a "wholly groundless" exception has not been invoked.

11 N.Y.3d 140, 144 (2008))).  Sater is not a party to the CAA and, thus, there is no agreement to arbitrate between and among Sater and the Plaintiffs.  However, this does not end the inquiry.

A non-signatory may be bound to an arbitration agreement "if so dictated by the ordinary principles of contract and agency." *Thomson-CSF, S.A.*, 64 F.3d at 776 (internal quotation marks omitted).  As noted above, the Court looks to state law to determine whether Sater, as a non-signatory, can be bound to the arbitration provision in the CAA and/or can compel Plaintiffs to arbitrate with him.  *See Bell*, 293 F.3d at 566.  Similarly, when determining whether a litigant who is not a party to an arbitration agreement may invoke Section 3 of the FAA and seek a stay of litigation pending arbitration, the Court evaluates whether relevant state contract law allows the non-signatory to enforce the agreement containing the arbitration provision.  *Arthur Andersen LLP v. Carlisle*,  556 U.S. 624, 629-32 (2009).  The parties have agreed that New York law governs, so the Court looks to New York law to determine whether Sater, as a non-party to the CAA, may force Plaintiffs to arbitrate whether the release provision in the CAA bars this action and invoke Section 3 of the FAA to stay this action pending the outcome of the Litco arbitration. [6]

The five "traditional" theories for binding non-signatories to arbitration agreements are incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel.  *Arthur Anderson*, 556 U.S. at 631 (recognizing "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver

---

[6] Federal law and New York law are materially the same on the issue of whether a non-signatory may enforce an arbitration agreement.  *See, e.g.*, *Government Employees Ins. Co. v. Grand Medical Supply, Inc.*, 11 Civ. 5339, 2012 WL 2577577, at *3 (E.D.N.Y. July 4, 2012).

and estoppel'") (citation omitted); *Thomson-CSF S.A.*, 64 F.3d at 776-77.  Courts also have

estopped "a *signatory* from avoiding arbitration with a nonsignatory when the issues the

nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the

estopped party has signed."  *Thomson-CSF S.A.*, 64 F.3d at 779 (emphasis in original); *see Sokol*

*Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358-61 (2d Cir. 2008) (surveying case law in

which non-signatory has compelled a signatory to arbitrate); *Government Employees Ins. Co. v.*

*Grand Medical Supply, Inc.*, 11 Civ. 5339, 2012 WL 2577577, at *3 (E.D.N.Y. July 4, 2012)

(surveying state case law and finding that the "New York Court of Appeals would recognize

estoppel as a ground by which a non-signatory can compel a signatory to arbitrate, and would

adopt the Second Circuit's well-developed analysis on" the theory); *332 E. 66th St., Inc. v.*

*Walker*, 106 N.Y.S.3d 727 (N.Y. Sup. Ct. 2018) (finding that a non-signatory may compel

arbitration with a signatory); *but see Rosenbach v. Diversified Grp., Inc.*, 833 N.Y.S.2d 78, 78–79

(App. Div. 2007) (suggesting that equitable estoppel does not enable a non-signatory "to

compel signatories to an arbitration agreement to arbitrate.").

        The theories relevant to the motion before the Court are whether Sater, as an

officer/member of Litco or as a third-party beneficiary of the release provision in the CAA, can

force Plaintiffs to arbitrate his affirmative defense to the claims in this case or otherwise estop

Plaintiffs from avoiding their arbitration agreement with Litco vis-à-vis his claim that the

agreement releases claims against him personally and bars this action.  Each theory is

addressed in turn below.

