UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   11/30/2020
```

City of Almaty, *et al.*,

                    Plaintiffs,

          –v–

Felix Sater, *et al.*,

                    Defendants.

19-cv-2645 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

In this case, Kazakhstan's largest city and a Kazakhstani bank seek to recover millions of dollars in stolen funds from those who allegedly helped the culprits launder them. Felix Sater—the alleged ringleader of the money-laundering operation—along with his associate Daniel Ridloff and several business entities they control, move to dismiss. For the reasons that follow, the Court grants the motion in part and denies it in part.

I.    **Background**

For purposes of this motion, the Court takes as true all factual allegations in the first amended complaint ("FAC"), Dkt. No. 120, and draws all reasonable inferences in the Plaintiffs' favor.

Between 1997 and 2009, Mukhtar Ablyazov and Viktor Khrapunov—sometimes working separately and sometimes in concert—used their prominent positions in Kazakhstani society and government to steal billions of dollars from the City of Almaty and BTA Bank JSC, a corporation headquartered there. Khrapunov served as Kazakhstan's Minister of Energy before taking office as the mayor of Almaty in 1997. FAC ¶ 53. As mayor, he wielded substantial

influence over the privatization of state-run assets in the formerly communist country. *Id.* ¶ 54. He used this influence to transfer public assets to shell companies controlled by his family members for a fraction of their value. *Id.* ¶¶ 56–62.

Ablyazov founded BTA and served as its chairman from 2005 to 2009. *Id.* ¶¶ 16–17. However, even before 2005 (including while serving a nine-month prison term for corruption), he exercised substantial informal influence over the bank's operations through a business partner. *Id.* ¶¶ 19–20. Ablyazov used his position to direct billions of dollars in sham loans from BTA to shell corporations that he secretly controlled. *Id.* ¶ 16. He also worked with Khrapunov, to whom he was related by marriage, using his network of shell companies to launder Khrapunov's ill-gotten gains and Khrapunov's properties as collateral for further fraudulent BTA loans. *Id.* ¶¶ 57–61.

Ablyazov's graft came to light after BTA defaulted on billions of dollars of debt in the wake of the 2008 financial crisis. *Id.* ¶ 30. In 2009, the New York Times reported that Ablyazov may have directed up to $12 billion in loans to companies he controlled, amounting to about half of the bank's loan book. *Id.* ¶ 31. Ablyazov fled to London. *Id.* ¶ 33. English courts entered a series of judgments against him for over $4 billion, imposing worldwide asset-freezing orders, requiring him to disclose details of his assets and surrender his passport, and ordering that his assets be placed into receivership. *Id.* ¶¶ 36–43, 47. Ablyazov largely defied these orders. *Id.* ¶ 44. An English court held him in criminal contempt and sentenced him to prison. *Id.* He then fled the United Kingdom and remained a fugitive until he was apprehended in France in mid-2013. *Id.* ¶ 46. A court in Kazakhstan sentenced him in absentia to 20 years' imprisonment for embezzlement, abuse of office, and organizing a criminal enterprise. *Id.* ¶ 49.

Khrapunov's career in Kazakhstani politics met a similar end.  He and his wife fled to Switzerland in 2007.  *Id.* ¶ 64.  Kazakhstani authorities indicted Khrapunov and several members of his family in 2011 and 2012.  *Id.*  Switzerland opened an investigation against him for money laundering, which remains ongoing, and ordered his assets frozen.  *Id.* ¶ 65.

Shortly after an English court ordered his assets frozen, but before he fled the United Kingdom, Ablyazov met with his son-in-law Ilyas Khrapunov in London and hatched a scheme to evade the English asset-freezing orders.  *Id.* ¶ 66.  The two of them routed about $440 million through a series of shell companies owned by members of the Khrapunov family into accounts at FBME bank.  *Id.* ¶¶ 68–77.  The next challenge was to get the funds out of FBME without arousing suspicion.  That is where Felix Sater enters the picture.

Sater began working with Viktor Khrapunov and other members of the Khrapunov family with his company Bayrock Group LLC in the mid-2000s.  *Id.* ¶¶ 89–91.  While Khrapunov was the mayor of Almaty, Sater and the Khrapunov family pursued several coal and gas extraction ventures together in Kazakhstan.  *Id.* ¶ 93.  Sater met Ablyazov at the wedding of Ablyazov's daughter Madina Ablyazova and Ilyas Khrapunov in 2007.  *Id.* ¶ 96.  Around that time, he learned of Ablyazov's theft of BTA funds.  *Id.*

Ilyas approached Sater near the end of 2011 and asked him to help launder money that Ablyazov and Khrapunov had stolen from BTA and Almaty.  *Id.* ¶ 102.  Throughout his involvement with the money-laundering scheme, Sater knew that the funds were the rightful property of BTA and Almaty and were subject to asset-freezing orders.  *Id.* ¶ 103.  The two negotiated the terms of Sater's involvement, and Sater executed a consulting agreement in early 2012 with Swiss Promotion Group ("SPG"), a company owned and controlled by Ilyas and used to launder the stolen funds.  *Id.* ¶ 104.  Working with Ilyas, Sater devised and executed a series

of schemes to launder the stolen funds, relying on his associate Daniel Ridloff and several business entities they owned and controlled. *Id.* ¶ 119–272. In the course of doing so, they pocketed tens of millions of dollars stolen from BTA and Almaty. *Id.* ¶ 272.

