**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAHKSTAN
and BTA BANK JSC,

                Plaintiffs,

              v.

FELIX SATER, DANIEL RIDLOFF, BAYROCK
GROUP INC., GLOBAL HABITAT SOLUTIONS,
INC., RRMI-DR LLC, FERRARI HOLDINGS LLC,
and MEM ENERGY PARTNERS LLC,

                Defendants.

No. 19 Civ. 2645 (AJN) (KHP)


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**MOSES & SINGER LLP'S MOTION TO QUASH THE SUBPOENA TO TESTIFY**
**AT A DEPOSITION**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT BACKGROUND .............................................................................................. 3

      A.   M&S's Involvement in the Transactions at Issue ....................................... 3

      B.   The Subpoenas ................................................................................................ 5

ARGUMENT ....................................................................................................................... 7

    I.   LEGAL STANDARD ................................................................................................ 7

    II.   MOSES & SINGER'S TESTIMONY IS HIGHLY RELEVANT AND
MATERIAL ................................................................................................................ 8

      A.   Moses & Singer Participated in Relevant Transactions ............................ 8

      B.   The Subpoena Is Not Unduly Burdensome. ............................................. 12

    III.   THERE IS NO PRESUMPTION AGAINST DEPOSING M&S, WHICH IS
NOT OPPOSING COUNSEL IN THIS ACTION ............................................. 14

    IV.   EVEN IF M&S IS TREATED AS OPPOSING COUNSEL, A DEPOSITION
IS APPROPRIATE. ................................................................................................. 17

      A.   The Requested Testimony is Not Available from Any Other Source. ..... 17

      B.   The Requested Testimony is Relevant. ...................................................... 19

      C.   The Requested Testimony Does Not Seek Information Subject to Attorney-
Client Privilege, and Regardless, M&S Can Make Any Appropriate
Objections During the Deposition. ........................................................... 20

      D.   Plaintiffs Are Not Precluded from Seeking Testimony Related to Topics
Covered by the Document Subpoena ....................................................... 22

CONCLUSION ................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aco Fabrica de Calcado S.A. v. Tic-Tac-Toes Mfg. Corp.*,
    No. 06:06-CV-0819, 2008 WL 11355382 (N.D.N.Y. Apr. 22, 2008) ............................ 15, 19

*Calvin Klein Trademark Trust v. Wachner*,
    124 F. Supp. 2d 207 (S.D.N.Y. 2000) ........................................................................ 15

*Campinas Found. v. Simoni*,
    No. 02 CIV. 3965BSJKNF, 2005 WL 1006511 (S.D.N.Y. Apr. 27, 2005) ........... 14

*Carey v. Textron, Inc. (E-Z-Go Textron)*,
    224 F.R.D. 530 (D. Mass. 2004) ................................................................................ 15

*Cooper v. Welch Foods, Inc.*,
    105 F.R.D. 4 (W.D.N.Y. 1984) .................................................................................. 16

*Crosby v. City of New York*,
    269 F.R.D. 267 (S.D.N.Y. 2010) ................................................................................ 8

*Doe v. Town of Greenwich*,
    2019 WL 426769 (D. Conn. Sept. 10, 2019) ........................................................... 18

*Goldberg v. Dufour*,
    No. 16-21301, 2020 WL 373206 (D. Vt. Jan. 23, 2020) ............................. 15, 18, 21

*Gragg v. Int'l Mgmt. Grp.*,
    No. CIVA5:03CV0904NPMDEP, 2007 WL 1074894 (N.D.N.Y. Apr. 5, 2007) ................. 14

*Gropper v. David Ellis Real Est., L.P.*,
    No. 13 CIV. 2068 ALC JCF, 2014 WL 904483 (S.D.N.Y. Mar. 4, 2014) ............................ 14

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ................................................................................................... 8

*In re Gawker Media LLC*,
    No. 16-11700 (SMB), 2017 WL 2804870 (Bankr. S.D.N.Y. June 28, 2017) ........................ 21

*In re Grand Jury Subpoena Duces Tecum*,
    *Dated Sept. 15, 1983*,
    731 F.2d 1032 (2d Cir. 1984) ................................................................................... 20

*Kleiman ex rel. Kleiman v. Jay Peak, Inc.*,
    No. 1:10-CV-83, 2012 WL 2498872 (D. Vt. June 27, 2012) ................................... 21

*Nakash v. United States Department of Justice*,
  128 F.R.D. 32 (S.D.N.Y. 1989) ................................................................... 15, 16, 21

*Resqnet Com, Inc. v. Lansa, Inc.*,
  No. 01 Civ. 3578 (RWS), 2004 WL 1627170 (S.D.N.Y. July 21, 2004) .............................. 22

*Resqnet.Com, Inc. v. Lansa, Inc.*,
  No. 01 CIV.3578(RWS), 2004 WL 1627170 (S.D.N.Y. July 21, 2004) ............................... 14

*Rubis v. Hartford Fire Ins. Co.*,
  No. 3:11CV796 WWE, 2012 WL 996530 (D. Conn. Mar. 23, 2012) .................................. 14

*Schlagenhauf v. Holder*,
  379 U.S. 104 (1964) ................................................................................. 8

*Sea Tow Int'l, Inc. v. Pontin*,
  246 F.R.D. 421 (E.D.N.Y. 2007) ..................................................................... 14

*Shaub & Williams, L.L.P. v. Augme Techs., Inc.*,
  No. 13 CIV. 1101 GBD JCF, 2014 WL 1033862 (S.D.N.Y. Mar. 17, 2014) ................. 14, 16

*Shaw v. Arena*,
  No. 17-MC-0448 (AJN), 2018 WL 324896 (S.D.N.Y. Jan. 3, 2018) .................................... 7

*Shelton v. American Motors Corp.*,
  805 F.2d 1323 (8th Cir. 1986) ...................................................................... 16

*Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.) Inc.*,
  111 F.R.D. 76 (S.D.N.Y. 1986) ...................................................................... 20

*Stauber v. City of New York*,
  No. 03 CIV.0163(RWS), 2004 WL 1013342 (S.D.N.Y. May 7, 2004) ................................ 14

**Rules**

Fed. R. Civ. P. 30(a)(1) ................................................................................. 7

Fed. R. Civ. P. 26(b)(1) ................................................................................. 7

Fed. R. Civ. Proc. 45(c)(3)(A)(iv) .................................................................... 7

Plaintiffs City of Almaty, Kazakhstan and BTA Bank JSC (the "Kazakh Entities" or "Plaintiffs") respectfully submit this memorandum of law in opposition to Moses & Singer LLP's ("M&S") motion to quash the subpoena to testify at a deposition, ECF No. 325 ("Mot.").

