

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

February 1, 2022

**BY ELECTRONIC MAIL**

John H. Snyder
John H. Snyder PLLC
555 Fifth Avenue, Suite 1700
New York, New York 10017
john@jhsnyderlaw.com

Thomas C. Sima
2 Park Avenue, 20th Floor
New York, New York 10016
tom@tsima.com

    Re:    *City of Almaty, Kazakhstan, et ano. v. Felix Sater, et al.*,
               Case No. 19 Civ. 2645 (AJN) (KHP)

Dear Counsel:

       As you know, I represent BTA Bank and the City of Almaty in the above-referenced case. I have reviewed a copy of a draft pleading prepared by you titled "[Proposed] Amended Answer with Counterclaims and Third-Party Complaint,"[1] which I understand you have threatened to file this week. I write to make clear that the proposed filing is factually false, legally meritless, and will subject you and your client to sanctions if filed.

       I do not send this letter lightly, and I have never sent one like it before in nearly twenty years of practice, because I believe every lawyer is responsible for his or her own professional ethics and does not need to be lectured by his or her adversaries. But the draft pleading is so clearly baseless, and so clearly put forward for improper reasons, that I am compelled to write on the assumption (or at least hope) that you have been led badly astray by your client.

**I.**    **The Draft Pleading Contains Demonstrably False Factual Allegations**

       **a.**    **The Purpose of the CAA Was to Recover Misappropriated Assets, not to Conduct a Covert Spy Operation on Sater**

       The central premise of the draft pleading rests on the absurd and demonstrably false accusation that BTA, Almaty, the Republic of Kazakhstan and private investigations firm Arcanum engaged your client Felix Sater under the so-called Confidential Assistance Agreement (the "CAA") "in bad faith" and "intended to use the CAA as a pretext for gathering intelligence against Sater, with the intent of harming Donald Trump's Presidential campaign." Draft Compl. ¶ 7; *see also id.* ¶ 61 ("Arcanum and Boies Schiller entered into the CAA with the goal of

---

[1]    File name: 2022-01-07 Amended Answer w Counterclaims - DRAFT 8.docx

BOIES SCHILLER FLEXNER LLP

55 Hudson Yards, New York, NY 10001 | (t) 212.446.2300 | (f) 212.446.2350 | www.bsfllp.com



conducting a shadow intelligence operation against Sater and Trump"); *id.* ¶¶ 96–102 (attempting to construct a fraudulent misrepresentation claim around a conspiracy theory).

There are numerous reasons of which you should be well aware that this core allegation is false as a matter of fact. We remind you of some of them here, so that you can re-consider the draft pleading in light of your professional ethical obligations.

*First*, as you and your client well know, neither my firm nor my clients gathered any "intelligence" against Sater under the CAA, let alone for use in connection with the U.S. presidential election. In fact, as both Sater and his then-counsel Robert Wolf agreed, the *very first meeting* between my firm and Sater was on Election Day in 2016. As Sater's then-counsel testified, "I remember it vividly because it was the day that Trump was elected, and the connection subsequently with Sater was extremely ironic to me." 8/8/2019 Hearing Tr. at 118, *City of Almaty v. Ablyazov*, No. 15 Civ. 5345 (S.D.N.Y.); *see id.* at 152 (Sater, agreeing). Sater also admitted in sworn testimony that he never met with or communicated with any representative of my clients, ever. *Id.* at 149. To state the obvious, it cannot be possible that my clients associated themselves with Sater to harm the Trump campaign if neither they nor their counsel met him until Election Day.

*Second*, Donald Trump announced his candidacy *after* the CAA was executed. The CAA was entered into as of June 12, 2015—a fact conveniently ignored in the pleading. Donald Trump did not announce his candidacy until June 16, 2015. Further, the negotiations over the CAA began much earlier. [*See, e.g.*, Case No. 15 Civ. 5345, ECF No. 1248 at 13 (Opinion and Order describing Wolf's attempt to negotiate the CAA with the City of Almaty's then-counsel in May 2015); 8/8/2019 Hearing Tr. at 94, *City of Almaty v. Ablyazov*, No. 15 Civ. 5345 (S.D.N.Y.) (Wolf testifying that his first meeting with Almaty's then-counsel was in or before April 2015). The draft pleading further falsely states that the "CAA was negotiated by counsel, with Boies Schiller & Flexner (Boies Schiller) advising the Kazakhs." *Id.* at 15–16. As Litco's own lawyer has testified, Boies Schiller was not involved in those negotiations, and was retained after the CAA was signed. *See, e.g.*, 8/8/2019 Hearing Tr. at 107–08, *City of Almaty v. Ablyazov*, No. 15 Civ. 5345 (S.D.N.Y.).

