```
                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

In re:                          :
                                    Docket #1:19-cv-02645-
 CITY OF ALMATY, KAZAKHSTAN et al,  :  AJN-KHP

                    Plaintiffs,     :

  - against -                   :

 SATER, et al,                  : New York, New York
                                  March 24, 2022
                    Defendants.  :

------------------------------------ :  DISCOVERY CONFERENCE

                  PROCEEDINGS BEFORE
            THE HONORABLE JUDGE KATHARINE H. PARKER,
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          BOIES SCHILLER FLEXNER LLP
                         BY:  CRAIG A. WENNER, ESQ.
                              SABINA MARIELLA, ESQ.
                         55 Hudson Yards
                         New York, NY 10001

For Defendants,
Sater and Felix Sater:  JOHN H. SNYDER PLLC
                         BY:  JOHN HOOVER SNYDER, ESQ.
                         555 Fifth Avenue, Suite 1700
                         New York, NY 10017

                         LAW FIRM OF THOMAS C. SIMA
                         BY:  THOMAS C. SIMA, ESQ.
                         102 Park Ridge Lane
                         White Plains, NY 10603

Transcription Service:  Carole Ludwig, *Transcription Services*
                         155 East Fourth Street, #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771
```

Proceedings conducted live and telephonically and recorded by electronic sound recording; Transcript produced by transcription service.

```
APPEARANCES - CONTINUED:

For Defendant, MeM
Energy Partners LLC:      CYRULNIK FATTARUSO LLP
                         BY:  JASON C. CYRULNIK
                         55 Broadway - Third Floor
                         New York, NY 10006
```

<u>INDEX</u>

**E X A M I N A T I O N S**

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                          PROCEEDINGS                    4

 2             THE CLERK:  Calling case 19-civil-2645, City of

 3   Almaty, Kazakhstan vs. Sater.

 4             Beginning with counsel for the plaintiffs, please

 5   make your appearance for the record?

 6             MR. CRAIG WENNER:  Your Honor, Craig Wenner and my

 7   colleague, Sabina Mariella from Boies Schiller Flexner for

 8   plaintiffs, City of Almaty and BTA Bank.

 9             THE HONORABLE KATHARINE H. PARKER (THE COURT):

10   Nice to see you.

11             THE CLERK:  And counsel for the defendants, please

12   make your appearance for the record.

13             MR. JOHN SNYDER:  Hi, your Honor; John Snyder,

14   John H. Snyder PLLC, counsel for the Sater defendants and

15   Felix Sater.

16             MR. THOMAS C. SIMA:  Tom Sima, Law Firm of Thomas C.

17   Sima, counsel for the Sater defendants and Felix Sater.

18             THE COURT:  Okay.

19             M. CYRULNIK:  Good afternoon, your Honor.  Jason

20   Cyrulnik from Cyrulnik Fattaruso.  I'm here on behalf of MeM

21   Energy.  I don't think we have anything in particular today,

22   so I'm sitting over here to make sure that counsel has the

23   table that's --

24             THE COURT:  Okay.  We do have some discovery to

25   talk about.  But welcome, everyone.
```

1                          PROCEEDINGS                    5

2          I wanted to first hear argument on the proposed

3  motion to amend and the counterclaim.  Since it is defendant

4  Sater et al's motion, tell me why you meet the Rule 16

5  standard for amending and why this should be permitted?

6          MR. SNYDER:  Sure, your Honor.  So, your Honor,

7  Felix Sater, as you're well aware, was sued in this action in

8  March of 2019.  And for the next two years, he was under the

9  belief that it was a garden-variety commercial case.  In

10  January 2021, the FBI --

11          THE COURT:  But this is not -- this case is not a

12  commercial case; it relates to Sater's alleged assistance in

13  laundering money.  Is that --

14          MR. SNYDER:  I guess I was thinking of --

15          THE COURT:  -- are you characterizing that as a

16  commercial transaction?

17          MR. SNYDER:  Well, I mean, there are commercial

18  transactions in it, but the point being, your Honor, is in

19  January 2021, he found out for the first time and had no

20  way to know before that, that Arcanum had been collecting

21  information on him and giving it to Christopher Steele to

22  be used in an effort to get Felix charged with RICO.

23          THE COURT:  But Arcanum's not even in this case.

24          MR. SNYDER:  Arcanum's is the Kazakh's -- well,

25  we're trying to implead them, your Honor.

 1                        PROCEEDINGS                6

 2             THE COURT:  I understand.

 3             MR. SNYDER:  And Arcanum is involved in the other

 4    case, the arbitration.  They were a party to the CAA, the

 5    Confidential Assistance Agreement that your Honor's very

 6    well familiar with.

 7             THE COURT:  Yes.

 8             MR. SNYDER:  And they're certainly part of the

 9    overall story.  Mr. Sater didn't bring this earlier because

10    he didn't know at the time even that it was a possibility

11    that Arcanum was going behind his back and trying to get

12    him charged with a crime.  It's not something that you

13    would normally assume would happen, but apparently it did

14    happen.  So Mr. Sater would like -- and, by the way, the

15    knowledge of Kazakhstan, of Almaty, of BTA, their knowledge

16    of Felix, their knowledge of the Confidential Assistance

17    Agreement is central to this case because we're going to

18    rely upon release and the validity of the release.  Now, if

19    the Kazakhs knew all about the CAA and knew all --

20             THE COURT:  But I don't understand what you just

21    said about the release.  How is that relevant to the

22    counterclaims that you're proposing?

23             MR. SNYDER:  The counterclaim -- well, it's the

24    same operative facts.  In other words, if the Kazakhs and

25    if Arcanum not only knew about Felix, but, you know, had

1                          PROCEEDINGS                        7

2  done this in-depth investigation into him sufficient to try

3  to get him charged with RICO, then that would, just as we

4  saw in previous opinions that your Honor has issued, the

5  knowledge -- their knowledge of the CAA and their knowledge

6  of Felix and his involvement is pivotal to both, you know,

7  the claims that we're trying to affirmatively assert as

8  well as the affirmative defenses of, among others, release.

9          THE COURT:  Okay.  So tell me what facts are

10 overlapping between your claims and the claims that

11 currently exist, which involve evaluation of real estate

12 transactions and evaluation of the companies that entered

13 into those transactions and the sources of their funds.

14         MR. SNYDER:  Okay, so, your Honor, in June 2015,

15 the CAA was signed.  The CAA contains a -- on its face -- I

16 think your Honor characterized it as a very broad release.

17 Now, if that release stands, if that's that as against BTA

18 and as against Almaty, then whatever claims they may have

19 against Felix or may have had are gone because they've been

20 released, and they lose.

21         THE COURT:  Okay.

22         MR. SNYDER:  So that is -- so the facts and

23 circumstances that will prove that are the very same facts

24 and circumstances, your Honor, that we will be looking into

25 and attempting to establish with our new counterclaims.

```
 1                      PROCEEDINGS                   8

 2          THE COURT:  Isn't the question of the scope of the

 3    release a legal question?

