**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and
BTA BANK JSC,

             Plaintiffs,

                -against-

FELIX SATER, DANIEL RIDLOFF, BAYROCK
GROUP INC., GLOBAL HABITAT SOLUTIONS,
INC., RRMI-DR LLC, FERRARI HOLDINGS LLC,
and MEM ENERGY PARTNERS LLC,

             Defendants.

19 Civ. 2645 (AJN) (KHP)


## FELIX SATER'S OBJECTIONS TO THE
## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


Dated:    New York, New York
          April 15, 2022

JOHN H. SNYDER PLLC
157 East 81st Street, Suite 3A
New York, NY 10028
(917) 292-3081
john@jhs.nyc

Thomas C. Sima, Esq.
102 Park Ridge Lane
White Plains, NY 10603
(212) 796-6661
tom@tsima.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ...................................................................................................................... 2

    A.    The Sater Case, the Ablyazov Case, and the Litco Arbitration Are Complex and Intertwined .............................................................................................................. 3

    B.    The Hunt For Ablyazov Money ................................................................................ 4

    C.    Felix Sater ................................................................................................................ 5

    D.    The Confidential Assistance Agreement .................................................................. 7

    E.    The FBI 302 .............................................................................................................. 8

    F.    The Kazakh Parties Hire Greenberg Traurig as Settlement Counsel ...................... 11

    G.    Chaos In Kazakhstan ................................................................................................ 12

    H.    The Sanctimonious Kazakh "Corruption Fighters" Flee To Their Swiss Bank Accounts .................................................................................................................. 12

    I.    The Kazakh War Against Ablyazov and Khrapunov Has Failed ............................. 14

OBJECTIONS ........................................................................................................................ 15

I.    Sater's Counterclaims Should Be Allowed Under Rule 16 Because Sater Exercised Diligence with Respect to His Proposed Counterclaims ................................ 15

II.    The Court Should Defer Ruling on Joinder, or Alternatively, Should Make the Denial "Without Prejudice" ........................................................................................ 19

CONCLUSION ...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page**

*Bridgeport Music, Inc. v. Universal Music Group, Inc.*,
    248 F.R.D. 408, 414 (S.D.N.Y. 2008) ..............................................................18

*City of Almaty v. Khrapunov*,
    956 F.3d 1129 (9th Cir. 2020) .......................................................................14

*Gullo v. City of New York*,
    540 F. Appx 45, 47 (2d Cir 2013)...................................................................18

*Thorpe v. Duve*,
    2020 WL 372676 (N.D.N.Y Jan. 23, 2020)...................................................18

*Republic of Kazakhstan v. Ketebaev*,
    No. 17-CV-00246-LHK (N.D. Cal. June 8, 2018).........................................14

Defendant Felix Sater (**Sater**), by his undersigned attorneys, respectfully submits this Objection to the Report and Recommendation of Magistrate Judge Parker dated April 1, 2022 (the **R&R**) denying Sater's motion to amend his answer to include the Proposed Counterclaims.

## PRELIMINARY STATEMENT

On February 3, 2022, Defendant Sater filed a motion to amend his Answer to the First Amended Complaint for the purpose of (1) asserting counterclaims against the City of Almaty (**Almaty**) and BTA Bank JSC (**BTA**), the plaintiffs in this matter; and (2) joining Arcanum (Asia) Limited (**Arcanum**) and the Republic of Kazakhstan (**Kazakhstan**) as additional counterclaim defendants.

On April 1, 2022, Magistrate Judge Parker issued her Report & Recommendation (Docket No. 379, the **R&R**) that Sater's motion be denied. In particular, the R&R concludes: (1) that Sater did not show "good cause" for the proposed amended counterclaims, as required by FRCP Rule 16(b)(4) (*see* R&R, pp. 6-8); and (2) that joinder of Arcanum and Kazakhstan is not permitted under FRCP Rule 20 (*see* R&R, pp. 8-10). Defendant Sater respectfully objects to the R&R pursuant to 28 U.S.C. § 636(b)(1) and FRCP Rule 72(b). The Court's standard of review is *de novo. See* FRCP Rule 72(b)(3).

The Court should analyze this Objection in two steps.

*First*, the Court should decide whether Sater demonstrated "good cause" for asserting his Proposed Counterclaims after the deadline for amended pleadings. The R&R faults Sater for not asserting his Proposed Counterclaims sooner, stating that Sater did not exercise "diligence" with respect to his Proposed Counterclaims. The Court should overrule this recommendation. Given the potential geopolitical ramifications of the allegations in the Proposed Counterclaims, Sater and his counsel had an obligation to investigate the claims carefully before filing them on a public

1

docket.  That is not a trivial undertaking when dealing with matters relating to Kazakhstan.

