UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,

      Plaintiffs,

         -against-

FELIX SATER, DANIEL RIDLOFF, BAYROCK
GROUP INC., GLOBAL HABITAT SOLUTIONS,
INC., RRMI-DR LLC, FERRARI HOLDINGS LLC, and MEM
ENERGY PARTNERS LLC,

      Defendants.

19 Civ. 2645 (GJK) (KHP)

---

**FELIX SATER'S OPPOSITION TO PLAINTIFF'S
MOTION FOR A PROTECTIVE ORDER**

**PRELIMINARY STATEMENT**

Felix Sater submits this memorandum in opposition to Plaintiffs' motion for a protective

order filed on September 15, 2022 (Docket No. 420).

Mr. Sater has noticed the deposition of the Plaintiffs, and the Plaintiffs' motion seeks to limit

or entirely exclude highly relevant lines of inquiry that Mr. Sater intends to explore in depositions of

the Plaintiffs.

Plaintiffs' motion also seeks to vacate the notice of deposition against BTA owner Kenes

Rakishev as improperly served under Rule 30 of the Federal Rules of Civil Procedure.

For the reasons stated below, Plaintiffs' motion should be denied.

**BACKGROUND**

**I.      The Need to Challenge Plaintiffs' Assumptions**

Plaintiffs in this case have attempted to paint this lawsuit as a straightforward case involving

money laundering on the part of our client, whom they have taken great pains to paint as a criminal,

in every pleading assuming their allegations are already proven and merely waiting for the sign off of this court to confirm what everyone already knows.

In reality, the matter is far more complicated.  The strategy of the Plaintiffs has been to reinforce the assumption of criminality on the part of all involved in order to attempt to focus the court's attention on the last step of their allegations, namely, the receipt of monies by our client, Felix Sater.

However, the matter is not as black and white as the Plaintiffs continually seek to portray. They represent a fundamentally corrupt nation and players who are hiding behind a thin veneer of purported legality to in fact settle scores in a 1990s ex-Soviet gangster fashion.

By continually bringing our client's purported "criminal history" into the matter, they have opened the door to questions of criminal wrongdoing on the part of the plaintiffs as well.  This wrongdoing goes back to the very heart of this matter, namely, did Mukhtar Ablyazov steal any money from what was his own bank?  Were the plaintiffs materially damaged from his actions?  Did our client benefit from the actions that materially damaged them?

These are questions that our client wishes to investigate because if the underlying assumptions of the alleged wrongdoing of our client are faulty, then our client engaged in no wrongdoing and the case must be dismissed.

II.     **The Growth of BTA Bank**

It is undisputed that Mukhtar Ablyazov, together with Yerzhan Tatishev, purchased a bank that was roughly valued at $72 million[1] and turned it into a bank that showed assets of almost $20 **billion** by 2007[2].

---

[1] http://en.mukhtarablyazov.org/p/37,bank-bta
[2] https://bta.kz/en/press/news/2007/05/24/235/

This increase in value was accomplished despite the fact that Ablyazov was arrested for being in the political opposition to Nazarbayev[3], tortured and beaten while in prison[4], and ultimately freed based on a promise, wrung from him in prison by President Nazarbayev, that Ablyazov would not participate in politics.

The government of Kazakhstan illegally and improperly manipulated its own laws and used political pressure to ensure that all of its officials would act against Ablyazov at that time, and there is evidence Kazakhstan engaged in criminal manipulation again in 2008. This criminality on the part of Kazakhstan and its agents is fair to the scope of this trial.

### III.     The Disputed Nature of Ablyazov Assets

Ablyazov denies that any of the business dealings outlined in the complaint were improper or illegal[5]. Furthermore, when he fled Kazakhstan fearing for his life and freedom, he was never compensated for the loss of the bank when the Kazakh state nationalized it. This taking by the government of Kazakhstan permitted the national entities, such as Samruk-Kazyna, to manipulate records and "find" problems with the bank.

However, there is ample evidence that the bank's diminution in value was not due to mismanagement or corruption on the part of the bank's owners, who had every incentive to maximize the bank's value to increase their own net worth, but because of the global financial crisis of 2008. It was a well-known fact that BTA had invested heavily in real estate markets and ended up exposed as a result[6]. The situation with BTA bank was no different than the situation with banks such as Citibank or Wells Fargo.

