```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                          Docket #1:19-cv-02645-
  CITY OF ALMATY, KAZAKHSTAN, et al., :  JGK-KHP

                    Plaintiffs,     :

   - against -                      :

  SATER, et al.,                    :  New York, New York
                                       August 23, 2022
                    Defendants.     :

------------------------------------ :


                       PROCEEDINGS BEFORE
               THE HONORABLE KATHARINE H. PARKER,
                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:          BOIES SCHILLER FLEXNER LLP
                         BY:  CRAIG A. WENNER, ESQ.
                              ERICA SWEETING, ESQ.
                         55 Hudson Yards
                         New York, New York 10001

For Defendants Sater,    JOHN H. SNYDER PLLC
Ridloff, Sater parties:  BY:  JOHN HOOVER SNYDER, ESQ.
                         555 Fifth Avenue, Suite 1700
                         New York, New York 10017




Transcription Service:   Carole Ludwig, *Transcription Services*
                         155 East Fourth Street, #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771


Proceedings recorded by electronic sound recording; Transcript
produced by transcription service.
```

## INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

```
 1                      PROCEEDING                 3

 2          THE CLERK:  Calling case 19cv2645, City of

 3  Almaty, Kazakhstan v. Sater.  Beginning with counsel for

 4  the plaintiffs, please make your appearance for the

 5  record?

 6          MR. CRAIG WENNER:  Good morning, Your Honor,

 7  Craig Wenner, Erica Sweeting from Boies Schiller Flexner

 8  for plaintiffs BTA Bank and City of Almaty.

 9          THE COURT:  Good morning.

10          MS. ERICA SWEETING:  Good morning.

11          THE CLERK:  And counsel for defendants, please

12  make your appearance for the record.

13          MR. JOHN SNYDER:  Hello, Your Honor, John

14  Snyder, John H. Snyder PLLC, counsel for Felix Sater,

15  Dan Ridloff, and the other Sater parties.

16          THE COURT:  Okay, good morning still.  So I

17  received plaintiff's letter from August 19 setting out

18  various issues.  I guess the biggest issue concerns the

19  privilege log related to the Herz production.  And I

20  wanted to understand what's going on.  Let me first hear

21  actually, Mr. Snyder, from you on this.

22          MR. SNYDER:  Sure.  Thank you, Your Honor.

23  Hold on, there we go.  At issue are, as I understand it,

24  about 1,500 documents involving Arnie Herz who was a

25  lawyer.  We encountered some issues getting the data.
```

1

2  But the bigger issue that we encountered, Your Honor,

3  was Mr. Sater wanted to talk to Mr. Herz about some

4  issues, and Mr. Herz was very, very sick, is very, very

5  sick, as I understand.  And so that's what slowed us

6  down.

7          Now, I learned this morning for the first time

8  that a privilege review may have already been done on it

9  --

10          THE COURT:  Okay.  Yeah, because I --

11          MR. SNYDER:  I haven't confirmed that.  That's

12  --

13          THE COURT:  I thought Moses & Singer or I

14  thought Ms. Levi had at some point done a privilege

15  review.  That was why this production was taking so long

16  because these records were subpoenaed a long time ago,

17  and they were supposedly being screened for privilege I

18  think by that firm.

19          MR. SNYDER:  So I have to investigate that,

20  Your Honor, because if it's already been done, then, of

21  course, you know, wonderful, but if not, then we have to

22  figure out how to get it done.

23          THE COURT:  Are the documents on an electronic

24  review platform?

25          MR. SNYDER:  They are on a review platform that

```
 1                        PROCEEDING                    5
 2  I think Blank Rome has.  I'm working on getting them on
 3  to my own platform.
 4            THE COURT:  Okay.
 5            MR. SNYDER:  But that we had some technical
 6  issues on that.
 7            THE COURT:  Because the system should be able
 8  to produce some kind of log without you having to
 9  manually enter a lot of stuff, and you could agree on
10  certain components of metadata to potentially minimize
11  the work in logging the documents.
12            MR. SNYDER:  Right.
13            THE COURT:  So can you – I'd like to get this
14  resolved sooner rather than later because discovery
15  really is supposed to be ending in this case.  Can you
16  get – I recognize this is the final weeks of August
17  because the holiday.  I'm wondering if you can get this
18  resolved, say, by September 15?
19            MR. SNYDER:  Your Honor, I can commit to use
20  best efforts to do that.  There are – I have to get in
21  touch with a number of people, and as you noted, it is
22  the end of August.  But I will – how about this?  I can
23  certainly commit to giving you, and Mr. Wenner, a good
24  status update by September 15.
25            THE COURT:  Well, I'm going to require a log,
```

