UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
CITY OF ALMATY, KAZAKHSTAN, *et al.*,

                    Plaintiffs,

          v.                          19-CV-2645 (JGK)
FELIX SATER, *et al.*,

                    Defendants.        Trial
------------------------------x
                                       New York, N.Y.
                                       June 21, 2024
                                       9:30 a.m.

Before:
                    HON. JOHN G. KOELTL,

                                       District Judge
                                       -and a Jury-
                    APPEARANCES

BOISE SCHILLER & FLEXNER LLP
        Attorneys for Plaintiffs
BY:   CRAIG A. WENNER
        MATTHEW L.SCHWARTZ
        JONATHAN T. ZACH
        SOPHIE ROYTBLATT
        SABINA MARIELLA
        LINDSEY RUFF

RICHARD L. YELLEN & ASSOCIATES, LLP
        Attorneys for Defendant MeM ENERGY PARTNERS LLC
BY:   BRENDAN C. KOMBOL

LAW FIRM OF THOMAS C. SIMA
        Attorneys for Defendant Felix Sater
BY:   THOMAS C. SIMA

JOHN H. SNYDER PLLC
        Attorneys for Defendant Felix Sater
BY:   JOHN H. SNYDER


ALSO PRESENT:  Zhadyra Nartay, BTA
               Baurzhan Darmanbekov, Almaty Rep.

1                    (Trial continued; at the sidebar)

2                    THE COURT:  I just wanted to confirm with respect to

3     Juror No. 9 who brought to Mr. Fletcher's attention that a

4     reporter had approached her and said he knew that she was a

5     juror on the case.  She brought it to Mr. Fletcher's attention.

6     She didn't ask to talk to me about it.  And I don't see any

7     reason to follow up with that juror based on that content, but

8     I want to make sure.

9                    MR. KOMBOL:  The only thing I would suggest is I think

10    we have a pretty strong idea who the reporter is.  He's had a

11    presence in the courtroom.  So if we see the gentleman come

12    back, I might message the Court and ask maybe we could have the

13    juror confirm that's who it was, if it is who we think it is.

14                    MR. SNYDER:  Or the person just may never show up

15    again.

16                    THE COURT:  She said it was a reporter.  I don't have

17    to track down who the reporter was.

18                    MR. ZACH:  That's someone right there.

19                    MR. SNYDER:  The guy who just waved.

20                    THE COURT:  Okay.

21                    MR. SNYDER:  All right.

22                    MR. ZACH:  Thanks, Judge.

23                    THE COURT:  But it's a fair point that I should simply

24    announce in court that no one should contact any of the jurors

25    in the case.

1                    MR. KOMBOL:  Yes.

2                    MR. SNYDER:  Yes.

3                    MR. ZACH:  Agreed.

4                    (In open court)

5                    THE COURT:  I have already made it clear at the final

6      pretrial conference that none of the lawyers or witnesses

7      should contact the jurors, even to say hello or to pass the

8      time of day.  And I have told that to the jurors also.

9                    Let me also give that advice to any of the other

10     persons who come and watch the proceedings.  No one should talk

11     to the jurors for any purpose.  As I told the parties at the

12     final pretrial conference, that shouldn't happen even to say

13     hello or pass the time of day.  The jurors shouldn't be

14     approached or contacted for any reason.

15                   Yesterday the plaintiffs used 33 minutes for a total

16     of 17 hours and 41 minutes.  The defendants used two hours and

17     38 minutes for a total of 8 hours and 30 minutes.

18                   Mr. Wolf is on the stand.  So can we bring Mr. Wolf

19     in.

20                   MR. SNYDER:  Yes.

21                   (Continued on next page)

22

23

24

25

1   ROBERT WOLF, resumed.

2              (Jury present)

3              THE COURT:  Good morning, ladies and gentlemen.

4   Please be seated.

5              It's good to see you all.  I hope you had a good

6   evening despite the terrible heat wave.  Trust me, I suffer

7   with you.  And, again, if there is anything about the

8   temperature in the courtroom that you want adjusted, just let

9   us know.

10             Mr. Wolf is on the stand.

11             Mr. Fletcher.

12             DEPUTY CLERK:  Mr. Wolf, you are reminded you are

13  still under oath.

14             THE WITNESS:  Yes.

15             THE COURT:  Mr. Snyder, you may proceed.

16             MR. SNYDER:  Thank you, your Honor.

17  DIRECT EXAMINATION

18  BY MR. SNYDER:

19  Q.  Mr. Wolf, do you have the confidential assistance agreement

20  on the screen in front of you?

21  A.  I have page 1.

22  Q.  Right.  And does the jury?

23             (Replies)

24  Q.  Mr. Wolf, I'd like to direct your attention -- we will get

25  right through this and get on to the next.  I don't intend to

1    spend much more time on this.  Take a look at paragraph 2,

2    consideration.

3    A.  Yes.

4    Q.  You testified yesterday about negotiating the 16 percent

5    figure in paragraph 2.  Do you see that?

6    A.  Yes.

7    Q.  And you negotiated that 16 percent number on behalf of

8    Litco with -- withdrawn.

9         You negotiated on behalf of Litco that 16 percent

10   number, right?

11   A.  Yes.

12   Q.  And you negotiated with Latham & Watkins, right?

13   A.  That's my recollection.

14   Q.  And can you describe, as best you recall, the

15   back-and-forth with Latham & Watkins about specifically the

16   16 percent number?

17   A.  You mean how we got to that percentage?

18   Q.  Yeah.

19   A.  I don't recall the specifics.  I just recall that that's a

20   number that ultimately -- the percentage we came to.  I believe

21   we started higher, and Latham & Watkins or David Schindler, the

22   lawyer, was lower, and that's the percentage that ultimately

23   was agreed to.

24   Q.  You said David Schindler was the lawyer for Latham?

25   A.  That's my recollection, yes.

1    Q.  Sitting here today, you can't remember why it was

2    16 percent as opposed to 10 or 20 percent.  It's just that was

3    what was agreed on?

4    A.  Yes.  Like I just said, it was a negotiation.

5    Q.  Did you have any understanding of who the decision-makers

6    were on the other side of the table?  In other words was it

7    Arcanum or was it somebody behind them?

8    A.  At that point, Latham & Watkins, they were counsel for the

9    City of Almaty in a litigation in California, so I assume it

10   was with his client, but that wasn't discussed.  Arcanum I met

11   for the first time at a meeting with the Latham & Watkins,

12   first time I met them actually -- when I say Arcanum, Peter

13   Galsky and Calvin Humphrey.

14   Q.  The three parties, the principals to the CAA were BTA Bank,

15   Almaty, and Kazakhstan, correct?

16   A.  I think as the agreement indicates who the parties were, I

17   think it indicates who they are.

18   Q.  And --

19   A.  You asked me specifically.  It indicates Arcanum signed the

20   agreement as an agent for -- as it says, the Kazakhstan

21   governmental authorities, which I believe included City of

22   Almaty, Kazakhstan, and BTA Bank.

23   Q.  Let's take a look at section 6(b) of the confidential

24   assistance agreement, which is a couple pages down from there,

25   6(b).  There we go.  Perfect.

1    I said 6(b).  I meant 6(e).  If you could scroll

2    down a tiny bit there.  6(e) which starts with "no potential

3    witness," do you see that?

4    A.  Yes.

5    Q.  I'm going to read it.

6         "No potential witness which Litco identifies and

7    produces to Arcanum in connection with assistance to be

8    provided under this agreement shall have any ownership interest

9    in Litco or in the monthly fees or recoveries consideration

10   payable to Litco under this agreement."

11        Do you see that?

12   A.  Yes.

13   Q.  Do you remember negotiating that term?

14   A.  I remember that provision being in the agreement.

15   Q.  Why was that provision in the agreement, if you recall?

16   A.  There were rules in various jurisdictions that if witnesses

17   were called by a party, and that witness was receiving

18   compensation, it would violate the ethical rules in those

19   proceedings.  So therefore for this agreement, it just made

20   clear that on Litco's behalf, any witness that Litco was going

21   to produce and identify to Arcanum would not be a witness --

22   would not have any ownership interest in Litco.  That was very

23   defined and it very much defined the relationship entirely from

24   beginning to end.  Litco never did produce any witness that had

25   an ownership interest in Litco.

1   Q.  Now, earlier in the trial, you were not here, but

2   Ms. Nartay testified for BTA Bank, and she testified about this

3   particular provision and noted that one of the reasons Felix

4   could not be paid under the CAA was because he was a witness.

5   Did Felix Sater become a witness in the Triadou case?

6           MR. ZACH:  Objection.

7           THE COURT:  Sustained.

8           You are directing the witness's an attention to what

9   occurred after June 12, 2015?

10          MR. SNYDER:  I don't want to necessarily do this --

11  well, I will move on, Judge.

12  Q.  I would like you to take a look at the release, section 10,

13  please.  Actually, go to the next page.  I want to focus on the

14  very last sentence of that paragraph.

15          Sir, I'm showing you paragraph 10 of the confidential

16  assistance agreement -- I'm showing you paragraph 10 of the

17  confidential assistance agreement which we looked at yesterday.

18  I want to direct your attention to the last sentence.

19          Last sentence says, "This release shall not apply

20  under any circumstances or in any way to any of the Khrapunov

21  Entities or the Ablyazov Entities."  Do you see that?

22  A.  Yes.

23  Q.  And do you remember that term being negotiated?

24  A.  I remember that was a proposed revision that was inserted

25  by Peter Garske in the process in terms of that paragraph.

1   Q.  You see there Khrapunov Entities and Ablyazov Entities,

2   those are capitalized terms, right?

3   A.  Yes.

4   Q.  Now, could we go up to the very top of the agreement.

5        Let's look at the first of the two paragraph Bs there

6   where it defines those two terms, Ablyazov entities and

7   Khrapunov entities.  Do you see that?

8   A.  Yes.

9   Q.  And do you agree that that paragraph B that we're looking

10  at defines the terms Ablyazov entities and Khrapunov entities

11  as those terms appear in paragraph 10, the release?

12  A.  Yes.

13  Q.  And if you need to go back to the release, I'm happy to or

14  perhaps you remember.

15  A.  No, it's very clearly identified what the Ablyazov entities

16  are.  It says so:  The family members, entities in which they

17  own or control.  And for Khrapunov, it was the former mayor of

18  Almaty, members of his family and entities which they own or

19  control.

20  Q.  So let's just go through this methodically if we could.

21  A.  Sure.

22  Q.  I'm looking at the definition of Ablyazov entities.  Okay?

23  Is Felix Sater Mukhtar Ablyazov?

24  A.  No.

25  Q.  Is Felix Sater a member of the family of Mukhtar Ablyazov?

1   A.  No.

2   Q.  Is Felix Sater an entity which Ablyazov or his family owns?

3   A.  No, not to my knowledge.

4   Q.  And wasn't the case in June 2015 either, right?

5   A.  No, not to my knowledge.

6   Q.  Felix Sater was not owned by Ablyazov in 2015, right?

7   A.  No, not that I know of.

8   Q.  And Felix Sater was not controlled by Ablyazov in 2015,

9   right?

10  A.  No.

11  Q.  So Ablyazov -- strike that.  Felix Sater was not an

12  Ablyazov entity in 2015, right?

13  A.  Not that I'm aware of, no.

14  Q.  And under the terms of this agreement, Felix Sater was not

15  an Ablyazov entity?

16  A.  No.

17  Q.  Now, same questions regarding Khrapunov entities.

18          Was Felix Sater Viktor Khrapunov in 2015?

19  A.  I never met Viktor Khrapunov, but I would say no to my

20  knowledge.

21  Q.  Was Felix Sater a member of the Khrapunov family in 2015?

22  A.  Not to my knowledge, no.

23  Q.  Was Felix Sater an entity that the Khrapunovs owned in

24  2015?

25  A.  Not to my knowledge, no.

1  Q.  Was Felix Sater an entity that the Khrapunovs controlled in

2  2015?

3  A.  Not to my knowledge, no.

4  Q.  Was Felix Sater a Khrapunov entity as that term is defined

5  in the confidential assistance agreement?

6  A.  Not to my understanding, no.

7  Q.  And you drafted the agreement, right?

8  A.  My partner did, yes.

9  Q.  But it was -- you were involved in the drafting in 2015,

10  responsible for the final output, right?

11  A.  Yes, on behalf of Litco.

12  Q.  Now, Ms. Nartay who is sitting at counsel's table testified

13  about the terms Ablyazov entities and Khrapunov entities a few

14  days ago.  You weren't there.  I'm telling you that.

15       Here is my question:  When you were negotiating the

16  confidential assistance agreement in 2015, was Ms. Nartay

17  there?

18  A.  Could you point out Ms. Nartay?

19  Q.  Ms. Nartay, could you raise your hand?  Ms. Nartay?

20       MR. ZACH:  You can stand up.

21  BY MR. SNYDER:

22  Q.  Go ahead and stand up.  That's Ms. Nartay.  Have you ever

23  seen Ms. Nartay before court?

24  A.  To my recollection, no.  I don't believe I met her or seen

25  her.

1    Q.  Did you have any interaction with Ms. Nartay during the

2    negotiation or execution of the confidential assistance

3    agreement in June 2015?

4    A.  No.  Only as I indicated, the attorneys at Latham & Watkins

5    and Peter Garske for Arcanum.

6    Q.  If Ms. Nartay were to tell the jury what this confidential

7    assistance agreement actually means, she would have no idea,

8    correct?

9           MR. ZACH:  Objection, your Honor.

10          THE COURT:  Sustained.

11   Q.  All right.  I want to talk about a meeting that occurred on

12   June 5, 2015, about a week before the confidential assistance

13   agreement was signed.  Do you remember a meeting in June 2015

14   in the Moses & Singer conference room in the Chrysler building?

15   A.  I remember -- I don't recall exact dates, but I do recall a

16   meeting with Peter Garske in our offices in early June before

17   this agreement was signed.

18   Q.  And just to be clear, we're talking about a meeting that

19   happened at your law firm offices, right?

20   A.  Yes.

21   Q.  Moses & Singer, right?

22   A.  Yes.

23   Q.  In the Chrysler building?

24   A.  Yes.

25   Q.  And it was a meeting that happened shortly before the

1    CEA -- there was a meeting that was held shortly before the CAA

2    was executed, correct?

3    A.  Yes.  Within a week or two, something in that range.

4    Q.  If I told you it was June 5, and if I told you the CAA was

5    dated June 12, does that sound about right?

6    A.  Yeah.  I don't remember the exact date, but I do remember

7    Peter Garske calling me and telling me he wanted to come and

8    see me in our office.

9    Q.  We'll get there.  We'll get there.

10            As you started to say, how did the meeting come about.

11   The meeting, I mean, the June 5 meeting.  How did that meeting

12   come about?

13   A.  As I recall, first there were negotiations with Latham &

14   Watkins, and then as that was continuing on, Peter Garske

15   indicated he was impatient with the progress of the assistance

16   agreement being agreed to in all terms, and contacted me and

17   said he wanted to come to my office, and he did.  He came to my

18   office and indicated that Arcanum would be taking over on the

19   assistance side in place of Latham & Watkins or Almaty, and the

20   agreement would be negotiated with Arcanum.

21   Q.  Was it at that time that somebody proposed an in-person

22   meeting?

23   A.  Yeah.  Mr. Garske called me and said I want to come to your

24   office, and -- it's a long, long time ago, but I recall, you

25   know, it was rather sudden and immediate.  I think it was "I'll

1  come the next day" or something.  It was a fluid situation.  As

2  I recall, there was some potential assets in Cyprus that were

3  discussed, and action, you know, hopefully if this had been --

4  if this was agreed to could be taken or information could be

5  given, and I think we -- at some point in this process I think

6  prior to the signing identified two and produced two witnesses

7  who could go to Cyprus.  This is what I recall.  So it was a

8  fluid situation and kind of every day mattered.

9  Q.  So there was a -- we're describing everything that happened

10  shortly before the CAA was signed, and it was a meeting that

11  Peter Garske asked for, right?

12  A.  Yes.

13  Q.  And it was set up in a day or two, right?

14  A.  As I recall.

15  Q.  And who was at the meeting?

16  A.  I believe it was just Peter Garske and myself.

17  Q.  You and Peter Garske?

18  A.  Yeah.

19  Q.  What about Felix?

20  A.  I don't recall the first time that Garske came up to my

21  office that anybody else was present other than myself.  That's

22  my recollection.  There could have been other meetings between

23  the first meeting and the signing of the -- and June 12.  In

24  fact, you know, I know there was a lot going on because there

25  were other individuals involved that had to be addressed.

1    Again, this is from a long time ago, my recollection, but there

2    were witnesses.  I think Nicholas Bourg was one of them, that

3    the witnesses needed to get release agreements of their own in

4    exchange for being a witness.  So I recall I think Nicholas

5    Bourg was one of them or whoever the witnesses were identified

6    for Cyprus, you know, whoever was being identified as a

7    starting point, they had to, you know, in exchange for their

8    being a witness, they wanted to be released from the

9    Kazakhstan -- they wouldn't be sued or sought after for any

10   assets if they were going to be, you know, helping.

11   Q.  Okay.

12   A.  I kind of recall that occurring, you know, in that process

13   with Garske.

14   Q.  So in the meeting with Garske, do you recall after the

15   meeting with Garske, did you go down and have dinner with him

16   at The Capital Grille?

17   A.  We certainly had dinner there, you know, on occasion.

18   Q.  Do you remember anything about having dinner with Garske

19   and maybe somebody else after the conversation on June 5?

20   A.  If I had dinner at Capital Grille, it would have been with

21   Felix and Peter Garske that I recall.  That day specifically I

22   don't recall, but ...

23   Q.  And I don't want you to testify what would have happened.

24   I don't want you to speculate.  I'm just asking if you

25   remember.  Do you remember having dinner at Capital Grille with

1    Peter Garske and Felix Sater after a meeting at your offices?

2              MR. ZACH:  Objection.  Timeframe.

3    A.  Yes.

4    Q.  On or about June 5, 2015 -- let me ask a better question.

5              On or about June 5, 2015, do you remember having

6    dinner at The Capital Grille with Felix Sater and Pete Garske?

7    A.  I don't remember the exact date, but in that range, I

8    believe.

9              THE COURT:  Prior to the execution of the confidential

10   assistance agreement?

11             THE WITNESS:  I believe so, yes.  I know they

12   certainly met before the agreement was signed, and I certainly

13   recall going to The Capital Grille which was downstairs from

14   the Chrysler building.  That's where our office was, and --

15   Q.  So sitting here today, is it your testimony that Felix

16   Sater met Peter Garske of Arcanum before the confidential

17   assistance agreement was signed?

18   A.  That's my recollection, yes.

19   Q.  And were you present to witness conversations between

20   Garske and Sater?

21   A.  Yes, I would have been there.  Yes.

22   Q.  Do you remember in general terms some of the topics that

23   Sater had discussed with Garske?

24   A.  I don't remember the specifics.  I, you know, remember

25   Mr. Sater identifying various individuals and witnesses that

1    could be put forth by Litco to assist in the asset recoveries.

2    And as I said before, it was a fluid situation.  There was some

3    urgency to, at least as indicated by Mr. Sater, in the

4    discussions that, you know, you know, actions, you know, needed

5    to be taken, you know, promptly if this was going to go

6    forward.

7    Q.  Around June 5, 2015, you personally witnessed Felix Sater

8    discussing Khrapunov and Ablyazov issues with Arcanum, right?

9              MR. ZACH:  Objection to leading.

10             MR. SNYDER:  He's not my witness.  He's --

11             MR. ZACH:  He's your client's lawyer.

12             THE COURT:  Hold on.

13             MR. SNYDER:  I can rephrase.  Doesn't matter.

14   Q.  Around June 5, 2015, did Felix Sater and Peter Garske

15   discuss asset recovery for Ablyazov or Khrapunov?

16   A.  I recall being discussed.  I don't recall Ablyazov at all.

17   I recall Khrapunov.

18   Q.  So you recall Felix Sater discussing Khrapunov with Arcanum

19   around June 5, 2015?

20   A.  Yes.  Because Nicholas Bourg was part of that because there

21   was a hotel project called the Flatotel that Khrapunov was

22   involved with through Nicholas Bourg when Nicholas at that time

23   was working for Khrapunov.  So that would have come up because

24   I do recall Nicholas Bourg's name getting mentioned and the

25   need for them to speak with him, and, you know, at that point

1    he was agreeing to be a witness provided he got a release, and

2    so I think that had to get done quick -- again, this is a long

3    time ago.  I kind of only remember the release being done

4    before the assistance agreement was actually signed because it

5    was important to get that in motion, whether it be Nicholas

6    Bourg or anyone else.  This is a long time ago, but I do

7    remember things needed to move, that was the witnesses that

8    Litco was producing or offering, you know, who were identified

9    all required releases so that they could assist and not be in

10   harm's way later on if the government of Kazakhstan or Almaty

11   was going to take action and try to collect assets.

12   Q.  Mr. Wolf, Mr. Wolf, I'm trying to keep the examination

13   focused.  So if you could listen to my questions, it will get

14   you out of here faster, I promise.

15   A.  Sure.

16   Q.  The meeting on or about June 5, 2015 at the Moses & Singer

17   law offices, was that held in two adjoining conference rooms?

18   A.  I don't remember.

19   Q.  During the meeting on or about June 5, 2015, did Peter

20   Garske say anything to you about a mystery guest?

21   A.  I don't recall.

22   Q.  Did Mr. Garske say anything to you about knowing who the

23   mystery guest was?

24   A.  I don't recall.

25   Q.  Did Kalsom Kam, the individual who signed the CAA on behalf

1    of Litco, did Kalsom Kam attend that meeting on June 5, 2015?

2    A.   Not that I recall.

3    Q.   Do you remember Kalsom Kam attending any meeting at any

4    time regarding Litco?

5    A.   I don't recall that.

6    Q.   Have you met Kalsom Kam?

7    A.   I have.

8    Q.   Can you characterize who Kalsom Kam was in relation to

9    Felix Sater?

10   A.   He worked for Felix Sater in some capacity in, you know,

11   other business.

12   Q.   Was he significantly junior to Felix Sater?

13   A.   As I recall, yes.

14   Q.   I believe somebody referred to him as a gopher.  I don't

15   want to be demeaning, but is that generally kind of the

16   relationship that Kalsom Kam had with Felix Sater?

17   A.   I don't remember the details, but I remember he worked for

18   him and he was certainly his junior, so ...

19   Q.   During the meeting on June 5, 2015, Felix Sater told Peter

20   Garske about witnesses, right, or potential witnesses?

21   A.   Yes, I recall, you know, that being discussed generally.

22   Q.   And do you recall any of the specific individuals that

23   Felix Sater brought to Peter Garske's attention on June 5,

24   2015?

25   A.   Again, without, you know, remembering the exact date, you

1   know, I remember the witnesses that were being discussed then

2   and only Cyprus as part of it.  So Cyprus would have involved

3   Boris Daneli.  I'm doing this by memory.  Michael --

4   Q.  Hold on.  Boris Daneli?

5   A.  I believe.

6   Q.  Do you have a spelling for that?

7   A.  D-A-N-E-L-I.

8   Q.  Do it again?

9   A.  Daneli, D-A-N-E-L-I.  I think it was Boris was his first

10  name.

11  Q.  So Boris Daneli.  Who else?

12  A.  I think it was David Elishakoff.

13  Q.  Elishakoff?

14  A.  I think they were -- they worked together on or were

15  involved in things that Khrapunov was involved with.  I don't

16  recall all the specifics, but it had something to do with

17  Cyprus, and I believe FBME Bank, I recall.

18  Q.  FBME Bank.  What's FBME Bank?

19  A.  It was a bank in Cyprus that apparently had monies of

20  Khrapunov or some entities that they were, you know, involved

21  with or knew of.

22  Q.  At the meeting on June 5 -- on or about June 5, 2015, it's

23  your testimony that Felix Sater discussed FBME Bank with Peter

24  Garske?

25  A.  Yeah, I think he would have identified the witnesses.

 1  Certainly I know that had been discussed before because it was

 2  a fluid situation, and I recall even discussing, and I'm pretty

 3  sure it was all before this was signed, that I think a law firm

 4  had to be engaged in Cyprus to help the asset recovery efforts

 5  with this bank in Cyprus, so he would have been identified.

 6  Q.  I'm going to ask about a number of topics and ask you

 7  whether you remember them being discussed at this meeting on or

 8  about June 5, 2015, okay?  And then we'll take each of these

 9  topics, and then you can tell us what you remember about them,

10  okay?

11          So at the meeting on or about June 5, 2015, did Felix

12  Sater discuss the Tri-County Mall deal as you remember?

13  A.  I don't recall.

14  Q.  Did he discuss the 36 million that he had redirected and

15  then eventually there had to be a settlement of a lawsuit?  Did

16  that come up?

17  A.  I don't recall that.

18  Q.  And at the meeting on or about June 5, 2015, do you

19  remember discussion of Nicholas Bourg?

20  A.  I remember Nicholas Bourg came up for sure because his name

21  had been mentioned already at that point, and I believe it

22  involved a real estate project that he had worked on for

23  Khrapunov.  The Flatotel, I think it was called.

24  Q.  At the meeting on or about June 5, 2015, do you remember

25  discussion of Philippe Glatz, Glass, Glatz?

1   A.  His name may have been mentioned.  I don't recall

2   specifics.

3   Q.  Do you remember a joke about a brick wall or a glass wall?

4   A.  I don't recall.

5   Q.  No.  How about the Central African Republic, did something

6   about the Central African Republic come up on or about June 15,

7   2015 in the meeting with Peter Garske?

