UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
CITY OF ALMATY, KAZAKHSTAN, *et al.*,

Plaintiffs,

v. 19-CV-2645 (JGK)

FELIX SATER, *et al.*,

Defendants. Jury Trial
------------------------------x

New York, N.Y.
June 26, 2024
9:45 a.m.

Before:

HON. JOHN G. KOELTL,

District Judge

APPEARANCES

BOISE SCHILLER & FLEXNER LLP
Attorneys for Plaintiffs
BY: CRAIG A. WENNER
MATTHEW L.SCHWARTZ
JONATHAN T. ZACH
SOPHIE ROYTBLATT
SABINA MARIELLA
LINDSEY RUFF

RICHARD L. YELLEN & ASSOCIATES, LLP
Attorneys for Defendant MeM ENERGY PARTNERS LLC
BY: BRENDAN C. KOMBOL

LAW FIRM OF THOMAS C. SIMA
Attorneys for Defendant Felix Sater
BY: THOMAS C. SIMA

JOHN H. SNYDER PLLC
Attorneys for Defendant Felix Sater
BY: JOHN H. SNYDER

ALSO PRESENT: Zhadyra Nartay, BTA

O6Q8ALM1

1          (Trial resumed; jury not present)

2          THE COURT:  So far Mr. Zach has used one hour and 29

3    minutes.  So he has another hour and one minute.  I hope he

4    doesn't intend to use that.

5          MR. ZACH:  He won't.

6          THE COURT:  Okay.

7          The plaintiffs made a motion under Rule 50(a) to

8    strike the affirmative defense of release.  I have reviewed the

9    motion.  I have reviewed the response.  The motion is denied

10   without prejudice to renewal after the verdict, applying the

11   standards of Rule 50.

12         Anything else for me today before we bring in the jury

13   as soon as they are here?

14         MR. ZACH:  No.

15         THE COURT:  So the parties can take their breaks, but

16   then please be back by five of so that we don't delay the jury.

17         See you shortly.

18         (Recess)

19         THE COURT:  By the way, I believe Mr. Fletcher is

20   providing luncheon menus to the jurors.

21         All right.  The jurors are here.

22         Mr. Fletcher has the luncheon menus if the lawyers

23   want to inspect them from the jurors.

24         MR. SCHWARTZ:  Sure.

25         MR. ZACH:  They are fine.  Thank you.

1      THE COURT:  Defense, do you want to look at the

2   luncheon menus?

3      MR. SNYDER:  Sure.

4      THE COURT:  Mr. Kombol.

5      MR. KOMBOL:  I don't need to see them.

6      THE COURT:  Let's bring in the jurors.

7      (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6Q8ALM1                    Summation - Mr. Zach

1          (Jury present)

2          THE COURT:  Good morning, all.

3          It's good to see you all.  I hope you all had a good

4     evening.

5          We are now towards the end of summations.  Mr. Zach is

6     giving the summation on behalf of the plaintiffs.

7          Mr. Zach, you may proceed.

8          MR. ZACH:  Thank you, your Honor.

9          Good morning.

10         When we left off yesterday, we were going through our

11    three claims, and just to reiterate, our claims have basically

12    three elements.  It's our money.  They had it.  And they don't

13    deserve to keep it.  And we made it through the first one,

14    conversion, and now we are going to move to the second one,

15    which is unjust enrichment.

16         So, for unjust enrichment, the elements are similar.

17    Defendants were enriched, at the plaintiffs' expense, and it's

18    against equity and good conscience.  This will all be in the

19    jury charge, but I am just orienting you.

20         There is really no question they were enriched because

21    they received the money.  You know that it was at our expense

22    because that was the whole purpose of the tracing of the money.

23         And to be clear again, if you look at my slides or you

24    looked at what Mr. Fliegler presented, there are exhibits on

25    all of this.  We are not referring to things out of thin air.

1   We are referring to things that are in the record that are part

2   of evidence.  So if you wanted to, you could actually pull up

3   all the documents and look at them yourselves.  It's a stack of

4   documents.  You probably wouldn't want to do that, but the

5   point being is that we are operating from a record of what

6   happens inside this courtroom.

7           And again, the third element is why they don't deserve

8   to keep it.  Because it would be against equity and good

9   conscience.

10          And with that, again, to reiterate, Mr. Sater, even

11  yesterday was saying, when he explained why did he keep the $15

12  million, he called it rough justice against Ilyas Khrapunov.

13  He is asking to keep 20-plus million dollars that he took from

14  a known money launderer as his version of rough justice.

15  That's obviously against equity and good conscience.

16          And in addition, he was asked -- this is pretty

17  extraordinary testimony.  He was asked:

18          "You didn't care one way or another if the money was

19  dirty?"

20          And his answer was:  "Not really."

21          Then I asked him:  "So if you knew the money was

22  dirty, you would have invested it anyway?"

23          "Probably."

24          That's not the real world, ladies and gentlemen.

25  That's not equity and good conscience.  And the reality, as we

1    have gone over and over again, he knew it was dirty money.

2          He knew about the money laundering allegations.  I

3    know I have been over that, but it's just important to

4    understand, our job is to meet a burden of proof to you, our

5    job is to prove our case.  And this is the testimony that does

6    that.

7          He also admitted directly and unequivocally that he

8    knew about the freezing orders when he received the funds.  But

9    then he said, I just didn't care.  That's wrong.

10          And the same thing with Mr. Mochkin.  He knew about,

11   when he received the $6,000, he didn't contact the BTA lawyers.

12   And we are going to get to that because it's a pretty amazing

13   moment and I will show you the specific chronology of it.  BTA

14   actually puts out a warning:  Our money has been stolen.  Can

15   you return it?  And you will see how Mr. Mochkin acts when he

16   receives that.

17          So just to summarize.  Why is it against good equity

18   and good conscience for the defendants to keep the money?  They

19   knew the money was stolen.  They were violating worldwide

20   freezing orders.  You saw that they were helping out with that

21   propaganda campaign about Tony Blair, that actually worked its

22   way to this case.  They orchestrated fake transactions.  They

23   lied about various fronts.  They knew these fronts were out

24   there.  And Sater himself stole the money from Ilyas Khrapunov

25   and then kept it through, sort of no honor among thieves,

1   extortion with the money launderer.

2           Now, all of that, as I said, it's almost a criminal

3   case.  But what is astonishing about this case is there is a

4   whole other angle.  Even if you eliminated all of that, these

5   were done through real estate transactions.  They were

6   operating in a way that you can't do real estate transactions

7   in the state of New York.  So even if this were a much, much

8   quieter, more grounded case, outside of all of this stuff of

9   international money laundering and Ablyazov, they still

10  wouldn't be able to keep the money.  And that's because

11  unlicensed real estate brokerage is a crime in New York.  It's

12  a misdemeanor.

13          Now, a single act -- again, there was a whole

14  back-and-forth by Mr. Kombol and our expert, Mr. Schechtman.

15  If you wanted to, you could read Mr. Kombol's cross, and then

16  you could read the judge's instruction.  Because you should

17  read the judge's instruction on this point.  It is a

18  misdemeanor to act without a real estate license in New York.

19          Mr. Mochkin, unequivocally, he is not licensed to do

20  real estate in New York.  Same with Mr. Sater.  And Mr. Sater

21  was so blithe about it.  He made a joke afterwards.  He was

22  just kidding.  But he does not have a license.

23          Now, in the grander scope, this is far less evil, but

24  it still makes it unfair.  So what are the things you can't do

25  in a real estate transaction?  You can't double-dip.  They

1  double-dipped.

2          Now, there was this argument, I think, one of the few

3  arguments they made in their closing arguments was that, well,

4  this doesn't apply to the Tri-County Mall transaction.  But

5  again, please listen to what Judge Koeltl instructs you.  The

6  law is that these rules apply whenever -- listen to the judge,

7  but I expect what the judge will say is that these rules apply

8  whenever an interest in real estate was the dominant feature of

9  the transaction at issue.

10          This was about a mall.  Tri-County is a real estate

11 transaction.  There is really no doubt about that.  And it

12 applies -- they keep saying, well, it's a loan, it's a note.  A

13 real estate broker is a person, not just someone who buys and

14 sells houses, it's someone who negotiates or attempts to

15 negotiate a loan secured or to be secured by a mortgage.  And

16 that's exactly what they were doing.  Again, don't take it from

17 me.  Listen to the judge's instructions.  I expect you are

18 going to see this when it's handed to you.

19          Now, again, Mr. Mochkin was paid on both sides of the

20 Tri-County deal.  Again, common sense tells you you can't do

21 that.  You have probably done this in your own lives.  You

22 can't share from the buyer and the seller.  And, obviously, you

23 can't conceal it.  And when you look at how these things were

24 put together, they were meant to hide the money they were

25 taking, the commissions they were taking.

1          And you heard Mr. Schechtman testify that MeM Energy

2     here, when we are talking about disclosure, it's allowing

3     itself to funnel moneys in the structure in a way that I

4     haven't seen before.  The only plausible explanation is it was

5     done intentionally to hide that undisclosed, unauthorized

6     manner in which they were paid.

7          The charts, in plaintiffs' 800, by Mr. Schechtman,

8     again, all of the red lines are undisclosed.  You can't do

9     that.

10         Now, Mr. Mochkin helped orchestrate these transfers of

11    money, and some of it going to Mr. Sater, trying to transfer

12    these undisclosed commissions.  You saw that he ordered -- this

13    is PTX 488, again, evidence.  He authorizes Arnie Herz to wire

14    money to Felix Sater and Dan Ridloff.  He signs it.  And when

15    he was confronted with this, he kind of backs away and says,

16    Well, I just signed it, I wasn't paying attention.  But of

17    course he knew what he was doing.

18         And here is how you know.  The very next day he sends

19    $600,000 to Mr. Sater's company at Bayrock.  And he admitted in

20    his own testimony that there was no business purpose for these

21    transactions.  Again, it's the same means and methods.  That's

22    why you can tell something is illegal and improper because

23    there is no real business purpose for it.  And this is where I

24    wanted to pause and show you.  I think this tells you all you

25    need to know.

1    So, plaintiffs' 486.  This is an e-mail exchange, on

2    October 22, between Mr. Mochkin and Mr. Sater.  And if you look

3    at this document, Mr. Mochkin has gone out and Googled a bunch

4    of stuff about the Ablyazov fraud and the money being stolen

5    from BTA Bank.  And if you look here——it's really worth pausing

6    here.  If you look here, "Should you have any reason to believe

7    that assets in regard of which you were contacted are actually

8    owned by Mr. Ablyazov, kindly immediately contact lawyers of

9    BTA Bank."  This is something he cut and paste and put into an

10   e-mail to Mr. Sater.  This is sort of like a hotline, a link to

11   a hotline for stolen money.  What does he do that very same

12   day?  He wires the money that is part of this deal to Mr.

13   Sater.  It's not even a debate.

14   Now, the third claim is money had and received.

15   Again, very similar.  It's our money.  They got it.  They don't

16   deserve to keep it.  Very quickly through here, they received

17   the money.  It was ours.  Again, the same things we just went

18   through.  It's against equity and good conscience.

19   So that's our case.  That was our job.  Our job was to

20   prove that to you.  That's the evidence.  That's what I wanted

21   to show you.

22   Now, they have raised defenses.  And in their closing

23   they didn't really take you through the law.  So now we have

24   moved to their case, this is their burden.  That was my job.  I

25   had to show you that it's more likely than not that I have met

1    those three elements on those three claims.  They are now

2    turning to their burden.

3          So the first thing they argue -- and in their closing

4    they didn't talk about the jury charge, they didn't walk you

5    through the law.  And again, the reason I have to do it is

6    because you're going to get, I suspect you are going to get

7    this verdict sheet when you get back there.  And I want to walk

8    through some of these issues so you can understand what this is

9    and what you will be asked to decide.

10         One of the things that you will note is that when they

11   ask you these questions, I suspect, it will identify the

12   burden, like whose job it is to prove it.  So if it says it's

13   plaintiffs', that's our job.  If it says it's defendants', it's

14   their job.

15         So this is their job.  So the first thing they argue

16   is the statute of limitations.  As I just mentioned, they bear

17   the burden of proof on that.

18         Now, what they have to show is that the plaintiffs

19   here, BTA Bank and the City of Almaty, knew or should have

20   known about the defendants' conduct.

21         Now, I want to start with a very important point, just

22   to orient us through this.  The statute of limitations on that

23   claim for money had and received is six years.  So there is no

24   statute of limitations argument for that.  So they can't argue

25   that because we are within the statute.

1            Now, for the others, it's three years.  This case was

2    filed in March 2019.  And so they need to show when we first

3    knew or should have known about what Mr. Sater was doing and

4    what MeM was doing.  But that's evidence.  It has to be

5    evidence in the record.  So here is the actual evidence in the

6    record.

7            Before 2017, BTA did not know that Felix Sater had

8    retained $20 million of stolen money from the Tri-County deal.

9    This is evidence from Ms. Nartay, and she explains how this all

10   came about.  This was first learned in a deposition, a

11   deposition of Mr. Cerrito, and you actually saw his testimony.

12   When he testified in 2017, this was the first time he gave this

13   testimony.  Mr. Ridloff did transfer the money on the account

14   of Mr. Felix Sater.  And then he explains that an agreement on

15   which Mr. Nicolas Bourg actively took part, this gentleman

16   called Felix Sater wired back only half of the money.  So it's

17   at this moment that they learn about taking money from Ilyas

18   Khrapunov and Mr. Sater seeing it.  That's what is in the

19   record.

20           Then Ms. Nartay explains, well, once they learned

21   that, they started looking at more bank records and they

22   identified MeM Energy.  And so MeM, they learn about it in

23   2017, which is within the statute, about Mr. Sater.  And they

24   learn about MeM shortly thereafter.  So there is no statute of

25   limitations issue with that.

1    Now, to be clear, that's when we knew.  They didn't

2    offer you a date of when we should have known.  They didn't

3    show you evidence contrary.  They put nothing in.  They just

4    got up here and waved their hands.  That's the evidence.

5    That's what's in the record.  They didn't meet their burden of

6    proof.  We established when we knew.

7    Now, like I said, this is long.  So that is their

8    burden.  Even if they had met their burden——the law can get a

9    little complicated——we can show, through something called

10   equitable estoppel, that the statute of limitations shouldn't

11   run.  So this now comes back on us.

12   So, again, they didn't meet their burden so the issue

13   should be over.  But even should you think well, there is

14   another reason that we have, which is our ability to show this

15   equitable estoppel defense, or to rebut the statute of

16   limitations defense.  And here, what we would have to show is

17   that the defendants' affirmative wrongdoing produced the delay

18   between sort of when we sued and -- the accrual of the cause of

19   action and the start of the legal proceeding.  Meaning,

20   basically, if they did things to sort of hide their wrongdoing,

21   then we can't be harmed by the statute of limitations.  It

22   makes sense.  You can't be hiding stuff and then say you're out

23   of time.  It's common sense.

24   So let's talk about that for a second.  This was

25   something that we went over in testimony a lot, and I am going

1    to get into Litco, but in 2018, Mr. Sater -- there is this

2    company called Litco.  Mr. Sater's name isn't on it.  A guy

3    named Kalsom Kam signs it.  This came out in a deposition in

4    September 2018.

5            The day before that deposition, Mr. Wolf, who is the

6    one that was negotiating the Litco agreement with Latham &

7    Watkins, lied to Mr. Schwartz.  Mr. Schwartz said, Does Mr.

8    Sater own Litco?  Because Mr. Sater's deposition was going to

9    be the next day.  And Mr. Wolf said, I don't know.  I'll get

10   back to you on that.  So he was hiding still, as of 2018, that

11   Mr. Sater was, in fact, the owner of Litco.  Again, what does

12   that show?  And a federal judge found that Mr. Wolf lied.  Now,

13   what does that show?  It shows an ongoing effort to hide what

14   was going on here.

15           You also heard from Mr. Schechtman, that the way these

16   transactions were set up was to make them extremely hard to

17   track.  Just look at this.  The reason it's set up this way is

18   to hide what's going on.  That's why you have to find all these

19   bank records, take all this testimony.  These are all efforts

20   to hide what is going on.

21           And again, commissions are supposed to be disclosed;

22   they are supposed to be on the paperwork for the deals.  If

23   they are not on the paperwork for the deals, you don't know

24   they're there.  Again, that is an effort to hide what's going

25   on.  And this is something that—because of the trial we don't

1  get to narrate what is going on——this is something worth

2  talking about.

3          So, remember that guy that appeared by video, he was

4  really loud and really soft and really loud.  I want to explain

5  what that was about.

6          So, as part of the shake-down letter, PTX 357, in

7  which Mr. Wolf basically threatens Ilyas Khrapunov and Mukhtar

8  Ablyazov with going public unless they pay the money, one of

9  the things that's buried in that letter is they say, "In that

10  regard, you are aware that we have many recordings made by Mr.

11  Sater in order to protect himself, confirming (among other

12  things) Mr. Khrapunov's domination and control of the various

13  entities for which he directed Mr. Sater to perform services."

14          So what he is saying there is Mr. Sater was secretly

15  recording Ilyas while all of this nonsense was going on.

16          And you heard from Mr. Piazza that -- and this letter

17  is in October 2013.  And you hear from Mr. Piazza that he was a

18  guy that restores -- he is a forensic guy, but he restores

19  audio.  He gets recordings from Mr. Sater saying, Can you sort

20  of make these easier to hear?  And the reality is, as part of

21  the settlement, those recordings were destroyed.  Those

22  recordings of Mr. Ilyas and Mr. Sater doing all of this stuff

23  were gone.  That is equitable tolling right there.  They are

24  hiding the evidence of what is going on.

25          So that's statute of limitations.  I think it's pretty

1    straightforward.

2         Now, I have to talk about this release defense.  Just

3    because we are talking about it, again, doesn't mean that it's

4    logical.  But let's walk through it.  They got up there, I

5    don't know how many times Mr. Snyder read to you the whole, in

6    varying tones of voice, the words of the release.  But let's

7    just walk through what the release defense actually is.

8         First of all, they have the burden.  They have to

9    establish proof that there was a release.  This isn't on us.

