**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                        Plaintiffs,

      -against-

FELIX SATER, DANIEL RIDLOFF, BAYROCK
GROUP INC., GLOBAL HABITAT
SOLUTIONS, INC., RRMI-DR LLC, FERRARI
HOLDINGS LLC, and MEM ENERGY
PARTNERS LLC,

                   Defendants.

No. 19 Civ. 2645 (JGK) (KHP)

**PLAINTIFFS THE CITY OF ALMATY, KAZAKHSTAN AND BTA BANK JSC'S**
**POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>TABLE OF CONTENTS</u>

I.  Findings of Fact ................................................................................................ 1

    A.  The Parties .......................................................................................... 1

        1.  The City of Almaty, Kazakhstan ................................................ 1

        2.  BTA Bank ................................................................................ 1

        3.  Felix Sater .............................................................................. 2

        4.  Bayrock Group, Inc. ............................................................... 2

        5.  Global Habitat Solutions, Inc. ................................................. 3

        6.  MeM Energy Partners LLC ..................................................... 3

    B.  Mukhtar Ablyazov Stole Billions of Dollars from BTA Bank .............. 3

        1.  Mukhtar Ablyazov's Control of BTA Bank ................................ 3

        2.  Ablyazov's Corruption of Corporate Business Department No. 6 ("UKB6") ................................................................................ 5

        3.  Ablyazov's Transfer of $115.3 Million of BTA's Funds to Tradestock ............................................................................... 9

        4.  Ablyazov's Transfer of $103 Million of BTA's Funds from Tradestock to Thyler and Investment in Zhaikmunai .............. 10

        5.  BTA's Discovery of Ablyazov's Embezzlement ....................... 13

        6.  The Courts of the United Kingdom Issue Worldwide Freezing Orders Over Ablyazov Assets ................................................ 13

    C.  Viktor Khrapunov Embezzled and Laundered Stolen Assets from the City of Almaty, with His Family's and Ablyazov's Help. ........................... 16

        1.  Viktor Khrapunov and Leila Khrapunova Stole Public Property from the City of Almaty .......................................................... 16

        2.  The Khrapunov Family Was Itself Subject to Criminal Investigations and Asset Freezes. ........................................... 18

    D.  Ablyazov and Viktor Khrapunov Relied on Felix Sater and Ilyas Khrapunov to Launder Stolen Assets. .................................................. 19

        1.  Felix Sater Is a Long-Standing Associate of the Khrapunov Family
            with Experience in Money Laundering...................................................... 19

        2.  With Sater's Guidance, Ilyas Founded a Real Estate Development
            Company with Plaintiffs' Stolen Funds.................................................... 21

        3.  To Evade the Worldwide Freezing Orders, Ablyazov and Ilyas
            Khrapunov Concealed the Proceeds of the Zhaikmunai Investment. ....... 22

        4.  Anticipating the Receipt of $440 million from the Zhaikmunai
            Investment, Sater and Ilyas Entered Into a Consulting Agreement
            to Compensate Sater for His Assistance With Laundering the
            Stolen Funds............................................................................................ 27

        5.  Sater and Ilyas Khrapunov Transfer Approximately $100 Million
            through Shell Entities for Investments in the United States. ................... 28

    E.  Sater and Mochkin Assisted Ilyas Khrapunov in Laundering the Stolen
        Funds Through Investments in U.S. Real Estate. .................................................. 32

        1.  The Tri-County Mall Scheme ................................................................... 33

        2.  The Syracuse Development Center Scheme ............................................. 41

        3.  The Trump SoHo Scheme ........................................................................ 43

        4.  World Health Networks Scheme .............................................................. 43

        5.  Creacard (PCS) Scheme........................................................................... 46

        6.  The Defendants and Their Co-Conspirators Controlled and
            Retained Millions of Dollars in Plaintiffs' Stolen Funds ........................ 47

    F.  The Defendants Knew That the Funds They Helped Ilyas and Ablyazov
        Invest Were Stolen and Subject to Worldwide Freezing Orders. ......................... 48

        1.  Sater and Mochkin Knew That the Stolen Funds Were the Rightful
            Property of the Plaintiffs. ....................................................................... 48

        2.  Mochkin and Sater Helped Devise a Propaganda Campaign for
            Ablyazov to "Spin the Story" Concerning Ablyazov's Fraud. ................. 55

        3.  Sater Hid His Involvement in Litco to Try to Profit Further From
            the Money Laundering Scheme. ............................................................... 57

II. **Conclusions of Law** ........................................................................................................ 61

**A.** **The Court has Jurisdiction** ................................................................. 61

**B.** **Plaintiffs Are Entitled to the Conversion Damages Awarded by the Jury** ................................................................................................. 61

**C.** **Plaintiffs Are Entitled to the Unjust Enrichment Damages Awarded by the Jury** .......................................................................... 64

**D.** **Plaintiffs Are Entitled to the Money Had and Received Damages Awarded by the Jury** ...................................................... 65

**E.** **Defendants' Unclean Hands Defense Is Without Merit.** ................... 67

**F.** **MeM's *In Pari Delicto* Defense Is Without Merit.** ........................... 71

**III.** **Conclusion** ....................................................................................................... **72**

iv

Consistent with Federal Rule of Civil Procedure 52(a)(1), Plaintiffs the City of Almaty, Kazakhstan and BTA Bank JSC ("Plaintiffs") respectfully submit these Proposed Findings of Fact and Conclusions of Law in support of the entry of judgment on their claims for conversion, unjust enrichment, and money had and received, which were tried in June of this year and on which a jury found in the Plaintiffs' favor.

## I.    Findings of Fact

### A.    The Parties

#### 1.    The City of Almaty, Kazakhstan

1.    The City of Almaty, Kazakhstan ("Almaty") is a legal subdivision and former capital of the Republic of Kazakhstan.  Almaty continues to be the largest city in Kazakhstan. (Trial Tr. 1421:19-20 (Sater Testimony)).

#### 2.    BTA Bank

2.    BTA Bank JSC ("BTA" or the "Bank") is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  Until 2014, BTA was "a general service bank" in Kazakhstan that extended services to business entities and individuals, issued and serviced loans, processed deposits, exchanged foreign currency, and provided account services for its clients.  (Trial Tr. 133:22-134:7 (Sadykov Testimony)).

3.    From 2009 until in or about July 2014, BTA Bank was majority owned and controlled by Samruk-Kazyna, Kazakhstan's sovereign wealth fund.  (Trial Tr. 295:12-15, 295:22-23 (Nartay Testimony); Trial Tr. 156:24-157:4 (Sadykov Testimony)).

4.    In 2014, BTA was purchased from Samruk-Kazyna by a private party and its banking operations were merged with Kazkommertzbank's banking operations.  (Trial Tr. 296:14-22 (Nartay Testimony)).

5.      At the time of its nationalization in early 2009, BTA had over 20 branches in Kazakhstan and numerous affiliates outside of Kazakhstan.  At that time, "approximately 5,000 people" were employed by BTA in Kazakhstan alone.  BTA was "one of the three leading banks in Kazakhstan" and it was considered a "systemic bank," meaning that its "assets and activities affect significantly the economy of the country." (Trial Tr. 133:10-23, 134:8-17 (Sadykov Testimony)).

### 3.  Felix Sater

6.      Felix Sater is a former business associate of Mukhtar Ablyazov and the Khrapunov family who made investments in the U.S. real estate projects that are the subject of this action. (Trial Tr. 854:853:25-854:3 (Fliegler Testimony), 720:20-721:6, 725:6-15 (Sater Testimony); PTX-357).

7.      A twice-convicted felon, Sater's career as a stockbroker ended in a bar fight in 1991, which led to a year in prison (Trial Tr. 1435:23-17, 1546:14-18 (Sater Testimony)).  In 1998, Sater was convicted of racketeering, with fraud and money laundering predicates, in connection with a $40 million penny stock pump and dump scheme.  (Trial Tr. 767:1-769:9 (Sater Testimony); PTX-663; PTX-664).

8.      In approximately 2003 or 2004, Sater was introduced to Viktor and Leila Khrapunov in Kazakhstan, and later met their son, Ilyas Khrapunov ("Ilyas"), in Switzerland. (Trial Tr. 715:15-18, 717:17-718:12, 720:20-721:3, 1518:19-1519:4 (Sater Testimony)).

### 4.  Bayrock Group, Inc.

9.      Bayrock Group, Inc. ("Bayrock"), a company wholly-owned by Sater, is based in New York.  (Trial Tr. 780:1-2 (Sater Testimony), 499:15-25 (Schectman Testimony), 854:14-20 (Fliegler Testimony); PTX-265).

### 5.  Global Habitat Solutions, Inc.

10.    Global Habitat Solutions Inc. ("GHS") is another company based in New York and wholly owned by Sater.  Similar to Bayrock Group, GHS was formed as an extension of Sater. (Trial Tr. 854:14-20 (Fliegler Testimony); PTX-232).

### 6.  MeM Energy Partners LLC

11.    MeM Energy Partners LLC ("MeM") is a company wholly owned by Mendel Mochkin and based in New York.  (Trial Tr. 637:5-24 (Mochkin Testimony); PTX-267).

## B.  Mukhtar Ablyazov Stole Billions of Dollars from BTA Bank

### 1.  Mukhtar Ablyazov's Control of BTA Bank

12.    In March 1998, Mukhtar Ablyazov bought BTA, then called Bank TuranAlem, through an auction for $72 million using an investment consortium called Kazakh (or Kazakhstani) Investors, which he controlled.  (Trial Tr. 819:17-21 (Fliegler Testimony); Ablyazov 10/30/18 Dep. 80:20–23, 81:22-24)) [1].

13.    From 1998 to 2009, Mukhtar Ablyazov was the majority owner of the Bank and controlled it and considered himself to be "the key owner."  (Ablyazov 10/30/18 Dep. 142:5-19).

14.    During that period, Ablyazov's ownership of the voting shares in BTA never fell below 75%, and he always maintained control over shares owned by others on his behalf. (Ablyazov 10/30/18 Dep. 88:19-89:17; 90:25-91:7, 91:23-92:2, 132:6–133:14).

15.    Beginning with the auction at which Ablyazov purchased BTA through companies he controlled, Ablyazov regularly used nominees and shell companies to hide his assets. (Ablyazov

---

[1]    All deposition testimony cited in the Kazakh Entities' proposed findings of fact was designated and played for the jury at trial and has been provided to the Court.

10/30/18 Dep. 67:4–20, 69:6–70:15, 85:25–86:8, 150:24-151:03, 152:11–154:1, 155:6–13). Ablyazov finds it "just impossible" to count the number of nominees he used because the ownership schemes are "very complex." (*Id*. at 69:6–15).

16.    Ablyazov initially controlled BTA with the help of his co-conspirator Yerzhan Tatishev.  In 1998, Tatishev was appointed chairman of BTA.  (Ablyazov 10/30/18 Dep. 142:9-13).  Tatishev reported to Ablyazov, and Ablyazov used Tatishev as a nominee.  (Trial Tr. 144:1-6 (Sadykov Testimony); Ablyazov 10/30/18 Dep. 142:5-142:19).

17.    Tatishev was Ablyazov's "trusted partner" and handled the "operational aspects of the banking activity," while Ablyazov controlled BTA's "general strategy." (Ablyazov 10/30/18 Dep. 142:5–19).

18.    In July 2002, Ablyazov was arrested for abuse of office and illegal commercial activity in connection with his role as Kazakhstan's Minister for Energy, Industry, and Trade. (Ablyazov 10/30/18 Dep. 63:7, 64:16-65:16).  Tatishev directly or indirectly held 100% of BTA's voting shares on his and Ablyazov's behalf during Ablyazov's imprisonment.  (*Id*. at 89:12–17).

19.    Ablyazov was released from prison on May 13, 2003, and moved to Moscow, where he had monthly meetings with Tatishev to discuss BTA operations (Ablyazov Dep. 10/30/18 Dep. 123:14-125:5, 125:19-126:1, 141:22-24).

20.    In December 2004, Tatishev was shot and killed while hunting, and Tatishev's widow transferred to Ablyazov for no consideration the assets and BTA stock that Tatishev had been holding on Ablyazov's behalf.  (Ablyazov 10/30/18 Dep. 119:4-125:5; 132:6-133:14). Ablyazov also purchased from Tatishev's widow the BTA shares that Tatishev held personally. (*Id.* at 133:23-133:14; Monstrey 7/17/18 Dep. 62:6-8, 62:21-63:1)

21.     After Tatishev's death, in May 2005, Ablyazov became Chairman of BTA Bank and served as Chairman until he was forced to step down on February 2, 2009. (Ablyazov 10/30/2019 Dep. 141:20-22; Trial Tr. 174:8-9, (Sadykov Testimony), 296:23-297:3 (Nartay Testimony)).

### 2. Ablyazov's Corruption of Corporate Business Department No. 6 ("UKB6")

22.     BTA had six or seven corporate business departments that facilitated loans to BTA's clients across different industries. (Trial Tr. 216:6-14 (Gozhakhmetova Testimony)).

23.     Corporate Business Department No. 6 ("UKB6") was one of the corporate business departments within BTA that "facilitated loans." UKB6 was smaller than the other corporate business departments at BTA. (Trial Tr. 216:4-21 (Gozhakhmetova Testimony)).

24.     UKB6 existed as early as 2002, when Tatishev was Chairman and Ablyazov had voting control of BTA. (Moldakhmet Dep. 8:18-9:1). In 2003, UKB6's credit portfolio was "approximately $250 million" and increased to "approximately $500 million" in 2004, around the time Tatishev died. (Trial Tr. 134:24-135:5 (Sadykov Testimony)). By "December of 2008, the credit portfolio of UKB6 was $4.5 billion" U.S. dollars. (Trial Tr. 140:21-141:1 (Sadykov Testimony)).

25.     UKB6 caused BTA to issue fake loans to offshore companies in "tax free zones." (Trial Tr. 135:6-9 (Sadykov Testimony)).

26.     The offshore companies that were "customers" of UKB6 were all owned or controlled by Ablyazov, and the "loans" it issued had no economic substance. (Trial Tr. 150:11-13 (Sadykov Testimony); 827:1-8 (Fliegler Testimony)). Instead of being arms-length transactions, the "loans" facilitated by UKB6 were meant to conceal Ablyazov's misappropriation of funds from BTA. (Trial Tr. 825:15-826:3 (Fliegler Testimony)).

5

27.    Zhaksylyk Zharimbetov was "first deputy chairman to the management board" of BTA and reported to Ablyazov.  (Trial Tr. 132:22-133:9 (Sadykov Testimony)).

28.    While Ablyazov was Chairman of BTA, Zharimbetov determined which individuals should have power of attorney for each of the UKB6 offshore companies.  (Trial Tr. 144:7-11 (Sadykov Testimony)).

29.    UKB6 operated secretly and separately from the other credit departments within BTA.  (Trial Tr. 217:4-18 (Gozhakhmetova Testimony)).  For example, BTA's "Middle Office" was responsible for storing credit dossiers containing information about the purpose of the loans and each client to whom the corporate business departments extended loans, including:

> the full information about the client to whom the loan was facilitated.  These are registration documents.  Also, you would find the charter in the credit dossier.  Also, there would be information concerning the beneficiaries and the ultimate beneficiary owner of the company, the leadership of the company, accountant of the company, and also financial reports, the business plan would be included in the dossier, and also reports of different bank departments.  Also, you will find credit or loan documents and collateral documents .

(Trial Tr. 214:14-215:4 (Gozhakhmetova Testimony)).

30.    But the Middle Office serviced all of the corporate business departments except for UKB6, which "retained their own credit dossiers, and they were very secretive about that" and "didn't want anybody to even look at them," so that the rest of BTA did not know the purpose of the sham loans, when repayment would occur, or the terms of repayment.  (Trial Tr. 217:4-18 (Gozhakhmetova Testimony)).

31.    When UKB6 employees "were sending some documents to the printer…they tried to as quickly as possible get those documents out of the printer" before a non-UKB6 employee sitting on the same floor could see them.  (Trial Tr. 218:10-15 (Gozhakhmetova Testimony)).

32.    Like most large lending institutions, BTA had a Credit Committee, which assessed the risks of loans BTA extended. (Trial Tr. 215:14-216:8 (Gozhakhmetova Testimony)).

33.    The Credit Committee did not approve the sham loans facilitated to offshore companies through UKB6 in the way that the Credit Committee approved loans facilitated through the other corporate business departments at BTA. (Trial Tr. 215:25-216:3 (Gozhakhmetova Testimony); Trial Tr. 155:18-156:8 (Sadykov Testimony)).

34.    For loans issued by other corporate business departments at BTA, the Credit Committee would convene to assess the risks of a loan, a credit manager from the corporate business department would make a presentation including information about the client and ultimate beneficiary of the loan, and the Credit Committee members would vote on whether or not to issue the loan.  (Trial Tr. 218:16-219:9 (Gozhakhmetova Testimony)).

35.    For the sham loans facilitated by UKB6, however, the Credit Committee never met in person to discuss the loans or to vote on them.  (Trial Tr. 216:22-217:3 (Gozhakhmetova Testimony); Trial Tr. 155:18-156:8 (Sadykov Testimony)).

