**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN
and BTA BANK JSC,

                Plaintiffs,

      v.

FELIX SATER, DANIEL RIDLOFF, BAYROCK
GROUP INC., GLOBAL HABITAT SOLUTIONS,
INC., RRMI-DR LLC, FERRARI HOLDINGS LLC,
and MEM ENERGY PARTNERS LLC,

           Defendants.

No. 19 Civ. 2645 (AJN) (KHP)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR CONTEMPT, SANCTIONS, AND CRIMINAL REFERRAL**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs*
*City of Almaty, Kazakhstan and*
*BTA Bank JSC*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ............................................................................................. ii

**PRELIMINARY STATEMENT** ..................................................................................... 1

**RELEVANT BACKGROUND** ........................................................................................ 3

I.     The Court's *In Limine* Ruling .................................................................................. 3

II.    The July 8, 2015 Meeting Recording and Transcript ......................................... 3

III.   The Court Admonished Sater's Repeated Attempts to Introduce the Recording at Trial ............................................................................................................................. 6

IV.   Sater Fabricated a June 5, 2012 Meeting to Further Thwart the Court's Rulings ............. 8

      A.    Wolf's Testimony ..................................................................................... 8

      B.    Sater's Perjury ........................................................................................ 10

**ARGUMENT** .................................................................................................................... 13

I.     The Court Should Hold Sater in Civil Contempt for Violating Its *In Limine* Orders ....... 13

II.    Regardless of Any Prior Orders, Sater's Perjury Is Sanctionable .................................. 15

III.   The Court Should Make a Criminal Referral .................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*ABF Freight System, Inc. v. N.L.R.B.*,
 510 U.S. 317 (1994) .................................................................................................. 16

*Abraham v. Leigh*,
 No. 17 CIV. 5429 (KPF), 2023 WL 6811647 (S.D.N.Y. Oct. 16, 2023) ................................ 16

*Absolute Nevada, LLC v. Baer*,
 No. 21-50-CV, 2022 WL 350255 (2d Cir. Feb. 7, 2022) ........................................................ 14

*Ades v. 57th St. Laser Cosmetica, LLC*,
 2013 WL 2449185 (S.D.N.Y. June 6, 2013) ............................................................................ 19

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*,
 No. 14-CV-585 (AJN), 2017 WL 3605583 (S.D.N.Y. July 26, 2017) .................................... 15

*City of Almaty, Kazakhstan v. Ablyazov*,
 No. 15 Civ. 5345, 2020 WL 13558984 (S.D.N.Y. May 19, 2020) ............................................. 1

*Mackler Prods., Inc. v. Turtle Bay Apparel Corp.*,
 153 F. Supp. 2d 504 (S.D.N.Y. 2001) ..................................................................................... 18

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
 191 F. Supp. 2d 440 (S.D.N.Y. 2002) ..................................................................................... 16

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
 369 F.3d 645 (2d Cir. 2004) .................................................................................................... 14

*Passlogix, Inc. v. 2FA Tech., LLC*,
 708 F. Supp. 2d 378 (S.D.N.Y. 2010) ..................................................................................... 16

*Roadway Express, Inc. v. Piper*,
 447 U.S. 752 (1980) .................................................................................................................. 13

*Skywark v. Isaacson*,
 No. 96 CIV. 2815 (JFK), 1999 WL 1489038 (S.D.N.Y. Oct. 14, 1999) ................................. 15

*United States v. Catalano*,
 No. 92 CR. 1189 (LLS), 1994 WL 637748 (S.D.N.Y. Nov. 10, 1994) .................................... 20

*United States v. Cornielle*,
 171 F.3d 748 (2d Cir. 1999) .................................................................................................... 19

*United States v. Goguen*,
   723 F.2d 1012 (1st Cir. 1983) ................................................................................. 20

*United States v. Hudson*,
   11 U.S. (7 Cranch) 32 L.Ed. 259 (1812) .............................................................. 13

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL CIO*,
   948 F.2d 1338 (2d Cir. 1991) ................................................................................. 15

*United States v. Stone*,
   429 F.2d 138 (2d Cir. 1970) ................................................................................... 20

*Warr v. Liberatore*,
   437 F. Supp. 3d 259 (W.D.N.Y. 2020) ................................................................. 17

**Statutes**

28 U.S.C. § 1927 ............................................................................................................. 17

**Other Authorities**

U.S. Department of Justice Criminal Resource Manual § 1743 .................................... 20

**Rules**

Fed. R. Civ. P. 16 ........................................................................................................... 16

N.Y. Rules of Prof. Conduct 3.4 ................................................................................... 16

Plaintiffs the City of Almaty, Kazakhstan, and BTA Bank JSC (the "Plaintiffs") respectfully submit this memorandum of law in support of their motion for an Order (1) holding Defendant Felix Sater in contempt for violating the Court's *in limine* order at trial, (2) imposing sanctions against Sater for his contempt and perjury by directing payment of the resulting incremental costs and reasonable attorneys' fees incurred by Plaintiffs (i) at trial, as a result of Sater's false testimony at trial and violations of the Court's *in limine* rulings, and (ii) in bringing the instant motion; and (3) referring this matter for the institution of an investigation into Sater's perjury and other potential crimes.