### a. Whether Sater, As An Officer/Member of Litco, Can Compel Plaintiffs to Arbitrate

Sater argues that he is entitled to enforce the CAA's arbitration clause because he is a member and principal of Litco. New York permits corporate officers and employees to enforce arbitration agreements entered into by their corporation in certain circumstances. *See Degraw Const. Grp., Inc. v. McGowan Builders, Inc.*, 58 N.Y.S.3d 152, 155 (App. Div. 2017). Sater relies on *DeGraw Construction Group, Inc. v. McGowan Builders, Inc.*, in which the plaintiff commenced an action to foreclose a mechanic's lien against the defendant company because it had failed to pay plaintiff for certain construction work. *Id.* at 154. The complaint also included various causes of action sounding in tort (e.g., conversion and unjust enrichment) against the defendant company and individual officers. *Id.* The individual defendants moved to compel arbitration on the tort causes of action as to them because the agreement between plaintiff and the corporate defendant contained an arbitration provision. *Id.* The trial court held that the individual defendants could not enforce the arbitration provision because they were not signatories to the contract. *Id.* The Appellate Division reversed because the alleged misconduct attributed to the individual defendants related to their behavior as employees and officers of the corporate defendant. *Id.* at 155. The Appellate Division reasoned that, because "a corporation can only act through its officers and employees, any breach of the agreement would necessarily have to occur as a result of some action or inaction attributable to an officer or employee of the company." *Id.* (internal quotation marks and citation omitted).

The New York Court of Appeals previously applied this reasoning with respect to owners of a company in *Hirschfeld Productions Inc. v. Mirvish*, which held that a rule allowing corporate

officers and employees to enforce arbitration agreements entered into by their corporation is "necessary not only to prevent circumvention of arbitration agreements but also to effectuate the intent of the signatory parties to protect individuals acting on behalf of the principle in furtherance of the agreement." 673 N.E.2d 1232, 1233 (1996). In *Hirschfeld*, individual defendants David and Edwin Mirvish (collectively, the "Mirvishes") were owners and officers of Mirvish Productions, a theatrical production company. *Id.* at 6. The plaintiff and Mirvish Productions entered into an agreement to produce a theatrical production at a theater also owned by the Mirvishs. *Id.* The joint venture agreement contained an arbitration clause governing disputes arising from or relating to interpretation of the agreement. *Id.* The play was a flop. *Id.* The plaintiff then sued the Mirvishes in court in their capacities as officers of Mirvish Productions for tortious interference with contract and breach of fiduciary duty. *Id.*

The Court of Appeals recognized that "[f]ederal courts have consistently afforded agents the benefit of arbitration agreements entered into by their principles to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation." *Id.* (collecting cases). Because the plaintiff's suit was directed to misconduct related to Mirvish Productions' failure to produce and promote the play, not to the Mirvishes' roles as owners of the theater or their conduct unrelated to the breach of contract, the court found that the Mirvishes could enforce the arbitration agreement against the plaintiff even though they were not signatories to the contract containing the arbitration provision. *Id.* The Court of Appeals therefore deemed a stay of the court action pending arbitration appropriate. *Id.*; *see also Highland HC, LLC v. Scott et al.,* 978 N.Y.S.2d 302 (2014) (holding that principals of architecture firm were entitled to enforce an arbitration provision and compel

arbitration of plaintiff's claims pursuant to arbitration clause in contracts between the plaintiff

and the architecture firm because the claims involved principals' behavior as agents of the

firm); *cf. Kwatinetz*, 356 F. Supp. 3d at 350-52 (S.D.N.Y. 2018) (holding that non-signatories to

an arbitration agreement could enjoin arbitration brought against them by former president of

basketball league they owned; although the petitioners were mentioned in various provisions

within the agreement containing the arbitration provision, nothing in the agreement "clearly

and explicitly" evinced an intent by petitioners to be bound to arbitrate because the provisions

that mentioned them were entirely unrelated to arbitration).

 Unlike *DeGraw*, in which the claims against the non-signatory officers of the company

pertained to their conduct in carrying out their company's obligations under a contract

containing an arbitration provision, the claims against Sater in this action do not pertain to his

conduct in carrying out Litco's obligations.  Likewise, unlike the Mirvishes in *Hirshfeld*, who

were being sued for conduct related to the alleged breach of a contract by their company, Sater

is being sued for conduct unrelated to Litco or his work for Litco.  Plaintiffs' claims center on

actions taken by Sater in his personal capacity or as a consultant to or agent of entities allegedly

controlled by Ablyazov or the Khrapunovs well before Litco ever was formed.  Sater points to no

case holding that a corporate officer can take advantage of an arbitration clause in his

company's contract in circumstances like those presented here.  Nor does Sater point to any

New York case that has compelled arbitration of an individual's affirmative defense to claims

that are not arbitrable.