In the first of these schemes, Sater created a sham healthcare startup called World Health Networks ("WHN"). *Id.* ¶¶ 120, 124. Sater installed Ridloff as the company's chief operating officer, and Ridloff submitted fraudulent visa applications for individuals connected to the Khrapunov family, including Ilyas's sister Elvira Kudryashova, who they misrepresented as the owner of the business. *Id.* ¶¶ 128, 133–34. Sater and Ridloff used the company to launder about $7,000,000 into the United States between June 20, 2012, and March 1, 2013. *Id.* ¶ 140. Sater and Ridloff received millions of dollars in consulting fees related to their work for WHN and spent WHN funds on lavish personal expenses. *Id.* ¶ 143. Sater also received transfers of about $1,300,000 to a company he wholly owned and controlled between March 2012 and July 2013, and he paid several of his personal credit card bills from WHN accounts. *Id.* ¶¶ 145, 150. In April 2013, Sater oversaw about $5,000,000 in fraudulent personal loans to Kudryashova, which were funneled into New York City residential units in which Sater had a financial interest through Bayrock. *Id.* ¶¶ 155–57, 165–68.

In another scheme, Sater and Ridloff used a straw purchaser to buy the French payment card processing corporation Creacard S.A. with funds from SPG subject to asset-freezing orders. *Id.* ¶¶ 169–81. In another, they purchased a disused mental health facility in Syracuse, New York, for a shell company called Syracuse Center LLC, which was a subsidiary of Triadou SPV S.A., which was itself a subsidiary of Swiss Development Group S.A. ("SDG"), a Swiss entity owned by Ilyas and funded by Ablyazov and the Khrapunov family. *Id.* ¶¶ 99, 182–90. The

Creacard transaction took place between November 2012 and April 2013, and the Syracuse transaction took place between April and July 2013.

The largest money-laundering scheme undertaken by Sater and Ridloff centered on the Tri-County Mall in Cincinnati, Ohio. *Id.* ¶¶ 191–93. The pair learned that the holder of some of the mall's debt was having financial difficulties. *Id.* ¶ 194. Sater and Ridloff sought to launder about $30,000,000 by quickly purchasing and then reselling the mall's debt with tainted funds held in an FBME account for Telford International Ltd., another of the shell companies controlled by Ilyas. *Id.* ¶ 158–60, 195.

Sater and Ridloff created a shell company headquartered in New York called Tri-County Mall Investors LLC ("TCMI") to conduct the transaction in April 2013. *Id.* ¶ 196. TCMI was a subsidiary of Triadou. *Id.* At Sater's direction, Ridloff submitted a bid for the note on behalf of TCMI brimming with fraudulent misrepresentations. *Id.* ¶¶ 202–03. The bid identified a fictitious Luxembourg specialized investment fund as TCMI's funding source, claimed that CEO Nicolas Bourg would control the investment, and failed to disclose Sater's involvement with the transaction. *Id.* In fact, Sater and Ridloff held power of attorney over TCMI and planned to personally control the investment. *Id.* ¶¶ 200–01. These misrepresentations were designed to conceal the involvement of Sater, Ablyazov, and Khrapunov both from the seller (who they feared might balk if they knew who was behind it) and entities like Almaty and BTA who were investigating Ablyazov's and the Khrapunovs' investment activities. *Id.* ¶¶ 198–99, 204–06.

The bid was successful. *Id.* ¶ 207. Sater and Ridloff attempted to obtain financing for the deal through a mortgage broker, but the broker backed out once its background investigation revealed the relationship between TCMI and the Khrapunov family. *Id.* ¶¶ 211–214. They ultimately funded the transaction entirely with funds from Telford's FBME account. *Id.* ¶ 216.

Ilyas arranged for transfer of a $2,800,000 deposit and then a second payment of $28,000,000 in stolen funds to complete the transaction, routed through a real estate law firm from which Sater and Ridloff also concealed the origin of the funds.  *Id.* ¶¶ 225–28.

Sater and Ridloff pocketed about a half-million dollars of the money transferred for the Tri-County Mall purchase.  Shortly after the firm handling the transaction received the transfer from Telford's FBME account in May 2013, it redirected $1,080,000 on Ridloff's instructions to an account for Ferrari Holdings LLC as a purported finder's fee.  *Id.* ¶ 230.  The next day, Ferrari transferred exactly half that amount to an account for RRMI-DR LLC, a company wholly owned and controlled by Ridloff.  *Id.* ¶¶ 231–32.  RRMI in turn cut a check for $345,000 to Bayrock Inc. (no formal relationship to Bayrock LLC), another company wholly owned and controlled by Sater.  *Id.* ¶¶ 233–34.

TCMI resold the Tri-County Mall note to a third party in July 2013 for $45,000,000.  *Id.* ¶ 245.  The funds were paid into an account held by TCMI that Sater and Ridloff controlled.  *Id.* ¶¶ 247–49.  They immediately disbursed more than $5,000,000 to entities controlled by Sater and other participants in the scheme.  *Id.* ¶ 250.  They also transferred $2,250,000 from the proceeds of the sale to MeM Energy Partners LLC, a company with no role in the Tri-County Mall transaction but whose owner, Mendel Mochkin, had done public relations work for Ablyazov following his flight from the United Kingdom and sentence for criminal contempt.  *Id.* ¶¶ 251–56.  Later that year, Sater and Ridloff transferred another $3,500,000 or so to accounts held by Bayrock Inc.  *Id.* ¶¶ 258–60.