## PRELIMINARY STATEMENT

M&S is a key fact witness in this case. M&S was one of Felix Sater's longtime law firms, and he often used M&S's attorney escrow account to move funds traceable to the money stolen from Plaintiffs. Separate from its involvement in Sater's efforts to conceal his receipt of stolen funds, M&S also sat at the center of one of the most important transactions at issue in the litigation, which was the dispute between Ilyas Khrapunov and Sater concerning Sater's misappropriation of approximately $43 million during the sale of what is referred to as the Tri-County Mall investment. The representations that M&S made to counterparties during those negotiations concern important facts, such as the source of the funds used to make the investments and why proceeds of those investments were distributed to Sater and his co-conspirators. M&S also represented to Ilyas Khrapunov and Triadou SPV S.A.'s attorneys what was contained on recordings of conversations between Ilyas Khrapunov and Sater – recordings that Sater has admitted to making, but that he has *not* produced and that have not been obtained from any other third parties. M&S also represented Litco LLC, including in all negotiations with representatives of Plaintiffs on the contract between them and Litco, as well as the subsequent non-disclosure agreement between Litco and an investigative firm retained by Plaintiffs. Sater has made clear that one of his key defenses is to invoke the provisions of Litco's agreement with the Plaintiffs, and the course of dealings between M&S (on behalf of Litco) and Plaintiffs' agents will be central to that defense.

Plaintiffs have so far served two targeted document subpoenas on M&S. The first sought records of financial transactions involving Sater and the funds stolen from Plaintiffs, such as the transfers into and out of M&S's escrow account. After months of delay, M&S produced a small

number of emails and records showing financial transfers among Sater and his co-conspirators. Plaintiffs' second subpoena to M&S sought copies of recordings, including recordings that Sater made of his conversations with Ilyas Khrapunov. M&S wrote at the time that Sater had made the recordings "in order to protect himself, confirming (among many other things) Mr. Khrapunov's domination and control of the various entities for which he directed Mr. Sater to perform services." M&S also wrote that Ilyas Khrapunov told Sater "that the funds for several of those companies belonged to Mr. Ablyazov," the architect of the fraud against BTA Bank. In response to that subpoena, M&S produced a small number of emails with a vendor who had enhanced and edited those audio recordings, but no copies of the recordings themselves. Instead, M&S produced an email from Sater that had a purportedly expired Dropbox link. M&S refuses to say what they have done to search for records other than conduct a "diligent" search, and no other party (including Sater and the audio technology vendor) has yet produced the recordings of Sater and Khrapunov.

Against the backdrop of M&S's role as a critical fact witness, Plaintiffs' deposition subpoena is entirely appropriate. In fact, it is hard to imagine that (especially with respect to Sater's release defense) M&S will not be a trial witness, just as M&S was a critical witness when this Court previously held an evidentiary hearing in connection with the Litco agreement in a related case. Among the many relevant and non-privileged topics called for in the deposition subpoena, Plaintiffs seeks to examine M&S about (1) its search for and production of responsive documents, including the recordings; (2) its communications and representations to third parties; (3) the use of its escrow account; (4) the contents of the audio recordings between Sater and Khrapunov; and (5) its course of dealings in negotiating the Litco agreement and subsequent NDA. None of these topics is privileged, all are highly relevant, and for most M&S is the only available witness. M&S's only response is to claim that the subpoena was issued for harassing purposes – which it plainly

was not – and that there is a presumption against deposing opposing counsel. But M&S has never

been opposing counsel in this litigation: M&S is a fact witness like anyone else, and its status as a

law firm does not shield it from discovery. The motion to quash should be denied.

## RELEVANT BACKGROUND

### A.    M&S's Involvement in the Transactions at Issue

The Amended Complaint, ECF No. 83 ("Am. Compl."), describes various transactions

through which Defendants "conspired with Ilyas [Khrapunov] and [Mukhtar] Ablyazov to

launder" funds stolen from the Plaintiffs through investments, including in the United States. The

Amended Complaint identified one of Felix Sater's "longtime law firms" as the recipient of a

$1,900,000 payment from "a Swiss private bank controlled by an associate of Ilyas" to that

attorney escrow account. Am. Compl. ¶ 188. In their Answer to the Amended Complaint, the Sater

Defendants identified M&S as that law firm and admitted "that $1,900,000.00 was transferred into

an attorney escrow account at Moses & Singer LLP in connection with the Syracuse Center

transaction." ECF No. 266 ¶ 188.

Throughout discovery in this action, Plaintiffs have identified several other transactions

relevant to this dispute that involved transfers to or from M&S escrow accounts. For example,

Sater used several of his shell companies to wire M&S proceeds from the Tri-County Mall sale,

an investment again funded with the Kazakh Entities' stolen funds, as described in the Complaint.

[Am. Compl. ¶¶ 191–261]. In early October 2013, Sater transferred $36 million of the Tri-County

proceeds to the account of his company Sands Point Partners Fund L.P. From that account, Sater

withdrew $2 million in cash, transferred ███████ directly to Moses & Singer, and then transferred

$32 million to the account of Sands Point Partners Group GP. After settling a dispute with Ilyas

Khrapunov and Triadou, Sater then transferred $20 million of the Tri-County proceeds to the

account of a company owned by his wife, Viktoria's Gourmet Foods, LLC, which transferred that

$20 million to M&S. M&S then transferred the $20 million to Argon Holding Corp., which is another entity controlled by Khrapunov. In his deposition in this action, Sater explained that he transferred $20 million of the proceeds of the Tri-County Mall transaction to his wife's granola business, and then directed his wife to transfer those funds to an account in the name of M&S. [Declaration of Craig Wenner ("Wenner Decl."), Ex. A (Excerpt of Jan. 29, 2021 Deposition of Felix Sater at 300:16–301:5)].