*Third*, it was Litco and its counsel Robert Wolf who approached our clients about providing assistance, not the other way around. As Wolf testified, he approached Latham & Watkins at some point no later than early 2015 after Latham filed a lawsuit on behalf of the City of Almaty against Ilyas Khrapunov in the Central District of California. According to Wolf, he pitched Latham and Arcanum on the assistance Litco could provide in our clients' asset recovery efforts. *Id.* at 86 ("we sought out Latham because Litco wanted to provide assistance."). This course of events is wholly at odds with the baseless narrative in your draft pleading, which falsely suggests that our clients sought out Sater with the intention of somehow using him against a presidential campaign that would not be announced by Donald Trump until months later.

*Fourth*, the stated and obvious purpose of the CAA was to engage *Litco's* assistance in recovering "misappropriated assets." CAA Recitals. As the federal court already determined, my clients did not "engage Sater" in anything because they had no idea that Sater was associated with Litco. *See id.* at 16. Similarly, *Sater's* "involvement with the Kazakhs" did not "begin in June 2015, when Sater entered into the [CAA]," *id.* ¶ 24, because *Sater* did not enter into the



CAA at all. Kalsom Kam entered into the CAA on Litco's behalf in June 2015, but it wasn't until much later – Election Day 2016 – that Sater himself appeared, as a witness.

As your client has admitted, and as the federal court has found, your client deliberately sought to hide his identity and association with Litco from our clients during this time period. 8/8/2019 Hearing Tr. at 147–48, *City of Almaty v. Ablyazov*, No. 15 Civ. 5345 (S.D.N.Y.); *City of Almaty, Kazakhstan v. Sater*, No. 19-cv-2645, 2019 WL 6681560, at *4 (S.D.N.Y. Dec. 6, 2019) ("Sater testified that he wanted to hide his affiliation with Litco"). This, too, is wholly inconsistent with the preposterous allegation that our clients not only knew about Sater's involvement with Litco, but entered into the CAA "as a pretext for gathering intelligence against Sater."

### b. The Kazakh Entities Terminated the CAA Because of Litco's Breach, not Because the Kremlin Secretly Controls Them

The draft pleading also falsely states that my clients "manufactur[ed] reasons not to pay" Sater under the CAA and that "the Kremlin had directed the Kazakhs not to pay Sater, because of his espionage activities against Russia." Draft Compl. ¶ 5; *see also id.* ¶ 14 (claiming my clients were "puppets" of "former KGB agent Vladimir Putin and his cronies at the Kremlin"). The pleading goes on to falsely state that, "[i]n 2019, [the Kazakh Entities] directed Boies Schiller to start a retaliatory action against Sater in response to his filing of an arbitration action." Draft Compl. ¶ 67.

Again, this allegation is incompatible with the objective facts. In reality, our clients notified Litco by letter dated October 9, 2018 that they had terminated the CAA shortly after they learned that Sater had secretly concealed his ownership of Litco. In doing so, Sater had received money paid to Litco in violation of Litco's contractual representation that "No potential witness which Litco identifies and produces to Arcanum in connection with assistance to be provided under this Agreement shall have any ownership interest in Litco or in the Monthly Fees or Recoveries Consideration payable to Litco under this Agreement." CAA ¶ 6(e). As the federal court has already found, Litco affirmatively hid this critical information from BSF and its clients. *See City of Almaty v. Ablyazov*, No. 15-cv-05345, ECF No. 1248, at *17 (S.D.N.Y. May 19. 2020) (Opinion and Order finding that "the day before Sater's deposition in this case, BSF asked Wolf who owned Litco and Wolf stated he did not know. This was obviously a lie, as Wolf knew full well that Sater owned Litco and was receiving compensation under the Litco CAA.").