 4          MR. SNYDER:  It's a mixed question of fact and

 5    law, as I understand it, your Honor, because of course, you

 6    know, on its face it says that BTA and Almaty hereby

 7    release all the owners of Litco -- and Felix Sater is an

 8    owner of Litco.  So on its face, he's released.  Now, they

 9    say we didn't know about it, they say Felix didn't tell us

10    that he was the owner of Litco, a bunch of reasons why

11    maybe it isn't enforceable.  But that that, at the end of

12    the day, as I see it, it's a question of law, but it's also

13    a question of fact as to whether the release is

14    enforceable.

15          THE COURT:  Okay.  But the facts related to the

16    release seem separate from the facts that you're asserting

17    in your proposed counterclaim that have to do with

18    international espionage.

19          MR. SNYDER:  So, your Honor, if, for example,

20    let's say we go forward with these claims, we serve a

21    subpoena on Arcanum for the PowerPoint presentation as well

22    as all communications discussing the PowerPoint

23    presentation, and we get back a big, thick binder of

24    everything about Felix and emails telling the Kazakhs all

25    about Felix, well, at that point, Judge, I think you would
```

1                                PROCEEDINGS                    9

2   say, well, you know what, Almaty and BTA very well did know

3   about Felix, and therefore, I'm not going to let them out

4   of that release.  So, you know, they both spring, I think,

5   from the same operative set of facts of what did the

6   Kazakhs know about Felix.

7            THE COURT:  But isn't there another agreement that

8   prevented Arcanum from informing anybody at Kazakhstan and

9   BTA Bank about the agreement?  Mr. Sater testified in this

10  court that he wanted to keep his affiliation with Litco

11  secret from Kazakhstan, from BTA, and that's why he set it

12  up the way he did.

13           MR. SNYDER:  Well, it doesn't mean it didn't

14  happen, your Honor.  You know, we also didn't know that

15  Arcanum was gathering information and sending it to

16  Christopher Steele.  That was a bit of a surprise to us.

17  So knowing that, if they also disclosed it to the Kazakhs,

18  would that make anybody fall out of their chair?  I don't

19  think so.

20           THE COURT:  Okay.  You have an address.  Why under

21  Rule 16 there's good cause to allow the amendments at this

22  point in time when discovery is supposed to be completed,

23  nearly complete.

24           MR. SNYDER:  Well, your Honor, as your Honor

25  knows, we did attempt to mediate this case and settle the

1                          PROCEEDINGS                    10

2 case. I think we went about it, you know, the best way we

3 knew how. In terms of Rule 16, you know, there is still

4 discovery yet to be done on both sides. I don't see any

5 particular prejudice to anybody given the fact that, again,

6 the question of the plaintiff's knowledge about Felix, his

7 ownership, etc. It's pivotal to the case that's already

8 existing here, so there's no prejudice. And, you know, in

9 terms of the nexus between the claims, you know, your

10 Honor, I think I've already addressed that part of it, and

11 I don't want to beat a dead horse.

12         THE COURT: Well, am I correct, though, that

13 Mr. Sater learned about this FBI report a year ago?

14         MR. SNYDER: Well, he -- you know, less than a

15 year ago -- well, maybe a year now. And then, so when he

16 learned that, he engaged counsel that was experienced with

17 Kazakhstan. There was outreach to them. They wanted to

18 discuss settlement. You know, with these kind of things

19 and with Kazakhstan being sort of -- you know, they don't

20 move quickly, so it did take some time. They wanted --

21 they wanted -- Kazakhstan wanted to have a retired federal

22 judge mediate, so we had to go find a retired federal

23 judge. That took a little bit of time. And then we

24 mediated in December. Things were going pretty well, and

25 then in early January, everything blew up in Kazakhstan,

2    and discussions ended, and now here we are.

3              So, you know, ordinarily do you try to run to

4    court the minute you get a claim?  You try to; but, in this

5    case, given the subject matter of it, given our knowledge

6    of at least at the time people in Kazakhstan, we wanted to

7    give every opportunity to settle the case before making

8    allegations.  And so that's why it took the time it took,

9    your Honor.

10             THE COURT:  And are you involved in the

11   arbitration that's pending concerning the validity of the

12   Litco agreement?

13             MR. SNYDER:  Yes, your Honor.

14             THE COURT:  And in that arbitration, I assume

15   there is discovery about the origins of the CAA and the

16   relationship, is there not?

17             MR. SNYDER:  There was the beginnings of it, your

18   Honor.  The arbitration has been stayed as of now because

19   Felix didn't have the money to pay the arbitration bill,

20   and he's working to rectify that.  But that's the status of

21   the arbitration right now.

22             THE COURT:  Okay.  And the defendants raised the

23   issue about the Foreign Sovereign Immunities Act.  Why is

24   that not applicable, at least to Almaty and the country of

25   Kazakhstan?

1                          PROCEEDINGS                    12

2              MR. SNYDER:  So, my understanding -- and as I said

3    in the brief -- Kazakhstan's --the sovereign immunity is

4    only for acts that are unique to a sovereign.  Right?  And

5    so there was a famous case where in Saudi Arabia they

6    supposedly imprisoned people to put leverage on them for

7    business.  And they said, okay, that is sovereign immunity

8    because only countries can put people in jail, only

9    governments can put people in jail; whereas, if you're a

10   country and you get in default on your bond offering,

11   you're treated just like anybody else.  That's commercial,

12   and you are not covered by sovereign immunity.  Now, what's

13   being alleged here is making false statements about

14   somebody.  Right?  And anybody can do that.  There's

15   nothing unique to a sovereign about that.  And so sovereign

16   immunity should not apply.

17              THE COURT:  But that's not a commercial activity.

18              MR. SNYDER:  I mean, they hired a consultant or an

19   investigation firm, Arcanum.  Arcanum went and did

20   intelligence on Felix, apparently, was paid for it.  I

21   mean, that's --

22              THE COURT:  Isn't a foreign state conducting

23   surveillance on an individual for political reasons, which

24   is what you allege, something that's solely the province of

25   the state?

1                          PROCEEDINGS                    13

2              MR. SNYDER:  Not at all.  I can -- if I had enough

3    money, I could hire Arcanum to go conduct surveillance on

4    anybody.  I don't have to be a government to do that.

5              THE COURT:  So you don't believe there's a

6    difference between hiring a PI in a commercial dispute

7    versus hiring an investigator for political spying?

8              MR. SNYDER:  Well, my understanding is the

9    difference between a PI and an intelligence firm is the

10   size of the retainer check.  They essentially do the same

11   thing.  And there's not --

12             THE COURT:  But my question pertains to the

13   purpose of it.  You allege that this case is about a plot

14   by the Kazakhstan KBG to interfere in an election.  How is

15   that anything like hiring a personal -- an investigative

16   firm to evaluate whether somebody is cheating on, you know,

17   a spouse or cheating on workers' comp or disability or any

18   of the other reasons why somebody might hire a personal

19   investigator?

20             MR. SNYDER:  All sorts of people wanted to hurt

21   Trump politically for good reasons and bad reasons, and

22   there's nothing unique about, you know, a Kazakh party

23   doing it versus anybody else other than perhaps there may

24   be some laws against that.  But in terms of its essential

25   nature, they're digging up dirt on somebody to hurt

1                             PROCEEDINGS                    14

2   somebody politically.  There's absolutely nothing that says

3   a country -- you have to be a country to do that.

4              THE COURT:  And can you please address why you

5   believe joinder is proper under Rule 20?

6              MR. SNYDER:  Well, for largely the same reasons

7   that it's a -- you know, it's a compulsory counterclaim