Furthermore, most of the delay in filing was due to the parties' mediation before retired Federal

Judge Timothy Lewis (which Plaintiffs had requested).  It would have been highly inappropriate

for Sater to file an inflammatory pleading on the public record while the parties were engaged in

good faith settlement talks.  When Plaintiffs terminated the mediation process in late January 2022,

Sater filed his Proposed Counterclaims about a week later.  Given the circumstances, the Court

should find that Sater exercised diligence and had "good cause" under Rule 16(b) to interpose his

Proposed Counterclaims after the January 15, 2021 deadline.

*Second*, the Court should decide whether Arcanum and Kazakhstan should be added as

Counterclaim Defendants pursuant to Rule 20.  Magistrate Judge Parker concluded that joinder of

two new counterclaim defendants (Arcanum and Kazakhstan) was not permitted under FRCP Rule

20.  In particular, she finds that (1) the Proposed Counterclaims do not arise from the same

"transaction or occurrence" as Plaintiffs' claims; and (2) adding two new parties to the case would

be prejudicial, as it would significantly delay the completion of fact discovery.  Having considered

the concerns raised in Magistrate Judge Parker's R&R, Defendant Sater requests that the Court

allow the Proposed Counterclaims to proceed against Almaty and BTA.  Regarding the proposed

new counterclaim defendants (Arcanum and Kazakhstan), we request that the Court either (1) defer

ruling on the joinder issue or (2) deny the motion without prejudice, so that the issue may be

considered on a more complete record.

## BACKGROUND

We are mindful that Your Honor was recently transferred this case upon Judge Nathan's

elevation to the Court of Appeals.  The undersigned, who joined this case less than a year ago, are

still neophytes in this remarkably complex case.  We empathize with the Herculean task of getting

up to speed not only on *Almaty v. Sater*, 19-Civ-2645 (the **Sater Case**) (385 docket entries); but also the closely intertwined case of *Almaty v. Ablyazov*, 15-CV-05345 (the **Ablyazov Case**) (1,486 docket entries).[1]  We will not assume that Your Honor has spent the hundreds of hours necessary to become fluent in the sprawling record of both cases.[2]

### A. The Sater Case, the Ablyazov Case, and the Litco Arbitration Are Complex and Intertwined

The Ablyazov Case (concerning roughly $24 million) was scheduled for trial in July 2022 prior to Judge Nathan's elevation to the Appeals Court.  Whenever Your Honor ultimately tries the Ablyazov Case – a jury trial expected to last three weeks – the outcome will significantly impact the Sater Case (a claim for $20-40 million against a judgment proof defendant).  Likewise, a AAA Arbitration entitled *Litco v. Arcanum, et al.* (the **Litco Arbitration**) may generate rulings affecting the Sater Case.[3]  Adding a layer of complexity, the Claimant in the Litco Arbitration – Litco LLC – is owned by Sater.  If the Kazakh Parties win the Ablyazov Case, it will establish

---

[1]  The Plaintiffs in both the Ablyazov Case (sometimes called the **Triadou Case**) and the Sater Case are the City of Almaty (**Almaty**) and BTA Bank JSC (**BTA**).  Almaty and BTA are also Respondents in the Litco Arbitration, along with Arcanum and the Republic of Kazakhstan.  Almaty and BTA (and the Republic of Kazakhstan, where applicable) are sometimes referred to collectively as the **Kazakh Parties**.

[2]  We refer the Court to our moving brief (Docket No. 362) and the accompanying Proposed Counterclaims (Docket No. 356-2) for an extended recitation of the underlying facts.  Also useful background is the sanctions hearing held before Magistrate Judge Parker in 2019 and resulting decision (*see* Ablyazov Case, Docket No. 1165 and 1248).

[3]  *Litco v. Arcanum, et al.*, AAA Arb. No. 01-18-0003-7960. The AAA Arbitration (the **Litco Arbitration**) concerns the enforceability of a certain Confidential Assistance Agreement (the **CAA**) (see Docket No. 78, Sater Aff., Exh. A).  If the Arbitration Tribunal were to find that the Release contained in the CAA was enforceable by Sater against Almaty and BTA, it would establish Sater's Affirmative Defense of waiver / release.  This arbitration is currently suspended due to Mr. Sater's temporary inability to pay the forum fees.

Litco's multimillion claim against the Kazakh Parties in the AAA Arbitration.[4]  On the other hand, if the Kazakh Parties lose the Ablyazov Case, then their case against Sater Case fails *a fortiori*; as this would mean the allegedly stolen funds in the Sater Case were not, in fact, stolen.  The Ablyazov Case, the Sater Case, and the Litco Arbitration are factually and legally intertwined.