---

3 https://www.refworld.org/docid/3edb47d81c.html

4 https://www.rferl.org/a/kazakhstan-nazarbaev-ablyazov/25010488.html

5 https://www.nytimes.com/2009/11/28/business/global/28kazakh.html

6 https://www.reuters.com/article/us-kazkommertsbank-btabank/kazkommertsbank-finalizes-deal-to-buy-stake-in-bta-bank-idUSBREA150VD20140206

The only difference was that Kazakhstan didn't institute a TARP-style program, but instead used the crisis as the pretext to squeeze business owners illegally, and to perpetuate the criminality of government officials in Kazakhstan, the same people who are behind the effort now to paint our client as a criminal.

Mukhtar Ablyazov fled Kazakhstan, and the Kazakh government used flimsy pretexts and sham courts to take his assets away from him without compensation. This criminality is now being obscured by attempting to pin the blame for the situation on the victim, Mukhtar Ablyazov.

**IV.          A Sham Transfer of BTA Bank**

The subsequent purchase by Rakishev of a stake in BTA Bank in 2014 for $465 million[7] represents a fire sale price. We intend to ask Rakishev who set the price and how this was determined to be the proper price for a bank that until recently was worth almost $19 billion and that international organizations had determined was still in good financial shape[8]. We believe that the criminal actors that stole BTA from Ablyazov also oversaw the transfer of the bank to Rakishev, potentially as a nominee for others, at a massively reduced price. Specifically, we intend to determine if Rakishev was acting on orders from Kulibayev, and we seek to uncover other details regarding the purchase of BTA in 2014.

As previously stated, these facts directly affect the case against our client. Criminality to steal a bank from its owner, failure to provide adequate compensation for the same, and transfer to the people who conspired against the owner, would invalidate the claims against our client in toto.

---

7  https://www.reuters.com/article/us-kazkommertsbank-btabank/kazkommertsbank-finalizes-deal-to-buy-stake-in-bta-bank-idUSBREA150VD20140206

8 http://en.mukhtarablyazov.org/p/37,bank-bta

**V.       Allegations of Bribing Witnesses**

Plaintiffs further intend to rely on testimony procured from Nicholas Bourg to support their

claims that Ablyazov is the bad actor and that Kazakhstan and its subdivisions, despite having a

reputation for corruption and criminality[9], are in fact innocent actors.  Our client has received verbal

assurances that Nicholas Bourg will testify that he was bribed $600,000 by Rakishev to further

Rakishev's actions on behalf of BTA against Ablyazov and our client.  This is material to the matter at

hand.

**ANALYSIS**

**I.       Motion Regarding Plaintiff Deposition Notices**

Many of the lines of questioning that Plaintiffs seek to exclude from deposition notices served

on the Plaintiffs are valid because our client wishes to question the Plaintiffs about matters that

directly affect the determination of whether Mr. Sater engaged in wrongdoing.

Beginning with the deposition topics that Plaintiffs have labeled as "irrelevant", we can

demonstrate that the questions to be asked are relevant independent from any "conspiratorial

counterclaims".  Mr. Sater is cognizant that his counterclaims were dismissed.

**A.       Asset Recovery**

The first topic Plaintiffs dispute is "Assets recovered by BTA in its worldwide effort to

recover assets purportedly stolen by Ablyazov."  This is highly relevant to our claim.  Have the

Plaintiffs succeeded in convincing courts in various countries of wrongdoing by Ablyazov?  Have

any of the matters been dismissed?  If so, were they dismissed due to a failure by the Plaintiffs to

demonstrate wrongdoing by Ablyazov, procedural failures or for other reasons?  Can the

Plaintiffs distinguish between Ablyazov and Khrapunov assets?  All of these questions have a

---

9 https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/kazakhstan/

5

direct bearing on our client's ability to argue that any assets invested by him on behalf of third parties are not "laundered" or "stolen".