2   whether that log is – I'm going to require some kind of

3   log by September 15.  That's three weeks, and it gives

4   you 15 days into September, and at least, almost a week

5   and a half after Labor Day to get this done.  At the

6   very least you should be able to spit out a computer

7   log.  It may not have everything, but it should, you

8   know, and you should be able to get metadata such as to,

9   from, date range, you know, names on the correspondence,

10  re line, that kind of information should be able to just

11  be generated relatively easily.

12          MR. SNYDER:  Of course, assuming that the

13  underlying substantive review's been done.

14          THE COURT:  Well, aren't the only documents

15  that have held back, the ones that have been held back

16  by some privilege?  Because a lot of Herz documents have

17  been produced.

18          MR. SNYDER:  Right.  Well, so it's, the

19  project, as I understand it, is to look at documents

20  that have been previously withheld as privileged and

21  determine whether we consider them privileged as to us.

22          THE COURT:  Right, but what I'm hearing is that

23  plaintiffs, there was no privilege log ever produced for

24  those documents.

25          MR. SNYDER:  Oh.  Oh, oh, oh, oh.  Sorry,

```
 1                        PROCEEDING                    7
 2   Judge, I totally misunderstood.
 3            THE COURT:  Isn't that right, there's no
 4   privilege log for those documents?
 5            MR. WENNER:  Your Honor, I did not want to
 6   interrupt, but I think I can help.
 7            THE COURT:  Okay.
 8            MR. WENNER:  I'm probably the only person with
 9   longevity who's carried this through from the original
10   subpoena.  If I could, if I could hand up to the Court
11   just a large 2022 letter from plaintiffs to defendants
12   and third parties.  What had had happened during the
13   pandemic, Your Honor, was that the third parties with an
14   interest in these communications --
15            THE COURT:  Right.
16            MR. WENNER:  -- namely, Triadu and Ilyas
17   Khrapunov and entities associated with them, and then
18   Felix Sater and his associates and entities, and we had
19   - those, you can think of them are three groups -
20   Triadu, Khrapunov, and Sater - they had done a privilege
21   review.
22            THE COURT:  Right.
23            MR. WENNER:  And that was with Jill Levi.
24            THE COURT:  Right.
25            MR. WENNER:  And they produced a metadata chart
```

1

2  of all withheld communications, that is as you described

3  which was the generated data which is a middle ground

4  because Your Honor well knows it does not have all the

5  information that local rules require.  For example, the

6  re line might just be re or forward.  That might not

7  disclose who the people are or what the subject matter

8  is.  There's no way to challenge it.

9       So we went through that log of I think it was

10  approximate 2,600 documents, that includes attachments,

11  and we wrote a couple of letters, this is our most

12  recent one, specifically challenging line items,

13  documents on it.  When we wrote this letter, we then

14  engaged in a meet and confer with Triadu who responded

15  to us, and we then challenged their privilege calls.

16  They went back, they identified on our – we don't know

17  who asserted which privilege, so we challenged a bunch

18  of documents.  Triadu identified the ones from their

19  review that they had asserted privilege over.  They

20  confirmed whether anyone else had asserted privilege

21  over them, and then they produced to us ones where they

22  compromised, and then they produced additional

23  information for us to evaluate the privilege on those

24  remaining documents.

25       We never received a response from Mr. Sater's

1

2  counsel or from the Khrapunovs.  So we don't know of

3  those documents we challenged were on the log itself

4  which ones Mr. Sater has asserted privilege over.

5          Now, I think the compromise for the metadata

6  chart worked well for third parties, it minimized their

7  burden.  They likely are done except for Mr. Khrapunov

8  because I don't know yet if he's continuing to assert

9  privilege, he hasn't responded, indicating at least that

10 he's not currently asserting privilege over the ones I'm

11 challenging.

12          THE COURT:  Well, what privilege, I mean does

13 he have - are any of these with his lawyers?

14          MR. WENNER:  Well, I would argue, Your Honor,

15 that no, Mr. Khrapunov has no privilege with Arnie Herz.

16 So he did not respond.  I expect --

17          THE COURT:  Herz wasn't his lawyer.

18          MR. WENNER:  No, and I may get all the

19 documents I want from Triadu or Mr. Sater.  So that's

20 why I haven't yet challenged or brought Mr. Khrapunov

21 back in court.