8   A.  I don't recall.

9   Q.  During that same meeting, do you remember discussion about

10  Joe Chetrit?

11  A.  Joe Chetrit had involvement with that Flatotel, the real

12  estate investment.  I think it was an investment that Khrapunov

13  had or it was a Khrapunov entity and Chetrit was involved in I

14  believe the entity.  And at that point I think Nicholas Bourg

15  was the director or president of Triadou on behalf of

16  Khrapunov.  He was I think the main officer of Triadou at that

17  time.

18  Q.  At the meeting on or about June 5, 2015 with Peter Garske,

19  did ADLUX, A-D-L-U-X, did ADLUX come up?

20  A.  I don't recall.

21  Q.  At that same meeting, did the name Max Interbrick, Max

22  Interbrick come up?

23  A.  I don't recall.

24  Q.  At the meeting on June -- strike that.

25          At the meeting on or about June 5, 2015, did the name

1    Elvira Kudryashova come up?

2    A.  I don't recall.  I'm familiar with these names.  I just

3    don't recall when they were --

4    Q.  So you've heard the name, but you're not sure whether it

5    came up at the particular meeting that we're talking about

6    right now, right?

7    A.  Yeah, all of those names I heard.  Yes.

8    Q.  Okay.  During the meeting on or about June 5, 2015, did the

9    topic of E2 visas come up?

10   A.  I don't recall.

11   Q.  Now, when these conversations are happening about Bourg or

12   FBME or whoever else, this is happening in a conference room at

13   your law firm, right?

14   A.  As I recall, it was a long time ago.

15   Q.  You're sitting at a table?

16   A.  We have conference rooms.

17   Q.  You're sitting in a conference room discussing these

18   things?

19   A.  It would have been one of the conference rooms.

20   Q.  And just very close to each other, face to face, a few feet

21   away from each other?

22   A.  At a table in the conference room.

23   Q.  And Peter Garske and Felix Sater were both there at the

24   meeting?

25   A.  I recall a meeting with both of them, yes.

1    Q.  Both of them were physically present?

2    A.  It would have been in person, yes.

3    Q.  Did you have any question in your mind that Peter Garske

4    knew exactly who Felix Sater was at that time in the meeting on

5    June 5, 2015?

6    A.  Well, when you say "who he was," can you be a little more

7    specific?

8    Q.  Peter Garske knew that the human being he was talking to

9    was named Felix Sater?

10   A.  Oh yes, he had been identified.  Of course.

11   Q.  To get to the question that you were perhaps going to,

12   what, if anything, did Peter Garske know about Felix Sater to

13   your knowledge on June 5, 2015?

14            MR. ZACH:  Objection, your Honor.

15   Q.  Let me try something else.

16            Do you recall telling Peter Garske yourself, telling

17   Peter Garske anything about Pete Felix Sater at the time?

18            MR. ZACH:  Objection.

19            THE COURT:  Overruled.

20   A.  Identified he was acting on behalf of Litco.

21   Q.  And anything else?  Did you give him color on who he was?

22   He's a fairly colorful person.  Did you say, hey, this is

23   Felix.  He did blah, blah, blah?

24   A.  I don't know if I discussed his past or anything like that.

25   I don't recall.

1   Q.   Maybe; maybe not?

2   A.   I'll tell you what I do recall.  I recall when we went to

3   Capital Grille, when that was, the two of them liked to drink,

4   and they spent a lot of time together.  And I don't drink, so I

5   think after awhile I left and went home to, you know, to my

6   wife, and the two of them stayed together for quite some time,

7   and I remember hearing afterwards, so... but I don't know what

8   was discussed afterwards, but they certainly got to know each

9   other.

10  Q.   So just to summarize and put this into a little bit more

11  logical form.  There was a meeting at Moses & Singer on or

12  about June 5 where many topics were discussed, and we just

13  talked about that, right?

14  A.   Yes.

15  Q.   And then there was dinner at Capital Grille after that,

16  right?

17  A.   I remember going to Capital Grille.  The exact, you know,

18  date, the exact day I don't remember, but it was right at the

19  time this was going on.

20  Q.   At around that time, you remember having dinner at Capital

21  Grille with Felix Sater and Pete Garske, right?

22  A.   That's my recollection.

23  Q.   And you said you are not a drinker, right?

24  A.   No, I don't drink.

25  Q.   Felix Sater and Pete Garske were drinkers?

1   A.  They liked to drink.

2   Q.  And Peter Garske regrettably passed away not too long after

3   the CAA, right?

4   A.  I believe in early January, as I recall, so that's six

5   months later, unfortunately.

6   Q.  Now, Pete Garske and Felix Sater had a lot of drinking

7   together at The Capital Grille that night, right?

8   A.  Yes.

9   Q.  And they were telling stories, right?

10  A.  Well, some, you know, in my presence, and after that I

11  can't -- I can't --

12  Q.  When you were there, was Felix telling stories about his

13  fascinating life?

14          MR. ZACH:  Objection, your Honor.

15          THE COURT:  Overruled.

16  Q.  They were drinking at The Capital Grille and Felix was

17  telling stories?

18  A.  Yes, Felix likes to -- Felix likes to talk sometimes too

19  much, but especially when he drinks.  I've known Felix for a

20  long time, and --

21  Q.  Between brain and mouth there is no interlocutor, right?

22          MR. ZACH:  Objection.

23          THE COURT:  Sustained.

24  Q.  So Mr. Sater and Mr. Garske were drinking and eating at The

25  Capital Grille and telling stories, right?

1    A.  I don't recall much of what Peter was saying, but Felix

2    certainly would have been speaking about his life and his

3    colorful life and, you know, I'm sure he was discussing some of

4    the Khrapunov-related stuff as well.  I don't remember the

5    specifics because, like I said, I do recall everything was very

6    time sensitive, you know, up until the signing of this because

7    there was an expectation that there were assets that could, you

8    know, possibly be recovered if action was taken quickly.  So I

9    think they wanted to just get in Arcanum's hands all the

10   information and identify the witnesses so they could meet

11   directly with Arcanum.

12        I do recall this:  Arcanum didn't know anything about

13   other than that they were a global intelligence firm and had

14   been working for the -- at least what I understood, had been

15   working for the Kazakhstan government for awhile.  You know, it

16   was never shared with us.  I just assumed that they had a

17   wealth of knowledge and history about everyone involved that,

18   you know, that Felix was discussing.

19        I didn't know one way or another because they

20   certainly weren't going to share -- Peter never shared with us

21   all the stuff that they knew, but I just knew as an attorney I

22   had a sense that he had been involved in this and quite, you

23   know, for a long time, and they knew I believe when Felix was

24   mentioning names, I do recall Garske, you know, expressing that

25   he was aware of these individuals.  I don't remember which

1    ones, but certainly, you know, they were involved.

2    Q.  In the conversations with Pete Garske, whether up in the

3    offices or down at Capital Grille over drinks, do you recall

4    anything in particular that Mr. Sater told Mr. Garske about his

5    background relating to his work with the CIA, for example?

6             MR. ZACH:  Objection, your Honor.

7             THE COURT:  Sustained.

8    Q.  Did Mr. Sater tell Mr. Garske anything about his

9    professional background at all?

10   A.  I recall generally.  And I'm saying -- I don't have much of

11   a recollection, but, like I said, Felix has a colorful past and

12   liked to speak about what's now public, his cooperation --

13            MR. ZACH:  Objection, your Honor.

14            THE COURT:  Sustained.

15   Q.  Without getting into details, was it your sense during the

16   dinner between, you know, yourself and Garske and Felix that

17   Felix was being generally forthcoming about who he was and what

18   his past was?

19            MR. ZACH:  Objection to form.

20            THE COURT:  Sustained.

21   Q.  When you were at dinner with Garske and Sater, did Sater

22   seem forthcoming?

23            MR. ZACH:  Objection.

24            THE COURT:  I'll allow it.

25   A.  Yes, of course.  To my recollection, yes.

1   Q.  And when you say you don't remember much of what Garske

2   said during that dinner, it's because Garske couldn't get a

3   word in edgewise, right?

4   A.  I -- Felix spoke a lot in my experience and tends to speak

5   at that dinner.  He's always forthcoming and truthful about

6   what he was discussing, but the specifics I don't recall.

7   Q.  Do you remember anything else from that meeting on or about

8   June 5, 2015 that you consider important?

9   A.  Not that I recall.

10  Q.  All right.  We're going to move to another topic then.

11           You've been a litigator for over 40 years?

12  A.  Yes.

13  Q.  You've litigated over statute of limitations issues, I

14  presume?

15           MR. ZACH:  Objection.  Relevance.

16           THE COURT:  Sustained.

17  Q.  There's been testimony in this trial about Mr. Sater

18  diverting $36 million of proceeds from the Tri-County Mall

19  deal.  You're aware of that topic generally even though you

20  weren't here to hear the testimony?

21  A.  At least to the extent I discussed it yesterday.

22  Q.  That's right, I asked you about it yesterday.

23           Now, just to be very clear, did you assist Felix in

24  any way in taking that 36 million and diverting it to an

25  account that he controlled.  Were you in any way, shape, or

1  form involved in that?

2  A.  No.

3  Q.  And did Felix tell you about it before he did it?

4  A.  No.

5  Q.  As a general matter, the idea of a client diverting

6  $36 million is something that you would highly disapprove of,

7  correct?

8  A.  My recollection is we weren't retained or contacted as

9  counsel until after all of that occurred.  We weren't involved

10  period in terms of his representation.

11  Q.  Now eventually you found out about the 36 million, right?

12  A.  A long time ago, but I believe as I testified yesterday.

13  Q.  And when you found out, did you represent Felix after the

14  fact?

15  A.  We did, yes, as a firm.  Yes.

16  Q.  And ultimately you negotiated a settlement on Felix's

17  behalf, right?

18  A.  Yes, a settlement was reached.  Yes.

19  Q.  And that was a settlement in a lawsuit in 2013 involving

20  Triadou, right?

21  A.  I remember the settlement discussions.  I don't remember

22  much of a lawsuit at all.  I do remember at the time Nicholas

23  Bourg was across the table on the other side during those

24  negotiations with Joseph Chetrit.  That I do remember.

25  Q.  Sitting here, you don't remember if there was an actual

1    lawsuit filed in 2013, but you remember the case settled

2    quickly?

3    A.   I remember it settling, you know.  There may have been a --

4    I don't remember there being any real litigation.  It's

5    possible Triadou might have started a lawsuit, but --

6    Q.   You mentioned Nicholas Bourg was sitting across the table

7    in negotiating that settlement, right?

8    A.   There were several meetings.  I do recall Nicholas Bourg.

9    Q.   And Nicholas Bourg is a lawyer, right?

10   A.   I don't know.

11   Q.   Oh.  But he was the person that you were negotiating

12   against?

13   A.   I recall Nicholas Bourg being there, and Joseph Chetrit.  I

14   believe it was actually in Chetrit's offices where these

15   meetings were.

16   Q.   And Nicholas Bourg, this is the same Nicholas Bourg who two

17   years later in 2015 reached out to Felix because he'd been

18   taken advantage of by Ilyas Khrapunov, right?

19              MR. ZACH:  Objection.

20              MR. SNYDER:  This is -- this is recounting what -- it

21   was the testimony yesterday.

22              THE COURT:  Rephrase.

23   Q.   You just referred to Nicholas Bourg, right?

24   A.   Yes.

25   Q.   Nicholas Bourg was involved in the settlement of the

1    Triadou matter in 2013, right?

2    A.  He was, I think, the president or CEO of Triadou.

3    Q.  And it's the same Nicholas Bourg that two years later

4    reached out to Felix, correct?

5    A.  I think I testified to yesterday what my recollection was,

6    how that he reached out or whatever.  I didn't know, but I

7    testified yesterday as to --

8    Q.  I'm trying to of establish that we are talking about the

9    same individual.

10   A.  Same person.

11   Q.  Thank you.

12          Are you familiar with what an internal rate of return

13   is in the real estate investing world?  Have you heard the word

14   internal rate of return?

15   A.  No.  Not my expertise.

16   Q.  Just one moment.

17          THE COURT:  Ladies and gentlemen, there's a brief

18   pause.  I told you that we were the oldest federal court in the

19   United States.  We were created in 1789 under the First

20   Judiciary Act.  I told you the first judge of this court was

21   James Duane.  George Washington signed his commission.  And

22   James Duane was a former mayor of the City of New York.  So I

23   often like to tell people that James Duane is the reason that

24   we have a Duane Street, and that there's the Duane Reade

25   drugstore chain which began on Duane Street, I think.  So every

1  time you follow -- every time you pass a Duane Reade drugstore,

2  you can remember the court.

3            THE WITNESS:  Can I add one more thing?

4            THE COURT:  No.  No.  No.  No.

5            THE WITNESS:  Reade Street was the --

6            THE COURT:  No.

7            THE WITNESS:  Sorry.

8            MR. SNYDER:  Just one?

9            THE COURT:  You're still up.

10           MR. SNYDER:  Okay, great.

11  Q.  Just for clarity of the record, we were talking about the

12  meeting on or about June 5, 2015 talking about the meeting up

13  in your conference room.  Who was in that meeting?  It was you,

14  right, Pete Garske, Felix Sater.  Is that right?

15  A.  That's my recollection, yes.

16  Q.  Was there anybody else from Arcanum that you can recall?

17  A.  I don't recall.

18  Q.  Was there anybody from your firm other than yourself?

19  A.  I don't recall.

20  Q.  So your recollection though for sure is you, Felix Sater

21  and Pete Garske, right?

22  A.  For sure, yes.

23           MR. SNYDER:  Nothing further.  Thank you.

24           THE COURT:  Mr. Kombol.

25

1    CROSS-EXAMINATION

2    BY MR. KOMBOL:

3    Q.  Good morning.  How are you?

4    A.  Good morning.

5    Q.  At the time that the CAA and related releases were

6    executed, was Litco a newly formed entity?  Was Litco a newly

7    formed entity?

8    A.  Yes, it was -- we didn't -- we weren't the law firm that

9    was involved with that, but yes, it was I think done through

10   Todd & Levi in the month or so before.

11   Q.  And was your impression that Arcanum at least was a

12   sophisticated party and counterparty?

13   A.  That was certainly my impression, yes.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Is it fairly easy to go online and see whether Litco is a

2   newly formed entity for a sophisticated party?

3   A.  Yeah.  You can go on the department -- for one, you can go

4   on the website of the New York State government and it

5   identifies corporations, LLCs, and I believe most states have

6   that publicly available for anyone.

7   Q.  Would a commercial -- when a release agreement is entered

8   into is the intention with that in order to provide commercial

9   certainty in moving forward?

10                  MR. ZACH:  Objection.

11                  THE COURT:  Sustained.

12  Q.  Is a release agreement a customary agreement that is

13  entered into or is it more of an extraordinary agreement?

14                  MR. ZACH:  Objection.

15                  THE COURT:  Be more specific.

16  Q.  In your experience, are release agreements entered into

17  without caution?

18                  MR. ZACH:  Objection.

19                  THE COURT:  Sustained.

20  Q.  Can you describe the kind of care that you customarily see

21  that goes into entering into a release agreement when a party

22  releases various matters?

23                  MR. ZACH:  Objection.

24                  THE COURT:  Sustained.

25                  MR. KOMBOL:  I will move on.

1    Q.  You say you have known Felix for many years?

2    A.  Yes.

3    Q.  Both as a friend as well as professionally?

4    A.  Professionally, and through the length of the relationship

5    we became friends as well, as I indicated yesterday.

6    Q.  And you know his customary group of business partners and

7    people who he interacts with for business purposes, at least as

8    it relates to your legal representation of him?

9    A.  It's a very general question.  Perhaps.  It depends on what

10   the matter is and whether it's related to that matter.

11   Q.  In your time with Felix, have you ever met Mendel Mochkin?

12   A.  Not that I recall, no.

13   Q.  Do you recall ever sending a wire to an entity known as MeM

14   Energy?

15   A.  I don't recall.

16   Q.  Do you know who MeM Energy is?

17   A.  No.

18           MR. KOMBOL:  Nothing further.

19           THE COURT:  Mr. Zach, you can examine.

20   CROSS-EXAMINATION

21   BY MR. ZACH:

22   Q.  Mr. Wolf, prior to you working on the dispute about the

23   Tri-County Mall, your firm had done work for Mr. Sater and his

24   companies, right?

25   A.  I'm sorry.  Can you repeat that?

1   Q.  You helped Mr. Sater handle a dispute relating to the

2   Tri-County Mall, right?

3   A.  Our firm, yes, at a point in time.

4   Q.  You participated in that, right?

5   A.  I did, yes, along with others.

6   Q.  Before your work on that, your firm had done work for Mr.

7   Sater before that, right?

8   A.  I don't know if Moses & Singer had represented -- I was at

9   Moses & Singer from June of 2011.  I don't recall a prior

10  matter at Moses & Singer involving Felix.

11  Q.  Did your firm do work on the Syracuse transaction?

12  A.  Not that I recall.

13  Q.  Now, Mr. Sater approached you in connection with the

14  Tri-County Mall dispute that he was having with Ilyas

15  Khrapunov, didn't he?

16  A.  At a point in time, yes, he contacted me.

17  Q.  Do you remember about when that occurred?

18  A.  The fall of 2013, I believe.

19  Q.  When he approached you, did he tell you that he had

20  recently on August 14 set up a New York state corporation in

21  the same name as the entity that purchased the note for

22  Tri-County Mall?

23  A.  I don't recall, no.

24  Q.  So, when he approached you about the dispute, you had a

25  discussion with him about the situation generally, right?

1    A.   What I do recall is he contacted us after the transaction

2    had occurred and he had taken possession of the proceeds, that

3    had already happened before he first contacted us, and the

4    details on that I didn't know, other than it led to meetings

5    with Felix and explanations as to why he believed he had an

6    entitlement to compensation, and there was a, I guess what

7    lawyers would call anticipatory breach, that Khrapunov had told

8    him that he wasn't going to honor his compensation agreements

9    with Felix over a period of time.  We came in way after the

10   fact.

11   Q.   So you came in after the funds had already been

12   transferred, right?

13   A.   Yes.

14   Q.   And when you and your partner sat down with Mr. Sater, you

15   had a discussion about the events relating to Mr. Sater taking

16   that money, right?

17   A.   I don't recall that, no.

18   Q.   Part of your job as a litigator is to understand the facts

19   surrounding the situation that you're about to address, right?

20   A.   I don't recall any litigation at the time.  I remember we

21   had meetings with Felix and myself and one of my partners, at

22   least, and the explanations for why Felix was entitled to

23   moneys and that he wasn't going to get paid pursuant to some

24   agreement that he had.  That was the topic and it was to see

25   whether -- for him to justify why he did what he did and why he

1   was owed what he felt he was owed.

2   Q.   Right.  But you understood that he had taken millions of

3   dollars from out of this deal, right, you already testified to

4   that?

5   A.   Yes.

6   Q.   Now he wants to keep that money, right?

7   A.   As I indicated, his position was he was entitled to

8   compensation and that he had been told beforehand by Ilyas

9   Khrapunov that he wasn't going to pay him.

10  Q.   I understand that.  But as part of the process of doing

11  that, you're a lawyer, you have to understand the full

12  situation, so when you go back to Mr. Khrapunov's lawyers, you

13  know the facts, right?

14  A.   I don't think we ever dealt with any lawyers for Khrapunov.

15  Q.   Let's talk about that.

16          MR. ZACH:  Let's pull up 489.

17          Which is in evidence, your Honor.

18  Q.   You see, sir, that this is a document that you're copied on

19  at the top, right?

20  A.   Yes.

21  Q.   And I want to go down to page -- let's go to Bates 2287.

22          MR. ZACH:  Can we blow up the bottom part of the

23  document, please.

24  Q.   Now, you see that this is an e-mail dated October 18, 2013,

25  right?

1   A.  I just have one question.  Is this part of an e-mail chain

2   that you're showing me?

3   Q.  At the top you're copied too.

4   A.  I would like to see the whole e-mail chain, if you could,

5   and then I can answer questions.

6           If you have a hard copy, it would be much better.  I

7   appreciate it.  The more hard copies the better.  This will be

8   quicker.

9   Q.  I have a hard copy but it's my hard copy.

10  A.  I will give it back to you.

11  Q.  I will give you a moment to flip through it.

12  A.  It's an e-mail chain --

13  Q.  Here's the top.  You're copied on the top.

14  A.  Is this the last e-mail on the chain?

15  Q.  It goes in reverse chronological order.

16  A.  So why don't you start on the last page?

17  Q.  Sure.

18  A.  If you give me a hard copy it will be much faster.

19  Q.  We are printing one out right now.

20          MR. ZACH:  Your Honor, maybe we can take a quick break

21  so we don't waste the jury's time on this.

22          THE COURT:  Ladies and gentlemen, we will take ten

23  minutes.  Please remember my continuing instruction.

24          All rise, please.  The jury should follow Mr. Fletcher

25  to the jury room.

1           (Jury exits courtroom)

2           (Recess)

3           THE COURT:  Mr. Wolf is on the stand.  Let's bring in

4    the jury.

5           (Jury present)

6           THE COURT:  Mr. Wolf is on the stand.

7           Mr. Fletcher.

8           THE DEPUTY CLERK:  Mr. Wolf, you are reminded you are

9    still under oath.

10          THE WITNESS:  Yes.

11          THE COURT:  Mr. Zach, you may proceed.

12          MR. ZACH:  Thank you.

13   BY MR. ZACH:

14   Q.  Mr. Wolf, in the break you were handed a copy of 489?

15   A.  Yes.  And I'm still reviewing it, if I could have a moment.

16   Q.  Tell us when you're ready.

17   A.  I will.  Thank you.

18          (Pause)

19   A.  Okay.  Thank you.

20          MR. ZACH:  So, let's go to page 2287, if we can.

21          And let's blow up the bottom part.

22   BY MR. ZACH:

23   Q.  So, Mr. Wolf, before the break I think you had testified

24   that you did not recall interacting with lawyers on the other

25   side as part of this Tri-County dispute.  Does this refresh

1   your recollection that you in fact were going back and forth

2   with them?

3   A.   These were the lawyers, now that I have read it, as I

4   understood, in the settlement communications; they were

5   representing Triadou.

6   Q.   So, is it your testimony that on October 18, 2013, you

7   believed that these lawyers were representing Triadou?

8   A.   That's my recollection, yes.

9   Q.   But you understood at that time, sir, that you weren't

10  really negotiating with Triadou, you were negotiating with

11  Ilyas Khrapunov, right?

12  A.   I think the communication indicates that this involves the

13  relationship of Felix Sater and Ilyas Khrapunov and all of his,

14  what were alleged to be business entities in real estate

15  transactions, and the names of different companies, and so on

16  and so forth.  Who they actually -- they were certainly

17  speaking, as I just read these settlement e-mails back and

18  forth, the lawyers certainly appear to be speaking on behalf of

19  Khrapunov or Khrapunov entities or representatives.  It's very

20  general.  There's a lot of transactions, but there was a

21  dispute between Sater, as indicated, and Khrapunov or his

22  company that he worked for.

23  Q.   Just yes or no.  You understood that you were negotiating

24  with Ilyas Khrapunov?

25  A.   They were representatives of Triadou and the companies, and

1   he was involved in those companies.

2   Q.  So you thought it was really the company that you were

3   negotiating with?

4   A.  I wasn't negotiating with any company; I was negotiating

5   with lawyers who had a client.

6   Q.  I understand, but lawyers represent clients, right?

7   A.  Correct.

8   Q.  And when you're interacting with a lawyer, you are acting

9   on behalf of a client, right?

10  A.  Yes.

11  Q.  And you understood that you were negotiating with lawyers

12  who ultimately were answering to Ilyas Khrapunov, right, sir?

13  A.  I can't tell you who they were answering to.  I can only

14  tell you within my recollection that they were lawyers for the

15  other side.  I think there were entities that Mr. Sater worked

16  for that were Khrapunov entities, and they were the lawyers for

17  one or more of those entities.  I don't recall the names.

18  Triadou I do recall because -- I just kind of recall that was

19  front and center on their side.  That's the name of the

20  company.

21  Q.  Looking at this e-mail, this is you, you can see, e-mailing

22  a lawyer named John Baranello, a lawyer named Luigi, and a

23  lawyer named David.  Do you see that?

24  A.  This is the October 18 e-mail?

25  Q.  Yes.

1   A.   Yes.

2   Q.   And you're making, without prejudice, a settlement purpose

3   demand, right?

4   A.   Yes.  For settlement purposes only.

5   Q.   That's a common thing in civil litigation, you communicate

6   back and forth with settlement communications, right?

7   A.   If there are settlement communications, it says that for

8   particular legal purposes, that settlement communications can't

9   be used in the litigation because they are for settlement.

10  That's why lawyers put that line in the communications so they

11  are identified as settlement communications.

12          MR. ZACH:  Let's go down to the top of the next page.

13          Can we highlight the top paragraph, please, Ms.

14  McKenzie.

15  Q.   In your e-mail you write to these lawyers, who purport to

16  represent Triadou that, "It would be conducive to this process

17  if your client would explain why all of the relevant,

18  significant wire transfers and business decisions in these

19  transactions were arranged and discussed by Mr. Khrapunov

20  directly with Mr. Sater, and not with anyone else, including

21  Mr. Bourg."

22          Do you see that?

23  A.   Yes.

24  Q.   And the reason you're writing that is because you are

25  trying to pressure them that behind the company Triadou is

1    actually Ilyas Khrapunov, right?