10   It's on them to prove to you that there was a release.

11        Now, stepping back, the release does not apply to MeM.

12   And the statute of limitations on the money had and received

13   does not apply to MeM.  MeM actually has no defense here, but

14   Mr. Snyder has raised this release defense.

15        So what do they have to prove?  By the way, I would

16   note in their closing argument they didn't actually walk you

17   through the law.  There are three things that they have to

18   prove:

19        First, they have to prove that there is a valid

20   contract, that Litco did not lie about or conceal Mr. Sater's

21   ownership interest in Litco;

22        Second, even though he is not named anywhere in the

23   contract and he didn't sign it, they have to show that the

24   parties intended Mr. Sater to be a beneficiary of the company;

25   and

1    Third, they have to prove that the language in the

2  release actually covers what they are talking about.

3    They have to prove all of three of those things to

4  you.

5    Now, let's take the first one about a valid contract,

6  that there was not a lie.

7    So, first, it has been well established, there is no

8  mention anywhere in the Litco agreement of Mr. Sater's name.

9  In fact, the only one from Litco that signed it is this guy

10  Kalsom Kam.  Let's take a step back and just put in context

11  what Litco was doing.

12    So, Robert Wolf, the lawyer for Litco, reached out to

13  lawyers for the City of Almaty.  And he said, We are in the

14  asset recovery business.  We can provide you with witnesses.

15  We can provide you with information.  Come and talk to us.  Let

16  me give you a taste of the information.

17    So he reaches out.  Doesn't say anything about Felix

18  Sater.  Just says we have information and starts giving them

19  information.

20    Who signs the agreement is Kalsom Kam.  Kalsom Kam is

21  another front.  It's a front for Mr. Sater.  This was Mr. Kam's

22  testimony.  This is the guy who is claiming -- they are putting

23  up as a director.

24    "Were you ever a director of an entity called Litco?

25    "I might have.

1        "Did you sign agreements on behalf of Litco?

2        "I might have.

3        "What was your role at Litco?

4        "I don't think I had a role.  I don't think I had an

5   official role."

6        And you heard from Mr. Sater's wife that he was a

7   gopher.  This is just another front that is being put forward.

8        You also heard——this is important——while the Litco

9   agreement was being negotiated by Mr. Wolf, the whole purpose

10  was to hide Mr. Sater's involvement.  This is Mr. Sater's own

11  lawyer.  He didn't want to be identified as providing

12  assistance to the Kazakh government authorities.  And you see

13  below, to Arcanum and the other side, to keep his name as far

14  away as possible from the assistance being offered.

15       So the whole point was to hide Mr. Sater's

16  involvement.  And that's not our witness; that's his witness

17  saying that.

18       And Mr. Wolf also admitted that Litco worked

19  exclusively with Arcanum, which was the investigative firm.

20  Never talked to the plaintiffs.  He was only working with

21  Arcanum.

22       Now, you heard from BTA that we only learned -- they

23  only learned about Litco in a deposition in 2018.  That

24  deposition was Mr. Sater's deposition.  And again, let's walk

25  through that deposition.

1      So the Litco agreement is signed in 2015.

2      In 2018, Mr. Sater is walking into his deposition, or

3  the day before.  Mr. Schwartz asks his lawyer, What's up with

4  Litco?  Is that Felix Sater?  And that's when the federal judge

5  found that Mr. Wolf lied to Mr. Schwartz.  Because even as of

6  2018, they were hiding Mr. Sater's involvement.

7      Why?  Well, they are -- we will get into why in a

8  second.  Let's now look at the evidence.

9      So there was all of this talk about this June 5th

10  meeting.  You guys heard back and forth.  I suspect Mr. Snyder

11  said the word June 5th 50 times and Mr. Sater said it 50 times.

12  What they are trying to do there -- this agreement is as of

13  June 12th.  What Mr. Sater testified to you as, he said on

14  June 5, I met with Arcanum, with Mr. Wolf, and I said, I'm

15  actually Litco.

16      That's the whole point of that meeting.  That's why

17  they leaned fully into it.  I think if you look at the

18  transcript of Mr. Sater's testimony, two-thirds of it has

19  nothing to do with this case, it's about his history; the other

20  third is about that meeting, looking you in the eye and saying

21  this happened on June 5.  Why June 5 matters is because after

22  June 12, it's not relevant to the contract because the contract

23  is signed on June 12, as of June 12.  And so it's not relevant

24  to the analysis of the contract.

25      So they put on the lawyer.  They are going for their

1    June 5 date.  That is literally their entire defense.  We on

2    the fly have to cross-examine him.  This is Mr. Wolf's billing

3    records.  Remember what Mr. Sater is telling you.  Mr. Sater is

4    saying, I had this meeting on June 5.  I am there with

5    Mr. Wolf.  We had all these discussions, and then we all got

6    drunk at the steak restaurant afterwards.

7          This is the billing records from his own lawyer.

8    That's June 5th.  He billed a half an hour.  He billed a half

9    an hour drafting an assistance agreement.  And you know, again,

10   just to be clear, billing records are really important for

11   lawyers.  We bill by the hour.  So you have to be very

12   meticulous.  There are ethical rules about it.  And Mr. Wolf

13   explained, it's really important to bill your time, and he was

14   very careful with it.  So that is evidence of what actually

15   happened that day.

16         But then, and what was kind of an amazing moment,

17   realizing that lying to a judge, they had to undo it.  So Mr.

18   Snyder starts asking questions of Mr. Wolf's own lawyer.  Isn't

19   it possible that the June 5 meeting was billed under a

20   different client matter number?  And even Mr. Wolf says, I

21   don't recall, I don't believe so.

22         Let me show you one more thing.  And then Mr. Sater

23   got on the stand and said, Well, look, I signed in at Moses &

24   Singer, at Mr. Wolf's office.  You have got to show your ID and

25   you have got to register.  So there would be a record that I am

1   there.

2           I am trying not to get overly excited about this, but

3   Mr. Wolf is his lawyer.  He has complete access to this.  If

4   there was any evidence that this meeting actually happened on

5   June 5, or any of this meeting happened like he says it did,

6   they could have presented it to you.  But there is no other

7   billing record from some other matter.  They didn't show you

8   any sign-in thing from Moses & Singer.  These are all things

9   that Mr. Wolf would have.

10          Again, it's their burden.  It's hard because I have to

11  make their argument for them and push it down.  They have shown

12  you no evidence.  The billing records contradict it.  There are

13  no calendar entries showing it.  There are no communications

14  scheduling the meeting.  There is no receipt from it.  There

15  could have been a credit card receipt.  There is no record of

16  Mr. Sater signing in.  And, we are going to get into this, he

17  has testified to the contrary time and again.  So let's look at

18  that.

19          So this is from June 2022 testimony:

20          "The first time you met or communicated with

21  Mr. Garske──that's Arcanum──was that meeting in July of 2015

22  where you signed an NDA?

23          "That was the first time I met with him in July of

24  2015."

25          That's his deposition testimony.  He did it.  And now

1    he says, Well, that was a mistake, it actually was in June.  So

2    he had previously testified in June 2022 that there was this

3    meeting with Garske in July, but now he is saying that's a

4    mistake, it's on June 5.  That's a lie.

5            Then, in September 2018, again, this is the deposition

6    where Mr. Wolf lied to Mr. Schwartz right before it, right

7    before it.  And this is the first time that we learn that Litco

8    is actually -- where we finally learn that Litco has Mr. Sater

9    behind it.  And the question that he was asked at that

10   deposition is:

11           "Did you ever discuss Litco with Arcanum?

12           "No, I did not.  I don't think the name ever came up."

13           So even back in the time when he was confronted with

14   hiding this thing, he lied in 2018 at the deposition.

15           Now, this was -- and I think this finally puts the

16   finest point on it.  When he fights on the stand in

17   questioning, he said, I have been deposed all these different

18   times, I have given all this testimony.  The guy has given

19   hundreds and hundreds, probably thousands of pages of

20   deposition testimony.  And I asked him, You have never actually

21   testified about the June 5, 2015 meeting in any of that prior

22   testimony?  That includes starting in 2018, when we learned

23   that he had been lying about Litco.  And he admits that he

24   never gave that.  They had the opportunity to show you a

25   scintilla of evidence of that June 5 evidence and they never

1    showed it to you.

2           And this is a bigger point, which is, in the different

3    context with the shields and the fronts, which Kalsom Kam is,

4    Mr. Sater admitted to me that doing that sort of thing is a

5    lie.  This is in a different context.  This is a lie.  And he

6    understands that -- well, it's a lie.  You can't put somebody

7    else in front of you to hide your presence.  That's lying to

8    someone.  He admitted that.  He knows that it's wrong.  He

9    knows that he is lying.

10          And, by the way, the arrogance with which he deals

11   with this is shocking.  He actually says at times, when we were

12   arguing about using fronts and shields in different contexts,

13   it's not on me.  I don't care.  I can lie.  It's on the other

14   person to figure it out.

15          The point being here that that meeting never happened.

16   There is not a shred of evidence that it happened.  And ladies

17   and gentlemen, it's your decision, I respectfully submit it was

18   offensive.  There was no June 5 meeting.

19          And again, this shows the lies within the lies.  Even

20   if you were to buy his story, this is about what he testified

21   in this trial.  Even in his story of the June 5 meeting, he

22   admits he says -- this was the question that was asked by his

23   own lawyer:

24          "And there was a conversation among the three of you

25   about the CAA——that's that agreement that's signed on

1    June 12——or what would become the CAA, and the things you might

2    potentially provide to them, right?

3         "No.  The conversation was all about assets, people,

4    strategy, on getting these assets back."

5         So even in his own goofy June 5 lie, he still can't

6    keep his story straight.  He goes back and forth on it.

7         I mentioned this briefly yesterday.  This was this

8    Karlin report that we were talking about last time.  And in his

9    testimony to me, back last week, or maybe it was two weeks ago,

10   he says, "I know what it says.  I'm the one that gave the

11   information to Karlin."  He just threw that out there.

12        And then in his prior deposition when he was asked, he

13   did not contribute information to this report, this report.  He

14   is talking about a report that was only one report.  It's this

15   Swiss background investigations.

16        All right.  That is part one.  The first thing they

17   have to prove to you is there is a valid contract.  They didn't

18   have a valid contract.

19        The second thing they have to show to you for the

20   release defense is that there was an intent for him to benefit.

21   It's called being a third-party beneficiary.

22        Now, again, the reason they have to do this is because

23   he didn't sign the agreement and his name is not on the

24   agreement.

25        So, I have to be a little bit of a nerdy lawyer and

1    read into the text of it.  We actually have to look at the

2    evidence.  If you actually look at the CAA, the idea here is

3    Litco presented itself to Latham and Arcanum as being able to

4    bring witnesses with the information to help recover assets.

5    They were an asset recovery firm.  And what is in the agreement

6    is, "No potential witness, which Litco identifies and produces

7    to Arcanum in connection with assistance to be provided under

8    this agreement, shall have any ownership interest in Litco or

9    in the monthly fees or recoveries, consideration payable to

10   Litco under this agreement."

11         So what does that mean?  What that means is that we

12   are going to go out; we found witnesses and we found money to

13   help you.  We are promising you none of the witnesses we

14   present to you have an ownership interest in Litco.  Because it

15   turns out——there is a lot of testimony on this——you can't pay

16   witnesses.  It's unethical to have a financial stake if you're

17   going to be a witness.  You can't do that.

18         But that's the whole reason he is not on the

19   agreement.  Even under his story, they present him as a

20   witness.  His story is, I showed up, I can tell you everything.

21   He actually says, go subpoena my bank records.  He is, by

22   definition, a witness, because by talking about your personal

23   involvement in all of these events you are by definition a

24   witness.  And that is specifically prohibited under this

25   agreement.

1    So, again, what it shows, what I am arguing here, is

2    that this shows there was never any intent by BTA or the other

3    signatories to benefit him, because he was, by definition,

4    going to be a witness.

5         Here is another thing that's worth sort of

6    contrasting, if you go back there.  We have been talking about

7    the CAA.  He claims that he is meant to be benefited by it and

8    that he is the third-party beneficiary.  And Mr. Wolf, as you

9    heard, drafted the CAA.  Mr. Wolf also helped draft the

10   settlement agreement with Ilyas Khrapunov.  This is 359.  These

11   are the releases in here.  Release from WHN to Sater.  Release

12   from Sater to WHN.  They specifically list the people's names

13   and identify the people.  These are what are third-party

14   beneficiaries.  It shows intent.  That's why you actually write

15   it out.

16        The point I am making is -- again, I have to address

17   it because they just got up there and waved their hands.  You

18   are going to have to go back and actually decide about two and

19   a half weeks.  This is a nonsense defense.  But I am spending

20   this time to actually show you the law, which they didn't, and

21   to walk you through the proof so you understand it.  Just

22   because I am talking about it, I am not trying to give it any

23   credence.  And this is what I am saying.  You identify the

24   people that are going to be released in a release, even if they

25   are not signatories.

1    Again, having to be a little bit of a lawyer here, we

2    are back at the CAA.  Here is another reason you can tell that

3    he wasn't meant to be a benefit of this.  One of the provisions

4    in here is confidentiality.  And what it says is that the

5    parties agreed to keep the terms of this agreement confidential

6    and to not disclose the terms of this agreement to anyone.  And

7    then it goes on, it says "except," and it gives you exceptions.

8    So, basically, any party who signs this has to keep it

9    confidential, except in one, two, and three.

10   Three is important.  "To enforce each party's

11   respective rights stated in this agreement in a judicial

12   proceeding."  And what that means is——it's kind of common

13   sense——if you make something confidential, you agree to keep it

14   confidential.  But if we are going to get into a fight, if you

15   breach your side of the contract, I can then break the

16   confidentiality to go enforce it.  This is a normal lawyerly

17   thing.

18   But what is essential here is that Mr. Sater is not a

19   party to the agreement.  Parties is a defined term.  It's

20   Litco.  It's the City of Almaty.  He is not named in the

21   agreement.  Again, the judge will instruct you and you will

22   hear the law on this, but you look at the terms of the

23   agreement to look at the parties' intent.  And he is actually

24   excluded from the ability to actually enforce the agreement.

25   Okay.  So at the end of the day, there was no intent.

1    There is no evidence of us ever having the intent to benefit

2    from the agreement.

3            And, finally let's look at the actual language of the

4    agreement.  So they have to prove one, they have to prove two,

5    and they have to also prove three.

6            Now, for three, I am not going to read it, but this is

7    the release that was read to you a bunch of different times.

8    But they always focused on the top part and not the bottom

9    part.  Because you basically have people that are released and

10   then you have the types of claims that are released.  So you

11   have the releasees, the releasors, and then you have the

12   claims.

13           The claims that are released are for any acts or

14   omissions relating to or arising from this agreement.  It makes

15   sense, common sense.  We are releasing you from claims about

16   the Litco agreement.  This is Litco, this is all relating to

17   Litco, and the services Litco will provide going forward.

18           The second thing is that the releasees' previous,

19   current, or future contractual obligations.  Those are also

20   released.  But, again, that's talking about this contract.

21           And then any other matter between the parties, and

22   other claims that come under the local, federal and ethical

23   rules, regulations statutes, and laws.  They keep dropping out

24   the parties.  The parties is a defined term.  Look at the

25   contract.  He is not a party to this.  So they basically ignore

1    the limiting principle in all this.

2            And finally, the release shall not apply under any

3    circumstances or in any way to any of the Khrapunov entities or

4    Ablyazov entities.  It's common sense why this is put in there.

5    And these things all overlap a bit.  This is also common sense

6    why there was never any intent by the parties to benefit him,

7    because the whole limiting principle was to avoid releasing

8    people who had any involvement in this stuff.  And that's what

9    Ms. Nartay testified to.  That's the evidence in the record.

10           But, again, going back to his consulting agreement.

11   This is Mr. Sater's consulting agreement.  "The consultants

12   shall be at the disposal of any company part of or affiliated

13   to SPG Group, Swiss Development Group, Adlux, and any other

14   Khrapunov related or affiliated companies."

15           The defendants here are Mr. Sater and his companies.

16   They were literally put at the disposal of any company involved

17   in with Ilyas Khrapunov.  That's actually what his agreement

18   says.

19           This is a hairbrained defense.  The reason they just

20   got up here and waved their hands and didn't walk you through

21   the law is because, when you actually listen to the law, listen

22   to what the judge tells you, listen to the evidence, it's a

23   nonsense defense.  And they haven't even made an effort to show

24   you how this is a valid contract, how there was any intent to

25   actually bind him.  All they did was wave their hands and show

1    you the language.

2              Okay.  I am almost done.

3              So that is me addressing the defenses.  Again, please

4    remember it's their burden.  I am sorry I had to take your time

5    to tell you their defenses, but I don't want you to be confused

6    when you go back in the jury room, because you're going to be

7    asked to fill out a long form.  I suspect that their hope was

8    that that form is confusing.  It's really.  If you read it

9    carefully, it's very straightforward.

10             So, let's talk about damages.  The damages are set

11   forth in PTX 801 and 800.  Again, you won't have my slides, but

12   that's where the damages are.

13             These are the summary of payments by investment.

14   Again, these will be in the exhibits.  But more importantly,

15   these are the summary of payments by defendant for the money

16   had and received and the unjust enrichment claims.  Again,

17   these are Fliegler 801.  And you can see that Mr. Bayrock got

18   $4 million, Felix got $16 million, Global Habitat Solutions got

19   1.3, and MeM got about 686,000.  You don't have to memorize

20   these.  They are in 800.  But this is the money they received.

21             That was for the claims of money had and received and

22   unjust enrichment.

23             Conversion is a different claim.  For conversion, the

24   damages would be any money that Mr. Sater handled.  The

25   conversion claim is only against Mr. Sater.  And for Mr. Sater

1    the money he handled for a conversion claim is $36 million.

2    And, again, that is in 801.

3            Now, this verdict sheet that you will be getting has

4    something on there that you are going to have to determine if

5    you -- again, if you agree with us, you have to determine this.

6    The verdict sheet will ask for the earliest ascertainable date

7    on which the plaintiffs had a claim against each defendant.