36.    The UKB6 customers generally received funding from BTA into payment accounts with the Latvian bank Trasta Komercbanka ("TKB"), which were controlled by "employees of UKB6."  (Trial Tr. 831:17-24 (Fliegler Testimony), 145:25-146:8 (Sadykova Testimony); *see, e.g.*, PTX-2 (TKB statements for companies including Tradestock, Comwork, United Clearing, and Balgaven)).

37.    UKB6 employees were able to access and download the offshore companies' TKB account statements directly on TKB's website. (Moldakhmet Dep. 15:24-16:04, 16:12-14, 17:9-16).

38.     UKB6 employees monitored the transfers of funds it facilitated from BTA to UKB6 customers with tracking spreadsheets that they created using information gathered from TKB bank statements. (PTX-10[2]; Trial Tr. 145:20-22 (Sadykov Testimony) (explaining that PTX-10 "demonstrates movement of funds pertaining to Tradestock")).

39.     In tracking the sham loans it facilitated to offshore companies, UKB6 falsified the purpose of payment information for the loans to make it look like the loans were legitimate loans with a legitimate business purpose.  (Trial Tr. 150:11-13 (Sadykov Testimony) ("This was a pretend agreement.  It just served a purpose to initiate payment.")).

40.     UKB6 ensured that the sham loans it facilitated would not default by paying outstanding debt using funds from new sham loans—a practice referred to as "roundtripping." (Trial Tr. 826:23-829:17 (Fliegler Testimony)).  UKB6 made it appear as if the offshore companies were repaying the sham loans by getting a new sham loan from BTA and transferring those funds to a different offshore company before using them to repay the so-called loan.  (Trial Tr. 140:7-12 (Sadykov Testimony) ("So when it was time to pay out the loan, the employees of UKB6 issued another loan to a different company, and that company repaid the initial loan that was due for repayment.  So it was a process of refinancing" to a different company from the one that need to repay the loan); PTX-6).

41.     As one example of roundtripping between UKB6 companies, on July 5, 2005, $5 million were transferred from BTA to Anital, one of the UKB6 customers.  (PTX-10 at 2; PTX-

---

[2]     PTX-10 is a compilation of the tracking spreadsheets created by UKB6 employees.  An abbreviated version of PTX-10 is filed as an exhibit to this document, including only those spreadsheets cited herein.

12).  The following day, on July 6, 2005, $4.1 million were transferred from Anital to Tradestock and, one day after that, $4.093 million were transferred from Tradestock back to BTA for the nominal repayment of a loan, the purpose of which was to provide funding to purchase soy flour. (PTX-10 at 2; PTX-12; *see also* Trial Tr. 147:13-148:25, 149:14-150:13 (Sadykov Testimony) (explaining that Anital never purchased soy flour from Tradestock, neither company was involved in the agricultural industry, and this was a "pretend agreement")).

42.    By 2008, the number of offshore companies that Ablyazov used in connection with the fraud at BTA Bank was somewhere between 500 and 2,000 companies.  (Udovenko Dep. 54:20-55:06).

43.    UKB6 largely ceased operations in December 2008 after the Kazakhstan Agency for Financial Oversight initiated an audit that demonstrated that "all of the loans issued by [UKB6] were of high risk, and they were also of high risk of non-repayment, and there was no collateral attached to these loans."  (Trial. Tr. 139:16-140:11 (Sadykov Testimony)).

### 3.   Ablyazov's Transfer of $115.3 Million of BTA's Funds to Tradestock

44.    Tradestock Inc. ("Tradestock") was an offshore company controlled by Ablyazov and his co-conspirators that had a bank account at TKB and was one of UKB6's customers.  (Trial Tr. 145:23-146:8 (Sadykov Testimony); PTX-1).  Tradestock had "no assets," it "did not offer any services" and it had "no employees."  (Trial Tr. 138:18-23 (Sadykov Testimony)).

45.    United Clearing, Balgaven Invest, and Comwork Ltd. were also offshore shell companies controlled by Ablyazov that were customers of UKB6.  (Trial Tr. 155:2-5 (Sadykov Testimony)).

46.    Through UKB6, Ablyazov amassed $115.3 million in Tradestock through the following transfers.  (PTX-801).

    a.   On July 7, 2004, BTA transferred $19 million to Tradestock's TKB account. (PTX-10 at 9).

    b.   On August 4, 2004, BTA transferred $18 million to Tradestock's TKB account. (PTX-2 at 7-8; PTX-10 at 9).

    c.   On August 4, 2004, BTA transferred $24 million to United Clearing, which then transferred $24 million to Tradestock.  (PTX-10 at 9).

    d.   On August 5, 2004, BTA transferred $15.9 million to Balgaven, which then transferred $15.9 million to Tradestock on August 12, 2004.  (PTX-2 at 8; PTX-10 at 9).

    e.   On August 10, 2004, BTA transferred $38.4 million to Comwork, which then transferred $38.4 million to Tradestock on August 12, 2004.   (PTX-2 at 23-24; PTX-10 at 9, 15).

47.    Ablyazov's co-conspirator, Sadykov, structured the transfers to Tradestock to go through other UKB6 customers in smaller amounts to evade national banking regulations, which prohibited one-time transactions over a certain limit. (Trial Tr. 155:6-14 (Sadykov Testimony) (explaining a one-time transfer of $96 million "would have been a violation of the norms of the national bank, and the national bank would have fined, sanctioned BTA"); 832:15-20 (Fliegler Testimony) ("This is a way of avoiding a red flag that something nefarious is going on.")).

48.    Although papered over as so-called "loans," the transfers to Tradestock were never repaid to BTA, were never intended to be repaid, and were eventually written off.  (Trial Tr. 829:14-17 (Fliegler Testimony)).

    **4.  Ablyazov's Transfer of $103 Million of BTA's Funds from Tradestock to Thyler and Investment in Zhaikmunai**

49.    On July 8, 2004, and August 20, 2004, Tradestock transferred a total of $103 million stolen from BTA for the benefit of an entity called Thyler Holdings Limited ("Thyler"). (PTX-10 at 9; PTX-2 at 28, 33).

50.    Years after this transfer, an unsigned loan agreement was drafted purporting that Tradestock was loaning $103 million to Thyler in order to make it appear that the transfer was a loan.  (Monstrey 7/17/18 Dep. 39:17-40:2, 42:3–8, 42:19–43:5, 43:14–16, 48:18–25).

51.    The transfers from Tradestock to Thyler were not made pursuant to a "loan." Thyler was another shell entity held for Ablyazov's benefit.  (PTX-95 (Thyler client agreement for Tatishev); PTX-103 (Thyler client agreement for Ablyazov); PTX-125 (later ownership structure of Thyler). Thyler never repaid the "loan" to Tradestock.  (PTX-801 at 1; Trial Tr. 152:15-18 (Sadykov Testimony)).

52.    At the time of the initial transfer of $103 million for Thyler's benefit from Tradestock, Tatishev was the owner of Thyler on paper.  (Trial Tr. 152:18-19 (Sadykov Testimony); PTX-95 (Thyler SMP client services agreement signed by Tatishev, witnessed by Sadykov)).

53.    Thyler never directly received the funds from Tradestock because it never had a bank account.  Instead, Tradestock transferred the funds to corporate services provider MeesPierson (an affiliate of SMP Partners ("SMP")) for Thyler's benefit.  (PTX-10 at 9 (showing $7 million transfer from Tradestock to Thyler)).

54.    Ablyazov used the money from Tradestock to purchase an investment in Zhaikmunai, "an oil and gas company that is involved with exploitation of an oil and gas field in the western part of Kazakhstan."  (Trial Tr. 154:7-15 (Sadykov Testimony)).

55.    After Tatishev's death, his widow Anar Tatisheva (a/k/a Anar Aidzhanova) became the successor to the "debt" owed on the Tradestock "loan" to Thyler, and became the purported ultimate beneficial owner of Thyler. (Trial Tr. 837:4-21, 838:11-849:4 (Fliegler Testimony); Monstrey 7/17/18 Dep. 60:24-61:12, 62:1-8).

56.    Tatisheva expressly transferred her interest in the Tradestock loan and Thyler to Ablyazov for no cash consideration, reflecting the reality that Ablyazov was always the true beneficial owner of Thyler.  (PTX-135 (June 2008 Letter from Tatisheva to Ablyazov ("Please be

advised that I have assigned my entire interest in the loan note from Tradestock Inc. (Lender) to Thyler Holdings Limited (Borrower), dated 8th of July 2004 to M. Ablyazov."); PTX-103 (MeesPierson Client Agreement for Thyler signed by Ablyazov); Monstrey 7/17/18 Dep. 62:1-8; Trial Tr. 837:4-21, 838:11-849:4 (Fliegler Testimony)).

57.      In 2007, Ablyazov retained his control over Thyler when Lineford, a company he owned, acquired Thyler directly.  (Monstrey 7/17/18 Dep. 78:24–25; *see also* PTX-131 at 5; PTX-125 (SMP documents showing Ablyazov owns Lineford); PTX-108 (SMP email from Udovenko showing Ablyazov owns Lineford); PTX-122 (Lineford client services agreement signed by Ablyazov)).

58.      A man named Frank Monstrey was hired as a consultant to manage Zhaikmunai. (PTX-125).   On paper, Monstrey was the owner of a company called Sartfield, of which he held indirect ownership through legal entities.  (Trial Tr. 835:18-836:5 (Fliegler Testimony)).

59.      On or around July 16, 2007, Ablyazov caused Lineford to transfer the ownership of Thyler to Sartfield.  (PTX-132).  This allowed Ablyazov to further conceal his ownership of the Zhaikmunai asset and create the appearance of ownership by Monstrey.  But under the terms of the "sale" from Ablyazov/Lineford to Monstrey/Sartfield, Ablyazov/Lineford was entitled to (a) a return of its $103 million original investment, plus interest (b) a return of 90% of the profits of Zhaikmunai, on an on-going basis; and (c) control over Zhaikmunai.  (*Id*. at 3–4, 6–7, 9–11). Sartfield promised "not to give any instructions to Harrison," (*id*. at 6), which was the entity owned by Ablyazov that held Lineford, PTX-107 (SMP document showing that Ablyazov owns Harrison). All decisions regarding Zhaikmunai required prior written approval of Lineford, and Ablyazov possessed the power to unilaterally reassign Thyler (and thus Zhaikmunai) back to his

entity Lineford.  (*Id*. at 9–11).  In other words, Ablyazov was and always remained the owner of the Zhaikmunai asset, which he purchased with money stolen from BTA.

### 5.  BTA's Discovery of Ablyazov's Embezzlement

60.    In early 2009, BTA Bank discovered that Ablyazov had stolen billions of dollars from it.  (Trial Tr. 294:7-9-295:21, 315:20-23 (Nartay Testimony)).

61.    As a result, BTA defaulted on billions of dollars of debt held by international investors.  (Trial Tr. 295:12-296:13 (Nartay Testimony)).  BTA Bank was bailed out by Samruk-Kazyna.  (*Id.*)

62.    After BTA discovered the fraud, Ablyazov and Zharimbetov were removed from their positions at BTA and fled to England.  (Trial Tr. 296:23-297:5 (Nartay Testimony), 157:21-23 (Sadykov Testimony)).

63.    Certain UKB6 employees who were complicit in Ablyazov's fraud also fled Kazakhstan, and Ablyazov financially supported them.   (Trial Tr. 157:14-20 (Sadykov Testimony)).

64.    After BTA's credit availability evaporated in 2008, the outstanding UKB6-related loans defaulted and were not repaid.  (Trial Tr. 163:20-24 (Sadykov Testimony); *see also* 829:14-16 (Fliegler Testimony)).

### 6.  The Courts of the United Kingdom Issue Worldwide Freezing Orders Over Ablyazov Assets.

65.    After Ablyazov arrived in London, BTA Bank initiated a series of lawsuits against him and his associates in England's High Court of Justice, alleging that he misappropriated billions of dollars in assets.  BTA filed its first lawsuit against Ablyazov in England in August 2009 just a few months after his departure from Kazakhstan.  (Trial Tr. 409:25-410:3 (Nartay Testimony)).

66.     Beginning in late 2009, the U.K. courts granted BTA worldwide freezing orders over Ablyazov's assets and issued numerous search and disclosure orders uncovering a vast network of Ablyazov's shell companies.  (Trial Tr. 315:20-316:4 (Nartay Testimony); PTX-39 at 4 (prohibiting Ablyazov from in any way disposing of, dealing with, or diminishing the value of "any of their assets whether they are in or outside England and Wales up to the value of £175 million."); PTX-43 (May 2011 freezing order against Ablyazov's assets)).

67.     The freezing orders included schedules listing companies that held Ablyazov's assets.  (PTX-47 (67 pages of schedules listing entities including Balgaven, Comwork, United Clearing, Tradestock and Anital); Trial Tr. 415:14–420:2 (Nartay Testimony)).  BTA sought to add these companies to the worldwide freezing order so that Ablyazov wouldn't be able to "deal via these companies and to conceal monies which were embezzled from BTA."  (Trial Tr. 418:20-24 (Nartay Testimony)).

68.     In 2010, "[h]undreds and hundreds" of Ablyazov's companies, which were already subject to freezing orders, were put into receivership by the High Court of Justice.  (Trial Tr. 301:8-23 (Nartay Testimony)); *see* PTX-42 at 5 (court appointing KPMG receivers), at 14 ("The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court"), at 15 (listing Ilyas Khrapunov); PTX-47 (schedules of Ablyazov's entities subject to the freezing orders)).

69.     In 2012, because Ablyazov "was lying under oath to the court about assets" and "refused to surrender his passport to the UK" he received a 22-month prison sentence for contempt of court.  (Trial Tr. 298:19-25 (Nartay Testimony)).  Ablyazov fled to France before he could be incarcerated in the United Kingdom.  (PTX-617 (August 7, 2013 article reporting that Ablyazov

14

was "arrested last week in France on fraud charges after 18 months on the run"); Bourg 9/11/17 Dep. 55:18-55:25; Ilyas Khrapunov 2/1/18 Dep. 115:1-4).

70.    BTA eventually secured final money judgments against Ablyazov for approximately $6 billion.  (Trial Tr. 298:2-6 (Nartay Testimony) (BTA obtained "UK court judgments against Mr. Ablyazov and his accomplices in the amount of more than 6 billion U.S. dollars, plus interest accruing day by day"); PTX-44; PTX-45).

71.    The U.K. Courts also recognized in freezing orders and judgments Ablyazov's son-in-law, Ilyas Khrapunov, as his co-conspirator.  (PTX-51 (judgment finding Ilyas had "conspired with Mr Ablyazov to break the terms of an original freezing order and a receivership order granted against Mr Ablyazov by effecting or assisting the removal or transfer of a number of funds so as to take those funds out of the reach of the freezing order against Mr Ablyazov and thus to assist him in evading and breaking clear court orders.").  In 2015, BTA also sued Ilyas in the English High Court of Justice for concealing assets and money laundering.  (Trial Tr. 306:7-20 (Nartay Testimony)). BTA obtained a worldwide freezing order against Ilyas.  (PTX-42).  In 2018, BTA also obtained a money judgment for $500 million plus interest. (PTX-49).

72.    To date, Ablyazov has not paid willingly any of the money owed pursuant to these judgments.  (Trial Tr. 307:8-10 (Nartay Testimony)).

73.    Ablyazov used his influence over former UKB6 employees to limit BTA's asset recovery efforts and to further his agenda in the U.K. litigation including, for example, by attempting to influence witness testimony and suborn perjury.  (Trial Tr. 157:21-158:15 (Sadykov Testimony)).  For example, Ablyazov and Zharimbetov threatened Sadykov and forced him to sign a witness statement that Sadykov knew to be false.  (*Id.* ("when Zharimbetov first approached me and asked me to sign the statement, I refused. But later he told me that my refusal will affect the

support of other people who were also outside of Kazakhstan at that time, that they could suffer as a result of my actions if I don't sign.")

74.    In July 2013, Ablyazov was arrested in France and incarcerated.  (Bourg 9/11/17 Dep. 55:18-55:25; Ilyas Khrapunov 2/1/18 Dep. 115:1-4).

75.    Ablyazov's fraud affected "BTA Bank itself, its clients, ordinary people, individuals, depositors, business entities…Western creditors as well as worldwide." (Trial Tr. 295:16-21 (Nartay Testimony)).

## C. Viktor Khrapunov Embezzled and Laundered Stolen Assets from the City of Almaty, with His Family's and Ablyazov's Help.

76.    Viktor Khrapunov ("Viktor") became "akim," or mayor, of the City of Almaty in or about June 1997 and remained in that position until approximately December 2004.  (Viktor Khrapunov 1/30/18 Dep. 50:17-21, 51:10-12).  Prior to becoming mayor of Almay, Viktor had been Kazakhstan's Minister of Energy.  (*Id.* 49:20-23).  When Viktor took office as mayor, Almaty was the nation's former capital and largest city, holding enormous public assets that were to be privatized as part of Kazakhstan's transition from a state-run communist model.  (Trial Tr. 821:21-822:1 (Fliegler Testimony), 1061:19-21 (Wolf Testimony), 1421:19-20 (Sater Testimony); Viktor Khrapunov 1/30/18 Dep. 59:7-20). Viktor, as mayor, was tasked with overseeing this privatization program.  (Viktor Khrapunov 1/30/18 Dep. 59:7-20).