## PRELIMINARY STATEMENT

At trial, Felix Sater brazenly lied under oath, telling a detailed story about a fabricated meeting between himself and representatives of the Plaintiffs that, Sater testified, occurred in early June 2015, before the Plaintiffs signed an agreement with the entity Litco LLC. Sater's concocted story was designed to support his release defense and therefore defraud Plaintiffs, and to evade the Court's numerous evidentiary orders barring any evidence about Litco that post-dated June 12, 2015, when the agreement with Litco was signed.

There was no such early June meeting. Sater has previously admitted as much under oath, testifying that he never met with any representative of Plaintiffs until after the agreement was signed, and specifically that he first met that Plaintiff's representative on *July* 8. (Judge Parker, following an evidentiary hearing, concluded the same thing.[1]) Sater's own lawyers have admitted

---

[1]    *See City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345, 2020 WL 13558984, at *7 (S.D.N.Y. May 19, 2020), *objections sustained in part and overruled in part*, 2020 WL 5269554 (S.D.N.Y. Sept. 3, 2020) (concluding that Sater and his counsel, Robert Wolf, deliberately

that the meeting he described as occurring in June in fact occurred later, after the Litco agreement was signed. A recording of the meeting itself makes crystal clear that the meeting occurred after the agreement was signed. And other contemporaneous evidence, such as Sater's lawyer's own billing records and the file name of the recording, demonstrate beyond any doubt that the described meeting occurred later, in July.

By falsely testifying that a meeting that occurred in July 2015 in fact occurred in early June 2015, Sater's perjury was designed to accomplish at least two related things. One was to get around this Court's repeated orders that the only relevant Litco-related conduct was conduct that occurred prior to June 12, 2015, when the Litco agreement was signed. By falsely placing the meeting earlier in June, Sater was able to tell the jury—in great detail—about a meeting that it ought never have heard about. Second, the reason why only pre-June 12 conduct mattered is because the jury had to determine whether Plaintiffs knew they were effectively contracting with— and therefore potentially releasing—Sater, or whether that fact was concealed from Plaintiffs to fraudulently induce them to sign the agreement with its broad release. By falsely testifying that he met with a representative of Plaintiffs before the contract was signed, Sater provided fabricated evidence in support of what would have been a complete defense to Plaintiffs' claims.

There is no doubt that Sater's perjury was willful. Among other things, it was pointed out to Sater and his lawyers during opening statements that this meeting occurred in July 2015, and just the day before Sater testified, the Court asked Sater's counsel how they could have a good faith basis to say otherwise. Sater lied nonetheless, and he should be held accountable for that offense independent of the jury verdict against him.

concealed from Plaintiffs the fact that Sater owned Litco, and Plaintiffs did not learn that Sater owned Litco until his 2018 deposition in a related matter).

## RELEVANT BACKGROUND

### I.    The Court's *In Limine* Ruling

Prior to trial, the Court granted Plaintiffs' motion *in limine* to preclude Sater from introducing any evidence relating to Litco that post-dated the execution of the Litco Agreement (also referred to as the Confidential Assistance Agreement or CAA) because the only relevant issue was the parties' knowledge and intent at the time of execution, holding:

> the Sater defendants cannot offer any of the Litco evidence subsequent to the execution of the CAA [on June 12, 2015] without a specific showing at trial outside the presence of the jury how any such proffered evidence is responsive to any of the plaintiffs' arguments of equitable estoppel.

5/16/24 Hr'g at 10:17–25 (emphasis added); [*see also* ECF No. 529 (Memorandum of Law in Support of Plaintiffs' Motion *in Limine* to Exclude Evidence Regarding Litco)].

### II.    The July 8, 2015 Meeting Recording and Transcript

Precluded by the Court's *in limine* ruling—and central to this motion—is an audio recording and unofficial transcript of a July 8, 2015 meeting between Sater, Sater's attorney (Robert Wolf), and Peder Garske of Arcanum, an investigative firm retained by Plaintiffs (the "Recording"). The Recording was produced during discovery, while Sater produced an uncertified transcript with his proposed trial exhibits. As explained below, there is no legitimate dispute that the Recording concerns a July 8 meeting.

To begin with, the content of the Recording demonstrates that it post-dates the June 12 execution of the Litco Agreement. For example, at the start of the recording, Wolf and Sater are alone, and they openly discuss the provisions of a soon-to-be-executed NDA between Litco and Arcanum (which was signed moments later and was dated that day, July 8).

> ***This is the exact language from the confidential assistance agreement in terms of the agreement being confidential for the parties***. And then I just added on because it had that language already that ***you have to give notice to the other parties so we can move for a prompt protective order. And then I just mirrored it, as the***

> ***Arcanum, to them if they requested for confidential information which is their
> identity, they'll also-- notice shall be given in accordance with the provisions of
> the confidential assistance***. I didn't touch the other paragraph, but it had to be
> reformated.be given in accordance with the provisions of the confidential
> assistance. I didn't touch the other paragraph, but it had to be reformatted.