 Under New York law, the right to compel arbitration does not extend to a non-signatory

unless the language of the arbitration provision itself suggests that the signatories intended to

confer upon the non-signatory a right to compel arbitration. *See Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605, 612-13 (S.D.N.Y. 2011) (discussing New York case law), *aff'd sub nom. The Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11 (2d Cir. 2012). An evaluation of the arbitration provision in the CAA also does not support Sater's argument that he can force Plaintiffs to arbitrate his affirmative defense merely because he is an officer/member of Litco. The arbitration provision in the CAA covers

> "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be settled by final and binding arbitration, in New York, New York, administered by the American Arbitration Association ("AAA"), in accordance with its Commercial Arbitration Rules, and with the procedures required under New York law."

Sater Aff. Ex. A, CAA ¶ 14. This language clearly does not encompass claims arising from conduct that occurred prior to the existence of the CAA and unrelated to the parties' obligations under the CAA. *See generally id*.

To the extent Sater argues that a claim concerning the release provision falls within the scope of the arbitration provision, and therefore that he can take advantage of the arbitration provision, his argument fails because the release provision must be separately considered from the arbitration provision. *See Kwatinetz*, 356 F. Supp. 3d 3 at 349-50 (analyzing an arbitration provision separately from the rest of the contract); *Republic of Iraq*, 769 F. Supp.2d at 612-14 (discussing New York case law). The arbitration provision pertains only to arbitration between the "Parties" to the CAA, and the "Parties" are defined as the signatories to the CAA. Sater Aff, Ex. A, CAA at 1, 9-10. Sater is not a signatory and not a "Party" to the CAA. The arbitration provision also states that any arbitration award is binding only on the Parties to the CAA. *Id.* ¶

14.  Nothing in the arbitration provision indicates that a non-signatory officer of Litco can utilize

or take advantage the arbitration provision or that Plaintiffs agreed to arbitrate claims against

officers and members of Litco unrelated to their work for Litco under the CAA.

The Court also notes that Litco appears to argue in the pending arbitration that the

release in the CAA was designed to protect Litco from being embroiled in litigation arising out

of its officers' and agents' conduct on behalf of Litco.  Litco's stated interest in enforcing the

release provision pertains to its possible duty to indemnify Sater for his defense fees in this

action insofar as it claims that it must indemnify Sater "for costs and expenses incurred and

damages suffered as a result of the work Sater performed pursuant to the CAA, including for

claims asserted [in this litigation] in violation of the Release in the CAA."  *See* Sater Aff. Ex. B,

AAA Statement of Claim ¶ 96.  This indicates that Litco believes the release provision directly

benefits Litco.  Any benefit to Sater as an officer/member of Litco is indirect.[7]  Indeed, Sater

acknowledges that any benefits to him under the under the Litco agreement are indirect,

emphasizing in his deposition in the Ablyazov Action that "the obligations under the [CAA] are

between Litco and BTA [Bank] and City of Almaty, not myself personally."  Schwartz Decl., Ex. 1,

Sater Dep. Tr., vol. 1, 31.  That the benefits under the CAA flowed only indirectly to Sater is

another reason Sater's argument fails.  *Cf. Kwatinetz*, 356 F. Supp. 3d at 350-52 (finding that the

benefits of corporate agreement containing arbitration clause flowed only indirectly to owners

---

[7] Given that the claims in this litigation do not concern work Sater performed under the CAA, the indemnification argument is dubious.  *See* Sater Aff. ¶¶ 9-11 & Ex. 2, AAA Statement of Claim ¶ 96.  But, the Court does not need to need to resolve Litco's indemnification obligation, as this is not an issue before this Court.

of company, which supported owners' argument that claims brought against them in their personal capacity were not arbitrable).

In sum, the rationale employed by New York courts for allowing corporate officers, employees, and principals to enforce arbitration agreements agreed to by their corporations – to prevent circumvention of arbitration agreements and effectuate the intent of the signatory parties to protect individuals acting on behalf of the principle in furtherance of the agreement—is inapplicable here. Accordingly, New York law does not support Sater's argument that he can force Plaintiffs to arbitrate his affirmative defense to this litigation merely because he is an officer and owner of Litco.