Conflict arose between Sater and Ilyas in late 2013.  In December 2013, TCMI sued Sater and Ridloff, alleging they had transferred the proceeds of the Tri-County Mall sale to an account they controlled without TCMI's authorization.  *Id.* ¶¶ 262–264. The parties reached a

confidential settlement. *Id.* ¶ 267. Several news organizations reported, and Sater later admitted in sworn testimony, that he retained approximately $20,000,000 in proceeds from the Tri-County Mall sale under the terms of the settlement. *Id.* ¶¶ 267–72.

Almaty and BTA have been involved in litigation with Ablyazov and Khrapunov since an interpleader action filed in 2015. Since early 2015, Sater has been in communication with the investigatory firm working on behalf of Almaty and BTA, and later with their counsel at Boies Schiller Flexner LLP. *Id.* ¶ 271. However, he omitted from his communications with them any mention of the settlement with TCMI and concealed that he had received stolen funds. *Id.* ¶¶ 269, 271. Almaty and BTA did not learn that Sater and Ridloff had received stolen funds until the March 2017 deposition of Cesare Cerrito, one of Ilyas's co-conspirators. *Id.* ¶ 269.

Almaty and BTA (which the parties in this litigation refer to collectively as "the Kazakh Entities") filed this suit against Sater, Ridloff, and several companies they allegedly control (collectively, "the Sater Defendants"), Ferrari, and MeM on March 25, 2019. *See* Dkt. No. 1. They assert claims of unjust enrichment, money had and received, fraud, and conversion under New York law and unlawful means conspiracy under English law. Ferrari and MeM are currently in default. The Sater Defendants have moved to dismiss. *See* Dkt. No. 105. They contend that the relationship between the Sater Defendants and the Kazakh Entities is too attenuated to support claims for unjust enrichment and money had and received; that they directed no fraudulent conduct toward the Kazakh Entities; and that the claim for unlawful means conspiracy fails because New York law governs this dispute. They further contend that the Kazakh Entities' claims are largely time-barred.

II.     **Legal Standard**

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Litwin v. Blackstone Grp.*, L.P., 634 F.3d 706, 715 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When determining whether a complaint states a claim, a court accepts as true all allegations in the complaint and draws all reasonable inferences in favor of the non-moving party.  *Id.*  A defendant may raise the affirmative defense that a claim is time-barred in a motion to dismiss only if that defense appears on the face of the complaint.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989).  A plaintiff must plead fraud with particularity.  Fed. R. Civ. P. 9(b).

III.    **Discussion**

A.      **The Kazakh Entities State Claims for Unjust Enrichment and Money Had and Received**

A claim for unjust enrichment rests on a restitutionary obligation imposed by law.  *State v. Barclays Bank of New York, N.A.*, 563 N.E.2d 11, 15 (N.Y. 1990) (citing Restatement of Restitution § 1). "The essential inquiry in any action for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (alteration omitted) (quoting *Paramount Film Distrib. Corp. v. State*, 285 N.E.2d 695, 698 (N.Y. 1972)).  "A plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is

sought to be recovered." *Id.* (cleaned up).  The Sater Defendants do not contest these elements, but instead contend that their connection to the Kazakh Entities is too attenuated to support a claim for unjust enrichment.

"[A] plaintiff need not be in privity with the defendant to state a claim for unjust enrichment . . . ." *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007).  To the contrary, courts in New York and throughout the American legal system have long recognized claims for unjust enrichment against third-party recipients of wrongfully obtained property, and have developed elaborate doctrines governing the circumstances in which third party recipients may be required to make restitution.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 66 & cmt. b (noting that a bona fide purchaser for value takes an asset free of any equitable interests, but a donee does not); *Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978) (holding the same); *see, e.g.*, *Hazlett v. Fusco*, 576 N.Y.S.2d 427, 429 (App. Div. 1991); *Bronowski v. Magnus Enterprises, Inc.*, 402 N.Y.S.2d 868, 869 (App. Div. 1978).

In more recent cases, the New York Court of Appeals has disallowed some claims for unjust enrichment when the relationship between the plaintiff and the defendant was "too attenuated." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 747 (N.Y. 2012); *Mandarin*, 944 N.E.2d at 1111.  In *Mandarin*, an agent working for an art investor obtained an appraisal letter for a painting and presented it to the investor.  *Mandarin*, 944 N.E.2d at 1106.  Unbeknownst the investor, the author of the letter was the painting's owner, and it overstated the painting's value. *Id.* at 1107.  The investor, having overpaid for the painting, sued the prior owner for unjust enrichment.  *Id.*  The court held that the relationship between the parties was too attenuated to render the circumstances of the transaction unjust—the prior owner "[n]ever met with [the

investor], was retained by [the investor] for an appraisal, or knew that the appraisal would be used by [the investor] for the purpose of purchasing the painting." *Id.* at 1109–10.