In addition to these transactions, during the corporate deposition of Bayrock Group Inc. and Global Habitat Solutions, Inc., at which Sater appeared as the corporate representative, Sater testified about multiple transfers to and from the M&S escrow accounts. [Wenner Decl., Ex. B (Excerpt of Oct. 29, 2020 Deposition of Bayrock/GHS at 184:23–186:6) (discussing transfers related to Syracuse Center, noting that "[M&S] handled most of the closing, but I don't remember what were the amounts paid to them for the closing or what the total amounts paid or how many payments, they handled all the legal on the closing.")]. ██████████████████████████
██████████████████████████████████████████████████████████████

The Sater Defendants have also asserted an affirmative defense related to Litco LLC. [ECF No. 266 ¶ 339]. Defendants have already previewed this affirmative defense in multiple filings with the Court, which repeatedly reference the relevance of M&S. For example, according to a sworn declaration submitted by Sater, his "attorney, Robert Wolf of Moses & Singer, dealt extensively with Arcanum and Boise [*sic*] Schiller in connection with the Litco Assistance provided pursuant to the [Confidential Assistance Agreement]" – that is, the agreement that Sater asserts provides a complete defense to the claims against him in this action. [ECF No. 78 at ¶ 6]. When asked at the Bayrock and GHS corporate deposition when and where he signed the Confidential Assistance Agreement, Sater could not recall and said he would "definitely take a

look and ask Robert Wolf," an M&S attorney. [Wenner Decl., Ex. B at 246:5–247:7]. And as the Court is aware, in the related *City of Almaty v. Ablyazov* case, Wolf himself testified at length about the Litco agreement and subsequent NDA, confirming that he was the sole representative of Litco who negotiated that agreement. [*See City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-05345 (AJN) (KHP), ECF No. 1248, at 12 (S.D.N.Y. May 19, 2020) (Opinion & Order on Sanctions Motions) ("On August 8, 2019, a number of witnesses testified at a hearing before this Court on the issue of when Plaintiffs and BSF learned that Sater owned Litco. The witnesses included . . . Sater's counsel Robert Wolf, from the law firm Moses & Singer LLP, who negotiated the Litco CAA with Arcanum")]. Wolf also confirmed that, as recently as the day before Sater's deposition in the related case, he concealed Sater's ownership in Litco from Plaintiffs. [*Id.* at 17 ("On September 12, 2018, the day before Sater's deposition in this case, BSF asked Wolf who owned Litco and Wolf stated he did not know. This was obviously a lie, as Wolf knew full well that Sater owned Litco and was receiving compensation under the Litco CAA.") (citation omitted)].

### B.    The Subpoenas

Plaintiffs served M&S with two document subpoenas. The first subpoena, served in March 2020, asked M&S for documents related to transfers between accounts, including the M&S escrow accounts, related to a list of individuals and entities relevant to this dispute. As M&S notes, they provided documents responsive to the document subpoena. M&S did not file a motion to quash that subpoena or serve any responses and objections to that subpoena, including any relating to the scope of the requests or the relevance of the information sought.

After months of searching for relevant documents, M&S produced a one-page redacted spreadsheet. [ECF No. 214 (Sep. 21, 2020 Letter from Kazakh Entities to Judge Parker re M&S Subpoena)]. Eventually, M&S produced an unredacted copy of the one-page escrow account

activity, along with five pages of redacted bank documents. [ECF No. 226 (Oct. 19, 2020 Letter from Kazakh Entities to Judge Parker re M&S Subpoena)]. Following M&S's six-page production, the Kazakh Entities identified responsive evidence missing from M&S's prior production. [ECF No. 230 (Nov. 6, 2020 Letter from Kazakh Entities to Judge Parker re M&S Subpoena)]. By that point, the Kazakh Entities had raised the issues with M&S's production in multiple letters to the Court, and gave M&S multiple extensions, and finally notified the Court that they "remain skeptical that this months-long process will finally conclude absent Court intervention." [*Id.*] In early 2021, M&S represented that it had completed its production of documents responsive to the first subpoena. At a subsequent status conference, Plaintiffs' counsel observed that because M&S had represented that it had searched for and produced all responsive documents and was not withholding any, Plaintiffs would not move to compel but would explore the adequacy of M&S's search at a deposition. [*See* Wenner Decl., Ex. K (ECF No. 282) at 4–6].

Plaintiffs next served a second, limited document subpoena on M&S seeking information related to recordings made by Sater. Sater has admitted to making at least two sets of recordings: one set with Ilyas Khrapunov from the time they were doing business together as part of the money laundering scheme, and another from 2015 or later with representatives of the Kazakh Entities that Sater believes are relevant to his release-based defense. Although Sater has produced two (partial) recordings from the second category, he has not produced a single recording with Ilyas Khrapunov. Nor have the Plaintiffs been able to obtain these recordings from any other source, including from a third party audio technician that Sater hired to enhance and/or manipulate the recordings. The document subpoena thus sought those recordings from M&S, which unquestionably possessed them at some point.

Plaintiffs also served M&S with a deposition subpoena, the subject of M&S's motion, which sought deposition testimony from M&S related to the transactions at issue in this case (all of which necessarily predate its filing); the negotiation of the Litco agreement and related course of dealings; and M&S's search for responsive documents. [ECF No. 324-1].

## ARGUMENT

The Court should deny the motion to quash. M&S is a witness with first-hand, non-privileged information concerning the role that Felix Sater, Daniel Ridloff, and certain of the entity defendants played in two of the five money laundering schemes alleged in the Amended Complaint (Tri-County Mall, Syracuse Center), Sater's release-based defense concerning Litco, Sater's concealment of the proceeds of the money laundering scheme, and the content and location of highly relevant audio tapes of conversations between Sater and Ilyas Khrapunov. M&S appeared on and authored important documents and communications during the period when Ablyazov and the Khrapunovs' relationship with Sater and Ridloff broke down, resulting in Sater and Ridloff extorting tens of millions of dollars traceable to the funds stolen from the Kazakh Entities. The facts concerning these transactions are not privileged and are within M&S's knowledge.