The same letter demanded that Litco repay to our clients all amounts paid under the CAA, and asked for a response by October 12, 2018. On that date, Litco responded by filing an anticipatory arbitration with the American Arbitration Association. Far from retaliating against your client for initiating the arbitration, the above timeline makes clear that our clients had already committed to litigating Litco's breach of the CAA. Further, the undisputed evidence is that our clients had been investigating the claims underlying the federal case against Sater since in or about March 2017, when they learned that he had kept more than $20 million in their stolen funds – information that Sater concealed from our clients. Sanctions Opp. Br., *City of Almaty v. Ablyazov*, No. 15-cv-05345, ECF No. 993, at 9–10 (S.D.N.Y. Mar. 26, 2019).



Finally, the allegation that my clients sued Sater in retaliation for filing the Litco arbitration is also contrary to his own sworn (and equally false) testimony, which was that ███████████████████████████████████████████████████████████████ (1/29/21 Depo. Tr. at 254).

### c. Sater Did Not Help the Kazakh Entities "Recover Billions of Dollars"

In one of Sater's more deluded and narcissistic allegations, the draft pleading contends that Sater "uncover[ed] information and witnesses who helped the Kazakhs identify, freeze or recover of billions of dollars." Draft Compl. ¶¶ 5, 66. Nowhere does the draft pleading articulate the basis for this ridiculous claim. And while the draft pleading asserts that "Sater has extensive documentary evidence, including audio recordings, proving that Sater provided detailed information and a number of key witnesses previously unknown," neither Sater nor Litco has produced any such evidence in discovery in either this action or the Litco arbitration, despite receiving numerous requests that call for such information (whether in the form of documents or otherwise). *See, e.g.*, Kazakh Entities' First RFPs to Litco (July 31, 2020). If such evidence existed, which it does not, Sater was obliged to produce it long ago.

It was in fact *despite* Sater's concealment of the tens of millions of dollars that he stole from the Tri-County Mall deal that my clients learned of Sater's own misappropriation. Sater was enriched through his participation in Ablyazov and Ilyas Khrapunov's money laundering scheme at the expense of my clients – he stole far more than he could ever plausibly claim to have assisted them in recovering.

### II.  The Draft Pleading Does Not Possibly Reflect a Good-Faith Investigation of Sater's Allegations Under Rule 11

Apart from the allegations in the draft pleading that are demonstrably false – of which there are many – it is replete with conspiracy theories that have no basis in reality. You could not have possibly made an appropriately reasonable inquiry to determine that there is evidentiary support for the pleading's (false) factual contentions, as required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 11(b)-(c).

Under Rule 11(b), an attorney who files a pleading represents that he or she has conducted "an inquiry reasonable under the circumstances," that the claims are not legally frivolous and that the factual contentions "have evidentiary support." This obligation is heightened when, as here, the attorney has access to years of discovery – none of which substantiate your client's claims. *See, e.g.*, *Saltz v. City of New York*, 129 F. Supp. 2d 642, 646 (S.D.N.Y. 2001) ("This court finds that Mr. Sheehan did not make a reasonable inquiry into the facts alleged in plaintiff's complaint. Mr. Sheehan did not attempt to investigate plaintiff's claims during the period of over one year between when he was first retained by his client and when he filed the complaint. . . . Mr. Sheehan persisted in pursuing this case even after discovery failed to elicit any evidence which could link plaintiff's alleged attackers with any persons within the police department.").



### a. The Draft Pleading Is Filled With Factual Contentions That Lack Any Evidentiary Support

Throughout the draft pleading, you make far-fetched claims that lack any basis in fact. It is not sufficient that your client – any client, but especially Sater – may have told you that the allegations in the pleading are true. Filing a complaint with such ridiculous and false allegations subjects you to sanctions for failing to conduct a reasonable inquiry into their accuracy and truthfulness. *See Goldman v. Barrett*, 825 F. App'x 35, 37 (2d Cir. 2020) ("[E]very attorney owes a duty to conduct a pre-litigation inquiry into the viability of a pleading that is objectively reasonable under the circumstances. . . . [A]n attorney may not base an allegation solely on a client's representation if it is objectively unreasonable to believe that the representation could support the allegation.").