8   because it arises from the very same -- here, let me just

9   get to this, your Honor.  I want to look for this specific

10  thing here.  All right.  The standard, your Honor -- and

11  this is 20(a)(2) -- "Persons may be joined in one action if

12  any right of relief is asserted against them jointly,

13  severally or in the alternative, and any question of fact

14  or law common to all defendants will arise in the action.

15             Now, in terms of the same transactions or

16  occurrence, your Honor, the facts underlying his

17  counterclaims, i.e., the knowledge that was collected by

18  agents of the Kazakh parties, is the same facts and

19  circumstances that are going to be adjudicated in terms of,

20  among other things, the validity of the release.

21             In addition, we also have an unclean hands

22  defense.  And to the extent that they were doing things in

23  connection with this that were dishonest -- and it sures

24  seems like they were -- that would be relevant to those, as

25  well.  So it's the same transactions and occurrences.

1                        PROCEEDINGS                    15

2            In terms of questions of fact or law overlapping,

3    again, is the CAA valid if it is the release in the CAA

4    valid?  If the Kazakh parties knew all about Felix and knew

5    all about who he was and what he was and nevertheless

6    signed the agreement and nevertheless let him work for

7    them, then your Honor may actually look at that and say,

8    you know what, they have unclean hands, I'm not going to

9    let them walk away, or I'm certainly not going to let them

10   assert these claims against Felix.  So it's the same

11   transactions or occurrences, and there are combinations of

12   fact and law, so it's proper under Rule 20.

13           THE COURT:  All right, are there any other

14   arguments you'd like to make with respect to your motion?

15           MR. SNYDER:  Just, your Honor, that I am at a bit

16   of a disadvantage because you've lived this case, they've

17   lived this case; I'm new.  So I'm doing the very best I

18   can.  I read very carefully the transcript of the sanctions

19   hearing in which, you know, knowledge of who Felix was and

20   what he did was at the center of everything.  I don't have

21   to tell you about it.  To me, if I were your Honor, I would

22   be pretty intrigued by this, and I would wonder how come

23   I've never heard of this big investigation into Felix,

24   given the fact that I just held a very long evidentiary

25   hearing where what people knew about Felix was at the

2    center of everything.  So if we're going to litigate this,

3    if we're going to find out what happened, let's get all the

4    facts on the table and find out what really happened.  So

5    that's my plea here, your Honor.  And I'll sit down now.

6                 THE COURT:  Okay.  Thank you.

7                 I'll hear next from plaintiffs.

8                 MR. WENNER:  Your Honor, with the Court's

9    permission, our associate, Ms. Mariella will argue?

10                THE COURT:  Sure.

11                MS. SABINA MARIELLA:  Thank you, your Honor.  Good

12   afternoon.

13                I'd like to start just by giving an overview of

14   why we oppose the motion, and then I'll address some of the

15   points that Mr. Snyder made specifically and then make

16   myself available for any questions that the Court might

17   have.  And just let me know if you can hear me sufficiently

18   from here.

19                THE COURT:  I can.  Thank you.

20                MS. MARIELLA:  Okay.  As you heard, Mr. Snyder has

21   explained Mr. Sater's proposed counterclaims in this case

22   essentially contend that BTA, Almaty, Kazakhstan and

23   Arcanum engaged Litco under a Confidential Assistance

24   Agreement in order to collect intel on Sater in order to

25   harm Donald Trump's Presidential campaign.  This theory is

2  totally contrary to known and public facts.  And I won't go

3  through them all, because there's a lot, but I'll just

4  highlight a couple for the Court.

5           First, Donald Trump announced his Presidential

6  candidacy after the CAA was signed.  So the theory that the

7  plaintiffs engaged Litco in the CAA to collect intel to

8  harm his campaign is simply not plausible.  Second, Litco,

9  as you heard during the hearing on the sanctions motion,

10  was the one who approached the plaintiffs to assist with

11  the plaintiffs' asset recovery efforts, not the other way

12  around.  And, third, as this Court has already found after

13  the sanctions hearing, the plaintiffs and their attorneys

14  did not know that Sater was affiliated with Litco.  So the

15  theory that they entered into this agreement with Litco

16  with the intent of gaining intelligence on Mr. Sater to

17  harm a Presidential campaign is simply not plausible.

18           The only evidence that supports these proposed

19  counterclaims is a record of an FBI interview.  And this

20  FBI interview does not mention any of the proposed

21  counterclaim defendants except for Arcanum, and all it says

22  about Arcanum is that Mr. Steele had a PowerPoint from

23  Arcanum about the Sater connection to Ablyasov, which is

24  true and which Mr. Sater has testified about.

25           As we explain in our brief, aside from these

1                          PROCEEDINGS                    18

2    factual -- these implausible facts, Mr. Sater's various

3    claims are also legally deficient for many reasons and

4    would immediately fall apart on a motion to dismiss.  But

5    that's all laid out in our brief; I won't regurgitate all

6    of that for you today.  Putting the factual implausibility

7    and the legal infirmity of the claims aside, this case is

8    not about anything that Mr. Sater has raised in his

9    proposed counterclaims.  This case is about Mr. Sater's

10   role in assisting Mukhtar Ablyasov and Ilyas Khrapunov in

11   carrying out a complex international money-laundering

12   scheme from about 2005 to 2013, well before this agreement

13   was ever signed.

14            The parties have been litigating that issue for

15   three years.  The parties have been conducting voluminous

16   discovery on those facts for three years.  There's a

17   scheduling order in place that the parties and the Court

18   have been relying on to manage this litigation; yet, just

19   last month Sater raised with the Court for the first time

20   his intent to raise this counterclaims that have absolutely

21   nothing to do with the plaintiffs' claims, that add two

22   brand-new parties who have had no involvement with this

23   litigation for three years, and who have not participated

24   in discovery at all.

25            If these were real claims that were grounded in

1                              PROCEEDINGS                    19

2    law or reality, Mr. Sater could have tried to bring them in

3    the pending arbitration between Litco and Arcanum, he could

4    have brought a new action based on them; instead, he's

5    trying to use this court as a forum to start an entirely

6    new case about a conspiracy theory about election

7    interference.  Why?  Because Mr. Sater wanted a platform to

8    try to publicly embarrass the plaintiffs to try to leverage

9    a settlement with them.

10          Mr. Sater can't show good cause to do so, as he

11   has to under Rule 161, and he hasn't given this Court any

12   good reason to permit the kind of expansive discovery that

13   would be required to litigate these counterclaims, nor has

14   he given the Court any good reason to add two new parties

15   who would essentially have to start anew in this case.  And

16   this is especially so in light of the fact that he had this

17   information that he purports to base these counterclaims on

18   for more than a year and still waited to raise this motion

19   with the Court until now, on the eve of the close of fact

20   discovery.

21          THE COURT:  Can you address the discovery, if any,

22   that Mr. Sater has taken on the release?  He has an

23   affirmative defense of release.

24          MS. MARIELLA:  I would ask Mr. Wenner to speak to

25   that, but I know that just recently he served his first

1                        PROCEEDINGS                    20

2  discovery requests specifically on the counterclaims.  And

3  they're extremely broad.  They would totally expand the

4  scope of discovery in this case.  He wants everything

5  related to Litco, everything related to this agreement,

6  documents --

7           THE COURT:  Right.  I understand that.  But