### B.    The Hunt For Ablyazov Money

These three matters -- the Ablyazov Case, the Sater Case, and the Litco Arbitration -- all arise from a decade-long (and mostly unsuccessful) worldwide war waged by the Nazarbayev regime against Mukhtar Ablyazov.  Ablyazov, trained as a theoretical physicist, came to prominence in Kazakhstan's "wild west" days in the early 1990s.  In 1998, Ablyazov led a group of investors who purchased Bank Turan Alem (later renamed "BTA Bank") in a privatization auction for US $72 million.

In November 2001, Ablyazov, along with other former Kazakh government officials, founded the Democratic Choice of Kazakhstan (QDT) political party to rival the Nazarbayev political machine that dominated Kazakhstan from the 1980s until very recently.  Four months later, Ablyazov was imprisoned over accusations of financial fraud and political abuse.  Nazarbayev pardoned Ablyazov in 2003 after Ablyazov promised to stay out of politics.

Ablyazov became chairman of BTA in 2005. During this period, BTA grew rapidly, eventually becoming the largest creditor in Kazakhstan, holding 30% of outstanding business loans. Ablyazov, as chairman, allegedly made thousands of loans to fictitious offshore entities that

---

[4]    Under the Confidential Assistance Agreement, Litco assisted the Kazakh Parties in locating purportedly stolen Ablyazov assets.  The Ablyazov case involves about $24 million in funds that Litco helped to locate.  The CAA provides that Litco is to receive 16% of any such recoveries, including the roughly $24 million that the Kazakh Parties may potentially recover in the Ablyazov Case.

were ultimately controlled by Ablyazov and his family. When the global financial crisis hit Kazakhstan in 2009, external audits found that BTA could not account for US $10 billion in assets. This led to a solvency crisis, which resulted in the Kazakh sovereign wealth fund (Samruk-Kayzna) providing an emergency capital infusion, effectively nationalizing BTA and bringing it under control of Nazarbayev. Ablyazov fled to London, allegedly with US$6 billion of BTA's money. The Nazarbayev regime (specifically the Kazakh KGB, led by Karim Massimov, as well as BTA's chairman, Kenes Rakishev) launched an international legal, diplomatic, and PR war against Ablyazov, not only seeking his extradition, but also to recover the money that Ablyazov had allegedly stolen.

### C.    Felix Sater

Felix Sater was born in Moscow, USSR on March 2, 1966. In the early 1970s, Felix and his family fled anti-Jewish persecution and the evils of Communism, escaping the Soviet Union. Initially, they moved to an Austrian refugee camp. Soon the family moved to a basement apartment in Israel, then to a one-room apartment above a factory in Italy. The Sater family immigrated to the United States in 1973 as political refugees, living in Baltimore for three months before settling permanently in Brooklyn. Sater's parents raised Felix to love America and hate Communism.

Sater began working at a young age, selling newspapers at age eight, later working retail jobs part-time through high school. He attended Pace University before withdrawing to take a job on Wall Street in 1984.

Sater started as an assistant to a Managing Director at Bear Stearns and worked there until he earned his Series 7 license and became a securities broker. Sater was a natural on Wall Street, achieving meteoric success, rising through the ranks of several prominent financial institutions. By 1991, at just 25 years of age, Sater was promoted to Managing Director at Shearson Lehman

Brothers – one of the youngest managing directors in Wall Street history.  Sater likely would have continued along this path had it not been for a regrettable barroom fight that led to a 1993 assault conviction and loss of Sater's Series 7 license.

After serving his sentence, Sater was unable to work as a licensed broker. With limited employment prospects as a convicted felon and a young family to feed, Sater joined a boyhood friend's pump-and-dump stock brokerage (eventually known as State Street Capital Partners) for a short period of time. Sater left State Street in 1996 and moved on with his life.

In 1997, Sater was working in Moscow as a consultant for an AT&T-related transaction when he met a high-ranking U.S. military intelligence officer and former military attaché at the U.S. embassy in Moscow (the Officer). At the Officer's request, Sater began gathering sensitive intelligence information for the U.S. government, at great risk to his own life.  As a former Soviet citizen, Sater would have been executed for treason if caught spying against Russia.

The Officer specifically asked Sater to help the U.S. acquire a particular high-end anti-missile system from Russia. Through Russian contacts, Sater was able to covertly enter closed Russian military installations where he located the missile system and provided details to the Officer.  Sater also helped the CIA repurchase U.S.-manufactured Stinger missiles in Afghanistan under a U.S. Presidential decree (our intelligence agencies were concerned they would fall into the hands of Al Qaeda). Sater traveled to Afghanistan and obtained the location and serial numbers of approximately 10 Stinger missiles, which he provided to U.S. authorities.

After the terrorist attacks of September 11, 2001, Sater used his overseas contacts to obtain extensive information regarding Bin Laden and Al Qaeda. As an example, Sater recruited the personal secretary of Mullah Omar (Bin Laden's protector in Afghanistan and founder of the

Taliban) as a U.S. intelligence asset. Intelligence sourced through Sater provided saved U.S. military lives and stopped terrorist attacks.