### B.    Rakishev Relationships

The second topic relates to BTA's relationship with Rakishev and Massimov.  It is well known that Massimov and Rakishev worked together, something that is evident from the now-infamous photograph of the two of them with then Vice President Joe Biden and his son, Hunter Biden[10].  We understand that prior to Massimov's arrest in January 2022, the two men were jointly spearheading and controlling the efforts to recover Ablyazov assets.  The communications between them and BTA are important because it appears that BTA is acting on their orders.  This is also relevant to our analysis of whether the notice of Rakishev pursuant to Rule 30 is proper, because the mere fact that he does not hold an official title cannot be used as a pretext to ignore actual, real and daily control of BTA Bank in order to subvert a notice of deposition through semantic manipulations.

Kenes Rakishev is also a close personal acquaintance of Timur Kulibayev, who ran the state entity that took over BTA bank in 2009.  By some accounts, Rakishev is merely a front for Kulibayev[11,12].  We want to determine whether Rakishev's relationship with the bank appears to be independent of other actors.

While we are not aware of a direct connection of Rakishev with Russian President Vladimir Putin, it is noteworthy that the owner of BTA Bank is related by marriage to the long-standing (now retired) Ambassador from Kazakhstan to Russia, and we believe inquiring as to Rakishev's

---

10 https://nypost.com/2020/10/20/photo-biden-meets-hunters-alleged-partner-from-kazakhstan/

11    https://www.independent.co.uk/news/uk/buckingham-palace-prince-andrew-fixer-kazakhstan-a7041186.html

12 https://twitter.com/jardemalie/status/1288596037091942402?lang=en

relationship with Putin is worth the time for limited questions to determine that he is not acting in coordination with the Russian government.

The inquiry regarding Rakishev's connections to Chechen strongman Ramzan Kadyrov are relevant because Mr. Sater has reported to us that he was forced to hide in Israel for several months because Rakishev had, through Kadyrov, hired Chechen hit men to murder him, ostensibly before Plaintiffs claim that they became aware that Mr. Sater was the sole owner of Litco. By inquiring of BTA Bank what it knows regarding these connections, we can determine how much BTA knew regarding the ownership of Litco, which is directly relevant to our client's affirmative defense of release under the CAA. As a result, Rakishev's ongoing and personal relationship with Kadyrov[13] is relevant to the matter at hand for matters not relating solely to counterclaims.

### C.    Rakishev Compensation and Net Worth

The questions regarding Rakishev's compensation and net worth are also relevant, as they directly reveal the potential extent to which his ownership of BTA may be fictitious or nominal. If the money earned by him from BTA far exceeds his stated net worth and assets, it is indicative that he is acting at the behest of others. It also provides another method of determining the true value of BTA Bank and whether the claims against Ablyazov are based on temporary, low valuations of BTA value and fire sale prices offered to a political insider being granted assets as a favor from a corrupt government, or whether they represent fair market pricing and internationally recognized practices.

### D.    The FBI 302

Despite Plaintiffs' attempts to connect the Christopher Steele FBI 302 with Mr. Sater's dismissed counterclaims to the exclusion of any other purpose, the FBI 302 remains extremely relevant to Mr. Sater's affirmative defense of release under the CAA. If Arcanum, as appears from the

---

13 https://oligarchs.eu/oligarchs/kenes-rakishev-risks-us-sanctions-over-ties-to-chechen-tyrant/

mere existence of the FBI 302, disseminated information about Sater improperly, there is a high likelihood that it told BTA Bank who Sater was despite the denials that have come from Almaty and Astana.

### E.   City of Almaty Corruption

Plaintiffs repeat the allegation that former mayor of Almaty Viktor Khrapunov was corrupt, feigning ignorance as to the potential for any other corruption by any other Kazakh official.  This is clearly not the case, and the United States government, as well as respected international non-governmental organizations, have highlighted the endemic and ubiquitous nature of corruption in the Republic of Kazakhstan.

This is relevant to our questioning because we seek to determine if the City of Almaty is providing material inducement to BTA Bank to continue the instant action against our client, or in the alternative, if BTA is providing material inducement to the City of Almaty.  We are also interested in determining if Almaty contributed to the alleged bribery of Nicholas Bourg.  Finally, some of our questions will concern the alleged corruption of Viktor Khrapunov, namely, which lawsuits the City of Almaty has been able to successfully conclude in foreign countries against Mr. Khrapunov.