22          THE COURT:  So on this letter what are ones

23 that you need Mr. Snyder to take a look at?

24          MR. WENNER:  I need him to respond and tell me

25 two things.  What are the documents on the metadata

PROCEEDING                    10

1    chart that he has asserted privilege over.

2         THE COURT:  That Sater has.

3         MR. WENNER:  Sater or his clients have asserted

4    privilege over.

5         THE COURT:  Okay, so --

6         MR. WENNER:  I don't know which party's

7    asserting privilege.  So I need to know on the chart

8    which entries --

9         THE COURT:  But do you already know on the

10   chart which ones Triadu was asserting?  I mean, in other

11   words, does the chart need to be updated based on what's

12   happened with Triadu?  Because that will make it easier

13   for Mr. Snyder.

14        MR. WENNER:  I'm not sure it will, Your Honor,

15   because Triadu may be asserting privilege or not, that's

16   independent of whether Mr. Sater believes he can assert

17   a privilege or not.  So even if Triadu is not asserting

18   privilege, or if they, it's a different question as to

19   whether Mr. Sater is asserting privilege.

20        MR. SNYDER:  Just a point of clarification,

21   question.  When you say a chart, you're referring to,

22   there's an Excel spreadsheet?

23        MR. WENNER:  Yes.

24        MR. SNYDER:  Okay.

```
 1                        PROCEEDING                    11
 2              THE COURT:  Can you provide that spreadsheet to
 3   Mr. Snyder --
 4              MR. WENNER:  Yes, he --
 5              THE COURT:  -- later today.
 6              MR. WENNER:  I will certainly provide it again.
 7              THE COURT:  Okay.
 8              MR. SNYDER:  Okay, and then so basically
 9   anything on that Excel spreadsheet that we were
10   asserting privilege as to, we indicate, and if we're not
11   asserting privilege to it, we indicate that.
12              MR. WENNER:  Right, but then I would ask, and I
13   think it's appropriate for a party, is that for those
14   documents that they're asserting privilege over, if the
15   metadata chart does not provide the information that a
16   log would, that they just supplement those rows so that
17   you can determine --
18              THE COURT:  These are the rows that you're
19   concerned with.
20              MR. WENNER:  Those are the rows that we were
21   able to challenge based on the metadata chart.
22              THE COURT:  Okay.
23              MR. WENNER:  And then I think it's appropriate
24   for the party, when Mr. Sater identifies these are the
25   rows we asserted privilege over, if a row just has no
```

```
 1                          PROCEEDING                    12

 2   information on it --

 3            THE COURT:  So you don't know, you don't even

 4   know if it's attorney-client or work product, for

 5   example.

 6            MR. WENNER:  In many instances.  And some we

 7   can identify who the people are and we know who they

 8   are.  In some the subject line is sufficiently

 9   descriptive.  In others it's not.

10            THE COURT:  Is there a column that says

11   attorney-client or work product?

12            MR. WENNER:  No.

13            THE COURT:  Okay.  So, Mr. Snyder, you need to

14   provide on the chart whether you're asserting attorney-

15   client or work produce or both or some other privilege

16   as to the items on that log.

17            MR. SNYDER:  Right.

18            THE COURT:  That is what I want you to do by

19   September 15.  Do you have those documents?  Those are

20   the ones getting loaded to your --

21            MR. SNYDER:  Those are the ones getting loaded,

22   Your Honor.  I will do everything I can to do that and

23   that's all I can promise.

24            THE COURT:  Fifteen hundred documents?

25            MR. SNYDER:  That's my understanding.
```

```
 1                    PROCEEDING                13
 2         MR. WENNER:  That may be what Mr. Sater
 3  asserted privilege over or that's the emails with their
 4  attachments.  I've never seen them.
 5         THE COURT:  Well, you know what – you know
 6  what's on the chart.
 7         MR. WENNER:  The metadata chart to my
 8  recollection is approximately 2,600 rows.
 9         MR. SNYDER:  Okay.
10         MR. WENNER:  But that includes – that includes
11  empty attachments.  Sometimes an email has meaningless
12  attachments to it that are just data that have no
13  content.  Sometimes there are multiple attachment to an
14  email.  So when Mr. Snyder says 1,500, I'm not sure how
15  he's counting, but the chart has 2,600 rows.
16         MR. SNYDER:  That was the number somebody told
17  me.
18         THE COURT:  Okay.  Okay.  All right, fine, so
19  I'm setting that September 15 date.
20         Now, also I guess there's an issue with Mr.
21  Sater's responses to interrogatories and production of
22  audio recordings.  What's happening with that?
23         MR. WENNER:  Our position's very simple, Your
24  Honor.  The interrogatory responses we got, every single
25  one says Mr. Sater's preparing a supplemental production
```

```
 1                      PROCEEDING                 14

 2  and we'll supplement his responses.  That's all we've

 3  been asking for.  If his response to the interrogatories

 4  is complete, that's fine, that's his answer, but every

 5  single response says he's preparing more productions,

 6  more documents, and will supplement his answers.

 7            THE COURT:  And what about the audio

 8  recordings?

 9            MR. WENNER:  The audio recordings Mr. Snyder

10  said in an email that he'd be personally visiting the

11  storage locker and would be reporting back on its

12  contents.  Mr. Sater has been deposed on them, so we

13  want to test his testimony.  The only evidence we've had

14  about the content of them is what Mr. Sater has

15  described.

16            THE COURT:  Well, okay.

17            MR. WENNER:  And so based on Mr. Snyder's offer

18  to view them himself, we've been following up with him

19  on that offer.

20            THE COURT:  Where is the storage locker?

21            MR. WENNER:  He has several.  Presently it's in

22  --

23            THE COURT:  In New York?

24            MR. WENNER:  The New York area --

25            MR. SNYDER:  Somewhere way out in Brooklyn.
```

```
 1                         PROCEEDING                    15

 2              THE COURT:  Okay, but in New York.

 3              MR. SNYDER:  But it is in New York.

 4              THE COURT:  Okay, fine.  So I'm going to give

 5   you until September 30 to do the supplemental responses

 6   because I want you to get the privilege issue done

 7   first.  Or say that there's no supplement.

 8              MR. SNYDER:  Now, Your Honor, part of what

 9   we're waiting on to do the supplement is to depose Kenes

10   Rakishev as well as the 30(b)(6) for BTA Bank.  Also we

11   have some outstanding interrogatories and document

12   demands that we think will bear upon our responses.

13              THE COURT:  Okay, when were those served?

14              MR. SNYDER:  March I think.

15              THE COURT:  Well, why hasn't plaintiff

16   responded to them?

17              MR. SNYDER:  Go ahead, Craig.

18              MR. WENNER:  We have served responses and

19   objections, and for I want to say the vast majority of

20   what Mr. Sater's asked for it's documents that have

21   already been produced.  We have narrowed our disputed

22   outstanding issues with Mr. Sater's counsel to a

23   handful, and we have gone back and forth on objections

24   narrowing the issues that we think either we should not

25   be compelled to provide or he believes that we should.
```