2    A.   No, that's not what I take this to say.  I take this to say

3    that this was the relationship that Mr. Sater had when he

4    performed what was being described as his involvement in his

5    real estate transaction; it was describing who he communicated

6    with in terms of his compensation and everything.  So that's

7    what it says.  I don't have an independent recollection now 11

8    years later, but that's what it says in the e-mail, and that's

9    the best as I can describe it.

10   Q.   Sir, you would agree with me that part of your strategy in

11   trying to retain some or all of the $43 million that Mr. Sater

12   took was to threaten Mr. Khrapunov with exposing his

13   involvement in these matters, right?

14        MR. SNYDER:  Objection.  His legal strategy, it's not

15   relevant.

16        THE COURT:  Overruled.

17   A.   I don't recall any legal strategy other than that it was a

18   stated entitlement to compensation for Mr. Sater's involvement

19   in various real estate transactions, and that there was a

20   related written agreement.  And I believe, having read the

21   whole e-mail chain, it appears that there may have been some

22   oral agreements as well that Mr. Sater had that are described

23   in this with Mr. Khrapunov.  But this was all about a claim of

24   compensation entitlement for services performed and promises,

25   that's it.

1          MR. ZACH:  Let's highlight the paragraph starting

2    "this process."

3    Q.  So, Mr. Wolf, you next state, "This process will be much

4    more effective and we can make great strides towards achieving

5    a resolution if you simply stop the charade and acknowledge the

6    elephant in the room, to wit:  That all business ventures

7    already identified, as the Khrapunov entities, Tri-County Mall,

8    Syracuse Center, SDG US Holdings, SDG New York OPCO, CF 135,

9    Flatotel properties and others, operated as alter egos of Ilyas

10   Khrapunov."

11         Do you see that?

12   A.  Yes.

13   Q.  So you're saying, look, even though these are entities,

14   they are really simply Mr. Khrapunov; that's what an alter ego

15   means, right?

16   A.  Yes.  He was controlling those companies.

17         MR. ZACH:  Let's go forward to the first page.  And go

18   down to the -- stop here, please.

19   Q.  This is the e-mail -- you have the hard copy up there.  So

20   this is the first page of 49?

21   A.  Yes.

22   Q.  This is an e-mail dated October 21st from Luigi Rosabianca,

23   right?

24   A.  Yes.

25   Q.  And he represents Triadou, right?

1    A.  I believe it was Triadou.

2    Q.  He is writing you?

3    A.  He represented the other side, but certainly Triadou I

4    recall.

5    Q.  I want to scroll down to the paragraph "for your

6    edification alone."

7         Do you see this?

8    A.  Yes.

9    Q.  And these are all being done in e-mails for settlement

10   purposes only, right?

11   A.  Yes.

12   Q.  And one aspect of something that's labeled a settlement

13   communication between lawyers is that it can't be used

14   typically against the other party, there are certain privileges

15   that attach to it in a litigation, right?

16   A.  Yes.

17   Q.  And Mr. Rosabianca writes, "For your edification alone, we

18   conducted a verification regarding the origin of the funds used

19   in the Tri-County Mall transaction, and we are absolutely

20   confident that the proceeds used during the herein transaction

21   did not originate from Mr. Khrapunov or one of his related

22   entities.  While Mr. Khrapunov may be an external adviser for

23   SDG Capital SA, he does not take any final decisions regarding

24   transactions led by Triadou SPV SA or one of its US related

25   companies.  His role is exaggerated by your client simply to

1   embolden your client's tale of woe."

2        Do you see that?

3   A.  Yes.

4   Q.  You thought, sir, at the time you read that, that that was,

5   to use the letters, BS, right?

6   A.  I took it as posturing.  What I read and indicated on a

7   prior page, especially as to Tri-County Mall and the

8   transaction, the transaction involved a relative of President

9   Bush.  It was on 291, describing this as -- it says, your

10  client is aware there was a commission that was awarded, and it

11  says Mr. Bush is the chairman of the buying entity of

12  Tri-County Mall, not a broker.  And my recollection is Neil

13  Bush was a relative of President Bush.

14  Q.  Isn't it true, sir, that Mr. Sater had told you that, in

15  fact, Ilyas Khrapunov controlled all of these entities; he told

16  you that, right?

17  A.  Without disclosing any confidences that I recall, but

18  whatever was shared in here as to information about Khrapunov's

19  involvement and control certainly came from Mr. Sater, yes.

20  Q.  And Mr. Sater told you that all of the money for these

21  deals came from Ilyas Khrapunov, didn't he?

22  A.  Whatever it says -- I don't have a recollection other than

23  what the communications state was what Mr. Sater was claiming.

24  Q.  Hold on, sir.  So you're saying all that you know about

25  what Mr. Sater, your client, told you is what is in this

1   e-mail?

2   A.   You have to repeat your question.

3   Q.   Mr. Sater was your client, right?

4   A.   Yes, he was a client of the firm and myself.

5   Q.   And you had many discussions with Mr. Sater about the

6   matters involving Tri-County Mall, right?

7   A.   I did, but my partners did as well.

8   Q.   In those discussions, Mr. Sater told you, did he not, that

9   the money from all of these deals came from Ilyas Khrapunov?

10  A.   That's attorney-client privilege as to what Mr. Sater would

11  have told me.

12  Q.   No, it's not, sir.

13  A.   I am required to assert the privilege.  The privilege

14  belongs to Mr. Sater, so I can't speak behind that, but I am

15  required to assert it.

16          MR. SNYDER:  I would want a sidebar on this.

17          THE COURT:  Okay.

18          (Continued on next page)

19

20

21

22

23

24

25

1                (At sidebar)

2                THE COURT:  What is the purpose of the sidebar?

3                MR. SNYDER:  To make sure that I am not waiving

4     privilege.

5                So what is it that he has waived?

6                MR. ZACH:  Your Honor, they have produced all of their

7     internal lawyer communications about this in discovery.  These

8     are literally e-mails between -- these are all internal.  The

9     lawyers are going back and forth with Felix Sater.  We have

10    their whole correspondence and their strategy behind this.

11    They produced it in discovery.  And they have been deposed on

12    it.  The privilege has been waived a long time ago.

13               MR. SNYDER:  We produced -- so you're asking him --

14               MR. ZACH:  This is a different e-mail.  I am just

15    showing this as an example.  They have waived this a long time

16    ago.

17               MR. SNYDER:  I don't know that there has been a

18    complete waiver or if it's a waiver just as to what was

19    produced.

20               MR. ZACH:  It's all about the Tri-County Mall.

21               THE COURT:  Here is the representation.  You can

22    consult with your client, but I know the client has to leave at

23    12.  But the representation is that all of the internal

24    correspondence among the lawyers and Mr. Sater was produced in

25    the course of discovery, and that Mr. Sater was deposed on

1   this.  So that would indicate a waiver of the privilege for the

2   subject matter.

3         MR. SNYDER:  If Sater has testified on that topic

4   already, then he has waived it, if he has testified on his

5   communications with his lawyers about this.

6         MR. KOMBOL:  There is nothing there that involves my

7   client, right?

8         MR. ZACH:  No.  I don't know what else to say, but we

9   have dozens of these e-mails back and forth between them.

10        MR. SNYDER:  Are you going to go for a long time on

11  this stuff?

12        MR. ZACH:  Yes.  He is going to be on the stand for a

13  bit.

14        MR. KOMBOL:  Will you finish with him by noon?

15        MR. ZACH:  No.

16        THE COURT:  He is coming back on Monday.  I have

17  already said that.

18        MR. ZACH:  Given the production, it has been

19  completely waived.

20        THE COURT:  We will take a moment.  You can consult

21  with your client.  I will take five minutes.  But if these

22  representations are correct that the correspondence between Mr.

23  Sater and his lawyers on the Tri-County Mall have been produced

24  and Mr. Sater was examined on it, I recall at least one other

25  letter, which was the threatening letter from Moses & Singer.

1           MR. SNYDER:  I don't think there has been a general

2     waiver, but if there is a waiver as to a particular thing,

3     sure.

4           THE COURT:  Well, you say there hasn't been a general

5     waiver.  We are talking about the Tri-County Mall.  The witness

6     has testified about conversations between himself and Mr. Sater

7     about the CAA.

8           MR. SNYDER:  Yes, he was.

9           THE COURT:  So there would also be a waiver with

10    respect to that.  I don't know if there are any other subjects

11    that are going to come up.

12          MR. SNYDER:  I am not sitting here trying to be

13    difficult, but I am also not here --

14          THE COURT:  We will take a break.

15          MR. ZACH:  Your Honor, just to make the record a

16    little bit clearer, this is literally them drafting that Moses

17    & Singer letter you were just talking about.  This is like how

18    they are strategizing about it.

19          THE COURT:  The internal --

20          MR. ZACH:  Exactly.  It is directly on point.

21          THE COURT:  The internal draft of Moses & Singer about

22    the letter that was sent to the other side.

23          MR. ZACH:  Exactly.

24          MR. SNYDER:  That I don't have an issue with, given

25    that it's been testified to.

1          Now, I need to put something on the record real quick

2    before we leave.

3          So, Mr. Wolf, if I had had my way, I would have asked

4    him, Mr. Wolf, a series of questions about what Sater did after

5    the CAA was signed to establish that he did a lot of very

6    valuable services under the CAA.  I did not ask those questions

7    because I expected the objections would be sustained.  But for

8    the record, I would have liked to have asked those questions,

9    and I believe it's error to not let me ask those questions.  So

10   I am making my record.

11         THE COURT:  Okay.  I have ruled on that.  You can do

12   with it what you will.  My rulings on all of these things have

13   been clear.

14         MR. SNYDER:  I am raising it while he is on the stand

15   so nobody says I didn't.  Thank you, your Honor.

16         MR. ZACH:  So we are going to take five?

17         THE COURT:  Yes.

18         (In open court)

19         THE COURT:  Ladies and gentlemen, we are going to take

20   five minutes to resolve a legal issue.  As I told you, I always

21   think it's more convenient for you to be in the jury room

22   rather than watch us at a sidebar.  So we will just hopefully

23   only need five minutes.  And Mr. Fletcher should be out in a

24   moment.

25         All rise, please.  And the jury should follow Mr.

1  Fletcher to the jury room.

2           (Jury exits courtroom)

3           THE COURT:  See you shortly.

4           THE WITNESS:  Your Honor, parties, I need to leave for

5  the doctor's appointment.

6           THE COURT:  You have to leave at noon.

7           THE WITNESS:  Exactly.

8           (Recess)

9           THE COURT:  Yes.

10          MR. ZACH:  My understanding is they understand that

11 the privilege has been waived.

12          MR. SNYDER:  Not a general waiver, but the question

13 that's pending and --

14          THE COURT:  Tri-County Mall, any attorney-client

15 attorney has been waived, right?

16          MR. SNYDER:  With respect to what is being discussed

17 here, sure.  Not necessarily more broadly, but yes.

18          THE COURT:  The Tri-County Mall.

19          MR. SNYDER:  Yes.

20          MR. ZACH:  To be clear, also the demand letter, which

21 includes other deals essentially, too.  It's everything

22 relating to this set of deals.  That is all in the demand

23 letter.

24          MR. SNYDER:  I think so, unless something comes up

25 that is unusual or I am not expecting, but I don't foresee it.

1           THE COURT:  All right.  Let's bring in the jury.

2           Yes, I understand, Mr. Wolf, you have to leave at noon

3   for a personal appointment.

4           So, Mr. Fletcher, let's bring in the jury.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Mr. Wolf is on the stand.

3          Mr. Fletcher.

4          THE DEPUTY CLERK:  Mr. Wolf, you are reminded you are

5    still under.

6          THE WITNESS:  Yes.

7          THE COURT:  Mr. Zach, you may proceed.

8          MR. ZACH:  Thank you.

9    BY MR. ZACH:

10   Q.  Mr. Wolf, understanding that the attorney-client privilege

11   has been waived, isn't it a fact, sir, that Mr. Sater told you

12   that all of the funds involved in the Tri-County deal in fact

13   came from Ilyas Khrapunov?

14   A.  I don't recall what was said to us other than what is

15   indicated in writings that I have looked at.  I have no

16   independent recollection other than what we have indicated in

17   communications.

18   Q.  So your client took $43 million from the Tri-County Mall,

19   right?

20   A.  I understood there was a transaction that occurred

21   regarding the sale of a mall, that it had occurred previously,

22   Tri-County Mall.

23   Q.  When the case came to you, he had already taken that $43

24   million, right?

25   A.  Yes.

1    Q.  He then asked you to help him engage with Ilyas Khrapunov

2    and the entities to keep that money, right?

3    A.  As I indicated, he claimed he had a financial entitlement

4    for work performed on numerous real estate transactions, that

5    we ultimately put in in these communications and ultimately in

6    a letter in more detail, and based upon those entitlements and

7    Mr. Khrapunov telling him that he wasn't going to honor his

8    agreement contractually or otherwise to pay him his

9    compensation, that is the position that was taken.

10   Q.  Mr. Wolf, your testimony today is you do not recall whether

11   Mr. Sater, in fact, told you that those funds came from Ilyas

12   Khrapunov?

13   A.  I believe the writings indicate what he would have told us,

14   and independent of that I don't have any recollection.  I would

15   have had no other source of knowledge other than Mr. Sater.

16   Q.  Sir, at this time -- you're a lawyer, sir, right?

17   A.  Yes.

18   Q.  And you practice in criminal defense, right?

19   A.  Yes.

20   Q.  And in other business litigation, right?

21   A.  Yes.

22   Q.  And you understood, sir, that at this point, on October 30,

23   2013, there were worldwide freezing orders in place for funds

24   dealing with Ilyas Khrapunov, right?

25   A.  I don't recall it, no.

1   Q.  You don't recall that.

2          Do you recall that during this time period, coming

3   into October 2013, there were multiple news articles relating

4   to Mukhtar Ablyazov and Ilyas Khrapunov involved in money

5   laundering; do you recall that?

6   A.  I don't recall, no.

7   Q.  Sir, in the demand letter that you make, and we will look

8   at it in a second -- let's just bring that up.

9          MR. ZACH:  Bring up 357.

10  Q.  This is a letter from your firm, right?

11  A.  Could you blow it up?  I can't really read it.

12          Yes.  It's from Moses & Singer.

13  Q.  This is a letter you signed, right?  You see Robert Wolf

14  there?

15  A.  I only see page 1, but I'm assuming if it's from me I

16  signed it.

17  Q.  Look at the top right.

18  A.  I see my name in the top right.

19  Q.  And the "re" line, can you please read that "re" line out

20  for us.

21  A.  Felix Sater v. Ilyas Khrapunov, Mukhtar Ablyazov, et al.

22  Q.  So you understood, sir, that on October 30, 2013, that

23  there were worldwide freezing orders against Mukhtar Ablyazov

24  relating to his funds, right?

25  A.  I don't recall other than what is in the letters of what

1   was the present -- what was the situation at the time.

2   Q.  You understood that you were threatening to sue Mukhtar

3   Ablyazov here, right?

4   A.  The letter speaks for itself.  Can you scroll through the

5   whole letter?  You're just showing me the first page.

6   Q.  Sure.

7   A.  Do you have a hard copy of this?  It would be easier.

8   Q.  I am told that I do.

9         Yes.  Please ignore the highlighting.

10  A.  Okay.  Question.

11  Q.  So my question to you is, at this point in time, your

12  client has taken $43 million out of the deal and wired it to a

13  separate bank account, right?

14  A.  I didn't know where it was sent, but yes, I understand he

15  was in possession of it.

16  Q.  That's not a normal commercial transaction, right?

17  A.  I can't really comment on the situation.  I don't do real

18  estate transactions, but however they were supposed to be

19  conducted, it didn't sound like this ended up the way the

20  participants, or the contractual participants, or whatever it

21  was, it didn't sound like it ended up the way others had

22  expected.

23  Q.  You knew that he wired some of that money to his wife's

24  granola company, right?

25  A.  I didn't know that.

1    Q.  We will get into the Moses & Singer bank records in a

2    moment, but let's just stick with this.

3            So, on October 30, your client has $43 million that he

4    has taken out of a deal, right?

5    A.  I understood he took the proceeds.

6    Q.  You are threatening to sue Mukhtar Ablyazov and Ilyas

7    Khrapunov, right?

8    A.  I don't believe that's accurate, no.

9    Q.  But, Felix Sater v. Ilyas Khrapunov, Mukhtar Ablyazov, et

10   al., for a lawyer, that's the caption of a lawsuit, right?

11   A.  It describes an adverse situation.

12   Q.  What does the "V" mean, sir?

13   A.  It describes an adverse situation.  There was no lawsuit.

14   Q.  And your testimony, as you sit here today, you did not know

15   that Mukhtar Ablyazov, the person you were threatening to sue,

16   was subject to worldwide freezing orders?

17   A.  We weren't threatening to sue.

18   Q.  Did you Google Mukhtar Ablyazov?

19           MR. SNYDER:  Objection.  When?

20   Q.  Before October 30, 2013, did you Google Mukhtar Ablyazov?

21   A.  I don't recall.

22           MR. ZACH:  Let's pull up 581.  This is already in

23   evidence.

24           THE WITNESS:  Your Honor, it's 12 noon.

25           THE COURT:  We are going to have to break.

1          MR. ZACH:  Two more questions.

2   BY MR. ZACH:

3   Q.  If you had Googled him, would you agree with me——see this

4   e-mail is July 18, 2013——that a Reuters article would likely

5   have come up?

6   A.  You're asking me speculation?

7   Q.  If you Google someone's name, do articles come up?

8          MR. SNYDER:  Objection.

9          THE COURT:  Sustained.

10  Q.  You see here this is a Reuters article that's in evidence

11  that says:  "An English judge has barred lawyers representing

12  fugitive Kazakh oligarch Mukhtar Ablyazov, accused of

13  embezzling $6 billion from his former bank, from making oral

14  submissions to the court because he has been serially in

15  contempt of court."

16          This was information that was publicly available to

17  you as of October when you signed that letter, right?

18  A.  Again, you're asking me to speculate?

19  Q.  And your testimony is you didn't do anything to check out

20  Mr. Ablyazov?

21  A.  You asked me that question already.  I said I do not

22  recall.

23          MR. ZACH:  It's noon.

24          THE COURT:  Ladies and gentlemen, we have to take an

25  early lunch break today, and we are going to take some

O6L8ALM2                                                    1131

1   witnesses out of order in order to deal with people's

2   commitments.  So that's why I am taking an early lunch today.

3   Mr. Wolf will return on Monday morning to conclude his

4   testimony.

5       So we will break for lunch.  Please remember my

6   continuing instructions not to talk about the case, always keep

7   an open mind, don't look at or listen to anything to do with

8   the case.  The jury should return at 1:00, please.

9       All rise, please.  The jury should follow Mr. Fletcher

10  to the jury room.

11      (Jury not present)

12      THE COURT:  Mr. Wolf can step down.

13      THE WITNESS:  Thank you, your Honor.

14      THE COURT:  Please don't run into any of the jurors as

15  you leave the courtroom.  Everyone else should be seated.

16      In fact, Mr. Wolf, if possible, stay in the back of

17  the courtroom until Mr. Fletcher advises you that the jurors

18  have left the floor.

19      So who is the next witness?

20      MR. SNYDER:  Mendel Mochkin will come back after

21  lunch.  And assuming we have time, I will start Felix, but not

22  complete him today.

23      MR. KOMBOL:  With respect to Mr. Mochkin, we are

24  recalling him for general purposes, as we discussed before.

25  Obviously, he is observant.  As a courtesy to my colleagues,

1    they asked for him to come today.  I don't think we will have

2    him on the stand for much more than a half hour, and I would

3    just ask the plaintiffs to be respectful to the fact that he is

4    observant.  I am confident that I am not going to be expanding

5    something beyond what they have already had an opportunity to

6    discuss with him except a possible minor deviation here or

7    there.

8              MR. SCHWARTZ:  Fortunately, yesterday was our summer

9    solstice and sundown is not until 8:30 today, so I don't see

10   that as an issue.

11             Just two things with respect to Mr. Mochkin.  Number

12   one, on the information about his background, I still have not

13   gotten the testimony that they intend to elicit.  So it would

14   be good to not have a dispute about that.  Two, we still don't

15   have a certified translation of the Italian article.  To the

16   extent that's something they want to go into, we should resolve

17   that.

18             MR. KOMBOL:  I sent Mr. Schwartz the script yesterday

19   at 2:15.  If he missed that, I apologize.

20             THE COURT:  2:15 a.m.?

21             MR. KOMBOL:  2:15 in the afternoon.  So he should have

22   that.

23             With respect to the Italian article, they brought it

24   up with respect to innuendo.  There are allegations in their

25   complaint we will be addressing as well.  I don't think we are

1   going to go much deeper into it than that.

2          THE COURT:  The question was, is there a translation

3   of the article?

4          MR. SNYDER:  We don't have a certified translation at

5   this moment.  We are hoping to get that resolved over the

6   weekend, but sitting here today we do not have one.

7          MR. KOMBOL:  Again, with respect to the Italian

8   article, I don't think the actual article is going to be

9   addressed.

10         THE COURT:  You can talk about the article even though

11  only the Italian version is in evidence.  But that's in

12  evidence.

13         MR. KOMBOL:  Obviously, there are allegations in the

14  complaint that relate to the article, but only as specifically

15  alleged in the complaint.  And obviously I don't think there

16  can be any limitation on that if it's one of their allegations.

17         THE COURT:  I have no idea what the examination will

18  be.  Okay.  Take a short lunch.  Be back by quarter of 1 so

19  that you avoid the jurors.

20         Were you rising for some reason, Mr. Schwartz?

21         MR. SNYDER:  I am very nervous on getting back on

22  time.

23         THE COURT:  I was addressing Mr. Schwartz.  You have

24  answered it.  Very generous of you.

25         (Luncheon recess)

1                          AFTERNOON SESSION

2                               1:00 p.m.

3           (In open court)

4           THE COURT:  Please be seated.

5           (Jury not present)

6           THE COURT:  The parties should discuss at the end of

7    the day when we're not using the jury's time if there are any

8    issues with respect to the attorney-client privilege with

9    respect to Mr. Wolf.  Easy enough for the plaintiffs to

10   indicate the areas that they intend to examine into.  And if

11   there is going to be an assertion of the attorney-client

12   privilege, then I want to have it briefed over the weekend why

13   it's been waived on those subjects.

14          MR. ZACH:  Sure, your Honor.  No problem.

15          MR. SNYDER:  And if he's -- based on where he's gone

16   so far, I am not close to asserting it, but, you know, we'll

17   see, I suppose.

18          THE COURT:  But I want it resolved over the weekend.

19   And if there is any dispute as to any particular area, I want

20   it briefed over the weekend.  Follow?

21          MR. SNYDER:  Yes, your Honor.  I will speak with

22   Mr. Zach after court and raise those issues.

23          THE COURT:  If I don't receive any correspondence by

24   Sunday afternoon, then I will take it that there is no issue.

25   I just don't want to use the jury's time with breaks or whatnot

1    on Monday.

2              MR. SNYDER:  Fully understood, your Honor.

3              THE COURT:  So the next witness is Mr. Mochkin?

4              MR. KOMBOL:  Yes, Mr. Mochkin.  Would you like him to

5    take the stand right now?

6              THE COURT:  Yes, please.

7              MR. KOMBOL:  Your Honor, can I step up to the dais.

8              THE COURT:  Not necessary.  You can do it when the

9    jury comes in.  Let's bring in the jury.

10             (Jury present)

11             THE COURT:  Good afternoon, ladies and gentlemen.  I

12   hope you had a good lunch despite the heat.

13             So defendant should call their next witness.

14             MR. KOMBOL:  Your Honor, defendant MeM calls Mendel

15   Mochkin on its behalf.

16             THE COURT:  All right.

17   MENDEL MOCHKIN,

18        called as a witness by the Defendant,

19        having been previously affirmed, testified as follows:

20             DEPUTY CLERK:  Mr. Mochkin, you've been previously

21   sworn, correct?

22             THE WITNESS:  Affirmed, yes.

23             DEPUTY CLERK:  Affirmed.  Excuse me.

24             Just to remind you, you are still under oath.

25             THE WITNESS:  Yes.

1        THE COURT:  Mr. Kombol, you may examine.

2    DIRECT EXAMINATION

3    BY MR. KOMBOL:

4    Q.  Good afternoon, Mr. Mochkin.

5    A.  Good afternoon.

6    Q.  We are continuing kind of as a hybrid today from your

7    examination a few days ago, so we will be touching a bit on

8    that and also be addressing your defenses during this

9    examination just to give you a context.

10        How old are you?

11   A.  I'm 50 years old.

12   Q.  And were you born in Brooklyn?

13   A.  I was born in Brooklyn, yes.

14   Q.  Do you live in Brooklyn to this day?

15   A.  Yes, I do.

16   Q.  So you've lived in Brooklyn your entire life?

17   A.  Pretty much aside from student, you know, school.

18   Q.  Is your family from Brooklyn?

19   A.  My family is from Brooklyn, yes.

20   Q.  Were they born here or did they immigrate?

21   A.  My parents immigrated from the former Soviet Union in 1947.

22   Q.  And when you say your parents, both your mother and your

23   father?

24   A.  Both my mother and my father, correct.

25   Q.  Why did they leave the former Soviet Union?

1   A.   Because of the religious persecution there that was

2   happening to religious Jews in the former Soviet Union.  It was

3   during Stalin's time.  Had several -- my father -- several of

4   my father's brothers were imprisoned in the gulag for about ten

5   years, and they left in 1966.  But my parents, my father and my

6   parents, my mother were able to escape in 1947.