8    This has nothing to do with the statute of limitations.  What

9    this has to do with is how interest would be calculated.

10           So, this is not on any of the charts, but if this is

11   something you're interested in, I would write this down.  The

12   date that Mr. Sater first received funds was on April 2, 2013.

13   The date that Global Habitat Solutions first received was

14   April 2, 2013.  The first date that Bayrock Group received

15   funds was June 3, 2013.  And the first date that MeM Energy

16   Partners received funds was August 22, 2013.

17           So these are dates.  These aren't on any of the

18   charts, but this is for the interest earliest day question

19   that's presented to you.  So I wanted to submit that to you for

20   your consideration.

21           There is also something called punitive damages.  I

22   want to be clear.  This is only against Mr. Sater.  And

23   punitive damages are available if you have a high degree of

24   moral culpability.  You can read the charge on that.  And the

25   judge will instruct you there are certain things you can

1   consider on that.

2          Punitive damages would be appropriate here because Mr.

3   Sater is just grossly irresponsible and he lied to you.  He

4   says things like this:

5          "You didn't care one way or another if the money was

6   dirty?

7          "Not really.

8          "So if you knew the money was dirty, you would have

9   invested anyway?

10         "Probably."

11         That's how he is behaving.  He thinks he is above the

12  law.  I don't care about it.  I'm not subject to the British

13  Crown.  It's a worldwide freezing order.  He tried to shake

14  down a money launderer to keep his own money.  You can consider

15  his prior convictions in this context, too, because he is a

16  recidivist.  And, frankly, he has been bragging, right?  This

17  is testimony he gave:

18         "Now, do you regret taking the 36 million?"

19         That's a question from his lawyer.

20         The answer he gives:  "No.  The only thing I regret is

21  that I gave them back 20."

22         That is not a sane, responsible thing to do.  That is

23  someone that thinks they are above the law, that thinks they

24  can get away with anything, and it should not be tolerated.

25         And this is your decision, but I submit to you Mr.

1  Sater lied to your face.  You heard about that June 5 meeting.

2  The whole point, that's their whole defense.  They kept you

3  here for two and a half weeks.  That was their defense.  We had

4  this meeting on June 5.  They didn't give you an iota of

5  evidence to support that.  I think that's insulting.  That's

6  your decision to make.

7       There are many ways to calculate punitive damages.

8  You can look at the money that came in to NSW, which was

9  hundreds of millions of dollars.  It's for you to decide.  One

10 way to think about it is the total amount of money that was

11 laundered through the deals that we are talking about in this

12 case was $62.65 million.  That's the amount of money that was

13 laundered.  It's up to you, you're the jury, but that's one way

14 of framing it in a responsible way.

15      So, again, respectfully, sorry I had to talk to you

16 for so long, but I had to show you the proof, I had to show you

17 that you were here for a reason.  The reason was for us to

18 bring the case.  Please evaluate our case.  Look at the

19 evidence they presented to you.  I think at the end of the day,

20 if you follow the evidence, you review the evidence, you listen

21 to the judge's instructions, and you apply your common sense,

22 you will see that these defendants are liable.

23      Thank you for your time.

24      THE COURT:  All right.  Ladies and gentlemen, that

25 concludes the summations.  The next stage is for me to charge

O6Q8ALM1

1    you on the law.  The charge will take somewhat more than an

2    hour.  So in order to avoid taking a break during the charge,

3    we will take our mid-morning break now for ten minutes.  Please

4    remember all of my continuing instructions.

5              All rise, please.  The jury should follow Mr. Fletcher

6    to the jury room.

7              (Jury exits courtroom)

8              THE COURT:  Ten minutes.  See you shortly.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6QQalm2                    Charge

1          (In open court)

2          THE COURT:  Let's bring in the jury.

3          (Jury present)

4          THE COURT:  Please be seated all.

5          Ladies and gentlemen, I am now about to charge you on

6     the law, but it is a tradition of the Court that the before the

7     Judge charges the jury on the law, the deputy makes an

8     announcement.

9          Mr. Fletcher.

10         DEPUTY CLERK:  Ladies and gentlemen, the Court is

11    about to instruct the jury on the law or, as it is commonly

12    called, the charge.  We ask members of the audience to please

13    be quiet during the charge so that the Court can have the

14    complete attention of the jury.

15         Your Honor.

16         THE COURT:  Ladies and gentlemen of the jury, before

17    you begin your deliberations, I will now instruct you on the

18    law that you will apply to the facts in this case.  You will

19    then determine the facts in accordance with my instructions on

20    the law.

21         It is a tradition and right of our legal system that

22    parties involved in legal disputes where their lives or

23    properties are at stake have a jury, chosen from the members of

24    their community, find the facts affecting them.  As I told you

25    at the beginning of the trial, I, as the judge, do not find the

1    facts.  Rather, you, the members of the jury, find the facts.

2              As I have also explained, the trial judge instructs

3    the jurors on the law that they are to apply to the case, and

4    the jurors are bound to accept those instructions even though

5    they may feel that the law should be different from what the

6    judge says it is.  If anyone has stated a legal principle

7    different from any that I state to you in my instructions, it

8    is my instructions that you must follow.  You should also not

9    single out any instruction or any one word or phrase in a

10   instruction as alone stating the law, but you should consider

11   the instructions as a whole.

12             Accordingly, you will find the facts in this case, but

13   you will accept the law as I state it to you and apply that law

14   to the facts as you find them.  The result of your work will be

15   the verdict that you return.

16             In the course of these instructions, I will instruct

17   you on several different matters.

18             First, I will give you instructions on certain

19   principles to apply in your deliberations.

20             Second, I will instruct you on the burden of proof in

21   this case.

22             Third, I will instruct you on the substantive law to

23   be applied to the facts that you find.

24             Fourth, I will instruct you on certain principles to

25   apply in assessing the evidence.

1          Fifth, I will review with you the special verdict form

2     to be used in this case.

3          Finally, I will give you some concluding instructions.

4          I expect that these instructions will take more than

5     an hour to explain.  I will provide a copy of these

6     instructions to you so that you will have them during your

7     deliberations.  Your verdict in this case will be a special

8     verdict in the form of a series of questions to be answered

9     principally by "yes" or "no" answers.  Each of your answers

10    must be by a unanimous vote of all the jurors.

11         I will review that special verdict form with you

12    toward the end of these instructions.  I ask that you now pay

13    careful attention to these instructions.

14         As I have said, your role is to decide the fact issues

15    in this case.  You are the sole and exclusive judges of the

16    facts.  You determine the weight of the evidence.  You appraise

17    the credibility of the witnesses.  You draw the reasonable

18    inferences from the evidence or lack of evidence.  And you

19    resolve such conflicts as there may be in the testimony.

20         In determining these issues, no one may invade your

21    province or function as jurors.  In order for you to determine

22    the facts, you must rely upon your own recollection of the

23    evidence.  What counsel have said in their opening statements,

24    in their closing arguments, or in their questions or objections

25    is not evidence.  Nor is what I may have said – or what I may

1    say in these instructions – about a fact issue evidence.

2    Because you are the sole and exclusive judges of the facts, I

3    do not mean to indicate any opinion as to the facts or what

4    your verdict should be.  The rulings I have made during the

5    trial are not any indication of my views of what your decision

6    should be.

7            You are expressly to understand that the Court has no

8    opinion as to the verdict you should render in this case.

9            As to the facts, ladies and gentlemen, you are the

10   exclusive judges.  You are to perform the duty of finding the

11   facts without bias or prejudice as to any party.  All parties

12   are entitled to the same fair and conscientious consideration.

13           All parties stand as equals before a jury in the

14   courts of the United States.  You must disregard any feelings

15   you have about any party's or witness's race, ethnicity,

16   religion, national origin, sex, age, physical condition or

17   background.  The plaintiffs and the defendants stand on equal

18   footing before you.  Your verdict must be based solely on the

19   evidence or lack of evidence.  In determining the facts, you

20   are reminded that you took an oath to render judgment

21   impartially and fairly, without prejudice or sympathy and

22   without fear, solely upon the evidence in the case and the

23   applicable law.  I know that you will fulfill this duty and

24   reach a just and true verdict.

25           You are not to consider the reaction of the parties or

1   the public to your verdict, whether it will please or displease

2   any one, whether it will be popular or unpopular, or, indeed

3   any consideration outside the case as it has been presented to

4   you in the courtroom.  You should find the facts from what you

5   consider to be the believable evidence and apply the law as I

6   give it to you.  Your verdict will be determined by the

7   conclusion you reach, no matter whom the verdict helps or

8   hurts.

9           For the same reasons, the personalities and the

10  conduct of any attorney is not in any way in issue.  If you

11  formed opinions of any kind as to these matters, those opinions

12  should not enter into your deliberations.

13          As I have said, in determining the facts, you must

14  rely upon your own recollection of the evidence.  What is

15  evidence?  Evidence consists of the testimony of witnesses and

16  the exhibits that have been received into evidence.

17          By contrast, a question put to a witness is not to be

18  considered by you as evidence.  It is witness's answers that

19  are evidence, not the questions.  At times, a questioner may

20  have incorporated into a question a statement that assumed

21  certain facts to be true and asked the witness if the statement

22  was true.  If the witness denied the truth of a statement, and

23  if there is no evidence in the record proving that assumed fact

24  to be true, then you may not consider it to be true simply

25  because it was contained in a question.

1         Objections to questions are not evidence.  Objections

2    are a proper part of the trial process.  You should not be

3    influenced by any objection or by the Court's ruling on it.

4         Testimony that has been stricken or excluded is not

5    evidence and may not be considered by you in rendering your

6    verdict.  Also, if testimony or evidence was received for a

7    limited purpose - for example, to assess a witness's

8    credibility or to show the knowledge that a party may have

9    had - then you must follow the limiting instructions I have

10   given.

11        Arguments are not evidence because they are not

12   testimony.  If your recollection of the facts differs from

13   statements made in an argument, it is your recollection that

14   controls.

15        Anything that you may have seen or heard when the

16   court is not in session is not evidence.  You are to decide the

17   case solely on the evidence that was presented in this

18   courtroom.

19        Exhibits that have been marked for identification may

20   not be considered by you as evidence unless they have been

21   received in evidence by the Court.  Exhibits marked for

22   identification but not admitted are not evidence, nor are

23   materials brought forth only to refresh a witness's

24   recollection.  It is for you to decide the weight, if any, to

25   be given to the testimony you have heard and the exhibits you

1    have seen.

2           During the trial I have been called upon to make

3    rulings on various questions.  There may have been objections,

4    or motions may have been made to strike answers, or conferences

5    may have been held on issues.  You are to disregard that these

6    procedural matters have occurred, and, of course, if at any

7    time I instructed you to disregard anything that was said, then

8    you must follow that instruction and pay no attention to the

9    statement in your deliberations.  Procedural matters are

10   matters of law, and although you may have been curious about

11   them, you should not consider them.

12          You should draw no inference or conclusion for or

13   against any party by reason of objections or my rulings on such

14   objections.  You should not be swayed against the plaintiffs or

15   the defendants because of any objection or my ruling on it.

16          It is my function to cut off questioning, to strike

17   remarks, and to reprimand any person when I think it is

18   necessary.  But you should draw no inference from that.

19          Also, and once again, the fact that at times I may

20   have commented during the course of trial or asked questions of

21   witnesses does not indicate any feeling of mine about the

22   facts.  I have no such feelings, and my comments were intended

23   only to clarify the issue at hand.  It is for you alone to

24   decide the weight, if any, to be given to the testimony you

25   have heard and the exhibits you have seen.

1           Any questions that I asked or instructions that I gave

2    were intended only to clarify the presentation of evidence and

3    to bring out something that I thought was unclear.  You should

4    draw no inference or conclusion of any kind, favorable or

5    unfavorable, with respect to any witness or any party in the

6    case by reason of any comment, question or instruction of mine,

7    nor should you infer that I have any views as to the

8    credibility of any witness, as to the weight of the evidence,

9    or as to how you should decide any issue that is before you.

10   That is entirely your role.

11          Members of the jury, now that I have given you general

12   instructions, I am going to instruct you on the law to be

13   applied to the specific issues in this case, but first I am

14   going to explain the concept of "burden of proof."  This case

15   is a civil case.  Therefore, the burden of proof here is "proof

16   by a preponderance of the evidence."

17          The party with the burden of proof on any given issue

18   has the burden of proving to you every disputed element of that

19   party's claim by a preponderance of the evidence.  If you

20   conclude that the party bearing the burden of proof has failed

21   to establish that party's claim by a preponderance of the

22   evidence, you must decide against that party on the issue you

23   are considering.

24          What does a "preponderance of evidence" mean?  To

25   establish a fact by a preponderance of the evidence means to

1    prove that the fact is more likely true than not true.  A

2    preponderance of the evidence means the greater weight of the

3    evidence.  It refers to the quality and persuasiveness of the

4    evidence, not to the number of witnesses or documents.  In

5    determining whether a claim has been proved by a preponderance

6    of the evidence, you should consider the relevant testimony of

7    all witnesses, regardless of who may have called them, and all

8    of the relevant exhibits received in evidence, regardless of

9    who may have produced them.

10          If you find that the credible evidence on a given

11   issue is evenly divided between the parties – that it is

12   equally probable that one side is right as it is that the other

13   side is right – then you must decide that issue against the

14   party having this burden of proof.  That is because the party

15   bearing this burden of proof must prove more than simple

16   equality of evidence.  That party must prove the element at

17   issue by a preponderance of the evidence.  On the other hand,

18   the party with this burden of proof need prove no more than a

19   preponderance.  So long as you find that the scales tip,

20   however slightly, in favor of the party with this burden of

21   proof, then that element will have been proved by a

22   preponderance of the evidence.

23          The plaintiffs in this case, BTA Bank JSC ("BTA") and

24   the City of Almaty, Kazakhstan ("Almaty"), have brought claims

25   against the defendants:  Felix Sater, Bayrock Group Inc.

("Bayrock") and Global Habitat Solutions ("GHS"), entities

wholly owned and controlled by Sater; and MeM Energy Partners

LLC ("MeM").  The plaintiffs bear the burden of proof on each

claim.

          The defendants have raised affirmative defenses and

they bear the burden of proof on these affirmative defenses.

The defendants contend that the claims against them are barred

by the statute of limitations, and the plaintiffs respond that

these defenses are barred by the doctrine of equitable

estoppel.  Defendant Sater, Bayrock, and GHS also allege that

the claims against them are barred by a release, but the

plaintiffs claim that these defendants are barred from raising

this defense.  The defendants bear the burden of proof on their

affirmative defenses.

          Once more I remind you, as I did at the beginning of

the trial, that proof beyond a reasonable doubt is the proper

standard of proof in a criminal trial.  That requirement does

not apply to a civil case such as this, and you should put it

completely out of your mind.

          Although there are multiple defendants in this trial,

and some of the defendants are being represented by the same

counsel, you are not to treat them as one person.  Each

defendant is entitled to your separate consideration.  The

question of whether liability has been proven is personal to

each defendant and must be decided by you as to each defendant

1  individually.

2       You may also have noticed throughout the trial that

3  counsel for various defendants have consulted with each other

4  and have divided the work of the trial in an effort to

5  facilitate their presentation and to avoid duplication.  This

6  does not mean that the defendants' cases are to be viewed

7  together.  Again, the issue of each defendant's liability is

8  personal and must be decided by you as to each defendant

9  individually.

10       BTA Bank and certain defendants are companies, and the

11  City of Almaty is a government entity.  The mere fact that

12  certain parties are companies or a governmental entity does not

13  mean that they are entitled to any greater or lesser

14  consideration by you.  All litigants are equal before the law,

15  and companies and a governmental entity, big or small, are

16  entitled to the same fair consideration as you would give any

17  other individual party.

18       A company or governmental entity may act only through

19  natural persons who are its agents or employees.  Generally,

20  any agents or employees of such an entity may bind the entity

21  by their acts and declarations made while acting within the

22  scope of their authority delegated to them by the entity or

23  within the scope of their duties as employees of the entity.

24  Hence, both the plaintiffs and entity defendants can act only

25  through their agents and employees, and the acts of those

1   agents and employees bind the plaintiffs and entity defendants

2   as I just explained.

3          However, management misconduct will not be imputed to

4   an entity if the officer of the entity responsible for the

5   misconduct acted entirely in that officer's own interest and

6   adversely to the interests of the entity.  This narrow

7   exception applies only when the officer has totally abandoned

8   the entity's interests and does not apply when the officer's

9   actions are intended to benefit the entity.

10         Now I will turn to the law governing the plaintiffs'

11  claims against the defendants and the affirmative defenses of

12  the defendants.  You must consider each of the plaintiffs'

13  claims separately and ask with respect to each claim whether

14  the plaintiffs have proven the elements of the claim by a

15  preponderance of the evidence.  Similarly, you must consider

16  each of the affirmative defenses separately and ask whether the

17  defendants have proven the affirmative defenses by a

18  preponderance of the evidence.

19         The plaintiffs' first claim is against only defendant

20  Sater, and it is for conversion.

21         A party who, without authority, intentionally

22  exercises control over the property of another and thereby

23  interferes with the other party's right of possession, has

24  committed a conversion and is liable for the value of the

25  property.  A defendant is liable for the conversion of

money - as the plaintiffs allege that defendant Sater is in

2     this case - where there is a specific, identifiable fund that

3     the defendant is obligated to return or otherwise treat in a

4     particular manner.  It is generally sufficient for a plaintiff

5     to identify a specific transfer of funds that were

6     misappropriated and to trace those funds to a knowing

7     recipient.  At the same time, however, a claim for conversion

8     of money cannot be used to enforce an obligation to repay

9     money, as in the case of a legitimate loan, or to recover money

10    that was already repaid to the plaintiffs.