### 1. Viktor Khrapunov and Leila Khrapunova Stole Public Property from the City of Almaty.

77.    Almost immediately after he took office, Viktor began a multi-year scheme to enrich himself and his family through the abuse of his position as mayor.  (Trial Tr. 822:21-823:2 (Fliegler Testimony)).  Viktor used his position as mayor to privatize property in the city, sell the assets for below market rates to shell entities he controlled, transfer the property to his wife Leila Khrapunova ("Leila"), and finally sell the property to a third-party buyer at markets rates, thus

generating millions of dollars in profit. (*Id.*; *see also* Trial Tr.1214:23-1215:7 (Sater Testimony) ("He was a senior member of the Nazarbayev cabinet. If all he stole was $300 million, the other ministers would have laughed him out of the cabinet meetings.")). Viktor and Leila then laundered the proceeds of these frauds. (Trial Tr. 927:23-928:4 (Fliegler Testimony); 1215:9-18 (Sater Testimony)).

78. As just one example of Viktor's personal profiteering from his position as mayor, in April 2001, Viktor Khrapunov issued an order to privatize the building of former Kindergarten No. 186. The building was offered up for sale by the Territorial Committee of State Property and Privatization of the City of Almaty ("Tercom"). (PTX-801 at 2; PTX-85; Viktor Khrapunov 1/31/18 Dep. 63:8-19). The shell entity KazRealIncom, controlled by Leila Khrapunova, purchased the property on December 26, 2001 for KZT 52,155,100 ($354.133). (PTX-801 at 2; PTX-85; Viktor Khrapunov 1/31/18 Dep. 64:1-6, 65:5-11, 65:20-67:7). Once obtained from the City of Almaty, the property was transferred through shell companies to Leila directly, and then contributed by Leila to an entity she controlled named Building Services Company ("BSC"). (PTX-801 at 2; PTX-85; PTX-80; PTX-70; Viktor Khrapunov 1/31/18 Dep. 67:8-110:9). Ten days later, Leila sold her 100% interest in BSC, which included former Kindergarten No. 186, to Kompaniya Stroytekh Company LLP ("Stroytekh") for approximately $14.1 million. Stroytekh was an entity owned and controlled by Ablyazov through a nominee. (PTX-801 at 2; PTX-85). Stroytekh then transferred this property to Bask Invest LLP, another Ablyazov-controlled entity, whose assets were then subdivided among two other shell companies—Dudar Capital Limited and Eseke Limited—again controlled by Ablyazov's nominees. (PTX-801 at 2). Those shell entities each used their ownership share of Bask Invest as collateral to obtain loans from BTA Bank, purportedly to improve the wrongfully obtained former Kindergarten No. 186 property. But the

loaned funds were never used to improve the properties and were instead spirted away by the conspirators without ever being repaid.  (Trial Tr. 821:21-823:2 (Fliegler Testimony); Viktor Khrapunov 1/31/18 Dep. 110:10-111:21).

> **2.  The Khrapunov Family Was Itself Subject to Criminal Investigations and Asset Freezes.**

79.    Like Ablyazov, the Khrapunovs were themselves subject to asset freezing restrictions.  (Trial Tr. 763:13-22 (Sater Testimony)).  On November 9, 2007, after learning that Kazakhstan law enforcement had begun investigating his financial dealing and in anticipation of possible criminal charges, Viktor, Leila, their minor son, and their daughter-in-law Madina (Ablyazov's daughter) boarded a private jet and fled Kazakhstan for Switzerland.  (Viktor Khrapunov 1/30/18 Dep. 57:20-25, 58:16-17, 75:3-10).

80.    Viktor was ultimately prosecuted for abuse of power and fraudulent acts. Additional charges were brought in Kazakhstan against members of the Khrapunov Family arising from the theft of public property and the laundering of resulting funds during Viktor's tenure as mayor.  (PTX-467; Trial Tr. 1214:23-1215:2 (Sater Testimony) ("the government of Kazakhstan accused Viktor Khrapunov of stealing $300 million out of Kazakhstan, but I knew that was probably a very low number")).

81.    Subsequently, in mid-2012, the Public Prosecutor of Geneva opened an investigation into the Khrapunov family on suspicion of violating Swiss money laundering laws. The Public Prosecutor of Geneva seized financial and banking documents and ordered the freezing of the Khrapunov family's Swiss assets, including accounts held at Swiss banks.  (Gillieron 10/3/17 Dep. 298:8-22; Trial Tr. 765:7-17, 796:12-18 (Sater Testimony); PTX-467).

82.    Ilyas– Viktor's son and Ablyazov's son-in-law – was also subject to freezing orders and money laundering investigations.  (*See, e.g.*, PTX-42; PTX-50).  As noted in a 2013

background investigation by a prospective third-party lender, conducted during the time of the Defendants' investments, it was publicly reported that "Ilyas is the son of Viktor Khrapunov (a former politician and 'disgraced' Mayor of Almaty, Kazakhstan) and his wife Leyla Khrapunov are both on Interpol's 'wanted list' on behalf of Kazakhstan authorities and reportedly subject to a formal request for extradition from Kazakhstan from their current residency in Switzerland. They are also reportedly to be subject of a judicial investigation in Switzerland for money laundering." (PTX-467).

### D.  Ablyazov and Viktor Khrapunov Relied on Felix Sater and Ilyas Khrapunov to Launder Stolen Assets.

83.    To launder their stolen funds without alerting BTA or the U.K. court-appointed Receivers, all while Ablyazov remained subject to the Worldwide Freezing Orders and the Khrapunov family was subject to asset freezes in Switzerland, Ablyazov and the Khrapunovs turned to Felix Sater, a longtime friend of the Khrapunov Family who had extensive experience with organized crime and money laundering.  (Trial Tr. 766:4 (Sater Testimony) ("I know a lot about money laundering.")).

### 1.  Felix Sater Is a Long-Standing Associate of the Khrapunov Family with Experience in Money Laundering.

84.    In 1991, Sater ran afoul of the law for the first time when he assaulted a rival commodities broker at a bar in Midtown Manhattan.  (Trial Tr. 1435:23-1436:11 (Sater Testimony)).  While arguing with the broker, Sater broke off the top of a margarita glass and thrust the broken stem into the broker's face.  (*Id.*).  Sater was convicted of assault, lost his securities license and served three months in prison.  (Trial Tr. 736:25-737:3, 1436:16-17, 1499:1-9 (Sater Testimony)).

85.    Following his release from prison in 1995, Sater went to work for State Street Capital Partners where he and his partners launched an illicit pump-and-dump scheme that

defrauded unsuspecting investors of more than $40 million.  (Trial Tr. 767:1-769:9 (Sater Testimony); PTX-663).  Consequently, in 2009, Sater was convicted of four different racketeering acts, including securities fraud and money laundering.  (PTX-664; Trial Tr. 766:20-767:16 (Sater Testimony)).

86.    In approximately 2004, Sater was introduced to Viktor Khrapunov, who was then the mayor of Almaty, and his wife Leila.  (Trial Tr. 715:15-18, 717:17-718:12, 720:20-721:3, 1518:19-1519:4 (Sater Testimony)).

87.    In September 2007, Sater met Ablyazov at the wedding of Ilyas and Madina Ablyazova, Ablyazov's daughter.  (Trial Tr. 719:4-9).  Sater admits that even before the wedding he was aware of Ablyazov's multibillion-dollar scheme to defraud BTA because he had conversations with Ilyas and other members of the Khrapunov family that "would have definitely included Mukhtar Ablyazov's problems."  (Trial Tr. (Sater Testimony) 764:19-765:2).  Ablyazov had worked with Viktor and Leila for more than a decade to enrich themselves through a range of wrongful schemes, described above.  *See supra* Sec. I.C).  And both Ablyazov as well as Viktor and Leila Khrapunov had funded Ilyas's company, Swiss Development Group, as a means of laundering their co-mingled, ill-gotten wealth.  (Trial Tr. 718:9-13, 1215:8-25 (Sater Testimony)) ("What he [Ilyas] told me was that it was his money from SDG.  His mother told me she gave him $30 million to start SDG back in 2007…Could it have been Mukhtar Ablyazov's money?  Could they have mixed it?  Of course.")).

88.    Around this time, Sater stepped up his business dealings with the Khrapunov family, who by then fled to Switzerland after investigations of Viktor's abuse of his offices were initiated by Kazakhstan law enforcement.  (Trial Tr. 717:17-718:4 (Sater Testimony)).

89.    As early as 2008, Ilyas was describing Sater as his business partner. (Gillieron 10/3/2017 Dep. 134:22-135:6). According to Sater, Leila asked Sater to mentor Ilyas as he began a purported career in real estate development. (Trial Tr. 718:4-12 (Sater Testimony)). Leila asked Sater to "train him and teach him how to be a real estate developer." (*Id.*). Sater agreed to mentor Ilyas and explained he "taught him many things a lot of it do with real estate and real estate development." (*Id.* 1519:25-1520:2).

90.    Sater and Ilyas frequently discussed other proposed investments to hide Ablyazov's and the Khrapunov family's misappropriated wealth. For instance, on November 3, 2009, Sater sent Ilyas a "golden opportunity (pardon the pun)" to purchase gold from African mines to be sold in the United States. (PTX-491). Sater assured Ilyas: "We can set this up in a number of ways where I assume full responsibility in the US and you can be financial backing" and "we are getting all the certificates from the Africans that there is no money laundering involved. I am sure you will agree that the US is not easy on money laundering or conflict issues." (*Id.*)

91.    By 2011, Sater described himself to Defendant MeM Energy's owner, Mendel Mochkin, as "Senior Advisor to Vyacheslav Khrapunov former Minister of Energy + Mayor of Almaty (partner with his son Ilyas in real estate in Switzerland)." (PTX-434).

## 2. With Sater's Guidance, Ilyas Founded a Real Estate Development Company with Plaintiffs' Stolen Funds.

92.    Around 2007, Ilyas Khrapunov founded a purported real estate development company called Swiss Development Group, or SDG. (Bourg 9/11/17 Dep. 42:7-10; Khrapunov 2/01/18 Dep. 38:23-8).

93.    SDG Capital is the holding company for SDG, initially owned by "the Khrapunov family." (Bourg 9/11/17 Dep. 41:21-22; 42:7-10). SDG Capital's offices from 2011 to 2015 were the same as Ilyas' personal offices, in Geneva. (Gillieron Dep. 22:6–11, 23:12–17, 24:13–16;

Bourg 9/11/17 Dep. 16:21-17:6).  SDG was funded with money from the Khrapunov family and from Ablyazov.  (Trial Tr. 718:9-13, 1215:8-25 (Sater Testimony); Gillieron 10/03/17 Dep. 247:21-248:14, 252:25-253:13 (Ilyas's company Vilder made "family investments," including investments in SDG, that benefitted his "direct family"); Viktor Khrapunov 1/31/18 Dep. 50:2-10 (if money was provided to SDG it would have been provided by Leila "who was responsible for all financial dealings").

94.    Ilyas controlled SDG and SDG Capital at all relevant times.  When SDG was incorporated in 2007, Ilyas owned the company.  (Gillieron 10/03/17 Dep. 148:14–16).  After that, his roles "would vary" as he acted as SDG's chairman, board member, and later an adviser to the board.  (Ilyas Khrapunov 2/01/18 Dep. 39:3-8).

95.    Eventually, SDG Capital's banks stopped working with the company because they believed that Ablyazov was involved and had criminal issues.  (Gillieron 10/03/17 Dep. 305:13-15, 305:18-306:3; Bourg 9/11/17 Dep. 70:3–71:12).

### 3. To Evade the Worldwide Freezing Orders, Ablyazov and Ilyas Khrapunov Concealed the Proceeds of the Zhaikmunai Investment.

96.    From 2009 onward, the worldwide freezing orders dramatically limited Ablyazov's ability to liquidate and launder the money he had embezzled from BTA Bank.  (Trial Tr. 840:16-25 (Fliegler Testimony) ("You cannot use those assets.  You cannot liquidate them.  They are truly frozen in time.").  Further, the Worldwide Freezing Orders explicitly forbade any of Ablyazov's nominees or agents from helping him move or launder assets, on pain of civil and criminal liability. (*See, e.g.*, PTX-39; PTX-47).  Many of Ablyazov's co-conspirators and nominees lacked his ability to fund a global legal defense with billions in ill-gotten wealth, thus many pleaded guilty in criminal proceedings or cooperated in civil proceedings related to Ablyazov's theft from BTA. (Trial Tr. 157:14-20, 161:1-8, 161:15-20 (Sadykov Testimony)).

97.     In light of these challenges, Ablyazov and his son-in-law Ilyas sought to monetize and launder key assets that had not then been discovered by BTA.  Ablyazov turned to Ilyas notwithstanding that Ilyas was himself listed on the freezing orders' schedules of the nominees and agents forbidden from transacting in the stolen funds that Ablyazov controlled.  (PTX-47; Trial Tr. 762:16-19 (Sater Testimony) (recognizing the freezing orders "were expanded to include Ilyas Khrapunov as well")).

98.     It was against this backdrop that Ablyazov deployed Ilyas's assistance to monetize and launder Ablyazov's interest in the Zhaikmunai investment.  (Trial Tr. 842:25-843:4 (Fliegler Testimony)).  In November 2011, Ablyazov transferred Lineford's interests in Zhaikmunai to Northern Seas Waterage ("NSW"). (PTX-136; Monstrey 7/17/18 Dep. 78:5-9, 78:12-79:5).

99.     NSW was controlled by Ilyas and Ablyazov, and nominally owned by another family member, Gennady Petelin. (Ilyas Khrapunov 2/01/18 Dep. 151:20–24; Monstrey 07/17/18 Dep. 82:9–10).  Petelin is related to Khrapunov by marriage: Ilyas's sister Elvira was married to Dimitri Kudryashov, who is Petelin's son.  (Trial Tr. 843:16-17 (Fliegler Testimony)); PTX-801 at 17).



(PTX-801 at 17).

100.    The purpose of NSW itself was to conceal Ablyazov's role and the true source of the stolen BTA funds. NSW is a shell company assigned to Petelin in 2011, (Ilyas Khrapunov 2/01/18 Dep. 151:20–24; Monstrey 7/17/18 Dep. 82:9–10), but beneficially owned by Ilyas. (Monstrey 7/17/18 Dep. 17:12-18:1; 83:17-22). At Ilyas's direction, in or about 2011, a nominee agreement for NSW between nominal owner Petelin and nominee Annick L. Razafindrakoto and a deed of trust for NSW signed by both were backdated to November 26, 2007, to create the appearance that NSW operated as a legitimate business for years prior to its creation, and prior to the issuance of the English freezing orders. (PTX-155 at 78–84).

101.    NSW maintained its bank account with FBME, a Cyprus bank which was shut down in 2014 after being designated by the United States as a foreign financial institution of primary money laundering concern under the USA PATRIOT Act. (PTX-231; Khrapunov 2/01/18 Dep. 252:19-252:21, 252:24-253:5; Trial Tr. 863:24-864:12 (Fliegler Testimony)).

24

102.    Ablyazov directed Monstrey to pay the "Tradestock loan" used to purchase Zhaikmunai to NSW, instead of paying it back to Lineford.  Monstrey paid the money to NSW after Khrapunov told him that the debt had been transferred to NSW, but Monstrey did not receive any documentation.  (Monstrey 7/17/18 Dep. 78:5-9, 78:12-79:5).

103.    In the fall of 2011, Monstrey prepared and executed a set of four documents purporting to transfer Sartfield's right to be repaid under the so-called Tradestock "loan"—then deemed to be worth $439.6 million—to NSW, and he backdated those documents to April 2009 at Ilyas' direction, before the date of the original 2009 U.K. freezing orders.  (Monstrey 7/17/18 Dep. 81:14-18, 81:20-82:10, 88:23-89:1, 89:3-6).

104.    There are multiple backdated documents that collectively purported to transfer the right to repayment from Sartfield to NSW.  One is a deed settlement signed in November 2011 and backdated to April 10, 2009, in which Sartfield is discharged of its purported debts to Lineford in exchange for entering a new "loan facility" with NSW. (PTX-138 at 1-2). The stated purpose of this deed settlement was to release Sartfield of any obligations—including its obligation to pay Lineford for the purported Tradestock "loan."  (Monstrey 7/17/18 Dep. 88:2-8).

105.    Another is a letter backdated April 10, 2009, and co-signed by Ilyas as witness, in which Ablyazov told SMP that he had transferred "all [his] beneficial interests" in Lineford to NSW.  (PTX-140; *see also* Monstrey 12/12/18 Dep. 30:14-23).

106.    And yet another is a deed poll signed in November 2011, backdated to April 10, 2009, and co-signed by Ilyas as witness, in which Ablyazov purported to release Monstrey-owned Sartfield from obligations related to the purported Tradestock "loan." (PTX-141 at 1–2; *see also* Monstrey 12/12/18 Dep. 31:10-20 (authenticating deed poll and Ablyazov's signature)).

107.    Petelin, however, produced alternative versions of these backdated records purporting to show that he was the beneficial owner of the Zhaikmunai investment. (PTX-206 (letter); PTX-207 (deed poll)).