Ex. 1 at 0:37 (emphases added); *see also* Ex. 9 (audio file of the Recording).[2]  The Recording then

reflects that Wolf left the room and came back with a signature on the NDA from Peder Garske of

Arcanum.  *Id.* at 1:24–1:27 (Wolf explaining that he is leaving to obtain Garske's signature), 5:48

(Wolf returning and stating "Okay, he signed it").

Consistent with the Recording, on July 8, 2015, nearly a month after the Litco Agreement

was executed, Arcanum and Litco signed a separate confidentiality agreement that perfectly

matches the provisions Wolf explains on the Recording.  *Compare* Ex. 2 § 3 (July 2015 NDA

providing that Arcanum must give notice), *with* Ex. 3 § 11 (June 2015 Litco Agreement, which

does not mention Arcanum in the confidentiality provision).  The Recording thus plainly reflects

a July 8, 2015, meeting at which Garske signed the NDA, and not a June 2015 meeting.

In fact, Sater and his current counsel *explicitly agreed* on the record in Litco's Rule 30(b)(6)

deposition in this case that the Recording was from a July 8, 2015, meeting in which Garske signed

the NDA, and not a June meeting.  The transcript of that deposition reflects that although Sater

initially testified that the Recording reflected an earlier meeting, after Sater and his counsel took

the time to actually listen to the Recording, they concede the Recording was of a July 2015

meeting, not a June 2015 meeting:

> MR. SNYDER: Craig, before we get back going, we did review the audio, the first
> 10 minutes over the lunch break and we have a clearer idea as to the circumstances
> of that recording; namely, ***we think that you are correct, that it was the July 8th
> or thereabouts was the date of the recording and not June 12th or whatever it***

---

[2]     All exhibit citations refer to the accompanying Declaration of Matthew L. Schwartz and

exhibits ("Schwartz Decl.").

*was.*

. . .

Q. And when was that audio recording made?

A [MR. SATER]. I believe you are correct, ***I believe it was July 8th***, I think.

Q. Okay. That is on or around the date that the confidentiality and nondisclosure agreement with Arcanum was signed, is that true?

A. Yes, I believe so.

Q. And prior to -- withdrawn. Am I correct that in that audio recording, what ***we hear in the approximately first seven minutes or so are you and Robert Wolf discussing the nondisclosure agreement with Arcanum***?

MR. SNYDER: Objection to the form of the question. You can answer.

A. I think Robert -- ***I believe from what I heard when you played the recording is Robert referring to the confidentiality – to the confidentiality agreement, the subsequent one, because I think he said something, it's the same as the one in the CAA.*** I think we were discussing -- we were discussing a confidentiality provision which I think he told me was pretty much, you know, covered the same in both agreements or similar.

Q. And what he describes in the first couple of minutes of that call is that he added, for purposes of the NDA, he added to that confidentiality clause, the notice provision regarding your identity in the NDA agreement?

A. I believe that's correct.

Ex. 4 at 110:13–21, 114:3–115:13 (emphases added).

There is ample other reason to be sure that the Recording concerns a July 8 meeting. For example, the file name for the electronic audio file of the Recording is "2015-07-08_15-27-14_126 3.wav," accurately reflecting that it's audio of a July 8, 2015 meeting. Ex. 1 (transcript prepared

5

by Sater's counsel, identifying the name of the "Input sound file").[3]

Simply put, the Recording is of a July 8, 2015, meeting—not a June 2015, meeting, as Sater later falsely testified.

## III. The Court Admonished Sater's Repeated Attempts to Introduce the Recording at Trial

Once trial began, Sater started to violate the Court's *in limine* ruling almost immediately. During opening statements, Sater's counsel attempted to reference the Recording. *See* Trial Tr. at 113:6–10. Plaintiffs objected. At side bar, Sater's counsel represented that the Recording concerned a June 12, 2015 meeting, *i.e.*, the date the CAA was signed, arguing: "The audio recording begins before the CAA is executed. They leave, they break, and then they go back in and then they go back in and continue speaking. I would argue that it's concurrent. Even if it's subsequent to the execution, it's concurrent. Same day. It's the same hour." *Id.* at 113:22-114:1.[4]

---

[3] On the other hand, June 5—the date when Sater falsely testified the meeting reflected in the Recording took place—was the date the transcript of the Recording was made. And that was June 5, *2020*, not 2015:

*TranscribeMe!*

Transcription details:

| | |
|---|---|
| Date: | 05-Jun-2020 |
| Input sound file: | 2015-07-08_15-27-14_126 3.wav |

Ex. 1.

[4] By arguing that the Recording was made literally as the CAA was being signed, counsel was necessarily taking the position that the Recording reflected a meeting on June 12, 2015—the day that the CAA was signed. This was not even consistent with Sater's subsequent perjury, which placed the meeting on June 5, a week before the CAA was signed.

Plaintiffs' counsel corrected this representation, stating: "That's factually incorrect. It's a different agreement as the NDA that is signed in the midst of that recording, it was all substantially after the CAA was signed." *Id.* at 114:2–5; *see also* Ex. 3. The Court sustained the objection, reminding Sater's counsel that "matters after the execution shouldn't be raised without bringing it to the attention of the Court before." Trial Tr. at 114:6–9.