### b. *Whether Sater is a Third-Party Beneficiary of the Arbitration Agreement Entitled to Enforce the Agreement*

Sater also argues that he is a beneficiary of the broad release provision in the CAA and, as a result, may force Plaintiffs to arbitrate the applicability and enforceability of the release to the claims against him in this action. Schwartz Decl., Ex. 10, Hr'g Tr. 11:20-24, June 4, 2019; *see, e.g.*, Oral Arg. Tr. 34:7-21, Nov. 18, 2019. "Under New York law, an intended third-party beneficiary has standing to enforce an agreement entered into between others." *Solutia Inc. v. FMC Corp.,* 385 F. Supp.2d 324, 336 (S.D.N.Y. 2005); *accord Groval Knitted Fabrics, Inc. v. Alcott*, 339 N.Y.S.2d 58, 61–62 (Sup. Ct. 1971), *aff'd*, 330 N.Y.S.2d 606 (App. Div. 1972), *aff'd sub nom. Groval Knitted Fabrics v. Alcott*, 291 N.E.2d 395 (1972). A third party is a beneficiary of an agreement when "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Bayerische*

*Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012)

(citation omitted); *cf. Nat'l Bank Ltd. v. Sec. Mgmt. Co.*, 816 N.Y.S.2d 414, 414–15 (2006); *see*

*also Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir.1991)

("An intended third party beneficiary will be found when it is appropriate to recognize a right to

performance in the third party and the circumstances indicate that the promisee intends to give

the third party the benefit of the promised performance." (citing Restatement (Second) of

Contracts § 302 (1981))). Alternatively, a non-signatory may be considered a third-party

beneficiary where no other party can recover under the contract in the event of breach.

*Europacific Asset Mgmt. Corp. v. Tradescape Corp.*, No. 03CIV.4556PKL, 2005 WL 497787, at *7

(S.D.N.Y. Mar. 2, 2005); *Bd. of Educ. of Northport-E. Northport Union Free Sch. Dist. v. Long*

*Island Power Auth.*, 60 Misc. 3d 1222(A), Slip Op. (Sup. Ct. 2018) (citing *Fourth Ocean Putnam*

*Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 44-45 (1985)). A party claiming to be a third-

party beneficiary "has the burden of demonstrating that he has an enforceable right." *Alicea v.*

*City of New York*, 534 N.Y.S.2d 983 (App. Div. 1988) (citing *Strauss v. Belle Realty Co.*, 469

N.Y.S.2d 948 (App. Div. 1983)); *accord Redzepagic v. Hammer*, No. 14 CIV. 9808 (ER), 2017 WL

780809, at *9 (S.D.N.Y. Feb. 27, 2017).

There are several reasons why New York third-party beneficiary law does not permit

Sater to take advantage of the CAA's arbitration provision. First, it is well settled that a third-

party beneficiary "is entitled only to those rights which the original parties to the contract

intended the third party to have." *Republic of Iraq*, 769 F. Supp. 2d at 612 (quoting *Williams v.*

*Progressive Ne. Ins. Co.*, 839 N.Y.S.2d 381 (App. Div. 2007)). Parties to a contract can intend for

a third party to benefit from some provisions in a contract and not others. *Id.* Thus, Sater must

demonstrate that the parties to the CAA intended him to benefit from the arbitration provision specifically. Second, "because 'the threshold for clarity of [an] agreement to arbitrate is greater than with respect to other contractual terms, a court will not resort to construction or implication' to find that a contract invests a third-party with a right to compel arbitration." *Id.* (quoting *Waldron v. Goddess*, 473 N.Y.S.2d 136 (1984)). In other words, New York courts will not compel a signatory to an arbitration agreement to arbitrate with a non-signatory unless the agreement provides for such arbitration explicitly. *Id.* (citing *H.I.G. Capital Mgmt., Inc. v. Ligature*, 650 N.Y.S.2d 124 (App. Div. 1996)); *Greater New York Mutual Insurance Co. v. Rankin*, 685 N.Y.S.2d 25, 26 (App. Div. 1999) (denying non-signatory right to compel arbitration because nothing in the arbitration clause of agreement suggested that contract's signatories intended to confer upon the non-signatory the right to compel arbitration).

Applying this law, while it is true that Sater is a member of Litco and that the release purports to cover Litco's members, nothing in the CAA itself suggests that Plaintiffs intended or agreed to arbitrate with Litco's members or other non-signatories to the agreement. Rather, the arbitration provision discusses arbitration between the "Parties" (i.e., the signatories) and states that the arbitrator's decision is binding only on the Parties to the CAA. Because the arbitration provision does not explicitly provide for arbitration with non-parties to the CAA, Sater cannot enforce the arbitration provision. *See Republic of Iraq*, 769 F. Supp. 2d at 613-14 (finding that plaintiff did not have sufficient relationship with signatory to agreement that contained arbitration provision that would entitle it to compel arbitration; stating that "had the parties intended to extend the right of arbitration, they would not have drafted an arbitration provision that singled out the 'Parties' and omitted any mention whatsoever of the [plaintiff]").