In *Georgia Malone*, the court held that the relationship between two rival brokerage firms was too remote when one received a commission on a sale using due diligence materials prepared for the developer by the other. *Georgia Malone*, 973 N.E.2d at 747.  The defendant brokerage firm knew that the plaintiff brokerage firm had prepared the materials, but it was unaware that the developer had agreed to keep them confidential or had failed to pay for them. *Id.*  The defendant even offered to reimburse the developer for the amount it assumed the developer had paid the plaintiff for the materials.  *Id.*

The Court does not read these cases to abrogate the well-settled rule that a claim for unjust enrichment lies against the knowing recipient of wrongfully obtained property, or the myriad cases in which New York courts have imposed constructive trusts against defendants who had no direct business dealings with the plaintiff.  The claims in *Georgia Malone* and *Mandarin* rested on the alleged unfairness of particular transactions.  Due to the lack of connection between the parties, it was not unjust to allow the defendants to retain what they had received in those transactions.  *See Mandarin*, 944 N.E.2d at 1111 ("Without further allegations, the mere existence of a letter that happens to find a path to a prospective purchaser does not render this transaction one of equitable injustice requiring a remedy to balance a wrong."); *Georgia Malone*, 973 N.E.2d at 747("The pleadings do not implicate [the defendant brokerage firm] in the [developer's] alleged wrongdoing.").

Unlike in *Georgia Malone* and *Mandarin*, the lack of direct business dealings between the Sater Defendants and the Kazakh Entities does not suggests that it would be just for the Sater Defendants to retain the stolen funds.  Nor does the imposition of liability on a knowing recipient

of stolen funds risk imposing an unfair inquiry burden on contracting parties.  *See Georgia Malone*, 973 N.E.2d at 748.

At least one court in this district has allowed a claim for unjust enrichment to proceed on very similar facts.  *See Amusement Indus., Inc. v. Midland Ave. Assocs.*, LLC, 820 F. Supp. 2d 510, 537 (S.D.N.Y. 2011).  In *Amusement*, fraudster Mark Stern convinced Amusement Industries to deposit about $13,000,000 into an escrow account to purchase properties in which Amusement was to receive an ownership interest.  *Id.* at 519.  Instead of using the funds to purchase the properties, Stern transferred the funds to an account held by his company.  *Id.*  He then disbursed funds to a number of his family members and friends in order to frustrate Amusement's attempts to recover it.  *Id.* at 520.

The third-party recipients of the stolen funds in *Amusement* made exactly the argument the Sater Defendants make here: that because they did not receive the money directly from Amusement, their relationship was too attenuated to support a claim for unjust enrichment.  *Id.* at 537.  Like the Sater Defendants, they did not have any direct business dealings with the plaintiff. Also like the Sater Defendants, accepting the Kazakh Entities' allegations as true, they knew that the funds rightfully belonged to the plaintiff and that by accepting the funds they were "furthering a money-laundering scheme."  *Id.*; *see* FAC ¶¶ 289–90.  The Court rejected these arguments.  It held that "[b]ecause Amusement alleges that the defendants knew that they were receiving Amusement's escrow funds illegitimately," the defendants had a sufficiently close relationship to support a claim for unjust enrichment.  *Amusement*, 820 F. Supp. 2d at 537.  The Sater Defendants cite no case in which a court has disallowed a claim for unjust enrichment in similar circumstances.

The Court is persuaded by the decision in *Amusement*.  The lack of any direct business dealings between a plaintiff and defendant may undermine the claim that the defendant was unjustly enriched in many circumstances.  However, it remains black letter law that "a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment."  *Sperry*, 863 N.E.2d at 1018.  The knowing receipt of stolen funds in furtherance of a money-laundering scheme, in the circumstances of this case, amounts to a sufficiently close connection to support a claim for unjust enrichment.  The Court therefore concludes that the Kazakh Entities have stated such a claim.

To maintain an action for money had and received, "New York law requires the following elements: (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money."  *Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir. 1987) (internal quotation marks and citation omitted).  The Sater Defendants contend that because a claim for money had and received closely resembles a claim for unjust enrichment, it too requires that a plaintiff plead a sufficiently close relationship to the defendant.  For the same reasons as with respect to the Kazakh Entities' claim for unjust enrichment, the knowing receipt of stolen funds amounts to a sufficiently close relationship.  The Court concludes that the Kazakh Entities have stated a claim for money had and received.

### B.   The Kazakh Entities Fail to State a Claim for Fraud

"The elements of a fraud cause of action consist of a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Pasternack v. Lab. Corp. of Am. Holdings*,

59 N.E.3d 485, 491 (N.Y. 2016) (cleaned up).  A fraud claim under New York law requires that

the misrepresentation or omission be made to the plaintiff—whether directly or indirectly—and

that the plaintiff, rather than a third party, rely on it.  *Id.* at 492–93.

The Kazakh Entities' claim for fraud centers on the bid package Sater and Ridloff

submitted for the Tri-County Mail deal.  *See* FAC ¶¶ 309–16.  They allege that "[t]he Real Estate

Advisor [for the seller of the note] relied on the fraudulent Bid Package" and that "Plaintiffs

were damaged as a result of this fraudulent Bid Package, as the Real Estate Advisor would not

have selected TCMI's bid had the Bid Package truthfully disclosed involvement of the Stolen

Funds."  *Id.* ¶¶ 314, 316.  The Kazakh Entities fail to state a claim for fraud, because they allege

injury based only on the real estate advisor's reliance, not their own.