## I.   Legal Standard

Federal Rule of Civil Procedure 45 provides that a district court "must quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ. Proc. 45(c)(3)(A)(iv). "On a motion to quash, the party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings. . . . Once relevance has been established, the movant bears the burden of demonstrating an undue burden. Determinations of issues of 'undue burden' are committed to the discretion of the trial court." *Shaw v. Arena*, No. 17-MC-0448 (AJN), 2018 WL 324896, at *1 (S.D.N.Y. Jan. 3, 2018) (Nathan, *J.*) (cleaned up).

Rule 26(b)(1) permits discovery regarding any non-privileged matter relevant to any party's claims or defenses that is proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). The deposition discovery regime set out by the Federal Rules of Civil Procedure is an extremely permissive one to which courts have long "accorded a broad and liberal treatment to effectuate their purpose that civil trials in the federal courts [needs not] be carried on in the dark." *Schlagenhauf v. Holder*, 379 U.S. 104, 114–15 (1964) (quoting *Hickman v. Taylor*, 329 U.S. 495, 501, 507 (1947)). "'The same scope of discovery applies when seeking discovery from a non-party.'" [ECF No. 194 at 5 (Order denying non-party lawyer motion to quash deposition subpoena) (quoting *Crosby v. City of New York*, 269 F.R.D. 267, 282 & n.82 (S.D.N.Y. 2010))]; *see also* Fed R. Civ. P. 30(a)(1) ("A party may take the testimony of any person by deposition upon oral examination without leave of court.").

## II.   Moses & Singer's Testimony Is Highly Relevant and Material

Moses & Singer is a percipient witness to many transactions and events that are at the core of the claims and defenses in this case. M&S contends that the Subpoena is "harassing" because there is purportedly "no basis for it." Mot. 5. The reasons M&S offers in support of its motion are wrong on the facts or the law or both.

### A.   Moses & Singer Participated in Relevant Transactions

M&S contends that "none of the issues are relevant," but like the other non-party attorneys who have given testimony in this and the related case against Triadou SPV S.A., M&S communicated with other witnesses during the transactions that are at issue in this case. [*See* ECF No. 194 at 5–6 ("[Diane Artal] represented Triadou and its subsidiaries in various matters and that she communicated with other witnesses in this case.")]. Like with Ms. Artal, in the course of its representation of Felix Sater, Moses & Singer "interacted with many individuals with knowledge of facts relevant to this matter and the Ablyazov Action," including Nicolas Bourg, Joseph Chetrit,

8

Peder Garske, Marc Gillieron, Luigi Rosabianca, Diane Artal, Peter Sztyk, Arnie Herz, Mendel Mochkin, and Daniel Ridloff, to name a few. These are individuals who appear on written communications with Robert Wolf, and sometimes John Baranello, of Moses & Singer. [*See, e.g.*, Wenner Decl., Exs. F, G, H, I].

To give a few examples, Moses & Singer has already produced documents concerning one of the central allegations in the Amended Complaint, the Tri-County Mall transaction. Neither Moses & Singer nor Felix Sater moved to quash the document subpoena on the basis that those records were irrelevant, and with good reason. Sater oversaw the acquisition and sale of a note on the Tri-County Mall in Cincinnati, Ohio, which was purchased with stolen funds. [Am. Compl. ¶¶ 191–272]. Following the sale, Sater misappropriated the approximately $43 million in proceeds, moving them into an account he personally opened and controlled. This became the subject of a dispute between Sater and Ilyas Khrapunov and his company, Triadou SPV S.A. Robert Wolf directly negotiated with Triadou and Khrapunov's counsel in that dispute, writing a demand letter describing key facts at issue in this case. [Wenner Decl., Ex. C (Oct. 30, 2013 letter from M&S to counsel for Ilyas Khrapunov); Wenner Decl., Ex. I]. The settlement that resulted from those negotiations is highly relevant to the Kazakh Entities' claim that Sater converted and was unjustly enriched from funds traceable to plaintiffs. In addition, Moses & Singer received no less than ▪▪▪▪▪▪ directly from the proceeds of the Tri-County Mall sale. [Wenner Decl., Ex. D].

The manner in which the settlement funds were distributed also demonstrates Sater's concealment of the proceeds of the money laundering, which Judge Nathan has already determined is relevant to whether the statute of limitations can be tolled. [ECF No. 244 at 22]. In just one example, after moving the Tri-County proceeds through several other intermediary accounts, including his wife's Gourmet Foods business account, Sater wired $20 million to Moses & Singer

on December 24, 2013. [Wenner Decl., Ex. E (M&S escrow account statement for Felix Sater)]. That same day, Wolf confirmed to Triadou's counsel that Moses & Singer had received $20 million to its escrow account—which was the anticipated consideration that Sater paid Triadou and Ilyas Khrapunov in the settlement—knowing that the funds had come from Sater's wife's granola business. [Wenner Decl., Ex. F]. With no obvious business purpose behind the transfers with the granola business, M&S accepted the $20 million and proceeded to pay a Triadou subsidiary called Argon Holding for the settlement with Ilyas Khrapunov. [Wenner Decl., Ex. J]. These machinations are precisely the kind of evidence the Kazakh Entities will use to prove that the statute of limitations should be equitably tolled.[1]

Two other examples of Moses & Singer's relevant knowledge are worth describing. In the demand letter drafted by Wolf and sent to Ilyas Khrapunov and Triadou's attorneys, Wolf represents that Moses & Singer has "many recordings, made by Mr. Sater in order to protect himself, confirming (among many other things) Mr. Khrapunov's domination and control of the various entities for which he directed Mr. Sater to perform services." [Wenner Decl., Ex. C]. Wolf also writes that Ilyas Khrapunov told Sater "that the funds for several of those companies belonged to Mr. Ablyazov[.]" [*Id.*] These are the tape recordings that the Kazakh Entities have been trying to obtain in discovery, but so far without success. Sater has admitted to making those recordings, but has failed to produce them, as has a third-party vendor called AudioPaint, which Sater hired to help enhance and/or manipulate the recordings. Moses & Singer's production shows that Sater