What follows is a small selection – by no means exhaustive – of the allegations in the draft pleading that are totally false and that lack any evidentiary support. In order to make these allegations, you, as counsel, would have to independently verify them, which is impossible because they are false.

- "the Kremlin had directed the Kazakhs not to pay Sater, because of his espionage activities against Russia." Draft Compl. ¶ 5.[2]

- The "plot against Sater was coordinated by . . . the Kazakh KGB." *Id.* ¶ 9.

- "[T]he Kremlin was furious" that our clients were "trying to settle with Sater." *Id.*

- "The Kazakhs' objective was to illegally influence the 2016 U.S. Presidential Election by obtaining information from Sater to politically damage Donald Trump." *Id.* ¶ 36.

- The "Kazakh KGB" agent allegedly directing our clients was "taking orders from his old bosses at the Kremlin," *id.* ¶ 37, and "was instructed by the FSB in Moscow to never pay Sater any money under the CAA," *id.* ¶ 54.

- Our clients "terminated mediation, likely as a result of the Kremlin's standing instructions not to pay Sater." *Id.* ¶ 48.

- "Arcanum and Boies Schiller . . . carried out the Kazakh KGB's objectives" Under the "direct operational control" of a "Kazakh KGB" agent. *Id.* ¶ 56.

---

[2]   It does not help that certain of your allegations are explicitly based on hearsay, as indicated by your use of introductory phrases like "Sater learned . . ." or "Kazakh sources subsequently informed Sater that. . . ."



- The purported "operation was sponsored, funded, and approved by the Kazakh KGB." *Id.* ¶ 61.

- "Sater finds himself across the table from former KGB agent Vladimir Putin and his cronies at the Kremlin, with the Kazakhs reduced to puppets." *Id.* ¶ 14.

We are aware of no conceivable facts that would support the above claims, among many others. If you rely on Sater's hearsay and speculation and fail to speak to his "sources" directly or otherwise take reasonable steps to verify that there is any "evidentiary support" for these outlandish claims, you will have failed to undertake a reasonable inquiry under Rule 11. In any event, because these claims are all false, it would be impossible to verify them.

### b. The Draft Pleading Contains Numerous Allegations That Are Admittedly Made For An Improper Purpose

Separate from the above assertions concerning Sater's imagined Russian-led conspiracy against him, the draft pleading is filled with irrelevant, scandalous, and false allegations that are obviously designed to harass and embarrass. Filing these allegations would also run afoul of Rule 11(b)(1), which prohibits pleadings "presented for any improper purpose."

It is incumbent on you, as Sater's counsel, to independently verify the factual basis for the defamatory statements concerning, for example, the allegedly "appalling acts" and business dealings concerning KazMunaiGas of BTA's majority shareholder. Draft Compl. ¶¶ 53–56. The purported basis for the statements at paragraph 53 are the unfounded claims by the very defendants in the related action – Ilyas Khrapunov and Mukhtar Ablyazov – who hacked and attempted to embarrass individuals associated with my clients, and who were later sanctioned for it. Unfounded allegations by Sater's co-conspirators do not satisfy an attorney's legal obligation to conduct a reasonable inquiry into false statements of fact. Other allegations concerning BTA's shareholder, such as those at paragraph 55, are simply irrelevant and designed to create the false appearance of political entanglement.[3]

---

[3] The draft pleading also attempts to smear my law firm by making up facts about the firm or otherwise trying to suggest its actions were unethical. The draft pleading, for example, falsely alleges that BSF worked "in collaboration with Christopher Steele" and against your client. Draft Compl. ¶ 38. The FBI 302 report, which appears to be the entire basis for your allegations about Mr. Steele, makes no mention of my firm. The draft pleading also falsely states that: the "CAA was negotiated by counsel, with [BSF] advising the Kazakhs," *id.* ¶ 31; that the "Kazakh KGB" "had direct operational control over" BSF, *id.* ¶ 56; "Hunter Biden was himself a partner at Boies Schiller until 2014," *id.* ¶ 57; and BSF "entered into the CAA," *id.* ¶ 61. These statements, among many others, are false.