8  already existing in the case is Mr. Sater's defense that

9  the claims against him are barred by a release that's

10 contained in the Litco agreement.  And so what facts, if

11 any, do you think are relevant to that issue?

12          MS. MARIELLA:  Well, the release -- so Mr. Sater

13 is not a party to the agreement.  So the legal issue there

14 would be whether he is a third-party beneficiary to the

15 agreement and would thus be -- I believe, your Honor, it

16 would be based on whether the parties expressed a clear

17 intent to release him, and then, of course, the language of

18 the release and whether it even applies to these claims at

19 all.

20          THE COURT:  Right.  So there would be factual

21 issues about what the intent was in entering into that

22 agreement that contained the release.  So who would be the

23 witnesses relevant for that?

24          MS. MARIELLA:  Well, whoever signed the agreement

25 for Litco and the --

1                            PROCEEDINGS                    21

2            THE COURT:  So back to Mr. Kam, who no one has

3    been able to find.

4            MS. MARIELLA:  Yes.  We're working on it.  So

5    we're in the process of attempting to get Mr. Kam's

6    deposition.

7            And, you know, Mr. Sater has asserted that

8    affirmative defense in early 2021.  So it's not new.  And

9    if there was relevant discovery to his affirmative defense,

10   he had the burden of finding it.  And he's had plenty of

11   time to do it, and I don't think asserting these proposed

12   counterclaims and then requesting extra time in discovery

13   based on them is an appropriate way to do it.  And

14   this -- you know, even if there are some minor overlapping

15   factual issues, this Court still has discretion to not let

16   him use the Court to essentially assert brand-new claims.

17           And the standard for permitting joinder and

18   whether there are overlapping issues of fact and law

19   essentially relies on whether there's enough of a logical

20   connection to make it make sense in terms of judicial

21   economy to try all of the claims together.

22           THE COURT:  Has there been discovery in the

23   arbitration concerning the agreement that contains the

24   release or any testimony that can be shared in this case?

25           MS. MARIELLA:  I don't believe so, your Honor.

1                           PROCEEDINGS                    22

2              THE COURT:  And the individual who entered on

3    behalf of Arcanum is deceased, so Mr. Kam is the only one

4    who actually was present, along with Mr. Wolf, is that

5    right?

6              MS. MARIELLA:  I believe so, your Honor.  I'd ask

7    Mr. Wenner to correct me if I'm wrong about that.

8              THE COURT:  Okay.

9              MR. WENNER:  Yes, your Honor.  That also assumes

10   that Mr. Kam was the one who signed Mr. Kam's name on the

11   documents here.

12             THE COURT:  He is --

13             MR. WENNER:  The only names --

14             THE COURT:  His name is the signatory --

15             MR. WENNER:  Yes.

16             THE COURT:  -- on the document.

17             Okay.  All right, can you talk about whether or

18   not there are any exceptions to FISA that would apply that

19   would permit jurisdiction, subject matter jurisdiction over

20   Almaty and Kazakhstan for these proposed claims?

21             MS. MARIELLA:  Well, your Honor, so Mr. Sater has

22   raised the exception based on commercial activity.  And as

23   you raised earlier, this is not a commercial transaction;

24   this is not a case where a sovereign is engaging as a

25   market player in a commercial transaction.  They're not

1                            PROCEEDINGS                    23

2  loaning someone money or taking out a loan.  As Mr. Sater's

3  own counterclaims contend, this is about political

4  interference with an election.  It is in no way commercial

5  activity, and it just cannot fall under that exception to

6  sovereign immunity under the plain text of the statute.

7            THE COURT:  Are there any other exceptions that

8  apply?

9            MS. MARIELLA:  So under the statute it would

10  be -- the only other exception that could apply -- so

11  28 USC 1607 governs counterclaims, so when the foreign

12  sovereign is the one to bring the claims.  Of course,

13  Mr. Sater hasn't raised this, but in that case, it would

14  only be if the counterclaims arose out of the same

15  occurrence or transaction, so a similar test to joinder and

16  compulsory counterclaims.  And then the other exception

17  under that provision of the statute would just be that

18  there's no immunity to the extent that the counterclaim

19  doesn't seek relief exceeding an amount or differing in

20  kind from that sought by the foreign state.  So that's

21  under 28 USC 1607.

22            THE COURT:  Okay.  Thank you.

23            And can you address Rule 20 joinder and why you

24  think that rule is not satisfied?

25            MS. MARIELLA:  Yes, your Honor.  First of all, of

1                                    PROCEEDINGS                        24

2    course, even if Mr. Sater can meet the requirements of

3    Rule 20, he still has to meet the requirement of Rule 16

4    for good cause because it would require modification of the

5    scheduling order that had a deadline for joining parties.

6    But putting that aside and putting aside any of the

7    prejudice that joining parties would cause, again, so the

8    test is the proposed claims have to arise out of the same

9    transaction or occurrence as the plaintiff's claims.  And

10   to determine that, the Court must assess the logical

11   relationship between the claims and determine whether the

12   essential facts of the various claims are so logically

13   connected that considerations of judicial economy and

14   fairness dictate that all of the issues be resolved in one

15   lawsuit.  So that's the test for the first prong of the

16   rule.

17           As we've said, Mr. Sater's counterclaims are about

18   Arcanum and the Kazakh party's using Felix Sater as a pawn

19   for interference in the US election in 2016 and for

20   damaging Donald Trump politically, while plaintiffs' claims

21   are about international money-laundering schemes spanning

22   from 2005 to 2013, well before this election or this

23   agreement was entered into.  While there may be some

24   tangential facts that could be relevant to both cases, we

25   don't think that dictates judicial economy requiring all of

2   the claims to come into one lawsuit.

3         Mr. Snyder also said something about, you know,

4   the validity of the CAA being relevant in both actions.

5   I'm not sure that I see that, either.  The validity of the

6   CAA may be relevant to his affirmative defense to the

7   plaintiffs' claims, but I don't see how the validity of the

8   CAA is relevant at all to his counterclaims.  If anything,

9   he says that, you know, the plaintiffs breached some

10  confidentiality agreement under that agreement, so if it's

11  invalid, then his counterclaims would fail.  So I don't see

12  the logical connection there.  He also mentioned well, if

13  we get this PowerPoint, there might be something in there

14  that shows that the plaintiffs knew that Sater was Litco at

15  the time they entered into the agreement; but, of course,

16  this Christopher Steele interview was in 2017, which was

17  two years after the 2015 agreement was signed.  So there's

18  no real connection there.  He also brought up unclean

19  hands.  The unclean hands defense would only bar the

20  plaintiffs' recovery on their own claims if they had

21  unclean hands as to the conduct for which they were suing.

22  Unclean hands defense is not a catchall for if you've

23  engaged in any misconduct, you can't recover.  There has to

24  be some connection to the plaintiffs' own claims and their

25  own unclean hands as to those claims.

1                              PROCEEDINGS                    26

2          So that's my response to the connections that

3  Mr. Snyder raised.  And then, of course, he would also have

4  to show common questions of law and fact.  And, again, we

5  would contend there are none.

6          THE COURT:  Okay.  Thank you.  Are there any other

7  points you wanted to raise?

8          MS. MARIELLA:  Yes.  I just wanted to briefly

9  raise good cause and prejudice that Mr. Snyder argued a bit

10  about before.  You know, as I explained earlier, this case

11  has been going on for three years, and the parties have