Sater participated in FBI undercover sting operations which took down two separate Russian cyber-criminal gangs, with their leaders arrested in Cyprus and Turkey in meetings that Sater orchestrated.  Information provided by Sater to law enforcement has led to nearly two dozen convictions.  Sater has been instrumental in helping the FBI attain a greater level of understanding of various sophisticated fraud schemes.  His assistance to US intelligence and law enforcement has been lauded and commended by numerous US officials including former Attorney General Loretta Lynch.

### D.    The Confidential Assistance Agreement

The Kazakhs hired Sater (through his company, Litco) to assist in the recovery of the Ablyazov funds in June 2015. The CAA was negotiated by counsel. The CAA did not mention Sater by name because he was fearful that public identification would jeopardize the safety of Sater's family.  However, it did contain a release against Litco and its owners for past activities, a curious provision for a service agreement if the parties didn't previously know each other.

On June 16, 2015, Donald Trump announced his candidacy for President. Sater has a relationship with Trump that goes back to 2000. Over the years, Sater had partnered on real estate deals with the Trump organization, including a Trump Tower deal in Moscow that never came to fruition.  Sater had no reason to imagine that his relationship with Donald Trump had anything to do with being hired in the Ablyazov matter.[5]

---

[5]  Magistrate Judge Parker notes that the CAA was signed prior to Trump's official announcement that he was running for President.  However, by April or May of 2015, it was widely assumed that Trump would be running for President. The Clinton campaign was planning for a potential Trump candidacy well before Trump's official announcement.

After the CAA was signed, Sater had numerous in-person meetings with the Kazakhs' representatives, including Ron Wahid and Calvin Humphrey of Arcanum, both of whom have close ties to the Clinton administration. He also met numerous times with Matthew Schwartz and other attorneys of Boies Schiller, the law firm of choice for many high-ranking Democratic politicians. The significance of their political affiliation with the Democratic Party is apparent only in retrospect.

When Sater entered into the CAA in June 2015, he had every reason to believe that his interests were aligned with those of Arcanum and Boies Schiller. To all appearances, they were all on the same team, working to recover funds taken by Ablyazov.

From June 2015 until September 2018, Sater worked diligently and in good faith, assisting the Kazakhs in locating Ablyazov funds. Sater has extensive documentary evidence, including audio recordings, proving that Sater provided detailed information and a number of key witnesses previously unknown to the Kazakhs and their agents Arcanum and Boies Schiller.

In or about October 2018, the Kazakh Parties purported to terminate the CAA based on their manufactured claim that they were unaware that Litco was owned by Sater.  In reality, the Kazakh Parties' agent, Arcanum, was fully aware of Sater's identity.  Some six months after Sater caused Litco to bring action to enforce the CAA in AAA arbitration, the Kazakhs brought the instant action as a retaliatory measure to avoid paying Litco the money that it earned.

### E.    The FBI 302

Stunning FBI disclosures confirm that Arcanum, the Kazakh Parties, and their counsel Boies Schiller were not acting in good faith. The Kazakhs' breach of the CAA was only the

---

*See*, e.g., https://observer.com/2016/10/wikileaks-reveals-dnc-elevated-trump-to-help-clinton/

beginning of their treachery. While Sater was helping the Kazakhs track down Ablyazov's stolen money, FBI documents reveal that the Kazakhs were playing a double game, pretending to work with Sater while actually conducting an espionage operation against Sater.[6]   The Kazakhs' objective was to illegally influence the 2016 U.S. Presidential Election by obtaining information from Sater to politically damage Donald Trump.

The spy operation was nominally overseen by Karim Massimov, then Chairman of the Kazakh KGB, direct successor to the old Soviet KGB apparatus. It was overseen on a day-to-day basis by his henchman Kenes Rakishev, Chairman of BTA Bank, known in Kazakhstan as "Massimov's Wallet."  Numerous Kazakh sources have told Sater that in reality, Massimov was taking orders from his old bosses at the Kremlin and directing Rakishev accordingly.

The operation was carried out by Arcanum (the private intelligence firm staffed by Clinton administration associates) and Boies Schiller in collaboration with Christopher Steele (**Steele**), author of the infamous and now discredited dossier about Trump's fictitious contacts with Russia (the **Steele Dossier**).  The Steele Dossier was part of a disinformation campaign to smear Trump with accusations of Russian interference in the 2016 U.S. Presidential Election (the **Russian Collusion Hoax**).

By myriad acts and omissions, Arcanum, the Kazakh Parties, and their counsel Boies Schiller fraudulently concealed their double game from Sater. From 2015 to 2018, they led Sater to believe that they were working hand-in-hand on the Ablyazov asset recovery project when, in fact, the Kazakh KGB had weaponized Arcanum and Boies Schiller against Sater and Trump.