### F.   Allegations of Irrelevancy are Disingenuous

Plaintiffs' counsel stated in their memorandum at p. 10, "For example, even if Rakishev had a relationship of some sort with Putin or Kadyrov, or even if an agent of Almaty somewhere in the world at some point in time attempted to commit bribery or accept bribes, it is not information that is reasonably available to Plaintiffs."

This assertion is staggering in both its presumptuousness and its willingness to concede that Mr. Sater's questions may have validity.  This is because Plaintiffs' counsel know that Rakishev clearly has a very close and intimate relationship with Kadyrov at a minimum.  To assume that the

Plaintiffs will not have relevant information is a leap of faith, and undermines the entire purpose of

our client being able to obtain answers at a deposition regarding these matters.

###    G.        Allegations of Lack of Specificity

Plaintiffs' counsel argue that certain of the deposition subjects lack specificity.   These topics

all related to the lawsuits conducted by BTA and Almaty against Ablyazov and Khrapunov, their

relationship with Arcanum, and the nature of the assets allegedly stolen by Ablyazov.  The Plaintiffs'

memorandum states, at p. 12,

> For instance, it would be virtually impossible for Plaintiffs to prepare corporate
> witnesses to become knowledgeable regarding every misappropriation of assets
> from BTA by Ablyazov —in a scheme that by all accounts involved at least
> thousands of shell entities—or every lawsuit BTA has undertaken against him
> around the world over a thirteen-year period. These requests completely ignore the
> scope and complexity of Ablyazov's fraud, including the number of years over
> which it occurred and the extensive litigation involved in recovering those assets.

The Plaintiffs' argument here is disingenuous and overstates the necessary preparations

for a deposition on these matters.   Clearly, someone at BTA is aware of the lawsuits and their

status, as well as whether or not they have been successful.  No one would expect the bank to have

an official who remembers by heart every document produced in every court in every action, and

our request was not framed in a way that would or should lead any reasonable recipient to believe

that this level of detail would be requested.

We are certainly interested in finding out how and why "thousands of shell entities" were

formed, how Plaintiffs were able to uncover them and determine they were shells, and spend the

resources to make such determinations, if the scope is truly as titanic as the Plaintiffs have

described.  We believe that there is an element of hyperbole at play here, designed to cut off our

legitimate questions by exaggerating the scope of the questioning anticipated to make it

impracticable in the Court's eyes.

**II.      Motion to Vacate Rakishev Deposition**

Plaintiffs' counsel have stated in their memorandum at p. 13 that "[a]s a shareholder, even as majority shareholder, Rakishev's rights are limited to matters of high level corporate governance. He has no ability to control decision-making at the corporate level or to exercise judgment or discretion on the part of the corporation. Nor can the corporation exert any control over him."

As we have previously stated, we believe that this is an obfuscation designed to forestall precisely the sort of Rule 30 deposition that we have served on BTA for his testimony.  The mere failure to hold an official title does not mean that he has ceded any day-to-day control of the bank to others.

Rakishev is vital to our client's affirmative defenses.  It is well known that Rakishev and Massimov were in charge of the search for Ablyazov assets.  Sater's company, Litco, entered into a Confidential Assistance Agreement to help them uncover the assets.  Regardless of whether or not they were illegally obtained, Sater was willing to identify such assets because the Kazakhs offered him compensation.  It is vitally important that Sater have the opportunity to ask questions of Rakishev regarding the CAA and Litco, and Rakishev's knowledge of the same.  As the plaintiffs deposed non-party Litco and asked a number of questions regarding the CAA, the opened the door to further questioning on that subject, and the subject is in any event key to affirmative defenses raised by our client.

<u>**CONCLUSION**</u>

Based on the foregoing, Defendant Felix Sater requests that the Court deny Plaintiffs' motion for a protective order.

Dated:     New York, New York
             September 30, 2022

JOHN H. SNYDER PLLC

By: _____

John H. Snyder
Thomas C. Sima
555 Fifth Avenue, Suite 1700
New York, New York 10017
Tel: (212) 856-7280
Fax: (646) 304-9230