 1

 2        To give an example, those interrogatories and

 3   RFP's were issued at the time he had his pending motion

 4   to amend the complaint, and included in the disclosure

 5   requests was information relating to his counterclaims.

 6   That information is no longer relevant.

 7        At the boundaries Mr. Snyder and I disagree

 8   about a couple of topics for the 30(b)(6) witnesses and

 9   a couple of requests for disclosures.  And we had – Mr.

10   Snyder had responded to us in I believe May narrowing

11   the topics that were in dispute, and we responded to

12   that, and he has not followed up with us on that issue.

13        We will produce our witnesses, and they'll be

14   deposed on numerous topics.  The question is whether we

15   move for a protective order on a couple of topics, a

16   handful of topics that are in dispute.  And we've sent

17   Mr. Snyder our position on these remaining topics, and

18   we were speaking earlier, Mr. Snyder's going to respond,

19   we'll meet and confer likely next week and be able to

20   identify then whether plaintiffs will move for a

21   protective order on a couple of topics or whether we

22   will just allow the deposition to proceed.

23        And then similarly on the RFP's and

24   interrogatories, there's a couple of issues at the

25   margin where Mr. Snyder after a meet and confer will

1                         PROCEEDING                    17

2   decide whether to move to compel or whether we'll

3   compromise on those.

4           THE COURT:  Well, look, I want these

5   depositions conducted either the week of September 19 or

6   26 because you need to bring discovery to a close.

7           MR. WENNER:  Understood, Your Honor, and we

8   will coordinate with our clients.  These are going to be

9   - I have to determine whether the witnesses will be, and

10  discuss with Mr. Snyder, whether they'll be flying here

11  to New York or whether they'll be remote.