7   Q.   And your family has lived in Brooklyn ever since?

8   A.   Yes.

9   Q.   Now, just to go a bit into your personal background.  Can

10  you explain your or give me a bit of background on your

11  educational history?

12  A.   Well, I studied in a Yeshiva, that's a Jewish parochial

13  school, until I was -- various levels of the parochial schools

14  until about when I was 22 or 23.  And that brings me to about,

15  I guess, in the mid-Nineties, and that's the extent of my

16  education.

17  Q.   Did you after that begin a career working in some context

18  or another?

19  A.   Yeah.  I was part of a startup.  This is in the mid to late

20  Nineties where the internet was just starting, and I was part

21  of a startup collectibles on the internet then, stamps and what

22  have you.  And then I went into the -- I was involved in a

23  company that was involved in the oil business, and so -- and

24  then I stopped doing that in the beginning of the 2010s, and

25  then I got involved in real estate which I'm still doing until

1  today.

2  Q.  When you say "involved in real estate," can you explain

3  what that means?

4  A.  I work for a company that owns, bought and owns some

5  multifamily in Brooklyn that works with non-profit

6  organizations to house homeless and women in need and stuff,

7  and non-profit organizations that provide supportive housing

8  are for the -- those that need it.

9  Q.  Are you a licensed real estate broker?

10  A.  I am not.

11  Q.  Do you ever work in transactions where you take a

12  commission or a piece of the transaction in connection for your

13  efforts?

14  A.  I have an eclectic circle of contacts, and I'm relatively,

15  I guess, decent in putting people together and deals happen, so

16  sometimes I get an advisory fee or finder's fee and sometimes

17  not.  Sometimes I invest in the deal or, you know, so it

18  depends.

19  Q.  In those instances, do you ever act as a real estate broker

20  or were you acting in a different capacity?

21         MR. SCHWARTZ:  Objection.

22  A.  I've never acted as a real estate.

23         MR. KOMBOL:  There's an objection.  Wait a moment.

24         THE COURT:  Overruled.

25  Q.  You can continue.

1   A.  I've never acted as a real estate broker, no.

2   Q.  You're familiar with the defendant, Mr. Felix Sater?

3   A.  Yes, I am.

4   Q.  Can you give me a little bit of background, how you came to

5   know Mr. Sater?

6   A.  I was involved in an energy deal in the state of Israel

7   from 2006 until 2012, I think it was, and one of the investors

8   that I was dealing with had a business relationship with

9   Mr. Sater, and he introduced us.

10  Q.  Again, you said that was 2006, 2007?

11  A.  Well, I was introduced to Mr. Sater through this investor.

12  He was an Israeli guy who has some interest in gas stations

13  here in the United States.  I was introduced in 2011 to

14  Mr. Sater.

15  Q.  2011?

16  A.  Correct.

17  Q.  How did that introduction take place?  Can you give us a

18  little bit more color on that?

19  A.  The man was coming to New York, and I was in New York.  I

20  was going back and forth.  I was sort of commuting to Israel

21  once a month, which wasn't easy with a family of five at that

22  time, and he said I want to make an introduction to one of my

23  business associates, and that's what happened.

24  Q.  Did anything grow from that introduction?  Did you engage

25  in business together at that time?

1  A.  I mean, we -- we met and we spoke about investing in my

2  project that I was working with in Israel.  That didn't work

3  out, and, you know, Felix is a colorful -- colorful guy and

4  also has a lot of contacts and a lot of interesting ideas, as

5  far as investments and ideas in business so we're looking at

6  somewhere where we can collaborate on, and then -- but nothing

7  really eventuated until I basically left the oil and gas

8  business and I, you know, was looking for some real estate

9  opportunities to be involved in.

10        Felix mentioned that they had bought a note, and so

11  one of my contacts in the energy business that I had met, the

12  aforementioned Mr. Bush, Neil Bush, the President's brother,

13  who -- he had joined a Singapore listed real estate investment

14  trust, a REIT, that was looking for distressed assets in the

15  United States, and so I dropped him a note and, you know, he

16  followed up, they're interested, send him information, and we

17  sent him information.  Yes.

18  Q.  Let's go back.  The business in Israel you said you were

19  working on, can you describe what that was?

20  A.  So I joined this company in 2002 that was involved in oil

21  and gas exploration.  At that time they were involved in the

22  Republic of Turkey, and in 2007 they switched focus, and they

23  applied for a license in Israel for an onshore oil field.  Very

24  few people know, but there's one oil field that was discovered

25  in Israel in 1950s.  It was an old oil field and it came up for

1   license, and so we put in a bid to rehab the oil field.  It was

2   doing 50 barrels a day or something like that, so I worked on

3   that for about five years.

4   Q.  Was the Tri-County Mall deal the first interaction or

5   business exploration that you had with Mr. Sater?

6   A.  The first business that came to fruition.

7   Q.  Was there any prior failed efforts before that?

8   A.  I'm sure there were many.  I try not to -- I have only

9   enough hard drive space in my head to think about deals.  A lot

10  of talk, but, you know, try to focus on stuff that actually

11  worked.

12  Q.  When you met Mr. Sater, where was his office?

13  A.  I believe his office was in -- I met him first in Trump

14  Tower, I think it was.

15  Q.  He had an office there or what was his relationship to

16  Trump Tower?

17  A.  I think he was working on then the Trump SoHo, if I

18  remember correctly.  I think he was involved in that

19  development somehow of putting up Trump's SoHo, so I'm pretty

20  sure, I think it was in a Trump's organization office there.

21  Q.  Did you have any involvement with Trump SoHo?

22  A.  No.

23  Q.  That just happened to be the office when you came to --

24  A.  When I first met him.  I only met him once there, and I

25  didn't meet him after that.  He had another office in

1   Rockefeller Center.  He moved after that.

2   Q.  Now, getting back to what you were saying about the

3   Tri-County Mall note.  Felix approached you, you said, and

4   discussed some kind of instrument that he had in connection

5   with the Tri-County Mall note.  Can you give us a little more

6   clarity on that?

7   A.  He -- I guess it was in the spring of 2013, he mentioned

8   that he is involved with this fund, trying this fund to

9   distressed real estate, and they're negotiating or buying this

10  debt instrument from -- that had like, it was a 1.5 million

11  square foot mall in Cincinnati that was 50 percent vacant,

12  50 percent occupied, and they were buying the note for a very

13  good price.  I think the outstanding balance was north of

14  200 million, and they had bought the note or they were buying

15  the note for 25, you know, in that vicinity, million, and so

16  he's buying the note, and he's either going to flip the note or

17  take possession and see if he can re-fi the mall, et cetera.

18  Q.  And he just mentioned this to you, hey, I got this

19  opportunity.  Do you know anybody who would be interested in it

20  or can you give us more color there?

21  A.  As much as I can recall.  It's eleven years ago, I can't

22  verbatim repeat it --

23  Q.  Now, you mentioned Neil Bush, President Bush's brother--

24  A.  Yes.

25  Q.  -- in the group.  Can you tell -- remind us again the name

1    of the group?

2    A.   The group was called Singhaiyi.  Like I said, it was a

3    Singapore listed real estate investment trust that was a very

4    active developer in Singapore, and at that time had a

5    subsidiary and affiliate entity in the United States that was

6    buying distressed assets.  I think they bought hotels in San

7    Francisco and bought an office building in Portland.  So, yeah,

8    that's -- we were coming out of the financial crisis, so that's

9    what was going on.

10   Q.   A lot of people were buying distressed assets and trying to

11   find ways to monetize them?

12   A.   I don't know.  Maybe; maybe not.  I wasn't involved in the

13   real estate business, so I didn't know if a lot or a little.

14   Q.   How did you know Neil Bush?

15   A.   I was -- because I was in the energy business.  I was going

16   a lot to Houston, and one of my oil and gas acquaintances was

17   working with Mr. Bush.  He introduced us and we, you know, sort

18   of hit it off, and I took him to some kosher restaurants here.

19   He tried to take me to kosher restaurants in Houston.  No

20   kosher restaurants in Houston, so -- but, you know, that's it.

21   Q.   You made a connection.  You made a friend?

22   A.   Friend, an acquaintance, I mean.  We didn't have drinks at

23   each other's house, but, you know, we spoke periodically, and

24   we had a good relationship.

25   Q.   Fair to assume that after you were alerted to the

1    Tri-County Mall opportunity with Felix, that you then brought

2    that to Neil Bush as kind of an intermediary capacity?

3    A.  Yes.  Actually, it was funny because I got a Linked In

4    message that he has this new role, and so I looked it up, and

5    then I messaged him or texted him or emailed him, I don't

6    remember which one, that I had this opportunity, if you're

7    looking for a distress, it seems like an interesting

8    opportunity in a mall, so that's how it eventuated.

9    Q.  You're saying Neil Bush, the President's brother, he has a

10   Linked In profile?

11   A.  At that time he did.  I don't know if he still does.

12   Q.  You happened to follow it, and you see he moved into a new

13   sector, and you connected the two dots.  Is that more or less

14   it?

15   A.  I guess you can call it dots, yes.

16   Q.  Is that all you did with the Tri-County Mall deal?

17   A.  I mean, I helped facilitate the bulk of the transaction.  I

18   sent him the information contact.  Do they want to come to a

19   site visit?  So several weeks later, there's a site visit,

20   brought a team of about five, six people to Cincinnati.  It was

21   out in Cincinnati.  We toured the mall.  Several weeks of back

22   and forth, several conversations, information, discovery, and

23   stuff like that.  And so I sort of was acting like some sort of

24   an intermediary between the two groups.

25   Q.  Were you doing underwriting for the deal as well?

1    A.  No.  I had no capacity to do underwriting and no expertise

2    in that and no interest.

3    Q.  You were just facilitating --

4    A.  Discussion.

5    Q.  And doing everything you could to try to make the

6    transaction happen?

7    A.  I guess, yeah.  That's what we do.

8    Q.  Do you recall how much -- maybe you can remind the jury how

9    much to your understanding Felix and his group bought that note

10   for?

11   A.  I didn't know the exact number.  I mean, only from what

12   I -- it was somewhere in the order of 25 million, but, you

13   know, at that time that's what -- the number that I recall.  I

14   mean, I've subsequently, you know, you read the documents, you

15   can see it's 28, but I had no -- I was not involved in any of

16   that and had no independent knowledge of what, when, and where.

17   Q.  So on the purchase side of the note by which Felix and his

18   group purchased the note, you had no involvement whatsoever?

19   A.  No.

20   Q.  Your involvement was solely on reselling the note to this

21   Neil Bush group?

22   A.  That's correct.

23   Q.  And did you help negotiate that price?

24   A.  I would say as a -- I'm not a principal, so I can't

25   negotiate, but I helped facilitate discussions about that.

1   Q.  You were involved in most steps of that as the prices were

2   negotiated, but it was between the principals to actually do

3   the actual transaction numbers?

4   A.  That's correct.

5   Q.  Do you recall what the price ultimately negotiated was?

6   A.  Yeah.  They originally were discussing, you know, actually

7   buying the note, but in the meantime between when they came to

8   the mall till they were ready to purchase, the sheriff's sale

9   was announced, so they decided they would like to come to the

10  sheriff's sale and bid on the note on the sheriff's sale

11  because it looks better optically that they bought something

12  out of foreclosure versus buying the note prior, so that's yes,

13  so that's what happened.

14  Q.  How much was that purchase price again?

15  A.  45 million.

16  Q.  That was a substantial increase over the price that they

17  had acquired the note on, correct?

18  A.  Yes.  I -- as you know, being familiar with the Bible, I

19  looked at this like manna from heaven, I mean.

20  Q.  And your position in this litigation is that all the monies

21  that you received from the Tri-County note transaction were

22  related to these efforts, correct?

23  A.  That is correct.

24  Q.  And that payment came in kind of two pieces, right?  Didn't

25  you get a payment from the Neil Bush group side?

1   A.   Yes.

2   Q.   And to your understanding, is that payment in your work in

3   connection with that payment in any way disputed in this

4   action?

5   A.   Not to my knowledge.

6   Q.   In that capacity, you acted in the same capacity as you

7   acted for any other payments, correct?

8   A.   Yes, I guess so.

9   Q.   So, in essence, you are now here being sued because you

10  took a buyer's side payment and no one appears to dispute that,

11  but it's that second payment, the seller's side payment, that

12  they're trying to say there was some impropriety in?

13          MR. SCHWARTZ:   Object to the form.

14          THE COURT:   Just rephrase it.

15  Q.   Your understanding is no one is disputing that first

16  payment you got from the Neil Bush group, correct?

17  A.   That's my understanding.

18  Q.   And that was for the same work that you did in connection

19  with all the other payments that you received, correct?

20  A.   With relating to the Tri-County Mall, yes.

21  Q.   It's only the balance of the money that you received that

22  you understand is being disputed here?

23  A.   That's what I understand.

24  Q.   Do you understand why that argument is being made against

25  you, those claims are being made against you?

1   A.  You mean besides no good deed goes unpunished?  Not really.

2   I mean, I don't even know what to say.  I'm not sure why I'm

3   dragged here.  I'm not even sure why I'm sitting here.

4   Q.  You were a broker for sure at least with the Neil Bush side

5   of it?

6   A.  I created value and put the pieces together, so that's it.

7   Q.  You got paid on both sides.  You got paid by the buyer's

8   side and the seller's side?

9   A.  Correct.

10  Q.  How much in total between those two payments did you

11  receive for your efforts?

12  A.  Well, it was 900,000 from the seller -- from the buyer and

13  it was like 650 from the seller.  So that was a total of 1 --

14  what was it, 1.5 -- 1.55.

15  Q.  Was that a small amount of money to you at that time?

16  A.  No.  That was a big amount of money for me.

17  Q.  You were transitioning careers.  Was that a welcome amount

18  of money to you at that time?

19  A.  That was a very welcome amount of money.  Especially, like

20  I said, I had the five children at that time.  I had a three

21  year old at home, and we were all coming out of financial

22  crisis and, you know, it was -- it was -- it was very well

23  timed.

24  Q.  Manna from heaven.  You say you have five kids.

25  A.  I have seven children, thank God.  But at that time I had

1   five.

2   Q.  Big family.

3   A.  I come from seven.  My wife comes from seven.  So I don't

4   know, it depends where you come from.  To me, it's a regular

5   family.  My sister has 14, so that's a big family.

6   Q.  I'm one of six.  My mom is one of 12.  My wife is one of

7   nine.  So I can relate.

8           Let's talk about the Syracuse transaction.  Are you

9   familiar with that?

10  A.  Yes.

11  Q.  Were you involved in that?  Did you receive payment from

12  that?

13  A.  So, yeah.  So Felix was also looking for distressed assets.

14  So I was doing some research, and I came across this auction in

15  Long Island that this auctioneer - I forgot his name, actually

16  - who was putting a large Syracuse property that used to be a

17  mental asylum and fell into disuse and going to a foreclosure

18  auction.  So I brought it to Felix's attention and facilitated

19  the conversation with the receiver and the auctioneer and also

20  was, again, looking for an end user in the eventuality that

21  they would buy it.  So I helped monetize on that as well.

22  Q.  How much did you receive in connection with that

23  transaction?

24  A.  If I recall, it was somewhere like 30,000, 35.  I don't

25  remember, but somewhere like that.

1    Q.  Substantially less than your -- what you received on the

2    Tri-County Mall transaction?

3    A.  Well, I was really an adviser in capacity of flex sourcing

4    deals for him.  And I didn't bring a buyer, I didn't bring --

5    you know, so that was more almost like he was, you know, like a

6    one time free for doing that, helping him research and

7    analysis, you know, for that deal.

8    Q.  Kind of like consulting fee?

9    A.  Correct.

10   Q.  That was a commercial transaction, not like residential

11   real estate?

12   A.  That is correct.

13   Q.  Among commercial buyers and sellers, right?

14   A.  It was an auction -- again, it was a distressed asset that

15   was going to auction, yeah.

16   Q.  Was anybody involved in that transaction on the buyer or

17   seller side who sued you saying you shouldn't have been paid

18   those monies?

19   A.  Not to my knowledge.

20   Q.  Do you know who Arnie Herz is?

21   A.  I do.

22   Q.  Who is Arnie Herz?

23   A.  Arnie Herz is a lawyer that worked with Felix.  He --

24   that's all I -- that's basically what I know.  He was a lawyer

25   who worked for Felix.  He was, I guess, prominently involved in

1   the Tri-County transaction.  That's when I dealt with him.  I

2   hadn't dealt with him before, and I hadn't dealt with him

3   after.

4   Q.  Just to be clear, you said you had not dealt.

5   A.  I was introduced to Arnie through Felix in the context of

6   the Tri-County transaction, and I have not dealt with him

7   after.

8   Q.  And to your understanding, did Arnie work essentially as

9   counsel on the Tri-County Mall transaction on behalf of Felix?

10  A.  I don't know what his role was.  I know that he was Felix's

11  lawyer.  Whatever that means, I had no knowledge nor

12  inclination to know what, you know, precisely who, what, when,

13  where, but that's the way it was presented to me, and that's

14  what I took at face value.

15  Q.  We heard testimony earlier a few days back when you were

16  here, there was that letter with the payment instructions that

17  you signed that directed the distribution of certain of the

18  payments.  Did you draft that letter?

19  A.  No, I did not.

20  Q.  Who drafted that letter again?

21  A.  Arnie did.

22  Q.  Do you know on whose instructions?

23  A.  I would assume it was on Felix's instructions, but I -- you

24  know, I don't know.

25  Q.  You didn't really care, you just wanted to get your money

1    and get it paid and move on to your family life, correct?

2    A.  Pretty much.

3    Q.  I notice that Arnie Herz was paid pursuant to that

4    direction letter I believe $50,000.  Do you recall that?

5    A.  Yes, I do.

6    Q.  Was he paid in connection with his work on those

7    transactions?

8    A.  I would assume so.  That's what Felix wanted him to be

9    paid.  I wasn't, you know, that was -- it was presented to me

10   as a fait accompli.  I didn't negotiate that fee because I had

11   no reason to pay him that fee.

12   Q.  It was a fee no different than you received a fee for

13   facilitating the transactions in connecting the two hands?

14              MR. SCHWARTZ:  Objection.

15              THE COURT:  Sustained.

16   Q.  Is Arnie Herz being sued in this litigation?

17   A.  I don't know.

18   Q.  Do you as you stand here today understand why plaintiffs

19   are trying to reclaim these monies for you -- from you that you

20   received for your work in connection with these transactions?

21   A.  Why I understand -- can you repeat that question?

22   Q.  Let me rewind a bit.

23              Do you understand that in this litigation you've been

24   accused of acting as a PR representative on behalf of various

25   people affiliated with Felix Sater, such as Khrapunov and other

1  parties, that we've been hearing about today?

2  A.   That's what I read, yes.

3  Q.   And you read that in the complaint?

4  A.   That's correct.

5  Q.   I'm going to read that to you very briefly from paragraph

6  265 of plaintiff's amended complaint.

7       "The funds Mochkin received were not a legitimate

8  seller side commission in connection with the Tri-County Mall

9  deal.  Instead, the payment was compensation for other work

10 Mochkin had performed for Ablyazov.  Specifically, Mochkin

11 worked on behalf of Ablyazov to generate negative publicity

12 about the Republic of Kazakhstan and to improve Ablyazov's

13 public image after Ablyazov's flight from justice in the United

14 Kingdom and sentenced for criminal contempt."

15      That's the allegation that they're making against you

16 to try to say that you received those monies for some other

17 purpose.  And there are others but I think that summarizes it

18 fairly closely.  Is there any truth to that allegation?

19 A.   Absolutely not.  If there was, I would have opened up my

20 own PR firm.

21 Q.   Are you Italian?

22 A.   No.

23 Q.   Do you speak Italian?

24 A.   Like I said prior, besides some opera that I know, no.

25 Q.   Were you retained to perform any PR work?

1    A.   No.

2    Q.   Now, earlier plaintiffs introduced an untranslated article

3    from Italy into evidence, kind of alluded to it and moved past

4    it.  Do you have any knowledge about what that article is

5    about?

6    A.   Yes.

7    Q.   Can you explain what that is?

8    A.   Sure.  In one of my conversations that we were having in

9    the deal with Felix, he mentioned to me that Mr. Khrapunov's

10   father -- mother-in-law and daughter were kidnapped by the

11   Kazakh government out of Italy and taken back to Kazakhstan,

12   and that really -- that really got me going because I know what

13   it means to live under a -- well, my family knows what it means

14   to live under an authoritarian regime and how they pursue

15   dissidents and stuff like that.  And to do that to a mother and

16   daughter was unconscionable, especially at that time it was

17   right around the time that the Amanda Knox thing was happening

18   where this American girl was imprisoned, falsely accused of

19   various allegations in Italy, so it was, you know, it just came

20   together.  That really, really got me upset.

21   Q.   It upset you on a personal level?

22   A.   Absolutely.  On a moral level.

23   Q.   On a moral level.  A mother and daughter had been

24   kidnapped?

25   A.   Yes.  And so the -- I knew a journalist, a prominent

1    journalist in Italy because he had been a correspondent for a

2    prominent Italian newspaper in New York, and he did a series

3    in, I think it was, 2008, 2007 of prominent people in New York,

4    and one of the people he interviewed was my father because of

5    the role that my father played in helping the members of my

6    community escape, I think over 2,000 members escape, in 1947

7    from Stalin's clutches.  So he interviewed him.  So we had a

8    relationship in the past, and I reached out to him and said

9    like what's -- how can this be?

10   Q.  This journalist had done a story here in New York about

11   your father and his work on rescuing, you said, close to 2,000

12   Jews from persecution in Russia?

13   A.  That's correct.

14   Q.  That's how you knew this journalist?

15   A.  That's correct.

16   Q.  You maintained a lengthy relationship with the journalist?

17   You emailed him weekly, daily?  Was this something that you --

18   A.  No, I had not really been in contact with him since he had

19   done that piece on my father, but I reached out to him through

20   a relative of mine that introduced me to him in the beginning,

21   you know, prior, and said this is -- this thing happened in

22   Italy.  It can't be a democracy that it's being allowed to be

23   hijacked to kidnap a woman and her three-year-old child back to

24   a place like Kazakhstan.  This cannot be.

25   Q.  Kind of like the Neil Bush connection.  Felix mentions the

1    mall.  You connect two dots.  Off that went.  Here you knew

2    about while working with the transaction on the Tri-County

3    Mall, you heard about the story, you introduced him to an

4    Italian journalist that you knew, and you moved on, correct?

5              MR. SCHWARTZ:  Object to the form.

6              THE COURT:  Sustained.

7    Q.  Beyond introducing Felix to the Italian journalist or to

8    Khrapunov the Italian journalist, did you have any more

9    involvement in that story?

10   A.  On a general approach, no.  But, you know, that triggered

11   me to look into what was going on what, you know, with the

12   whole situation, why he was being pursued, et cetera.  So that,

13   you know, so that caused me to do some research of what was

14   going on, et cetera.

15   Q.  But that was just a fluke of circumstance.  It had nothing

16   to do with your work on the Tri-County Mall?

17   A.  Well, it was -- no, it had nothing to do with Tri-County.

18   It had to do with the fact that I was trying to save a woman

19   and her daughter which actually worked because an enormous

20   political firestorm that happened in Italy that caused the

21   Kazakhs to repatriate the mother and daughter back to Italy,

22   and I believe thereby saving their lives.

23   Q.  Were you paid anything for that?

24   A.  No, and I would reject any payment if offered.

25   Q.  It was a moral duty that you felt you should at least do

1   what you could to redress?

2   A.  Absolutely.  It was part of the fabric of my family and

3   part of what I am.

4   Q.  And part of what your family escaped from almost?

5   A.  It was part of who we are.  It was part of our DNA.

6   Q.  And like you said, now you're being sued under claims that

7   you were illicitly paid funds with that?

8   A.  No good deed goes unpunished.

9   Q.  No good deed goes unpunished, like you said.

10          Have you worked with Felix Sater since those two

11  transactions?

12  A.  No.  I mean, after that I got involved in my own real

13  estate deals in Brooklyn, like I said, doing multifamily with

14  supportive housing, so we maybe kept in touch periodically, but

15  it wasn't so -- so -- you know, wasn't intimate like it was

16  before.

17  Q.  You live a small life in Brooklyn with your wife and your

18  seven children.  That's your focus?

19  A.  Yes.

20  Q.  And Felix is a lot, is he not?

21  A.  No.  Felix is, like I said, he's a larger than life

22  personality, and everyday is another interesting idea, another

23  deal, another, you know, business idea that can, you know,

24  another billion dollar deal, but where I was in my life, I

25  couldn't be involved in that roller coaster that much longer,

1    so, you know, deals that worked worked, and you just move on

2    sometimes and go to the next deal, you know, the next phase.

3    Q.  You were focused on what you were building then, which was

4    your real estate multifamily servicing the homeless here in New

5    York --

6    A.  Correct.

7    Q.  Have you been paid on deals on the buyer and seller side

8    before?

9    A.  No, I didn't really -- I don't recall being much of a

10   principal in other real estate deals that I tried.  Meaning,

11   when I say principal, I didn't recall being an adviser in some

12   other real estate deals.  I decided just to become a principal

13   and work for a company that owns things versus trying -- you

14   know, the life of an adviser is difficult.  Nobody likes to pay

15   advisors even though they make the deals happen.  So, you know,

16   I worked on putting together a group of investors to buy, you

17   know, become a principal, and that's what I ended up focusing

18   on more and more.

19   Q.  But is it fair to say when you work on a deal, when you

20   make it rain like you did on Tri-County or a serious deal, you

21   collect as much as you can when it's raining because the money

22   is there?