11              In this case, the plaintiffs allege that defendant

12    Sater converted money belonging to the plaintiffs.  The

13    plaintiffs allege that Mukhtar Ablyazov and others wrongfully

14    transferred money from BTA to a company called Tradestock, and

15    that money then moved through companies called Zhaikmunai and

16    Northern Seas Waterage, and then through companies controlled

17    by Ilyas Khrapunov, including companies called Telford,

18    Triadou, Crownway and RPM-Maro.  The plaintiffs further allege

19    that Viktor Khrapunov wrongly transferred property owned by the

20    City of Almaty to his wife, and that Viktor Khrapunov and his

21    wife then sold the property and transferred the proceeds to

22    Ilyas Khrapunov's company, Swiss Development Group.  The

23    plaintiffs allege that defendant Sater helped Ilyas Khrapunov

24    invest those funds taken from BTA and Almaty in property in the

25    United States, and that defendant Sater misappropriated a

(212) 805-0300

O6QQalm2                    Charge

1   portion of those funds and is obligated to return the portion

2   of those funds he misappropriated.

3            Defendant Sater denies the allegations against him.

4   Defendant Sater contends that he had no knowledge as to the

5   source of funds used for any such investments, and that any

6   monies he received were strictly limited to compensating him

7   for his services.  Defendant Sater also contends that the

8   plaintiffs cannot identify a specific, identifiable fund that

9   must be returned to them.

10           To prevail on their conversion claim, plaintiffs must

11  prove to you each of the following three elements by a

12  preponderance of the evidence.

13           First, the plaintiffs must prove that they had a

14  possessory right or interest in the property at issue.

15           Second, the plaintiffs must prove that defendant Sater

16  exercised unauthorized control over that property in a way that

17  interfered with the plaintiffs' rights.

18           Third, the plaintiffs must prove that there is a

19  specific, identifiable fund that defendant Sater is obligated

20  to return.  To satisfy this element, it is necessary for the

21  plaintiffs to identify a specific transfer of funds and trace

22  those funds to a knowing recipient – here, defendant Sater.  As

23  long the plaintiffs can identify specific funds that were

24  stolen, it does not matter if the stolen funds were later

25  commingled with other funds.

1    If you find that the plaintiffs have proven each of

2  these elements by a preponderance of the evidence, you will

3  find that the plaintiffs have proven the elements on their

4  claim of conversion against defendant Sater.  You will then go

5  on to consider the affirmative defenses, which I will discuss

6  in a few moments.  On the other hand, if you find that the

7  plaintiffs have failed to prove any of the elements of

8  conversion by a preponderance of the evidence, then you will

9  find for defendant Sater on this claim, and you will not go on

10  to consider any affirmative defenses.

11    Besides conversion, the plaintiffs also bring claims

12  against the defendants for unjust enrichment.  The plaintiffs

13  bring their unjust enrichment claims against all of the

14  defendants.

15    To succeed on a claim for unjust enrichment, a

16  plaintiff must show that the defendant was enriched at the

17  plaintiffs' expense and that it is against equity and good

18  conscience to permit the defendant to retain what is sought to

19  be recovered.

20    The plaintiffs claim that the defendants were each

21  unjustly enriched at the plaintiffs' expense because the

22  defendants received money or the benefit of investments in

23  property using funds that the plaintiffs claim were wrongfully

24  taken from them.  Specifically, the plaintiffs contend that the

25  defendants knowingly received funds that had been stolen from

1    the plaintiffs, and that the defendants helped hide the stolen

2    money through a series of real estate and other investments in

3    the United States.

4          The defendants deny the plaintiffs' claims.  The

5    defendants contend that they had no knowledge as to the source

6    of funds used for any such investments, and that any monies

7    they received were strictly limited to compensating them for

8    their employment.  The defendants also assert that the services

9    they provided benefited the plaintiffs by increasing the amount

10   of money available for the plaintiffs to recover.

11         To prevail on their unjust enrichment claims, the

12   plaintiffs must prove each of the following three elements by a

13   preponderance of the evidence against the defendant you are

14   considering.

15         First, the plaintiffs must prove that the defendant

16   was enriched.  To satisfy this element, the plaintiffs must

17   demonstrate that the defendant received a financial benefit

18   through the receipt of money or property.

19         Second, the plaintiffs must prove that the defendant

20   was enriched at the plaintiffs' expense.  To satisfy this

21   element, the plaintiffs must demonstrate that the defendants

22   knowingly received the benefit of funds that were

23   misappropriated from the plaintiffs.

24         Third, the plaintiffs must prove that it would be

25   against equity and good conscience for the defendant to retain

1    what the plaintiffs seek to recover.

2           If you find that the plaintiffs have proven each of

3    these elements by a preponderance of the evidence against the

4    defendant you are considering, then you will find that the

5    plaintiffs have proven the elements of their claim of unjust

6    enrichment against that defendant.  You will then go on to

7    consider the affirmative defenses.  On the other hand, if you

8    find that the plaintiffs have failed to prove any of the

9    elements of unjust enrichment by a preponderance of the

10   evidence against the defendant you are considering, then you

11   must find for that defendant on this claim, and you will not go

12   on to consider any affirmative defenses.

13          Finally, the plaintiffs also bring claims against the

14   defendants for money had and received.  The plaintiffs bring

15   their money had and received claims against all of the

16   defendants.

17          To succeed on a claim for money had and received, a

18   plaintiff must show that the defendant you are considering

19   received money belonging to the plaintiff; that the defendant

20   benefited from the receipt of that money; and that it is

21   against equity and good conscience to permit that defendant to

22   retain what is sought to be recovered.

23          The plaintiffs claim that the defendants received

24   money or the benefit of investments in property using funds

25   that the plaintiffs claim were wrongfully taken from them.

1  Specifically, the plaintiffs contend that the defendants

2  knowingly received funds that had been stolen from the

3  plaintiffs, and that the defendants helped hide the stolen

4  money through a series of real estate and other investments in

5  the United States.

6          The defendants deny the plaintiffs' claims.  The

7  defendants contend that they had no knowledge as to the source

8  of funds used for any such investments, and that any monies

9  they received were strictly limited to compensating them for

10 their employment.  The defendants also assert that the services

11 they provided benefited the plaintiffs by increasing the amount

12 of money available for the plaintiffs to recover.

13         To prevail on their money had and received claims, the

14 plaintiffs must prove each of the following three elements by a

15 preponderance of the evidence against the defendant you are

16 considering.

17         First, the plaintiffs must prove that the defendant

18 knowingly received money from the plaintiffs.

19         Second, the plaintiffs must prove that the defendant

20 benefited from the receipt of that money.

21         Third, the plaintiffs must prove that it would be

22 against equity and good conscience for the defendant to keep

23 that money.

24         If you find that the plaintiffs have proven each of

25 these elements by a preponderance of the evidence, then you

1    will find for the plaintiffs on this claim against the

2    defendant you are considering.  You will then go on to consider

3    the affirmative defenses.  On the other hand, if you find that

4    the plaintiffs have failed to prove any of the elements of the

5    money had and received by a preponderance of the evidence

6    against the defendant you are considering, then you must find

7    for that defendant on this claim, and you will not go on to

8    consider any affirmative defenses.

9           Certain of the plaintiffs' claims require you to

10   consider whether the defendants exercised control over the

11   plaintiffs' property.  You have heard evidence that certain of

12   the investments made by the defendants were successful and made

13   money.

14          The property that you may consider for purposes of the

15   plaintiffs' claims should include the proceeds, or fruits, of

16   the plaintiffs' property.  If you find that the defendants were

17   involved in a financial transaction involving the plaintiffs'

18   property, then you should consider the proceeds of that

19   transaction to be the plaintiffs' property as well, even if

20   that transaction increased the overall amount of assets.

21          The defendants have alleged affirmative defenses as to

22   which they have the burden of proof.  If you find that the

23   defendant you are considering has established any of the

24   affirmative defenses by a preponderance of the evidence, you

25   must return a verdict in favor of that defendant on the claim

1   you are considering.  The defendants allege the following

2   affirmative defenses:

3           Defendant Sater asserts that all of the plaintiffs'

4   claims against him, Bayrock, and GHS are barred by a release.

5   All of the defendants assert that the plaintiffs' claims

6   against them for conversion and unjust enrichment are barred by

7   the statute of limitations.  I will now explain each of these

8   defenses to you in more detail.

9           Defendant Sater contends that the plaintiffs signed a

10  contract called the confidential assistance agreement ("CAA")

11  releasing their claims against him and the defendants that are

12  entities wholly owned by him; namely, Bayrock and GHS.  The

13  plaintiffs agree that they signed the CAA, but they claim that

14  defendant Sater is not among the individuals intended to be

15  released in the CAA because the parties to the CAA were the

16  plaintiffs, certain third parties, and Litco LLC, which,

17  unbeknownst to the plaintiffs at the time, was an entity wholly

18  owned by defendant Sater.  The plaintiffs further contend that

19  Litco lied about and concealed Sater's ownership interest in

20  Litco, rendering the contract void and unenforceable.

21          Sater has the burden of proving by a preponderance of

22  the evidence that the claims against him were released under

23  the CAA.  Because this defense is based on a contract entered

24  into by Litco, Sater must prove the existence of the contract

25  and that the contract its unenforceable by Sater.  Sater is not

 1   a party to the CAA, and so he must prove that the circumstances

 2   surrounding the execution of the CAA indicate that the

 3   plaintiffs intended to give Sater the benefit of the contract

 4   and that releasing claims against Sater is appropriate to

 5   effectuate the intention of the parties.

 6           When interpreting the CAA, as with any contract, you

 7   should give a fair meaning to all of the language employed by

 8   the parties.  Any undefined terms in the contract should be

 9   given their plain and ordinary meaning.  If the meaning of any

10   term or provision is not clear, then you may consider evidence

11   outside of the language of the agreement – such as the

12   testimony and other documentary evidence introduced at

13   trial – and the purpose of the agreement to interpret its

14   terms.  You should reach a practical interpretation of the

15   expressions of the parties so that their reasonable

16   expectations will be realized.

17           The plaintiffs also contend that the CAA is not

18   enforceable because the plaintiffs were lied to when they

19   entered into the agreement.  A contract induced by fraud is

20   unenforceable.  The plaintiffs contend that Litco fraudulently

21   induced the plaintiffs to enter into the CAA by falsely

22   representing that no potential witness that Litco identified

23   and produced in connection with assistance under the agreement

24   would have any ownership interest in Litco while knowing that

25   Sater, a witness, actually was the owner of Litco.  If you find

1    that Litco knowingly misrepresented or concealed an important

2    fact that the plaintiffs relied on, then you should find that

3    the CAA is unenforceable and that Sater cannot rely on the

4    release as an affirmative defense.

5         If you find (1) that Litco did not lie about or

6    conceal Sater's ownership interest in Litco, or that although

7    Litco did so represent, the plaintiffs did not rely upon the

8    representation in signing the document, and (2) you further

9    find that Sater was an intended beneficiary of the agreement,

10   and (3) you further find that the release covers the claims in

11   this case, then you will find for Sater, Bayrock, and GHS on

12   this issue.

13        The defendants claim that certain of the plaintiffs'

14   claims are barred by the relevant statutes of limitations,

15   which are the time limits for bringing those claims.

16        To establish that a statute of limitations bars a

17   plaintiff's claim, the defendant must prove by a preponderance

18   of the evidence that the plaintiffs failed to file the lawsuit

19   within the relevant time allowed after the plaintiffs knew or,

20   in the exercise of reasonable diligence, should have known

21   about the defendant's conduct that gave rise to the claim.

22        I instruct you that the statute of limitations on the

23   plaintiffs' claim for conversion against defendant Sater is

24   three years.  I further instruct you that the statute of

25   limitations on the plaintiffs' claims for unjust enrichment is

1    also three years.  Finally, I instruct you that the statute of

2    limitations on the plaintiffs' claims for money had and

3    received is six years.

4         Defendant Sater asserts that the plaintiffs claim he

5    received the money underlying the plaintiffs' conversion claim

6    in 2012 and 2013.  Defendant Sater further asserts that because

7    the plaintiffs did not commence this action until March 2019,

8    the plaintiffs' conversion claim against him is barred by the

9    statute of limitations.

10        Similarly, defendants Sater, Bayrock, and GHS assert

11   that the plaintiffs claim Sater and his entities received the

12   money underlying the plaintiffs' unjust enrichment claim in

13   2012 and 2013.  Defendant Sater and his entities further assert

14   that because the plaintiffs did not commence this action until

15   March 2019, the plaintiffs' unjust enrichment claims against

16   Mr. Sater and his entities are barred by the statute of

17   limitations.

18        Finally, defendant MeM asserts that the plaintiffs

19   claim MeM received the money underlying the plaintiffs' unjust

20   enrichment claim in August 2013, and that the statute of

21   limitations expired in August 2016.  Defendant MeM further

22   asserts that because the plaintiffs did not commence this

23   action until March 2019, the plaintiffs' unjust enrichment

24   claim against MeM is barred by the statute of limitations.

25        The plaintiffs contend that the defendants are

1  equitably estopped from asserting the defense of the statute of

2  limitations.  Equitable estoppel allows a plaintiff to pursue a

3  claim that is brought after the statute of limitations has

4  expired, if the plaintiff can prove that the defendant's

5  affirmative wrongdoing produced the delay between the accrual

6  of the cause of action and the start of the legal proceeding.

7          To establish equitable estoppel, the plaintiffs must

8  prove by a preponderance of the evidence that the plaintiffs

9  were induced by fraud, misrepresentation, or deception to

10  refrain from filing the action before the statute of

11  limitations expired.

12          The plaintiffs contend that because the defendants

13  concealed their roles in the transaction and receipt of the

14  stolen funds, the plaintiffs did not learn, despite diligent

15  investigation, that the defendants had received stolen funds

16  until March 2017, and as a result, their unjust enrichment and

17  conversion claims are not time-barred.

18          The defendants deny these allegations.

19          As I have just mentioned, if the plaintiffs have

20  proven that the defendants are liable to them for the claims

21  made against them, then you must determine the damages to which

22  the plaintiffs are entitled.  The plaintiffs must prove their

23  damages by a preponderance of the evidence.

24          You should not infer that the plaintiffs are entitled

25  to recover damages merely because I am instructing you on

1    damages.  It is exclusively your function to decide upon

2    liability.  If you decide that the plaintiffs are not entitled

3    to recover, you need not consider damages.  I am instructing

4    you on damages only so that you will have guidance should you

5    decide that the plaintiffs are entitled to recovery.

6            Damages for conversion are measured by the value of

7    the property at the time the property was taken.  On your

8    verdict sheet, the amount of damages you indicate should be

9    equal to that amount.  The plaintiffs' claim for conversion

10   seeks damages for the amount of allegedly misappropriated money

11   traceable to the plaintiffs that defendant Sater received.  It

12   is the plaintiffs' burden to prove this amount by a

13   preponderance of the evidence.

14           If you award the plaintiffs damages for conversion,

15   you will also be asked on the verdict sheet to provide the

16   earliest ascertainable date that the plaintiffs had a claim for

17   conversion.  If you find that the plaintiffs incurred damages

18   for conversion at various times, you may select a single,

19   reasonable intermediate date.

20           Additionally, if you find that the plaintiffs are

21   entitled to damages for their conversion claim, you may, but

22   are not required to, award the plaintiffs punitive damages.  If

23   you find that the plaintiffs are not entitled to damages for

24   conversion, you may not award punitive damages.  Punitive

25   damages are available for conversion where the defendant's

conduct was gross, wanton, or deliberate and demonstrates a

high degree of moral culpability.  The purpose of punitive

damages is to punish a defendant for shocking conduct and to

set an example in order to deter the defendant and others from

committing similar acts in the future.

A award of punitive damages is within your discretion.

You are not required to award them.  Punitive damages are

appropriate only for especially shocking and offensive conduct.

If you decide to award punitive damages, you must use sound

reason in setting the amount.  It must not reflect bias,

prejudice, or sympathy toward any party.  But the amount may be

as large as you believe necessary to fulfill the purpose of

punitive damages.  In this regard, you may consider the

financial resources of defendant Sater in fixing the amount of

punitive damages.

If you find for the plaintiffs on the unjust

enrichment and/or money had and received claims, you must

separately determine the amount of damages that should be

awarded to the plaintiffs on these claims.  To do so, you must

determine the amount of money rightfully belonging to the

plaintiffs that the defendants knowingly received.  The measure

of damages for these claims is the value of the property,

money, or benefit that the defendants received at the

plaintiffs' expense.  On your verdict sheet, the amount of

damages you indicate should be equal to that amount.

1    As with the plaintiffs' conversion claim, if you find

2    for the plaintiffs on the unjust enrichment and/or money had

3    and received claims, you will be asked to provide the earliest

4    ascertainable date that the plaintiffs had a claim for unjust

5    enrichment and/or money had and received.  If you find that the

6    plaintiffs incurred damages for unjust enrichment and/or money

7    had and received at various times, you may select a single,

8    reasonable intermediate date.

9    Punitive damages are not available for claims of

10   unjust enrichment or money had and received, so you will not

11   consider whether to award punitive damages on these claims.

12   However, you should not award damages more than once

13   for the same injury.  For example, if the plaintiffs were to

14   prevail on multiple claims and establish a one dollar injury,

15   you should not award them one dollar compensatory damages on

16   each claim -- the plaintiffs are only entitled to be made

17   whole, not to recover more than they lost.  Of course, if

18   different injuries are attributable to the separate claims,

19   then you must compensate the plaintiffs fully for all of the

20   injuries.

21   You also must be careful to impose any damages that

22   you may award on a claim solely upon the defendant or

23   defendants who you find to be liable on that claim.  Although

24   there are four defendants in this case, it does not follow that

25   if one is liable, all or any one of the others are liable as

1    well.  Each defendant is entitled to fair, separate, and

2    individual consideration of the case without regard to your

3    decision as to the other defendants.  If you find that only one

4    defendant is responsible for a particular injury, then you must

5    impose damages for that injury only upon that defendant.

6         You have heard testimony about the law relating to

7    real estate brokers in New York.  Because it is for the Court

8    to instruct you on the law, let me explain certain aspects of

9    New York real estate law which have been discussed in the

10   course of testimony before you.

11        Under New York's Real Property Law, a "real estate

12   broker" is a person who, on behalf of another person or

13   company, and in exchange for a fee, commission, or other

14   valuable consideration, lists for sale, sells, at auction or

15   otherwise, or offers or attempts to negotiate a sale, at

16   auction or otherwise, an estate or interest in real estate, or

17   who negotiates or attempts to negotiate a loan secured, or to

18   be secured, by a mortgage or other incumbrance upon or transfer

19   of real estate.