108.    Whereas the authenticity of the documents produced by Monstrey, described in paragraphs 104 and 105 above, is corroborated by versions obtained from an independent third party (SMP) that maintained those documents contemporaneously as of their signing in 2011, (*see, e.g.*, PTX-113 (SMP-produced version of PTX-141)), the versions produced by Petelin are forgeries and were not maintained by SMP Partners. (*Compare* PTX-207, *with* PTX-113).

109.    Plaintiffs' handwriting expert – the former Chief Document Examiner for the U.S. Secret Service – confirmed that the signatures on the letter and deed poll produced by Monstrey match Ablyazov's and Ilyas Khrapunov's. (Trial Tr. 381:16-24 (Hargett Testimony), referencing PTX-140 and PTX-141).

110.    Shortly after the 2011 execution of the four backdated documents, (PTX-138, PTX-140, PTX-141), Sartfield made nine payments to NSW totaling $439,999,271, representing the principal on the "Tradestock loan" plus profits. (Trial Tr. 838:16-20, 844:4-15 (Fliegler Testimony); PTX-801 at 1, 6; PTX-258 (Deutsche Bank bank statement); PTX-231 (NSW transfer spreadsheet); PTX-220 (Sartfield ING Bank bank statements); PTX-221 (Sartfield wire instructions; PTX-136 or -140 (letter transferring Lineford interest in Monstrey's debt to NSW, signed by Ablyazov and produced by Monstrey); Monstrey Dep. 7/17/18 78:5-9, 78:12-79:5 (explaining PTX-136 that Lineford is Ablyazov and that Ilyas told Monstrey to pay NSW); PTX-116 (payment instructions from Claremont to ING to make first payment to NSW); PTX-132 (N project chart)).

111.    These payments ignored the payment schedule and the default terms set forth in the "loan facility" agreement. (*See* PTX-138).

> ### 4. Anticipating the Receipt of $440 million from the Zhaikmunai Investment, Sater and Ilyas Entered Into a Consulting Agreement to Compensate Sater for His Assistance With Laundering the Stolen Funds.

112.    In February 2012, Sater entered into a consulting agreement with Swiss Promotion Group ("SPG"), represented by Ilyas Khrapunov, to assist Ilyas in "the development of partnership projects" and "the structuring, the promotion and development of the business plan of [SPG]." (PTX-438).

113.    The Consulting Agreement provided for (1) monthly payments of $30,000 as base compensation; (2) monthly payments of $2,500 to cover medical insurance; (3) biannual bonus payments of $180,000; and (4) 15 percent of the profit of SPG. (PTX-438). In total, the Consulting Agreement provided for annual pay of $750,000 plus profit participation. (*Id.*).

114.    As a result of the consulting agreement, Sater and his entity Global Habitat Solutions received various payments from Ilyas's companies Adlux and RPM USA LLC ("RPM USA"), which Ilyas used to invest the misappropriated funds. (PTX-801 at 7, 20).

115.    RPM USA was wholly owned by Ilyas's entity SPG, and Sater and Sater's associate, Daniel Ridloff, were named as directors and were both signatories on RPM USA's bank accounts. (PTX-506 (RPM USA Operating Agreement dated May 30, 2012)). RPM USA received approximately $1 million in funding from Chabrier, Ilyas's counsel, which held an escrow account funded with money from Vilder, Ilyas's entity. (PTX-506; PTX-259 (Deutsche Bank bank statement showing Vilder transactions)).

116.    In reality, GHS received payments from RPM USA of $936,388 from September 2012 through July 2013. (PTX-232; PTX-801 at 19; *see infra* ¶ 173). In addition, from March

2012 to August 2012, GHS also received $401,469 of payments from Adlux, Ilyas's entity, representing recurring payments pursuant to the Consulting Agreement.  (*Id.*).

**5.  Sater and Ilyas Khrapunov Transfer Approximately $100 Million through Shell Entities for Investments in the United States.**

117.    Once NSW received the $439.6 million from the Zhaikmunai investment, Sater and Ilyas started funneling funds through Ablyazov- and Khrapunov-controlled shells, using the money manager Eesh Aggarwal to transfer funds.  (Bourg 9/11/17 Dep. 57:6-57:15; *see also, e.g.*, PTX-279 (Ilyas emails Bourg: "You need to send this to Eesh and do amendment to the loan again.")).

118.    Aggarwal was a "corporate service provider" who provided accounting and bookkeeping services and created companies and transferred money according to Khrapunov's instructions.  (Ilyas Khrapunov 2/01/18 Dep. 61:4-62:1; 62:10-11).

119.    While living in Dubai, United Arab Emirates, Aggarwal also created corporations on Ilyas' behalf; retained records for Ablyazov- and Ilyas-controlled entities; and managed the bank accounts for Ilyas, Ablyazov, and their family members.  (Trial Tr. 849:17-850:1 (Fliegler)).

120.    Aggarwal communicated regularly and directly with Ilyas.  (*See* Bourg 9/11/17 Dep. 57:16-20 (Ilyas contacted Aggarwal and Bourg only send Aggarwal "some e-mails, but at the behest of Ilyas")).

121.    As Sater received payments pursuant to the Consulting Agreement, he too frequently communicated with Ilyas's co-conspirators, like Aggarwal, throughout 2012 and 2013 regarding various investments to launder the Stolen Funds.  (Trial Tr. 727:13-24 (Sater Testimony); PTX-175, PTX-510, PTX-511 (email correspondence between Sater and Aggarwal)).  He knew that Aggarwal was an offshore specialist and keeper of bank accounts for Ablyazov, Ilyas and the Khrapunov family, and understood that Aggarwal was responsible for hiding the true

ownership of the stolen funds.  Sater even met with Aggarwal, who was at the time visiting New York with Ilyas.  (Trial Tr. 725:18-726:2 (Sater Testimony)).

122.    Aggarwal utilized accounts at FBME Bank.  (Ilyas Khrapunov 2/01/18 Dep. 131:11-18 (admitting that FBME was the only bank that he dealt with because "as regards what was handled with Eesh Aggarwal there was FBME Bank"); Trial Tr. 864:9-12 (Fliegler Testimony) (FBME Bank was "sanctioned by several regulators for money laundering"), 1235:23-1236:1 ("FBME Bank was a bank in Cyprus that was used by Ablyazov for sure and the Khrapunovs to—a lot of money would sit there and it was one of their go-to banks")).

123.    Charts prepared by Aggarwal accurately explain the flow of funds from NSW to a company called Telford International, Ltd. ("Telford").  (PTX-167).  Specifically, NSW transferred $369.68 million to Fairlean; Fairlean transferred $369.65 million to Alkine; Alkine transferred $369.61 million to Crownway; Crownway transferred $130.11 million to Speville; Speville transferred $129.16 million to Darwin; and Darwin transferred $95.84 million to Telford.  (PTX-167; PTX-801 at 7).  Each of these entities was nominally owned by Petelin, his wife, or his son; was administered by Aggarwal; and was in fact controlled by Ilyas and Ablyazov.  (PTX-154).

124.    NSW transferred $69.3 million of the $439.6 million to Vilder, which is beneficially owned and controlled by Ilyas.  (Gillieron 10/3/17 Dep. 247:16–20, 249:5–9, 252:14–18, 252:25-253:16, 253:19-22, 255:4-12, 255:15-17; Ilyas Khrapunov 2/01/18 Dep. 63:1-7; *see also* PTX-167 (N project chart)).  And on Ilyas' behalf, Petelin "waived" NSW's "loan" to Vilder and assumed "personal liability" over the debt.  (PTX-154).  Aggarwal helped open the bank account for Vilder.  (Ilyas Khrapunov 2/01/18 Dep. 62:23–63:3).

125.    The evidence presented at trial demonstrates conclusively that the Defendants made the U.S. investments at issue with funds that are directly traceable to the $115.3 million stolen from BTA Bank by Ablyazov through Tradestock.  (PTX-800 at 1; Trial Tr. 816:6-12 (Fliegler Testimony); *see infra* Sec. I.E).  The evidence also conclusively establishes that Petelin and Petelina had no genuine interest in these funds, and that they were only nominee owners of NSW, Telford, Vilder and other entities.  (*See infra* ¶¶ 127-31).

126.    Ilyas could not proceed with particular investments without Ablyazov's approval. (Bourg 9/11/17 Dep. 53:7–17).  Ablyazov made the decisions even when he was imprisoned for three and a half years in France starting in July 2013.  (Bourg 9/11/17 Dep. 45:16-19 (Ilyas told Bourg that the Telford funds "came from Mr. Ablyazov"), 53:7-17 (Ablyazov always made "the final decision" in approving the payments made for the U.S. investments); Khrapunov 2/01/18 Dep. 155:1–4, 209:23–25).

127.    Although Petelin claims to be a billionaire, with the NSW money representing only a portion of his fortune, there is no actual evidence that Petelin had wealth independent of the misappropriated funds at issue in this case.  (*Compare* Khrapunov 2/01/18 Dep. 123:18-124:5 (Petelin purportedly sold his shares in Gazprom for hundreds of millions of dollars); Petelin 8/21/18 (estimating his current worth to be "anywhere from 0.9 to 1 billion") *with* Petelin 8/21/18 Dep. 14:15-17, 14:24-25 (lives in a rented condominium in Orange County, California), 63:25-64:2 (cannot say if he was a beneficiary of any other companies aside from NSW); Petelina Dep. 54:24-55:2, 59:20-25, 60:2-4, 60:6-15, 60:17-18 (despite claiming to know "for a fact" that her husband acquired Gazprom shares, not recalling any other details regarding the shares, including when or even whether her husband supposedly sold those shares for hundreds of millions of

dollars)). Petelin was a public employee in the Russian government with a modest income. (Petelin Dep. 40:14-15).

128.    Further, whereas in a prior litigation, Petelin had testified to his net worth and ownership of Zhaikmunai, (Petelin 8/21/2018 Dep. 36:24-37:14 (estimating his net worth was close to a billion dollars), 38:25-39:2 (admitting he had an investment in Zhaikmunai)), in this action, Petelin pled the Fifth Amendment, 9/16/2020 Dep. 38:1-6, 54:16-18 (pleading the Fifth Amendment and refusing to answer the identical questions asked in the prior deposition).

129.    Petelin testified that Ilyas communicated with Aggarwal on Petelin's behalf to assist in managing Petelin's money. (Petelin 8/21/18 Dep. 64:22-25, 72:7-11, 82:19-23). This testimony is not credible. Petelin supposedly relied on Ilyas as his principal or potentially even sole financial advisor despite Ilyas' youth and lack of experience. (Ilyas Khrapunov 2/01/18 Dep at 88:1-20, 88:22-89:3, 89:5-89:9, 89:11-90:13). However, Petelin provided "no direct payment" for Ilyas' services, despite Ilyas' alleged help with investing hundreds of millions of dollars of Petelin's money. (Petelin 8/21/18 Dep. 75:2-3, 75:5-6). There was no written agreement for Ilyas' purported assistance with Petelin's investments related to Zhaikmunai. (*Id*. at 76:20–24). Petelin could not recall ever receiving a report concerning his supposed investments from Ilyas. (*Id*. at 122:13–16). Although Aggarwal was purportedly managing approximately $440 million of Petelin's money, receiving such a report was "not a primary concern." (*Id.*).

130.    In a prior litigation, Ilyas communicated with Petelin and Petelina's attorney as "an interpreter," while being a party to this same action in which they were witnesses. (Petelin 8/21/18 Dep. 17:13-22; 17:25-18:2). Petelina prepared for her deposition by speaking to her attorneys by phone and Khrapunov joined the call as "an interpreter." (Petelina Dep. 19:6-7, 19:24-20:5). But despite talking with Ilyas and her attorneys for an hour, Petelina claims to not "know anything

about the case" and "[i]t's not something that interests [her]." (*Id.* 19:4-7; 19:24-20:5).  Ilyas also participated in Petelin's communications with his attorney while being a party to the action.

131.    Despite purportedly signing documents that forgave loans for which she was a beneficial owner, (PTX-209 (loan forgiveness letter); *see infra* ¶ 141), Petelina had never heard of Telford prior to her deposition.  (Petelina Dep. 103:24–104:1).  Nor did she recall hearing the name Eesh Aggarwal or his firm, Azure Consultants, in any context, (*id.* 72:17-21), and she had no idea how Aggarwal came to have copies of her passports, (*id.* 75:2-4; PTX-197).

### E. Sater and Mochkin Assisted Ilyas Khrapunov in Laundering the Stolen Funds Through Investments in U.S. Real Estate.

132.    In addition to the proceeds Sater received under his Consulting Agreement with Ilyas, (*see infra* Sec. I.D.4), the Defendants also profited from investments made in the U.S. on behalf of Ilyas and Ablyazov.  (Trial Tr. 816:6-12 (Fliegler Testimony)).  After the Stolen Funds were transferred to NSW and disbursed to the offshore entities discussed above, the Defendants invested the Stolen Funds in the United States through various assets.  (Trial Tr. 858:1-4 (Fliegler Testimony)).  Sater and Mochkin were responsible for sourcing deals in the United States for Ilyas to transfer the misappropriated funds.  (Ilyas Khrapunov 2/1/2018 Dep. 192:20-193:2; PTX-436).  To Ilyas, Sater "was one of our go to persons in US to find opportunities to invest."  (*Id.* 195:16-195:22).

133.    The misappropriated funds were used to acquire the Tri-County Mall debt, the Syracuse Center, three units in the Trump SoHo Condominiums, and to purchase and subsequently fund World Health Networks and Creacard ("PCS").  (Trial Tr. 858:1-4 (Fliegler Testimony)).



(PTX-801 at 1).

### 1. The Tri-County Mall Scheme

134.    The largest investment of the Stolen Funds by Sater and his co-conspirators was the purchase and resale of a note on the Tri-County Mall, a shopping mall in or around Cincinnati, Ohio (the "Note"). (PTX-801; Trial Tr. (Fliegler Testimony) 859:4-9)).  Further, Sater—with the assistance of his co-conspirator Ridloff—diverted to themselves and retained over $35 million of illicit proceeds from the resale of the Note.   (Trial Tr. (Sater Testimony) 737:5-8 (Sater admits he "ran the deal completely" and was involved "[f]rom A to Z")).

#### a. Acquisition of the Note

135.    In early 2013, the noteholder began a bidding process to sell the debt along with all its rights and obligations.  On April 16, 2013, Sater's co-conspirator Ridloff prepared a bid package on behalf of SDG Investment Fund, one of Ilyas's entities, to acquire the senior loan secured by Tri-County Mall.  (PTX-364).  The bid package alleged that the funds held by SDG were from real

investments and that the fund was led by CEO Nicolas Bourg. (*Id.*). Sater knew that SDG was funded with money from the Khrapunov family. (Trial Tr. 1214:17-1215:20 (Sater Testimony)).

136.    On April 22, 2013, Ilyas and his co-conspirators won the bid on the Tri-County Mall note for $28,350,000 and were required to wire a 10% deposit to the lender. (PTX-175 (email from Felix Sater to Khrapunov: "We won the Cincinnati deal…The buying entity is our newco Tri-County Mall Investors, LLC, that [local counsel] formed today.")). That same day, at the direction of Sater and Ridloff, their local counsel created a shell company for the Note acquisition named Tri-County Mall Investors LLC ("TCMI") with the Sole Member listed as Triadou, another of Ilyas's entities. (*Id.*; Cerrito 3/09/17 Dep. 105:18–106:11; Bourg 9/11/17 Dep. 50:20-1:5).

137.    Triadou SPV S.A. ("Triadou") is a special purpose vehicle formed on September 12, 2012, in Luxembourg by Nicolas Bourg at the direction of Ilyas Khrapunov. (PTX-581 at 4; Bourg 9/11/17 Dep. 22:11-15; Khrapunov 2/01/18 Dep. 38:23-39:8). Khrapunov formed Triadou to make investments in U.S. real estate projects. (*Id.*).

138.    Around 2007, Ilyas Khrapunov had previously founded Swiss Development Group SA ("SDG"). (Bourg 9/11/17 Dep. 42:7-10; Khrapunov 2/01/18 Dep. 38:23-8). SDG was incorporated by Harlem Securities, Ltd., which is also owned by Ilyas Khrapunov. (Khrapunov 2/02/2018 Dep. at 14:5-15:10; DTX-194). SDG Capital S.A. is the holding company for Swiss Development Group SA. (Bourg 9/12/17 Dep. 14:5-15:2). SDG Capital wholly owned Triadou until May 2015. (Khrapunov 2/01/18 Dep. 47:3–6; Cerrito 3/09/17 Dep. 20:21–21:3).

139.    Bourg was Triadou's director until October 2014, when SDG's Chief Financial Officer, Cesare Cerrito, was appointed the sole director of Triadou. (Bourg 9/11/17 Dep. 43:6-8, 68:4-10). Triadou had no official place of business nor any offices or employees of its own. (Cerrito 3/09/17 Dep. 26:8-13, 46:10-12).