Several days later, Sater again attempted to introduce the Recording as an exhibit. On June 18, 2024, Sater's counsel filed their list of exhibits to be used with Robert Wolf and Sater on direct examination. [ECF No. 632-1]. On that exhibit list, which Sater's counsel failed to send to Plaintiffs prior to filing as required by the Court's instructions, Sater listed as his first exhibit something labeled "SDX-001 (Audio June 2015)," and its purported transcript, labeled SDX-003 (Audio -001 Transcription)." [*Id.* at 3].

Immediately after Sater filed this exhibit list, Plaintiffs' counsel emailed Sater's counsel requesting a copy of "SDX-001" because they were unaware of any June 2015 audio recording. Ex. 5. Sater's counsel replied and stated that "The official file name may say it's from July but the actual recording was from June." *Id.* That is, Sater's counsel clarified that SDX-001 was the Recording, and asserted that the Recording reflected a June 2015 meeting.

Plaintiffs objected to admission of the Recording on the basis that, among other things, "this recording is of a meeting that occurred well after the Litco agreement was signed" and thus violated the Court's *in limine* ruling—putting Sater's counsel on notice for the third time that the Recording was of a meeting in July 2015, not June 2015. [ECF No. 634 at 2.] The Court sustained Plaintiffs' objections to the exhibit (among the majority of Sater's other exhibits) and reiterated, "I sustained an objection [in opening statements] **because it was subsequent to the execution of the CAA**. But it raises the question in my mind now what the good faith basis was, having

7

reviewed the record, to even refer to that nondisclosure agreement." Trial Tr. at 896:8–22, 900:22–901:10 (emphasis added).

Then, as Sater took the stand in his defense case, the Court directly instructed him to abide by its prior orders:

> [T]he plaintiffs certainly didn't open up activities allegedly pursuant to the confidential assistance agreement after June of 2015 when it was executed. So the efforts to explain that there was lots of work that was being done pursuant to the confidential assistance agreement which Mr. Sater argues he should be paid for and which is the subject, as I understand it, of another proceeding, shouldn't be testified to or volunteered in response to questions. And as I've pointed out before, that's a two-edged sword. But that's the instruction. **Mr. Sater should not testify about work that he did pursuant to the confidential assistance agreement after its execution**. . .
>
> . . .
>
> So I've discussed this at length in the motions in limine. I've discussed it at length during the trial, and so I just repeat the caution for Mr. Sater's testimony now.

Trial Tr. 1202:1-1203:18 (emphasis added); *see also* ECF No. 638.

## IV.    Sater Fabricated a June 5, 2012 Meeting to Further Thwart the Court's Rulings

Despite the Court's repeated warnings, Sater and his counsel dedicated their defense case almost exclusively to the lie that Sater met with Peter Garske at this imagined early June meeting. Sater's desperation to find a way to introduce the Recording or its contents is not surprising in light of his admission, as Litco's Rule 30(b)(6) representative, that he did not have "any other evidence" that would "sho[w] that Peder Garske understood who owned Litco prior to entering into the CAA." Ex. 4 at 88:12-16.

### A.    Wolf's Testimony

Sater called two witnesses:  his lawyer Robert Wolf, and himself.   During Wolf's testimony, Sater's counsel stated—without eliciting any testimony or foundation whatsoever to support his statement—"I want to talk about a meeting that occurred on June 5, 2015, about a week

before the confidential assistance agreement was signed. Do you remember a meeting in June 2015 in the Moses & Singer conference room in the Chrysler building?" Trial Tr. at 1081:11–14. Wolf said he did not "recall exact dates" but remembered "a meeting with Peter Garske in our offices in early June before this agreement was signed." *Id.* at 1081:11–17; *see also id.* at 1082:4–8. Despite Wolf stating that he did not recall the exact date of this meeting, Sater's counsel continued to refer to the meeting as "the June 5 meeting" in his questions. *See id.* at 1082:10–12. When Sater's counsel asked if Sater was at that pre-Litco Agreement meeting with Wolf and Garske, Wolf testified that Sater was *not* present, saying "I believe it was just Peter Garske and myself" and "I don't recall the first time that Garske came up to my office that anybody else was present other than myself." *See id.* at 1083:20–21.

Sater's counsel then asked Wolf if he recalled having dinner with Garske and Sater on June 5, 2015, and Wolf responded that he at some point had dinner with Sater and Garske but could not recall the exact date. *Id.* at 1085:4–8. Again, despite the witness's lack of recollection of the date of the dinner, Sater's counsel continued to pepper Wolf with leading questions referring to the meeting and dinner between Wolf, Garske, and Sater as the "June 5" meeting and dinner. *See, e.g., id.* at 1086:18–19. Wolf proceeded to describe the dinner that he recalled. *See, e.g., id.* at 1088:19–21, 1089:22–25, 1094:10–14–19, 1102:11–15.