Furthermore, Sater, as the moving party, has not met his burden to demonstrate that he is an *intended* third-party beneficiary of the CAA. There are serious factual disputes as to whether Plaintiffs knew that Sater was affiliated with Litco before his deposition in the Ablyazov Action. Sater's name is not mentioned in the CAA, and Sater admits that he actively hid his affiliation with Litco from Plaintiffs. Schwartz Decl., Ex. 1, Sater Dep. Tr., vol. 1, 358-59, vol. 2, 143-44 & Ex. 11, Hr'g Tr. 87, 145, Aug. 8, 2019; Sater Aff. Ex. 2, AAA Statement of Claim ¶ 32 & Ex. B. Plaintiffs also have submitted affidavits and testimony from their agents attesting that they did not know Sater was affiliated with Litco until his deposition in the Ablyazov Action. Schwartz Decl., Ex. 5, Humphrey Decl. & Ex. 6, Mazzoleni Decl. & Ex. 11, Hr'g Tr, 234-35, Aug. 8, 2019. Drawing inferences in favor of the non-moving party, this evidence precludes a finding on this motion that Sater was an intended third-party beneficiary of any provision in the CAA.

Thus, New York law does not support Sater's argument because the arbitration provision itself does not extend to non-parties and because there are factual issues that preclude a finding that Sater is an intended third party beneficiary of the CAA. *See, e.g., Redzepagic v. Hammer*, 2017 WL 780809, at *9-10 (S.D.N.Y. Feb. 27, 2017) (holding that defendant in employment case was not an intended third-party beneficiary of attorney fee shifting provision in a release agreement because it was not the only party that could recover under the agreement, could not point to language in the agreement that gave rise to an inference that the signatories intended to permit enforcement of the provision by the third-party beneficiary, and there were no documents indicating that the defendant was an intended beneficiary).

### c. Whether Sater Can Estop Plaintiffs from Avoiding their Arbitration Agreement With Respect the Effect of the Release in This Action

Finally, the parties dispute whether Sater can force Plaintiffs to arbitrate the enforceability of the release/his affirmative defense of waiver and release under a theory of equitable estoppel. In *Sokol Holding, Inc. v. BMB Munai, Inc.*, the Second Circuit set forth a test for determining whether a non-signatory can estop a signatory to an arbitration agreement from avoiding arbitration. 542 F.3d at 361. Under the test, the subject matter of the dispute between the non-signatory and signatory must be intertwined with the contract providing for arbitration. *Id.* A determination of intertwined-ness is dependent on the facts and circumstances of the plaintiffs' claims and the underlying agreement containing the arbitration provision. *Bankers Conseco Life Insurance Co. v. Feuer*, 16 Civ. 7646, 2018 WL 1353279, at *5 (S.D.N.Y. Mar. 15, 2018). Additionally, the non-signatory and signatory must have a relationship that is close enough to conclude that the signatory effectively consented to extend its agreement to arbitrate to the non-signatory or that it would be inequitable to allow the signatory to avoid arbitration. *Sokol.,* 542 F.3d at 361. A determination of this prong of the *Sokol* test focuses on the "role of the non-signatory defendants when the misconduct occurred." *Bankers Conseco*, 2018 WL 1353279, at *6. By applying the *Sokol* test, "arbitration remains a matter of consent, and the doctrine of estoppel simply recognizes that consent can be implied in certain limited circumstances." *Gov't Employees Ins. Co. v. Grand Med. Supply, Inc.*, No. 11 CIV. 5339 BMC, 2012 WL 2577577, at *3 (E.D.N.Y. July 4, 2012) (citing *Sokol,* 542 F.3d at 361-62).

In *Sokol*, the Second Circuit declined to estop the plaintiff from pursuing a claim in court against a non-signatory to an arbitration agreement because the court found that the plaintiff

did not consent to extend its agreement to cover the non-signatory defendant alleged to have tortuously interfered with the plaintiff's rights under the agreement. 542 F.3d at 357, 361-62.