To escape this result, the Kazakh Entities contend in their briefing that the

misrepresentations in the bid package were "specifically designed for the consumption of the

Kazakh Entities."  Plf. Br., Dkt. No. 124, at 26.  They further contend that the Sater Defendant's

partial disclosures in the bid package gave rise to a duty to truthfully disclose the source of the

funds.  The Court, however, need not decide whether the misrepresentations and omissions in the

bid package would be actionable by the Kazakh Entities were the other elements of fraud

satisfied.  The reliance element is not satisfied.  *Pasternack* is crystal clear that a claim for fraud

under New York law does not "include a claim based on the reliance of a third party, rather than

the plaintiff."  *Pasternack*, 59 N.E.3d at 493.  While the Sater Defendant's misrepresentations

may have frustrated the Kazakh Entities' investigation and hindered them in bringing suit, it was

the real estate advisor's reliance—and their reliance alone—that allowed the Sater Defendants to

convert the stolen funds.  This third-party reliance falls short of what New York law requires to

state a claim for fraud.

C.      **The Kazakh Entities State a Claim for Conversion**

The Sater Defendants do not dispute that the Kazakh Entities state a claim for conversion, only that such claim is timely.  The Kazakh Entities allege that the Sater Defendants intentionally exercised control over specific funds that belonged to them to deprive them of use of those funds altogether, and so state a claim for conversion.  *See Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1275 (N.Y. 2007) (citing Restatement (Second) of Torts § 222A(1)).

D.      **The Kazakh Entities Fail to State a Claim for Unlawful Means Conspiracy Under English Law**

The Kazakh Entities assert a claim for unlawful means conspiracy under English law; that is, they contend that that the Sater Defendants are liable for forming an agreement to act unlawfully and taking overt acts in furtherance of that agreement that caused them harm.  *See* Plf. Br. at 35 (citing *Revenue and Customs Commissioners v Sunico A/S*, [2013] EWHC 941 (Ch), 2013 WL 1563186).  The Kazakh Entities do not identify any parallel cause of action available under New York law.  Thus, their claim can succeed only if English law governs the claim.  The Court concludes that it does not.

A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits.  *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626–27 (2d Cir. 1998) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Under New York law, a court first must first "determine whether there is an actual conflict between the laws of the jurisdictions involved." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (quoting *In re Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993)).  If so, "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute."  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997) (citing *Babcock v. Jackson*, 191 N.E.2d 279, 283–84 (N.Y. 1963)).  The

parties do not dispute that a true conflict exists, because English law allows a freestanding claim for conspiracy and New York law does not. But they differ on whether the governmental interest analysis favors the application of English law or New York law on these facts.

In evaluating the governmental interests involved in a dispute, New York courts distinguish between rules that regulate primary conduct and those that regulate the allocation of loss. *See Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.* The fraudulent schemes the Kazakh Entities identify in their complaint occurred in New York, and that is where the Sater Defendants allegedly converted the Kazakh Entities' money to their own purposes. *See* FAC ¶¶ 123, 140 (money wired to New York shell companies for purported investments in WHN); ¶¶ 163–68 (money laundered by purchasing residential units in New York City); ¶¶ 169–77 (New York-based entity used to purchase Creacard); ¶¶ 182–85 (New York entity used to purchase disused mental health facility in New York); ¶ 197 (New York entity created to purchase and re-sell the Tri-County Mall note). Each of the Sater Defendants "is domiciled in the State of New York, and . . . knowingly committed acts in New York that form the basis of this action." FAC ¶ 15. None of the alleged conduct by the Sater Defendants occurred in the United Kingdom.

The United Kingdom's interest in enforcing its asset-freezing order is not squarely implicated by the Kazakh Entities' claim for unlawful means conspiracy; nor is it enough to surmount New York's interest in regulating conduct within its borders. The gravamen of that claim is not circumvention of an English court order. It is a conspiracy to use unlawful means (including violations of both English and American law) and overt acts in furtherance of that

conspiracy.  *See* FAC ¶¶ 335–41.  All of the conduct contemplated by the conspiracy and the overt acts in furtherance of it occurred in New York.  The Court rejects the Kazakh Entities' rather metaphysical argument that the tort "was not complete until the conspiracy achieved its intended goal of successfully helping to evade the Worldwide Freezing Orders."  Plf. Br. at 37.  Under New York's choice-of-law rules, the jurisdiction with the greatest interest in regulating conduct is nearly always the jurisdiction where that conduct occurs.

The Kazakh Entities note that New York law allows dépeçage—that is, where the law of one jurisdiction governs some issues in a case and the law of another jurisdiction others.  *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 n.4 (2d Cir. 2008) (citing *Babcock*, 191 N.E.2d at 285).  However, dépeçage applies only where the governmental interest analysis shakes out differently for different legal rules.  It does not simply allow a plaintiff to pick and choose their favorite causes of action from different legal systems.  In a typical case, a court may interpret a contract under the law of the place it was executed, while looking to the law of the place of performance to determine whether its object was lawful.  *See, e.g.*, *Hutner v. Greene*, 734 F.2d 896, 900–01 (2d Cir. 1984).  Or it may apply the law of the place of the tort to the standard of care, but the law of the domicile of the parties to whether a particular class of plaintiffs may recover.  *See, e.g.*, *Babcock*, 191 N.E.2d at 285.  The liability rules for the Kazakh Entities' various causes of action are all rules that regulate conduct.  The considerations underlying the governmental interest analysis for each are largely the same.  The Kazakh Entities do not articulate any reason why New York law should govern the conduct-regulating rules in their claims for fraud and conversion, but not those for unlawful means conspiracy arising out of the same conduct.