---

[1]    Sater used Moses & Singer's escrow account in connection with another transaction at issue in this case as well, the Syracuse Center. With the Syracuse transaction, Sater instructed Moses & Singer to pay ▆▆▆▆ to co-defendant MeM Energy Partners. [Wenner Decl., Ex. G]. Then, Moses & Singer paid ▆▆▆▆▆ from its escrow account to Felix Sater's company, Bayrock Group, a transaction that Sater as Bayrock's 30(b)(6) witness could not explain. [Wenner Decl., Ex. B at 186:13–23]. The purpose and manner of these payments is likewise relevant.

provided the recordings to Moses & Singer, but the firm claims it no longer has the audio files themselves—though Moses & Singer refuses to explain whether they have searched archived emails, local storage devices, cloud storage, or document management systems. Presumably, though, to represent in good faith what the contents of the recordings demonstrated, Moses & Singer listened to them. Moses & Singer should be required to explain what was on the tapes, what they did to search for the tapes, how many there were, and what Ilyas and Sater said. (M&S similarly should be able to explain the good faith basis for its other assertions in the demand letter concerning other transactions and facts.)[2]

Separate from the Kazakh Entities' claims, Moses & Singer singularly negotiated the Litco agreement and subsequent non-disclosure agreement, which is relevant to Sater's release-based defense. Moses & Singer was Litco's counsel, and Wolf was the face of Litco. The Court is already familiar with this topic, given Wolf appeared to testify about Litco during a hearing in the related case where his testimony was relevant to Triadou's sanctions motion that the Court subsequently denied. Sater claims that the Kazakh Entities knew Sater was Litco's owner, and Moses & Singer should be required to testify to facts concerning that defense, such as what was communicated to the Kazakh Entities, when, and by whom. As Judge Nathan held just recently in overruling Sater's objections to Your Honor's order denying a stay pending arbitration, Litco's concealment of Sater's ownership prior to execution of the Litco agreement affects not only the agreement to arbitrate, but whether "the parties mutually intended Sater to benefit from . . . *any* provision in the

---

[2]    M&S's motion asserts that Sater has produced the recordings, Mot. 4, but it is incorrect. The only recordings produced by Sater are the ones that he believes are helpful to his defense, relating to the Litco issue: one is a recording with a representative of Arcanum and the other is a partial recording of a meeting with Plaintiffs' counsel. To be clear, no one has produced the recordings Sater made of Ilyas Khrapunov, which were undisputedly in M&S's possession at some point. [Wenner Decl. ¶ 12].

CAA," including the release provision. [ECF No. 323 at 8 (emphasis added); *see also id.* at 11–12 ("'Sater admits that he hid his Litco affiliation from Plaintiffs.'" In fact, 'Sater . . . insisted that Arcanum, Plaintiffs' investigative firm, enter into the [non-disclosure agreement] to shield his affiliation from Plaintiffs and their counsel.' What's more, Litco represented in the CAA that '[n]o potential witness which Litco identifies and produces to Arcanum . . . shall have any ownership interest in Litco.' That express representation cuts directly against a finding that Plaintiffs understood the CAA to extend contractual benefits to Sater.").

In short, M&S represented Sater in connection with the transactions at issue in this litigation. M&S communicated directly with Sater's counterparties and involved itself in the financial transactions themselves. And M&S single-handedly negotiated the agreement that Sater relies on for a complete defense. M&S is a witness with relevant knowledge.

## B.     The Subpoena Is Not Unduly Burdensome.

M&S fails to meet its burden to demonstrate that the Subpoena is unduly burdensome. To start, the Subpoena is not overbroad. Moses & Singer argues that "none of the topics for the deposition remotely relate to Plaintiffs' claims in this case," Mot. at 1, but in just looking at the handful of examples described above—the Tri-County Mall, the Syracuse Center, the demand letter, and Sater's release-based defense—nearly every single Individual, Entity, and Topic in the Subpoena are represented. For example, the Tri-County Mall negotiations and transactions involve multiple Individuals: Sater, Viktoria Sater (whose company and M&S roundtripped $20 million), Daniel Ridloff (part of the settlement), Mendel Mochkin (received Tri-County Mall funds that Triadou contested and M&S defended, [Wenner Decl., Ex. H]), Ablyazov (the source of funds that M&S mentioned in the demand letter), and Ilyas Khrapunov and Nicolas Bourg (counterparties in the dispute). The entities involved in just that one dispute include Adlux (subject of the demand letter, also funded Syracuse), Argon (Triadou subsidiary that received settlement proceeds),

Bespoke (subject of the demand letter), Herz (involved in the MeM Energy payment), Sands Point (Sater entity that paid M&S with funds from the Tri-County proceeds), Payment Card Systems (subject of the demand letter), Swansea Mall (subject of the demand letter), SDG and Triadou (counterparties claiming the funds), Telford (source of funds), World Health Networks (subject of the demand letter), Tri-County Mall Investors (two different companies, one owned by Sater and another owned by Triadou), and Viktoria's Gourmet Foods (involved in fund transfers). M&S complaints that there are 45 Individuals and Entities listed in the Subpoena, *see* Mot. 5, but that is a function of the complexity of the transactions, not overbreadth in the Subpoena. In just the Tri-County Mall deal and settlement, no fewer than 30 Individuals and Entities are relevant. And together with Litco, the Syracuse Center, the Flatotel, and other transactions Sater pursued with funding from Ilyas Khrapunov, there are easily 45 or more Individuals or Entities at issue.

Preparation for the deposition also does not impose an undue burden. This is not an instance of a corporate deposition that requires a wide-ranging investigation and interview of numerous witnesses. The documentary record shows that Robert Wolf was directly involved in the communications and transactions at issue, corresponding directly with Sater, people within M&S, and external counterparties. Wolf also was solely responsible for all of the Litco-related communications. John Baranello was also involved in at least a certain number of communications, including the handling of the Khrapunov audio tapes. Between these two attorneys, there should be very little additional personal knowledge if any that M&S would need to obtain to prepare for the deposition. And, as M&S represents, it has already responded to the document subpoenas, and so any additional search for records could be targeted and incremental solely to fill in gaps in Wolf and Baranello's recollection of events. (And if such a search turns up any additional relevant documents, they would be responsive to document subpoenas to which M&S has not objected).