Your client has made crystal clear that the purpose of these and similar allegations in the pleadings is to attempt to embarrass my clients publicly, with the intention of leveraging some sort of settlement. As Sater explained at his deposition, for instance:



(1/29/21 Depo. Tr. at 246–49). You yourself amplified this threat earlier this week when you wrote that "Felix is having lunch with Donald Trump on Tuesday and is going to give him a copy of the case, and once that happens, there's no going back." Those words are susceptible to only one meaning: that your client was (through you) threatening to share the draft pleading with President Trump, who would use his political and/or media profile to maximize any embarrassment to my clients.

The attempts by Sater, including through the draft pleading, to apply public pressure to embarrass my clients and leverage a settlement are totally improper and sanctionable under the Federal Rules. It is black letter law that attempting to obtain a settlement through the wrongful threat of injury to one's reputation is not only unethical, it is a crime. See, e.g., 18 U.S.C. § 875. And there can be no question that your client's



threats – and yours, if you file the draft pleading – are wrongful, because they are totally false.

### III. The Draft Pleading Is Legally Frivolous

Separate from its many false and unsupported factual allegations, the draft pleading also raises purely legally frivolous claims, and is independently sanctionable for that reason. What follows is just a handful of the reasons that the claims in the draft pleading inevitably fail as a matter of law.

#### a. There Can Be No Defamation Without Allegations of False Statements That Were Published

The first two causes of action, for defamation, are frivolous because they do not actually identify a purportedly defamatory statement by *anyone*, let alone by my clients. The FBI 302 report, quoted at paragraph 62 of the draft pleading, states that Steele told the FBI that he was investigating Ablyazov's "connections to Felix Sater and Trump SoHo." *Id.* The draft pleading does not contend that the statement that Steele was conducting such an investigation was false, and seems to instead credit the suggestion that Steele was in fact conducting such an investigation.

The only reference to my clients or Arcanum in the FBI 302 is the statement that "Steele brought along a PowerPoint presentation from the company Arcanum explaining the Sater connection." *Id.* Neither the FBI 302 report nor the draft pleading purports to repeat any information that was contained in the PowerPoint, nor does it allege that Arcanum or my clients caused the PowerPoint to be shared with anyone.

The draft pleading also does not say that anything in the FBI 302 was untrue, nor does it deny that Sater is in fact connected to Trump SoHo and Ablyazov. Sater himself testified that, with respect to the Trump SoHo development project, he ███████████████████████████ ███████████████████████████████████████████████ (10/29/20 Depo. Tr. at 193.) He also testified that ████████████████████████████████████████████████████████, *id.* at 195–96, ████████████████████ *id.* at 197. Sater has, of course, previously admitted that he understood Ilyas's funding came from Ablyazov more broadly. *E.g.*, Almaty-BTA_FS70007553.

The draft pleading also fails to identify any statement by any proposed defendant that may have been made in the PowerPoint that was false. The draft pleading similarly does not contend that Steele's statement to the FBI that "Sater is also involved with the daughter of Ablyazov" was false, though even if it were, this is a statement by Steele, not any proposed defendant. Anyway, your client has himself admitted that, for example, ████████████ ███████████ (1/29/21 Depo. Tr. at 7–8.)

In short, the first two causes of action depend on the factual assertion that "the PowerPoint and other communications by Arcanum contained false and defamatory statements of fact about Sater and his business activities," Draft Compl. ¶¶ 76, 83, but completely fails to identify any



such statement or communication. The defamation claims are therefore legally meritless. *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 245 (2d Cir. 2017) ("If a plaintiff must ultimately show falsity to win, a defamation claim described in the plaintiff's complaint would not be 'plausible' absent an allegation that the defendant's statements were false."); *de Rothschild v. Serlin*, No. 19 CIV. 11439 (PGG), 2021 WL 860227, at *7 (S.D.N.Y. Mar. 8, 2021) (to state a claim, defamation complaint "must at least 'identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published.'" (internal citations omitted)).