12  been doing a lot of discovery.  Mr. Sater says that he did

13  not find -- he did not come to learn of the information on

14  which he based his counterclaims on until January of 2021,

15  but he doesn't explain why he still waited a year when

16  discovery was rapidly coming to a close and when the

17  parties were under the impression that we were all bound by

18  a scheduling order and proceeding accordingly.

19          THE COURT:  Well, he says it's because of a

20  mediation.

21          MS. MARIELLA:  Yes, your Honor.  Parties mediate

22  all the time, and it does not justify blowing deadlines.

23  And there are some cases that we cited in our brief where

24  courts have found that the fact that parties were engaging

25  in settlement discussions wasn't enough to meet the

1                          PROCEEDINGS                    27

2  good-cause requirement.  Some Courts require mediation.  It

3  doesn't mean that, you know, you can sit on your rights

4  when you've learned information that could, you know,

5  require you to amend.

6           And then as to prejudice -- oh, and I also wanted

7  to mention on that point, Mr. Sater's proposed counterclaim

8  and his brief say that he actually was able to prepare a

9  draft of these counterclaims in July of 2017.  So even

10  giving him the benefit of the doubt, you know, he still

11  waited six months from even that point to raise with your

12  Honor the prospect that he might need to modify the

13  scheduling order and move for leave to amend, and that we

14  also have cases in our brief where Courts have found that

15  even that amount of time was too long and wasn't diligence

16  under the good cause standard.

17           And then, as to prejudice, Mr. Snyder said that

18  adding these counterclaims and these parties would not

19  prejudice anyone.  It's simply not true.  Again, these

20  counterclaims are totally unrelated to what the parties

21  have been litigating for three years.  It would expand the

22  scope of discovery significantly.  We just got his document

23  requests, which want everything from documents about Hunter

24  Biden, about Robert Mueller, everything about Litco and the

25  CAA, everything about Arcanum.  It is not a narrow issue;

1                          PROCEEDINGS                    28

2   it would significantly open the door to huge amounts of

3   discovery, foreign discovery, I'm nearly certain a good

4   amount of litigation over these discovery requests with

5   your Honor.  So it's simply not true that there would be no

6   prejudice by allowing him to open up discovery to these

7   brand-new issues that have not really been relevant to the

8   claims so far and discovery so far.

9            And that's not even to mention the prejudice to

10  the two new parties, who have not had the benefit of

11  participating in discovery for the past three years, have

12  not been present at any of the nine depositions that we've

13  already taken, and who would be, again, starting anew in

14  this case.

15            THE COURT:  Okay.  Thank you.

16            MS. MARIELLA:  You're welcome.

17            THE COURT:  Mr. Snyder, are there any points you'd

18  like to make in reply?

19            MR. SNYDER:  Just very, very briefly, your Honor.

20            First, that she mentioned that the CAA was signed

21  I think shortly before Trump announced in 2015 for

22  President.  Everybody in the world knew Trump was running

23  for President.  They were doing opposition research on him

24  well before he announced.  So that is not the kill shot

25  that she might think it is.

1                           PROCEEDINGS                    29

2          In terms of talking about the breadth of the

3   counterclaims and how broad the discovery's going to be and

4   all the new issues, if you read their Complaint, their

5   initial Complaint in this matter or the First Amended

6   Complaint, it reads, you know, like a grand saga.  The

7   thing's, you know, very, very long, and it talks about all

8   sorts of things.  So, you know, this has never been, you

9   know, a laser-focused case.  It's a case that requires

10  quite a bit of context; and, you know, there's nothing

11  anybody could do about that.  It's just the nature of the

12  case.

13          In terms of the release -- and, of course, the

14  release and the validity of the release and whether it

15  applies to Sater, you know, those are central.  I just want

16  to point one thing out.  Have you ever seen a commercial

17  engagement where the parties sign a release at the

18  beginning of the relationship?  It never happens.  You

19  know, when you're a lawyer, you don't get a release in your

20  engagement letter for stuff you did in the past.  So, you

21  know, there was obviously, you know, an understanding that

22  they wanted to put the past in the past.  And so the

23  release, the validity of it, it runs through this entire

24  case whether the counterclaims are allowed or not.

25          The last thing I want to say -- and this is about

1                              PROCEEDINGS                    30

2    the sovereign immunity issue -- because your Honor has sort

3    of lasered in on that.  And I want to point out *Republic of*

4    *Argentina v. Weltover*, 504 US 607; it's a 1992 case.  And

5    there was discussion of, well, you know, their intent was

6    to harm the election, and that isn't commercial.  Okay, I'm

7    going to read the -- this is Supreme Court, US Supreme

8    Court.  It says, "We conclude that when a foreign

9    government acts not as regulator of the market but in the

10   manner of a private player within it, the foreign

11   sovereign's actions are commercial within the meaning of

12   the FSIA."  And I'm going to skip a little bit -- and this

13   is very, very important, Judge.  It says, "The question is

14   not whether the foreign government is acting with a profit

15   motive -- that's not the question -- or instead with the

16   aim of fulfilling uniquely sovereign objectives."  And here

17   comes the important part, Judge.  "Rather, the issue is

18   whether the particular actions that the foreign state

19   performs, whatever the motive behind them, are the type of

20   actions by which a private party engages in trade and

21   traffic or commerce."  So the motive behind the acts

22   doesn't matter; it's the acts themselves.  And here, hiring

23   an investigation firm, that act, there's nothing uniquely

24   governmental about that.

25                  THE COURT:  But the claims are defamation and

1                          PROCEEDINGS                    31

2   other breach of fiduciary duty, and the claims are not

3   hiring a private investigator.  They relate to alleged

4   defamation.  How are you connecting the hiring a PI to --

5   how are those -- how's that act supportive of the claim of

6   defamation, for example?

7          MR. SNYDER:  Well, I would come back and say that,

8   you know, anybody with enough money that didn't want to see

9   Trump elected could have hired Arcanum to gather dirt on

10  anybody they wanted, and I'm sure did.  You don't have to

11  be a government to do that.  And, you know, in terms of --

12  and I did hear the -- and it's a good argument, saying,

13  well, this involved an election, and elections are about

14  governments, and therefore, this is sovereign immunity.  AT

15  the end of the day -- and the US Supreme Court has been

16  very clear about this -- the motive doesn't matter.  The

17  question is are you doing things that only a government can

18  do.  And here, as evidenced by the fact that

19  nongovernmental -- we're naming Arcanum as a defendant.

20  They're not a government.

21          THE COURT:  Okay.

22          MR. SNYDER:  Thank you, your Honor.

23          THE COURT:  Thank you.  I'll take this under

24  advisement.

25          I'd like to talk now about discovery because I

1                        PROCEEDINGS                    32

2   received two letters, one from plaintiffs and one,

3   Mr. Snyder, from you regarding items.  In response, you're

4   saying that you need an additional 90 days of discovery.

5   What's plaintiffs' view on the additional time needed for

6   the outstanding items?

7           MR. WENNER:  Your Honor, I think in Mr. Snyder's

8   letter he makes some representations about getting some

9   responses back to us on outstanding items by April 30th.

10  And I think, assuming that that date sticks and he's able

11  to get us those responses, which we expect will be

12  challenging to some degree, our discovery is largely

13  already our on the table, and we're waiting to bring that