---

[6]     The FBI 302 is annexed to Sater's Proposed Counterclaims.  Docket No. 362-2 at pp. 28-55 (with the relevant content on page 54).

Their fraud resulted in the Kazakh KGB gaining access to confidential information about Sater, his contacts around the world, his dealings with Donald Trump, and many other subjects.

The Kazakh KGB used Arcanum as its agent to pass the fraudulently obtained information to Steele.  The information was then passed to the FBI, DOJ and numerous news sources.  In December 2015, confidential information about Sater was leaked to Brian Ross of ABC News. Soon thereafter, Brian Ross broadcast an innuendo-laden hatchet job on Sater (the **_Brian Ross Smear_**) that falsely and maliciously painted Sater as a Trump-connected Russian mobster, laying the groundwork for the Russian Collusion Hoax.  The Brian Ross Smear started an avalanche of false reports and outright libel, all to create a cloud of suspicion that Trump was beholden to shadowy Russian interests.  The Russian Collusion Hoax, in part a product of a Kazakh KGB operation, ushered in a new era of American McCarthyism, with supporters and allies of Trump unfairly portrayed as Russian stooges and traitors.

Sater's reputation was irreparably damaged. After Trump won the 2016 election and the Russian Collusion Hoax reached new levels of hysteria, death threats forced Sater's wife and children to live under different names. Over several years, the emotional and financial strain of relentless media attacks destroyed Sater's marriage. Meanwhile, Sater's business is in ruins because of the disinformation operation waged against him, which the world will now learn was funded and sponsored by the Kazakh KGB.

The Kazakhs meddled in the 2016 U.S. presidential election as a cynical ploy to curry favor with Hillary Clinton, who they believed would defeat Trump. When Trump shocked the world by defeating Hillary Clinton, the Kazakh KGB doubled down, promoting the Russian Collusion Hoax that triggered the appointment of Robert Mueller as Special Counsel in May 2017. The hoax

persisted until March 2019, when Robert Mueller issued a report finding no evidence of Russian collusion.

**F.      The Kazakh Parties Hire Greenberg Traurig as
          Settlement Counsel**

Shortly after learning of the FBI 302 and Arcanum's dirty tricks, Sater engaged the undersigned counsel because of their experience and relationships with Kazakh business and government leaders. Sater sought to determine, among other things, whether the Kazakhs had directed Arcanum to spy on Sater.  American and Kazakh sources in a position to know identified Karim Massimov, head of the Kazakh KGB, as the individual directing both Arcanum's activities in the US and the Kazakh Parties' legal efforts against Sater.

A number of Sater's personal contacts offered to explore settlement possibilities for Sater. Each time, they expressed initial optimism, only to return empty-handed, stating that the nominal decision makers were receiving directions from other sources "higher up" who categorically refused to settle. After further inquiries, these sources "higher up" were determined to be the Federal Security Service of the Russian Federation (FSB), the direct successor of the Soviet KGB whose former chief, Vladimir Putin, now rules Russia.

However, one American source, who had been a highly placed official in the Clinton and Obama Administrations, was able to convince Massimov that it was in his interest and Kazakhstan's interest to resolve the Sater case privately. In May 2021, within days of the official's discussion with Massimov, the Kazakh Parties hired Greenberg Traurig as settlement counsel.  In July 2021, Sater's counsel provided Greenberg Traurig with a draft pleading setting forth Sater's understanding of the facts, both in English and Russian, so that the decision makers in Kazakhstan including Massimov would know exactly what Sater believed had happened and was prepared to file.

In the Fall of 2021, the Kazakh Parties and Sater engaged Retired Judge Timothy Lewis as a neutral mediator. Sater and the Kazakh Parties met in Philadelphia for a full-day mediation session in December 2021. Following the mediation, Sater, the Kazakh Parties, and Arcanum entered into an interim tolling agreement so that the parties could continue discussions.

### G.    Chaos In Kazakhstan

In January 2022, Kazakhstan erupted into protests, resulting in President Tokayev firing his entire cabinet. Shortly thereafter, Russian special forces were called in to crush the protest. Former President Nazarbayev was removed from all remaining positions of power. Massimov, the head of the Kazakh KGB, was arrested and charged with treason. A large number of Nazarbayev loyalists fled to their Swiss and UK bank accounts. On January 26, 2021, Greenberg Traurig advised Sater's counsel:

> As you know, the situation in KZ remains fluid at the moment and there have been changes to almost every ministerial position. In our most recent interaction, our clients have determined that, given all that is unfolding in KZ, they cannot engage in further settlement discussions at present, including executing the longer-term tolling agreement. In fact, we have been instructed to stand down for now. We are quite disappointed by this turn of events but feel obligated to inform you. We remain in touch with the clients and should developments change we will bring that to your attention immediately.