12          THE COURT:  I mean remote is easier to

13  schedule.

14          MR. WENNER:  We may want them present just to

15  prepare with them in person beforehand.  Because they're

16  30(b)(6) depositions, so it's a little bit more involved

17  to --

18          THE COURT:  That's up to you.

19          MR. WENNER:  Okay.  Yes, Your Honor.

20          THE COURT:  That's up to you.  You can do it in

21  person if you want.  Because these are going to be,

22  well, the 30(b)(6) is your witness, so you can obviously

23  bring them here.  What about Sater's ex-wife, is she

24  here in New York?

25          MR. SNYDER:  She's in New York.  She's quite

1

2   sick and has not been in a physical condition where she

3   can testify.

4          THE COURT:  Well, could she do - do you want to

5   think about contention interrogatories instead, would

6   that be easier for her to accommodate her illness?

7          MR. SNYDER:  Well, that would be much easier if

8   they were amenable to that.

9          MR. WENNER:  Your Honor, I'm not sure that we

10  are.  We've offered to do short sittings of the

11  deposition remotely at her convenience --

12         THE COURT:  What's - what information does she

13  have that's so important?

14         MR. WENNER:  So part of what occurred in

15  several of these deals is that Mr. Sater used associates

16  in other companies and attorney escrow accounts and his

17  ex-wife, her companies, to receive funds, move funds

18  through those companies and conceal payments back to

19  himself as part of the concealment and his handling of

20  the proceeds of the sales, and it's his means of

21  personally profiting from the deals.  She has evidence

22  about the TriCounty Mall proceeds where she received

23  approximately I believe $20 million that were used to

24  pay off a Triadu subsidiary in a settlement.  And that

25  concealment of that payment and the movement of funds

PROCEEDING                    19

through her account is what we'll be deposing her about.

And I'm concerned about doing contention interrogatories, Your Honor, frankly, because Mr. Sater is in direct communication with her about her testimony, and, for example, Mr. Snyder produced to us at our request text messages between Mr. Sater and Ms. Gutsko about her deposition and about plaintiff's conduct and his allegations against us.  I'm concerned that the contention interrogatories will be not just her statements but her statements with Mr. Sater's input.

THE COURT:  All right, but the bank records are showing these funds going in and out.  Is there anybody else who can testify?  I mean how critical is her testimony because if you have certified bank records showing this flow of funds, you know, what else is – what she knew is sort of less important than what Sater knew and was doing, right?

MR. WENNER:  Well, the transactions lack economic substance, and that's the testimony that we want to elicit.  These are transfers of funds, they're not transactions or loans among companies.  It establishes that he's not actually using these corporations in the proper corporate form.  He's using them to conceal the movement of funds.  So the questions

```
 1                          PROCEEDING                20

 2   to her about what was the granola business interest in

 3   this money, what was the basis for you receiving it,

 4   this is a small company, I'm not aware of anyone else

 5   who would know this information about it.  So it can be

 6   a very targeted deposition.  That's why we've been,

 7   that's why we're willing to make it very short.  It's

 8   about this transaction.

 9             THE COURT:  Okay.

10             MR. WENNER:  And about what she understood the

11   purpose of it was.

12             THE COURT:  Is she in the hospital?

13             MR. SNYDER:  She's been in and out of the

14   hospital.  I really don't want to go into detail about

15   her condition, but suffice it to say it's quite serious

16   and requires her to take medicine that makes her not a

17   good witness.

18             THE COURT:  Well, she may just become available

19   because of this medical, these medical issues.  So --

20             MR. SNYDER:  I hear that's possible.

21             THE COURT:  This is, this, you know, plaintiffs

22   are going to have to think about what, how they want to

23   deal with this.  Maybe it's a request to admit.  Maybe

24   it's something simple in light of her medical status.

25   Right?  Because --
```

```
 1                        PROCEEDING              21
 2            MR. SNYDER:  And I'm happy to meet and confer
 3   and, you know, you can, if we can figure out the core of
 4   what you really need is, I'm happy to help.
 5            MR. WENNER:  Your Honor, we'll take that under
 6   advisement, and certainly I have no interest in putting
 7   someone at risk or pressing them for no reason, but Mr.
 8   Sater's credibility will be a central issue, and I
 9   believe --
10            THE COURT:  Sure.
11            MR. WENNER:  -- it's incumbent upon me to find
12   that evidence that impeaches his credibility and shows -
13   -
14            THE COURT:  But he's transferring money to the
15   granola company.
16            MR. WENNER:  That's right, Your Honor.
17            THE COURT:  Do you have all the records of the
18   granola company, the bank records of the granola
19   company?
20            MR. WENNER:  Not from – the bank records that
21   we received both from banks and from Ms. Gutsko don't go
22   back, they stop right – as far back in time as we can
23   go, we don't get that transaction.
24            THE COURT:  I see.
25            MR. WENNER:  So it's – I believe it's proper
```

```
 1                          PROCEEDING                22
 2    for me to push to get this, and I understand the
 3    difficulty that she faces, and I'm not - that's why I
 4    haven't moved to compel, so I'm not trying to make it
 5    difficult for her, but I do believe it's something that
 6    we should be entitled to.
 7              THE COURT:  All right.
 8              MR. WENNER:  But we will certainly think hard
 9    about alternative ways.
10              THE COURT:  I mean she could be deposed from
11    her home, for example, remotely so that you don't have
12    to go into her home if there's, you know, issues about
13    COVID, etc.  That's something you could think about.
14              MR. WENNER:  And that's what we have offered to
15    do, one hour remote in her home.
16              THE COURT:  Yeah, like maybe one hour.  It's
17    not too much time.  It actually may be less taxing just
18    to answer some questions as opposed to dealing with
19    drafts of answers to written requests.  Sometimes that's
20    more of a slog than actual just talking for an hour.
21              MR. SNYDER:  I've been leaving her alone, but I
22    will, Your Honor, I will get back in touch with her and
23    get an update on her condition, and if we can do the
24    one-hour bursts and keep it as narrow as we can, maybe
25    that's the easiest way.  I'll find out.
```