23              MR. SCHWARTZ:  Objection.

24              THE COURT:  Sustained.

25   Q.  Is it fair to say that when you work on a deal where

1    there's a windfall like Tri-County, for example, you make sure

2    to get paid every cent that you are can?

3    A.   I provide a value.  We made up an agreement, and I got paid

4    an agreement.  I don't want anything more than what I deserve

5    or what we made up and don't want anything less.

6    Q.   I'm just going to take a brief moment to speak with --

7              MR. KOMBOL:  I pass the witness.

8              THE COURT:  Mr. Snyder?

9              MR. SNYDER:  Nothing from the Sater defendants.

10             THE COURT:  Mr. Schwartz, you may examine.

11   CROSS-EXAMINATION

12   BY MR. SCHWARTZ:

13   Q.   Good afternoon, Mr. Mochkin.

14   A.   Good afternoon.

15   Q.   So we spoke at some length last week.  I will try not to

16   repeat the topics that we covered, okay?

17   A.   I'm sure you'll be successful.

18   Q.   One of the things that you just spoke to Mr. Kombol about

19   was the beginning of your relationship with Felix Sater, and

20   you said you may have discussed some deals prior to Tri-County

21   and Syracuse.  Is that right?

22   A.   That's correct.

23   Q.   We discussed last week that you knew from essentially day

24   one that Mr. Sater was partners with Ilyas Khrapunov, right?

25   A.   That's incorrect.  You characterize it to say, but, I mean,

1    the email that you showed me was he said he knows a bunch of

2    people, one of them being Khrapunov, so I wasn't focused on

3    Khrapunov at that time, and I wasn't focused on -- you know, we

4    didn't -- we actually were dealing with some of the other

5    people, I believe.  I don't even remember who they were, but,

6    you know, there was a list, if I remember correctly, that you

7    showed of five or seven people on the email, so he was one of

8    them, but it wasn't my focus of attention.

9    Q.  Well, the email you're referring to I believe is

10   Plaintiff's Exhibit 434 in evidence.

11   A.  If you say so.

12   Q.  Ms. McKenzie, if we could pull that up.  At the bottom of

13   the page, Mr. Sater tells you that he is partners with Viktor

14   Khrapunov's son, Ilyas, correct?

15   A.  Yes.  Actually it says it after four other people -- three

16   other people, yes.

17   Q.  The subject line of this email is "Re: Kazakhstan,"

18   correct?

19   A.  Correct.

20   Q.  Now -- you can take that down.

21        Isn't it true that from essentially day one of your

22   relationship with Felix Sater, you and he were looking for

23   deals to do with Ilyas Khrapunov?

24   A.  That's not correct.

25   Q.  Isn't it true that you were -- wanted to help Mr. Sater

1   build out Ilyas Khrapunov's U.S. network?

2   A.  That isn't correct.

3   Q.  Well, Ms. McKenzie, can we show the Judge and the witness

4   and the parties -- actually, this one is in evidence.  You can

5   show everyone Exhibit 436.  This is an email from you to

6   Mr. Sater, correct?

7   A.  So it seems.

8   Q.  And the date is November 2011, right?

9   A.  Yes.

10  Q.  2011 is the year you met Mr. Sater, true?

11  A.  November, correct.

12  Q.  The subject is ADLUX, correct?

13  A.  Yes.

14  Q.  And you write at the bottom of this email, "ADLUX has zero

15  presence in the U.S.  Maybe instead of flying to Geneva, you

16  should stay here and build out their network," correct?

17  A.  That's what it says.

18  Q.  And Geneva is where Ilyas Khrapunov lived, correct?

19  A.  Amongst how many million people?  Ilyas is not the only one

20  who lives in Geneva, right.  I understood that his capital is

21  some -- whatever it was from Geneva, but it doesn't say

22  Khrapunov.  It says Geneva.

23  Q.  Okay, but Mr. Khrapunov lived in Geneva, correct?

24  A.  Maybe.  I don't know.

25  Q.  And ADLUX was his company, correct?

1  A.  I wouldn't have a clue.

2  Q.  Oh, okay.

3          You can take that down.

4          Now, you spent some time with Mr. Kombol talking about

5  the moral duty you had to help Mr. Khrapunov and Mr. Ablyazov.

6  Do you recall that?

7  A.  In with regards to the kidnapping of their --

8          MR. SNYDER:  Objection.  Mischaracterizes the

9  testimony.

10          THE COURT:  Overruled.

11 A.  With regards to the kidnapping, correct.

12 Q.  Well, you're using the word kidnapping.  That's based on,

13 you said, what Mr. Sater told you, correct, originally?

14 A.  The kidnapping?  It was -- it was -- it's a fact, I mean.

15 Q.  Well, you learned about the supposed kidnapping from

16 Mr. Sater originally, you testified about --

17 A.  That's correct.

18 Q.  And then you did some of your own research, correct?

19 A.  That's correct.

20 Q.  And by research, you looked on the internet, right?

21 A.  That's correct.

22 Q.  And I believe you testified a second ago that what happened

23 was that the Kazakh government kidnapped Ilyas' mother-in-law

24 and her daughter, right?

25 A.  That's correct.

1    Q.  But isn't what actually happened that they were arrested by

2    Italian authorities?

3    A.  That is correct.

4    Q.  And they were charged with passport fraud, correct?

5    A.  That is correct.

6    Q.  And that's because they were in Italy on fraudulent Central

7    African Republican passports, correct?

8    A.  Which was later proven incorrect.

9    Q.  They were charged with being in Italy on fraudulent Central

10   African Republic passports, correct?

11   A.  Yes, which was later proven incorrect.

12   Q.  And you saw here Mr. Ablyazov testify that he had a Central

13   African Republic passport, correct?

14   A.  I have no knowledge of that.

15   Q.  You saw here that Ilyas Khrapunov testified that he got

16   Central African Republic passports for his family members,

17   correct?

18   A.  What does it mean where "I saw here"?  I don't even know

19   what that means.

20   Q.  You haven't been paying attention to this trial?

21           MR. SNYDER:  Objection.

22           MR. KOMBOL:  Objection, your Honor.

23           THE COURT:  Okay.  I'll sustain as to form.

24   Q.  Are you aware, sir --

25   A.  Have you seen me at this trial?

1   Q.  Are you aware, sir, that Ilyas Khrapunov testified by video

2   that he obtained Central African Republic passport for members

3   of his family?

4   A.  I am not aware.

5   Q.  Are you aware, sir, that Mr. Khrapunov testified that he

6   paid hefty sums of money to a soccer player named Honjeen, who

7   was connected to the government at the Central African

8   Republic?

9   A.  I am not aware.

10  Q.  Are you aware, sir, of testimony that Ilyas Khrapunov

11  purported to be an ambassador of the Central African Republic

12  to Switzerland?

13  A.  I'm not aware.

14  Q.  And what happened was that an Italian court deported

15  Mr. Khrapunov's mother-in-law and her daughter to Kazakhstan,

16  their country of citizenship, correct?

17  A.  Correct, and the people that were involved in it were

18  essentially sentenced by Italian courts for doing that.

19  Q.  Until they were acquitted, right?

20  A.  Maybe.

21  Q.  Well, you don't remember that they were acquitted?

22          MR. SNYDER:  Objection.

23          MR. KOMBOL:  Objection.  Form.  Clarify who he's

24  referring to as to who was acquitted.  It's a vague question.

25          THE COURT:  This is not an opportunity for people to

1   talk over each other.  If there is an objection, you raise the

2   objection, and I rule on it.  And it's not team tagging, all

3   right?  So it's unclear at this point.

4            I'll sustain an objection.  Rephrase the question.

5   Q.  You testified not in response to my question, but you

6   testified a second ago that some people were convicted in Italy

7   in connection with this incident.  My question is, isn't it

8   true that every single one of them was subsequently acquitted?

9            MR. KOMBOL:  Objection.  Again.  Form.

10           THE COURT:  Overruled.

11  A.  It could be.  I only know this from Google subsequently.  I

12  think it happened in 2020.  So I wasn't following the case

13  whether someone was this and that, but my point is that there

14  was malfeasance definitely done.  The government almost fell

15  because of this, because of the illicit acts that were being

16  done between the Italians and Kazakhs.  There was definitely

17  something going on because otherwise all these things wouldn't

18  have happened.

19  Q.  I understand your story, but listen to my questions.

20           THE COURT:  No.  Sustained.

21  Q.  Isn't it true --

22           THE COURT:  Start again.

23  Q.  Isn't it true, sir, that an Italian court ordered the

24  deportation of Mr. Khrapunov's mother-in-law and her daughter?

25  A.  That is correct.

1  Q.  And isn't it true that once deported to Kazakhstan, they

2  lived freely in their own home?

3  A.  I have no idea.  That's incorrect.

4  Q.  Isn't it true that subsequently the Italian government

5  rescinded the order of deportation?

6  A.  So I was led to believe.  So from reports that's what it

7  seems like, yes.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Isn't it true that the Kazakh government promptly returned

2  them to Italy?

3  A.  Yes.

4  Q.  And it is your testimony that that entire process was

5  corrupt and involved malfeasance?

6  A.  If it looks like a duck, it seems like it.

7  Q.  So it is your testimony that the Italian government was

8  corrupted here?

9  A.  It's not my testimony.  This is what was going on on the

10  internet.  This is what was reported.

11  Q.  It is your belief, sir, that the Italian government was

12  corrupted?

13  A.  That's correct.

14  Q.  And we looked last week at some of the communications that

15  you had with Mr. Sater and others where you expressed the view

16  that the UK government, the English government was corrupt.  Do

17  you recall that?

18  A.  That's correct.

19  Q.  You called into question the UK judgments against

20  Mr. Ablyazov, correct?

21  A.  That's correct.

22  Q.  And you called into question the English freezing orders

23  against Mr. Ablyazov, correct?

24  A.  I don't recall if it was specifically the freezing orders,

25  but your general point, yes.

1  Q.  And you suggested that an English justice of the High Court

2  had been bribed, correct?

3  A.  Suggested?  Maybe.

4  Q.  And you suggested that the English High Court order

5  sentencing Mr. Ablyazov to jail for contempt was corrupt,

6  correct?

7  A.  I don't recall specifically, but the general idea was, yes.

8  Q.  Now, are you aware that the English High Court of Justice

9  also sentenced Mr. Ablyazov's brother to jail?

10  A.  No.

11  Q.  You're not aware of that?

12  A.  No.

13          MR. SCHWARTZ:  Can we pull up for the witness, the

14  judge, and the lawyers exhibit 1048, please.

15  Q.  This is an e-mail from Mr. Sater to yourself dated

16  November 2013, correct?

17  A.  Yes.

18          MR. SCHWARTZ:  I offer Plaintiffs' 1048.

19          THE COURT:  Plaintiffs' Exhibit 1048 received in

20  evidence.

21          MR. KOMBOL:  I have no objection, except to ask for

22  clarity, is the article that's linked also going to be

23  introduced in evidence or are we just going to look at this

24  HTML link?

25          MR. SCHWARTZ:  The exhibit is the e-mail between Mr.

1    Sater and Mr. Mochkin.

2              MR. KOMBOL:  No objection.

3    BY MR. SCHWARTZ:

4    Q.  Mr. Mochkin, this is an e-mail that you received from Mr.

5    Sater, correct?

6              THE COURT:  Plaintiffs' Exhibit 1048 received in

7    evidence.

8              (Plaintiffs' Exhibit 1048 received in evidence)

9    Q.  This is an e-mail, Plaintiffs' Exhibit 1048, that you

10   received from Mr. Sater, correct?

11   A.  Yes.

12   Q.  And the subject is:  "BTA Bank AO:  English High Court

13   sentences another of Mukhtar Ablyazov's brothers in law to

14   prison."  Do you see that?

15   A.  Yes.

16   Q.  Does this remind you that you knew that the English High

17   Court had sentenced one of Mr. Mukhtar Ablyazov's brothers in

18   law to prison?

19   A.  It does not.  It doesn't mean it didn't happen, but it does

20   not remind me.

21   Q.  Was that corrupt?

22   A.  It could be.  I don't know.

23   Q.  Now, England and Italy were not the only countries that

24   were making findings against Mr. Ablyazov and his conspirators,

25   correct?

1    A.  So it seems, yes.

2    Q.  For example, you know that the Spanish courts had issued

3    orders extraditing people close to Mr. Ablyazov, correct?

4    A.  Could be.

5    Q.  You recall that, don't you?

6    A.  I do not.

7           MR. SCHWARTZ:  Well, let me show again to the judge,

8    the witness, and the parties Plaintiffs' Exhibit 1047.

9           MR. KOMBOL:  Is this in evidence?

10          MR. SCHWARTZ:  Not yet.

11   BY MR. SCHWARTZ:

12   Q.  This is again an e-mail from Mr. Sater to yourself in

13   November 2013, correct?

14   A.  You expect me to remember every e-mail from 2013?

15   Q.  This is an e-mail from felixsater@gmail.com, which you know

16   to be Mr. Sater's e-mail address, correct?

17   A.  That's correct.

18   Q.  To mendelmemenergy.com, which you know to be your e-mail

19   address, correct?

20   A.  That's correct.

21   Q.  Dated November 8, 2013, correct?

22   A.  That's correct.

23          MR. SCHWARTZ:  Ms. McKenzie, can you go to the bottom

24   right-hand corner of this document.

25   Q.  You see at the very bottom it says "MeM" and then there is

1  a number?

2  A.  Yes.

3  Q.  That's what has been referred to in this trial as a Bates

4  stamp?

5  A.  I don't even know what that means.

6  Q.  Doesn't this mean that you yourself produced this document

7  to us in discovery?

8  A.  It could be.  It doesn't mean I remember every e-mail from

9  2013.

10  Q.  Can we agree that this is an e-mail from Mr. Sater to

11  yourself in November 2013?

12  A.  Yes.

13          MR. SCHWARTZ:  Thank you.  I offer Plaintiffs' Exhibit

14  1047.

15          MR. SNYDER:  No objection.

16          MR. KOMBOL:  No objection.

17          THE COURT:  Plaintiffs' Exhibit 1047 received in

18  evidence.

19          (Plaintiffs' Exhibit 1047 received in evidence)

20          MR. SCHWARTZ:  Can you publish that to the jury?

21  BY MR. SCHWARTZ:

22  Q.  Now, the underlying e-mail here is a Google alert to Mr.

23  Sater for Mukhtar Ablyazov.  Do you see that?

24  A.  Yes, I do.

25  Q.  I guess he had a Google alert for that name?

1   A.   Could be.

2   Q.   And he forwards it to you, right?

3   A.   Yes.

4   Q.   And the article here is, "Spain to extradite BTA Bank

5   ex-CEO's security chief," right?

6   A.   Yes.

7   Q.   And the reference, as you can see in two lines below, to

8   "ex-CEO" is Mr. Ablyazov, correct?

9   A.   That's correct.

10  Q.   And this was something that you discussed with Mr. Sater,

11  correct?

12  A.   What does that mean?

13  Q.   The extradition of Mr. Ablyazov's security chief from

14  Spain, correct?

15  A.   I do not recall.

16        MR. SCHWARTZ:  You can take that down and show to the

17  witness, the parties, and the judge exhibit 1046.

18  Q.   This is an e-mail from, the top e-mail, from yourself to

19  Mr. Sater, correct?

20  A.   Yes.

21        MR. SCHWARTZ:  I offer exhibit 1046.

22        THE COURT:  No objection, Plaintiffs' Exhibit 1046

23  received in evidence.

24        MR. KOMBOL:  Is this the entire e-mail?  There is no

25  Bates stamp on it.

1    BY MR. SCHWARTZ:

2    Q.   The Bates stamp here is MeM 002738, correct?

3              MR. KOMBOL:  No objection.

4              THE COURT:  Plaintiffs' Exhibit 1046 received in

5    evidence.

6              (Plaintiffs' Exhibit 1046 received in evidence)

7              MR. SCHWARTZ:  Can you blow up the top half again, Ms.

8    McKenzie.

9    BY MR. SCHWARTZ:

10   Q.   The subject of this e-mail is, "Spain approves extradition

11   of Ablyazov bodyguard," right?

12   A.   Yes.

13   Q.   And you write to Felix, "Let's talk tomorrow morning,"

14   right?

15   A.   Yes.

16   Q.   Does this remind you that you discussed the Spanish court

17   approving the extradition of Mr. Ablyazov's bodyguard?

18   A.   No.

19   Q.   Was the Spanish court decision corrupt?

20   A.   I don't know.

21   Q.   Were the decisions of other courts involving Mr. Ablyazov's

22   fraud corrupt?

23             MR. KOMBOL:  Objection.

24             MR. SNYDER:  Objection.

25             THE COURT:  Overruled.

1   A.  I don't know.

2   Q.  Sitting here today, do you disagree that Mukhtar Ablyazov

3   committed a massive fraud at BTA Bank?

4   A.  I am not qualified to say yes or no.  I just know that in

5   that part of the world it's very difficult to know what is or

6   what isn't, to know which side is a criminal and which side is

7   not.

8   Q.  It didn't stop you from doing business there, right?

9   A.  It didn't stop a lot of people from doing business, not

10  just me.

11  Q.  But you did business in Russia, right?

12  A.  I visited Russia several times for family trips to visit

13  cemeteries, but I don't recall doing business in Russia.

14  Q.  You tried to do business in Russia, no?

15  A.  I don't recall trying to do business in Russia.

16  Q.  You tried to get involved in a titanium deal in Russia,

17  correct?

18  A.  It could be.  I was looking at a lot of energy and mining

19  deals.  So there may have been several deals in Russia.

20  Q.  You tried to get involved in an oil and gas deal in

21  Kaliningrad, correct?

22  A.  I don't recall specifically, but yes, in part of my looking

23  at deals at that time, some of them could have been in Russia,

24  correct.

25  Q.  So, whatever your moral opposition was, it didn't prevent

1   you from doing business over there?

2           MR. SNYDER:  Objection.

3           MR. KOMBOL:  Objection.

4           THE COURT:  Overruled.

5   A.  The moral opposition was to the kidnapping of a mother and

6   a child.

7   Q.  Says you, right?

8           THE COURT:  Stricken.

9           MR. SNYDER:  What was stricken?

10          THE COURT:  I struck the question.

11  Q.  Mr. Mochkin, you were actively involved in thinking about

12  Mr. Ablyazov's global legal strategy, correct?

13  A.  No.

14  Q.  You sought assistance to evaluate Mr. Ablyazov's legal

15  options, for example, in England, correct?

16  A.  What does that mean?

17          MR. SCHWARTZ:  Can we bring up again for the witness,

18  the judge, and the parties exhibit 1044.

19  Q.  The top e-mail here is from you to Mr. Sater, dated July 2,

20  2013, correct?

21  A.  Yeah.

22          MR. SCHWARTZ:  I offer 1044.

23  A.  Yes.

24          MR. KOMBOL:  No objection.

25          MR. SNYDER:  No objection.

1          THE COURT:  Plaintiffs' Exhibit 1044 received in

2     evidence.

3          (Plaintiffs' Exhibit 1044 received in evidence)

4     BY MR. SCHWARTZ:

5     Q.  The bottom e-mail here is from you to a man named Yonah

6     Pruss.  Do you see that?

7     A.  Yes.

8          MR. SCHWARTZ:  And if you scroll down to the top of

9     the next page, please, Ms. McKenzie.

10    Q.  You're sending a bunch of links.  And then you write to Mr.

11    Pruss, who is in London, correct?

12    A.  Yes.

13    Q.  You write to him, "Can the European Court of Human Rights

14    stay a decision by the UK Judge/High Court to foreclose on his

15    properties?"

16         Did I read that right?

17    A.  Yes.

18    Q.  Stay means effectively stop or pause, correct?

19    A.  That's correct.

20    Q.  And "his" is a reference to Mr. Ablyazov, correct?

21    A.  That's correct.

22    Q.  You were, in addition to asking questions about

23    Mr. Ablyazov's legal options, also involved in his public

24    relations strategy, correct?

25    A.  As far as I recall, it was specifically related to the

1  kidnapping of his mother, his wife, and his daughter, which is

2  mentioned in this e-mail as well.

3  Q.  Well, we looked last week at a number of e-mails between

4  you and Mr. Sater, and in some cases Mr. Sahlas, about the need

5  to "plant stories."  Do you recall that?

6  A.  Yes.

7  Q.  And you told Mr. Sater that you needed to plant stories,

8  right?

9  A.  I guess I got involved in this aspect of it because of the

10 kidnapping of the mother and the daughter and, like I said, it

11 triggered me from that perspective.  So I may have went all in,

12 let's call it, in my own little way.  I am not a PR executive,

13 nor do I have any expertise in PR or -- that's not what I do.

14 I never did that.  I never will do that.  But I was trying to

15 do this all in the aspect of putting pressure of saving the

16 woman and the child, and that's it.

17 Q.  But you told Mr. Sater that Peter Sahlas needed to spin in

18 the news, right?

19 A.  Could be.

20 Q.  You told Mr. Sater, you got to do something, when there

21 were articles that were not sufficiently favorable to

22 Mr. Ablyazov, correct?

23 A.  Could be.

24 Q.  You told Mr. Sater that you needed to attack the UK case in

25 the media, correct?

1   A.  Could be.

2   Q.  You suggested that Mr. Ablyazov should use the same

3   strategy as Yair Klein who, as we discussed last week, was that

4   fellow convicted for training Pablo Escobar's Medellin cartel

5   militias, correct?

6   A.  Could be, yes.

7   Q.  And, in fact, you and Mr. Sater discussed the possibility

8   of using an army of fake avatars of Russian bots in order to

9   manipulate the news stories around Mr. Ablyazov, correct?

10  A.  I do not recall that.

11  Q.  You don't remember that?

12  A.  No.

13          MR. SCHWARTZ:  Can we go to the top of this very

14  document.

15  Q.  Now, Mr. Pruss, if you look halfway through the page, says

16  attached is their presentation.  Do you see that?

17  A.  Yes.

18  Q.  And here is a link to their website IntelQuest.  Do you see

19  that?

20  A.  Yes.

21  Q.  And you forwarded that to Mr. Sater on July 1st, correct?

22  A.  Yes.

23  Q.  And then to make sure he gets it, you forward it to him at

24  a different e-mail address the very next day, correct?

25  A.  I don't know.  Could be.

1  Q.  You forward it to him the next day at a different e-mail

2  address, correct?

3  A.  I don't recall.

4  Q.  You can see that, correct?

5  A.  Yes.  On top I see, yes.

6       MR. SCHWARTZ:  Ms. McKenzie, can we show page 3 of

7  this document.

8  Q.  So this is the attachment.  This is a deck from a slide

9  show from IntelQuest, correct?

10 A.  Yes.

11      MR. SCHWARTZ:  And can we go, please, to what should

12 be PDF page 14 of this exhibit.

13 Q.  So, in describing IntelQuest's capabilities, they have what

14 is listed here as SMM and SMI.  Do you see that?

15 A.  Yes.

16 Q.  And you know that to be mean social media monitoring and

17 social media interference, correct?

18      MR. SNYDER:  Objection.  No foundation.

19      THE COURT:  Overruled.

20 A.  I do not.

21 Q.  And if you look at the services that are being offered

22 here, the third bullet point says, "Political and public

23 opinion influence," correct?

24 A.  It does.

25 Q.  And the next bullet point says, "Avatars and Avatar-like

1  objects," correct?

2  A.  It does.

3  Q.  And the last bullet point says, "Control and anticipate a

4  social media initiated popular uprising (Arab Spring Egypt)"?

5  A.  Yes, that's what it says.

6  Q.  And you discussed with Mr. Sater and others the idea of

7  having avatars and avatar-like objects influence public opinion

8  by, for example, falsely amplifying some of the negative news

9  stories, correct?

10            MR. SNYDER:  Objection.

11            THE COURT:  Basis.

12            MR. SNYDER:  No foundation, misstates the document,

13  misstates what is written on the document.

14            THE COURT:  Overruled.

15            MR. KOMBOL:  I am joining in the objection.  This is

16  far beyond the scope of anything that was brought up in either

17  side of the examinations.  I have given it some latitude, but

18  now we are going down a rabbit hole --

19            THE COURT:  Overruled.

20  A.  I don't recall.  I forwarded a brochure of this group.  I

21  reached out to a friend of mine in London, and he sent me this.

22  I forwarded it to Felix.

23  Q.  But you discussed this with Mr. Sater, too, right?

24  A.  I do not recall.

25  Q.  In fact, you communicated directly with Ilyas Khrapunov

1   about this, correct?

2   A.  I did not.

3   Q.  And you communicated directly with Peter Sahlas, correct,

4   about this?

5   A.  I don't recall.  I don't recall if I communicated with

6   Sahlas about this, no.

7   Q.  To remind us, Mr. Sahlas is the man that you described as

8   Mr. Ablyazov's point man, correct?

9   A.  I understood him to be his lawyer.

10  Q.  You described him as his point man, correct?

11  A.  Could be.

12          MR. SCHWARTZ:  Can we bring up, please, for the

13  witness, the judge, and the parties exhibit 1045.

14  Q.  This is an e-mail from Mr. Sater to Mr. Sahlas, cc you and

15  Ilyas Khrapunov, correct?

16  A.  That seems like it, yeah.

17          MR. SCHWARTZ:  I offer exhibit 1045.

18          MR. SNYDER:  No objection.

19          MR. KOMBOL:  No objection.

20          THE COURT:  Plaintiffs' Exhibit 1045 received in

21  evidence.