20        "A broker is a fiduciary with a duty of loyalty and an

21   obligation to act in the best interests of the principal," and

22   has a duty to "act honestly and with candor toward the broker's

23   employer."

24        Under New York law, no person or entity may act as a

25   real estate broker or hold himself out to be a real estate

1   broker unless he is duly licensed.  A single act of real estate

2   brokerage without a real estate license is a misdemeanor crime.

3   Unlicensed real estate brokerage can also result in significant

4   monetary penalties.  These rules apply to anyone located in New

5   York providing brokerage services, even if the relevant

6   property is not located in New York.

7          New York's Real Property Law also prohibits a broker

8   from splitting any part of a fee, commission, or other

9   compensation to any other person who is providing brokerage

10  services, unless that person is also duly licensed.  These

11  rules apply regardless of how the broker's fee is

12  characterized.  For example, an unlicensed person or company

13  providing brokerage services may not receive a "finder's fee"

14  or "commission," either directly from a party to a transaction

15  or from another broker.

16         These rules apply whenever an interest in real estate

17  was the "dominant feature of the transaction at issue."

18         When someone is acting as a real estate broker, other

19  rules apply to them as well.  For example, a real estate broker

20  is not permitted to commingle the money of his principal with

21  his own money, and is instead required to maintain a separate,

22  special bank account to be used exclusively for the deposit of

23  these monies.  Additionally, "a real estate broker shall make

24  it clear for which party he is acting, and he shall not receive

25  compensation from more than one party except with the full

O6QQalm2                    Charge

1    knowledge and consent of the broker's client."

2         I also instruct you now that these rules apply even if

3    a person who is not licensed as a real estate broker works with

4    someone who is licensed.

5         Now that I have instructed you on the substantive law

6    to be applied to the facts as you find them, I will give you

7    further instructions on certain evidentiary principles.

8         You may have heard me refer on several occasions to

9    direct and circumstantial evidence, and also to drawing

10   inferences.  As I noted at the beginning of the trial, there

11   are two types of evidence that you may use in reaching your

12   verdict - direct evidence and circumstantial evidence.  Direct

13   evidence is when a witness testifies about something the

14   witness knows by virtue of his or her own senses -- something

15   the witness has seen, felt, touched or heard.  Direct evidence

16   may also be in the form of an exhibit admitted into evidence.

17        Circumstantial evidence is evidence that tends to

18   prove a disputed fact by proof of other facts.  There is a

19   simple example of circumstantial evidence that is often used in

20   this courthouse.

21        Assume that when you came into the courthouse this

22   morning, the sun was shining and it was a nice day.  Assume

23   that the courtroom blinds were drawn, and you could not look

24   outside.  As you were sitting here, someone walked in with an

25   umbrella that was dripping wet.  Then a few minutes later,

another person also entered with a wet umbrella.  Now you

cannot look outside the courtroom, and you cannot see whether

or not it is raining, so you have no direct evidence of that

fact.  But on the combination of facts that I have asked you to

assume, it would be reasonable and logical for you to conclude

that it was raining.

That is all there is to circumstantial evidence.  On

the basis of reason and experience and common sense, you infer

from one established fact, the existence or nonexistence of

some other fact.  Circumstantial evidence is of no less value

than direct evidence.  It is a general rule that the law makes

no distinction between direct evidence and circumstantial

evidence.

During the trial, you may have heard the attorneys use

the term "inference," and in their arguments they have asked

you to infer on the basis of your reason, experience, and

common sense, from one or more established facts, the existence

of some other fact.

An inference is not a suspicion or a guess.  It is a

reasoned, logical conclusion that a disputed fact exists on the

basis of another fact which has been shown to exist.

There are times when different inferences may be drawn

from facts, whether proved by direct or circumstantial

evidence.  The plaintiffs ask you to draw one set of

inferences, while the defendants ask you to draw another.  It

O6QQalm2                    Charge

1    is for you, and you alone, to decide what inferences you will

2    draw.

3          Again, the process of drawing inferences from facts in

4    evidence is not a matter of guesswork or speculation.  An

5    inference is a deduction or conclusion that you, the jury, are

6    permitted to draw – but are not required to draw – from the

7    facts that have been established by either direct or

8    circumstantial evidence.  In drawing inferences, you should

9    exercise your common sense.

10         So while you are considering the evidence presented to

11   you, you are permitted to draw from the facts that you find to

12   be proven such reasonable inferences as would be justified in

13   light of your experience.

14         Now, for the important subject of evaluating

15   testimony.

16         You have observed the witnesses.  It is now your job

17   to decide how believable each witness was in that witness's

18   testimony.  You are the sole judges of the credibility of each

19   witness and of the importance of the witness's testimony.

20         It must be clear to you by now that you are being

21   called upon to resolve various factual issues raised by the

22   parties in the face of very different pictures painted by both

23   sides.  In making these judgments, you should scrutinize all of

24   the testimony of each witness, the circumstances under which

25   each witness received, and any other matter in evidence which

1   may help you decide the truth and the importance of each

2   witness's testimony.

3          You watched the witnesses testify.  Everything a

4   witness said or did on the witness stand counts in your

5   determination.  How did the witness impress you?  Did the

6   witness appear to be frank, forthright and candid, or evasive

7   and edgy as if hiding something?  How did the witness appear?

8   What was the witness's demeanor?  What was the witness's

9   behavior, bearing, manner and appearance while testifying?

10  Sometimes it is not what a witness says but how the witness

11  says it that counts.

12         You should use all the tests for truthfulness that you

13  use in determining matters of importance to you in your

14  everyday life.  You should consider any bias, hostility, or

15  affection the witness may have shown for or against any party

16  as well as any interest the witness has in the outcome of the

17  case.  You should consider the opportunity the witness had to

18  see, hear, and know the things about which the witness

19  testified, the accuracy of the witness's memory, the witness's

20  candor or lack of candor, the witness's intelligence, the

21  reasonableness and probability of the witness's testimony, and

22  its consistency or lack of consistency with, and its

23  corroboration or lack of corroboration by other credible

24  testimony.

25         In other words, what you must try to do in deciding

credibility is to size a witness up in light of the witness's

demeanor, the explanations given, and all of the other evidence

in the case.  Always remember that you should use your common

sense, your good judgment, and your own life experience.

       In deciding whether to believe a witness, you should

note any evidence of hostility or affection which the witness

may have toward one of the parties.  Likewise, you should

consider evidence of any other interest or motive that the

witness may have in cooperating with a particular party.  It is

your duty to consider whether the witness has permitted any

such bias or interest to color the witness's testimony.  In

short, if you find that a witness is biased, you should view

the witness's testimony with caution, weigh it with care, and

subject it to close and searching scrutiny.

       In evaluating the credibility of the witness, you

should also take into account any evidence that a witness may

benefit in some way from the outcome of the case.  Such

interest in the outcome creates a motive to testify falsely and

may sway a witness to testify in a way that advances the

witness's own interests.  Therefore, if you find that any

witness whose testimony you are considering may have an

interest in the outcome of this trial, then you should bear

that factor in mind when evaluating the credibility of that

witness's testimony, and accept it with great care.

       Keep in mind though that it does not automatically

1  follow that testimony given by an interested witness is to be

2  disbelieved.  There are many people who, no matter what their

3  interest in the outcome of the case may be, would not testify

4  falsely.  It is for you to decide based on your own perceptions

5  and common sense to what extent, if at all, the witness's

6  interest has affected that witness's testimony.

7         You have heard evidence that at some earlier time

8  witnesses have said or done something, or failed to say or do

9  something, which the parties argue is inconsistent with the

10 witness's trial testimony.

11        Evidence of a prior inconsistent statement is not to

12 be considered by you as affirmative evidence in determining the

13 facts.  Evidence of a prior inconsistent statement was placed

14 before you for the more limited purpose of helping you to

15 decide whether to believe the trial testimony of a witness who

16 contradicted a prior statement.  If you find that the witness

17 made an earlier statement that conflicts with the witness's

18 trial testimony, you may consider that fact in deciding how

19 much of the witness's trial testimony, if any, to believe.

20        In making this determination, you may consider whether

21 the witness purposely made a false statement or whether it was

22 an innocent mistake; whether the inconsistency concerns an

23 important fact or whether it had to do with a small detail;

24 whether the witness has an explanation for the inconsistency;

25 and whether that explanation appealed to your common sense.

1     It is exclusively your duty, based upon all the

2   evidence and your own good judgment, to determine whether the

3   prior statement was inconsistent, and, if so, how much, if any,

4   weight to give to the inconsistent statement in determining

5   whether to believe all or part of the witness's trial

6   testimony.

7     An exception to the principle that a prior

8   inconsistent statement is not to be used by you as affirmative

9   evidence is if the person who made the statement is a party to

10  this case.  A prior statement by a party can be used as

11  affirmative evidence by the opposing party.

12    If it appears from the evidence in the case a person

13  had information that would lead a reasonably prudent person to

14  make inquiry through which that person would surely learn the

15  facts, then this person may be found to have had actual

16  knowledge of those facts, the same as if the person had made

17  such inquiry and had actually learned such facts.  The law

18  charges a person with notice and knowledge of whatever that

19  person would have learned on making such inquiry as it would

20  have been reasonable to expect the person to make under the

21  circumstances.

22    Knowledge or notice may also be established by

23  circumstantial evidence.  If it appears that a certain

24  condition has existed for a substantial period of time, and

25  that the person had regular opportunities to observe the

1    condition, then you may draw the inference that the person had

2    knowledge of that condition.

3           You have heard evidence of discrepancies in the

4    testimony of certain witnesses, and the parties have argued

5    that such discrepancies are a reason for you to reject the

6    testimony of those witnesses.

7           Evidence of discrepancies may be a basis to disbelieve

8    a witness's testimony.  On the other hand, discrepancies in a

9    witness's testimony or between the witness's testimony and that

10   of others do not necessarily mean that the witness's entire

11   testimony should be discredited.

12          People sometimes forget things and even truthful

13   witnesses may be nervous and contradict themselves.  It is also

14   a fact that two people witnessing an event will see or hear it

15   differently.  Whether a discrepancy pertains to a fact of

16   importance or only to a trivial detail should be considered in

17   weighing its significance, but willful falsehood always is a

18   matter of importance and should be considered seriously.

19          It is for you to decide, based on your total

20   impression of the witness, how to weigh discrepancies in the

21   witness's testimony.  You should, as always, use common sense

22   and your own good judgment.

23          After making your own judgment, you will give the

24   testimony of each witness such weight, if any, as you may think

25   it deserves.  You may, in short, accept or reject the testimony

1  of any witness in whole or in part.

2          Also, the weight of the evidence is not necessarily

3  determined by the number of witnesses testifying to the

4  existence or nonexistence of any fact.  You may find that the

5  testimony of a small number of witnesses as to any fact is more

6  credible than the testimony of a larger number of witnesses to

7  the contrary.  The law does not require a party to call as

8  witnesses all persons who may have been present at any time or

9  place involved in the case or who may appear to have some

10  knowledge of the matters at issue in this trial.

11          There are persons whose names you have heard during

12  the trial but who did not appear here to testify.  I instruct

13  you that each party had an equal opportunity or lack of

14  opportunity to call any of these witnesses.  Therefore, you

15  should not draw any inferences or reach any conclusions as to

16  what they would have testified to had they been called.  Their

17  absence should not affect your judgment in any way.

18          You should attach no significance to the fact that

19  certain witnesses were called to testify by plaintiffs or by

20  the defendants.  Likewise, no significance should be attached

21  to the fact that a document or other exhibit was introduced by

22  one party or another.  Every party is entitled to rely on any

23  evidence introduced in this case.

24          You should draw no inferences, favorable or

25  unfavorable, towards the plaintiffs or the defendants from the

1    fact that there are no other parties in this case.  Further,

2    you may not speculate as to why there are no other parties in

3    this case.  Those matters are wholly outside your concern and

4    have no bearing on your duties as jurors in this case.

5         Some of the testimony before you is in the form of

6    depositions.  A deposition is simply a procedure where one

7    party may question a witness or an adverse party under oath

8    before a court stenographer prior to trial.  This is part of

9    the pretrial discovery process, and each side is entitled to

10   take depositions.  You may consider the testimony of a witness

11   given at a deposition according to the same standards you would

12   use to evaluate the testimony of a witness given at trial.

13        You have heard testimony from experts.  An expert is

14   allowed to express his or her opinion on those matters about

15   which he or she has special knowledge and training.  Expert

16   testimony is presented to you on the theory that someone who is

17   experienced and knowledgeable in the field can help you to

18   understand the evidence or to reach an independent decision on

19   the facts.

20        In weighing expert testimony, you may consider the

21   expert's qualifications, the witness's opinions, and reasons

22   for testifying, as well as all the other considerations that

23   ordinarily apply when you are deciding whether to believe a

24   witness's testimony.  You may give the testimony whatever

25   weight, if any, you find it deserves considering all the

1    evidence in this case.  However, you should not accept an

2    expert witness's testimony merely because the witness is an

3    expert, nor should you substitute it for your own reason,

4    judgment, and common sense.  I remind you once more that the

5    determination of the facts in this case rests solely with you.

6           You have seen exhibits in the form of charts and

7    summaries.  Some of these charts and summaries were admitted

8    into evidence in order to save time and to avoid unnecessary

9    inconvenience.  You may ask for these charts and summaries

10   during your deliberations in the same way that you may ask for

11   any other exhibit in evidence.

12          As I explained during trial, other charts and

13   summaries were shown to you in order to make the other evidence

14   more meaningful and to aid you in considering the evidence.

15   They were used as demonstrative aids for the testimony of a

16   witness or in the arguments of counsel.  They were not admitted

17   in evidence and therefore you cannot ask for them in the course

18   of your deliberations.  They are no better than the testimony

19   and the documents upon which they are based, and, therefore,

20   you are to give them no greater consideration than you would

21   give to the evidence upon which they are based.

22          It is for you to decide whether these charts and

23   summaries correctly present the information contained in the

24   testimony and in the exhibits on which they are based.  You are

25   entitled to consider these charts and summaries if you find

1  that they are of assistance to you in understanding and

2  analyzing the evidence.

3          Evidence as to any oral statements or admissions

4  claimed to have been made outside of court by a party to any

5  case should always be considered with caution and weighed with

6  great care.  The person alleged to have made the alleged

7  statement or admission may not have expressed clearly the

8  meaning intended, or the witness testifying to an alleged

9  admission may have misunderstood or may have misquoted what was

10  said.

11          However, when an oral statement or admission made

12  outside of court is proved by evidence that you deem to be

13  reliable, that statement or admission may be treated as

14  trustworthy and should be considered along with all other

15  evidence in the case.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          THE COURT:  Languages other than English have been

2     used during this trial.  If an interpreter or translator has

3     been used, you must consider only that evidence provided

4     through the official court interpreters or translators.

5     Although some of you may know the non-English languages used,

6     it is important that all jurors consider the same evidence.

7     Therefore, you must base your decision on the evidence

8     presented in the English interpretation or translation.  You

9     must ignore any different meaning of the non-English words.

10          You have heard that Mr. Sater was previously convicted

11     of two crimes:  (1) a 1993 conviction for assault in the first

12     degree and (2) a 2009 conviction in the United States District

13     Court for the Eastern District of New York of the crime of

14     racketeering.

15          Defendant Sater introduced the first conviction, and

16     the plaintiffs introduced the second conviction.  These prior

17     convictions are relevant to your evaluation of Mr. Sater's

18     credibility.

19          You may consider the fact that Mr. Sater was convicted

20     of these crimes in deciding how much of his testimony to accept

21     and what weight, if any, it should be given.

22          You may also consider Mr. Sater's prior convictions

23     and the underlying conduct of which he was convicted when you

24     assess whether to impose punitive damages against him, and the

25     amount of those damages.

1          In addition, one of Mr. Sater's prior convictions was

2     for racketeering, based on predicate acts of securities fraud

3     and money laundering.  The plaintiffs argue that the conduct

4     underlying this conviction is similar to the allegations in the

5     complaint against Mr. Sater.

6          In that connection, let me caution you that Mr. Sater

7     is not on trial for committing these acts which are not alleged

8     in the complaint.  Accordingly, you may not consider this

9     evidence of similar acts as a substitute for proof of the

10    conduct alleged in the complaint.  Nor may you consider this

11    evidence that Mr. Sater has a bad character.  The evidence of

12    the other, similar acts was admitted for a much more limited

13    purpose, and you may consider it only for that limited purpose.

14         If you determine that Mr. Sater committed the acts

15    alleged in the complaint and the similar acts as well, then you

16    may, but you need not, draw an inference that in doing the acts

17    which are the subject of this trial, Mr. Sater acted knowingly

18    and intentionally and not because of some mistake, accident or

19    other innocent reason.

20         As I mentioned, this evidence may also be considered

21    by you as it relates to Mr. Sater's credibility.

22         Evidence of similar acts may not be considered by you

23    for any purpose other than what I have just explained.

24    Specifically, you may not use this evidence to conclude that

25    because Mr. Sater committed the other acts, he must also have

1    committed the acts alleged in the complaint.

2            You have heard a witness decline to answer certain

3    questions on the grounds of his Fifth Amendment privilege

4    against self-incrimination.

5            The Fifth Amendment of the United States Constitution

6    affords every person the right to decline to answer any

7    questions if he or she believes that the answers may tend to

8    incriminate them.  However, in civil cases, you are permitted,

9    but not required, to draw the inference that the withheld

10   information would have been unfavorable to the witness.

11           Any inference you may draw should be based on all of

12   the facts and circumstances in this case as you may find them.

13   You are also entitled to consider that witness's assertion of

14   the Fifth Amendment in assessing that witness's credibility.

15           However, the defendants in this case have not invoked

16   the Fifth Amendment privilege against self-incrimination.

17           In an effort to assist you, your verdict in this case

18   will be a special verdict in the form of a series of questions

19   to be answered by you in the jury room after you have begun

20   your deliberations.  The questions will be answered principally

21   by "yes" or "no" answers.  I will distribute copies of the

22   Special Verdict Form now.  Please do not make any notes on

23   these copies.  They will be collected at the end of my

24   instructions and I will then give you the original Special

25   Verdict Form which you will complete in the course of your

1    deliberations.