140. The $2,835,000 deposit for the Tri-County Mall bid was sent in two wires. The first was a $35,000 wire from RPM USA, using funds that came from Vilder. (PTX-240 (TCMI bank records); PTX-160 (SWIFT information showing wire transfer; PTX-581 (Triadou corporate profile showing money came from Telford)). The second wire for $2,800,000 (plus wire fees of $45.23) was sent on April 24, 2013 from Telford's FBME account on behalf of Triadou (the Sole Member of TCMI) to TCMI's escrow account. (PTX-376 (escrow activity for Tri-County Mall); PTX-160, PTX-257, PTX-376 (FBME Bank statements for Telford)).

141. On May 22, 2013, Telford wired $28,000,000 to TCMI's law firm to complete the acquisition of the Tri-County Mall mortgage. (PTX-354 (Chase Bank statement for TCMI)). An October 2, 2013 letter from Petelin's wife, the purported owner of Telford, to Telford's management company states that she waived all loans given by Telford. (PTX-209). She wrote that she assumed personal liability for collecting the debts, included the purported loan of $30,800,000 Triadou owed to Telford. (*Id.*).

142. In connection with the purchase of the Tri-County Mall debt, a fee agreement was entered into between TCMI and Castle & Bishop, a purported advisor for the deal. (PTX-569). Sater's co-conspirator Ridloff entered into this agreement on behalf of TCMI, which included a success fee whereby TCMI as the acquirer agreed to pay a fee of 4 percent of the money paid for the Tri-County Mall debt, of which 1 percent would go to Castle & Bishop and 3 percent would go to co-conspirator Frank Ferrari, one of Ridloff's business associates and the owner of Ferrari Holdings LLC. (*Id.*).

143. On May 23, 2013, Frank Ferrari's company, Ferrari Holdings, received $1.08 million (*i.e.*, 4 percent of the assets of $27 million) from TCMI's escrow account, (PTX-376), and

then wired the 1 percent fee intended to be paid to Castle & Bishop, (PTX-572 (Capital One bank summary for Ferrari Holdings LLC)).

144.    Ferrari separately entered into a fee sharing agreement with Ridloff, through his entity RRMI-DR, where Ferrari agreed to pay RRMI-DR two-thirds of the success fee he received. (F_000002).  As a result, on May 24, 2013 Ferrari Holdings wired $540,000 to RRMI, which in turn wired $345,000 to Bayrock, Sater's entity, on May 30, 2013.  (PTX-572; PTX-265 (Wells Fargo statement for Bayrock accounts)).

145.    The transfer of funds by Ferrari Holdings back to Sater constituted undisclosed, unlicensed brokerage activities.  (Trial Tr. 498:14-499:3, 505:4-21, 519:24-520:10 (Schectman Testimony) (Sater is "wearing two hats…negotiating on your own behalf a commission which is unlicensed and undisclosed is in direct contravention of your duty of loyalty to a principal")).  And as an agent of Ilyas and of the buyer of the note, Tri-County Mall Investors LLC, Sater owed fiduciary duties to maximize value and exhibit undivided loyalty in the transaction.  (Trial Tr. 505:4-11 (Schectman Testimony) ("if you're controlling an entity and you have a fiduciary, you want to negotiate the best deal for that entity")).  But Sater, with the assistance of Ridloff and Ferrari Holdings, violated his fiduciary duty when he, Ridloff, and Ferrari Holdings kept undisclosed payments of illicit funds.  (Trial Tr. 505:12-21 (Schectman Testimony) (Sater "had a personal interest in making sure that was a big pile of money because he was being paid all the way around the horn and was getting a cut from the back end as a broker.  So you can't represent TCMI and say, we are going to pay a certain amount, knowing you're going to eat or take money in an undisclosed fashion from that pile of money"), 816:6-12, 968:12-21 (Fliegler Testimony)).

b. *Resale of the Note*

146.    As noted above, BTA secured numerous final money judgments against Ablyazov

in the United Kingdom from November 2012 to November 2013.  (Trial Tr. 410:16-18 (Nartay

Testimony); *see supra* Sec. I.B.6).  In July 2013, Ablyazov was arrested in France after he fled the

U.K. criminal contempt judgment.  (PTX-617; Bourg 9/11/17 Dep. 55:18-55:25; Ilyas Khrapunov

2/1/18 Dep. 115:1-4).  Sater and Mochkin read the widespread reporting in publications worldwide

that Khrapunov and Ablyazov were being pursued by BTA in 2013 and that Ablyazov had been

imprisoned.  (Trial Tr. 685:3-12, 694:6-12 (Mochkin Testimony) (admitting he sent articles to

Sater in August 2013 and "was doing some Google searching"); PTX-479; PTX-1047 (email

showing Google alert to Sater for Ablyazov's name), 789:23-799:3 (Sater Testimony) (admitting

he and Mochkin exchanged a variety of emails relating to Ablyazov's arrest and the freezing

orders); *see also infra* Sec. I.F).

147.    After Ablyazov was imprisoned, Triadou did not receive any funding from Telford

and it did not itself make any further U.S. investments.  (Bourg 9/11/17 Dep. 56:23-57:4).

148.    In August 2013, FBME froze the bank accounts that Aggarwal managed for

Khrapunov.  (PTX-183 at 2 (email from Eesh Aggarwal to Ilyas Khrapunov on August 18, 2013:

"I talked to C and he is very upset and all funds are frozen with immediate effect.  Therefore, we

are recommending to our client companies that no transactions shall be effected until matters are

resolved.  We would recommend that no further communication with us shall be made except to

arrange the end of month meeting wherein we can discuss all matters in detail.")).

149.    Around the same time, in or around July 2013, Sater and Ilyas resold the debt at

auction to a third party for $45,000,000.  (PTX-354 (Chase bank statement for TCMI)).  On August

30, 2013, $43,395.529.55 was transferred into a bank account in the name of TCMI at JP Morgan

Chase, representing the proceeds of the sale minus costs. (*Id.*) The same day, Sater, not TCMI, transferred $2,586,382 to his entity Bayrock and $2.25 million using the signature authority provided to him by co-conspirator Ridloff to an attorney escrow account for the benefit of MeM. (*Id.*; PTX-237 (Wire Transfer Request executed by Sater, directing funds to be wired to the "Account Name" of "MeM Energy Partners, LLC"); PTX-488 (letter from Arnie Herz to Mendel Mochkin describing "the following disbursements from the $2,250,000 wire on 8/30/13").

150.    Next, Sater, Ridloff and Mochkin took additional steps to conceal the use and source of the funds. On or about September 3, 2013, at the instruction of Sater, Ridloff, and Mochkin, $827,276 of the $2,250,000 payment that MeM received was transferred from the attorney escrow account held in MeM's name to Ridloff's company, RRMI-DR. (PTX-488). Also on September 3, 2013, MeM caused $650,000 to be transferred from the escrow account to MeM's bank account. (*Id.*; PTX-234). Then, on October 22, 2013, MeM transferred an additional $599,950 to MeM's bank account, only to transfer the same amount ($599,920 (accounting for a wire fee)) just one day later, on October 23, 2013, to defendant Bayrock Group's account. (PTX-270) (MeM's Wells Fargo account showing the receipt of $599,950 from Herz on October 22, 2013, and a day later transferring those funds to Sater's Bayrock Group Inc. account)).

151.    As their local counsel later acknowledged, TCMI's Operating Agreement "did not appoint Felix Sater as Manager" and that he acted "without written authority under the Operating Agreement" and "without the consent of [TCMI]" when he directed the distribution of proceeds from the sale of the Note. (PTX-559 (October 10, 2013 letter from Herz to Bourg))

152.    Instead of the remaining proceeds reverting back to the initial funder of Tri-County Mall (Triadou), in August 2013, Felix Sater, who was authorized to act as a co-manager of TCMI, diverted the remaining proceeds of the sale ($36,073,196) to a bank account only he controlled

under another entity he formed in New York, identically named Tri-County Mall Investors LLC. (PTX-245; PTX-246; PTX-354; Cerrito 3/09/17 Dep. 105:18-106:11).    From here, Sater transferred the funds to another entity under his control, Sands Point Partners Fund ("Sands Point") from which he personally withdrew funds and transferred $25 million to his wife's granola and health food company, Viktoria's Gourmet Foods.    (PTX-227; PTX-246; Trial Tr. 500:1-16 (Schectman Testimony)).

153.    Sater's wife, Viktoria Sater, testified Sater instructed her to open a bank account for Sands Point and there was absolutely no connection between that entity and her granola company.    (Viktoria Sater Dep. 223:23-23:2, 27:18-19, 27:23-25, 28:3-6, 60:7-10 (adding that "god forbid" her husband would at any point have been an employee of her granola business).

154.    As with the transfer of funds from the acquisition of the note, the Defendants' transfers of funds to themselves in connection with the sale of the note constituted undisclosed, unlicensed brokerage activities.    (Trial Tr. 523:12-524:6 (Schectman Testimony)).    And as an agent of Ilyas and of the buyer of the note, Tri-County Mall Investors LLC, Sater owed fiduciary duties to maximize value and exhibit undivided loyalty in the transaction.    But Sater, with the assistance of Ridloff and MeM Energy, violated his fiduciary duty when he, Ridloff, and MeM Energy kept undisclosed payments of illicit funds.    (Trial Tr. 520:21-522:11 (Schectman Testimony), 816:6-12, 868:7-869:12 (Fliegler Testimony)).



(PTX-800 at 4).

### c. Sater Betrays Ilyas and Retains Tens of Millions in Stolen Funds

155.     Shortly after the resale of the Note, Sater and Ilyas had a falling out.  (Trial Tr. 1212:15-1214:16, 1216:18-1217:3 (Sater Testimony)).

156.     On or about October 30, 2013, Sater's counsel sent Ilyas and Triadou a letter demanding payment of "at least many tens of millions of dollars," purportedly in earned fees. (PTX-357).   The letter referenced "many recordings, made by Sater" that confirm "Mr. Khrapunov's domination and control of the various entities for which he directed Mr. Sater to perform services."  (PTX-357; *see also* Trial Tr. (Piazza Testimony) 809:9-14 (in or around October 2013, Sater asked Piazza to enhance audio files and delete the files immediately after the enhancement was performed)).  Sater insisted he be allowed to retain the funds because the entities in question, such as TCMI, "functioned as Mr. Khrapunov's alter egos," that "the funds for several of those companies belonged to Mr. Ablyazov," and that Ablyazov's funds were used to pay for

the Tri-County Mall debt. (PTX-357 ("Mr. Khrapunov's excuse to Mr. Sater that he could not pay him on this because the transaction was controlled and funded by Mr. Ablyazov.").

157.    On December 19, 2013, after several months of negotiations, Ilyas and Sater entered into a settlement agreement in which Sater agreed to return $20 million of the funds that he misappropriated, in exchange for the relinquishment of Triadou and its subsidiaries' claim to a majority of the sales proceeds, mutual releases, a non-disclosure agreement, and a mutual non-disparagement agreement. (PTX-359). The releases ran to the benefit of numerous individuals and entities who helped Ablyazov and Ilyas launder BTA's stolen funds, but who had nothing to do with the Tri-County Mall dispute. (*See id*).

158.    Sater admitted under oath that he retained approximately $20 million as a result of this settlement. (Trial Tr. 1384:16-22 (Sater Testimony)).

### 2. The Syracuse Development Center Scheme

159.    Sater, Mochkin, and their accomplices also conspired with Ilyas and Ablyazov to launder nearly two million dollars in Stolen Funds through a real estate investment in Syracuse, New York. (Trial Tr. 872:15-873:24 (Fliegler Testimony)).

160.    In April 2013, Sater and Mochkin facilitated an investment of Stolen Funds into a former mental health facility in Syracuse ("Syracuse Center"). (*Id.*) The facility's owner was in bankruptcy and the Syracuse Center up for auction. (Trial Tr. 501:23-502:3 (Schectman Testimony), 872:13-18 (Fliegler Testimony)). To participate in the auction, Sater, through RPM USA, funded with money from Vilder, wired a $250,000 deposit, which was used to bid at the auction. (PTX-507 (Chase bank statement for RPM USA LLC)). Instead of using RPM USA, Triadou, SDG or Ilyas Khrapunov as the bidder, Sater listed the bidder as JETS Synagogue. (*Id.*).

161.    Once the deal closed, on August 15, 2013, the Syracuse Center property was transferred from the bankruptcy trustee to an entity named Syracuse Center LLC ("Syracuse

Center"). (PTX-340; PTX-589; PTX-265). Syracuse Center was a subsidiary of Triadou, which in turn was a subsidiary of Ilyas's Swiss company SDG. (*Id.*). Sater and Ridloff were each managers of Syracuse Center and each exercised control over Syracuse Center and its investments. (*Id.*).

162. On or about July 10, 2013, the Syracuse Center acquisition was funded by $1,900,000 transferred from the account of Ilyas's entity ADLUX at a Swiss private bank to the attorney escrow account of Moses & Singer LLP ("Moses & Singer"), one of Sater's longtime law firms. (PTX-325; PTX-358; PTX-800; Trial Tr. 1024:23-1025:1, 1105:1-5 (Wolf Testimony)). ADLUX's funds came from an Ilyas-controlled shell that received its funding from Ablyazov. (Gillieron Dep. at 247:16–248:14, 249:5–9, 252:14–18, 252:25-253:13, 255:4–10 Khrapunov 2/01/18 Dep. 63:1-7; PTX-167 (10/02/13 chart)).

163. Subsequently, on or about August 22, 2013, Sater directed Moses & Singer to transfer $36,000 to MeM from the funds received from ADLUX, as purported compensation for MeM's role as a broker in connection with the Syracuse Center deal. (PTX-480). Sater subsequently paid $40,000 to Daniel Ridloff via check with a memo "Syracuse." (PTX-265; PTX-266; Trial Tr. 873:873:6-12 (Fliegler Testimony)). On November 25, 2013, Bayrock received an additional $177,613 from Moses & Singer. (PTX-589; PTX-265; Trial Tr. 873:14-874:2 (Fliegler Testimony))

164. However, no broker agreement was ever executed between MeM and the purchaser in connection with the Syracuse Center deal. Further neither Sater nor Mochkin have ever had a real estate brokerage license. (Trial Tr. 736:18-24 (Sater Testimony), 639:4-11 (Mochkin Testimony), *see also* 503:15-23 (Schechtman Testimony) ("I was unable to locate a license for any of the defendants or any of their entities")).

### 3. The Trump SoHo Scheme

165.    Sater and Ilyas also laundered more than $3 million in Stolen Funds through the Trump SoHo project in New York.  In 2013, with the assistance of Sater's co-conspirator Ridloff, Elvira and Ilyas purchased three units at the Trump SoHo Hotel Condominium in New York ("Trump SoHo") using funds misappropriated from BTA.  (Trial Tr. 874:18-877:3 (Fliegler Testimony)).

166.    On or about April 4, 2013, at Ilyas's direction, over $5 million in Stolen Funds were transferred from Crownway's account at FBME to Elvira Kudryashova's personal bank account at Wells Fargo.  (PTX-263 (Wells Fargo bank statement for Elvira's personal account)).  On or about April 6, 2013, Ilyas transferred just over $300,000 from his sister's account to the escrow account of Jajan PLLC, an escrow account held for the purchase of the Trump SoHo units.  (PTX-263).  The three units were purchased for a total of $3,025,000.  (Trial Tr. 875:17-19 (Fliegler Testimony)).

167.    Prior to the purchase of the units, Sater's co-conspirator Ridloff entered into a consulting agreement with the units' seller.  (PTX-404; PTX-406; PTX-408).  The agreement provided that Ridloff would receive five percent of the net purchase price, or $151,250.  (PTX-404).  Ridloff agreed to split 50/50 with Sater the commission from the Trump SoHo units—a commission not disclosed in Ridloff's agreement with the seller.  (PTX-406; PTX-408).  In sum, Sater received $75,000 in profits from the Trump SoHo transaction, effected using Stolen Funds.

### 4. World Health Networks Scheme

168.    Among the earliest schemes through which Sater and Ilyas invested the Stolen Funds in the United States was through a company named World Health Networks ("WHN").

169.    While WHN was held out as a legitimate investment in a medical start-up company, in fact, it was intended to commit fraud on the United States and to provide cover to move the

Stolen Funds out of FBME and into the United States, where they could be spent by Sater and his co-conspirators. (Trial Tr. 877:8-17, 877:24-880:11 (Fliegler Testimony)).

170.    In June 2012, Ilyas, through Sater and Ridloff, began assessing the purchase of WHN (then-named Health Station Networks, Inc. ("HSNI")) for the purpose of buying Ilyas's sister Elvira residency with an investor visa. (PTX-447 (emails between Sater, Ilyas, and Herz discussing the purchase of HSNI "[w]ith the goal of Elvira's immigration visa the prime goal"); Trial Tr. 459:3-7 (Herz Testimony) (explaining "the primary reason" for Elvira being the ultimate owner of WHN "is that she was trying to get a visa, which was permitted under the US immigration laws if you made an investment"). Ilyas and Sater then decided to purchase the company, through an entity nominally owned by Elvira, named RPM-MARO LLC ("RPM Maro"). (PTX-447 ("the investment should be made through RPM-Maro LLC which entity should be 100% owned by Elvira personally"); Trial Tr. 458:2-10 (Herz Testimony); PTX-324 (RPM Maro operating agreement designating Elvira as owning 100 percent of the company). RPM Maro was purportedly wholly owned by Elvira, only Sater and Ridloff were listed as signatories on RPM Maro's bank account in 2012. (PTX-533). Sater and Ilyas's lawyer, Herz, resigned after Elvira was made the 100% owner because "way too many questions surround her." (PTX-450).