Although Wolf described this dinner involving himself, Sater, and Garske—even though he could not remember when it occurred, including whether it occurred before or after the CAA was signed—in response to counsel's questions that referred to a "June 5" meeting and dinner, Wolf supplied no evidence to support Sater's claim that the dinner occurred in June 5. Instead, Wolf surely was describing a dinner that occurred in July 2015, following the meeting reflected in the Recording. In fact, in the Recording, Wolf and Sater explicitly discuss whether to invite Garske

to dinner.  *See* Ex. 1 at 1:53–2:08.

Further, Wolf's own Moses & Singer billing records reflect that no meeting between him and *anyone* occurred on June 5, 2015.  *See* Ex. 6 (PTX-1051 (Moses & Singer July 2015 billing records for Wolf, showing one time entry on June 5, 2015 for 0.5 hours for "Continued review of draft assistance agreement – o/c's Wai Chan")).[5]   By contrast, Wolf's time records do show a multi-hour meeting with Garske on July 8, 2015—the date of the Recording.  *See* Ex. 7 (Moses & Singer August 2015 billing records for Wolf, showing a time entry on July 8, 2015 for 5.00 hours for "Prep and meeting with Arcanum Revise NDA Confidentiality Agreement – worldwide strategy"); *see also* Trial Tr. 1317:16-22, 1330:18-25 (agreeing that it is very important for attorneys to be accurate in billing time because each increment of time is passed on to the client; Wolf also clarified that a meeting between himself, Garske, and Sater about Litco would not have been billed under a different client matter number).

B.    Sater's Perjury

Sater then took the stand, at which point the Court again reminded him that he "should not testify about work that he did pursuant to the confidential assistance agreement after its execution." Trial Tr. at 1202:7–1203:18.

Sater testified at great length about a supposed June 5, 2015, meeting with Wolf and Garske—which he claimed was the first time he met Garske.  *See, e.g.*, *id.* at 1206:17-1; 1225:20-1226:3, 1234:4-8, 1241:24-1242:2.  According to Sater, he participated in both the meeting in Wolf's office with Garske and the subsequent dinner.  *Id.* at 1232:16–19.  Sater then began to testify in breathtaking detail about the contents of the "two plus hours" long meeting he supposedly

---

[5]    Wai Chan is a corporate partner in Wolf's law firm who worked on the drafting of the CAA.  *See* Trial Tr. 1029:18-25, 1324:21-25, 1332:22-24.

had with Wolf and Garske and another Arcanum employee named Erica on June 5. *Id.* at 1231:2–12.

The meeting Sater described is nearly beat-for-beat the meeting reflected in the Recording. Both meetings supposedly began with Sater and Wolf in a separate room, and then joining Garske and Erica, at which time someone took their coffee orders. *Compare* Trial Tr. 1226:4–15, *with* Ex. 1 at 7:39–7:40. In fact, Sater testified that he met Erica for the first time during the June 5 meeting, *see* Trial Tr. at 1225:22-25, and on the Recording, Sater and Erica introduce themselves to one another, *see* Ex. 1 at 7:40 ("Hi, Erica. Pleasure. Felix Sater."). Both meetings involved some reference by Garske to "Mr. F." *Compare* Trial Tr. at 1228:20–23, *with* Ex. 1 at 5:48. And both meetings involve the same substantive topics. For example, Sater testified that he provided information in the meeting about Nicolas Bourg, FBME Bank, Eesh Aggarwal, and Phillipe Glatz, topics which are all discussed extensively in the Recording. Trial Tr. at 1232:21–1233:25, 1235:19–1238:5, 1238:6–1239:11, 1239:12–1240:12. A chart comparing Sater's trial testimony with the "transcript" of the Recording produced by Defendants is attached to the Declaration of Matthew L. Schwartz as Exhibit 8.

But the meeting did not take place on June 5, 2015, or at any time prior to the execution of the Litco Agreement. The meeting took place on July 8, the date of the Recording. In fact, Sater has not only admitted that the Recording reflects a June 8 meeting, as described above, but ***Sater has expressly admitted under oath that he did not meet Garske until July 8, 2015, the day the NDA was signed***:

> Q. So you had – the first time you met or communicated with Mr. Garske was that meeting in July 2015 where he signed the NDA, correct?
>
> A. That was the first time I met with him, I believe so, yes.

Ex. 4 at 152:21–153:2. Further, Sater admitted that in the depositions he gave in this and the

related action, he never once previously testified that he had a meeting with Garske on June 5, 2015, or any other time prior to the signing of the CAA on June 12. *See* Trial Tr. 1566:2-9, 1568:1-20.

Sater's trial testimony that this or any meeting took place on June 5 is a total fabrication, and the third separate date that the Sater Defendants have ascribed to the meeting reflected on the Recording.[6] It is obvious that Sater did so to evade the Court's ruling. If Sater had been truthful about the date of the meeting, all of his testimony about the fact that he personally met with Garske, along with all of the information he provided Garske, would have been plainly precluded by the Court's *in limine* ruling, which it emphasized again directly before Sater testified.

When Plaintiffs objected to Sater's testimony, in order to circumvent the Court's ruling, Sater's counsel represented that "I am walking the witness through the information that he provided to Kazakhstan before the CAA was signed." Trial Tr. at 1232:11–13. Further, Sater's counsel falsely represented that the meeting "happened on June 5" and, what's more, that the "recording is of a June 5 meeting." Trial Tr. 1268:13-1269:1.