Similarly, in *Ross v. American Express Co.*, the Second Circuit held that plaintiffs could not be compelled to arbitrate a dispute with American Express Co. ("AMEX") because AMEX was a non-signatory to the cardholder agreements, was not mentioned anywhere in the agreements, and had no role in the formation or operation of the agreements. 547 F.3d 137, 142-43, 148 (2d Cir. 2008). AMEX argued that the plaintiffs could not avoid arbitration under a theory of equitable estoppel because plaintiffs accused it of conspiring with the signatory defendants in a related litigation and plaintiffs' claims against AMEX were intertwined with the agreements with those defendants. *Id.* at 140-41. The Second Circuit reversed the district court's decision compelling arbitration, finding that the district court had improperly extended "the principle of compelling arbitration through equitable estoppel to a situation where the requisite contractual basis for arbitration [did] not exist." *Id.* at 143. The Second Circuit held that intertwined factual issues are insufficient to compel a signatory to an arbitration agreement to arbitrate with a non-signatory. *Id.* at 145-46. It explained that "there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Id*. (quoting *Sokol*, 542 F.3d at 359). In reaching this conclusion, the Second Circuit noted that other cases in which courts have applied estoppel involved some sort of *known* relationship between the non-signatory and a signatory to the arbitration agreement, such as a corporate relationship, or where the non-signatory was explicitly named in the

agreement. *Id*. at 144-45 (citing cases); *cf. Moss v. BMO Harris Bank, N.A.* 24 F. Supp. 3d 281 (E.D.N.Y. 2014) (noting that arbitration provision contemplated arbitration with parties to contract but also explicitly with one party's "agents" and "servicers" and, thus, plaintiffs could be forced to arbitrate claims against agents and servicers under estoppel theory); *Government Employees*, 2012 WL 2577577, at *4, *7 (holding that *Sokol* test was met where the plaintiffs' claims were intertwined with insurance policies that contained the relevant arbitration provisions and plaintiffs treated the non-signatory, an owner of the corporate signatory, as one and the same); *In re A2P SMS Antitrust Litig.,* 972 F. Supp. 2d 465, 477-80 (S.D.N.Y. 2013) (finding that parties to the arbitration agreement were aware that by signing the agreement they were entering into a relationship with the non-signatories, estopping plaintiffs from avoiding arbitration with the non-signatory defendants).

Sater cannot satisfy the *Sokol* test for compelling Plaintiffs to arbitrate with him. *See Sokol*, 542 F.3d at 361-62. First, the dispute between Sater and the Plaintiffs in this lawsuit is not intertwined with the CAA. Rather, the dispute relates to Sater's conduct before the CAA was signed and has nothing to do with Litco or Sater's ownership and efforts on behalf of Litco. Sater himself is not a party to the Litco arbitration, and the reason Litco is seeking a ruling on the release appears to pertain to its obligation of indemnification to Sater. Sater's affirmative defense of release and waiver in this action is too attenuated from the CAA to meet the *Sokol* intertwined-ness test. *Cf. Bankers Conseco*, 2018 WL 1353279, at *5-7 (granting motion to compel arbitration filed by non-signatories to arbitration clause where majority of plaintiffs' claims against defendants, the non-signatories, arose from formation, execution, and existence

of agreements containing arbitration provision so that the issues were substantially intertwined with the claims against the defendants).

Second, Plaintiffs' relationship with Sater is not close. Though Litco agreed to assist Arcanum in its efforts to uncover Plaintiffs' stolen funds, nothing about the formation of the CAA suggests that Plaintiffs implicitly consented to extend their agreement to arbitrate to cover claims against Sater in his personal capacity or his personal affirmative defenses to such claims. Sater admits that he hid his Litco affiliation from Plaintiffs and has argued that he never had any direct dealings with or a contractual or quasi-contractual relationship with Plaintiffs. This underscores the lack of a close relationship between Plaintiffs and Sater. Likewise nothing in the CAA suggests that Plaintiffs implicitly consented to extend their agreement to arbitrate to non-Parties to the CAA. Additionally, Sater presents no evidence that Plaintiffs treated him as interchangeable with Litco or conspired with Litco with regard to the conduct that is the focus of this action. *See Ross*, 547 F.3d 137, 142-43, 148 (reversing order compelling arbitration because even though issues were intertwined with contract containing arbitration provision, plaintiffs' relationship with defendant was not sufficiently close to compel arbitration based on estoppel theory); *Bankers Conseco*, 2018 WL 1353279, at *6 (finding close relationship between plaintiffs and non-signatory to agreement containing arbitration provision because allegations in the complaint asserted that signatories and non-signatories were involved in a conspiracy). Sater certainly has not demonstrated by a preponderance of the evidence that he and Plaintiffs had a close relationship in the formation of the CAA or that Plaintiffs knew that Sater was affiliated with Litco at that time. And, as noted above, there are factual disputes as