English law does not govern any issue in this case thus far raised by the parties.  The Court therefore dismisses the Kazakh Entities' claim for unlawful means conspiracy arising under English law.

### E.    The Kazakh Entities' Claims are Not Untimely

The Sater Defendants allegedly received stolen funds during 2012 and 2013.  The Kazakh Entities filed suit on March 25, 2019.  The Sater Defendants contend that the Kazakh Entities' claims for unjust enrichment and conversion are subject to a three-year statute of limitations and are therefore time-barred.  The claim for money had and received is subject to a six-year statute of limitations, and so the Sater Defendants contend that they may be held liable only for any stolen funds they received prior to March 25, 2013.  The Court agrees with the Sater Defendants as to the applicable limitations periods.  However, because it is not clear on the face of the complaint that equitable estoppel does not toll the statute of limitations, the Court declines to hold, in this posture, that any of the claims are untimely.  *See Pani*, 152 F.3d at 74; *cf. Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 712 (2d Cir. 2002) (holding that a court may reject equitable tolling as a matter of law only where it is "evident from the face of the complaint" that the plaintiff will be unable to make the required factual showing).

#### 1.    Statute of Limitations

Only the limitations period for unjust enrichment is disputed.  The parties agree that a claim for money had and received under New York law must be brought within six years.  *See* Plf. Br. at 31; Def. Br., Dkt. No. 134, at 12; *see also Reg'l Econ. Cmty. Action Program, Inc. v. Enlarged City Sch. Dist. of Middletown*, 964 N.E.2d 396, 398 (N.Y. 2012).  They agree that a claim for conversion must be brought within three.  *See* Plf. Br. at 33; Def. Br. at 18; *see also Obstfeld v. Thermo Niton Analyzers, LLC*, 93 N.Y.S.3d 338, 341 (App. Div. 2019).  They

disagree, however, as to whether a three- or six-year limitations period applies to the Kazakh Entities' claims for unjust enrichment.

The New York Civil Practice Law and Rules do not define a limitations period for unjust enrichment. Section 214 sets a limitations period of three years for suits including "an action to recover a chattel or damages for the taking or detaining of a chattel" and "an action to recover damages for an injury to property." N.Y. C.P.L.R. § 214(3)–(4). Section 213 sets a limitations period of six years for suits including "an action for which no limitation is specifically prescribed by law" and "an action upon a contractual obligation or liability, express or implied." N.Y. C.P.L.R. § 213(1)–(2).

Sources of binding authority shed little light on this question. Answering a certified question from the Second Circuit, the New York Court of Appeals has held that a "six-year statute of limitations . . . governs a claim for unjust enrichment from a breach of fiduciary obligation" when the plaintiffs seek equitable relief, at least for certain shareholder disputes. *Loengard v. Santa Fe Indus., Inc.*, 514 N.E.2d 113, 114–15 (N.Y. 1987) (internal citation omitted). The Second Circuit has held that "[t]he statute of limitations in New York for claims of unjust enrichment, breach of fiduciary duty, corporate waste, and for an accounting is generally six years." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001). The word "generally" in *Golden Pacific*, however, carries a heavy load: the Second Circuit has also recognized that the claims in *Loengard* "would be governed by a three-year limitations period if the action sought monetary relief but by a six-year period if the action sought equitable relief." *Cooper v. Parsky*, 140 F.3d 433, 441 (2d Cir. 1998) (citing *Loengard*, 514 N.E.2d at115).

Further complicating matters, *Loengard* did involve the possibility of monetary relief, albeit in the form of an equitable decree, and the court there said six years, not three. *Loengard*,

514 N.E.2d at 115 ("[T]he relief demanded in the complaint here—the restoration of the minority to their status as full stockholders, or, alternatively, a determination of the fair value of their shares and an order directing defendants to pay that value for them—is equitable in nature . . . ."). These cases stand for the proposition that the limitations period for a claim of unjust enrichment predicated on a breach of fiduciary duty depends on whether the action more closely resembles one "to recover damages for an injury to property" or one "for which no limitation is specifically prescribed by law" (including suits in equity). N.Y. C.P.L.R. §§ 213–14. They do not rule out that other provisions of §§ 213–214 might govern claims for unjust enrichment in other contexts.