13

### III.   There Is No Presumption Against Deposing M&S, which Is Not Opposing Counsel in this Action

Contrary to M&S's assertions, there is no "strong presumption" against deposing an attorney—especially when, as here, the attorney is not "opposing counsel"—nor is it a "last resort." Instead, courts in this Circuit routinely order the deposition of attorneys in the circumstances present here. [*See, e.g.*, ECF No. 194 (denying attorney Diane Artal's motion to quash)]. In each of the cases that M&S cites, Mot. 8–9 & n.1, the party requested a deposition of its *opposing counsel* in *that case*.[3] But M&S is not "opposing counsel" in this case. It does not, and has never, represented a party in connection with this action. [ECF No. 324 ¶ 4 (Declaration of John V. Barnanello) ("M&S represented Felix Sater in various matters. M&S no longer represents Mr. Sater and has never represented Mr. Sater in this case.")].

As explained above, M&S's role in this litigation has been that of a fact witness, not counsel. Mot. 7 (M&S characterizing itself as "non-party lawyers"). "The simple and basic

---

[3]   *Campinas Found. v. Simoni*, No. 02 CIV. 3965BSJKNF, 2005 WL 1006511, at *2 (S.D.N.Y. Apr. 27, 2005) ("Depositions of opposing counsel are disfavored."); *Resqnet.Com, Inc. v. Lansa, Inc.*, No. 01 CIV.3578(RWS), 2004 WL 1627170, at *2 (S.D.N.Y. July 21, 2004) ("In this Circuit, depositions of opposing counsel are disfavored. The rationale behind the presumption against such discovery is that even a deposition of counsel limited to relevant and nonprivileged information risks disrupting the attorney-client relationship and impeding the litigation." (cleaned up)); *Stauber v. City of New York*, No. 03 CIV.0163(RWS), 2004 WL 1013342, at *2 (S.D.N.Y. May 7, 2004) (same); *Gragg v. Int'l Mgmt. Grp.*, No. CIVA5:03CV0904NPMDEP, 2007 WL 1074894, at *9 (N.D.N.Y. Apr. 5, 2007) ("plaintiff's avowed intention, in seeking leave to take Ms. Levine's deposition, is to inquire concerning her gathering of documents for presentment to the court in connection with defendants' initial dismissal motion"); *Gropper v. David Ellis Real Est., L.P.*, No. 13 CIV. 2068 ALC JCF, 2014 WL 904483, at *1 (S.D.N.Y. Mar. 4, 2014) ("courts seek to avoid the disruption and misuse of the adversary process attendant on allowing a party to depose its adversary's litigation counsel"); *Rubis v. Hartford Fire Ins. Co.*, No. 3:11CV796 WWE, 2012 WL 996530, at *1 (D. Conn. Mar. 23, 2012) ("Courts are understandably leery of turning trial counsel in the case before them into subpoenaed witnesses, because too often it is an effort to harass and intimidate and make trouble for a party by going after the lawyer."); *Shaub & Williams, L.L.P. v. Augme Techs., Inc.*, No. 13 CIV. 1101 GBD JCF, 2014 WL 1033862, at *6 (S.D.N.Y. Mar. 17, 2014) (same); *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 427 (E.D.N.Y. 2007) (same).

relevant fact is that [M&S] is not the opposing trial counsel in this action." *Aco Fabrica de Calcado S.A. v. Tic-Tac-Toes Mfg. Corp.*, No. 06:06-CV-0819, 2008 WL 11355382, at *1 (N.D.N.Y. Apr. 22, 2008). As a result, the presumption against deposing opposing counsel, and the analysis in *In re Friedman*, 350 F.3d 65 (2d Cir. 2003), does not apply. *Aco Fabrica de Calcado S.A.*, 2008 WL 11355382, at *1 ("[Defendant] cites to . . . authority for the 'traditional rule against deposition of active counsel.' But all of these cases reference 'opposing counsel,' which, as noted above, [counsel to be deposed] is not."). M&S has never been attorney of record in this case, to Felix Sater or any other party. *Id.* (distinguishing cases that "involved trial counsel who were attorneys of record" because attorney "does not play that role here"); *see also Goldberg v. Dufour*, No. 16-21301, 2020 WL 373206, at *4 (D. Vt. Jan. 23, 2020) ("Attorneys Gillett and Naymark are not opposing counsel in this lawsuit and, indeed, play no role in it other than as fact witnesses."); *Calvin Klein Trademark Trust v. Wachner,* 124 F. Supp. 2d 207, 211 (S.D.N.Y. 2000) (noting that counsel's role in litigation was peripheral" and refusing to apply *Shelton* on that basis); *Carey v. Textron, Inc. (E-Z-Go Textron),* 224 F.R.D. 530, 532 (D. Mass. 2004) ("Moreover, the fact that Attorney Gelineau no longer represents Carey in this matter reduces the degree [of] interference that any deposition of him would introduce. He, presumably, does not possess information concerning Plaintiff's current litigation strategy.").[4]

For example, in *Nakash v. United States Department of Justice*, 128 F.R.D. 32, 35 (S.D.N.Y. 1989), on which the Second Circuit in *Friedman* relied, the court permitted the deposition of two attorneys representing plaintiffs' adversaries in a different state court lawsuit. The attorneys argued that their depositions on their inspection and release of seized documents on

---

[4]   M&S was briefly co-counsel to Litco in the arbitration, but has since withdrawn and reportedly does not currently represent Sater at all. [ECF No. 324 ¶ 4]. In any case, none of the questioning of M&S will relate to its representation of Litco in the arbitration.

behalf of the defendant were inappropriate. *Nakash*, 128 F.R.D. at 34–35. The court rejected that argument, reasoning that "[i]n this context, they are no more than fact witnesses." *Id.* at 35. The court also rejected the attorneys' attempt to apply the opposing counsel standard:

> Their attempt to cast themselves in the role of "opposing" counsel, to bring themselves within the strict standards of cases such as *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986) [which *Friedman* interpreted], is not persuasive because they are not opposing counsel in this action. Therefore, the major rationales in these cases—discouraging the depositions of opposing attorneys in a particular lawsuit to avoid unnecessary expense and interference with the attorney-client relationship—are not applicable here.