### b. The Kazakh Entities Did Not Have Any Fiduciary or Confidentiality Obligations under the CAA

The remaining claims in the draft pleading are premised on the frivolous notion that my clients and Arcanum had some special obligations to your client, such that they could conceivably be liable for breach of fiduciary duty, breach of a lawyer's professional duties to its client, and the like. Not only did my clients have no such relationship with Sater – whom, again, they did not know was associated with Litco – but the CAA itself does not contain the confidentiality obligations that the draft pleading relies upon. *See* Draft Compl. ¶ 91 (claiming that the defendants "had a duty to maintain confidentiality with respect to information supplied by Sater"); *see also id.* ¶ 62 (claiming that the "Kazakh KGB," which wasn't even a CAA counterparty, violated "its confidentiality obligations under the CAA"); *id.* ¶¶ 103–13 (claiming the use of information learned about Sater was an attorney ethical breach).

The draft pleading does not actually identify any such confidentiality obligation under the CAA, because there is none. The CAA, in fact, explicitly gives my clients the "sole discretion to determine the scope, duration, and strategy of all investigative, asset recovery, and litigation efforts." CAA ¶ 5. And its confidentiality clause covers only the existence of the agreement, not the information learned during the course of the cooperation. *Id.* ¶ 11.[4]

### c. The City of Almaty and the Republic of Kazakhstan Have Not Waived Sovereign Immunity

The draft pleading also alleges no facts establishing that the City of Almaty and the Republic of Kazakhstan – both sovereign entities – are subject to Sater's claims in New York. *See* 28 U.S. Code § 1605 (listing exceptions to foreign sovereign immunity). Unlike with Litco's claim to enforce the CAA, where the foreign sovereigns agreed to be subject to suit in arbitration, there is no waiver of sovereign immunity in connection with Sater's proposed tort claims. And the focus of the draft pleading – the ridiculous allegation that the defendants purportedly engaged in an intelligence campaign to affect a political election – is an inherently political activity, not a commercial one. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). Further, the allegations

---

[4] Likewise, the related agreements (the Common Interest Agreement and the separate non-disclosure agreement that Arcanum signed with Litco) have no provisions that would conceivably impose a general confidentiality obligation on information learned about Sater. For example, the NDA covers solely information revealing the identities of Litco's members or owners – information that Sater volunteered during his deposition.

9



in the draft pleading have no relationship to the claims asserted by my clients in the federal action against Sater. Instead, it seems obvious that Sater intends to file the pleading in the federal action for no reason other than that, unlike the arbitration, the federal action is a public forum that will allow your client to peddle his meritless conspiracy theories to the press in an improper attempt to embarrass my clients.

### IV. The Draft Pleading Contains All Sorts Of Material Covered By Mediation Confidentiality

The draft pleading also repeatedly references details of the parties' confidential mediation – including follow-up communications, many including the mediator himself – in direct violation of the confidentiality obligations under the November 2021 Mediation Agreement, which you signed. Section II of the Mediation Agreement provides:

> This entire mediation process is a compromise negotiation. All offers, promises, conduct, and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and the mediators are confidential. Such offers, promises, conduct, and statements will not be disclosed to third parties . . . and are privileged and inadmissible for any purpose, including impeachment, under Rule 408 of the Federal Rules of Evidence and any applicable federal or state statute, rule or common law provisions.

Thus, this prohibition, to which you agreed, makes all communications in the "entire mediation process" "privileged and inadmissible *for any purpose*." Section III of the Mediation Agreement further prohibits any public statements about the mediation: "The parties and the mediator shall not make any public statement concerning the mediation."

Despite these obligations, the draft pleading repeatedly discloses the existence and details of the mediation, and purports to repeat things that were said to you or your client during the mediation process (many of which, for the avoidance of doubt, are untrue or mischaracterizations). Among the numerous statements in your draft pleading that run afoul of your undertaking in the Mediation Agreement are the allegations at paragraphs 10, 13, 46, 47, 48, 69, and 70.

\*   \*   \*

We appreciate that you have a client who is a liar and a criminal, and who wants desperately to avoid being held responsible for his conduct. But as lawyers, we all have a responsibility to resist our clients' worst impulses and, in any event, not to abet their lies. The draft pleading that you have threatened to file is riddled with false statements and fanciful conspiracy theories, and is without any conceivable legal merit. I sincerely hope that you will think better of filing it in its current form. If you nonetheless persist, you do so at your own risk.

Sincerely,

*/s/*
Matthew L. Schwartz