14  material back in.

15          THE COURT:  Right.

16          MR. WENNER:  And I think the 90 days is okay with

17  us in that regard.  There is an important distinction,

18  though -- and it's an issue that came up in argument.

19  Extending that discovery by 90 days, in our view, is not

20  something that's anticipating discovery into the

21  counterclaims.  We received two days ago, two days before

22  the close of fact discovery, document demands, the first

23  deposition notices from the Sater defendants, the first

24  interrogatories.  And these are the document demands that

25  Ms. Mariella referenced that include references to Hillary

1                          PROCEEDINGS                      33

2  Clinton or, you know, all communications between Kenes

3  Rakishev and Hunter Biden or all documents that refer to

4  Fusion GPS.  I mean, they're clearly about the

5  counterclaims.  So we don't want to put ourselves in the

6  position of having to prepare responses and collect that

7  discovery and do that work while we have this pending

8  motion, and we would just hope and ask the Court that as

9  quickly as that motion can be resolved, it will help us

10  determine whether those are actually properly part of the

11  case and whether we actually need to do the work to respond

12  to them.  So extending 90 days to finish what we have, to

13  finish out the discovery on the claims that are part of the

14  case now, I think we're okay with, assuming we get the

15  responses that (indiscernible) that was asked for.  But we

16  don't want that to be a signal that we think this is a

17  proper extension to include discovery of the counterclaims

18  and that it can be done within that time.

19            THE COURT:  Well, in terms of the timing of this

20  and the motion to dismiss that you filed with respect to

21  MeM that has been referred to me for resolution, I just

22  note that Judge Nathan was voted on last night.  So she is

23  going up to the Second Circuit, and she is not going to be

24  the district judge on the matter as soon as that happens,

25  which I expect it will be shortly.  So I don't know who the

1                         PROCEEDINGS                    34

2   judge will be.  The parties have the option to consent to

3   my jurisdiction just for single motions.  If you want to do

4   that, you can.  You don't have to make a decision today.

5   But I would ask that, if you are going to consent for

6   purposes of either of these motions, that you submit a

7   notice form within the next week.  And, again, I have no

8   idea exactly what the timing is, but we do know that the

9   Senate voted on Judge Nathan.  So some new district judge

10  is going to be coming in.

11          MR. WENNER:  Your Honor, we actually -- it's

12  important, I think, to all the parties to know.  Has a

13  determination been made whether the case will stay?  We

14  understand it to be within Judge Nathan's discretion

15  whether to keep the matter when she's elevated.  Has that

16  decision been made, to your knowledge or --

17          THE COURT:  I don't know.

18          MR. WENNER:  So we may find out sometime in the

19  near future whether it's been referred to another judge or

20  not.

21          THE COURT:  Correct, yes.  I don't have any

22  information on that.

23          MR. WENNER:  We will certainly confer with

24  opposing counsel and consider ourselves the referral of

25  this motion to your Honor.  And I agree that that would

2   likely help with the expediency with which we think that it

3   should be resolved.

4           There are a couple of issues on the outstanding

5   discovery that I would like to just raise.  I don't

6   anticipate that much, if any, of this would actually

7   require a ruling from your Honor now.  The parties have

8   been in active discussion.  The Kalsom Kam deposition, I've

9   been trying to think of ways to push that forward in light

10  of his departure from Malaysia.  As you know, we've

11  requested the transcripts from -- the only known transcript

12  we have from the deposition of Kim, which is in the divorce

13  proceeding.  That's, in our view, squarely within the

14  control of Mr. Sater and should be produced.  We don't --

15          THE COURT:  But in the divorce proceeding, I

16  assume -- I assume that there's going to be information

17  that's covered in that transcript that has no bearing on

18  this case.

19          MR. WENNER:  That may be.  That may be.  But I

20  don't think it's -- I think it's clearly going to be, at

21  the very least, a mix, because we anticipate there is --

22          THE COURT:  What information would he testify

23  about in the divorce hearing that would be relevant to this

24  case?

25          MR. WENNER:  That -- if you look at the docket in

1                           PROCEEDINGS                    36

2  the divorce proceeding, they've been proceeding for a

3  couple of years on active discovery.  And the ownership of

4  Litco and the control of that asset --

5            THE COURT:  I see.

6            MR. WENNER:  -- we expect is the relevance of his

7  deposition to that proceeding.  I don't know what else may

8  have been discussed, but I expect counsel will review and

9  will have a process of discussing whether the -- redactions

10 need to be made or whether the protective order is

11 sufficient.  I just don't think it's ripe yet to make those

12 arguments.

13           MR. SNYDER:  Can I just very quickly --

14           THE COURT:  Sure.

15           MR. SNYDER:  -- on the point of Kalsom Kam's

16 transcript, Felix Sater does not have a copy of it.  I have

17 asked opposing counsel in the divorce case for a copy.

18 When I get it, I'll review it.  And, to your point, I

19 expect likewise that there's going to be a lot of stuff

20 that's not relevant.  But until I see it, I can't really

21 speak to that.

22           THE COURT:  Okay.

23           MR. WENNER:  The other step that I thought would

24 be a good incremental step to secure his testimony was to

25 request the Court order to compel him to comply with the

1                          PROCEEDINGS                    37

2    subpoenas.  That we could communicate to him that it's not

3    just compliance with subpoenas; he's now under court order,

4    which if he returns to the United States, he would be

5    within the jurisdiction again to enforce it, but also it

6    may give him the necessary motivation to, for example, sit

7    for the deposition via Zoom from Malaysia or -- I'm just

8    trying to think of the -- before I start putting this fault

9    on Mr. Sater, which we alluded to in our letter, that he

10   was within their control and knew of his whereabouts, I

11   think there's still additional steps.  I can give it a try

12   and persuade Mr. Kam that it's in his best interest to

13   comply with the subpoenas.

14             THE COURT:  And does Malaysia allow someone to sit

15   for a deposition in Malaysia where it's being -- you know,

16   for purposes of an American litigation?

17             MR. WENNER:  To be frank, your Honor, I haven't

18   looked at what conventions or local rules apply in

19   Malaysia.  And I'll do that.  And it raises the prospect of

20   a court order with opposing counsel, and I don't know yet

21   if it would be on consent or not.  But that's the step I'm

22   thinking of.  And I would write a letter to your Honor with

23   a proposal for a court order.  I think it's something, you

24   know, I think would be an appropriate response to his

25   noncompliance with the subpoena at this time.

1                          PROCEEDINGS                    38

2              THE COURT:  It would only be enforceable if he was

3   within 100 miles of this court, this district.

4              MR. WENNER:  Yes, your Honor.

5              THE COURT:  Well, if you want to propose a form of

6   court order with a letter with whatever legal support you

7   would have for issuance of such an order, you can do that.

8              MR. WENNER:  Thank you, your Honor.

9              There's a representation in Mr. Snyder's letter

10  about an adequate search that Mr. Sater's purportedly done

11  for additional documents responsive to our demands --

12             THE COURT:  And I guess particularly the tape

13  recordings?

14             MR. WENNER:  In particular, tape recordings; but

15  also other records that he testified about that may have

16  been papers and other hard drives and audio recordings that

17  were on storage devices elsewhere.  In his deposition he

18  explained that he had brought one hard drive with him to