Prior to January 26, 2022, Sater had every belief that a global settlement would be achieved. When Sater learned that the Kazakh Parties had pulled out of settlement talks, Sater filed his Proposed Counterclaims within approximately one week.

### H.    The Sanctimonious Kazakh "Corruption Fighters" Flee
### To Their Swiss Bank Accounts

This case and the Ablyazov case are part of a massive, worldwide litigation war that President Nazarbayev and his regime waged against Ablyazov and Khrapunov for a decade.  For

years, the Kazakh Parties, controlled by Nazarbayev loyalists, have pretended to be shocked (shocked!) to learn that a Kazakh oligarch would hide money overseas.

The Kazakhs' phony outrage looks ridiculous now that President Nazarbayev has been removed from power and Massimov jailed for treason. According to Organized Crime and Corruption Reporting Project (**OCCRA**) (a source cited frequently by in the Plaintiff's First Amended Complaint), Nazarbayev personally controls over $7.8 billion in assets that were diverted to private funds under his control.[7] Dozens of Nazarbayev loyalists have fled the country, taking vast amounts of money with them.

The Tokayev regime, having invited Russian special forces to slaughter hundreds of Kazakh protesters in the streets, is now purging Nazarbayev loyalists from the government and threatening to go after their money. Recently, the UK Labor Party has "named and shamed" 28 Kazakhs living in the UK, including President Nazarbayev's daughter and son-in-law, Dinara Nazarbayeva and Timur Kulibaev (Kazakhstan's richest man), Vladimir Kim (known as "Nazarbayev's Wallet"), mining tycoons Alexander Machkevich and Patokh Chodiev, and businessman Bulat Utemuratov, who was formerly Nazarbayev's chief of staff.

Nazarbayev and his loyalists now find themselves in the same position as Ablyazov and Khrapunov in 2009. Kazakh President Tokayev is seeking to force the Nazarbayev loyalists to disgorge assets or face the same legal torment as Ablyazov and the Khrapunovs. However, just in case the Court is tempted to imagine that President Tokayev is the real corruption fighter, Tokayev and his family also have enormous wealth outside of Kazakhstan, with Tokayev's finances intertwined with Nazarbayev's. Tokayev is pressuring Nazarbayev loyalists to hand their wealth

---

[7]   https://www.occrp.org/en/investigations/the-nazarbayev-billions-how-kazakhstans-leader-of-the-nation-controls-vast-assets-through-charitable-foundations

over to a "For the People of Kazakhstan Fund", which will, of course, be embezzled by Tokayev and his loyalists.[8]  There are no angels in this case.

> **I.    The Kazakh War Against Ablyazov and Khrapunov Has Failed**

The Kazakhs' war against Ablyazov and Khrapunov has amounted to a long and expensive series of defeats:

- In the Ablyazov Case, the Court has dismissed both Ablyazov and Khrapunov on jurisdictional grounds. *See* 15-CV-5345, Docket No. 1423 (March 29, 2021).

- In *City of Almaty v. Khrapunov*, 956 F.3d 1129 (9th Cir. 2020), the Ninth Circuit affirmed the dismissal of Almaty's civil RICO suit against Khrapunov.

- In a related case, *Republic of Kazakhstan v. Ketebaev*, No. 17-CV-00246-LHK (N.D. Cal. June 8, 2018), Kazakhstan's lawsuit against Muratbek Ketebaev and Ilyas Khrapunov was dismissed on jurisdictional grounds. In this case, Kazakhstan accused Khrapunov of hacking certain Gmail and Hotmail email accounts that Kazakhstan used for official government business.

- Paragraphs 65 of the First Amended Complaint refers to the Swiss investigation into the Khrapunov family, which was opened in 2012 at the behest of the Kazakhs. On or about November 21, 2019, the Office of the Attorney General of Geneva closed an investigation into suspected money laundering by Viktor Khrapunov without recommending any charges.[9] In January 2021, Viktor and Leila Khrapunov were granted asylum by the Swiss government on the grounds that they would face unfair treatment back in Kazakhstan.[10]

- Paragraphs 46 and 164 of the First Amended Complaint refer to Ablyazov's arrest in France. In October 2020, France granted Ablyazov political asylum. On January

---

[8]        https://www.thebureauinvestigates.com/stories/2022-02-17/kazakh-ex-dictator-used-uk-company-to-help-protect-8-billion-business-empire

[9]        https://www.swissinfo.ch/eng/khrapunov-affair_swiss-dismiss-kazakh-money-laundering-case/45382932

[10]        https://www.swissinfo.ch/eng/kazakh-political-exile-khrapunov-gets-asylum-in-switzerland/46268342

13, 2022, it was reported that the charges against Ablyazov had been dropped by the Paris appeals court.[11]  In a statement issued through his representative, Ablyazov added: "I am relieved by this decision, which finally gives me the opportunity to devote all my energy to my political fight for freedom and democracy in my country."