1

2          THE COURT:  Okay.  All right, so I'd like to

3   schedule another case management conference for the

4   beginning of October.

5          (pause in proceeding)

6          MR. SNYDER:  So, Judge, I have – oh.

7          THE COURT:  I'm just looking at the calendar.

8          (pause in proceeding)

9          THE COURT:  It's weird.

10         (pause in proceeding)

11         THE COURT:  Yeah, we can do that.  2 o'clock on

12  October 17.  It is Shemini Atzeret.  I don't know if

13  that's a problem for anybody here.

14         MR. SNYDER:  If Jason, I'm not sure about Jason

15  from MeM Energy who's not here today.

16         THE COURT:  If it's a problem, you can write to

17  me.  I'm going to schedule it for now.  Okay?

18         MR. SNYDER:  October 17 you said?

19         THE COURT:  At 2 p.m.  I want you all to be

20  wrapping discovery dealing with any remaining issues so

21  that you can close out all discovery by the end of the

22  October.

23         MR. WENNER:  Understood, Your Honor.  The one

24  caveat I would ask that we make is the Swiss depositions

25  where the Swiss court has entertained objections from

PROCEEDING                    24

the witnesses.  And there was correspondence back and

forth between the Geneva court and Judge Koeltl, and

most recently the Geneva court disclosed to us

Khrapunov's objection which then asked for a response to

that which we'll be providing.  We had originally asked

for that months ago, but the court, the Geneva court

denied our request waiting for us to see how Judge

Koeltl would respond.  So we are moving that along, but

we're at the whim of that court.

          THE COURT:  Yeah, I mean we can --

          MR. WENNER:  That should be the only remaining

issue that is left outstanding --

          THE COURT:  Right, prior to trial.

          MR. WENNER:  Yes.

          THE COURT:  Right, okay.  So Judge Koeltl will

ultimately be presiding over any trial in the matter, so

he can, you know, adjust the timing to that.  I don't

see a problem in allowing you to get that evidence once

it's obtained and utilize it.  So I won't cut off that

process.

          MR. WENNER:  Thank you, Your Honor.

          THE COURT:  Okay.  Anything further from

defense counsel?