22          (Plaintiffs' Exhibit 1045 received in evidence)

23  BY MR. SCHWARTZ:

24  Q.  So, if we look at the bottom of the page --

25          MR. SCHWARTZ:  Can you publish this, please, to the

1  jury, Ms. McKenzie.

2  Q.  If we look at the bottom of page, Mr. Sater writes to

3  Mr. Sahlas, Mr. Khrapunov and yourself, "These bullshit stories

4  cannot continue.  The truth about the complicity of Italian and

5  English government officials has to come out right now."

6          Do you see that?

7  A.  Yeah.

8  Q.  And you respond, "Finally, The New York Times," right?

9  A.  To Mr. Sater, correct.

10          MR. SCHWARTZ:  If we go up to the top of the e-mail.

11  Q.  Felix says, "We need bloggers to add significant number of

12  comments to all the articles in all publications.  With your

13  permission, we would like to see who to task with this."

14          Do you see that?

15  A.  Yes.

16  Q.  And in this e-mail, Mr. Sater was asking Mr. Khrapunov and

17  Mr. Sahlas for permission to hire an army of avatars to make,

18  quote, a significant number of comments to all the articles and

19  all the publications, correct?

20  A.  It doesn't say that in the e-mail.

21  Q.  You don't understand it to mean that?

22  A.  I understand it, but it doesn't say that in the e-mail.

23  You can interpret it in a lot of ways, number one.  Number two

24  is your characterization that I communicated with Khrapunov,

25  when I was copied on an e-mail, is a mischaracterization

1   because I never communicated with Khrapunov.

2   Q.  I am not missing an e-mail where you say, Hey, I don't want

3   any part of this, right?

4   A.  No.

5   Q.  By the way, Ilyas Khrapunov there is using the e-mail

6   address ik@rprca-omc.ch.  Do you see that?

7   A.  Yes.

8   Q.  That is the e-mail address that he used in his role as the

9   fictitious ambassador from the Central African Republic, right?

10  A.  I have no idea.

11  Q.  Now, as we were just discussing a second ago, you had no

12  hesitation to do business in Russia or Kazakhstan, correct?

13  A.  We looked at deals there.

14  Q.  You looked at deals there, including with Mr. Sater,

15  correct?

16  A.  That's correct.

17  Q.  And, in fact, you looked at deals there with Mr. Bush, who

18  you talked about at great length on direct, correct?

19  A.  If I recall correctly, yes.

20  Q.  And you looked at deals, in fact, involving the government

21  of the Republic of Kazakhstan, right?

22  A.  When you're doing energy deals, most likely you're dealing

23  with the government, correct.

24  Q.  And, in fact, you facilitated some direct communication

25  between Mr. Bush and the government of the Republic of

1    Kazakhstan through Mr. Sater, correct?

2    A.  I vaguely recall that.  That was also, I think, before this

3    whole thing happened.

4    Q.  And as I think Mr. Kombol was getting at, when there is

5    money in a deal, you want to try and get as much out of it as

6    possible for yourself, right?

7    A.  What does that mean?

8    Q.  If you don't know, then I don't know.  That's fine.

9            THE COURT:  Stricken.

10   Q.  Isn't it true --

11           THE COURT:  Question, answer.  Not commentary.

12   Q.  Isn't it true, Mr. Mochkin, that the reason you were so

13   involved in Mr. Ablyazov's legal PR and other interests was

14   because it had the potential to directly affect your money?

15   A.  No.

16   Q.  Isn't it true that you and Mr. Sater became much more

17   interested in all the lawsuits and orders against Mr. Ablyazov

18   as the deals, meaning the Tri-County deal, got closer to

19   fruition?

20   A.  I didn't understand the question.

21   Q.  Isn't it true that as the Tri-County deal got more real,

22   you and Mr. Sater got more interested in the various lawsuits

23   and investigations concerning the Khrapunovs and Mr. Ablyazov?

24           MR. SNYDER:  Objection.  Argumentative.

25           THE COURT:  Overruled.

1    A.   I can't speak for Mr. Sater; I can speak for myself.  And

2    for myself, what triggered me was this whole issue with the

3    kidnapping of the mother and child.  I don't recall that it was

4    anything more than an outgrowth of that.

5              MR. SCHWARTZ:  Ms. McKenzie, do we have the ability to

6    pull up page 673 of the trial transcript, which is

7    Mr. Mochkin's testimony from last week?  No?

8              MR. KOMBOL:  Your Honor, I believe you previously

9    ruled that you're not going to allow deposition transcripts, or

10   rather, trial transcripts to be reread during examinations.  I

11   bring this up in the context of my request Monday.

12             THE COURT:  The ruling was you can't simply re-read

13   portions of the transcript as part of your case.  I certainly

14   didn't rule that if there is a prior inconsistent statement in

15   the trial transcript, that a witness couldn't be questioned

16   about that.

17             MR. KOMBOL:  Understood, your Honor.

18             MR. SCHWARTZ:  Ms. McKenzie, can we switch to the

19   elmo.

20   BY MR. SCHWARTZ:

21   Q.  Mr. Mochkin, I am showing you the transcript of your

22   testimony before this Court last week.

23             MR. SCHWARTZ:  Can everyone see that clearly?

24             THE COURT:  It's not in evidence.  So just ask him.

25   Q.  Do you see we are asking about the Tri-County Mall here,

1   correct?

2   A.  Yes.

3   Q.  And at page 673 --

4           THE COURT:  It shouldn't be put before the jury.

5   Q.  At page 673, at line 3:

6   "Q.  Now, as this deal --

7           THE COURT:  Were you asked these questions and did you

8   give these answers?

9   Q.  Mr. Mochkin, you see the transcript on your screen?

10  A.  Yes.

11  Q.  You recall testifying in this court?

12  A.  Yes.

13  Q.  You were under oath, correct?

14  A.  Yes.

15  Q.  I am going to read to you, and the question is, were you

16  asked these questions and did you give these answers?  Okay?

17  A.  Yeah, it seems like it.

18  BY MR. SCHWARTZ:

19  "Q.  Now, as this deal got more real, you got much more

20  interested in the various lawsuits and investigations

21  concerning the Khrapunovs and Mr. Ablyazov, isn't that true?

22  "A.  I recall something to that effect, yes.

23  "Q.  And that was a frequent topic of conversation between

24  yourself and Mr. Sater, true?

25  "A.  We had discussions upon that."

1      You gave those answers, correct?

2  A.  Yes.

3  Q.  Thank you, Mr. Mochkin.

4          MR. SCHWARTZ:  I have nothing further.

5          THE COURT:  Mr. Kombol, you may examine.

6  REDIRECT EXAMINATION

7  BY MR. KOMBOL:

8  Q.  Mr. Mochkin, we saw a lot of e-mails there talking about,

9  we will call it broadly, international intrigue.  Do you recall

10 that you provided all of those e-mails as part of the discovery

11 process in this matter to the plaintiffs?

12 A.  I am assuming that if it's there, yes.  I don't recall

13 every e-mail.

14 Q.  Did you hold anything back or did you give over everything

15 that they had asked for?

16 A.  To the best of my ability.

17 Q.  And we saw, for example, e-mails relating to your

18 payments -- e-mails and records relating to your payments for

19 the Tri-County Mall deal, correct?

20 A.  When did I see that?

21 Q.  In evidence earlier.  We saw records relating to your work

22 on Tri-County Mall, and we saw the records relating to your

23 payments, correct?

24 A.  Yes.

25 Q.  In all those e-mails that we saw talking about this

1   international intrigue, was there anything that said, Hey,

2   Mendel, we are going to pay you for your PR work?

3   A.  Not to my knowledge.  Not that I recall.  Not a single

4   time.

5   Q.  You were paid for the real estate brokerage transaction

6   work you did, correct?

7   A.  For advising on the fee for the note, yes.

8   Q.  Out of candor, you provided everything, even these

9   conversations that plaintiffs are now trying to rely as

10  evidence that you were paid for some other kind of work, right?

11  A.  I don't understand the question.

12  Q.  Out of candor, you gave everything, even these

13  conversations that the plaintiffs are now trying to say are

14  evidence that you --

15          MR. SCHWARTZ:  Objection.

16          THE COURT:  Sustained.

17  Q.  Did you provide every e-mail that you could find in

18  response to the plaintiffs' requests?

19  A.  To the best of my abilities.

20  Q.  And you did that to be fully candid, correct?

21          MR. SCHWARTZ:  Objection.

22          THE COURT:  Overruled.

23  A.  It's discovery.

24  Q.  And as you could see, the plaintiffs were trying to use

25  these e-mails now to tie together some improper remuneration in

1    connection with, I guess some alleged PR role that you covertly

2    served?

3    A.  That's what they said in their complaint.

4    Q.  Is there any basis to that?

5    A.  Zero.

6    Q.  Is there anything that discusses how you got paid for that

7    or you would get paid for that?

8    A.  As I said, even if it was offered, I would have rejected

9    it.

10   Q.  And your family comes from Russia and the former Soviet

11   Union and you have witnessed political persecution in the past,

12   correct?

13   A.  I didn't witness, but my uncles and my parents frequently

14   spoke about it.

15   Q.  And you understand how governments can many times, even

16   wrongfully, prosecute citizens or residents for political

17   purposes?

18            MR. SCHWARTZ:  Objection.

19            THE COURT:  Sustained.

20   Q.  With respect to the Tri-County Mall deal, you created

21   enormous value, correct?

22   A.  I believe so, yes.

23   Q.  Close to $15 million of value was created through your

24   efforts?

25            MR. SCHWARTZ:  Objection.  Scope.

1          THE COURT:  Sustained.

2          MR. KOMBOL:  Your Honor, he asked about the Tri-County

3    Mall deal.

4          THE COURT:  Yes.  But not about that.  Go ahead.

5    Q.  Was any payment that you received for anything other than

6    the profits that you generated in connection with your work?

7    A.  Not to my knowledge.

8    Q.  Is there any written communication or anything that would

9    support that you were being paid as a media liaison or

10   consultant?

11   A.  Not that I recall.

12   Q.  You're an orthodox Jewish man from Brooklyn, correct?

13         MR. SCHWARTZ:  Objection.

14         THE COURT:  Sustained.

15   Q.  You're from Brooklyn?

16         MR. SCHWARTZ:  Objection.

17         THE COURT:  I will allow it, except it's repetitious.

18         Ladies and gentlemen, I have already instructed you

19   that any appeals to sympathy or prejudice are completely

20   improper, and I will instruct you again on that in my final

21   conclusions.  Those sentiments have no place in any court in

22   the United States.  And I think the jury fully appreciates

23   that.  But in any event, I will repeat it again in my final

24   conclusions.

25         Go ahead.

1  A.  Yes, I'm from Brooklyn.

2  Q.  You're not Italian?

3  A.  I am not.

4  Q.  You're not Spanish?

5  A.  No.

6  Q.  You're not English?

7  A.  I'm not from English extraction, no.

8  Q.  You have never worked as a media liaison in your entire

9  career, correct?

10  A.  No.

11  Q.  Have you ever been paid in your entire career as a media

12  liaison in any capacity?

13  A.  Not to my knowledge.  Maybe once years ago when some local

14  councilman was running for a seat or something to that effect.

15  Q.  Was that in Italy?

16  A.  No, that was in Brooklyn.

17  Q.  Were you paid hundreds of thousands of dollars for that?

18  A.  No.

19  Q.  You were asked about a number of videos that were played

20  during your cross by Mr. Schwartz in this proceeding, and you

21  said you had no knowledge of those, correct?

22  A.  That's correct.

23  Q.  Because you weren't here, right?

24  A.  That's correct.

25  Q.  You were home with your family, you are busy, this is a big

1   ordeal for you to attend to?

2   A.   I wasn't home; I was actually working.  I have to provide.

3   Q.   And that's why you weren't here?

4   A.   Yes.

5   Q.   And that's your primary focus?

6   A.   That's correct.

7   Q.   After you got involved with Mr. Sater and you put together

8   the Tri-County Mall deal and later the Syracuse transaction,

9   which we have discussed, at least with Tri-County, there is no

10  dispute that you worked at least in some capacity as a broker,

11  you did gratuitously make that introduction to the Italian

12  journalist, correct?

13          MR. SCHWARTZ:  Objection to the form and the prelude.

14          THE COURT:  Well, since there is an objection, I will

15  sustain it.  It's not a fair characterization of the witness's

16  testimony.

17          Go ahead.  Just ask a question.

18  BY MR. KOMBOL:

19  Q.   You worked as a broker on the Tri-County Mall transaction?

20  A.   Not as a broker, but as an introducer.

21  Q.   As a facilitator?

22  A.   That's correct.

23  Q.   And during that interaction, you became aware of what we

24  will call the Italian situation?

25  A.   That is correct.

1  Q.  After that introduction, Felix started bringing you other

2  international matters to your attention, correct?

3  A.  I don't recall.

4  Q.  But Felix is a lot, he lives in this larger-than-life world

5  with international intrigue, and you experienced that through

6  those e-mails?

7          MR. SCHWARTZ:  Objection.

8          THE COURT:  Sustained.  Stricken.

9  Q.  Do you customarily deal with international politics and

10  intrigue of the nature that you were introduced to by Sater?

11          MR. SCHWARTZ:  Objection.

12          THE COURT:  Overruled.

13  A.  Not really, no.

14  Q.  It's not your world?

15  A.  I live in Brooklyn.

16  Q.  You travelled the world for a while working on oil and gas,

17  but you left that industry?

18  A.  I travelled the world, but I went out of the country for a

19  significant period of time, for a period of about four, five

20  years, yes.

21  Q.  You don't operate in those circles like Felix does?

22  A.  No.

23  Q.  And since, say, October, November of 2013, did you interact

24  even at all with Mr. Sater or any of the parties we have

25  discussed in this action relating to any of these international

1    matters?

2    A.  Definitely not with the parties.  With Mr. Sater, I would

3    say as I got further from that, it was less frequent

4    communication, but --

5    Q.  Because the deals you had brought him and closed, you got

6    paid and you moved on and got back to your life in Brooklyn?

7    A.  I went on to another stage and got involved in, like I

8    said, a real estate deal that we were principals on, so that's

9    where I turned my focus to.

10   Q.  That's where you are even to this day, correct?

11   A.  By and large, yeah.

12            MR. KOMBOL:  Nothing further.

13            THE COURT:  Mr. Snyder.

14            MR. SNYDER:  Thank you, your Honor.

15   RECROSS-EXAMINATION

16   BY MR. SNYDER:

17   Q.  Mr. Mochkin, are you aware that Mr. Sater has testified and

18   intends to testify that you had absolutely nothing --

19            THE COURT:  Sustained.

20            MR. SNYDER:  Withdrawn.

21   Q.  Mr. Mochkin, with respect to the Italian article that we

22   talked about earlier, you had a role in placing that article,

23   right?

24   A.  I introduced them to the journalist.  I don't know what

25   placing means.

1    Q.  You made the introduction to the journalist?

2    A.  Correct.

3    Q.  And that then resulted in an article being written, right?

4    A.  I would say that's correct, yeah.

5    Q.  And your activities in this regard were motivated by a

6    desire to save the mother and daughter, right?

7    A.  Yes.

8    Q.  Now, the mother and daughter, the Ablyazov mother and the

9    daughter, were extradited from Italy back to Kazakhstan, right?

10   A.  If that's the term, yes.

11   Q.  Well, they were physically taken and moved back to

12   Kazakhstan, right?

13   A.  Within 24 hours, which was a speed record.

14   Q.  You said 24 hours.  What took 24 hours?

15   A.  From the time that they were detained until they were put

16   on a plane to Kazakhstan was 24 hours.  Nothing happens in

17   Italy in 24 hours, or anywhere else in the world, actually.

18   Q.  And it's your testimony that from the moment the Italian

19   authorities arrested the mother and the daughter to the moment

20   that they were put on a plane and sent back to Kazakhstan, it

21   only took 24 hours?

22   A.  That was what was reported.

23   Q.  And were they flown back on a commercial flight?

24   A.  No.  What was reported was a private jet.

25   Q.  Is that usual for extraditions?

1      MR. SCHWARTZ:  Objection.  Foundation.

2   Q.  Do you know if that's typical for extraditions of this

3   nature, 24 hours on a private jet?

4   A.  I have no idea.

5   Q.  Why were you so concerned about the mother and the

6   daughter?

7   A.  As I stated, I had a three-year-old at home and my parents

8   and my extended family members come from the former Soviet

9   Union.  We have unfortunate experience with the totalitarian

10  regimes in that area.  So I was very concerned.

11  Q.  And based on your family history and knowledge, what in

12  particular did you fear would happen to the daughter and the

13  mother when they got sent back to Kazakhstan?

14      MR. SCHWARTZ:  Objection.

15      THE COURT:  Overruled.

16  A.  Anywhere from a harsh imprisonment to even death.

17  Q.  Sir, aren't you being an alarmist here?  That would never

18  happen in Kazakhstan, would it?

19      MR. SCHWARTZ:  Objection.

20      THE COURT:  Sustained.

21  Q.  Sitting here today, do you believe you played a role in

22  saving the mother and the daughter?

23  A.  I do.

24  Q.  Are you proud of what you did?

25  A.  Yes, I am.

1   Q.  Now, Mr. Mochkin, you were asked by Mr. Schwartz about the

2   UK court proceedings.  Do you remember that?

3   A.  I do.

4   Q.  And you were asked your opinion about whether you thought

5   the UK court proceedings were corrupt.  Do you remember that?

6   A.  Yes.

7   Q.  And you were also asked if you thought the Italian court

8   proceedings and the Italian government was corrupt.  Do you

9   remember that?

10  A.  Yes.

11  Q.  And you were asked about whether you thought the Spanish

12  government was corrupt.  Do you remember that?

13  A.  I believe so.

14  Q.  And you answered those questions as best you could, right?

15  A.  Yes.

16  Q.  In your opinion, is Kazakhstan corrupt?

17  A.  It's a dictatorship, so it's corrupt.

18  Q.  In your opinion, was the Nazarbayev regime that controlled

19  Kazakhstan corrupt?

20  A.  He was a dictator, so it's corrupt.

21  Q.  What about the Kazakh courts.  In your opinion, are the

22  Kazakh courts corrupt?

23  A.  It's a dictatorship, so it's corrupt.

24          MR. SNYDER:  Nothing further.

25          MR. SCHWARTZ:  Nothing further.

1          THE COURT:  No further questions.

2          Ladies and gentlemen, this is a good time for us to

3   take our afternoon break for about ten minutes.  Please

4   remember my continuing instructions not to talk about the case,

5   always keep an open mind until I instruct you on the law.  And

6   I am sure Mr. Fletcher will be here momentarily.

7          All rise.  And the jurors should follow Mr. Fletcher

8   to the jury room.

9          (Jury exits courtroom)

10          THE COURT:  The witness is excused.  I always wait for

11   the jury to be excused first.

12          See you shortly.

13          (Witness excused)

14          (Recess)

15          THE COURT:  Please be seated.

16          I take it, the next examination will be Mr. Snyder's

17   examination of Mr. Sater; is that right?

18          MR. SNYDER:  That's right.

19          MR. KOMBOL:  I do want to revisit my request from

20   yesterday to recall Ms. Nartay for a brief impeachment or to

21   revisit the conflicting testimony from a deposition in a

22   related matter that we discussed the other day.

23          THE COURT:  You have to be more specific.

24          (Continued on next page)

25

1          MR. KOMBOL:  If you recall, Ms. Nartay was examined

2     about the recovery of the monies.  I would like to recall her

3     for impeachment purposes in order to introduce prior testimony

4     in a related proceeding related to those recoveries.  It's

5     deposition testimony of her under oath, and to recall her for

6     that limited purpose.

7          THE COURT:  Okay.  Plaintiffs?

8          MR. SCHWARTZ:  So we don't think this is appropriate.

9     If we understand correctly, the testimony that Mr. Kombol wants

10    to impeach is the testimony on direct that the witness didn't

11    know exactly what the total asset recovery has been by BTA

12    Bank, but that it was only a small portion of the total amount

13    stolen.  They obviously had the ability to cross-examine on

14    this.  They had a deposition transcript, which is a deposition

15    from not a related case, totally different case having to do

16    with BTA's 2010 restructuring and subsequent bond issuance.  It

17    was a case pending before Judge Furman where some Panamanian

18    buyers in a 2010 bond offering sued on a securities fraud.  It

19    was dismissed at summary judgment in favor of BTA Bank.  In the

20    course of that, Ms. Nartay was designated as a 30(b)(6) witness

21    for BTA on certain topics.  This was not one of those topics.

22         I don't know what this has to do with anything.  It is

23    not relevant, and the opportunity to cross-examine and impeach

24    a witness was on cross-examination.  I don't think it's

25    appropriate in a defense case to essentially recall witnesses

1   for the purposes of having another opportunity to cross-examine

2   them by simply trying to impeach with the benefit of time the

3   testimony that they gave on direct.

4           MR. KOMBOL:  Your Honor, if I could respond to that?

5           THE COURT:  Yes.

6           MR. KOMBOL:  It's both for impeachment but also in our

7   direct case in defense.  One of our defenses is obviously that

8   there's no money -- that every penny that they claim was stolen

9   has been recovered.  Ms. Nartay in that action, which I

10  disagree, is related to many of the same factors I believe in

11  2019, well after 2010, gave a deposition.  In that deposition,

12  she was asked specifically how much money has been recovered,

13  and she gave a specific answer.

14          That is the sole reason I would be recalling her to

15  account for as of that time how much had been recovered, and

16  she has testified unequivocally under oath.  She's in the

17  courtroom, and it's for that limited purpose.

18          THE COURT:  The argument is you had your opportunity

19  to examine Ms. Nartay on cross, and you didn't.  This is not

20  something that has come up after your opportunity to cross.

21  It's an argument that, by the way, we want to go back, Judge.

22  And so, I mean, you can give me a letter by noon tomorrow

23  explaining what exactly it is you want do and why under the

24  rules you should be allowed to do that, why this is an unusual

25  or extraordinary circumstance having had the opportunity to

1    cross Ms. Nartay initially, you should be allowed to do that

2    now and what the relevance of that is.

3            There is no question, as I understand the testimony,

4    that only a relatively small portion of the amounts that BTA

5    argues was stolen from the bank had been recovered.  And

6    there's no evidence in the case that the funds that were

7    recovered in various countries such as Russia, Kazakhstan are

8    the funds at issue in this case.

9            So you can give me a letter tomorrow morning by noon,

10   and the plaintiffs can respond by 4:00, and if you are still

11   are pursuing this, I'll give you a ruling on Monday morning.

12           MR. KOMBOL:  Just to be clear, the request is to call

13   her as a defense witness in support of our defense which is

14   different than her proffer.

15           THE COURT:  I know it's to call her on defense, but

16   just to be clear, to use your terms, you designated three

17   witnesses for defense.  So just to be clear, Ms. Nartay was not

18   one of those witnesses designated, so you have to show me why

19   your list of witnesses shouldn't be kept.

20           MR. KOMBOL:  Or why under some different theory, it's

21   permissible on this request, I understand, and obviously I will

22   include that in my letter.

23           THE COURT:  Okay.

24           MR. ZACH:  Your Honor, may I just bring up one other

25   thing very briefly?

1          **Mr. Sater is about to testify.  Mr. Sater has been in**

2     **the court the whole time I would ask the Court admonish or**

3     **reiterate the bounds that have been set up with the various in**

4     **limine rulings and reiterate that because sometimes things can**

5     **go a little sideways.  I want to make sure that's clear since**

6     **we're moving into another -- his direct testimony.**

7          THE COURT:  Well, I certainly wouldn't preclude

8     Mr. Sater from testifying about something that the plaintiffs

9     have opened up, and the plaintiffs opened up more with respect

10    to the last witness, Mr. Mochkin, but the plaintiffs certainly

11    didn't open up activities allegedly pursuant to the

12    confidential assistance agreement after June of 2015 when it

13    was executed.  So the efforts to explain that there was lots of

14    work that was being done pursuant to the confidential

15    assistance agreement which Mr. Sater argues he should be paid

16    for and which is the subject, as I understand it, of another

17    proceeding, shouldn't be testified to or volunteered in

18    response to questions.  And as I've pointed out before, that's

19    a two-edged sword.  But that's the instruction.  Mr. Sater

20    should not testify about work that he did pursuant to the

21    confidential assistance agreement after its execution because

22    that's not itself relevant to any of the issues in this case

23    which go to what the plaintiffs knew about Mr. Sater's

24    relationship with Litco at the time that the confidential

25    assistance agreement was entered into and whether there were

any misrepresentations in connection with the confidential

assistance agreement, what the meaning of the confidential

assistance agreement was.

And from the standpoint of 403, as I indicated in the

motion in limine, the relevance of any subsequent information

offered by the defendants substantially outweighs the

prejudicial effect of any post execution evidence is

substantially outweighed by the danger of unfair prejudice;

namely, the argument that Mr. Sater should recover for any of

that fund.

It's also irrelevant, and the only relevance that's

been proffered throughout the case is motive for having brought

this case, which I discussed at length in the motion in limine,

is not relevant.  Why the plaintiffs brought the case is not

relevant if in fact the plaintiffs have valid claims in the

case.  So I've discussed this at length in the motions in

limine.  I've discussed it at length during the trial, and so I

just repeat the caution for Mr. Sater's testimony now.

MR. ZACH:  Thank you, your Honor.

The other in limine really was with respect to

character evidence that they needed to proffer whatever

specific acts they were going to do in advance.  Just as in

their prior letter, they refer to Mr. Sater's cooperation with

the U.S. Government back in the day.  The Court's ruling was

that he would take it only on notice.  There's been no notice

1    of that.  Just flagging those boundaries so they're fresh in

2    everyone's mind.