2            I will now review the questions on the Special Verdict

3    Form with you.

4            Part I:  The plaintiffs' claim for conversion against

5    Defendant Sater.

6            Question I.A.  Do you find that the plaintiffs have

7    proven by a preponderance of the evidence their claim of

8    conversion against Defendant Felix Sater, as that claim is

9    defined for you in the Court's instructions?  Yes or no.

10           If you answered "yes" to question I.A, proceed to

11   question I.B.  Otherwise, please proceed to question II.A.

12           Question I.B.  Do you find that Defendant Sater has

13   proven by a preponderance of the evidence his affirmative

14   defense of release, as that defense is defined for you in the

15   Court's instructions?  Yes or no.

16           If you answered "yes" to question I.B, proceed to

17   question II.A.  Otherwise, please proceed to question I.C.

18           Question I.C.  Do you find that Defendant Sater has

19   proven by a preponderance of the evidence his affirmative

20   defense of the statute of limitations, as that defense is

21   defined for you in the Court's instructions?  Yes or no.

22           If you answered "yes" to question I.C, proceed to

23   question I.D.  Otherwise, please proceed to question I.E.

24           Question I.D.  Do you find that the plaintiffs have

25   proven by a preponderance of the evidence that equitable

1   tolling bars the statute of limitations defense by Defendant

2   Sater, as equitable tolling is defined for you in the Court's

3   instructions?  Yes or no.

4            If you answered yes to question I.D, proceed to

5   question I.E.  Otherwise, please proceed to question II.A.

6            Question I.E.  What amount of damages do you find

7   should be awarded to the plaintiffs for conversion against

8   Defendant Sater?  And then a line with a dollar sign.

9            Remember that the amount of damages that you award may

10  not exceed the total amount of damages incurred by the

11  plaintiffs.

12           Please proceed to question I.F.

13           Question I.F.  What do you find was the earliest

14  ascertainable date that the plaintiffs had a claim for

15  conversion against Defendant Sater?  And then a line for the

16  date.

17           Please proceed to question I.G.

18           Question I.G.  Do you find that the plaintiffs have

19  proven by a preponderance of the evidence that the plaintiffs

20  should be awarded punitive damages against Defendant Sater?

21  Yes or no.

22           If you answered "yes" to question I.G, proceed to

23  question I.H.  Otherwise, please proceed to question II.A.

24           Question I.H.  What amount of punitive damages do you

25  find should be awarded to the plaintiffs against Defendant

1    Sater?  And then a line with a dollar sign.

2              Please proceed to question II.A.

3              Part II.  The plaintiffs' claim for unjust enrichment

4    against Defendant Sater.

5              Question II.A.  Do you find that the plaintiffs have

6    proven by a preponderance of the evidence their claim of unjust

7    enrichment against Defendant Sater, as that claim is defined

8    for you in the Court's instructions?  Yes or no.

9              If you answered "yes" to question II.A, proceed to

10   question II.B.  Otherwise, please proceed to question III.A.

11             Question II.B.  Do you find that Defendant Sater has

12   proven by a preponderance of the evidence his affirmative

13   defense of release, as that defense is defined for you in the

14   Court's instructions?  Yes or no.

15             If you answered "yes" to question II.B, proceed to

16   question III.A.  Otherwise, please proceed to question II.C.

17             Question II.C.  Do you find that Defendant Sater has

18   proven by a preponderance of the evidence his affirmative

19   defense of the statute of limitations, as that defense is

20   defined for you in the Court's instructions?  Yes or no.

21             If you answered "yes" to question II.C, proceed to

22   question II.D.  Otherwise, please proceed to question II.E.

23             Question II.D.  Do you find that the plaintiffs have

24   proven by a preponderance of the evidence that equitable

25   tolling bars the statute of limitations defense by Defendant

1   Sater, as equitable tolling is defined for you in the Court's

2   instructions?  Yes or no.

3           If you answered "yes" to question II.D, proceed to

4   question II.E.  Otherwise, please proceed to question III.A.

5           Question II.E.  What amount of damages do you find

6   should be awarded to the plaintiffs for unjust enrichment

7   against Defendant Sater?  And then a line with a dollar sign.

8           Remember that the amount of damages that you award may

9   not exceed the total amount of damages incurred by the

10  plaintiffs.

11          Please proceed to question II.F.

12          Question II.F.  What do you find was the earliest

13  ascertainable date that the plaintiffs had a claim for unjust

14  enrichment against Defendant Sater?  And then a line for the

15  date.

16          Please proceed to question III.A.

17          Part III:  The plaintiffs' claim for unjust enrichment

18  against Defendant Bayrock.

19          Question III.A.  Do you find that the plaintiffs have

20  proven by a preponderance of the evidence their claim of unjust

21  enrichment against defendant Bayrock Group Inc. ("Bayrock"), as

22  that claim is defined in the Court's instructions?  Yes or no.

23          If you answered "yes" proceed to question III.A.,

24  proceed to question III.B.  Otherwise, please proceed to

25  question IV.A.

1    Question III.B.  Do you find that Defendant Bayrock

2    has proven by a preponderance of the evidence its affirmative

3    defense of release, as that defense is defined for you in the

4    Court's instructions?  Yes or no.

5    If you answered "yes" to question III.B, proceed to

6    question IV.A.  Otherwise, please proceed to question III.C.

7    Question III.C.  Do you find that Defendant Bayrock

8    has proven by a preponderance of the evidence its affirmative

9    defense of the statute of limitations, as that defense is

10   defined for you in the Court's instructions?  Yes or no.

11   If you answered "yes" to question III.C, proceed to

12   question III.D.  Otherwise, please proceed to question III.E.

13   Question III.D.  Do you find that the plaintiffs have

14   proven by a preponderance of the evidence that equitable

15   tolling bars the statute of limitations defense by Defendant

16   Bayrock, as equitable tolling is defined for you in the Court's

17   instructions?  Yes or no.

18   If you answered "yes" to question III.D, proceed to

19   question III.E.  Otherwise, please proceed to question IV.A.

20   Question III.E.  What amount of damages do you find

21   should be awarded to the plaintiffs for unjust enrichment

22   against Defendant Bayrock?  And then a line with a dollar sign.

23   Remember that the amount of damages that you award may

24   not exceed the total amount of damages incurred by the

25   plaintiffs.

1          Please proceed to question III.F.

2          Question III.F.  What do you find was the earliest

3  ascertainable date that the plaintiffs had a claim for unjust

4  enrichment against Defendant Bayrock?  And then a line for the

5  defendant.

6          Please proceed to question IV.A.

7          Part IV:  The plaintiffs' claim for unjust enrichment

8  against Defendant GHS.

9          Question IV.A.  Do you find that the plaintiffs have

10 proven by a preponderance of the evidence their claim for

11 unjust enrichment against Defendant Global Habitat Solutions

12 ("GHS"), as that claim is defined for you in the Court's

13 instructions?  Yes or no.

14         If you answered yes to question IV.A, proceed to

15 question IV.B.  Otherwise, please proceed to question V.A.

16         Question IV.B.  Do you find that Defendant GHS has

17 proven by a preponderance of the evidence its affirmative

18 defense of release, as that defense is defined for you in the

19 Court's instructions?  Yes or no.

20         If you answered "yes" to question IV.B, proceed to

21 question V.A.  Otherwise, please proceed to question IV.C.

22         Question IV.C.  Do you find that Defendant GHS has

23 proven by a preponderance of the evidence its affirmative

24 defense of the statute of limitations, as that defense is

25 defined for you in the Court's instructions?  Yes or no.

1    If you answered "yes" to question IV.C, proceed to

2    question IV.D.  Otherwise, please proceed to question IV.E.

3    Question IV.D.  Do you find that the plaintiffs have

4    proven by a preponderance of the evidence that equitable

5    tolling bars the statute of limitations defense by Defendant

6    GHS, as equitable tolling is defined for you in the Court's

7    instructions?  Yes or no.

8    If you answered "yes" to question IV.D, proceed to

9    question IV.E.  Otherwise, please proceed to question V.A.

10   Question IV.E.  What amount of damages do you find

11   should be awarded to the plaintiffs for unjust enrichment

12   against Defendant GHS?  Then a line with a dollar sign.

13   Remember that the amount of damages that you award may

14   not exceed the total of damages incurred by the plaintiffs.

15   Please proceed to question IV.F.

16   Question IV.F.  What do you find was the earliest

17   ascertainable date that the plaintiffs had a claim for unjust

18   enrichment against Defendant GHS?  Then a line for the date.

19   Please proceed to question V.A.

20   Part V:  The plaintiffs' claim for unjust enrichment

21   against Defendant MeM.

22   Question V.A.  Do you find that the plaintiffs have

23   proven by a preponderance of the evidence their claim of unjust

24   enrichment against Defendant MeM Energy Partners LLC ("MeM"),

25   as that claim is defined for you in the Court's instructions?

1    Yes or no.

2            If you answered "yes" to question V.A, proceed to

3    question V.B.  Otherwise, please proceed to question VI.A.

4            Question V.B.  Do you find that Defendant MeM has

5    proven by a preponderance of the evidence its affirmative

6    defense of the statute of limitations, as that defense is

7    defined for you in the Court's instructions?  Yes or no.

8            If you answered "yes" to question V.B, proceed to

9    question V.C.  Otherwise, please proceed to question V.D.

10           Question V.C.  Do you find that the plaintiffs have

11   proven by a preponderance of the evidence that equitable

12   tolling bars the statute of limitations defense by Defendant

13   MeM, as equitable tolling is defined for you in the Court's

14   instructions?  Yes or no.

15           If you answered "yes" to question V.C, proceed to

16   question V.D.  Otherwise, please proceed to question VI.A.

17           Question V.D.  What amount of damages do you find

18   should be awarded to the plaintiffs for unjust enrichment

19   against Defendant MeM?  And a line with a dollar sign.

20           Remember that the amount of damages that you award may

21   not exceed the total amount of damages incurred by the

22   plaintiffs.

23           Please proceed to question V.E.

24           Question V.E.  What do you find was the earliest

25   ascertainable date that the plaintiffs had a claim for unjust

1   enrichment against Defendant MeM?  And then a line for the

2   date.

3           Please proceed to question VI.A.

4           Part VI:  The plaintiffs' claim for money had and

5   received against Defendant Sater.

6           Question VI.A.  Do you find that the plaintiffs have

7   proven by a preponderance of the evidence their claim of money

8   had and received against Defendant Sater, as that claim is

9   defined for you in the Court's instructions?  Yes or no.

10          If you answered "yes" to question VI.A, proceed to

11  question VI.B.  Otherwise, please proceed to question VII.A.

12          Question VI.B.  Do you find that Defendant Sater has

13  proven by a preponderance of the evidence his affirmative

14  defense of release, as that defense is defined for you in the

15  Court's instructions?  Yes or no.

16          If you answered "yes" to question VI.B, proceed to

17  question VII.A.  Otherwise, please proceed to question VI.C.

18          Question VI.C.  What amount of damages do you find

19  should be awarded to the plaintiffs for money had and received

20  against Defendant Sater?  And a line with a dollar sign.

21          Please proceed to question VI.D.

22          Question VI.D.  What do you find was the earliest

23  ascertainable date that the plaintiffs had a claim for money

24  had and received against Defendant Sater?  And then a line for

25  the date.

1           Please proceed to question VII.A.

2           Part VII:  The plaintiffs' claim for money had and

3    received against Defendant Bayrock.

4           Question VII.A.  Do you find that the plaintiffs have

5    proven by a preponderance of the evidence their claim of money

6    had and received against Defendant Bayrock, as that claim is

7    defined for you in the Court's instructions?  Yes or no.

8           If you answered "yes" to question VII.A, proceed to

9    question VII.B.  Otherwise, please proceed to question VIII.A.

10          Question VII.B.  Do you find that Defendant Bayrock

11   has proven by a preponderance of the evidence its affirmative

12   defense of release, as that defense is defined for you in the

13   Court's instructions?  Yes or no.

14          If you answered "yes" to question VII.B, proceed to

15   question VIII.A.  Otherwise, please proceed to VII.C.

16          Question VII.C.  What amount of damages do you find

17   should be awarded to the plaintiffs for money had and received

18   against Defendant Bayrock?  And then a line with a dollar sign.

19          Remember that the amount of damages that you award may

20   not exceed the total amount of damages incurred by the

21   plaintiffs.

22          Please proceed to question VII.D.

23          Question VII.D.  What do you find was the earliest

24   ascertainable date that the plaintiffs had a claim for money

25   had and received against Defendant Bayrock?  And then a line

1    for the date.

2              Please proceed to question VIII.A.

3              Part VIII:  The plaintiffs' claim for money had and

4    received against Defendant GHS.

5              Question VIII.A.  Do you find that the plaintiffs have

6    proven by a preponderance of the evidence their claim of money

7    had and received against Defendant GHS, as that claim is

8    defined for you in the Court's instructions?  Yes or no.

9              If you answered "yes" to question VIII.A, proceed to

10   question VIII.B.  Otherwise, please proceed to question IX.A.

11             Question VIII.B.  Do you find that Defendant GHS has

12   proven by a preponderance of the evidence its affirmative

13   defense of release, as that defense is defined for you in the

14   Court's instructions?  Yes or no.

15             If you answered "yes" to question VIII.B, proceed to

16   question IX.A.  Otherwise, please proceed to question VIII.C.

17             Question VIII.C.  What amount of damages do you find

18   should be awarded to the plaintiffs for money had and received

19   against Defendant GHS?  And a line with a dollar sign.

20             Please proceed to question VIII.D.

21             Question VIII.D.  What do you find was the earliest

22   ascertainable date that the plaintiffs had a claim for money

23   had and received against Defendant GHS?  Then a line for the

24   date.

25             Please proceed to question IX.A.

1           Part IX:  The plaintiffs' claim for money had and

2     received against Defendant MeM.

3           Question IX.A.  Do you find that the plaintiffs have

4     proven by a preponderance of the evidence their claim of money

5     had and received against Defendant MeM, as that claim is

6     defined for you in the Court's instructions?  Yes or no.

7           If you answered "yes" to question IX.A, proceed to

8     question IX.B.  Otherwise, please sign the Special Verdict Form

9     on the next page.

10          Question IX.B.  What amount of damages do you find

11    should be awarded to the plaintiffs for money had and received

12    against Defendant MeM?

13          Remember that the amount of damages that you award may

14    not exceed the total amount of damages incurred by the

15    plaintiffs.

16          Please proceed to question IX.C.

17          Question IX.C.  What do you find was the earliest

18    ascertainable date that the plaintiffs had a claim for money

19    had and received against Defendant MeM?  Then a line for the

20    date.

21          Please sign the Special Verdict Form on the next page.

22          And the final page says the jury reached the above

23    verdict unanimously.  And then there is a line for the

24    foreperson, and then for all of the other jurors.  And then a

25    line for the Special Verdict Form to be dated.

1   Ladies and gentlemen, when you answer the questions on

2   the Special Verdict Form, you are to answer them based on the

3   facts that you find pursuant to the instructions on the law

4   that I have given you.  Your answer to each question must be

5   unanimous.

6   That almost completes my instructions.  I will close

7   briefly with final directions as to how you arrive at your

8   verdict.  When you were sworn as jurors, you promised to come

9   into this jury box without any preconceived bias, views, or

10  opinions concerning the rights of any of these parties.  What

11  you now know about this case should have been learned only from

12  the witness stand and the exhibits in evidence.  Your final

13  determination of the facts must be based only upon such

14  evidence viewed in the light of the standards and criteria and

15  rules of law that I have given you.

16  The evidence presented by the parties has raised

17  factual issues that you must decide as the trier of fact, and

18  you must resolve those issues solely on the basis of the

19  evidence you have heard, or the lack of evidence, and my

20  instructions on the law.  Your sworn duty is to decide the

21  issues in this case fairly and impartially on the evidence and

22  these instructions.  During your deliberations you may not talk

23  with anyone other than your fellow jurors and the marshal.  You

24  may not use any electronic communications to get or give any

25  information about the case or your deliberations.

1          Your sworn duty is to decide the issues in this case

2    fairly and impartially on the evidence and these instructions.

3          Each juror is entitled to his or her opinion, but you

4    are required to exchange views with your fellow jurors.  This

5    is the very essence of jury deliberation.  It is your duty to

6    discuss the evidence.  If you have a point of view and after

7    reasoning with other jurors it appears that your own judgment

8    is open to question, then of course you should not hesitate in

9    yielding your original point of view if you are convinced that

10   the opposite point of view is really one that satisfies your

11   judgment and conscience.  However, you are not to give up a

12   point of view that you conscientiously believe in simply

13   because you are outnumbered or outweighed.  You should vote

14   with the others only if you are convinced on the evidence, the

15   facts, and the law that is the correct way to decide the case.

16         Your verdict will and must be announced only in open

17   court at the end of your deliberations.  Your verdict must be

18   by a unanimous vote of all of you.

19         We have made a record of these proceedings.  If any of

20   you wish at any time to have any part of the testimony provided

21   to you, then simply have the foreperson send me a note, signed

22   and dated and with the time, to that effect, and we will comply

23   with your request as quickly as we can.  I am not suggesting

24   that you must or should do this.  I am simply saying that it is

25   a service we can make available to you.  It would be helpful in

1   the case of such a request if your note is as precise as

2   possible so that we can know exactly what it is that you need.

3   It does take time for the court reporter to find testimony in

4   the transcript.  Therefore, please be patient if you send a

5   note and there seems to be a delay in our response to you.

6   Finally, if you do send me any notes, however, please make sure

7   you do not give any indication of your present state of

8   thinking on any disputed issue or on your verdict.  The

9   foreperson should sign any notes that you send to me.

10          In the course of your deliberations, you have the

11  right to review any of the exhibits that have been received in

12  evidence.  Exhibits received in evidence capable of being

13  displayed electronically will be provided to you in that form.