171.    The operating agreement for RPM Maro cites an initial $3 million capital contribution from Elvira. (PTX-324). However, instead of Elvira making the contribution, $3 million was transferred from Crownway to RPM Maro on July 20, 2012. (PTX-509). In addition to the $4 million received from Crownway, RPM Maro received $1 million from Vilder on January 9, 2013 which was subsequently used to fund WHN. (*Id.*)

172.    Sater knowingly misrepresented that Kudryashova was the source of funds for WHN, when at all relevant times, Sater knew that Kudryashova was neither the beneficial owner

nor funder of WHN.  For example, on July 17, 2012, Sater emailed the conspirators' Dubai-based accountant and offshore administrator, Aggarwal, requesting a wire transfer of "the sum of $3,000,000.00 (Three Million Dollars)" and "a letter on letterhead of a reputable law firm or accounting firm attesting that these funds belong to Mrs. Kudryashova."  (PTX-511 (Sater subsequently forwards Aggarwal's email to Herz requesting that he "send over documentation to satisfy Mr. Eesh's request").  On or about July 20, 2012, Crownway transferred $3 million to RPM Maro.  (PTX-509).

173.    Not only did Sater help facilitate the acquisition of WHN and subsequent transactions to invest the misappropriated funds, but he received payments directly from the transaction.  Ilyas's entity RPM USA, equipped with an escrow account with money from Vilder, invested millions of dollars into WHN.  (PTX-506; PTX-507; Trial Tr. 879:17-880:11 (Fliegler Testimony)).  As discussed above, (*see infra* Sec. I.D.4), Sater entered into a consulting agreement with Ilyas's entity SPG, where he agreed to assist in the "structuring, the promotion an development of the business plan of [SPG]," including by creating "new strategic opportunities for SPG."  (PTX-438).  As a result of the Consulting Agreement, Sater and his entity, Global Habitat Solutions, received various payments from RPM USA.  (PTX-232; PTX-801 at 19).  Sater made various transfers to pay his American Express card directly from RPM USA and withdrew approximately $12,000 in cash from the RPM USA bank account in September 2013, around the time of his falling out with Ilyas.  (PTX-507).

174.    Elvira was a front for RPM Maro.  Elvira did not remember whether or not she owned RPM Maro and Crownway Limited.  (Kudryashova 9/17/2020 Dep. 43:16-17 ("I think I did" own the company RPM Maro"), 72:16-73:1 ("I don't recall exactly" whose company was Crownway Limited), 44:22-45:01)).  Nor did she have any knowledge about World Health

Networks.  (Kudryashova 9/17/2020 Dep. 88:12-18 ("I am not aware of what happened" to the company, "I don't know" if it still exists, and "I don't recall" if it generated any revenue")).  In May 2013, Sater's co-conspirator Ridloff hesitated to disclose to a lender inquiring about the ownership of WHN.  (PTX-463 (while Herz wrote "Legally, its Elvira Kudryashova," Ridloff responded, "Will be risky to disclose her as owner," and linking to a negative news article as the "first thing that comes up in a Google search").

175.    In reality, it was Sater who ran RPM-Maro with Ilyas.  (Kudryashova 9/17/2020 Dep. 67:7-9 (Elvira would rely on Sater to run RPM-Maro on a day-to-day basis), 70:17-71:1 (Sater decided where to send funds that RPM-Maro received, managed the bank accounts for RPM-Maro, and would handle the finances of RPM-Maro)).  And the source of funds was money misappropriated from Plaintiffs, laundered through Crownway, which was an entity nominally owned by Dmitry Kudryashov.  (Trial Tr. 877:8-880:11 (Fliegler Testimony); *see also* Petelin 9/16/20 Dep. 118:9-22 (recognizing Dmitry's signature on a letter stating "I am the beneficial owner of Crownway," but pleading the Fifth Amendment as to whether Dmitry was, in fact, the beneficial owner of Crownway)).

### 5.  Creacard (PCS) Scheme

176.    In another scheme to launder the Stolen Funds, Sater and Ilyas conspired to use RPM USA to purchase an interest in a payment card processing business named Creacard S.A. or Payment Card Systems ("PCS").  As described above, RPM USA was beneficially owned by Ilyas (through SPG) and controlled by its directors, Sater and Ridloff.  (PTX-506).

177.    Pursuant to a non-binding term sheet between RPM USA and the seller to purchase 75.59 percent of PCS for 5.5 million euros, on November 13, 2012, a $1.2 million deposit was made by RPM USA to an escrow account.  (PTX-507).  A week prior, RPM USA had received approximately $1.2 million from Vilder.  (*Id.*)

178.     Despite the term sheet being signed by RPM USA, Ilyas and Sater chose to replace RPM USA with a different purchasing company after due diligence was partially completed. (PTX-525).  Additionally, RPM USA needed to hire French counsel as part of the negotiation process, but encountered challenges due to Ilyas's involvement.  (PTX-527).  After this, Sater instructed counsel on the Creacard deal to only BCC or forward emails with the sellers to him and Ilyas.  (PTX-530).

179.     Ultimately, a new entity was created in Luxembourg called Techvest S.A. ("Techvest") to finalize the purchase of PCS and one of Ilyas's co-workers, Lloyd LaMarca, was represented as its purported beneficial owner.  (PTX-539).  Sater testified that he knew LaMarca was a "front" for Ilyas on this transaction.  (Trial Tr. 735:23-736:8 (Sater Testimony)).

180.     The initial deposit that RPM USA wired to the escrow account for the purchase of PCS was returned to RPM USA, the entity that Sater used to pay himself a "consulting fee" and other payments.  (Trial Tr. 880:25-881:13 (Fliegler Testimony); *see supra* Sec. I.D.4).

### 6.    The Defendants and Their Co-Conspirators Controlled and Retained Millions of Dollars in Plaintiffs' Stolen Funds

181.     The total funds that passed through bank accounts that the Defendants and their co-conspirators controlled as part of these five schemes and pursuant to Sater's Consulting Agreement with SPG/Ilyas are summarized in the below chart:

| Defendant / Co-Conspirator | WHN | Trump SoHo | Syracuse | Tri-County Mall | Consulting Payments | Total Amount |
|---|---|---|---|---|---|---|
| Bayrock Group | - | - | $571,448 | $3,531,302 | - | $4,102,750 |
| Daniel Ridloff | $20,080 | $151,250 | $40,000 | $827,276 | - | $1,038,606 |
| Felix Sater | $316,748 | $75,000 | - | $36,195,892 | - | $36,587,640 |
| Ferrari Holdings | - | - | - | $1,080,000 | - | $1,080,000 |

| | | | | | |
|---|---|---|---|---|---|
| Global Habitat Solutions | $936,388 | - | - | - | $401,469 | $1,337,857 |
| MeM Energy Partners | - | - | $36,000 | $2,250,000 | - | $2,286,000 |
| RRMI-DR | - | - | - | $540,000 | - | $540,000 |

(PTX-801 at 30).

182.    The total funds that the Defendants and their co-conspirators each kept for themselves are as follows:

| **Defendant / Co-Conspirator** | **Amount** |
|---|---|
| Bayrock Group | $4,062,750 |
| Daniel Ridloff | $963,606 |
| Felix Sater | $16,587,640 |
| Ferrari Holdings | $270,000 |
| Global Habitat Solutions | $1,337,857 |
| MeM Energy Partners | $686,052 |
| RRMI-DR LLC | $195,000 |
| **Total** | **$24,102,905** |

(PTX-801 at 29).

### F.  The Defendants Knew That the Funds They Helped Ilyas and Ablyazov Invest Were Stolen and Subject to Worldwide Freezing Orders.

#### 1.  Sater and Mochkin Knew That the Stolen Funds Were the Rightful Property of the Plaintiffs.

183.    As discussed below, Sater and Mochkin knew the money funding the U.S. real estate investments was money stolen by Ablyazov and the Khrapunov family.  (*See also, e.g.*, Trial Tr. 725:4-17, 737:19-22 (Sater Testimony), 671:9-14, 696:1-8 (Mochkin Testimony) (admitting

to knowing that SDG was investing Khrapunov family money); PTX-357 ("the funds for several of those companies belonged to Mr. Ablyazov").

184.    On numerous occasions, Ilyas told Sater and others that the source of the Stolen Funds was his father-in-law, Ablyazov, and that Ilyas was in regular communication with Ablyazov about these investments.  (Trial Tr. 797:13-17, 1215:8-25 (Sater Testimony)).

185.    Mochkin also knew Sater was working closely with Ablyazov and that the Khrapunov family's money was being invested in SDG.  (Trial Tr. (Mochkin Testimony) 671:9-14, 698:4-6 (Mochkin Testimony)).

186.    Sater admitted that he understood the money for the U.S. investments came from Ilyas, who he believed had "a lot of money" from the Khrapunov family.  (Trial Tr. 1214:17-22, 1235:23-1236:1 (Sater Testimony)).  According to Sater, although Viktor was accused of "stealing $300 million out of Kazakhstan," Sater "knew that that was a probably a very low number" and "[i]f all he stole was $300 million, the other ministers would have laughed him out of cabinet meetings."  (Trial Tr. 1214:17-1215:7 (Sater Testimony)).

187.    Sater did not care whether the money was dirty, and even if he knew the money was dirty, he "probably" would have invested it anyway.  (Trial Tr. 797:18-798:7 (Sater Testimony)).

188.    Mochkin also knew that Ablyazov and the Khrapunovs obtained the stolen funds illegitimately and that BTA Bank was actively seeking to recover the funds and had secured worldwide freezing orders that covered Ablyazov's assets.  (Trial Tr. 669:8-21, 696:22-699:1 (Mochkin Testimony); PTX-486).

189.    While MeM was assisting with Khrapunov's investments in the Note and the Syracuse Center, Mochkin admits that in July 2013 he was doing internet research about Ablyazov

and the U.K. court proceedings against him. (Trial Tr. 690:25-691:3 (Mochkin Testimony)). For instance, on July 16, 2013, Mochkin sent Sater an email with excerpts from an article stating: "What followed was unprecedented in the English courts. Ablyazov was accused of siphoning billions of dollars from the bank into an underworld of offshore accounts. He retaliated that the Kazakh government had persecuted him because of his political opposition to the ruling regime." (PTX-475). Two days later, Mochkin sent Sater another article that discussed the 22-month jail sentence that Ablyazov received and the worldwide freezing orders against him. (PTX-581).

190.    Mochkin and Sater were also aware that Swiss prosecutors were interrogating and investigating Ablyazov's extended family, including the Khrapunovs, for money laundering. (Trial Tr. 796:8-18 (Sater Testimony)). On August 14, 2013, Mochkin sent Sater an email with the subject line, "Swiss interrogate Kazakh oligarch Ablyazov's extended family." (PTX-479). The Reuters article quoted in Mochkin's email to Sater describes how Swiss prosecutors had "effectively frozen some assets" of the Khrapunov family, that Viktor Khrapunov was accused "of using public money for property investments" while mayor in Kazakhstan, that the Swiss prosecutors were investigating whether "the money that came from Kazakhstan was earned illegally" and could be considered "money laundering," and that "'restrictions' had now been placed on the Khrapunov family's funds following allegations about a very large amount of money." (*Id.*). The article states that "Khrapunov's son Ilyas is a Geneva-based real estate developer married to Ablyazov's daughter Madina." (*Id.*).

191.    On October 15, 2013, Mochkin sent Sater an email with the subject line "bta" and provided information concerning BTA's asset recovery efforts. (PTX-486). Mochkin's email states, "Should you have any reasons to believe that assets in regard of which you were contacted to are actually owned by Mr. Ablyazov, kindly immediately contact lawyers of BTA Bank." (*Id.*)

192.     On October 22, 2013, the same day Mochkin received $599,950 in proceeds from the sale of the Tri-County Mall Note, (PTX-270), Mochkin forwarded his October 15 email concerning BTA's asset recovery efforts to Sater again, (PTX-486).  The very next day, Mochkin transferred $599,920 to Sater at his company's account in the name of Bayrock Group Inc. (*Id.*; Trial Tr. 659:21-24 (Mochkin Testimony)).

193.     After MeM received payments of illicit proceeds, Sater and Mochkin continued to monitor the fraud cases against Ablyazov. For example, on November 8, 2013, Sater sent Mochkin an article via an underlying Google news alert for the name "Mukhtar Ablyazov."  (PTX-1047). The article was entitled "Spain to extradite BTA Bank ex-CEO's security chief."  (*Id.*)

194.     On January 9, 2014, Mochkin emailed Sater a link to a Bloomberg article concerning the "Hunt for Kazakh Bank's Missing $6 Billion," which described "a court order freezing all of Ablyazov's holdings worldwide and directing him to disclose their whereabouts." (PTX-496).

195.     Sater knew, when he received stolen funds, that there were freezing orders against Ablyazov's assets but insists he "was not bound by U.K. orders" because he is "not a subject of the British crown.  (Trial Tr. 797:23-798:7 (Sater Testimony)).

196.     Sater understood that the Worldwide Freezing Orders forbade any dissipation of Ablyazov's assets.  (Trial Tr. 750:20-752:2 (Sater Testimony)).  As part of their frequent discussions about the investment of the Stolen Funds, Sater and Ilyas regularly discussed the Worldwide Freezing Orders and ways to evade them.  (Trial Tr. 762:12-763:9 (Sater Testimony)).

197.     Sater and Mochkin also knew that the Khrapunovs were attempting to evade those freezing orders by moving their assets around the world.  (Trial Tr. 764:1-5, 798:8-13 (Sater

Testimony) ("They were being chased and looked at, and all these assets everybody was looking for them, of course. They were trying to hide them, yes.")).

198.    Sater understood that Ilyas was trying to hide his involvement in the U.S. investments by presenting an individual named Phillipe Glatz as the beneficial owner of SDG. (Trial Tr. 742:10-15 (Sater Testimony)).

199.    Among the other investments on which Sater and Ilyas conspired, in or about early 2013, Sater helped facilitate the acquisition by Triadou of the Flatotel, a New York City hotel that was to be redeveloped into condominiums. (Trial Tr. 443:18-445:2 (Herz Testimony), 745:12-746:3, 746:19-20 (Sater Testimony) ("I was pretty involved in the Flatotel acquisition that they made.")). Prior to closing the Flatotel deal, Khrapunov tried to hide his ownership of and control over Triadou by falsely presenting Glatz as the owner. (Trial Tr. 747:18-24 (Sater Testimony) (Glatz "would have never been the owner. He was just a front.")). Jehoshua Graff, Chetrit's attorney involved in papering his real estate deals with Triadou, sought to ascertain the "warm bodies" who owned SDG from Triadou's counsel two days in a row to fulfill KYC requirement prior to closing the Flatotel transaction. (PTX-348 ("It is critical that we ascertain ASAP the warm bodies who own interest in SDG. If we don't provide the information, we are in jeopardy of not closing on time.")).

200.    Counsel to Ilyas and Sater told Graff that Glatz was the owner of SDG and Triadou to close the Flatotel transaction, *before* Glatz purchased SDG. (PTX-348 at 2 (the lawyer "just spoke with Josh Graff. He told me to send him the info of Mr. Glatz, and he will present Glatz as the beneficial owner. He understands that Mr. Glatz is traveling and we cannot close until March 25"), at 3 (Khrapunov claims "[t]here will be no red flags with Mr. Glatz")).

201.    Although Glatz acquired SDG and its subsidiary on paper, with money provided by Ilyas, Ilyas retained actual ownership and control of the companies.  (Trial Tr. 750:4-19 (Sater Testimony) ("I think at that point SDG got, let's call it for lack of a better word, smacked around based on the Khrapunov family being in the company, and he brought in Glatz to prevent people from knowing that he owned the company")).  Ilyas himself admitted he "was involved for sure" in SDG for years after Glatz bought SDG.  (Ilyas Dep. 106:6-11 (admitting that he directed bidding on behalf of Triadou in the auction to purchase the Syracuse in 2013, and in the efforts to sell the same property in 2015.

202.    Long after Glatz supposedly acquired SDG and long after Ilyas ceased to have any documented relationship with SDG (including as an employee or consultant), Ilyas held himself out as its owner and transacted business on its behalf.  (PTX-388, PTX-389, PTX-390, PTX-391, PTX-392, PTX-393 (emails showing Ilyas's involvement in Syracuse Center)).

203.    Sater knew of Ilyas's continued control and repeatedly admitted that "effectively" Ilyas always controlled SDG, and Glatz was nothing more than a proxy, front and shill for Ilyas to hide behind.  (Trial Tr. 742:10-743:15, 747:21-747:24, 754:9-19 (Sater Testimony)).  Indeed, Sater prides himself on having turned Glatz into a running joke with the employees of SDG.  (*Id.* 752:3-6).

204.    And Glatz was not the only shill that Ilyas used, and of whom Sater was well aware.  Sater viewed Lloyd LaMarca—the purported beneficial owner of Techvest in the PCS scheme (*see supra* ¶ 179)—as a front, a shill, and someone who had "zero" to do with the deal.  (*Id.* 736:4-17).