---

[6]      Sater has at times claimed that the Recording reflected (1) a meeting on June 5 as he testified as trial; (2) a meeting on June 12 as he initially testified in Litco's Rule 30(b)(6) deposition and as his counsel argued in opening statements; and (3) a meeting on July 8, as Sater and his counsel were forced to admit was the case after actually listening to the Recording. It is crystal clear that the Recording cannot possibly reflect a June 5 meeting, as Sater testified, because in the Recording Wolf leaves to obtain Garske's signature on a document (the NDA). *See* Ex. 1 at 1:24–1:27 (Wolf explaining that he is leaving to obtain Garske's signature), 5:48 (Wolf returning and stating "Okay, he signed it"). No document was signed on June 5, however—the CAA was signed on June 12, and the NDA on July 8.

**ARGUMENT**

Sater lied under oath, pure and simple. And he did so in a calculated way to evade this Court's orders and put false evidence before the jury that it should never have heard. The jury rightly rejected Sater's testimony, finding against him and his entities on all counts. But his perjury was an independent wrong that prejudiced Plaintiffs, undermined the judicial system, and which should have its own consequences. Plaintiffs therefore respectfully request that the Court (1) hold Sater in contempt; (2) impose sanctions against Sater for his contempt and perjury by directing payment of the resulting incremental costs and reasonable attorneys' fees incurred by Plaintiffs (i) at trial, as a result of Sater's false testimony at trial and violations of the Court's *in limine* rulings, and (ii) in bringing the instant motion; and (3) referring this matter for the institution of an investigation into Sater's perjury and other potential crimes.

**I.    The Court Should Hold Sater in Civil Contempt for Violating Its *In Limine* Orders**

Sater should be held in contempt for violating the Court's *in limine* ruling, as well as the numerous subsequent orders reiterating it.

The Supreme Court has long recognized that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812). "The most prominent of these is the contempt sanction, which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (quotation marks omitted). Pursuant to this inherent authority, the Court may hold an individual in contempt for violating a court order if the party seeking contempt demonstrates that "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to

comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004); *see also Absolute Nevada, LLC v. Baer*, No. 21-50-CV, 2022 WL 350255, at *2 (2d Cir. Feb. 7, 2022) (citing standard and holding that the trial court "did not abuse its discretion in finding that [the contemnor] was bound by the stipulation and that he violated it"). It "need not be established that the violation was willful." *Paramedics Electromedicina Comercial*, 369 F.3d at 655.

Here, there is no question that Sater and his counsel's conduct meets the contempt standard. First, the Court's *in limine* ruling was undoubtedly clear, and the Court and counsel discussed that ruling on multiple occasions throughout the trial while Sater was present in the courtroom. *See, e.g.*, Trial Tr. at 111:21–112:6, 345:13–25, 900:22–10. The Court even reminded Sater of its ruling immediately prior to his testimony. *Id.* at 1202:13–1203:14.

Second, Sater violated the order by clear and convincing evidence, including by referencing the Recording in opening statements and at numerous other times, even after the Court questioned whether there could be any good faith basis for counsel to have claimed the Recording took place contemporaneously with the signing of the CAA. *Id.* at 113:9–114:9, 1081–1102, 1224–1243.

Finally, Sater and his counsel did not attempt in the slightest to comply with the Court's order; they deliberating evaded it. The Court ordered Sater to bring to the Court's attention any evidence from after the Litco Agreement *prior* to offering that evidence in front of the jury. 5/16/24 Hr'g at 10:17–25. Sater did not once front any such evidentiary issue with the Court prior to trying to introduce post-June 12, 2015, evidence throughout the trial. Instead, Sater's counsel attempted to circumvent the Court's ruling by concocting evidence that the Recording was of a meeting that occurred a week prior to June 12, 2015, so that Sater could testify about the meeting

14

freely without having to first alert the Court to his testimony. Sater went so far as to brandish a flash drive that he claimed contained the Recording and slam it down onto the witness stand as if to suggest he had corroborating evidence of the June 5 meeting that he was not allowed to introduce. *See* Trial Tr. 1577:13-15. And this is not the first time, or the only subject, on which Sater intentionally tried to evade the Court's *in limine* rulings. *See, e.g.,* Trial Tr. at 705, 708-09, 789 (Sater volunteering testimony about the "Italian situation" immediately after the Court ordered that "neither side should refer to what we will describe as the Italian situation"). Accordingly, contempt is appropriate here.

## II.    Regardless of Any Prior Orders, Sater's Perjury Is Sanctionable

The Court should likewise order Sater to pay monetary sanctions. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, No. 14-CV-585 (AJN), 2017 WL 3605583, at *4 (S.D.N.Y. July 26, 2017) ("Upon a finding that a party is in civil contempt, [courts] retain broad discretion to fashion an appropriate coercive remedy based on the nature of the harm and the probable effect of alternative sanctions.") (internal quotation marks omitted); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) (the Court has the power to sanction perjury under its inherent authority "to sanction for improper conduct, which derives from the very nature of courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases").