to whether Plaintiffs knew that Sater was affiliated with Litco at any time prior to his deposition in the Ablyazov Action.

Furthermore, Sater cites no case in which a court granted a motion to compel arbitration or stay pending arbitration in similar circumstances under an estoppel theory (i.e., when a non-signatory to an arbitration agreement sought to compel a signatory to arbitrate an affirmative defense to claims that are not arbitrable) under the *Sokol* test or New York law. Accordingly, Sater, as a non-party to the CAA, may not compel Plaintiffs to arbitrate, under an estoppel theory, the validity of the release vis-à-vis the claims in this action and/or his affirmative defense of release and waiver because the issues in this action are not sufficiently intertwined with the CAA and because Sater's relationship with Plaintiffs is not close.

Because Sater has failed to demonstrate that New York (or federal) law would permit him to enforce the CAA's arbitration provision under any theory (i.e., as an officer/member, as a third-party beneficiary, or under equitable estoppel), he also may not invoke Section 3 of the FAA to stay arbitration pending the outcome of the Litco arbitration. *See Arthur Andersen*, 556 U.S. at 633.

### 3. Whether The Court Should Stay This Case Under its Inherent Powers

Separate and apart from the FAA, courts have the inherent power to issue a stay as a case management tool. *Credit Suisse*, 2019 WL 2325609, at *2. Stays are appropriate when they promote judicial economy and avoid confusion and possibly inconsistent results. In determining whether to stay, a court must be careful not to abdicate its authority and responsibility to adjudicate disputes. *See Sierra*, 937 F.2d at 749-50. Further, it must tailor any stay so as not to unduly prejudice other parties who are not seeking a stay of the litigation. *Id.*

at 750 (citing *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d Cir. 1964)). The party moving for a stay "bears a heavy burden of showing necessity for the stay." *Id.* (citing *Nederlandse,* 339 F.2d at 442). This includes demonstrating that they will not hamper the progress of the arbitration, that the arbitration will conclude within a reasonable time, and the delay will not prejudice the other parties in the litigation. *Id.*; *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings*, LLC, 808 F. Supp. 2d 552, 564 (S.D.N.Y. 2011). "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Nederlandse*, 339 F.2d at 442 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).

Sater has not met his burden of showing the necessity for a stay. In Sater's motion to dismiss, he seeks dismissal of the claims against him which, if granted, may obviate the need for a stay altogether. *See* Doc. Nos. 65-67. None of the claims against Sater or the other defendants are before the arbitrator, thus none of the direct claims will be addressed at all in the arbitration. And, as discussed above, Plaintiffs did not consent to arbitrate with Sater and cannot be compelled to arbitrate Sater's affirmative defense of waiver and release. Thus, the arbitration will not resolve Sater's affirmative defense of waiver and release. Rather, the validity of Sater's affirmative defense will be determined by this Court and/or a jury.

Also, there is no guarantee that the arbitration, which has just commenced, will conclude by the end of second quarter of 2020, when Sater has stated that the trial in the arbitration will occur. The arbitration panel is considering bifurcating the arbitration to first determine whether the CAA is void ab initio, which means that it may never rule directly on the release provision and even if it does rule, such a ruling may occur well after June 2020. A delay

34

in this litigation of potentially a year would be unreasonable and unfair to the other parties who are not moving for a stay. *See Donjon Marine Co., Inc. v. Water Quality Ins. Syndicate*, 523 F. App'x 738, 740 (2d Cir. 2013) (upholding district court's refusal of stay where moving party could not provide assurance that the "arbitration could be expected to end expeditiously—at least before the federal litigation, including appeal, might conclude," which in that case was about one year); *Flinn v. Bank of America Corp.*, 15 civ. 193, 2016 WL 9334709, at *2 (D. Vt. June 1, 2016) (declining stay when stay would last a year).