New York's intermediate appellate courts have split in their treatment of the statute of limitations for unjust enrichment. The Second Department has held that the three-year limitations period under C.P.L.R. § 214(3) applies to a claim for unjust enrichment whenever a plaintiff seeks monetary relief. *See Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134 (App. Div. 2007); *see, e.g.*, *Lambert v. Sklar*, 817 N.Y.S.2d 378, 380 (App. Div. 2006) (applying three-year limitations period where plaintiff sought damages); *Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 596 N.Y.S.2d 435, 437 (App. Div. 1993) (applying six-year limitations period where plaintiff sought a constructive trust). The First Department, recognizing the split, has applied the six-year limitations period when a claim for unjust enrichment rests on facts that also support another claim governed by a six-year statute of limitations, even when the plaintiff seeks damages. *See Deutsche Bank, AG v. Vik*, 40 N.Y.S.3d 23, 24–25 (App. Div. 2016); *see, e.g.*, *Maya NY, LLC v. Hagler*, 965 N.Y.S.2d 475, 477 (App. Div. 2013); *Knobel v. Shaw*, 936 N.Y.S.2d 2, 6 (App. Div. 2011). For example, when addressing a claim for unjust enrichment coupled with a claim for breach of contract, it reasoned that in these circumstances liability for

restitution arises from a quasi-contractual obligation imposed by law.  *See Maya*, 965 N.Y.S.2d at 477; *see also Georgia Malone*, 973 N.E.2d at 746 ("The theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice." (cleaned up)).  Such a claim thus more closely resembles "an action upon a contractual obligation or liability, express or implied" or a suit in equity, C.P.L.R. § 213(1)–(2), than a tort claim for conversion or trespass to chattels, *see* C.P.L.R. § 214(3)–(4).  In essence, the First Department emphasizes the nature of the claim, where the Second Department emphasizes the nature of the remedy.  *Cf. Paver & Wildfoerster v. Catholic High Sch. Ass'n*, 38 N.Y.2d 669, 675, 345 N.E.2d 565, 568–59 (N.Y. 1976) (describing how New York courts have historically considered both the claim and remedy in determining the applicable statute of limitations).  To the extent that the Kazakh Entities contend that unjust enrichment is *always* subject to a six-year limitations period in the First Department, the Court rejects that reading of the cases as plainly irreconcilable with *Loengard*.

Federal courts in this district have largely followed the Second Department without comment and have applied a three-year limitations period whenever a claim for unjust enrichment seeks monetary relief.  *See, e.g.*, *Cohen v. Dunne*, No. 15-cv-3155 (DAB), 2017 WL 4516820, at *3 (S.D.N.Y. Sept. 27, 2017); *Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013); *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 263 (S.D.N.Y. 2008); *Grynberg v. Eni S.p.A.*, No. 06-cv-6495 (RLC), 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007); *Hughes v. LaSalle Bank, N.A.*, 419 F. Supp. 2d 605, 612 (S.D.N.Y. 2006), *vacated on other grounds*, No. 06-3778-CV, 2007 WL 4103680 (2d Cir. Nov. 19, 2007).

The Court is skeptical of the line of cases in this district that simply recite the Second Department's rule without considering the split of authority or the specific provisions of the New

York Civil Practice Law and Rules.  However, on these facts, a three-year limitations period

applies under either the First or Second Department's standard.  The Kazakh Entities do not

allege elements of a contract claim.  The gravamen of their claims is not that of an implied-in-

law contract but of a restitutionary obligation arising from an alleged conversion of their

property.  Because their claim for unjust enrichment rests on "the taking or detaining" of their

property, it most closely resembles the types of actions defined in C.P.L.R. § 214.  *See Bd. of*

*Managers of Chelsea 19 Condo. v. Chelsea 19 Assocs.*, 905 N.Y.S.2d 8, 10 (App. Div. 2010).

And the relief they seek—compensatory and punitive damages—is unquestionably legal, not

equitable, in nature.  *See* FAC at 70.  Both the "'essence' of . . . the wrong complained of" and

the "form of the remedy" suggest a three-year limitations period.  *Paver*, 345 N.E.2d at 568–59

(citations omitted).  The Court therefore concludes that a three-year limitations period applies to

their claim for unjust enrichment.

### 2.   Equitable Estoppel

New York "courts have long had the power, both at law and equity, to bar the assertion of

the affirmative defense of the Statute of Limitations where it is the defendant's affirmative

wrongdoing . . . which produced the long delay between the accrual of the cause of action and

the institution of the legal proceeding."  *Gen. Stencils, Inc. v. Chiappa*, 219 N.E.2d 169, 171

(N.Y. 1966).  Under the doctrine of equitable estoppel, "a defendant is estopped from pleading a

statute of limitations defense if the 'plaintiff was induced by fraud, misrepresentations or

deception to refrain from filing a timely action.'"  *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d

189, 198 (N.Y. 2007) (quoting *Simcuski v. Saeli*, 377 N.E.2d 713, 716 (N.Y. 1978)).  "New York

appears to use the label 'equitable estoppel' to cover both the circumstances where the defendant

conceals from the plaintiff the fact that he has a cause of action and where the plaintiff is aware

of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired." *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002) (cleaned up).

For equitable estoppel to apply, "a plaintiff may not rely on the same act that forms the basis for the claim." *Ross*, 868 N.E.2d at 198.  The plaintiff must point to distinct acts designed to conceal the prior wrongdoing.  *Id.*  "A wrongdoer is not legally obliged to make a public confession, or to alert people who may have claims against it, to get the benefit of a statute of limitations." *Zumpano v. Quinn*, 849 N.E.2d 926, 930 (N.Y. 2006).  A plaintiff must either allege either specific acts of "deceptive conduct" or "a fiduciary relationship which gave the defendant an obligation to inform him or her of facts underlying the claim." *Id.* (citations and alterations omitted).

Equitable estoppel cases in the New York Court of Appeals have most often turned on whether a defendant's subsequent acts of concealment were responsible for a plaintiff's delay in bringing suit.  For example, the court has held that equitable estoppel did not apply in a suit brought by victims of child abuse by priests.  The victims did not allege any "separate and subsequent acts of wrongdoing" that would have prevented them from suing within the limitations period.  *Id.*  The Diocese had reassigned priests without disclosing their offenses and taken steps to avoid claims of sexual misconduct being publicized.  *Id.*  However, the court noted that these actions, while "morally questionable," did not affect the ability of the victims to bring their claims in a timely fashion: the "concealment . . . of the priests' conduct, postwrongdoing, does not alter the fact that plaintiffs were fully aware that they had been abused.  Plaintiffs also knew the identity of their abusers and that the abusers were employed by the Diocese." *Id.* Thus, the court held that the Diocese's conduct was not responsible for the victims' delay in

bringing suit.  Similarly, the court has held that equitable estoppel did not apply where an adoption agent misrepresented the mental health of a child, because the adoptive parents did not contact the agency again, and thus no further deceptive conduct occurred, until long after the statute of limitations had lapsed.  *See Ross*, 868 N.E.2d at 198.