*Id.* In the Second Circuit's later decision in *Friedman*, the Court cited *Nakash* as an example of a district court that had "properly applied a flexible approach to the issue of lawyer depositions." *Friedman*, 350 F.3d at 72.

M&S's only argument for application of this presumption to it is that the presumption applies even to testimony from former counsel. Mot. 9. But it cites only one case, and there, the attorney sought to be deposed was former opposing counsel *in that litigation*, and the plaintiff wanted to depose the former counsel about conduct in that litigation. *Shaub & Williams, L.L.P. v. Augme Techs., Inc.*, No. 13 CIV. 1101 GBD JCF, 2014 WL 1033862, at *1 (S.D.N.Y. Mar. 17, 2014). But M&S was never opposing counsel in this case.

M&S's concern about privilege is also not a reason to quash the subpoena. Notably, the privilege holder, Felix Sater, has not filed a motion to quash. And M&S cannot argue that facts themselves are privileged. Like any other non-party deposition under Rule 45, "[t]he mere possibility that such [protected] issues may arise does not merit the drastic relief of quashing these subpoenas before a single question has been asked." *Nakash*, 128 F.R.D. at 35. If there are questions at M&S's corporate deposition that ask for privileged information, M&S can state a proper objection at that time. *Cooper v. Welch Foods, Inc.*, 105 F.R.D. 4, 6 (W.D.N.Y. 1984)

(ordering deposition of attorney and noting that proper objections can be made thereat if necessary). M&S's role here is that of a fact witness with information on the underlying transactions that are the subject of this dispute. Courts routinely grant depositions of attorneys in that context. *See, e.g.*, *Aco*, 2008 WL 11355382, at *2 n.1 ("Mr. Domingues is not trial counsel. His role is very comparable to those of the attorneys whose depositions were permitted[.]").

## IV.    Even if M&S is Treated as Opposing Counsel, A Deposition is Appropriate.

Even if the Court were to treat M&S as "opposing counsel" under *Friedman*, "the fact that the proposed deponent is a lawyer does not automatically insulate him or her from a deposition nor automatically require prior resort to alternative discovery devices, but it is a circumstance to be considered." *Friedman*, 350 F.3d at 72. The Second Circuit has instructed courts to take "a flexible approach to lawyer depositions whereby the judicial officer supervising discovery takes into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship[,]" including: "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *Id.*

### A.    The Requested Testimony is Not Available from Any Other Source.

Plaintiffs are not required to exhaust all other avenues of discovery before seeking deposition testimony from M&S. In *Friedman*, the Court specifically rejected a rule that would require the requesting party to "exhaust all practical alternative means of obtaining the information sought from [the attorney] before it would consider allowing the proposed deposition." *Friedman*, 350 F.3d at 67. Courts have thus refused to apply a rigid rule requiring a party to first seek evidence from all alternative sources before seeking the information from an attorney, particularly where the attorney is not counsel in the action. *See, e.g.*, *Doe v. Town of Greenwich*, 2019 WL 4267692,

17

at *5 (D. Conn. Sept. 10, 2019) (permitting the deposition of opposing counsel regarding a conversation between counsel and a defendant, even though similar testimony was available through a third party, where "only [the attorney] and [the defendant] have firsthand knowledge" of the contents).

M&S gives a single example of a topic that could be answered by someone else: "testimony of an M&S attorney who was witness to some alleged meeting(s) between Mr. Sater and Mr. Ilyas Khrapunov." Mot. 10. To be sure, Plaintiffs asked Sater about such meetings at his deposition, and will ask Ilyas Khrapunov if they are permitted to depose him. But Plaintiffs should not be required to rely on the testimony of Sater and Khrapunov – two individuals with strong incentives to exculpate themselves and long track records of dishonesty and criminality. Further, M&S is (or at least, was) in possession of actual audio recordings of meetings between Sater and Khrapunov. Plaintiffs have tried to obtain these recordings from other sources, and have been unsuccessful. They are entitled to question M&S about what was on those recordings, what happened to them, and what M&S did (and did not do) to try to locate them.

In any event, there are numerous topics about which *only* M&S can testify. For example, only M&S can explain the basis for statements it made in letters and emails sent during the course of the Tri-County Mall settlement negotiations. *See Goldberg v. Dufour*, No. 16-21301, 2020 WL 373206, at *5 (D. Vt. Jan. 23, 2020) ("Third parties are copied on portions of the communications; however, only Attorneys Gillett and Naymark can speak to every fact and opinion contained in the emails they authored. . . . Plaintiff has thus established a need to depose Attorneys Gillett and Naymark."). Only M&S can explain its understanding of the purpose for which funds were transferred to third parties from its own escrow account. Only M&S can explain its role in and

communications concerning the execution of the Litco agreement—particularly where the only

other person involved in directly negotiating that agreement is dead.[5]

B.      The Requested Testimony is Relevant.

As already explained above, the Subpoena seeks highly relevant testimony. The fact that

M&S is a law firm does not change that analysis. For example, in *Aco Fabrica de Calcado S.A. v.*

*Tic-Tac-Toes Mfg. Corp.*, No. 06:06-CV-0819, 2008 WL 11355382, at *1 (N.D.N.Y. Apr. 22,

2008, the court allowed the deposition of a former attorney for the plaintiff, "who represented

ACO in various matters that occurred prior to the commencement of this litigation." The attorney

declared that he was "actively involved" in the litigation, but the court rejected that assertion

because "[t]he simple and basic relevant fact is that [the attorney is not the opposing trial counsel

in this action." *Aco*, 2008 WL 11355382, at *1. The court pointed to the fact that the plaintiff had

identified the attorney as a person likely having discoverable information, including in a brief to

the court, in which the plaintiff "expand[ed] upon the transactional role that [the attorney] played

in a variety of matters that are at issue in this case." *Id.* "This alone," the court held, "is a sufficient

basis for me to conclude that [plaintiff] should be permitted to depose [the attorney]." *Id.*

Like in *Aco*, Sater himself has expanded on the role that M&S played in relation to his

release-based defense. When Sater moved for a stay of discovery, Sater relied on the Litco release