19  Guyana, and that was -- that one device was the basis for

20  his search and production at the time in this case.  We

21  don't think the representation in Mr. Snyder's letter is

22  sufficient.  We expect that that was communicated to him by

23  Mr. Sater.  We think we will need to hear in more detail,

24  possibly from Mr. Sater, the steps that he did to actually

25  search that.  Whether counsel searched the storage unit or

1                              PROCEEDINGS                    39

2    looked at those materials, we don't know.  We just don't

3    think it's -- the information we have now satisfies what

4    would be required to comply with the disclosure demands.

5              THE COURT:  Okay, but you do have to have a basis

6    for -- a factual basis to support discovery on discovery,

7    essentially, and a factual basis for believing that an

8    adequate search wasn't conducted.  What factual basis is

9    that?

10             MR. WENNER:  And that would be in his own

11   deposition testimony where he explained what these contexts

12   were, what was located there, his failure to go search for

13   them, and also his representation that no one else would be

14   able to go into it, his employees in Guyana.  So there is a

15   factual basis that I can proffer that, at least at the time

16   of his deposition, there was substantial reason to believe

17   the search was inadequate.  All we have in response so far

18   is just one statement from Mr. Snyder, who wasn't part of

19   that process to begin with -- it was his prior counsel.  So

20   I just wanted to flag that I don't think we're done yet

21   with that issue.

22             THE COURT:  Okay.

23             MR. SNYDER:  And that's fine, and I'm happy to

24   discuss that, meet and confer on that point with

25   Mr. Wenner.

1                          PROCEEDINGS                    40

2              THE COURT:  Well, as I understand it, Mr. Sater

3   would like to find the recordings, as well.

4              MR. SNYDER:  Absolutely.  I wish I had them.

5              THE COURT:  Okay.

6              MR. WENNER:  Your Honor, one point.  I just want

7   to be clear that emails that we have with the document

8   vendor -- I'm sorry -- with the third-party vendor who

9   enhanced the tapes and with Moses & Singer, they

10  demonstrate that these were tapes that were in possession

11  of both those third parties.

12             THE COURT:  Of Moses & Singer, as well?

13             MR. WENNER:  And the vendor, which I've obtained

14  them from.

15             THE COURT:  I thought Moses & Singer said they

16  didn't have --

17             MR. WENNER:  Well, they did not have --

18             THE COURT:  -- copies.

19             MR. WENNER:  They do not have them presently.  But

20  they did have them at one time.

21             THE COURT:  At one point in time.  Okay.

22             MR. SNYDER:  Were those the tapes with Arcanum and

23  Boies Schiller, or were they the ones with Ilyas Khrapunov?

24             MR. WENNER:  Ilyas Khrapunov, your Honor.

25             MR. SNYDER:  Okay.

1                       PROCEEDINGS                    41

2              MR. WENNER:  Based on the timing of the

3  communications, if my recollection is correct.

4              THE COURT:  Okay.

5              MR. WENNER:  One minor point, the Litco

6  arbitration is not stayed; it's suspended indefinitely.

7  And the lifting of the suspension, as Mr. Snyder said, is

8  contingent upon him paying the fees.

9              THE COURT:  What's owed in it?

10             MR. WENNER:  The amount?  I don't know, your

11 Honor.

12             THE COURT:  In the arbitration?

13             MR. WENNER:  In the --

14             THE COURT:  I assume you're splitting the cost of

15 the arbitration?

16             MR. WENNER:  Splitting costs and --

17             THE COURT:  And it's AAA, right?

18             MR. WENNER:  Yes, your Honor.  Respondents have

19 paid their side, their share.

20             THE COURT:  Okay.

21             MR. WENNER:  The last point, your Honor, I think

22 that we would raise today, because other things are in the

23 process of meet-and-confer.  We mentioned MeM Energy's

24 responses to our document demands.  We heard from counsel

25 today before the hearing that they expect to get us early

1                              PROCEEDINGS                    42

2   next week their further detail on hit reports and volume of

3   documents and the production estimation.  That's okay with

4   us if the 90 days is granted; we'll work within it.  If

5   it's not, we think we should still be entitled to pursue

6   those pending document requests.  We also wanted to get

7   those documents before we deposed MeM.  So, in our view, if

8   the Court denies the discovery extensions generally, we

9   should still be entitled to further get the documents

10  responsive to our existing demands and depose MeM outside

11  the discovery period.

12          THE COURT:  Okay.  Does MeM Energy want to weigh

13  in on this?

14          MR. CYRULNIK:  Good afternoon, your Honor.  We

15  have no objection.  There's no attempt here to try and run

16  out a clock.  We're engaging in good faith and have been.

17  We had a communication last week regarding collection of

18  the limited documents that we're going to collect and

19  produce.  There are hit reports that we're expecting next

20  week, and we have no objection, to the extent your Honor

21  did not extend discovery, to permitting whatever discovery

22  is ultimately permitted to occur after the deadline.

23          THE COURT:  All right, I'm inclined to extend

24  discovery for 90 days but only as to the discovery that's

25  contemplated with respect to the existing claims in the

1                         PROCEEDINGS                    43

2   case.  Depending on the outcome of the motion to amend,

3   then we can address what additional schedule might be

4   needed.  So discovery is only extended, again, for the

5   existing claims and for the existing discovery that's

6   contemplated.  I'm not extending it for purposes of

7   expanding and sending out new requests, things that haven't

8   been discussed by either party already yet.

9              MR. SNYDER:  Your Honor, I do intend, unless your

10  Honor tells me I can't, to serve a subpoena on Arcanum,

11  which would be relevant to the new claims but also to the

12  issue of release and claims and defenses that are already

13  in play within the case.  So I just want to flag that

14  that's my intent.

15             THE COURT:  The release agreement was signed --

16  what information does Arcanum have on the release?  That's

17  what I'm wondering because the defense in this case goes to

18  the existing plaintiffs having released the claims in that

19  agreement.  As far as I'm aware, the only person at Arcanum

20  who was involved in any of these agreements is dead.  So

21  what -- and there's already been testimony from somebody

22  from Arcanum, who really didn't have any information about

23  the formation of the agreement, because he was asked about

24  it.  And there's testimony, which you may have seen

25  already.  So I'm just wondering what the purpose of a

1                              PROCEEDINGS                    44

2   subpoena on Arcanum would be.  I don't know what additional

3   information you would get based on what's already been

4   exchanged and testified to.

5            MR. SNYDER:  So, your Honor, the narrative that's

6   been put forth so far is that they were working with Litco,

7   they started in 2015, 2016, 2017, 2018.  And then October

8   2018, oh, my God, who knew Felix Sater was the owner of

9   Litco, this is terrible.  We didn't know who the owner was;

10  but, of all people, it can't be Felix Sater.  And so we're

11  going to terminate the agreement, and it's over.  Now --

12           THE COURT:  But your client testified he purposely

13  kept it a secret.

14           MR. SNYDER:  Probably not very well, because, you

15  know, Felix Sater went to numerous meetings with Arcanum,

16  with Boies Schiller, with other professionals that were

17  involved in the process of trying to hunt down the Ablyasov

18  money.  They -- you know, he was certainly well beyond what

19  a witness would be.  But --

20           THE COURT:  But his lawyer also testified that

21  this was a secret and intended to be a secret.

22           MR. SNYDER:  Perhaps --

23           THE COURT:  And that he approached Arcanum, not

24  the other way around.  That was testified to.

25           MR. SNYDER:  Yes, yes.  And, you know, perhaps it