The Nazarbayev regime's war against Ablyazov and Khrapunov, like their claims against Sater, are a house of cards. The world has become wise to the Kazakhs' charade, which is why, around the world, investigations are being closed, cases being dismissed, and asylum granted to Ablyazov and Khrapunov in France and Switzerland.

## OBJECTIONS

I.    **Sater's Counterclaims Should Be Allowed Under Rule 16 Because Sater Exercised Diligence with Respect to His Proposed Counterclaims**

Defendant Sater respectfully objects to Magistrate Judge Parker's recommendation that Sater failed to demonstrate "good cause" for interposing his Proposed Counterclaims after the January 15, 2021 deadline contained in the case management order.  We take particular exception to the Magistrate Judge's conclusion that Sater was not "diligent" with respect to asserting his Proposed Counterclaims.  Here is a timeline of events:

| DATE | EVENT |
|------|-------|
| January 15, 2021 | Sater Defendants file their Answer to the First Amended Complaint.  (Docket No. 266) |
| January 21, 2021 | The FBI 302 is declassified and made public. |
| Late January 2021 | Sater learns of the FBI 302. |

---

[11]    https://www.barrons.com/news/france-drops-legal-probe-against-kazakh-opposition-figure-01642095607

| February 26, 2021 | Upon request of the parties, the deadline for fact discovery is extended to July 12, 2021.  (Docket No. 285) |
|---|---|
| April / May 2021 | Sater speaks with high-level contacts from the Obama Administration who, in turn, communicate with Massimov, the head of the Kazakh KGB. |
| May 7, 2021 | Sater engages counsel experienced in Kazakhstan matters and capable of reading and writing in Russian. |
| May 11, 2021 | Sater is introduced to Greenberg Traurig as settlement counsel for the Kazakh Parties. |
| May 29, 2021 | Upon request of the parties, the deadline for fact discovery is extended to November 9, 2021.  (Docket No. 299) |
| June / July 2021 | Sater provides FRE 408 settlement materials to Greenberg Traurig; parties discuss potential settlement structure. |
| September 2021 | At the request of Greenberg Traurig, the parties agree to engage a retired judge as mediator.  The parties agree upon Judge Timothy Lewis. |
| September 10, 2021 | Upon request of the parties, the deadline for fact discovery is extended to January 31, 2022.  (Docket No. 309) |
| October / November 2021 | The parties prepare mediation statements and other pre-mediation materials for Judge Lewis. |
| November 30, 2021 | Upon request of the parties, the deadline for fact discovery is extended an additional 30 days beyond 1/30/22.  (Docket No. 350) |
| December 21, 2021 | The parties meet in Philadelphia for an all-day mediation session with Judge Lewis.  At the conclusion of the session, the parties plan to have another session. |
| Early January 2022 | Massive protests in Kazakhstan result in President Tokayev firing his entire cabinet including Massimov, who was arrested for treason. |
| January 21, 2022 | The Kazakh Parties (Greenberg Traurig) enter into a 2-week tolling agreement with respect to Sater's Proposed Counterclaims. |

| January 26, 2022 | Greenberg Traurig advises Sater's counsel: "Given all that is unfolding in KZ, they cannot engage in further settlement discussions at present." |
|---|---|
| February 3, 2022 | Sater files motion to amend Answer to include the Proposed Counterclaims.  (Docket No. 356) |
| March 4, 2022 | Upon request of the parties, the deadline for fact discovery is extended to March 24, 2022.  (Docket No. 366) |
| March 23, 2022 | At oral argument, fact discovery deadline is extended an additional 90 days.  (Docket No. 381, pp. 32-33) |
| April 1, 2022 | Report & Recommendation Issued (Docket No. 379) |

Sater learned of the existence of his potential counterclaims only after the FBI declassified (and media outlets published) the FBI 302 in January 2021.  No amount of diligence would have enabled Sater to assert those counterclaims before the January 15, 2021 deadline.

The Proposed Counterclaims include potentially inflammatory allegations that the Republic of Kazakhstan had engaged in interference in the 2016 U.S. Presidential Election.  Given the potential geopolitical ramifications of this claim, Sater and his counsel took care to investigate the facts rather than rushing to get something on file.  This included Sater hiring new counsel with experience and contacts in Kazakhstan (including, in the case of Mr. Sima, the ability to read and speak Russian).

In May 2021, the Kazakh Parties engaged Greenberg Traurig as settlement counsel. Discussions with Greenberg Traurig led to the parties retaining Judge Lewis as mediator.  The parties repeatedly advised Magistrate Judge Parker of the ongoing settlement talks.  Since early 2021, Magistrate Judge Parker has adjourned the deadline for fact discovery six times, always on consent of both sides.