          MR. SNYDER:  So, Your Honor, just to summarize,

```
 1                        PROCEEDING                 25
 2    September 15 we have to produce or provide the privilege
 3    logs for the Herz --
 4             THE COURT:  Or you can just produce those
 5    documents that you don't - obviously you don't have to
 6    log anything that you think (indiscernible) you have no
 7    objection to producing.
 8             MR. SNYDER:  Of course.  And produce the
 9    supplemental interrogatory responses the 30th.  So we
10    have two outstanding depositions.  We've got the
11    30(b)(6) --
12             THE COURT:  And I want BTA to produce its
13    witness in the last two weeks of September.
14             MR. SNYDER:  Okay, and also Kenes Rakishev, we
15    also noticed his deposition.  That would be those times
16    as well.
17             THE COURT:  Yes, I'd like you to get his
18    deposition.
19             MR. WENNER:  Your Honor, on Mr. Rakishev, this
20    has been the subject of a meet and confer with Mr.
21    Snyder.  Our understanding, where we left that, was that
22    he was going to determine whether he still needed that
23    deposition after deposing our witnesses.  And he can
24    correct me if I'm wrong obviously.  But we were prepared
25    to move for a protective order on his deposition based
```

```
 1                        PROCEEDING                 26
 2   on the overbreadth of what we understood would be the
 3   topics about which he'd be asked.
 4             THE COURT:  He's a fact witness, right?
 5             MR. SNYDER:  Yes.
 6             MR. WENNER:  I don't understand how, but he is,
 7   he would be appearing in his personal capacity, Your
 8   Honor, yes.
 9             THE COURT:  Okay, so, Mr. Snyder, what kind of
10   information does he have personal knowledge of?
11             MR. SNYDER:  He was personally involved in the
12   asset recovery effort.
13             THE COURT:  But this case concerns specific
14   deals that Mr. Sater was involved in, real estate
15   transactions, right?  That's what this case concerns.
16   So you're entitled to discovery that's relevant to the
17   claims and defenses in this case --
18             MR. SNYDER:  Yes.
19             THE COURT:  So how, what information do you
20   believe he has that goes to the elements of claims or
21   defenses in this action?
22             MR. SNYDER:  A whole range of things, Your
23   Honor, including the entire asset recovery effort that
24   this --
25             THE COURT:  Again, entire asset recovery effort
```

```
 1                         PROCEEDING                27

 2   is really not, that's not going to a claim or defense.

 3            MR. SNYDER:  Well --

 4            THE COURT:  What does he have knowledge about

 5   going to the transactions at issue and the defense of

 6   the transactions at issue?

 7            MR. SNYDER:  Well, Your Honor, he testified I

 8   think in 2017 as to his knowledge up to that point.  He

 9   has not testified after that.  And so there's no

10   testimony from him --

11            THE COURT:  But these transactions happened

12   before 2017.

13            MR. SNYDER:  Well, the transactions occurred,

14   yes, but then the asset, then the recovery effort --

15            THE COURT:  Again, the asset recovery --

16            MR. SNYDER:  -- postdated that.

17            THE COURT:  -- is not relevant to the

18   underlying transactions.  What the plaintiffs are trying

19   to ascertain and to demonstrate is that money that came

20   from BTA Bank was funneled through various shell

21   companies and used in real estate transactions that Mr.

22   Sater was involved in and that Mr. Sater knew it and was

23   helping to launder the funds --

24            MR. SNYDER:  Yes.

25            THE COURT:  -- and received some of, and, in
```

PROCEEDING                    28

1

2   fact, received some of the funds as di some of the other

3   defendants.  That's what they're trying to prove.  So I

4   haven't yet heard that the asset, the broader asset

5   recovery is neither here nor there to this claim.  He

6   needs to have information that's relevant to these

7   particular transactions or money that came from BTA Bank

8   and why that money, why he thinks that money is the same

9   money that was used in these real estate transactions,

10  that's the only area of relevant testimony that I can

11  think of.

12          MR. SNYDER:  Well, and obviously, Your Honor,

13  we'll see because we're going to take the 30(b)(6) of

14  them, and what I did say to Mr. Wenner, I said, I didn't

15  say that I thought that it would make Rakishev

16  unnecessary.  I said I'm happy to do that first, and to

17  the extent that we can have issues, answer questions,

18  answer, you know, and not have to have Mr. Rakishev

19  testify, then I'm all for that.  I'm all for

20  streamlining the deposition.  And as a matter of fact,

21  the 30(b)(6) is going to, you know, sort of shape what

22  we will ask Mr. Rakishev.