3            MR. SNYDER:  Your Honor, on that point, this afternoon

4    I am going to go -- we don't have that much time left, maybe an

5    hour, and I won't be going anywhere near anything that's going

6    to -- I expect is going to cause any heartburn.  I am going to

7    be sending your Honor a letter tonight raising -- you know,

8    putting before the Court what I intend to do Monday morning

9    with respect to a couple of issues that may draw an objection,

10   but I'd like to deal with them with the Court outside the

11   presence of the jury.

12           THE COURT:  That's great.

13           MR. SNYDER:  Excellent.  So I'm going to be try to be

14   non-controversial.

15           THE COURT:  That's exactly the process.  So you're

16   going to do that tonight, and the plaintiffs can respond

17   tomorrow by 4:00.

18           MR. SNYDER:  I'll even try to cite to the right

19   evidentiary rule, Judge.

20           THE COURT:  That's good.

21           MR. SNYDER:  Right.

22           THE COURT:  It's always helpful to refer to the

23   Federal Rules of Evidence rather than the book of guidance for

24   New York State evidence.  You're absolutely right.

25           MR. SNYDER:  It's not as easy as it looks, Judge.

1          THE COURT:  For your guidance, the plaintiffs used one

2     hour and 13 minutes so far today, added to 17 hours and 41

3     minutes for a total of 18 hours and 54 minutes, leaving two

4     hours and 6 minutes.

5          The defendants used one hour and 44 minutes.  Added to

6     8 hours and 30 minutes for a total of ten hours and 14 minutes.

7          By the way, the other thing, Mr. Snyder, if there is

8     going to be any issue with respect to attorney-client privilege

9     for Mr. Wolf, you have to bring that to my attention also.

10          MR. SNYDER:  Yes, your Honor.

11          THE COURT:  With time for the plaintiffs to respond.

12          MR. SNYDER:  Insofar as we have something to write to

13     your Honor, that will go out tonight or tomorrow morning.  I

14     don't think there is going to be anything about privilege, but

15     perhaps.

16          MR. ZACH:  Your Honor, one very small housekeeping.

17     For responding to their letter related to Mr. Sater's good

18     acts, could you please give us till 6:00 p.m. tomorrow.  My

19     wife is going to kill me if I don't get to see her tomorrow.

20          THE COURT:  Yes.  Yes.  Okay.  Let's bring in the

21     jury.

22          Mr. Sater is on the stand.

23          Mr. Sater.

24          (Continued on next page)

25

1           (Jury present)

2    FELIX SATER,

3         called as a witness by the Defendant,

4         having previously affirmed, testified as follows:

5              THE COURT:  Mr. Sater is on the stand.  Mr. Fletcher.

6              DEPUTY CLERK:  Mr. Sater having been previously --

7    having previously affirmed, you're reminded you're still under

8    oath.

9              THE WITNESS:  Yes, sir.  Thank you.

10             THE COURT:  Mr. Snyder, you may examine.

11             MR. SNYDER:  Thank you, your Honor.

12   DIRECT EXAMINATION

13   BY MR. SNYDER:

14   Q.  Good afternoon, Mr. Sater.

15   A.  Please call me Felix.  Everybody else does.

16   Q.  I will do, Felix.

17             So, Felix, earlier today, Robert Wolf gave testimony

18   about a meeting that occurred on June 5, 2015 at Moses & Singer

19   in the Chrysler building.  Do you remember that testimony from

20   Mr. Wolf?

21   A.  Yes, I do.

22   Q.  And do you recall the meeting at Moses & Singer on June 5,

23   2015?

24   A.  Yes, I do.

25   Q.  How well do you recall that meeting?

1   A.  Very well.

2   Q.  Who was at the meeting?  And by the way, just for

3   reference, June 5, 2015 was about a week before the

4   confidential assistance agreement containing the release was

5   executed, correct?

6   A.  Yes.  That was the whole reason for the meeting, to see if

7   the confidential assistance agreement would even be executed

8   because Arcanum and the Kazakh side wanted to make sure that

9   the information was going to be good, solid, and helpful to

10  them.

11  Q.  Tell the jury, Felix, what series of events --

12          THE COURT:  Actually, even though others may refer to

13  the witness by his first name, we do have some formality, and

14  witnesses really should be addressed with their proper last

15  name.  Go ahead.

16          MR. SNYDER:  Of course, your Honor.

17  Q.  Mr. Sater --

18  A.  Yes.

19  Q.  -- how did the June 5, 2015 meeting get set up?

20  A.  Okay.  Robert was dealing with Latham regarding, this

21  was -- they were representing Kazakhstan against Elvira in the

22  California case, and he approached them about a significant

23  amount of intel for them in their recovery efforts against

24  Khrapunov and Ablyazov, and it was taking a very long time.  He

25  was introduced to Arcanum.  Latham, in conversations that we

1    had, was dragging their feet.

2         MR. ZACH:  Your Honor, I object for foundation and

3    just potential hearsay issue.

4         THE COURT:  Sustained.  Foundation.

5         MR. SNYDER:  Sure.

6         THE COURT:  Go ahead.

7    Q.  Mr. Sater, let's back up a little bit to the point where

8    you first got the idea to help track down Ablyazov money, okay?

9    A.  Okay.

10   Q.  So tell the jury how the initial notion of reaching out to

11   help Latham or somebody else track down the Ablyazov money, how

12   did that begin?

13   A.  Sometime in early -- best of my recollection, about March.

14   Q.  March of 2015?

15   A.  March of 2015, Nicholas Bourg contacted me and said to me,

16   "You were right.  They tried to cheat me also.  I can't believe

17   what they did to me.  What can we do?"  I have all the

18   information about, obviously, Khrapunov because he was

19   president and they were doing a fund together, and he was

20   around for a long time, and that as soon as they cheated or

21   tried to cheat, according to Nicolas, what he told me, that

22   they fired -- Ilyas fired his bodyguard, and that the bodyguard

23   and two people that the bodyguard brought to open offshore

24   accounts, as well as Laurent Fouchet and combined as a group

25   would be very happy to help Kazakhstan, because they felt

1   cheated by Khrapunov.  And after he contacted me, I contacted

2   Robert Wolf and suggested that I have a treasure trove of

3   information to help Kazakhstan to recover assets, and I thought

4   that I could make money off of that.

5   Q.  And what, if anything, do you recall about what Nicolas

6   Bourg to you in that conversation where he indicated he had

7   been cheated?

8   A.  He gave me a list of assets and people, names of banks

9   where accounts could potentially be or were or are.  As I said,

10  a group of close insiders to the Khrapunovs were with them for

11  a number of years in Switzerland.  Bodyguard was with them

12  effectively 24/7 who overheard all of his conversations, and he

13  gave me all of the projects that he was working on, all of the

14  projects that Peter Sztyk was working on, all of the projects

15  that Laurent Fouchet was working on with Ilyas.

16  Q.  And this was, you said, around March of 2015?

17  A.  To the best of my recollection, it was about March.  And I

18  say that because it took about two months to deal with Latham.

19  And, like I said, that's how I put it approximately March

20  because of the two months of dealing with Latham back and

21  forth.

22  Q.  Did you have an understanding of why Nicolas Bourg reached

23  out to you about this?

24  A.  Yes.  Because I was one of the very few people that

25  actually taught Ilyas a lesson about trying to cheat his

1    partners.

2    Q.  And when you refer to being one of the few people that

3    taught Ilyas a lesson, what do you mean by that?

4    A.  Well, I believe, as I testified earlier, his mother asked

5    me to train him in real estate.  And in 2007 I picked a castle

6    in Geneva as his first project.  I co-invested or my company

7    co-invested in it.  I taught him how to do everything, and I

8    was very helpful in starting up his sort of understanding in

9    real estate in SDG, and she wanted me to teach him because he

10   was from, you know, privileged private schools in Switzerland,

11   and I guess she wanted me to teach him which hunting trips to

12   go on and which to avoid.  And when he decided to cheat me out

13   of my share of a gigantic profit I made him, I taught him a

14   lesson.

15   Q.  And that wasn't the first time that Ilyas had cheated you,

16   right?

17   A.  That's right.  And, you know, thank God.

18   Q.  When did Ilyas cheat you previous to the Tri-County?

19   A.  Well, they were all very close in time.  The reason I said

20   thank God was because of that, my antenna was up, and I knew or

21   thought that it could happen again, obviously.  And that was

22   over the CreaCard PCS deal, a friend of mine --

23   Q.  Mr. Sater, when was the CreaCard deal?

24   A.  I don't remember the dates, but it was close enough

25   previously before the Tri-County Mall deal closed.  It may have

1   even overlapped a little time-wise, not from the sale of

2   Tri-County Mall but when the deal began, PCS or CreaCard, which

3   is one and the same thing, could have even overlapped in time,

4   sort of the beginning of Tri-County and the ending, or at least

5   for me, the ending of Creacard PCS.

6   Q.   So Tri-County Mall was the middle of 2013, right?

7   A.   Mmm-hmm.

8           THE COURT:   You have to answer with words.

9   A.   Yes.

10  Q.   CreaCard would have been a little before that, right?

11  A.   Yes.

12  Q.   And you got cheated by Ilyas on the CreaCard deal, right?

13  A.   Yes.

14  Q.   So then there was the Tri-County Mall deal --

15  A.   Yes.

16  Q.   -- that everybody has heard about, right?

17  A.   Yes.

18  Q.   Now, tell the jury what Ilyas did that caused you to -- I

19  forget the phrase you used, but put him in his place?

20  A.   Self-help.

21  Q.   Tell what you mean by that.

22  A.   We were obviously doing many transactions back in 2007, as

23  I told you or as I told just now, we did a castle, which was

24  turned into a hotel which we turned into residences called

25  du Parc, and I was a co-investor.  I worked with him for about

1    a year and a half to two and helping him on that, and then I

2    went to do other things and was introduced in trying to -- in

3    working with him.  I don't remember whether it was 2012 or 2013

4    but somewhere around that time, and -- could you repeat the

5    question?

6    Q.  I think you answered it.  We'll go to the next question.

7    A.  Sure.

8    Q.  Which is, after the Tri-County Mall deal closed, did there

9    come a time when you had a discussion with Ilyas Khrapunov

10   about whether or not you would receive the money due to you

11   from the Tri-County deal?

12   A.  Yes.

13   Q.  What was that discussion?

14   A.  I guess that was the previous question also.

15        As the deal was closing, it was just understood that I

16   was to receive a third of the profits on deals that we worked

17   on together.  This was discussed hundreds of times between me

18   and him.  I don't know if it was hundreds, but dozens of times.

19   And as the deal was getting closer to closing, right after the

20   closing but before around really the same time that the money

21   was supposed to be transferred from the sheriff to us --

22   because, remember, the deal closed but the money didn't come

23   over for a couple of weeks.  Every time I'd mention to him my

24   share, he was suspiciously silent.  I already knew what was

25   going on, and that's when I embarked on setting up a company

1    with the same name, knowing full well that if the money went to

2    him, Triadou, wherever they would have wired it, I would have

3    never seen a dime of it again.  It would have been gone, and he

4    would have told me good-bye.

5            So we set up a meeting in Geneva, and I flew in, I

6    remember it like yesterday because I stayed at the La Réserve

7    Hotel, and Nicolas and him reserved a conference room at the

8    La Réserve Hotel where we sat down and --

9    Q.  Let me just get a question in there.

10   A.  Sure.

11   Q.  This was around the time of the closing of the Tri-County

12   Mall deal, maybe a little after?

13   A.  After and around the time that the money was coming or had

14   come.  Within a day before or after, like literally the day

15   that the wire was supposed to come from the sheriff, there was

16   this meeting in Geneva.

17   Q.  This would have been around what, July, August of 2013 or

18   thereabouts?

19   A.  I believe so, yes.

20   Q.  So you're in Geneva at a meeting with Ilyas.  Tell the jury

21   who was at that meeting and what happened at that meeting.

22   A.  Well, as was customary with these type of meetings, it

23   wasn't the first one, Ilyas would bring a bunch of people that

24   he was working with.  He used the opportunity as sort of a call

25   it a board meeting or a catch-up on business meeting.  Max

1   Interbrick, a few other -- Nicolas Bourg was there.  Yasic, I

2   forgot his last name was there.  So there was a few people at

3   this meeting, and they went through everything.  They went

4   through all of the business at hand that they had on the

5   agenda.

6           And as everybody was leaving, I said, you know, "I'd

7   like to talk to you.  You know, how do you want me -- should I

8   just leave the money in the account, transfer to myself?"

9           And that's when he turned around and said to me, "Oh,

10  I can't give you a third on this money."

11          And I said, "Why?"

12          And he said, "It's not my money.  It's my

13  father-in-law's money."

14  Q.  And his father-in-law, you understood to mean Mukhtar

15  Ablyazov?

16  A.  Yes, Mukhtar Ablyazov, exactly.

17  Q.  Now, prior to this moment, did you have an understanding or

18  belief where the money from the Tri-County Mall deal came from?

19  A.  I believed that he had a lot of money at the Khrapunov

20  family.

21  Q.  Who did?

22  A.  Ilyas.

23  Q.  How much money did Ilyas have to your understanding of his

24  own family's money?

25  A.  Well, the government of Kazakhstan accused Viktor Khrapunov

1  of stealing $300 million out of Kazakhstan, but I knew that

2  that was a probably a very low number.

3  Q.  Your belief was that Khrapunov probably had more than

4  300 million?

5  A.  He was a senior member of the Nazarbayev cabinet.  If all

6  he stole was $300 million, the other ministers would have

7  laughed him out of the cabinet meetings.

8  Q.  When you were doing the Tri-County Mall deal and the other

9  deals with Ilyas, prior to this meeting in Geneva, did anybody

10  ever tell you it was Ablyazov money?

11  A.  He never told me it was Ablyazov's money, but at the same

12  time he was also working with his father-in-law.  What he told

13  me was that it was his money from SDG.  His mother told me she

14  gave him $30 million to start SDG back in 2007.  They were

15  doing a fund with Nicolas Bourg.  And I don't want my testimony

16  to sound like I knew for a fact it wasn't Mukhtar Ablyazov's

17  money.  I knew that it was Ilyas and the Khrapunov family

18  money.

19      Could it have been Mukhtar Ablyazov's money?  Could

20  they have mixed it?  Of course.  But until that day, he never

21  told me that the Tri-County Mall money was Mukhtar Ablyazov's.

22  In fact, that was the first time that he told me it was

23  Ablyazov's money.  And I did not believe it because I believe

24  he came up with that story to cheat me out of my share.  It's

25  not me.  It's my father-in-law.

1  Q.  Now when he said, "It's my father-in-law's money, and I

2  can't pay you," what about it being father-in-law's money made

3  it so that he couldn't pay you?

4  A.  In his mind I guess effectively that his father-in-law

5  didn't cut a deal with me for a third of the profits; he did.

6  Q.  So it's your testimony then that the reason that Ilyas told

7  you that he couldn't pay your third is not because it was

8  Ablyazov's money and it was subject to a freezing order, right?

9  It was because it was Ablyazov money and he just hadn't agreed?

10  A.  Yes, exactly.

11  Q.  Did he say anything about freezing orders at that meeting

12  in Geneva?

13  A.  At that meeting, no.

14  Q.  Did anybody say anything about freezing orders at that

15  meeting in Geneva in the middle of 2013?

16  A.  I don't believe that we had a discussion about freezing

17  orders at that meeting.

18  Q.  Okay.  And then is there anything else notable that you

19  remember from that meeting in Geneva?

20  A.  Yes.  We went downstairs -- like an hour and a half later,

21  we went downstairs to the Chinese restaurant which is in

22  La Réserve, and he brought his wife, which was Mukhtar's

23  daughter, and I told him that I got sick.  I went to dinner

24  with him on purpose.  I told him I got sick from dinner.  I

25  must have gotten poisoned and told him that I'd be staying in

1    the next day in the hotel, when in reality I took the very

2    first flight out back to New York to effectuate the transfer.

3    Once he told me I wasn't getting my share, that's what I did.

4    Q.   And prior to that meeting, you'd already set up the New

5    York LLC with a similar name to the Delaware LLC, right?

6    A.   Preparation is key.

7    Q.   And you made those preparations because, for lack of a

8    better term, your spider sense told you that something was

9    going to happen, right?

10   A.   Yes.

11   Q.   And that's based upon what you just told the jury about the

12   CreaCard and about the meeting in Geneva and all that?

13   A.   The CreaCard set off the chain of events that I knew

14   that -- well, it was well-known that Ablyazov and Khrapunov

15   cheated many people.  Didn't think they would cheat me, but

16   they did.  CreaCard -- I viewed CreaCard as a huge opportunity.

17   I wanted to bring that business to the United States.  It was a

18   French -- and I found the deal.  It was a friend of mine who

19   introduced me to the deal and a friend of mine who introduced

20   me to the CEO of the company.  And I put the whole deal

21   together and ran around and found voyeurs in France and dealt

22   with all the issues to try to close on the deal.  And then last

23   minute he brought in someone and said, "Oh, now it's his."

24          So I already knew, but I was knee deep at that point

25   on all these other deals, and I believe including Tri-County

1   and I said, okay, and I tested it when I repeatedly spoke to

2   him about my share of the profits during sort of when we

3   already knew we had the deal when after Neil Bush already

4   confirmed, brought in the Chinese guys, and we knew that they

5   were going to the auction to bid.  I was peppering

6   conversations with him on that subject, and, as I said, he was

7   suspiciously quiet.  He wouldn't say no because he didn't want

8   the deal blown up or anything like that.  He thought that if he

9   told me that it was Mukhtar Ablyazov's money, I would soil my

10  diapers or something and lower my head and say, "Okay, well

11  maybe you could take care of me on the next one."

12  Q.  All right.  So you have the meeting in Geneva and then you

13  tell everybody you got sick, but you really get on the airplane

14  and go back to the United States, right?

15  A.  Yes.

16  Q.  And when you get back to the United States, what did you

17  do?

18  A.  Excuse me?

19  Q.  When you get back to the United States from Geneva, what

20  did you do next?

21  A.  I transferred the money out of the Tri-County Mall account

22  into the company that I set up with the same name.

23  Q.  So the wire goes to the New York company instead of the

24  Delaware company, right?

25  A.  I moved it from the Delaware company to the New York

1   company.

2   Q.  So now the money is in the New York company that you

3   control, right?

4   A.  Yes.

5   Q.  And you wait 24 hours so they can't call back the wire,

6   right?

7   A.  Well I moved it again.

8   Q.  Ahh, even better.  Okay.  So after you transfer the

9   36 million roughly to yourself, then what did you do?

10  A.  I -- nothing.  I transfer the money, and he started calling

11  me and freaking out.

12  Q.  Did there come a time when you left the United States after

13  the transfer?

14  A.  About a week later.

15  Q.  And where did you go and why?

16  A.  I was an adviser to a very large development firm in

17  Moscow.  A friend of mine who was also working at that company

18  and I became very friendly with, called me and said, "Why are

19  Chechens calling me about you?"

20          MR. ZACH:  Objection.

21          THE COURT:  Sustained.  Stricken.

22  Q.  After the 36 million was transferred to the New York

23  account, did you leave the United States?

24  A.  Yes.

25  Q.  And where did you go?

1   A.   I went to Israel.

2   Q.   And was there a reason that you went to Israel?

3   A.   I was informed that --

4            MR. ZACH:  Objection.

5            THE COURT:  Sustained.  No.  Sustained.

6            MR. SNYDER:  I will withdraw it and move on.

7            THE COURT:  Okay.  Let me have a sidebar briefly,

8   ladies and gentlemen.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  These appear to be directed to eliciting

3    some information about political prosecution.

4           MR. SNYDER:  As I recall, he testified earlier about

5    going to the King David Hotel and having a mossad protect him

6    because the Chechens had put out a contract on him.  He

7    testified to that a couple days ago.

8           MR. ZACH:  This is all being offered -- it's all

9    hearsay.  It's all being offered for the truth for the matter

10   asserted.  I think what he's trying to say is that other

11   people -- I don't actually know what he's going to say.

12          THE COURT:  Whether he testified about that before,

13   you have it.  I think that he did that, but I don't understand

14   the relevance to any of the transactions in this case.

15          MR. SNYDER:  I'm telling the story.  I didn't think it

16   was controversial since he already testified to it, but I will

17   move on.  It's not critical.

18          THE COURT:  Okay.

19          MR. ZACH:  Thanks, Judge.

20          (Continued on next page)

21

22

23

24

25

1              (In open court)

2              THE COURT:  Go ahead.

3              MR. SNYDER:  Thank you.

4    Q.  Mr. Sater, I'm going to ask you to focus on my questions

5    much?

6    A.  Sure.

7    Q.  I'm going to ask somewhat more narrow questions here just

8    to get through this.

9              So after the money was transferred to the New York

10   LLC--

11   A.  Yes.

12   Q.  -- it doesn't matter why.  You went to Israel, right?

13   A.  I went to Israel to protect my life.

14   Q.  And then while you were in Israel, you were -- you

15   communicated with Robert Wolf, correct?

16   A.  Yes, I did.

17   Q.  And there was negotiation about what would happen to the

18   $36 million, right?

19   A.  Yes.

20   Q.  And ultimately there was a settlement, correct?

21   A.  After they filed a lawsuit across the street in New York

22   Supreme.

23   Q.  And that was Triadou, right?

24   A.  Triadou, yes.  Triadou was the owner of the money and the

25   shopping center, effectively, and that was the -- that's who

1    sued me.

2    Q.  Okay.  And Triadou sued you in New York Supreme, right

3    across the street in 2013, and the case was relatively quickly

4    settled, correct?

5    A.  Within days, I think.

6    Q.  And you ended up giving back about 20 million roughly, 20,

7    21 or was it dead 20.  How much did you give back?

8    A.  I'm sorry to say 20.

9    Q.  And after that, did you come home from Israel?

10   A.  No.  I met my family outside of the U.S. and spent an extra

11   two weeks outside to make sure that everything was quiet before

12   I came back.

13   Q.  And then eventually you came back, right?

14   A.  Yes, I did.

15   Q.  And this is sometime toward the end of 2013, roughly?

16   A.  Actually, I came back early 2014, probably mid-January.

17   Q.  So you came back in early 2014.  And from that point until

18   the reach-out from Nicolas Bourg, did you have any involvement

19   with the Khrapunovs or Ilyas?

20   A.  Zero.

21   Q.  All right.  So a couple of years pass, a year and a half

22   passes between you settling your lawsuit with Triadou, paying

23   back 20 million.  Nothing happens.  And then 2015, maybe

24   March--

25   A.  Maybe March, maybe April.

1   Q.  -- you get a reach-out from Nicolas Bourg, right?

2   A.  Exactly.

3   Q.  And you told the jury a few minutes ago about that

4   conversation and what Nicolas Bourg told you, right?

5   A.  Yes.

6   Q.  And that led to you reaching out to Robert Wolf to set

7   something up, right?

8   A.  Well, I specifically told him that there was a lawsuit --

9   lawsuits are, you know, you punch it up to the internet, you

10  know there was a lawsuit.  That there was a lawsuit against

11  Elvira, and that I gave him the name of the law firm, and I

12  went to see him, explained the whole situation to him, and

13  asked him to reach out to Latham & Watkins.

14  Q.  And Mr. Wolf indeed did reach out to Latham & Watkins,

15  right?

16  A.  Yes, he did.

17  Q.  And that led to some initial conversations between Mr. Wolf

18  and Latham & Watkins, right?

19  A.  Many conversations.

20  Q.  And were you involved in those or were those always with

21  Mr. Wolf?

22  A.  In some cases I was there, but I did not present myself.

23  If I was in his office when it was happening, it was on speaker

24  phone and I would listen in, but I wouldn't participate in the

25  conversations.  I let Robert manage that conversation to try to

1    get the deal.

2    Q.  And we're talking right now about the time period of March,

3    April, May of 2015 when the confidential assistance agreement

4    was sort of coming into being, right?

5    A.  Yes, exactly.

6    Q.  And there came a time when Latham & Watkins referred you to

7    or referred Mr. Wolf to Arcanum, is that right?

8    A.  Yes.

9    Q.  And at the time, did you have an understanding of who and

10   what Arcanum was?

11   A.  Yes.

12   Q.  Tell the jury who and what Arcanum was.

13   A.  It is a private intelligence firm headquartered in London

14   that works very closely for President for Life Nazarbayev and

15   various elements of his regime.

16   Q.  And you understood that Arcanum was assisting BTA Bank and

17   the City of Almaty and the Republic of Kazakhstan in trying to

18   recover the stolen Ablyazov money, right?

19   A.  That and chasing other enemies.

20   Q.  In Arcanum, the person at Arcanum that you dealt with was a

21   man named Peter Garske, is that right?

22   A.  In the beginning I dealt with a lot of other people at

23   Arcanum, but initially the first person I met was Peter Garske

24   and a young lady by the name of Erica at that meeting on

25   June 5.  That was the first time I actually met them.

1   Q.  And the meeting on June 5, was that the first time you'd

2   met anybody from Arcanum in person?

3   A.  Yes, it was.

4   Q.  Okay.  So let's talk about that meeting on June 5 now that

5   we have sort of set the stage and explained how we got into

6   that room.

7           As mentioned, there was a meeting on June 5, 2015 --

8   sorry, there was a meeting on June 5, 2015 at Moses & Singer.