14  You will be able to view them in the jury room.  Necessary

15  equipment will be available to you in the jury room.  If you

16  wish to see any exhibits, simply have your foreperson send me a

17  note requesting any such exhibits.  Again, however, I stress

18  that no note should give me any indication of your thinking on

19  any disputed issue or on your verdict.

20          The juror who sits in the number one chair, Mr. Colli,

21  will be the foreperson of the jury unless for any reason he

22  prefers not to act in that capacity.  In that event, your first

23  order of business will be to send me a note, signed and dated,

24  identifying the new foreperson.

25          After your deliberations are complete and you have

1    reached a verdict, you will indicate your verdict on the

2    original Special Verdict Form, which I will send with you into

3    the jury room.  As I mentioned, please leave the copies of the

4    Special Verdict Form in the jury box when you leave to

5    deliberate.  After your deliberations, the foreperson will sign

6    the bottom of the original Special Verdict Form, and then each

7    of the remaining jurors will sign the form as well.  I remind

8    you that your verdict must be unanimous.  The foreperson will

9    then advise the marshal that a verdict has been reached.  The

10   foreperson should keep the Special Verdict Form and hand it up

11   to the Court after you have returned to the courtroom.  It is

12   important that you adhere strictly to the instructions on the

13   form.  Please do not add anything that is not called for by the

14   Special Verdict Form.

15          Members of the jury, I will ask you to remain seated

16   where you are briefly while I confer with the parties to see if

17   there are any additional instructions which they would like me

18   to mention or anything I may not have covered in my previous

19   instructions.

20          Please do not discuss the case while seated in the

21   jury box because there is the possibility that I might find it

22   proper to give you additional instructions which you have not

23   yet presently received.  Please remain where you are for a few

24   minutes.

25          (In robing room)

1        THE COURT:  I attempted to read the jury charge

2   exactly as it appears in haec verba.  There was one place on

3   page 23 where I said, To establish a statute of limitations

4   bars a plaintiff's claim, the defendant must prove by a

5   preponderance of the evidence that the plaintiffs, plural,

6   rather than singular, failed to file the lawsuit within the

7   relevant time allowed after the plaintiffs knew or in the

8   exercise of reasonable diligence should have known.

9        The charge said "plaintiff."  I said "plaintiffs,"

10  plural.  And I did that deliberately.  So I will change that

11  page when the jury charge goes to the jury.

12       Did anyone hear that I said anything else other than

13  exactly as what is written?

14       MR. SNYDER:  No.

15       MR. KOMBOL:  It sounded perfect.

16       LAW CLERK:  Just to confirm, Judge, that's page 33,

17  not page 23.

18       THE COURT:  33.  Yes.

19       MR. SCHWARTZ:  Nothing.

20       THE COURT:  I will swear the marshal, tell them they

21  can't talk to Mr. Fletcher any longer.  I will send them to

22  deliberate.

23       Anything else before I do that?

24       MR. SNYDER:  When the jury goes back, are we going to

25  be, like, within a ten-minute phone call or do we stay in the

O6Q8ALM3                    Charge

1    court?

2                THE COURT:  Discuss it with Mr. Fletcher.  After some

3    short period of time where I can get any quick notes from the

4    jury, we will give you time to get lunch, and you can leave and

5    we will hold notes.  After that, you should be within arm's

6    length of Mr. Fletcher so that if we get a note we can respond

7    to it promptly.

8                MR. SNYDER:  Sounds good.

9                THE COURT:  Okay.

10               (In open court)

11               THE COURT:  Ladies and gentlemen, I will now

12   momentarily send you to deliberate.  In the course of

13   deliberations, again, a tradition of the court, you are

14   protected by the marshal.  Any notes for the Court are given to

15   the marshal, and then the marshal provides them to the Court.

16   You can no longer talk to Mr. Fletcher.  All communications

17   must be through the marshal.

18               So, Mr. Fletcher, please swear the marshal.

19               (Marshal sworn)

20               THE COURT:  Ladies and gentlemen, remember to leave

21   the copies of the Special Verdict Form on your chairs.  The

22   jurors should now go to deliberate.  Please follow the marshal

23   to the jury room.

24               (At 12:53 p.m., the jury retired to deliberate)

25               THE COURT:  I am having page 33 retyped with the

1    correct plural put in for plaintiffs in the two places.

2            Meanwhile, the parties can inspect the Special Verdict

3    Form, legal pads, pens, envelopes, that will go to the jury.

4    And then we have the charge with the corrected page 33.  I will

5    give you the charge also and extra copies for your files of

6    page 33.

7            All right.  Here is the copy of the jury charge to go

8    to the jury with the corrected page 33, to go along with the

9    other Special Verdict Form that you have already inspected.

10   And we will have either individual page 33s or new charges for

11   all of you.  But you can inspect the charge to go to the jury.

12           MR. SNYDER:  I am confident that it is perfect.

13           Sounds good.

14           THE COURT:  Okay.  All the parties inspected the

15   documents?

16           MR. SCHWARTZ:  Yes.

17           MR. SNYDER:  Yes.

18           THE COURT:  Mr. Fletcher will give all of that to the

19   marshal to give to the jurors.  I am told that the jurors have

20   lunch.

21           Mr. Fletcher says he will hold notes until 1:35.  And

22   you can talk to Mr. Fletcher about the need to be in arm's

23   distance after 1:35 if we get any notes.

24           (Recess pending verdict)

25

O6QQalm4

1          (In open court; jury not present)

2          THE COURT:  I have two notes from the jury.

3          Note number 1, which is marked as Court Exhibit 1

4     says:

5          1.  800.

6          2.  801.

7          3.  593.

8          4.  1051.

9          5.  467.

10          6.  359.

11          7.  486.

12          8.  357.

13          9.  285.

14          10. 42.

15          11. 536.

16          12. 530.

17          13. 540.

18          Can I please have copies of these numbers in evidence?

19          Also, can we have a copy of the plaintiff's closing

20     punitive damages.  Thank you.  D. Colli 6/26/24.  1:16 p.m.

21          Note number 2.  Court Exhibit No. 2 says:

22          Can we confirm the definition of "earliest

23     ascertainable date" had claim for money.

24          The parties are welcome to inspect the notes.  The

25     plaintiff should gather those specific exhibits.  The answer to

O6QQalm4

1    can we have a copy of the plaintiff's closing punitive damages,

2    I assume that's a request for summation, and the answer to that

3    is the parties' summations are not in evidence, and therefore

4    could not be sent.

5        If the parties have a proposed -- as to note 2, if the

6    parties have a proposed definition of earliest ascertainable

7    date, I welcome that.  In any event, I will check to see if I

8    can come up with one.  The parties are welcome to inspect the

9    notes.

10       MR. ZACH:  Can we have hard copies?  We can pull those

11   in probably five minutes.

12       THE COURT:  I'm sorry?

13       MR. ZACH:  Can I have hard copies of all the exhibits?

14   I can bring those out to you in five minutes.

15       THE COURT:  Yes.

16       MR. SNYDER:  Your Honor, regarding "earliest

17   ascertainable date," I feel like that's a fact issue for the

18   jury.  I don't know how much more gloss we can put on that, but

19   to me it seems like a fact question for the jury.

20       THE COURT:  Oh.  Plainly, the determination of what

21   the earliest possible -- the earliest ascertainable date is, is

22   a fact question for the jury.  I just wonder whether I can give

23   them any further instructions on what that means.

24       Yes?

25       MR. SCHWARTZ:  With respect to the exhibits, I'm

O6QQalm4

1  sorry, would it make sense to have multiple copies of each

2  exhibit?

3         THE COURT:  No.

4         MR. SCHWARTZ:  One copy of each?

5         THE COURT:  Yes.  Excuse me briefly.

6         (Recess)

7         THE COURT:  With respect to the "earliest

8  ascertainable date," I propose to tell the jury:

9         In response to your question, the "earliest

10  ascertainable date is the earliest date on which it can be

11  determined that the cause of action existed; namely, the date

12  on which damages occurred from the cause of action."

13         MR. SNYDER:  Could you read that one more time,

14  please?

15         THE COURT:  Sure.  I can give it to you.  I'll read

16  it.

17         In response to your question, the "earliest

18  ascertainable date" is the earliest date on which it can be

19  determined that the cause of action existed; namely, the date

20  on which damages occurred from the cause of action.

21         MR. SNYDER:  No objection.

22         MR. KOMBOL:  No objection, your Honor.

23         MR. SCHWARTZ:  That's fine.

24         THE COURT:  Okay.  Have you gathered the exhibits?

25         MR. SCHWARTZ:  We are just printing one off.  We'll

1    have it in a moment.  One of the exhibits on the list is not

2    in -- one of the exhibits on the jurors' list is not in

3    evidence.

4              THE COURT:  I'm sorry, I can't --

5              MR. SCHWARTZ:  One of the exhibits on the jurors' note

6    is not in evidence.

7              THE COURT:  Then we can't send it to them.

8              MR. SCHWARTZ:  Right.

9              THE COURT:  What exhibit is not in evidence?

10             MR. SCHWARTZ:  285.

11             THE COURT:  Okay.

12             MR. SCHWARTZ:  That was not discussed either, so it

13   was likely a transcription error.

14             THE COURT:  Okay.

15             MR. SCHWARTZ:  Apparently 540 is also not in evidence.

16             THE COURT:  It should be "damages to the plaintiffs

17   occurred from the cause of action."

18             MR. SNYDER:  No objection.

19             THE COURT:  Show all of the exhibits to the

20   defendants.

21             MR. SCHWARTZ:  We have.

22             MR. KOMBOL:  Your Honor, we've reviewed them.  We have

23   no objections.

24             THE COURT:  My note, which will be Plaintiff's

25   Exhibit 3 --

O6QQalm4

1   MR. SNYDER: Plaintiff's Exhibit 3 or Court Exhibit 3?

2   THE COURT: Did I say -- Court Exhibit 3.

3   Members of the jury, we have received your notes. We

4   are sending you the specific exhibits that you requested except

5   for Plaintiff's Exhibit 540 and Plaintiff's Exhibit 285, which

6   are not in evidence. We cannot provide you with the

7   plaintiff's summation on punitive damages because that is not

8   in evidence.

9   In response to your question, the "earliest

10   ascertainable date" is the date on which it can be determined

11   that the cause of action existed; namely, the date on which the

12   damages to the plaintiffs occurred from the cause of action.

13   And the parties should inspect the note Court Exhibit

14   3 and the exhibits.

15   Is this satisfactory to everyone?

16   MR. SNYDER: Yes.

17   MR. SCHWARTZ: Yes.

18   THE COURT: Mr. Kombol, satisfactory?

19   MR. KOMBOL: I defer to Mr. Snyder on that. If he's

20   fine, I'm fine.

21   MR. SNYDER: We're fine.

22   THE COURT: Mr. Fletcher will give the marshal Court

23   Exhibit 3 and the exhibits.

24   MR. KOMBOL: Your Honor, we're free to remain hovering

25   nearby until we hear further?

O6QQalm4

| | |
|---|---|
| 1 | THE COURT:  Sorry. |
| 2 | MR. KOMBOL:  We're free to remain hovering nearby |
| 3 | until we hear further? |
| 4 | THE COURT:  Yes.  Keep in touch with Mr. Fletcher. |
| 5 | (Recess pending verdict) |
| 6 | THE COURT:  Please be seated. |
| 7 | I have a note from the jury.  It's marked as Court |
| 8 | Exhibit 4.  It reads:  6/26/2024.  We've completed our |
| 9 | deliberation and have reached a deliberation.  3:33.  D. Colli. |
| 10 | The parties are welcome to inspect the note. |
| 11 | Mr. Fletcher advises that the jurors attempted to give |
| 12 | Mr. Fletcher the exhibits, but he only took the note. |
| 13 | DEPUTY CLERK:  And the verdict sheet. |
| 14 | THE COURT:  And the verdict sheet, but he only took |
| 15 | the note. |
| 16 | Are the parties ready for the jury to come in?  Yes? |
| 17 | MR. ZACH:  We are. |
| 18 | MR. SNYDER:  Yes.  I think we shouldn't keep them |
| 19 | waiting. |
| 20 | MR. ZACH:  One thing.  Could we get a copy.  Fine. |
| 21 | THE COURT:  Yes. |
| 22 | MR. KOMBOL:  We're ready to proceed? |
| 23 | THE COURT:  Okay. |
| 24 | (Jury present) |
| 25 | THE COURT:  Please be seated all. |

O6QQalm4

1      Mr. Foreperson, I've received your note indicating

2  that the jury has reached a verdict.  Have you reached a

3  verdict?

4      JUROR:  Yes.

5      THE COURT:  Would you please pass it up to

6  Mr. Fletcher.

7      DEPUTY CLERK:  Will the foreperson please rise.

8      And will the foreperson please answer the questions

9  after it is put to you in the matter of City of Almaty

10  Kazakhstan, et al. v. Felix Sater, et al. 19 Civ. 2645.

11      Question 1 A.  Do you find that the plaintiffs have

12  proven by a preponderance of the evidence their claim of

13  conversion against defendant Felix Sater as that claim is

14  defined for you in the Court's instructions?

15      JUROR:  Yes.

16      DEPUTY CLERK:  Question 1 B.  Do you find that

17  defendant Sater has proven by a preponderance of the evidence

18  his affirmative defense of release as that defense is defined

19  for you in the Court's instructions?

20      JUROR:  No.

21      DEPUTY CLERK:  Question 1 C.  Do you find that

22  defendant Sater has proven by a preponderance of the evidence

23  his affirmative defense of a statute of limitations as that

24  defense is defined for you in the court's instructions?

25      JUROR:  No.

1      DEPUTY CLERK:  We should go to question 1 E.  What

2 amount of damages do you find should be awarded to the

3 plaintiffs for conversion against defendant Sater?

4      JUROR:  $504,213.33.

5      DEPUTY CLERK:  Question 1 F.  What do you find was the

6 earliest ascertainable date that the plaintiffs had a claim for

7 conversion against defendant Sater?

8      JUROR:  April 2, 2013.

9      DEPUTY CLERK:  Question 1 G.  Do you find that the

10 plaintiffs have proven by a preponderance of the evidence that

11 the plaintiff should be awarded punitive damages against

12 defendant Sater?

13      JUROR:  Yes.

14      DEPUTY CLERK:  Question 1 H.  What amount of punitive

15 damages do you find should be awarded to the plaintiffs against

16 defendant Sater?

17      JUROR:  20 million.

18      DEPUTY CLERK:  Question 2 A.  Do you find that the

19 plaintiffs have proven by a preponderance of the evidence their

20 claim of unjust enrichment against defendant Sater as that

21 claim is defined for you in the Court's instructions?

22      JUROR:  Yes.

23      DEPUTY CLERK:  Question 2 B.  Do you find that

24 defendant Sater has proven by a preponderance of the evidence

25 his affirmative defense of release as that defense is defined

1  for you in the Court's instructions?

2           JUROR:  No.

3           DEPUTY CLERK:  Question 2 C.  Do you find that of

4  defendant Sater has proven by a preponderance of the evidence

5  his affirmative defense of the statute of limitations as that

6  defense is defined for you in the court's instructions?

7           JUROR:  No.

8           DEPUTY CLERK:  Question 2 E.  What amount of damages

9  do you find should be awarded to the plaintiffs for unjust

10 enrichment against defendant Sater?

11          JUROR:  $504,213.33.

12          Question 2 F.  What do you find was the earliest

13 ascertainable date that the plaintiffs had a claim for unjust

14 enrichment against defendant Sater?

15          JUROR:  April 2, 2013.

16          DEPUTY CLERK:  Question 3 A.  Do you find that the

17 plaintiffs have proven by a preponderance of the evidence their

18 claim of unjust enrichment against defendant Bayrock Group,

19 Incorporated (Bayrock) as that claim is defined for you in the

20 Court's instructions?

21          JUROR:  Yes.

22          DEPUTY CLERK:  Question 3 B.  Do you find that

23 defendant Bayrock has proven by a preponderance of the evidence

24 its affirmative defense of release as that defense is defined

25 for you in the Court's instructions?

O6QQalm4

1    JUROR:  No.

2    DEPUTY CLERK:  Question 3 C.  Do you find that

3 defendant Bayrock has proven by a preponderance of the evidence

4 its affirmative defense of the statute of limitations as that

5 defense is defined for you in the Court's instructions?

6    JUROR:  No.

7    DEPUTY CLERK:  Move to question 3 E.  What amount of

8 damages do you find should be awarded to the plaintiffs for

9 unjust enrichment against defendant Bayrock?

10    JUROR:  $2,031,375.

11    DEPUTY CLERK:  Question 3 F.  What do you find was the

12 earliest ascertainable date that the plaintiffs had a claim for

13 unjust enrichment against defendant Bayrock?

14    JUROR:  June 3, 2013.

15    DEPUTY CLERK:  Question 4 A.  Do you find that the

16 plaintiffs have proven by a preponderance of the evidence their

17 claim of unjust enrichment against defendant Global Habitat

18 Solutions (GHS) as that claim is defined for you in the Court's

19 instructions?

20    JUROR:  Yes.

21    DEPUTY CLERK:  Question 4 B.  Do you find that

22 defendant GHS has proven by a preponderance of the evidence its

23 affirmative defense of release as that defense is defined for

24 you in the Court's instructions?

25    JUROR:  No.

O6QQalm4

1    DEPUTY CLERK:  Question 4 C.  Do you find that

2    defendant GHS has proven by a preponderance of the evidence its

3    affirmative defense of the statute of limitations as that

4    defense is defined for you in the Court's instructions?

5    JUROR:  No.

6    DEPUTY CLERK:  Go to question 4 E.  What amount of

7    damages do you find should be awarded to the plaintiffs for

8    unjust enrichment against defendant GHS?

9    JUROR:  $668,926.50.

10    DEPUTY CLERK:  Question 4 F.  What do you find was the

11    earliest ascertainable date that the plaintiffs had a claim for

12    unjust enrichment against defendant GHS?

13    JUROR:  April 2, 2013.

14    DEPUTY CLERK:  Question 5 A.  Do you find that the

15    plaintiffs have proven by a preponderance of the evidence their

16    claim of unjust enrichment against defendant MeM Energy

17    Partners or MeM as that claim is defined for you in the Court's

18    instructions?