205.    Sater understood that Ilyas was misrepresenting the ownership of his entities and admitted that by using fronts and shills, like Glatz and LaMarca, he knew he (Sater) was lying to the counterparties involved in the various U.S. investments.  (*Id.* 754:9-23, 756:14-16).  Sater

believes in "buyer beware"—he asserted that he "wasn't legally obliged to tell the seller, the buyer of anything, to tell anyone of dirty laundry of a deal I was working on. They had a due diligence department. If they found it, they found it. If they didn't find it, they didn't find. But no, I didn't stop it. And yes, I continued doing business with whatever Ilyas's concocted story on SDG was, yes, sir." (*Id.* 756:4-13).

206.    Other third parties knew of Ilyas' continued control, too. One bank, Black Sea Trade & Development Bank, refused to complete a $6 million loan agreement with SDG because it completed due diligence and thought Glatz was not a "credible purchaser of SDG Capital." (Bourg 9/11/17 Dep. 70:3–71:12; PTX-353 at 3 (e-mail thread including Black Sea official, Ilyas, and Bourg) ("I am not persuaded that there's been any real change in the ownership of SDG.")).

207.    The connection between Ilyas Khrapunov and Ablyazov – and the investigations into their money laundering – was obvious at that time and available through public sources. For example, in connection with the Tri-County Mall deal, Sater and Ridloff pursued a mortgage from an investor called Karlin Real Estate, which resulted in the commissioning of a report on SDG. (PTX-467). That report, which was provided to Ridloff and Sater, found that "The wife of Ilyas Khrapunov, Madina Ablyazova, appears to be the daughter of Mukhtar Ablyazov" and "A number of potentially adverse articles and posts on blog forums were found which related to the association of SDG Capital, Swiss Development Group and the Khrapunov family who are reportedly implicated in and subject to investigation in connection with money laundering." (*Id.*) Karlin declined to invest after its background investigation was "not very positive" and revealed that, although Glatz was the purported owner, "Ilyas Khrapunov, the scion of a controversial Kazakh family, owns some portion of the company." (*Id.*)

208.    George Stergiopolous, a mortgage broker who helped Defendants find a lender to assist them in purchasing the Tri-County Mall Note, testified that had he seen this report in June 2013, he "would have walked away."  (Trial Tr. 248:14-16, 263:4-6 (Stergiopolous Testimony)). Neither Sater nor Ridloff provided Stergiopolous with the investigation report on SDG, but Sater and Ridloff asked Stergiopolous to continue trying to find financing for the Tri-County Mall debt regardless.  (*Id.* 248:24-25, 252:3-15, 262:1-6; PTX-501 (approximately a month after Karlin refused to finance the debt, Stergiopolous received another term sheet from a loan investment originator)).

### 2.  Mochkin and Sater Helped Devise a Propaganda Campaign for Ablyazov to "Spin the Story" Concerning Ablyazov's Fraud.

209.    Before MeM received payments from the stolen funds, Mochkin provided Sater with strategic advice relating to Ablyazov's public relations campaign.  (Trial Tr. 1176:22-1177:2 (Mochkin Testimony)).

210.    For example, Mochkin offered to connect Ablyazov with an Italian journalist to write a story on the deportation of Ablyazov's wife after she was determined by an Italian court to be in that country illegally based on a fraudulent visa.  (Trial Tr. 676:23-677:9, 1194:21-1195:2 (Mochkin Testimony)).  On June 11, 2013, Mochkin provided the Italian journalist with the contact information for Ablyazov's attorney Peter Salhas, whom Mochkin described as "Mukhtar's point man." (PTX-580).  After the article was published, Salhas wrote to Mochkin and Sater to thank them "for the introduction" the journalist.  (*Id.*).

211.    Mochkin then wrote to Sater on July 5 and again on July 15 that the article about Italy "needs to be followed up quickly" in order to attack the UK fraud judgments.  (*Id.*)  Mochkin advised that Peter Salhas should "make a case, that the judgment and the prior rulings have a whiff of political malfeasance (Blair contract, blair brother, recent Cameron trip to Kazakhstan etc)" in

an attempt to "get the judgment reopened." (*Id.*) The reference to "Blair contract, blair brother" concerns how Prime Minister Tony Blair took a "trip last week to Kazakhstan," which could "raise question that perhaps the UK lawsuit was politically motivated" because Prime Minister Blair's brother, Justice William Blair, was one of the judges who froze Ablyazov's assets. (*Id.*) It was Mochkin's "general idea" to claim that Justice Blair had somehow corrupted the U.K. proceedings. (Trial Tr. 683:10-16 (Mochkin Testimony)).

212. Around this time, Mochkin also reached out to his contacts for suggestions on how Sater could help falsely amplify Ablyazov's media campaign. (Trial Tr. 674:10-23, 1180:6-22 (Mochkin Testimony); PTX-1044 (Mochkin sending Sater a brochure for intelligence services, including "Political and public opinion influence," "Avatars and Avatar like objects," and "Control and anticipate a social media initiated popular uprising (Arab Spring Egypt)"); PTX-579 (Mochkin sending Sater information on "My Israeli Lawyer" who had "architected and implemented the defense for Yair Klein," who was convicted "for allegedly assisting the Colombian rebels," and "I suggest that a similar strategy be put in place for your people").

213. On July 16, 2013, Mochkin emailed Sater "excerpts from UK case article" and provided advice on what Ablyazov's lawyer, Peter Salhas, should do. (PTX-475). Mochkin advised that "Peter needs to spin the story to Maurizio raising questions of 'political' interference in the UK judiciary." (*Id.*) That same day, he also emailed Sater: "I think u should plant the uk story with Maurizio and La Stampa," an Italian news publication. (PTX-580).

214. Mochkin followed up with Sater multiple times on his advice to spin the story on "political" interference in the UK cases. On July 18, 2013, Mochkin emailed Sater regarding how the "UK court bars fugitive Kazakh oligarch from oral submissions" and told Sater, "U gotta do something." (PTX-581). The next day, Sater emailed Ilyas and Salhas: "We need bloggers to

add significant number of comments to all the articles in all publications. With your permission would like to see who to task with this." (PTX-1045). On July 23, 2013, Mochkin emailed Sater again noting that BTA was "starting to get traction in using the UK fraud case." (PTX-477; *see also* Trial Tr. 693:13-15 (Mochkin Testimony) (admitting to following Ablyazov's case very closely at that time)). Mochkin asked, "Why isn't headway being made in attacking the UK case in the media?" (PTX-477).

215.    Ablyazov and Viktor Khrapunov ultimately adopted Mochkin's advice and have argued, including in their sworn testimony, that the decisions of the judges in the United Kingdom were the result of improper political influence. For example, Ablyazov testified that "Judge William Blair, who ordered to have my assets frozen, is the brother of Tony Blair, who was President Nazarbayev's adviser[.]" (Ablyazov 10/30/2018 Dep. 105:15-105:15, 106:18-22). Likewise, Viktor testified that he has "lots of very interesting information" regarding the U.K. proceedings, including a theory that "the decisions made vis-à-vis Mr Ablyazov" were made by Justice Blair because Prime Minister Blair's salary was being paid by the former Prime Minister of Kazakhstan. (Viktor Khrapunov 1/31/2018 Dep. 118:5-20).

### 3. Sater Hid His Involvement in Litco to Try to Profit Further From the Money Laundering Scheme.

216.    In 2015, Sater, with the assistance of his counsel Robert Wolf, sought to further conceal and profit from his role in Ablyazov and Ilyas's money laundering enterprise by trading on that knowledge to surreptitiously assist in Plaintiffs' asset recovery efforts, for a fee. On June 12, 2015, Plaintiffs executed an agreement with a company named Litco, understanding it was a "consulting agreement" where "Litco as a consultant would procure services in finding information which would lead to BTA's recovery assets efforts." (Trial Tr. 309:9-12 (Nartay Testimony); PTX-593 (Confidential Assistance Agreement ("CAA"))).

217.    At the time Plaintiffs signed the CAA, they did not know who were Litco's shareholders, members or partners.  (Trial Tr. 311:22-24 (Nartay Testimony)).  Prior to signing, Plaintiffs had not met with, communicated with or had dealings of any kind with Sater or Wolf, (Trial Tr. 310:15-21 (Nartay Testimony)).

218.    It was later revealed that Sater was the "100 percent owner of" Litco, (Trial Tr. 1411:13-17 (Sater Testimony)), despite Sater's and his counsel Robert Wolf's deliberate concealment from Plaintiffs of Sater's ownership.  (Trial Tr. 1059:13-22, 1326:20-1327:4, 1351:14-20 (Wolf Testimony) (Wolf told Plaintiffs' counsel the day before Sater's deposition in September 2018 that he did not recall what Sater's interest in Litco was, and that he would have to "get back" to counsel, explaining Sater wanted "to keep his name as far away as possible from the assistance being offered," and acknowledging Magistrate Judge Parker's determination that Wolf lied to Plaintiffs' law firm about Sater's ownership of Litco a day before Sater's 2018 deposition).  For one, Sater is not mentioned anywhere in nor is he a signatory to the CAA; instead Sater's associate Kalsom Kam signed on Litco's behalf.  (PTX-593; Trial Tr. 440:7-19 (Kam Testimony) (testifying he had only an "administrative" but not "official" role at Litco but might have signed agreements on behalf of Litco), 1044:9-16 (Wolf Testimony) (recognizing Kam's signature); *see also* Viktoria Sater Dep. 59:15-19 (Kam was Sater's "employee.  He was basically his gopher")).  Nor did Litco ever interact with Plaintiffs themselves.  (Trial Tr. 1041:21-23 (Wolf Testimony)  ("Litco worked exclusively with Arcanum.").  In fact, Plaintiffs did not learn that Sater owned Litco until his 2018 deposition in a related matter.  (Trial Tr. 428:12-16 (Nartay Testimony)).

219.    Sater concealing his ownership of Litco directly violated certain of the CAA's provisions.  For instance, the CAA provides a representation and warranty of Litco that "no

potential witness which Litco identifies and produces to Arcanum in connection with assistance to be provided under this agreement shall have any ownership interest in Litco or in the monthly fees or recoveries consideration payable to Litco under this agreement."  (PTX-593).  This provision was "very important" to Plaintiffs because "it's wrong and unethical to pay witness[es] for their testimony in any jurisdiction in Kazakhstan or in the states."  (Trial Tr. 311:16-312:19 (Nartay Testimony)).

220.    Similarly, while the CAA provided a release of certain claims for Litco, its officers, directors, and shareholders, that release "shall not apply under any circumstances or in any way to any of the Khrapunov entities or Ablyazov entities."  (PTX-593 (defining "Khrapunov Entities" as "the former Mayor of Almaty, Victor Khrapunov, members of his family and entities which they own or control," and "Ablyazov Entities" as "the former head of BTA, Mukhtar Ablyazov, members of his family and entities which they own or control")).  In other words, Plaintiffs could not release "any person or entity…that would work under direction of Mr. Ablyazov or the Khrapunovs."  (Trial Tr. 314:1-8 (Nartay Testimony)).  This carveout was important for Plaintiffs because it did not want to release a co-conspirator of Ablyazov or the Khrapunovs when Ablyazov's "web of co-conspirators is very complicated, and we do not know everyone, every co-conspirator in his web."  (*Id.* 315:1-9).  As discussed above, Sater acted under Ilyas's control.  (*See supra* Sec. I.D).  Further, Sater's Consulting Agreement with SPG expressly provides that Sater "shall be *at the disposal of* any company part of or affiliated to the SPG, Swiss Development Group, ADLUX and *any other Khrapunov related or affiliated companies*."  (PTX-438 ¶ 2.2 (emphasis added)).

221.    Sater continued to make misrepresentations at trial.  Sater testified repeatedly that, on June 5, 2015, he attended a meeting with Robert Wolf and Peter Garske of Arcanum, an

investigative firm hired by Plaintiffs.  (Trial Tr. 1558:4-17 (Sater Testimony) (Sater is "sure" the record will reflect he testified about the June 5 meeting "many times"); *see, e.g.*, *id.* 1206:17-1; 1225:20-1226:3, 1234:4-8, 1241:24-1242:2).

222.    There was no such meeting between Sater and anyone associated with Plaintiffs, including Garske, in June 2015 or at any time prior to the execution of the CAA.  Sater's testimony about that meeting was knowingly false.  First, Sater admitted that, in the depositions he gave in this action and the related action, he never once testified that he had a meeting with Garske on June 5, 2015.  (Trial Tr. 1566:2-9, 1568:1-20 (Sater Testimony)).

223.    Second, Litco's counsel Robert Wolf—who was purportedly at the fabricated June 5 meeting—repeatedly testified that did not recall a meeting with Sater and Garske in June 2015.  (Trial Tr. 1081:11-14 (did not recall "exact dates"), 1083:20-21 (recalling a meeting with "just Peter Garske and myself" in early June and "I don't recall the first time that Garske came up to my office that anybody else was present other than myself"), 1085:4-8 (could not recall the exact date that he had dinner with Sater and Garske) (Wolf Testimony)).

224.    Wolf's own billing records reflect that no meeting between him and *anyone* other than one of his own law partners occurred on June 5, 2015.  (PTX-1051 (Moses & Singer billing records for Wolf, showing one time entry on June 5, 2015 for 0.5 hours for "Continued review of draft assistance agreement – o/c's Wai Chan"); *see also* Trial Tr. 1317:16-22, 1330:18-25 (Wolf Testimony) (agreeing it is very important for attorneys to be accurate in billing time because each increment of time is passed on to the client, and he does not believe that the June 5 meeting would have been billed under a different client matter number)).

225.    The CAA is another example of Sater knowingly using fronts and shills to conceal his identity and profit from stolen funds.  (*See, e.g.*, Trial Tr. 757:12-19 (Sater Testimony) (in

reference to using Glatz as a front for SDG, admitting it is "of course" a lie to represent to a counterparty in a transaction someone who is disclosing his/her identity, and he "absolutely" knew it was a lie at the time)). Sater believed he was not obligated to tell the truth. (Trial Tr. 756:4-13 (Sater Testimony) ("I wasn't legally obliged to tell the seller, the buyer of anything, to tell anyone of dirty laundry of a deal I was working on.")).

## II. Conclusions of Law

### A. The Court has Jurisdiction

226.    This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because (i) there is diversity of citizenship among the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

227.    Plaintiff BTA Bank is headquartered in Almaty, Kazakhstan [ECF No. 83 ¶ 4]; Plaintiff the City of Almaty is a foreign city in the Republic of Kazakhstan [*id.* ¶ 5]; Defendant Felix Sater is domiciled in New York [*id.* ¶ 6]; Defendant Bayrock Group Inc. is incorporated in Delaware [*id.* ¶ 8]; Defendant Global Habitat Solutions, Inc. is incorporated in New York [*id.* ¶ 8]; and Defendant MeM Energy Partners LLC is incorporated in Delaware [*id.* ¶ 12.]

### B. Plaintiffs Are Entitled to the Conversion Damages Awarded by the Jury

228.    Plaintiffs are entitled to an award of $504,213.33 in damages against Felix Sater for conversion, with pre-judgment interest running from April 2, 2013. Plaintiffs are also entitled to an award of $20,000,000 in punitive damages against Felix Sater for conversion.

229.    As the Court instructed the jury, "A party, who, without authority, intentionally exercises control over the property of another, and thereby interferes with the other party's right of possession, has committed a conversion and is liable for the value of the property." (Trial Tr. 1719:21-25.) Plaintiffs were required to prove three elements by a preponderance of the evidence:

First, the plaintiffs must prove that they had a possessory right or interest in the property at issue. Second, the plaintiffs must prove that defendant Sater exercised unauthorized control over that property in a way that interfered with the plaintiffs' rights. Third, the plaintiffs must prove that there is a specific identifiable fund that defendant Sater is obligated to return. To satisfy this element, it is necessary for the plaintiffs to identify a specific transfer of funds and trace those funds to a knowing recipient – here, defendant Sater. As long as the plaintiffs can identify specific funds that were stolen, it does not matter if the stolen funds were later commingled with other funds.

(*Id.* 1721:13-25.)

230.    The Court further instructed the jury that "Punitive damages are available for conversion where the defendant's conduct was gross, wanton, or deliberate and demonstrates a high degree of moral culpability." (*Id*. 1732:24-1733:2.)

231.    Following the trial that was completed on June 26, 2024, a jury found Sater liable to Plaintiffs for conversion and granted a verdict in favor of Plaintiffs for damages of $504,213.33 against Sater on that claim, with pre-judgment interest running from April 2, 2013.  The jury also awarded Plaintiffs $20,000,000 in punitive damages against Sater for conversion.  (*Id*. 1778:4-17.)

232.    The jury's conclusion is amply supported by the record. Sater exercised unlawful control over substantially more than $504,213.33 in funds stolen from Plaintiffs and began receiving stolen funds as early as April 2, 2013.  To cite just one example, Sater diverted over $36 million in stolen funds from the account of a Delaware-based Triadou subsidiary – Tri-County Mall Investors LLC – to a New York-based company with the same name – Tri-County Mall Investors LLC – that Sater himself owned and controlled exclusively.  (*See* Findings of Fact ("FOF") ¶ 152.)  The fact that the jury awarded less than the total amount of converted funds shows that the jury was following the Court's instructions to ensure that dollars were not double counted across claims.  (*See, e.g.*,1753:9-11 ("Remember that the amount of damages that you award may not exceed the total amount of damages incurred by the plaintiffs."))