Where perpetrators have been caught in obvious lies that were contradicted by independent records or undisputed facts, Courts have not hesitated to impose sanctions. *See Skywark v. Isaacson*, No. 96 CIV. 2815 (JFK), 1999 WL 1489038, at *14 (S.D.N.Y. Oct. 14, 1999), *aff'd*, No. 96 CIV. 2815 (JFK), 2000 WL 145465 (S.D.N.Y. Feb. 9, 2000) (sanctioning under court's inherent power defendant's submission of falsified evidence and untruthful testimony by awarding costs and attorney's fees to plaintiff). "False testimony in a formal proceeding is intolerable. . . Perjury

should be severely sanctioned in appropriate cases." *ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 322 (1994). Further, knowingly using perjured testimony or false evidence is a violation of the New York Rules of Professional Conduct. *See* N.Y. Rules of Prof. Conduct 3.4(a)(4).

Fraud on the court "occurs where a party has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action." *Skywark*, 1999 WL 1489038, at *14; *see also Abraham v. Leigh*, No. 17 CIV. 5429 (KPF), 2023 WL 6811647, at *9 (S.D.N.Y. Oct. 16, 2023) (same, citing cases); *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 393 (S.D.N.Y. 2010) ("A fraud on the court occurs where it is established by clear and convincing evidence that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by unfairly hampering the presentation of the opposing party's claim or defense." (cleaned up)). Like perjury, the Court can sanction such fraud on the court under its inherent authority. *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 461 (S.D.N.Y. 2002) (imposing terminating sanctions for fraud on the court). "The available sanctions at a court's disposal in the face of fraud upon the court range from the issuance of a jury charge on falsehoods under oath, to the imposition of attorney's fees occasioned by the conduct in question, and finally to the entry of judgment against the offending party." *Skywark*, 1999 WL 1489038, at *14.

The Court also has independent authority to impose monetary sanctions pursuant to Rule 16(f)(1)(C). Under that Rule, "the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f). "Instead of or in addition to any other sanction, the court ***must*** order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with [Rule 16(f)], unless the noncompliance was substantially

justified or other circumstances make an award of expenses unjust." *Id.* (emphasis added). Courts have interpreted *in limine* rulings as pretrial orders pursuant to Rule 16(f). *See, e.g.*, *Warr v. Liberatore*, 437 F. Supp. 3d 259, 283 (W.D.N.Y. 2020). 28 U.S.C. § 1927 also states that the Court may order an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously" to pay "the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Here, the Court is not bound to accept Sater's attempt to mislead jurors and should not ignore the harm of placing such evidence before the Court. Sater and his counsel elicited and provided what was clearly false testimony about the purported June 5 meeting to improperly influence the jury, evade the Court's orders, and put forward a story that obstructed the truth-finding process and amounted to a fraud upon the Court. As outlined above, there is evidence beyond a reasonable doubt—not the least of which is Sater's own admissions from a time before the Court had issued its *in limine* orders and when Sater was not focused on the importance of the date of the Recording—that Sater had not met Garske prior to the signing of the Litco Agreement, and that they met for the first time on July 8, 2015, the day the NDA was signed, as reflected on the Recording itself. Further, the record demonstrates that Sater purposefully decided to contend that the meeting occurred on June 5 so that Sater (and potentially Wolf) could testify about matters that would have otherwise been precluded by the Court's *in limine* ruling. Indeed, Sater admitted that the Recording was the ***only evidence*** that Arcanum knew about his identify prior to the signing of the Litco Agreement. Ex. 4 at 88:12-16. But over the course of that deposition, he was forced to admit that the Recording was actually made a month after the Agreement was signed. *Id.* at 114:3–11.

Sater's lies at trial wasted the jury's, the Court's and Plaintiffs' time at best, and risked

seriously deceiving the jury and perverting justice at worst.  As compensatory sanctions for contempt, the Court should order Sater to pay the legal fees and costs incurred by Plaintiffs in taking substantial time at trial to try to ensure his compliance with the Court's *in limine* ruling and to rebut his false testimony, as well as the time associated with bringing this motion.[7] *See Mackler Prods., Inc. v. Turtle Bay Apparel Corp.*, 153 F. Supp. 2d 504, 507 (S.D.N.Y. 2001) (imposing monetary sanctions for suborning perjury because perjury extended trial).

But for Sater fabricating the June 5 meeting date, all evidence and testimony about the meeting would have been precluded based on the Court's orders. Sater's subversion of the Court's rulings by introducing this otherwise inadmissible testimony required Plaintiffs to introduce impeachment evidence and spend substantial time cross-examining witnesses to demonstrate the falsity of the fabricated June 5 meeting.  Accordingly, the Court should impose monetary sanctions on Sater.

## III.    The Court Should Make a Criminal Referral

As importantly, the Court should exercise its inherent authority to refer this matter to the United States Attorney's Office for investigation.  It is not enough that the jury rejected Sater's lies; there must be independent serious consequences for those lies, or else parties in Sater's situation would have very little incentive not to perjure themselves in the hope that doing so would save a losing case.