Further, neither a favorable outcome on Sater's pending motion to dismiss nor a stay will result in Sater being let out of this case entirely. Sater is a fact witness who will need to produce documents and testify in this action as a party, as an agent of Bayrock Inc. and Global Habitat, or as a dismissed party (if his motion to dismiss is granted). Therefore, staying this action would not minimize costs to Sater or limit the scope of discovery. Thus, a stay is inconsistent with the mandate of Federal Rule of Civil Procedure 1, which requires the Court to ensure, among other things, the efficient and speedy resolution of cases. Fed. R. Civ. P. 1. The Court also notes that the discovery in the Litco arbitration is unrelated to the discovery in this case. Thus, the parties will not be subject to overlapping discovery. Finally, a stay would prejudice the other parties to this litigation who are entitled to have the claims against them adjudicated as expeditiously as possible. Sater's suggestion that delay is not prejudicial because Plaintiffs have been litigating their claims for a long time and waited until 2019 to bring suit against him is incorrect. Fading memories of witnesses will only continue to fade with further delay, prejudicing all parties to this litigation. When balancing the interests of the

parties in expeditiously proceeding with this case, the burdens of a stay, and the interests of the court, non-parties, and the public, all factors weigh against a stay.

The case Sater cites, *Lipford v. N.Y. Life Insurance Co.*, does not change this Court's conclusion. 2003 WL 21313193 (S.D.N.Y. June 9, 2003). In that case, an employee of Kelly Services, Inc. ("Kelly"), who had been placed to work on a temporary basis at New York Life Insurance Company ("NY Life"), sued both Kelly and NY Life for employment discrimination when she was not offered a permanent position at NY Life. *Id.* at *1-2. Kelly filed cross-claims against NY Life for indemnification and contribution pursuant to a services agreement with an arbitration provision between Kelly and a non-party entity called NYLTEMPS, Inc. *Id.* at *2. NY Life likewise filed a cross-claim against Kelly for indemnification and contribution. *Id.* The plaintiff later reached a settlement with NY Life, after which NY Life moved to be dismissed as a party or, alternatively, to stay pending arbitration of Kelly's claim for contribution or indemnification. *Id.* at *3. The court found that the issue of indemnification and contribution had to be litigated in one proceeding to avoid the risk of inconsistent determinations but declined to stay the litigation of plaintiff's claim against Kelly because Kelly's claim was contingent on a favorable finding of discrimination for the plaintiff. *Id.* at *6. As previously discussed, Plaintiffs' claims against Sater and the other defendants are not contingent on the outcome of the arbitration. Further, the CAA states that the arbitrator's decision is not binding on Sater. Sater's self-serving agreement to adhere to the arbitrator's ruling is not contractually enforceable.[8] There is no risk of inconsistent decisions.

---

[8] Sater's citation to *American Shipping Line, Inc. v. Massan shipping Ind., Inc.* also does not assist his argument. 885 F. Supp. 499 (S.D.N.Y. 1995). In that case, the court declined to grant a stay pending arbitration, noting it was

For all these reasons, the Court declines to exercise its inherent powers to stay this action.

**CONCLUSION**

For the reasons set forth above, Sater's motion to stay is denied.  In denying the motion, the Court makes no comment as to the strength or validity of Sater's affirmative defense of release and waiver.  That issue, if need be, will be decided later in this litigation.  The Clerk of Court is respectfully requested to terminate the motion at Doc. No. 77.

Dated:      December 6, 2019
            New York, New York

_Katharine H Parker_
_____
            Katharine H. Parker
            United States Magistrate Judge

---

far from certain that the pending arbitration proceeding would have any preclusive effect on the litigation of non-arbitrable claims and that any outcome of the arbitration might need to be relitigated in court.  _Id_. at 502.  Here, Plaintiffs do not agree to be bound by an adverse ruling in arbitration on the release issue and do not agree that the arbitrator has authority to determine the validity of Sater's affirmative defense to the claims in this action. Sater's purported agreement to be bound by the arbitrator's ruling does not alleviate the fundamental conflict between the parties about the potential preclusive effect on this action of a ruling by the arbitration panel on the release issue (if the arbitration panel even reaches that issue).