The New York Court of Appeals has allowed the application of equitable estoppel where a bookkeeper pilfered petty cash and concealed the losses by making forged entries in the books. *General Stencils*, 219 N.E. at 125, 128–29.  The court held that it was a factual question suitable for disposition on a new trial whether the plaintiff's failure to discover the theft within the limitations period was the result of the bookkeeper's artifice or its own negligence.  *Id.* at 128– 29.  So too when a physician told a patient that the injuries she suffered as a result of his malpractice were transient and the statute of limitations lapsed while she waited in vain for recovery.  *Simcuski*, 377 N.E.2d at 715.  The dividing line between *Zumpano* and *Ross* on the one hand and *General Stencils* and *Simcuski* on the other is whether deceptive conduct apart from the underlying wrongdoing could fairly be said to have caused the plaintiff's failure to timely file.

Although the Kazakh Entities' allegations of deceptive conduct are thin, they are enough at the pleading stage to plausibly support the application of equitable estoppel.  The Kazakh Entities identify three broad categories of deceptive conduct.  First, they point to the manner in which the Sater Defendants conducted the transactions by which they laundered the stolen funds. This includes both an overarching strategy to obscure the source of the funds and specific fraudulent misrepresentations designed to evade detection by the Kazakh Entities' investigators. *See, e.g.*, FAC ¶ 158 (describing the Sater Defendants' general strategy to avoid having transactions flagged as suspicious); ¶¶ 202–06 (describing specific misrepresentations in the bid

23

for the Tri-County Mall deal "designed not to arouse the suspicions of the Kazakh Entities . . . [who] were actively investigating the Khrapunovs' and Ablyazov's investment activities"). Second, they note the settlement agreement Sater entered into with TCMI, which kept from public view his role in the transaction and receipt of stolen funds.  *Id.* ¶¶ 267–69.  Third, they allege that Sater was in communication with the Kazakh Entities' investigatory firm since early 2015, but actively concealed his role in the money-laundering activities and that he had received stolen funds.  *Id.* ¶¶ 269–71.  They allege that despite diligent investigation, as a result of this concealment, they did not learn that the Sater Defendants had received stolen funds until March 2017, after many of their claims would have been time-barred.  *Id.* ¶ 269.

These factual allegations suffice to plausibly allege that the Sater Defendants' deceptive conduct, distinct from the actions forming the basis for the Kazakh Entities' claims, prevented them from timely bringing suit.  The Kazakh Entities' surviving claims essentially sound in conversion.  To prevail on those claims, they must prove only that the Sater Defendants took money that rightfully belonged to them.  They need not prove that the Sater Defendants accomplished that task with subterfuge or successfully covered their tracks afterwards.  That is, the Kazakh Entities do not allege merely a "self-concealing wrong."  *Sejin Precision Indus. Co. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 552 (S.D.N.Y. 2016).  The Sater Defendants' corporate shell game and fraudulent bid on the Tri-County Mall deal are distinct acts from those that give rise to liability.  Like with the bookkeeper in *Simcuski*, the claim rests on taking the money, not hiding it.  The hiding, if proved as alleged, supports the application of equitable estoppel.

While insufficient to justify equitable estoppel on their own, the Tri-County Mall settlement agreement and Sater's selective disclosures to the Kazakh Entities' investigators bolster the Court's conclusion.  To be sure, a confidential settlement that prevents one's

wrongdoing from coming to light does not, by itself, amount to the sort of active concealment necessary for equitable estoppel. *See Zumpano*, 849 N.E.2d at 930. The Court also doubts that the relationship between a private investigator and an apparent cooperating source amounts to the sort of fiduciary relationship contemplated by the equitable estoppel cases. *See id.* Still, these allegations further suggest a broad pattern of deceptive conduct designed to frustrate the Kazakh Entities' ability to use civil process to recover their stolen funds. They further suggest that the Sater Defendants intended to prevent the Kazakh Entities from timely bringing suit and that their failure to do so was the reasonable result of this pattern of deception, not their own lack of diligence. *See Ross*, 868 N.E.2d at 198.

The Court emphasizes that the Kazakh Entities will need to adduce evidence showing the Sater Defendants' deceptive conduct and their justifiable reliance on that conduct in significantly greater detail to meet their burdens of production and of proof as the case progresses. However, at this stage, the Court concludes that it is not clear on the face of the complaint that their claims are untimely, and so declines to dismiss any claims on that basis.

## Conclusion

The Court GRANTS the Sater Defendants' motion to dismiss as to the Kazakh Entities' claims for fraud and unlawful means conspiracy, and it dismisses those claims with prejudice. The Court otherwise DENIES the motion. This resolves Docket Number 105.

SO ORDERED.

Dated: November 30, 2020
New York, New York

_____
ALISON J. NATHAN
United States District Judge

25