---

[5]      M&S's authority on this point, Mot. 10, is not to the contrary. *Sea Tow International, Inc.*
*v. Pontin*, 246 F.R.D. 421, 425–26 (E.D.N.Y. 2007) (party seeking attorney deposition did
not identify any "specific personal knowledge" by the attorney that was not available from the party
to the case); *Patsy's Italian Restaurant v. Banas*, No. 06–CV–5857, 2007 WL 174131, at *3
(E.D.N.Y. Jan.19, 2007) (finding that defendants had failed to demonstrate a specific need to
depose plaintiff's counsel where defendants sought only "a complete record" from a prior civil
action, which defendants could obtain through a document request and "public records");
*ResQnet.com v. Lansa*, No. 01 Civ. 3578, 2004 WL 1627170, at *5 (S.D.N.Y. July 21, 2004) (in
a patent prosecution case, deposition of attorney on patent prosecution was not necessary because
the "patent prosecution histories speak for themselves").

and claimed that "my attorney, Robert Wolf of Moses & Singer dealt extensively with Aranum and Boise [sic] Schiller in connection with the Litco Assistance provided pursuant to the CAA." [ECF No. 78 (Affidavit of Felix Sater)]. In other testimony, Sater has confirmed that he never met any representative of Plaintiffs prior to the execution of the Litco agreement, [*see City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-05345 (AJN) (KHP), ECF No. 1248, at 16–17 (S.D.N.Y. May 19, 2020) (Opinion & Order on Sanctions Motions)], and Wolf himself has confirmed that he exclusively negotiated the agreement on Litco's behalf, [*see id.* at 12–14].

### C.   The Requested Testimony Does Not Seek Information Subject to Attorney-Client Privilege, and Regardless, M&S Can Make Any Appropriate Objections During the Deposition.

M&S argues that the deposition contains topics that create a risk of infringing on attorney-client privilege. Mot. 11. But M&S does not explain how topics "concerning the negotiation and execution of certain agreements, and a whole array issues like settlement negotiations, litigation assistance, purchase and sale of debt, investments in property" implicate attorney-client privilege at all. Mot. 11–12. The only topic that M&S mentions that could theoretically implicate attorney-client privilege is its "communications with Sater." Mot. 11 (quoting Request 4). But not all communications between Sater and M&S necessarily implicate attorney-client privilege. And "it is important to bear in mind that the attorney-client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that that disclosure would reveal confidential communications." *In re Grand Jury Subpoena Duces Tecum, Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984). Nor does the privilege attach to any of the topics on which either M&S or Sater have already voluntarily disclosed documents in this litigation. *Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.) Inc.*, 111 F.R.D. 76, 85 (S.D.N.Y. 1986) ("[T]he voluntary production of a privileged document effects a waiver of the privilege as to all other privileged communications concerning the same subject matter.").

M&S does not explain how any of the deposition topics would categorically implicate attorney-client privilege, nor can it do so at this stage, before any question has been asked.

M&S also fails to mention that all of the other topics seek information on its communications involving, or its relationship with, individuals other than Sater or explain how any of those topics would implicate attorney-client privilege. Vague assertions of a risk of waiver of privilege are insufficient to quash the subpoena. "Moreover, it is difficult to reconcile movants' privilege arguments with their previous revelations of the underlying facts," *Nakash*, 128 F.R.D. at 35, including M&S's and Sater's prior disclosure of documents in this action over which neither M&S nor Sater asserted privilege concerns.

"Nevertheless, movants' concerns are premature, since plaintiffs may not question them in these areas. If they do, movants may make appropriate objections at that time. . . . The mere possibility that such issues may arise does not merit the drastic relief of quashing these subpoenas before a single question has been asked." *Id.* M&S may "invoke the attorney-client privilege and refrain from responding if asked to disclose confidential communications between [themselves] and [their clients][.]" *Kleiman ex rel. Kleiman v. Jay Peak, Inc.*, No. 1:10-CV-83, 2012 WL 2498872, at *6 (D. Vt. June 27, 2012) (noting "it is somewhat difficult to determine whether the attorney-client privilege applies to [the attorney's] *potential* testimony" because his deposition "has not yet occurred") (emphasis in original); *In re Gawker Media LLC*, No. 16-11700 (SMB), 2017 WL 2804870, at *7 (Bankr. S.D.N.Y. June 28, 2017) (holding that if attorneys' responses "implicate a privilege . . ., the [c]ourt can address those issues as it would in any other litigation"); *Goldberg v. Dufour*, No. 16-21301, 2020 WL 373206, at *6 (D. Vt. Jan. 23, 2020) ("Because Plaintiff seeks to depose Attorneys Gillett and Naymark regarding non-privileged

communications, the court will not preclude their depositions."). Plaintiffs should be permitted to depose M&S, and M&S and/or Sater can raise any appropriate privilege objections as they arise.[6]

### D.   Plaintiffs Are Not Precluded from Seeking Testimony Related to Topics Covered by the Document Subpoena

M&S is incorrect that Plaintiffs must bring all of their subpoena requests under Rule 45 at the same time. M&S's only authority, *Resqnet Com, Inc. v. Lansa, Inc.*, No. 01 Civ. 3578 (RWS), 2004 WL 1627170, at *6 (S.D.N.Y. July 21, 2004), simply held that a deposition was unnecessary because the issues on which the party requesting the deposition sought the testimony "ha[d] already been decided." That is not the case here. Discovery is ongoing, and none of the issues on which Plaintiffs seek M&S's testimony have been decided by the Court. To the contrary, Plaintiffs expressly informed the Court following M&S response to the first subpoena that a deposition would be necessary to determine whether it had conducted an adequate search for responsive records. [Wenner Decl., Ex. K (ECF No. 282) at 6].

### <u>CONCLUSION</u>

The motion to quash should be denied.

---

[6]   M&S cites repeatedly to Plaintiffs' counsel's statement that the deposition can take place during hours when the Court may be available to rule on any objections, Mot. 6, 7, 12, suggesting that this is some sort of admission that the questioning will call for privileged communications. To the contrary, counsel suggested that the deposition take place when objections could be promptly ruled upon to avoid the possibility of baseless privilege objections derailing the deposition.

Dated: New York, New York
      October 25, 2020

Respectfully,

*/s/ Craig Wenner*
Matthew L. Schwartz
Craig Wenner
Brianna Hills
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs City of Almaty, Kazakhstan and BTA Bank*