```
 1                           PROCEEDINGS                    45

 2   was a --

 3            THE COURT:  By your client.

 4            MR. SNYDER:  -- target of -- perhaps it was

 5   opportunistic.  I don't know, perhaps they --

 6            MR. WENNER:  Sorry, your Honor, that's not

 7   precisely correct.  Felix Sater approached through counsel

 8   Latham & Watkins, who was working on (indiscernible) in

 9   California at the time on other matters.  And Latham

10   directed Robert Wolf, Felix's counsel at the time, to Boies

11   Schiller and to Arcanum.

12            THE COURT:  Okay.

13            MR. SNYDER:  So coming back around to the point

14   of, you know, why do I want to subpoena Arcanum, if --

15   okay, so we just found out a new piece of information,

16   Judge.  We just found out that Arcanum was putting together

17   information about Felix Sater at least, you know, no later

18   than the middle of 2017 -- and it may have been earlier --

19   because the FBI interview was September of 2017 -- so

20   sometime before 2017.  They obviously did quite an

21   investigation into Mr. Sater and all sorts of different

22   things.  That indicates to me, your Honor, that there is an

23   investigation file that nobody's seen.

24            Now, why is that relevant?  Well, Arcanum has been

25   Kazakhstan, BTA, Almaty, they have been --
```

1                          PROCEEDINGS                      46

2             THE COURT:  Let me stop you right now.  I'm not

3    going to allow any subpoena of Arcanum right now.

4    That's -- this is getting -- there's too much overlap with

5    your counterclaims, and I'm not extending discovery for

6    that.  So the answer is no to subpoenaing Arcanum.

7             MR. SNYDER:  Your Honor, I must ask you to

8    reconsider that --

9             THE COURT:  I'm not going to reconsider that.

10   I'll take the motion under consideration, and we'll address

11   it based on the outcome of the motion.

12            MR. SNYDER:  Okay, but, your Honor, even if you

13   deny motion to, you know, add the counterclaims, I still do

14   want the opportunity to argue to you that they are relevant

15   to the core claim, as well.  I understand that they kind of

16   touch upon both.  But, you know, I'd like to get my hands

17   on that PowerPoint, and I'd like to see what else there is

18   because --

19            THE COURT:  Why is that not a fishing expedition?

20            MR. SNYDER:  Well, it --

21            THE COURT:  That has nothing to do with what these

22   plaintiffs knew when -- there's been extensive testimony by

23   your own client and by his former lawyer about what

24   happened with that agreement.  And there was nothing that

25   prevented Mr. Sater from subpoenaing Arcanum during the

PROCEEDINGS                    47

2   three years that this case has been pending.  So, no, I'm

3   not going to permit that subpoena.

4            MR. SNYDER:  Okay, very well, your Honor.

5            MR. CYRULNIK:  Your Honor, just one point of

6   clarification.  I don't know that your Honor intended to

7   cover this, but, obviously, MeM Energy has not filed an

8   answer because it's filed a motion to dismiss.

9            THE COURT:  Yes.

10           MR. CYRULNIK:  Obviously, to the extent that MeM

11  Energy remains in the case, which we're hoping they don't,

12  but if they do, we'd obviously need to serve some discovery

13  on whatever defense we would assert in connection with our

14  answer, but --

15           THE COURT:  Have you already spoken with

16  plaintiffs about what documents you're seeking?

17           MR. CYRULNIK:  We have, but we haven't asserted

18  our affirmative defenses yet.  We didn't want to -- we

19  thought it would be inefficient to be seeking discovery

20  with respect to issues that are not in the case yet and if

21  we don't feel -- if we don't end up getting --

22           THE COURT:  And you've exchanged information

23  informally, as I understand it?

24           MR. CYRULNIK:  Yes.

25           THE COURT:  In an attempt to try to get to a

1

2  resolution?

3         MR. CYRULNIK:  There were extensive efforts to get

4  to a resolution between -- before I got involved -- between

5  my client, before he was represented, and plaintiffs.  And

6  I think they got close but not close enough.

7         THE COURT:  So I'm going to give you two weeks to

8  evaluate what discovery that you need in connection with

9  the claims against your client and its defenses.  I want

10 you to discuss that with plaintiffs' counsel.  And I want

11 to remind you of Rule 34, which requires you to narrowly

12 and precisely tailor what you need.  Okay?

13        MR. CYRULNIK:  So your Honor's preference would be

14 for us to serve the discovery after conferring before

15 there's a resolution on the motion to dismiss or --

16        THE COURT:  Yes, yes, before there's a resolution

17 on the motion to dismiss, you should go -- discovery's not

18 stayed, so --

19        MR. CYRULNIK:  I understand that.  I'm just saying

20 with respect to affirmative defenses that have not been

21 asserted in the case.  But that's -- if your Honor's

22 preference is to do that, I'm happy to do it that way.

23        THE COURT:  Yes, I think that you should do that.

24        MR. CYRULNIK:  Thank you.

25        THE COURT:  Okay.  Anything further from

```
 1                        PROCEEDINGS                    49

 2   plaintiffs?

 3           MR. WENNER:  No, your Honor.  Thank you.

 4           THE COURT:  Anything further, Mr. Snyder, for your

 5   clients?

 6           MR. SNYDER:  No, your Honor.  Thank you very much.

 7           THE COURT:  Okay.  And, lastly, for MeM, anything

 8   further?

 9           MR. CYRULNIK:  No, your Honor.  Thank you.

10           THE COURT:  Okay.  Thank you, everybody.  Nice to

11   see you.  And we can address any outstanding discovery

12   issues at -- we have another conference scheduled for

13   April, so -- where there's going to be oral argument on the

14   motion to dismiss.  Okay.  Great.  Thank you.  See you

15   then.

16           (Whereupon, the matter is recessed.)

17

18

19

20

21

22

23

24

25
```

50

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of City of Almaty,

Kazakhstan et al v. Sater et al, Docket #19-cv-02645-AJN-

KHP, was prepared using digital transcription software and

is a true and accurate record of the proceedings.

Signature *Carole Ludwig*

Carole Ludwig

Date:    March 28, 2022