Magistrate Judge Parker faults Sater for not filing his Proposed Counterclaims sooner. However, "diligence" in this context required Sater and his counsel to investigate the claims carefully. *See Bridgeport Music, Inc. v. Universal Music Group, Inc.*, 248 F.R.D. 408, 414 (S.D.N.Y. 2008) (good cause for the delay where defendant reasonably waited until it could inquire further into the counterclaims before moving to add a new defendant). Moreover, while the parties were engaged in mediation before Judge Lewis, it would have been wildly inappropriate (and against Judge Lewis's wishes) for Sater to file his Proposed Counterclaims on the public docket in the middle of mediation.

The Magistrate Judge points to two short, unpublished, non-precedential opinions, *Gullo v. City of New York*, 540 F. Appx 45, 47 (2d Cir 2013) and *Thorpe v. Duve*, 2020 WL 372676 (N.D.N.Y Jan. 23, 2020) as standing for the proposition that mere settlement discussions do not excuse delay in seeking leave to amend. *See* R&R at 7. Both *Gullo* and *Thorpe* were Section 1983 prisoner cases. Neither involved a situation where (1) the potential amendment had serious potential geopolitical ramifications for a foreign nation; (2) counsel's investigation of the potential claims required extensive review of Russian language documents and interviews of individuals in Kazakhstan; (3) settlement discussions and mediation were initiated by the opposing party, at the direction of a very senior Kazakh government official; (4) a retired Federal judge was overseeing a mediation process and demanded strict confidentiality; (5) filing the Proposed Counterclaims on a public docket would blow up a potential global settlement; and (6) productive settlement talks were abruptly ended by a revolution in Kazakhstan.

Under the unique circumstances presented here, Sater should not be penalized for taking the time necessary to investigate his potential counterclaims; for engaging in a settlement process

that the Plaintiffs asked for; or for honoring a retired Federal judge's request that the mediation be conducted confidentially and that neither party do anything provocative.

Defendant Sater requests that the Court overrule the Magistrate Judge's finding that Sater's Proposed Counterclaims be denied under Rule 16(b) for lack of diligence.  Instead, the Court should find that under these circumstances, Sater acted reasonably in not filing his Proposed Counterclaims while mediation was pending before Judge Lewis.

## II.    The Court Should Defer Ruling on Joinder, or Alternatively, Should Make the Denial "Without Prejudice"

Defendant Sater also objects to Magistrate Judge Parker's determination that the proposed new counterclaim defendants (Arcanum and the Republic of Kazakhstan) cannot be joined under Rule 20.  Magistrate Judge Parker expresses concern over the delay and motion practice that would be involved in adding these two new parties:

> [T]he counterclaims would exponentially expand discovery, delaying this case potentially for years. This is particularly so given that the new proposed parties have not participated in any of the extensive discovery that already has occurred and would need time to catch up, but also because one of the new proposed parties is the sovereign nation of Kazakhstan. This would likely lead to extensive motion practice about jurisdiction.

We doubt that adding these two new parties would add "years" to discovery.  However, we acknowledge her broader point that new parties would delay the case and likely involve motion practice concerning jurisdiction and other matters.   We understand the reluctance to add complexity to a dispute that is already insanely complex.  We would like to suggest a compromise position.

The Court should overrule Magistrate Judge Parker's R&R to a limited extent.  Rather than denying our motion with prejudice, the Court should either (1) defer ruling on the joinder of the

two new defendants; or (2) deny the motion *without* prejudice.  The Court should allow Defendant

Sater to assert his Proposed Counterclaims against Almaty and BTA (who are already parties to

the case).  Defendant Sater will serve targeted discovery to determine whether viable claims exists

against Arcanum and Kazakhstan that would permit (or require) bringing them into the case as

counterclaim defendants.

## **CONCLUSION**

Based on the foregoing, Defendant Sater requests that the Court sustain his objections to

the R&R and:

1) Grant Sater leave under FRCP Rule 16 to serve his Proposed Counterclaims upon

   plaintiffs Almaty and BTA.

2) Defer ruling on Sater's FRCP Rule 20 motion to join Arcanum and Kazakhstan as

   counterclaim defendants; or alternatively, deny the motion without prejudice.

3) Grant such other and further relief as the Court may deem appropriate.


Dated:    New York, New York           JOHN H. SNYDER PLLC
            April 15, 2022

_____

John H. Snyder, Esq.
157 East 81st Street, Suite 3A
New York, NY 10028
(917) 292-3081
john@jhs.nyc

Thomas C. Sima, Esq.
102 Park Ridge Lane
White Plains, NY 10603
(212) 796-6661
tom@tsima.com