23          THE COURT:  Right.  But the broader assert

24  recovery is really way beyond the scope of what's

25  proportional and necessary in this case.  The fact

```
 1                    PROCEEDING                29
 2   inquiry needs to be on where the funds came from, what
 3   is the basis for these funds alleging to be any part of
 4   what Sater was doing.  That's really the key, you know -
 5   -
 6            MR. SNYDER:  Well, don't forget, Your Honor, we
 7   do have defenses.  We have the defense of the
 8   confidential assistance agreement --
 9            THE COURT:  Sure.
10            MR. SNYDER:  -- that that was a release.  We
11   have defenses of unclean hands --
12            THE COURT:  Yeah, you can ask about that, sure.
13            MR. SNYDER:  -- and those all, those involve
14   facts not in 2011.  Those involve facts in 2017, 2018,
15   2019.  And really those would be among the things that
16   we would be asking Mr. Rakishev.  Not so much the nuts
17   and bolts of this wire sent in 2011, what was that for.
18   More the affirmative defenses or just plain defenses.
19            THE COURT:  Well, sure, you're entitled to
20   discovery on your defenses, that's of course.  So if
21   there's questions relevant to those defenses, you are
22   entitled to explore those.  Okay, so I'll ask you to
23   meet and confer about that.  If you're going to move for
24   a protective order, then that motion needs to be filed
25   by September 15.  So you should meet and confer what the
```

```
 1                          PROCEEDING                  30
 2  scope of that, his testimony is going to be.
 3            MR. WENNER:  Thank you, Your Honor.
 4            THE COURT:  So any motion for a protective
 5  order, September 15; any response by September 30.  No
 6  reply.  Okay.  Other items, Mr. Snyder?
 7            MR. SNYDER:  I don't think so.
 8            THE COURT:  Okay.  Any other items for
 9  plaintiff?
10            MR. WENNER:  No, Your Honor, thank you.
11            THE COURT:  Okay, good to see everybody.  We're
12  adjourned.
13            MR. SNYDER:  Oh, just last question.
14            THE COURT:  Yes.
15            MR. SNYDER:  And this is not to put anybody on
16  the spot, but I do have to ask the question, my client
17  asked me to ask the question.  Relating to the security
18  of sealed filings, a lot of documents or a number of
19  documents in this case have been filed under seal.  In
20  January 2021 it was reported that there was a breach of
21  the ECF system probably by Russians.  And then about
22  three weeks ago there was testimony in Congress about a
23  second separate breach of the same system.  And so as a
24  lawyer in this case if I think that a sealed filing
25  isn't safe, I'm going to be behalf differently than if
```

```
 1                        PROCEEDING                    31
 2   it is.
 3          So is there anything, any news or update on the
 4   security of sealed ECF files?
 5          THE COURT:  Well, my understanding is that this
 6   particular court has not been impacted --
 7          MR. SNYDER:  Good.
 8          THE COURT:  -- in the same way that other
 9   courts may have been impacted.
10          MR. SNYDER:  All right.
11          THE COURT:  So the Southern District of New
12   York takes security pretty seriously.  As you know, we
13   don't have WiFi in this building even.  So my
14   understanding is that district may not have been
15   affected in the same way, but, again, I don't have
16   personal knowledge of that, of everything, but I have no
17   reason to believe, I've received no information that
18   would lead me to believe that any sealed documents in
19   this case were hacked, if you will.  Now, I may not, you
20   know, I don't know what I don't know, but I've received
21   nothing to indicate that they were, the sealed documents
22   in this case were compromised.
23          MR. SNYDER:  And I did not mean to put you on
24   the spot.
25          THE COURT:  That's okay.
```

 1

 2          MR. SNYDER:  My client wanted me to ask the

 3 question.

 4          THE COURT:  Yeah, I have received nothing.

 5 But, you know, of course, any documents that get into

 6 court they're filed by people, and so any leaks could be

 7 attributed to things having nothing to do with ECF.  So

 8 I just want to be clear about that.  Because the court

 9 system is one thing, but we only have things because

10 people have them.  We can control only, you know, here,

11 but we can't control people who otherwise have access to

12 the documents.  Okay?

13          MR. SNYDER:  Many potential points of failure,

14 yes.

15          THE COURT:  Right.  Okay.

16          MR. SNYDER:  Thank you for that, Your Honor.

17          THE COURT:  Okay.  We're adjourned.

18          (Whereupon the matter is adjourned to October

19 17, 2022 at 2 p.m.)

20

21

22

23

24

25

33

                    C E R T I F I C A T E

          I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of City of Almaty,

Kazakhstan, et al. v. Sater, et al., Docket #19cv02645,

was prepared using digital transcription software and is

a true and accurate record of the proceedings.




Signature_____
                    *Carole Ludwig*

                    Carole Ludwig

Date:     March 2, 2023