9   Can you tell the jury who was present for that meeting?

10  A.  I was in the large conference room.  There were people in

11  the small conference room.  And then later they moved to where

12  I was in the large conference room, and that was myself, Robert

13  Wolf, Robert's assistant came in for a few minutes just to ask

14  if anybody wanted coffee, but she promptly left afterwards, and

15  Peter Garske and Erica from Arcanum.

16  Q.  So it was you, Robert Wolf, Peter Garske and Erica, and an

17  assistant for some of the time?

18  A.  Pretty much, yes.

19  Q.  But the assistant was not a participant in the meeting,

20  right?

21  A.  No.

22  Q.  Was Kalsom Kam there?

23  A.  No, he wasn't.

24  Q.  Was Kalsom Kam ever at any in-person meeting at Arcanum

25  that you were present at?

1   A.  In every meeting I've ever had at Arcanum, I'm the only

2   person that has ever met them.  They have never even seen

3   Kalsom Kam.

4   Q.  You mentioned a small conference room and a large

5   conference room.  Can you just sort of describe the setup for

6   the meeting at Moses & Singer on June 5, 2015, which is a week

7   before the signature of the confidential assistance agreement?

8   A.  So on the main floor of the Moses & Singer after the

9   reception, there is a long hallway with conference rooms on

10  both sides and including at the end.  The conference rooms at

11  the end are small ones, three, four people.  There's, I

12  believe, two conference rooms of medium size, and then the two

13  large conference rooms.  And that's like a partner's conference

14  room with a gigantic long table, I don't know, 20, 30, 40

15  chairs, and they have those two large ones on either side of

16  that corridor.

17  Q.  Let's just walk through that day, okay?  It's June 5, 2015.

18  You're coming to a meeting.  You walk into the Chrysler

19  building.  You go through security.  You go up to Moses &

20  Singer, walk up to reception, right?

21  A.  Yes.

22  Q.  Then what happened?  Just describe that day.  Sort of you

23  go in.  What happened next?

24  A.  So I met with Robert, and he said, "I'm going to put you in

25  this conference room."  I had already known Garske's name

1  because Robert was reporting to me on his conversations with

2  Arcanum and Latham & Watkins, so I already knew his name, and I

3  knew the purpose of this meeting, but Robert wanted to speak

4  with him first and then introduce me.

5          And I waited in the large conference room while Robert

6  met with Peter Garske and Erica -- I forget her last name -- in

7  the adjoining conference room.  And maybe 15 minutes or so

8  later -- I don't know sometimes when you're waiting, it feels

9  like forever, but I guess 15 minutes or so, Robert Wolf came in

10  with them and sat down right opposite me.  We were at the end,

11  so it was Robert Wolf at the main head of the table, and I was

12  on one side and on the other side was Peter Garske and Erica.

13  Q.  And so you sat alone in a conference room while Robert Wolf

14  chatted with Peter Garske, and then eventually Robert Wolf

15  brought you into the --

16  A.  No.  First he stepped in and we had a laugh because Peter

17  Garske guessed that Felix Sater was in the next room.

18          MR. ZACH:  Objection.  Hearsay, your Honor.

19          MR. SNYDER:  I'll ask a foundational question.

20  Q.  Did Robert Wolf or anybody on June 5, 2015 use the phrase

21  "mystery guest" or something like that?

22  A.  Robert Wolf said to me, "Peter said he knows who the

23  mystery guest is.  Mr. F."

24  Q.  Mr. F?

25          MR. ZACH:  Objection.

1           THE COURT:  Basis?

2           MR. ZACH:  Hearsay.

3           THE COURT:  Offered for the truth?

4           MR. SNYDER:  It's not for the truth.  It's for his

5    awareness of --

6           THE COURT:  Okay.  Okay.

7           Ladies and gentlemen, remember my instruction.  The

8    statement is being offered not for the truth but rather for its

9    impact on others who are hearing it.

10   Q.  So, Mr. Sater, it was your understanding on June 5, 2015

11   that Peter Garske had told Robert Wolf, in sum and substance,

12   "I know who the mystery guest is and that mystery guest is

13   Mr. F."  Is that what --

14   A.  Yes, exactly.

15          MR. ZACH:  Objection, your Honor.

16          THE COURT:  Same instruction, ladies and gentlemen.

17   Q.  And the impact on you of hearing that was to make you

18   confident that Peter Garske indeed knew that you were Felix

19   Sater --

20          THE COURT:  Objection.

21          MR. ZACH:  Thank you.

22   Q.  What impact, if any --

23          THE COURT:  Form.  Form.  This is the -- this is --

24          MR. SNYDER:  You're right.

25          THE COURT:  Yes, I know I'm right.  This is direct.  A

1   little less leading.

2   Q.  What, if any, impact did learning that Pete Garske said, "I

3   know who the mystery guest is, it's Mr. F," what impact did

4   that have on you in terms of awareness of who knew what?

5   A.  Very little.  I assumed that from the information being

6   provided in the going back-and-forth by Robert Wolf and an

7   intelligence firm of the quality of Arcanum could have easily

8   figured out that it was Felix Sater.

9   Q.  And did you have an understanding as to whether Mr. Garske

10  had to expend a great deal of effort to figure out who the

11  mystery guest was?

12          MR. ZACH:  Objection.  Foundation for that.

13          THE COURT:  Sustained.  Foundation.

14  A.  It --

15          THE COURT:  No.  Hold on.  There is another question

16  coming.

17  Q.  Did Mr. Garske ever indicate to you whether he had to work

18  very hard to figure out who you were?

19  A.  No, he did not.

20  Q.  Okay.  And so eventually there came a time when Mr. Wolf

21  and Mr. Garske and you and Erica were sitting at a conference

22  table in the Moses & Singer conference room, correct?

23  A.  Yes.

24  Q.  And there was a conversation among the three of you about

25  the CAA or what would become the CAA and things you might

1  potentially provide to them, right?

2  A.  No.  It was -- the conversation was all about assets,

3  people, strategy on getting those assets back.  A good portion

4  of the conversation was the Flatotel-Chetrit deal, how to file

5  a lawsuit against Chetrit, how to negotiate with Chetrit to get

6  the money, how to go and get various assets in Switzerland,

7  Africa.  Like I said, litigation strategy, strategy to try to

8  get, in addition to the witnesses that I procured for

9  Kazakhstan, to get additional witnesses, how to put pressure on

10  certain people for them to start cooperating with Kazakhstan.

11  It was a very long meeting.  Well, long.  About two plus hours,

12  I'm guessing.

13                  (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And, Mr. Sater, I am going to ask you a series of questions

2    where I am going to mention different topics, and I would just

3    like you to tell the jury what, if anything, was said at that

4    meeting on June 5, 2015.

5    A.  Okay.

6    Q.  So, at the meeting on June 5, 2015, was there a discussion

7    of the Democratic Choice of Kazakhstan?

8               MR. ZACH:  Objection, your Honor.

9               THE COURT:  Relevance?

10              The question is relevance?

11              MR. SNYDER:  I am walking the witness through the

12   information that he provided to Kazakhstan before the CAA was

13   signed.  The question is, what did they know, what did he

14   provide?

15              THE COURT:  Overruled.

16   Q.  Mr. Sater, at the meeting on June 5, 2015, was there any

17   discussion about Democratic Choice of Kazakhstan?

18   A.  No.  That conversation happened later in the evening when

19   we went to dinner.

20   Q.  Okay.  We are going to come back to that then.

21              During the conversation in the conference room, was

22   there any discussion of Nicolas Bourg?

23   A.  There was extensive conversation about Nicolas Bourg.  I

24   procured him, he was a very important witness, and Peter was

25   interested in -- very happy that I got such a high-placed

1   insider flipped to the Kazakh side.

2   Q.  Did they have any contact with Nicolas Bourg before you

3   brought them -- before you brought Nicolas Bourg to them?

4   A.  They did not.  Nicolas Bourg would never speak to them

5   before that time because he was in the Khrapunov camp, and any

6   attempt to speak to him would have been blocked by attorneys or

7   he would have not been responding to them, for sure.

8   Q.  And tell the jury what you remember telling Garske about

9   Nicolas Bourg.

10  A.  We got Bourg.  He is a big insider, knows a lot about a

11  lot, and we have got significant info.  He gave us, that I told

12  Garske at that first meeting, about Eesh Aggarwal, about an oil

13  block in Sudan, about some mining deal in Mali, about

14  Portopelli, which was a real estate development, about numerous

15  other deals and witnesses.  We discussed -- I don't know if

16  they knew before, but we had done extensive work prior to that

17  meeting, myself and Robert, including in Cyprus, and we gave

18  them FBME and told them --

19  Q.  I want to try to keep the questions a little bit tighter.

20          So, with respect to Nicolas Bourg, you told them

21  extensive things about Nicolas Bourg at this meeting on June 5,

22  2015, right?

23  A.  Peter Garske knew what Nicolas Bourg was before I told him

24  who he was.  It was the conversations about the benefits

25  that --

1          THE COURT:  Mr. Sater, listen to your counsel's

2     question and answer the question that was asked.

3          Go ahead.

4     Q.  At the meeting on June 5, 2015, was there a discussion of

5     an individual named David Elishakov?

6     A.  Yes, there was.

7     Q.  Tell the jury about what was discussed on June 5, 2015, at

8     the meeting about David Elishakov.

9     A.  He was the hired front to open bank accounts on behalf of

10    Ilyas and whoever else, with or without Ablyazov or not.  As I

11    said, I don't know that.  But he was opening bank accounts on

12    behalf of Ilyas, including at FBME Bank, and he had a lot of

13    information about account names and numbers.

14    Q.  At the meeting on June 5, 2015, was there a discussion

15    about Boris Daneli?

16    A.  Yes, there was.

17    Q.  Tell the jury about the discussion regarding Boris Daneli.

18    A.  They referred to each other as cousins.

19    Q.  Who and who?

20    A.  Daneli and Elishakov.

21    Q.  David Elishakov and Boris Daneli refer to each other as

22    cousins?

23    A.  Yes.

24    Q.  So tell what was said about Boris Daneli.

25    A.  That's exactly what he did.  The two of them would open

1   accounts, act as directors, sign papers.

2   Q.  Were they what has sometimes been referred to as nominees

3   in this case?

4   A.  Yes.

5   Q.  Was anything else said about Boris Daneli at the meeting

6   that you can recall?

7   A.  Just about we have them and they will join the team

8   Kazakhstan.

9   Q.  So the point was that Elishakov and Daneli, you had already

10  convinced them to flip?

11  A.  Yes.

12  Q.  And at the meeting on June 5, 2015, you described to

13  Mr. Garske who these people were and that you had flipped them?

14  A.  Yes, I did.

15  Q.  Is there anything else you remember about Elishakov or

16  Daneli?

17  A.  That they were important and knew the numbers and the

18  accounts at FBME Bank and other banks.

19  Q.  Let's go on to that next topic, FBME Bank.

20      Was there a discussion at the meeting at Moses &

21  Singer, on June 5, 2015, about FBME Bank?

22  A.  Yes, there was.  There was an extensive discussion.

23  Q.  Tell the jury what FBME Bank was.

24  A.  FBME Bank was a bank in Cyprus that was used by Ablyazov

25  for sure and the Khrapunovs to -- a lot of money would sit

1    there and it was one of their go-to banks.  And we had a long

2    discussion about what we did with Robert even prior to signing

3    to get at the accounts.  And we gave a full strategy to Peter

4    Garske on what our next moves were to lock up those accounts.

5    Q.  At the meeting on June 5, 2015, when you told Peter Garske

6    about FBME, did you have an understanding as to whether that

7    was new information for Peter Garske?

8    A.  I believe it was.

9    Q.  Did he react as if it were new information?

10   A.  There was one thing that happened that leads me to believe

11   that it was new information for him.

12   Q.  And what happened that leads you to believe that your

13   disclosure of FBME to Peter Garske on June 5, 2015 was new

14   information to Arcanum?

15   A.  Robert Wolf said that they were flagged for money

16   laundering already, unrelated to this case, and Peter Garske's

17   response was, I believe, wonderful, lovely.  And I believe that

18   had he known that, he would not have responded that way.  He

19   responded surprised and happy that the bank was already the

20   subject of money laundering flags.

21   Q.  And so Mr. Garske's pleasant surprise reaction indicated to

22   you that it was new information to Arcanum, correct?

23   A.  Yes.

24   Q.  Is there anything else that you remember from that meeting

25   on June 5, 2015 discussing in regard to FBME?

1    A.   Yes.  We had already, with Robert Wolf, secured an attorney

2    in Cyprus who was in very close contact with the banking

3    regulators, and we discussed retaining him and flying out to

4    Cyprus sooner than later to retain that attorney and move

5    expeditiously and quickly to lock up those accounts.  And the

6    discussion about the attorney, I discussed what we would do,

7    Robert discussed how he knew him and things of that nature,

8    regarding retaining an additional person in Cyprus to quickly

9    lock up those accounts on behalf of the Kazakh entities.

10   Q.   So just to be clear, it wasn't simply a matter of telling

11   them, Hey, there is this bank FBME that we should take a look

12   at, right; it was a step beyond, not only are we going to look

13   at it, but we have the lawyers already lined up to go do it,

14   correct?

15   A.   Yes.  And two witnesses who we could use if we needed

16   testimony in Cyprus to activate the regulators.  In addition to

17   an attorney that would be hired by the Kazakh entities, they

18   would have witnesses to be able to present so that the

19   authorities could quickly lock up those accounts that we

20   identified.

21   Q.   And those two witnesses were David Elishakov and Boris

22   Daneli?

23   A.   Correct.

24   Q.   And those two witnesses, you testified before, you had

25   flipped and brought to the Kazakhs, right?

1    A.   Absolutely.  They didn't know it until I brought them to

2    the table.

3    Q.   Is there anything else about FBME that was said at that

4    meeting that you haven't yet said?

5    A.   No, I think that's pretty much it.

6    Q.   At the meeting on June 5, 2015, was there a discussion of

7    Eesh Aggarwal?

8    A.   Yes, there was.

9    Q.   And tell the jury what was discussed with Peter Garske

10   about Eesh Aggarwal.

11   A.   I explained to Peter Garske that Eesh Aggarwal was a

12   service provider in Dubai who was opening and maintaining a lot

13   of accounts, paperwork, and potentially money movement on

14   behalf of Ilyas Khrapunov.

15   Q.   Was he also a person that you had flipped or not?

16   A.   I had not flipped him, and I have never flipped him.  But

17   he was instrumental, and we discussed the possibility of

18   applied pressure and how to potentially get him to flip.  But

19   once the Kazakhs found out about Eesh and tracked that down, it

20   was ball game over.  That's where the whole freezing order

21   comes from.

22   Q.   Explain what you meant by it was game over once they found

23   out about Eesh.

24   A.   I don't know if they knew about him before or not, but he

25   was a very important component, as you saw from the plaintiffs

1    putting up all of those videos and discussing Eesh Aggarwal and

2    how important he is.  I am actually agreeing with Boise

3    Schiller, he was very important.

4    Q.  And you were the one who brought Eesh Aggarwal to the

5    attention of the Kazakhs, as far as you know?

6    A.  I know for a fact that I brought him to their attention.  I

7    cannot testify as to whether they knew his name before me or

8    not.

9    Q.  Anything else about Eesh Aggarwal that you remember from

10   the meeting on June 5, 2015?

11   A.  No.

12   Q.  And at that same meeting on June 5, 2015, was there a

13   discussion of Philip Glatz?

14   A.  Of course.  I told the Kazakhs about Philip Glatz.

15   Q.  What was said at the meeting on June 5, 2015 about Philip

16   Glatz?

17   A.  I explained to them that he was -- I gave them the history,

18   the total history.  They did not know who he was or how he

19   interacted with Ilyas, and I explained to them that he was

20   partners with a politician whose last name I remember because

21   his last name was Chevrolet, literally, like the car.

22   Chevrolet had passed away.  They were both politicians in

23   Geneva.  Chevrolet was, I believe, fairly prominent in Geneva

24   politics.  And that was the relationship between Ilyas and

25   Philip Glatz.  And I explained that Philip Glatz bought a

1   medical spa, for lack of a better word, and that I don't

2   believe that -- he was not a Kazakh politician, he was a Geneva

3   politician.  He didn't have any money and he wasn't a

4   billionaire like the Kazakhs.  I told them that I believe that

5   Ilyas funded the buying of the clinic and then made him the CEO

6   or president of Swiss Development Group.  I remember telling

7   that whole story, and I remember describing to them even going

8   back to Mr. Chevrolet.

9   Q.  Do you remember any other discussion about Mr. Glatz at

10  that meeting on June 5, 2015?

11  A.  I don't remember if I used the stone wall or glass wall

12  joke.  I'm sorry.

13  Q.  It may have been then or it may have been later?  Well, if

14  it was later, don't say anything about it.

15         At that same meeting we have been discussing, June 5,

16  2015, was there any discussion about an individual named Max

17  Interbrick?

18  A.  Yes, there was.

19  Q.  We saw some video of Max Interbrick a day or two ago,

20  right?

21  A.  Mr. Snyder, basically at that meeting was the foundation of

22  their entire case that they presented here.  Yes, we discussed

23  Max Interbrick and Adlux.

24  Q.  When you say at that meeting was the basis of the case they

25  present here, what do you mean by that?

1    A.   Every single video played in this courtroom was effectively

2    information and/or people that I brought to the Kazakhs.   Max

3    Interbrick as an example.

4    Q.   And tell what was said at the meeting about Max Interbrick.

5    A.   Described to them basically about Adlux and that he was

6    working with Ilyas.

7    Q.   Anything else?

8    A.   That's pretty much it.   It was not a major topic of the

9    conversation.

10   Q.   At that meeting on June 5, 2015, was there a discussion of

11   Elvira Kudryashova?

12   A.   Yes, there was extensive discussion of Elvira Kudryashova.

13   Q.   Tell the jury what was discussed on June 5, 2015 about

14   Elvira Kudryashova.

15   A.   I explained to him about her visa, the lawyer that was

16   hired.   Basically, the entire presentation that you saw in this

17   courtroom I explained to Peter Garske on June 5, 2015 word for

18   word, which was later turned into, let's call it a movie by the

19   plaintiffs to show against me.   And I'm the one who gave them

20   the info.

21   Q.   You mentioned that Ms. Kudryashova's visa was a topic of

22   discussion at the meeting?

23   A.   Yes, it was.

24   Q.   Let me ask a better question.

25        Ms. Kudryashova's visa situation was a topic of

1   discussion at the June 5, 2015 meeting, correct?

2   A.  Yes, it was.

3   Q.  And tell the jury what was said at that meeting about that

4   topic.

5   A.  I explained to Peter Garske the entire transaction, who the

6   attorneys were and what I believe to be opportunity to put

7   pressure on Elvira because she invested in the U.S. without

8   operating the entity, and I believe that that was enough

9   pressure to try to get -- my whole approach was put pressure

10  from every side as much as possible and see what cracks.

11  Q.  So, just to be clear, it's your testimony that you are the

12  one who initially brought to Arcanum's attention the

13  possibility that Ms. Kudryashova might have some visa problems,

14  right?

15  A.  Absolutely.  I was the first one who told them about this.

16  The guy in the video probably owes me a commission for giving

17  him all that information.

18  Q.  Did Arcanum know about Ms. Kudryashova's potential visa

19  problems before you told them about it?

20  A.  I am almost certain that they did not.

21  Q.  So the origin of what the jury was shown earlier about

22  Ms. Kudryashova's E-2 visa problems, that was from you,

23  correct?

24  A.  Everything the jury saw came from me.

25  Q.  Is there anything else other than the E-5 -- strike that.

1          Is there anything else, other than Ms. Kudryashova's

2     visa problems, that was discussed at the meeting regarding

3     Ms. Kudryashova?

4     A.   Yes.  The fact that what kind of pressure could be put on

5     regarding her family, regarding Elvira's mom's sort of response

6     to her daughter being potentially thrown out of the US for visa

7     violations.  We discussed how to squeeze lemon juice out of

8     lemons, regarding Elvira, how her mother would react, how we

9     could put pressure on the lawyer, how we could put pressure on

10    everyone.  As I said, everything that you saw in this courtroom

11    for the last two weeks, all of that information originated with

12    me.

13    Q.   Mr. Sater, at the meeting on June 15 -- strike that.

14          At the meeting on June 5, 2015, was there a discussion

15    of something called Adlux?

16    A.   Yes.

17    Q.   And tell the jury what Adlux is and what was discussed.

18    A.   Adlux is a digital network where Ilyas's company was

19    installing large video, high-end screen TVs at private jet

20    terminals and private jet airports, to sell advertising time to

21    high-end advertisers, like Rolex or Gucci, and that business

22    was being managed by Max Interbrick, and initially, in fact, I

23    believe our first -- I believe the first contract that I signed

24    with them, I think part --

25                THE COURT:  Stop.  The question was what was discussed

1    at the meeting.

2    A.   Pretty much what I just said to you was explained to Peter.

3    Q.   Just so that we have a clean record --

4              THE COURT:   It's time to break.

5              Let me talk to the lawyers briefly at the sidebar.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  I intend to tell the jurors that the

3   testimony will be finished on Monday and that on Tuesday they

4   will hear summations and my charge.  Any reason for me not to

5   tell them that?

6          MR. SNYDER:  I think it's safe to say that, from our

7   perspective anyway.

8          MR. SCHWARTZ:  We only have two hours left.

9          MR. KOMBOL:  I can't imagine I will take more than ten

10  minutes with him.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, we are going to

3  break for the weekend, but I wanted to give you a status report

4  on timing.

5          Barring something unforeseen, we expect that the

6  evidence in the case will be concluded on Monday, so that on

7  Tuesday the lawyers will be given the opportunity to sum up, to

8  explain to you what they submit the evidence in the case has

9  shown or not shown.  I will then charge you on the law and you

10  will go to the jury room to begin your deliberations.

11          So, as I say, barring unforeseen circumstances, that's

12  the schedule, and I have no reason to believe that it won't be

13  that way.  We are very much on time.

14          So, with that, I want to wish you a very good weekend.

15  Survive the heat as best we all can.  Please remember my

16  continuing instructions not to talk about the case, don't look

17  at or listen to anything to do with the case.  Don't consult

18  any materials or websites or blogs or use any electronic

19  devices to try to get or give any information about the case.

20  Remember not to talk to anyone, even among yourselves, about

21  the case.  Always keep an open mind until I have finally

22  instructed you on the law and you have gone to the jury room to

23  begin your deliberations.

24          The reason I continue to give that instruction, which

25  is commonly given in jury trials, is that the jurors listen to

1   the evidence but they don't know the specific issues that they

2   have to decide until the judge instructs them on the law at the

3   end of the case.  So they may be talking about individual

4   issues which are not relevant to the factual determinations

5   they have to make at the end.  So it's very important that the

6   jurors listen carefully, as all of you have, to the evidence

7   and then await the judge's instructions on the law to tell you

8   what the specific findings are that you will have to make.

9           So, have a very good weekend.  I look forward to

10  seeing you on Monday morning a little before 10:00.

11          All rise, please.  And the jurors should follow Mr.

12  Fletcher to the jury room.

13          (Jury exits courtroom)

14          THE COURT:  Mr. Sater can step down now.

15          THE WITNESS:  Thank you, sir.

16          THE COURT:  Please be seated.

17          In order to continue to act expeditiously, I will give

18  you my current draft of the jury charge now.  I always reserve

19  the right to make any changes to the charge right up through

20  summations, because people may say something in summations that

21  need correction or comment in the charge.  I am distributing

22  the charge now so that we can have the charge conference at the

23  end of the day on Monday, or whenever it is that you finish on

24  Monday, so that you can begin promptly on Tuesday with

25  summations.

1        As I think I told you in the course of the final

2   pretrial conference, I follow the New York state practice.  So

3   defendants sum up first, followed by the plaintiffs, no

4   rebuttal, unless the parties want to agree upon another

5   schedule, for example, plaintiffs, defendants, plaintiffs'

6   rebuttal.  But no one ever agrees to that so I just set it out

7   for you.

8        There are some issues that you are going to give me

9   some information on over the weekend.

10       Anything else for me now?

11       MR. SNYDER:  I don't think so, your Honor.

12       MR. SCHWARTZ:  No, Judge.

13       MR. KOMBOL:  No, your Honor.

14       THE COURT:  Okay.  Please be here at 9:00 on Monday

15   morning.

16       MR. SNYDER:  Thank you, Judge.

17       MR. ZACH:  Have a good weekend.

18       THE COURT:  If you wait, I will give you the final

19   time from today.

20       (Pause)

21       The defendants used an additional one hour and four

22   minutes, for a total of 11 hours and 18 minutes.  The

23   plaintiffs are still at 18 hours and 54 minutes.

24       Okay.  See you on Monday.

25          (Adjourned to June 24, 2024, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

ROBERT WOLF

Direct By Mr. Snyder . . . . . . . . . . . .1073

Cross By Mr. Kombol  . . . . . . . . . . . .1103

Cross By Mr. Zach  . . . . . . . . . . . . .1105

MENDEL MOCHKIN

Direct By Mr. Kombol . . . . . . . . . . . .1136

Cross By Mr. Schwartz  . . . . . . . . . . .1159

Redirect By Mr. Kombol . . . . . . . . . . .1187

Recross By Mr. Snyder  . . . . . . . . . . .1194

FELIX SATER

Direct By Mr. Snyder . . . . . . . . . . . .1206

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 1048    . . . . . . . . . . . . . . . . . .1169

 1047    . . . . . . . . . . . . . . . . . .1171

 1046    . . . . . . . . . . . . . . . . . .1173

 1044    . . . . . . . . . . . . . . . . . .1176

 1045    . . . . . . . . . . . . . . . . . .1181