19    JUROR:  Yes.

20    DEPUTY CLERK:  Question 5 B.  Do you find that

21    defendant MeM has proven by a preponderance of the evidence its

22    affirmative defense of the statute of limitations as that

23    defense is defined for you in the Court's instructions?

24    JUROR:  No.

25    DEPUTY CLERK:  Question 5 D.  What amount of damages

1    do you find should be awarded to the plaintiffs for unjust

2    enrichment against defendant MeM?

3              JUROR:  343,000.26.

4              DEPUTY CLERK:  Question 5 E.  What do you find was the

5    earliest ascertainable date that the plaintiffs had a claim for

6    unjust enrichment against defendant MeM?

7              JUROR:  August 22, 2013.

8              DEPUTY CLERK:  Question 6 A.  Do you find that the

9    plaintiffs have proven by a preponderance of the evidence their

10   claim of money had and received against defendant Sater as that

11   claim is defined for you in the Court's instructions?

12             JUROR:  Yes.

13             DEPUTY CLERK:  Question 6 -- question 7 B -- excuse

14   me, 6 B.  Correction.  Do you find that defendant Sater has

15   proven by a preponderance of the evidence his affirmative

16   defense of release as that defense is defined for you in the

17   Court's instructions?

18             JUROR:  No.

19             DEPUTY CLERK:  Question 6 C.  What amount of damages

20   do you find should be awarded to the plaintiffs for money had

21   and received against defendant Sater?

22             JUROR:  $504,213.33.

23             DEPUTY CLERK:  Question 6 D.  What do you find was the

24   earliest ascertainable date that the plaintiffs had a claim for

25   money had and received against defendant Sater?

1        JUROR:  April 2, 2013.

2        DEPUTY CLERK:  Question 7A.  Do you find that the

3   plaintiffs have proven by a preponderance of the evidence their

4   claim of money had and received against defendant Bayrock as

5   that claim is defined for you in the Court's instructions?

6        JUROR:  Yes.

7        DEPUTY CLERK:  Question 7 B.  Do you find that

8   defendant Bayrock has proven by a preponderance of the evidence

9   its affirmative defense of release as that defense is defined

10  for you in the Court's instructions?

11       JUROR:  No.

12       DEPUTY CLERK:  Question 7 C.  What amount of damages

13  do you find should be awarded to the plaintiffs for money had

14  and received against defendant Bayrock?

15       JUROR:  $2,031,375.

16       DEPUTY CLERK:  Question 7 D.  What do you find was the

17  earliest ascertainable date that the plaintiffs had a claim for

18  money had and received against defendant Bayrock?

19       JUROR:  June 3, 2013.

20       DEPUTY CLERK:  Question 8 A.  Do you find that the

21  plaintiffs have proven by a preponderance of the evidence their

22  claim of money had and received against defendant GHS as that

23  claim is defined for you in the Court's instructions?

24       JUROR:  Yes.

25       DEPUTY CLERK:  Question 8 B.  Do you find that

1    defendant GHS has proven by a preponderance of the evidence its

2    affirmative defense of release as that defense is defined for

3    you in the Court's instructions?

4            JUROR:  No.

5            DEPUTY CLERK:  Question 8 C.  What amount of damages

6    do you find should be awarded to the plaintiffs for money had

7    and received against defendant GHS?

8            JUROR:  $668,926.50.

9            DEPUTY CLERK:  Question 8 D.  What do you find was the

10   earliest ascertainable date that the plaintiffs had a claim for

11   money had and received against defendant GHS?

12           JUROR:  April 2, 2013.

13           DEPUTY CLERK:  Question 9 A.  Do you find that the

14   plaintiffs have proven by a preponderance of the evidence their

15   claim of money had and received against defendant MeM as that

16   claim is defined for you in the Court's instructions?

17           JUROR:  Yes.

18           DEPUTY CLERK:  Question 9 B.  What amount of damages

19   do you find should be awarded to the plaintiffs for money had

20   and received against defendant MeM?

21           JUROR:  $343,000.26.

22           DEPUTY CLERK:  Question 9 C.  What do you find was the

23   earliest ascertainable date that the plaintiffs had a claim for

24   money had and received against defendant MeM?

25           JUROR:  August 22, 2013.

O6QQalm4

1    DEPUTY CLERK:  Shall I -- your Honor, shall I poll the

2    jury?

3    THE COURT:  Yes.  Don't you usually say that it's been

4    signed by all of the jurors first?

5    DEPUTY CLERK:  Oh.  That's when I -- that's the poll.

6    THE COURT:  Poll the jury.

7    DEPUTY CLERK:  You may be seated.

8    Ladies and gentlemen of the jury, please listen are to

9    your verdict as it stands recorded:

10    Question 1 A.  Do you find that the plaintiffs have

11    proven by a preponderance of the evidence their claim of

12    conversion against defendant Felix Sater as that claim is

13    defined for you in the Court's instructions?

14    Your answer is yes.

15    Question 1 B.  Do you find that defendant Sater has

16    proven by a preponderance of the evidence his affirmative

17    defense of release as that defense is defined for you in the

18    Court's instructions?

19    Your answer is no.

20    Question 1 C.  Do you find that defendant Sater has

21    proven by a preponderance of the evidence his affirmative

22    defense of the statute of limitations as that defense is

23    defined for you in the Court's instructions?

24    Your answer is no.

25    Question 1 E.  What amount of damages do you find

O6QQalm4

1  should be awarded to the plaintiffs for conversion against

2  defendant Sater?

3          Your answer $504,213.33.

4          Question 1 F.  What do you find was the earliest

5  ascertainable date that the plaintiffs had a claim for

6  conversion against defendant Sater?

7          Your answer is April 2, 2013.

8          Question 1 G.  Do you find that the plaintiffs have

9  proven by a preponderance of the evidence that the plaintiffs

10  should be awarded punitive damages against defendant Sater?

11          Your answer is yes.

12          Question 1 H.  What amount of punitive damages do you

13  find should be awarded to the plaintiff against defendant

14  Sater?

15          Your answer is $20 million.

16          Question 2 A.  Do you find that the plaintiffs have

17  proven by a preponderance of the evidence their claim of unjust

18  enrichment against defendant Sater as that claim is defined for

19  you in the Court's instructions?

20          Your answer is yes.

21          Question 2 B.  Do you find that defendant Sater has

22  proven by a preponderance of the evidence his affirmative

23  defense of release as that defense is defined for you in the

24  Court's instructions?

25          Your answer is no.

O6QQalm4

1      Question 2 C.  Do you find that defendant Sater has

2  proven by a preponderance of the evidence his affirmative

3  defense of the statute of limitations as that defense is

4  defined for you in the Court's instructions?

5      Your answer is no.

6      Question 2 E.  What amount of damages do you find

7  should be awarded to the plaintiffs for unjust enrichment

8  against defendant Sater?

9      Your answer $504,213.33.

10      Question 2 F.  What do you find was the earliest

11  ascertainable date that the plaintiffs had a claim for unjust

12  enrichment against defendant Sater?

13      Your answer April 2, 2013.

14      Question 3 A.  Do you find that the plaintiffs have

15  proven by a preponderance of the evidence their claim of unjust

16  enrichment against defendant Bayrock Group Incorporated, or

17  Bayrock, as that claim is defined for you in the Court's

18  instructions?

19      Your answer is yes.

20      Question 3 B.  Do you find that defendant Bayrock has

21  proven by a preponderance of the evidence its affirmative

22  defense of release as that defense is defined for you in the

23  Court's instructions?

24      Your answer is no.

25      Question 3 C.  Do you find that defendant Bayrock has

O6QQalm4

1 proven by a preponderance of the evidence its affirmative

2 defense of the statute of limitations as that defense is

3 defined for you in the Court's instructions?

4        Your answer is no.

5        Question 3 E.  What amount of damages do you find

6 should be awarded to the plaintiffs for unjust enrichment

7 against defendant Bayrock?

8        Your answer $2,031,375.

9        Question 3 F.  What do you find was the earliest

10 ascertainable date that the plaintiffs had claim for unjust

11 enrichment against defendant Bayrock?

12        Your answer June 3, 2013.

13        Question 4 A.  Do you find that the plaintiffs have

14 proven by a preponderance of the evidence their claim of unjust

15 enrichment against defendant Global Habitat Solutions, or GHS,

16 as that claim is defined for you in the Court's instructions?

17        Your answer is yes.

18        Question 4 B.  Do you find that defendant GHS has

19 proven by a preponderance of the evidence its affirmative

20 defense of release as that defense is defined for you in the

21 Court's instructions?

22        Your answer is no.

23        Question 4 C.  Do you find that defendant GHS has

24 proven by a preponderance of the evidence its affirmative

25 defense of the statute of limitations as that defense is

O6QQalm4

1  defined for you in the Court's instructions?

2  Your answer is no.

3  Question 4 E.  What amount of damages do you find

4  should be awarded to the plaintiffs for unjust enrichment

5  against defendant GHS?

6  Your answer $668,926.50.

7  Question 4 F.  What do you find was the earliest

8  ascertainable date that the plaintiffs had a claim for unjust

9  enrichment against GHS?

10  Your answer April 2, 2013.

11  Question 5 A.  Do you find that the plaintiffs have

12  proven by a preponderance of the evidence their claim of unjust

13  enrichment against defendant MeM Energy Partners as that claim

14  is defined for you in the Court's instructions?

15  Your answer is yes.

16  Question 5 B.  Do you find that defendant MeM has

17  proven by a preponderance of the evidence its affirmative

18  defense of the statute of limitations as that defense is

19  defined for you in the Court's instructions?

20  Your answer is no.

21  Question 5 C -- no, go to -- question 5 D, excuse me.

22  what amount of damages do you find should be awarded to the

23  plaintiffs for unjust enrichment against defendant MeM?

24  Your answer 343,000 --

25  THE COURT:  Start again, please.  $343,026, right?

O6QQalm4

1    DEPUTY CLERK:  Correct.  Shall I repeat?

2    THE COURT:  Go ahead.

3    DEPUTY CLERK:  I'll repeat the question.  What amount

4  of damages do you find should be awarded to the plaintiffs for

5  unjust enrichment against defendant MeM?

6    Your answer $343,026.

7    Question 5 E.  What do you find was the earliest

8  ascertainable date that the plaintiffs had a claim for unjust

9  enrichment against defendant MeM?

10    Your answer August 22, 2013.

11    Question 6 A.  Do you find that the plaintiffs have

12  proven by a preponderance of the evidence their claim of money

13  had and received against defendant Sater as that claim is

14  defined for you in the Court's instructions?

15    Your answer is yes.

16    Question 6 B.  Do you find that defendant Sater has

17  proven by a preponderance of the evidence his affirmative

18  defense of release as that defense is defined for you in the

19  Court's instructions?

20    Your answer is no.

21    Question 6 C.  What amount of damages do you find

22  should be awarded to the plaintiffs for money had and received

23  against defendant Sater?

24    Your answer $504,213.33.

25    Question 6 D.  What do you find was the earliest

1  ascertainable date that the plaintiffs had a claim for money

2  had and received against defendant Sater?

3      Your answer April 2, 2013.

4      Question 7 A -- excuse me.  Question 7 A.  Do you find

5  that the plaintiffs have proven by a preponderance of the

6  evidence their claim of money had and received against

7  defendant Bayrock as that claim is defined for you in the

8  Court's instructions?

9      Your answer is yes.

10      Question 7 B.  Do you find that defendant Bayrock has

11  proven by a preponderance of the evidence its affirmative

12  defense of release as that defense is defined for you in the

13  Court's instructions?

14      Your answer is no.

15      Question 7 C.  What amount of damages do you find

16  should be awarded to the plaintiffs for money had and received

17  against defendant Bayrock?

18      Your answer $2,031,375.

19      Question 7 D.  What do you find was the earliest

20  ascertainable date that the plaintiffs had a claim for money

21  had and received against defendant Bayrock?

22      Your answer June 3, 2013.

23      Question 8 A.  Do you find that the plaintiffs have

24  proven by a preponderance of the evidence their claim of money

25  had and received against defendant GHS as that claim is defined

O6QQalm4

1    for you in the Court's instructions?

2              Your answer is yes.

3              Question 8 B.  Do you find that defendant GHS has

4    proven by a preponderance of the evidence its affirmative

5    defense of release as that defense is defined for you in the

6    Court's instructions?  Your answer is no.

7              Question 8 C.  What amount of damages do you find

8    should be awarded to the plaintiffs for money had and received

9    against defendant GHS?

10             Your answer $668,926.50.

11             Question 8 D.  What do you find was the earliest

12   ascertainable date that the plaintiffs had a claim for money

13   had and received against defendant GHS?

14             Your answer April 2, 2013.

15             Question 9 A.  Do you find that the plaintiffs have

16   proven by a preponderance of the evidence their claim of money

17   had and received against defendant MeM as that claim is defined

18   for you in the Court's instructions?

19             Your answer is yes.

20             Question 9 B.  What amount of damages do you find

21   should be awarded to the plaintiffs for money had and received

22   against defendant MeM?

23             Your answer $343,026.

24             Question 9 C.  What do you find was the earliest

25   ascertainable date that the plaintiffs had a claim for money

O6QQalm4

1    had and received against defendant MeM?

2              Your answer August 22, 2013.

3              This verdict form is dated June 26, 2024 and signed by

4    the foreperson Daniel Colli and the members of the jury, James

5    Thompsen, Christopher Bruno, Tracy McDermott, Kyla Dayer.  Lisa

6    Gulick, Dongbin Kim, Amy Damascus, Stephanie Guyet, Ayuma

7    Sangale.

8              Mr. Colli, is that your verdict?

9              JUROR:  Yes.

10             DEPUTY CLERK:  Mr. Thompsen, is that your verdict?

11             JUROR:  Yes.

12             DEPUTY CLERK:  Mr. Bruno, is that your verdict?

13             JUROR:  Yes.

14             DEPUTY CLERK:  Ms. McDermott, is that your verdict?

15             JUROR:  Yes.

16             DEPUTY CLERK:  Ms. Dayer, is that your verdict?

17             JUROR:  Yes.

18             DEPUTY CLERK:  Ms. Gulick, is that your verdict?

19             JUROR:  Yes.

20             DEPUTY CLERK:  Mr. Kim, is that your verdict?

21             JUROR:  Yes.

22             DEPUTY CLERK:  Ms. Damascus, is that your verdict?

23             JUROR:  Yes.

24             DEPUTY CLERK:  Ms. Sangale, is that your verdict?

25             JUROR:  Yes.

1          DEPUTY CLERK:  Let the record reflect that the jury

2    has been polled and the verdict is unanimous.

3          Your Honor.

4          THE COURT:  Let me talk to the lawyers.

5          (At the sidebar)

6          THE COURT:  I always show the verdict form to the

7    lawyers before I let the jury go.

8          Anything further before I let the jury go?

9          MR. KOMBOL:  No.

10         MR. SIMA:  No.

11         THE COURT:  Okay.

12         (In open court)

13         THE COURT:  Ladies and gentlemen, you've returned your

14   verdict, and so now I will discharge you as jurors in this

15   case.  You are no longer subject to any of my orders not to

16   talk about the case, always keep an open mind, don't look at or

17   listen to anything to do with the case, don't talk to anyone

18   about the case.  You are no longer under my orders not to do

19   that.  But I always tell jurors as a matter of prudence not to

20   talk about the case or about their deliberations.  And the

21   reason for that is to preserve the confidentiality of juror

22   deliberations.  But as I say, that is simply advice of

23   prudence.  You are no longer under my orders not to talk about

24   the case.  So I discharge you as jurors in this case.

25         Many judges use this opportunity as an opportunity to

O6QQalm4

1    thank jurors for their deliberations and for their service.

2    But many years ago I clerked for a great judge of this court

3    who made it a practice never to thank jurors because he told

4    jurors that what they had done was to perform one of the

5    highest and noblest obligations of citizenship.  They had acted

6    as finders of fact.  They had acted as ministers of justice.

7    And for doing that, they were entitled to the deep personal

8    satisfaction of knowing that they had performed a public

9    service, the deep personal satisfaction that the judge has or

10   any other public servant that you may see or hear.

11          And so having sat with you over these last two and a

12   half weeks, having observed your conscientiousness and your

13   promptness, I think that each of you takes away from this

14   process a deep personal satisfaction that you have performed a

15   public service.  And that gives me satisfaction.

16          So with that, there are just a couple of other things

17   for me to do.  I can tell you that I can't assure you that your

18   check is in the mail, but I believe it soon will be.  You don't

19   have to go back downstairs.  You can go home.  All of the

20   paperwork will be taken care of by mail.  And there is then

21   only one final thing for me to do, which is to ask everyone in

22   the courtroom to stand as a final show of respect to all of

23   you.

24          All rise, please.

25          The jurors should now follow the marshal to the jury

O6QQalm4

1     room.

2                    (Jury discharged)

3                    THE COURT:  Please be seated.

4                    Mr. Fletcher.

5            The rules provide for post verdict motions or

6     post-judgment motions.  I think the actual motions are

7     post-judgment motions.  And there are time limits provided for

8     in the rules with respect to all of the post verdict or

9     post-judgment motions.  So you can check the rules.  You can

10    either follow the procedures in the rules for all of the post

11    verdict or post-judgment motions.  I warn you that the

12    deadlines are strict.  But of course I would grant extensions

13    of time for all of that if asked in a timely fashion, and you

14    all can figure out what subsequent motions you intend to make

15    and either make them or send me a letter indicating what

16    motions you intend to make and what time you want to make those

17    motions.

18           Again, I just leave with you the caution that the

19    rules provide some strict deadlines which if you don't meet end

20    up leading to disputes as to whether the time limits are

21    jurisdictional or not.  So I leave that with you.

22           We presently have the verdict.  The verdict has to be

23    turned into a judgment.  I know I would need input on what the

24    appropriate judgment is.  So you can all talk about all of that

25    and send me a timely letter.

1    MR. SCHWARTZ:  We will.

2    MR. SNYDER:  Thank you, your Honor.

3    MR. KOMBOL:  Thank you, your Honor.

4    MR. ZACH:  Thank you, your Honor.

5    THE COURT:  Okay.  Good day.

6    (Trial concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25