233.    Sater's conduct was gross, wanton, or deliberate, and demonstrates a high degree of moral culpability.  There are numerous bases on which the jury could have determined that Sater's conduct was deserving of punishment.  In the example discussed immediately above, for example, Sater had created a fake company with the same name in a different state in order to conceal his theft of stolen money from his own co-conspirator, Ilyas.  As Sater testified, he then moved funds rapidly through multiple accounts in order to prevent banks from unwinding the transactions.  (*See* FOF ¶ 152.)

234.    Sater testified at trial to his own indifference as to the source of funds and his own disregard for communicating truthful information about the owners and source of funds to counterparties.  In fact, Sater testified he did not care whether the money was dirty, and that even if he knew the money was dirty, he "probably" would have invested it anyway.  (Trial Tr. (Sater Testimony) 797:18-798:7)).  Sater also admitted that he helped Ilyas use shills to trick third parties and conceal Ilyas's involvement in the transactions at issue.  (*See, e.g.*, *id.* 754:9-23 ("[T]he purpose of the front, you would agree, is to hide Ilyas Khrapunov's involvement with SDG, right? A. A hundred percent . . . Q. But you were representing to the world, to creditors, to lawyers, to banks, that in fact it was the shill or the front that was SDG, right? A. Yes."); *id.* 756:4-16 ("A. Like they say, buyer beware. I wasn't legally obliged to tell the seller, the buyer of anything, to tell anyone of dirty laundry of a deal I was working on. They had a due diligence department. If they found it, they found it. If they didn't find it, they didn't find it. But no, I didn't stop it. And yes, I continued doing business with whatever Ilyas's concocted story on SDG was, yes, sir. Q. You understand, sir, by using these fronts and shills, you were lying to the counterparty in these deals, right? A. Yes."))  Sater further admitted to extorting Ilyas so that he could keep a larger share of Plaintiffs' funds for himself as his own form of "rough justice."  (*See id.* 1522:12-14

("[W]hen he tried to cheat my out of my share of it, I turned around and took the whole thing as rough justice.")) Sater also admitted to his history of money laundering activities, including his experience using offshore accounts. (*See id.* 770:6-11 ("Q. So it's your preference to use offshore bank accounts when you're laundering money, right? A. Is it my preference? I guess at that moment it was a preference, but I generally, you know, don't have a preference of which bank to use for money laundering activities. Look, in this particular case, yes. In subsequent cases, no.")).

235. And Sater has a substantial criminal history, including being convicted of racketeering involving fraud and money laundering predicates, including strikingly similar money laundering conduct to his activity in this case, which underscores that his conduct was deliberate and with a high degree of moral culpability.

236. CPLR § 5004 sets the statutory interest rate of pre-judgment interest in New York at "nine per centum per annum."

**C. Plaintiffs Are Entitled to the Unjust Enrichment Damages Awarded by the Jury**

237. As to their claim for unjust enrichment, Plaintiffs are entitled to an award of $504,213.33 in damages against Felix Sater, with pre-judgment interest running from April 2, 2013; $2,031,375 in damages against Bayrock Group, with pre-judgment interest running from June 3, 2013; $668,926 in damages against Global Habitat Solutions, Inc., with pre-judgment interest running from April 2, 2013; and $343,000.26 in damages against MeM Energy Partners LLC, with pre-judgment interest running from August 22, 2013.

238. As the Court instructed the jury, "To succeed on a claim for unjust enrichment, a plaintiff must show that the defendant was enriched at the plaintiff's expense and that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." (Trial Tr. 1722:15-19.) Plaintiffs were required to prove three elements by a preponderance of the evidence:

First, the plaintiffs must prove that the defendant was enriched. To satisfy this element, the plaintiffs must demonstrate that the defendant received a financial benefit through the receipt of money or property. Second, the plaintiffs must prove that defendant was enriched at the plaintiffs' expense. To satisfy this element, the plaintiffs must demonstrate that the defendant knowingly received the benefit of funds that were misappropriated from the plaintiffs. Third, the plaintiffs must prove that it would be against equity and good conscience for the defendant to retain what the plaintiffs seek to recover.

(*Id.* 1723:15-1724:1.)

239.    Following the trial that was completed on June 26, 2024, a jury found each of the Defendants liable to Plaintiffs for unjust enrichment and granted a verdict in favor of Plaintiffs for damages on that claim of $504,213.33 against Sater, with pre-judgment interest running from April 2, 2013; $2,031,375 against Bayrock Group, with pre-judgment interest running from June 3, 2013; $668,926 against Global Habitat Solutions, Inc., with pre-judgment interest running from April 2, 2013; and $343,000.26 against MeM Energy Partners LLC, with pre-judgment interest running from August 22, 2013.

240.    The jury's conclusion is amply supported by the record.  Sater, Bayrock Group, Global Habitat Solutions, Inc., and MeM Energy Partners LLC retained a substantially greater amount of funds that were wrongfully taken from Plaintiffs.  (*See* FOF ¶ 182.)  It is against equity and good conscience to permit Defendants to retain the benefit of these money and investments, which Defendants received knowing that the money was stolen from Plaintiffs, and Defendants helped hide the stolen money through a series of real estate and other investments in the United States.

### D.  Plaintiffs Are Entitled to the Money Had and Received Damages Awarded by the Jury

241.    As to their claim for money had and received, Plaintiffs are entitled to an award of $504,213.33 in damages against Felix Sater, with pre-judgment interest running from April 2, 2013; $2,031,375 in damages against Bayrock Group, with pre-judgment interest running from

June 3, 2013; $668,926.50 in damages against Global Habitat Solutions, Inc., with pre-judgment interest running from April 2, 2013; and $343,000.26 in damages against MeM Energy Partners LLC, with pre-judgment interest running from August 22, 2013.

242.    As the Court instructed the jury, "To succeed on a claim for money had and received, a plaintiff must show that the defendant you are considering received money belonging to the plaintiff; that the defendant benefited from the receipt of that money; and that it is against equity and good conscience to permit that defendant to retain what is sought to be recovered." (*Id.* 1724:17-22.)  Plaintiffs were required to prove three elements by a preponderance of the evidence:

> First, the plaintiffs must prove that the defendant knowingly received money from the plaintiffs. Second, the plaintiffs must prove that the defendant benefited from the receipt of that money. Third, the plaintiffs must prove that it would be against equity and good conscience for the defendant to keep that money.

(*Id.* 1725:17-23.)

243.    Following the trial that was completed on June 26, 2024, a jury found the Defendants liable to Plaintiffs for money had and received and granted a verdict in favor of Plaintiffs for damages on that claim of $504,213.33 against Sater, with pre-judgment interest running from April 2, 2013; $2,031,375 against Bayrock Group, with pre-judgment interest running from June 3, 2013; $668,926.50 against Global Habitat Solutions, Inc., with pre-judgment interest running from April 2, 2013; and $343,000.26 against MeM Energy Partners LLC, with pre-judgment interest running from August 22, 2013.

244.    The jury's conclusion is amply supported by the record.  Sater, Bayrock Group, Global Habitat Solutions, Inc., and MeM Energy Partners LLC received substantially more money through the investments in property using funds that were wrongfully taken from Plaintiffs.  (*See* FOF ¶ 182.)  It is against equity and good conscience to permit Defendants to retain the benefit of these money and investments, which Defendants received knowing that the money was stolen from

Plaintiffs, and Defendants helped hide the stolen money through a series of real estate and other investments in the United States.

### E.  Defendants' Unclean Hands Defense Is Without Merit.

245.    The jury expressly rejected Sater's defense of release, and it also expressly rejected the Defendants' statute of limitations defense.  (*See* Trial Tr. 1777:16-25; 1778:23-17779:7; 1780:21-1781:5; 1781:20-24; 1783:7-11.)

246.    In the Pretrial Order, MeM Energy Partners LLC also raised equitable defenses of unclean hands and *in pari delicto*. MeM did not request that the jury be instructed on these defenses during trial, and so to the extent that MeM continues to press these defenses, they are for the Court to decide.  Sater and his entities previously raised these same defenses in their pleadings and briefings before the Court.  [*See, e.g.*, ECF Nos. 266, 614.]  While Sater and his entities did not preserve these defenses in the Pretrial Order, the same reasoning below with regard to MeM's affirmative defense of unclean hands and *in pari delicto* applies equally to Sater and his entities.

247.    MeM has contended that Plaintiffs have unclean hands because "Plaintiffs committed willful misconduct that pertains to the issues in this lawsuit."  [ECF No. 559 (Joint Pretrial Order) at 8.]   Specifically, MeM contends that "BTA committed misconduct by participating in Mukthar Ablyazov's scheme to divert funds from the bank, and in a scheme to kidnap two individuals, where MeM is accused of helping bring public attention to that humanitarian issue. MeM also asserts that the highest levels of BTA management knew of and participated in Ablyazov's scheme, that BTA benefitted from the alleged scheme."  [*Id.*]

248.    MeM's unclean hands defense is meritless.  To start, the conduct for which MeM accuses BTA of having unclean hands is unrelated to the transactions by which MeM was unjustly enriched.  The jury considered and determined that equity and good conscience demand that MeM return the profits and proceeds of its investments to Plaintiffs.  In doing so, the jury considered the

fairness between the parties as well as the history of Ablyazov's fraud at BTA.  An unclean hands defense, in contrast, is narrower than the equitable considerations under unjust enrichment and must bear some relation to the conduct by which the defendant was purportedly enriched.  *See Specialty Mins., Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) ("The unclean hands doctrine applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation'"); *Gidatex S.r.L. v. Campeniello Imports, Ltd*., 82 F.Supp.2d 126, 131 (S.D.N.Y.1999) (holding that unclean hands defense failed in trademark infringement suit where misconduct underlying defense related to agreement between the parties but did not directly relate to trademark infringement claim).  There is no evidence that the Plaintiffs were involved in any of MeM's investments in the United States.

249.    Indeed, MeM does not even allege that BTA's supposed conduct was directed at MeM itself.  "In order for the clean hands maxim to apply to preclude relief to the plaintiff, the wrong complained of by the defendant must have been done to the defendant himself . . . If a plaintiff is not guilty of inequitable conduct toward the defendant in the transaction, his hands are as clean as the law requires."  *Brown v. Lockwood*, 76 A.D.2d 721, 729 (1980).

250.    Regardless, BTA did not participate in a scheme to defraud itself.  The sham loans issued by UKB6 were part of a fraud orchestrated by Mukhtar Ablyazov and his co-conspirators, who used their control over the bank to loot its assets.  The bank's credit committee never approved UKB6 loans; rather, Ablyazov circumvented the normal credit committee procedures when issuing fake loans through UKB6.  (*See* Trial Tr. 216:2-219:20 (Gozhakhmetova Testimony); Trial Tr. 135:6-136:22; 138:15-141:1 (Sadykov Testimony)).  Ablyazov relied on his trusted lieutenant, Zharimbetov – who headed the credit committee and directly controlled UKB6 companies – to

push through UKB6 "loans" without involving the broader credit committee.  (*See* Trial Tr. 144:7-11; 155:18-156:8 (Sadykov Testimony)).  This process was concealed from BTA itself.  (*See, e.g.*, Trial Tr. 217:4-218:15 (Gozhakhmetova Testimony)).  The UKB6 sham loans themselves had no economic substance and were used to either steal from BTA or used in a round-tripping scheme to create the appearance of loans repayments.  (*See, e.g.*, Trial Tr. 828:1-833:8 (Fliegler Testimony)).

251.    Ablyazov's actions and the actions of his trusted associates were not in the interest of the bank.  The funds that Ablyazov misappropriated from the bank enriched Ablyazov, and the bank was further victimized when UKB6 engaged in round tripping – using new loans to create the appearance of repayment of old loans.  This was not unclean hands, it was a bank fraud committed against BTA.

252.    Relatedly, and implicit in the jury's verdict, the knowledge of Mukhtar Ablyazov and UKB6 employees cannot be imputed to BTA because under the adverse interest exception, "management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation."  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000).  That is because "where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it."  *Id.* (quoting *Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936)).  Here, Mukhtar Ablyazov and UKB6 employees acted ultra vires for their own benefit, to the detriment of BTA.  Accordingly, their knowledge cannot be imputed to BTA.  *See, e.g.*, *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03 CIV. 3748 (DAB), 2006 WL 278138, at *10 (S.D.N.Y. Feb. 2, 2006) (refusing to impute conduct of bank's former employee to the plaintiff bank for the

purposes of the defendant's *in pari delicto* defense where the former employee participated in a "rogue trading scheme" that "caused substantial losses" to the plaintiff bank).

253.    Nor can the alleged "scheme to kidnap two individuals" support an unclean hands defense.  First, there is no evidence of any such scheme; Mochkin admitted that the individuals were arrested by Italian law enforcement and deported as a result of a determination by an Italian judge.  There is no evidence to support any claim of "kidnapping" nor any involvement by Plaintiffs in these determinations by Italian government officials.  (*See supra* Sec. I.F).  Nor is there any basis for MeM to argue that these Italian government decisions were somehow directed at MeM. *Brown*, 76 A.D.2d at 729.

254.    Sater previously suggested that his unclean hands defense was supported by the "Confidential Assistance Agreement."  [*See* ECF No. 614 ¶ 395 (arguing Plaintiffs had unclean hands because "[a]t all relevant times, Plaintiffs or their agents were aware of the CAA and that Sater was the source of the information provided by Litco").]  Sater does not – and cannot – identify any support for his suggestion that a release agreement can provide an adequate basis to support an unclean hands defense.  In any event, the jury expressly rejected Sater's release defense.  (*See* Trial Tr. 1777:16-20 ("DEPUTY CLERK: Question 1 B. Do you find that defendant Sater has proven by a preponderance of the evidence his affirmative defense of release as that defense is defined for you in the Court's instructions? JUROR: No."))

255.    Finally, to the extent Sater raised an unclean hands defense, it is inapplicable to Plaintiffs' claim for conversion.  The "doctrine of 'unclean hands' 'is an equitable defense to equitable claims' and does not apply to claims that 'seek damages in an action at law.'"  *Puebla Palomo v. DeMaio*, 403 F. Supp. 3d 42, 61 (N.D.N.Y. 2019) (quoting *Aetna Cas. & Sur. Co. v.*

*Aniero Concrete Co.*, 404 F.3d 566, 607 (2d Cir. 2005)) (concluding doctrine of unclean hands would not bar conversion claim).

**F.  MeM's *In Pari Delicto* Defense Is Without Merit.**

256.    MeM's *in pari delicto* defense is also without merit.

257.    MeM contends that "Plaintiffs' claims are barred by the defense of in pari delicto, because Plaintiffs are responsible for the very misconduct that pertains to the funds at issue in this lawsuit. MEM claims that Plaintiffs permitted their employees to facilitate the theft of funds at issue in this case."  [ECF No. 559 (Joint Pretrial Order) at 8.]

258.    For the *in pari delicto* defense to apply, Plaintiffs' alleged misconduct must have been of the same degree as the Defendant's, and Plaintiffs' involvement must have been voluntary and in its own self-interest.  *See, e.g.*, *Bus. Foods Serv., Inc. v. Food Concepts Corp.*, 533 F. Supp. 992, 997 (E.D.N.Y. 1982); *see also, e.g.*, *BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 219 (2d Cir. 2006) (finding defense inapplicable where plaintiff's "omissions pale in comparison to defendants' fraudulent scheme").

259.    Here, however – as described above with respect to MeM's unclean hands defense – MeM's allegations of misconduct are unrelated to the transactions by which MeM was unjustly enriched, and Plaintiffs' conduct was not directed at MeM.  In any event, Plaintiffs did not participate in a scheme to defraud itself.  The loans issued by UKB6 were part of a scheme orchestrated by Mukhtar Ablyazov and his co-conspirators, who used their control over the bank to loot its assets. Even if Ablyazov had some co-conspirators who also worked at the Bank, these conspirators followed his instructions and were not acting in the interest of the Bank. The funds that Ablyazov misappropriated from the Bank enriched Ablyazov, and the bank was further victimized when UKB6 engaged in round tripping – using new loans to create the appearance of repayment of old loans.  *See, e.g.*, *In re Firestar Diamond, Inc.*, 654 B.R. 836, 881 (Bankr.

S.D.N.Y. 2023) ("Under the adverse interest exception, the *Wagoner* rule and *in pari delicto* doctrine will not apply where a corporate officer 'totally abandoned the corporation's interests and [is] acting entirely for his own or another's purposes.'").

### III. Conclusion

Plaintiffs are entitled to judgment on the claims and in the amounts determined by the jury. A separate judgment shall issue.


Dated: August 30, 2024

<div style="margin-left:40%;">

Respectfully,

 /s/    *Matthew L. Schwartz*            
Matthew L. Schwartz
John T. Zach
Craig Wenner
Lindsey Ruff
Sophie Roytblat

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Phone: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Plaintiffs the City of Almaty, Kazakhstan and BTA Bank JSC*

</div>