The Second Circuit has explained, "[n]o legal system can long remain viable if lying under oath is treated as no more than a social solecism.  Swearing to tell the truth is a solemn oath, the breach of which should have serious consequences." *United States v. Cornielle*, 171 F.3d 748,

---

[7]    Should the Court grant Plaintiffs' request for attorneys' fees and costs, Plaintiffs are prepared to submit an application for a specific amount of fees with supporting documentation.

753 (2d Cir. 1999) (noting that referral for criminal prosecution is warranted where an individual's falsehoods are "material to the truth-seeking function" of the Court); *see also Ades v. 57th St. Laser Cosmetica, LLC*, 2013 WL 2449185, at *13 (S.D.N.Y. June 6, 2013) ("Since the undisputed evidence stablishes that [defendant's] purported license was falsified and her deposition testimony was false, the Court finds that it is appropriate to refer [defendant's] conduct to the [U.S. Attorney's Office] for investigation and, if appropriate, prosecution for perjury.").

*Mackler Products*, 153 F. Supp. 2d 504, is on all fours.  In that case, following a judgment in favor of the plaintiff, Judge Chin imposed sanctions on the defendant and his attorney, finding that (1) "[the defendant] gave false testimony, with [his attorney's] knowledge," and (2) that the defendant and his attorney caused a witness "to present false evidence."  *Id.* at 506.  As the court found: the defendant's attorney "based his clients' entire defense on lies; and, after the perjury became known, he failed to acknowledge his role."  *Id.* at 511.  In addition to sanctions, the court referred the issue of whether a defense witness committed perjury to the United States Attorney's Office for potential criminal investigation.  *Id.* at 506.

Here, too, Sater's defense was "based entirely on lies."  *Id.* at 508-09.  Sater committed demonstrable perjury in claiming that the meeting reflected in the Recording occurred on June 5, 2015.  Sater's counsel elicited this testimony, and tried to do the same from Wolf, including through the use of repeated improper leading questions that placed a meeting between Wolf, Sater, and Garske on June 5 even though Wolf was clear that he did not know the date of the meeting and did not believe that Sater attended any meeting with Garske prior to the signing of the CAA. The overwhelming evidence, including Sater's own prior testimony, Wolf's billing records, the content (and file name) of the recording, and the language and dates of the relevant agreements, all demonstrate beyond a reasonable doubt that there was no meeting on June 5, or at any other

time before the Litco Agreement was signed.

Plaintiffs respectfully submit that, on these facts, a referral to the United States Attorney's Office for criminal investigation into Sater's violations of 18 U.S.C. §§ 1621-23 and related statutes is warranted. *See generally United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970) (discussing elements of § 1621 offense); *United States v. Catalano*, No. 92 CR. 1189 (LLS), 1994 WL 637748, at *3 (S.D.N.Y. Nov. 10, 1994) (discussing elements of § 1623 offense); *United States v. Goguen*, 723 F.2d 1012, 1020 (1st Cir. 1983) ("Section 1621 requires specific intent to deceive and to violate one's oath. Section 1623 requires only that the false statement be made voluntarily and knowingly as opposed to mistakenly or inadvertently" (citation omitted)); *see also* U.S. Department of Justice Criminal Resource Manual § 1743 ("Section 1621 is the traditional, broadly applicable perjury statute, and is used to prosecute perjuries committed before legislative, administrative or judicial bodies. Section 1623, added in 1970, eliminated some of the proof problems associated with these difficult prosecutions, but Congress limited its applicability to false statements before Federal courts and grand juries."), available at https://www.justice.gov/archives/jm/criminal-resource-manual-1743-perjury-overview-18-usc-1621-and-1623-violations.

It is not irrelevant, in this connection, that Sater has previously been convicted of serious federal crimes and got the benefit of a cooperation agreement with the government. Part of any cooperation agreement is the notion that a cooperator has turned the page on his criminal conduct and committed himself to living a law-abiding life. In this case, Sater not only knowingly participated in the underlying money laundering conspiracy—including at a time when he was actively cooperating with the government—but he then lied under oath to a jury to try to avoid liability for that behavior. The Department of Justice should be apprised of these facts so that it

may conduct an investigation and take any appropriate action.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court (i) hold Sater in civil contempt, (ii) impose monetary sanctions for the attorneys' fees and costs incurred by Plaintiffs in rebutting Sater's lies at trial and for making the instant motion, and (iii) make a referral to the United States Attorney's Office to initiate an investigation into Sater's perjury.

Dated: August 31, 2024
      New York, New York

Respectfully,

 /s/     *Matthew L. Schwartz*
Matthew L. Schwartz
John T. Zach
Craig Wenner
Sabina Mariella
Sophie Roytblat

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs the City of Almaty,*
*Kazakhstan and BTA Bank JSC*

## <u>CERTIFICATION OF COUNSEL</u>

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word. Pursuant to the word count system in Microsoft Word, the total number of words in the Brief, excluding the caption, signature block, and this certification is 6,294.

Dated:          August 31, 2024

                                        /s/       *Matthew L. Schwartz*
                                        Matthew L. Schwartz