**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**CITY OF ALMATY, KAZAKHSTAN, ET AL.,**

                                **Plaintiffs,**                **19-cv-2645 (JGK)**

                **- against -**                                **MEMORANDUM OPINION AND**
                                                                **ORDER**

**FELIX SATER, ET AL.,**

                                **Defendants.**

---

**JOHN G. KOELTL, District Judge:**

The plaintiffs, the City of Almaty, Kazakhstan ("Almaty"), and BTA Bank JSC ("BTA"), brought this action against various defendants, including Felix Sater, Bayrock Group Inc. ("Bayrock"), Global Habitat Solutions Inc. ("GHS") (together with Sater and Bayrock, the "Sater entities"), and MeM Energy Partners LLC ("MeM") (collectively, the "defendants"). After a nearly three-week trial, the jury returned a verdict in favor of the plaintiffs and against each of the defendants. In January 2025, this Court granted the defendants' motion pursuant to Federal Rule of Civil Procedure 59 for a new trial on the plaintiffs' claims for conversion and unjust enrichment. See ECF No. 702; City of Almaty v. Sater, No. 19-cv-2645, 2025 WL 218838 (S.D.N.Y. Jan. 15, 2025).

The defendants now move for summary judgment dismissing these claims pursuant to Federal Rule of Civil Procedure 56. See Notice of Mot., ECF No. 733. The defendants argue that the

1

plaintiffs' claims are barred by the respective statutes of limitations and that the defendants are not foreclosed from asserting the statute of limitations by equitable estoppel. The defendants claim that the Court can determine as a matter of law that equitable estoppel does not apply to the facts of this case. The defendants have also filed a "conditional motion to disqualify" Boies Schiller as trial counsel. <u>See</u> Defs. Br. at 16–18, ECF No. 734. For the following reasons, the defendants' motions are **denied.**

## I.

The Court assumes familiarity with the history of this case, which has been described in previous opinions. <u>See, e.g.</u>, ECF Nos. 244, 323, 392, 396, 625, 702. The following summary sets forth only those facts necessary to resolve this motion.

Unless otherwise noted, the following facts are taken from the parties' Local Rule 56.1 Statements and supporting papers and are undisputed.[1]

## A.

The plaintiffs allege that Viktor Khrapunov ("Khrapunov"), the former mayor of Almaty, misappropriated funds from Almaty through fraudulent means. Second Am. Compl. ("SAC") ¶¶ 53–62, ECF No. 399. The plaintiffs also allege that Mukhtar Ablyazov,

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

the former chairman of BTA, stole funds from BTA by causing BTA to make sham loans to companies that Ablyazov owned. Id. ¶¶ 16–49. Ablyazov allegedly turned to Ilyas Khrapunov ("Ilyas"), Khrapunov's son and Ablyazov's son-in-law, to help launder these stolen funds. Id. ¶¶ 50–52. The plaintiffs allege that Khrapunov also laundered the funds stolen from Almaty with the aid of Ablyazov, through Ablyazov's control of BTA and a vast network of shell companies. Id. ¶¶ 56–57.

The plaintiffs claim that Sater, a long-time associate of the Khrapunov family, conspired with Ilyas to launder the stolen funds through real estate investments in the United States. Id. ¶¶ 82, 106. Sater allegedly enlisted in this laundering scheme several entities wholly owned and controlled by him, as well as various associates and entities owned and controlled by those associates, including MeM, which is owned and controlled by Mendel Mochkin. See id. ¶¶ 6–12, 287–94.

**B.**

At the crux of this case is an alleged laundering scheme that involved at least five investment projects—namely, the Tri-County Mall, the World Health Networks, the Trump SoHo Hotel, the Syracuse Center, and Creacard S.A. Id. ¶¶ 2–3, 119–286.

The Tri-County Mall scheme involved the April 2013 purchase and July 2013 resale of a note on the Tri-County Mall in Ohio by Tri-County Mall Investors LLC ("TCMI"), an entity controlled by

3

Sater, Ilyas, and Triadou SPV S.A. ("Triadou"), TCMI's sole member and an alleged front for Khrapunov and Ablyazov. See id. ¶¶ 211, 249; Defs. Local Rule 56.1 Statement ("Defs. 56.1") ¶ 1, ECF No. 733; Pltfs. Responses to Defs. 56.1 ("Pltfs. 56.1") ¶¶ 1, 62, ECF No. 746. Sater structured the Tri-County Mall transaction to conceal the true ownership and source of the allegedly stolen funds used to purchase the note. Pltfs. 56.1 ¶¶ 62-63. According to Sater, the Tri-County Mall investment was "extremely successful," turning $28.5 million into $43 million in three months. Defs. 56.1 ¶ 1.[2]

However, the partnership between Sater and Ilyas went south. Id. ¶¶ 2-3. Sater diverted over $36 million of the Tri-County Mall sale proceeds to a bank account that only he controlled. Id. ¶ 3.

On December 19, 2013, TCMI sued Sater in a New York state court, seeking to recover the misappropriated proceeds (the "2013 Lawsuit"). Id. ¶¶ 4, 14; see also Ex. A to Decl. of John H. Snyder ("Snyder Decl."), ECF No. 735-1. That same day, Nicolas Bourg filed an affidavit in the 2013 Lawsuit, stating in relevant part that he was "the president of the sole member of

---

[2] The plaintiffs dispute these numbers, asserting that "the gross profit figure does not account for the money that Defendants misappropriated and stole from TCMI" in connection with the purchase and resale of the note. Pltfs. 56.1 ¶ 1.

[TCMI]." Defs. 56.1 ¶¶ 15-16; Ex. B to Snyder Decl., ECF No. 735-2.[3]

The next day, on December 20, TCMI filed a notice of discontinuance. Pltfs. 56.1 ¶ 14. TCMI voluntarily withdrew the 2013 Lawsuit after Sater and TCMI entered into a confidential settlement agreement whereby Sater agreed to return $20 million of the proceeds that he had allegedly misappropriated in exchange for TCMI's relinquishment of its claim to a majority of the sales proceeds, as well as mutual releases and a non-disclosure agreement. Id. As a result of the settlement, Sater was able to retain over $16 million of the proceeds that he had diverted. Defs. 56.1 ¶¶ 5, 13. The settlement agreement was not filed publicly on the 2013 Lawsuit docket, and the notice of discontinuance—which was filed publicly on the docket—did not indicate that there had been a settlement or what the terms of the settlement were. Pltfs. 56.1 ¶ 14. The plaintiffs assert that they did not learn about the settlement agreement until a 2017 deposition in a related case, BTA Bank v. Triadou SPV S.A., No. 15-cv-5345 (S.D.N.Y.) (the "Triadou Action"). Id.

The plaintiffs claim that the World Health Networks, Trump SoHo Hotel, Syracuse Center, and Creacard S.A. investments were

---

[3] Although the defendants claim that Ilyas "caused" TCMI to commence the 2013 Lawsuit, "TCMI" was the plaintiff, and the complaint in that action and the supporting affidavit make no mention by name of "Ilyas", any member of the Khrapunov family, Ablyazov, Triadou, or the plaintiffs. See Pltfs. 56.1 ¶ 14; Exs. A & B to Snyder Decl.

other examples of similar schemes run by the defendants to
launder the stolen funds in ways that enriched the defendants
and obscured the true source of the funds. See id. ¶¶ 56-67.

### C.

In early 2015, a lawyer named Robert Wolf approached Latham
& Watkins ("Latham"), which was representing Almaty at the time
in litigation against the Khrapunov family. Id. ¶ 37. Wolf
offered Latham the services of his client, a company called
Litco LLC ("Litco"), to assist Almaty in recovering funds. Id.
Latham signed a non-disclosure agreement ("NDA") stating that it
would not "discuss, disclose, or otherwise transfer" the
identities of the "persons having ownership interests" in Litco
to "any person or entity, including, without limitation,
Almaty." Id. ¶ 38. After Latham signed the NDA, Wolf disclosed
that Sater was the sole member of Litco. Id. Latham declined to
engage Litco on behalf of Almaty. Id. ¶ 39.

Wolf then contacted Peder Garske, a partner at Arcanum
(Asia) Limited ("Arcanum"), an investigative firm working with
the plaintiffs on the plaintiffs' asset recovery efforts. Id.
¶¶ 39-40. On behalf of Litco, Wolf offered to provide the
plaintiffs with investigative and litigation assistance with
locating and recovering funds stolen from the plaintiffs through
Ablyazov's and Khrapunov's fraud. Id. ¶ 40. At that point,

Arcanum dealt solely with Wolf; no one at Arcanum dealt with any other representative of Litco. Id. ¶ 41.

On June 12, 2015, Litco entered into a Confidential Assistance Agreement (the "CAA") with Arcanum and the plaintiffs. Id. ¶¶ 41-42. The CAA granted Litco a contingent interest in recoveries that resulted from Litco's assistance. Id. ¶ 42; Ex. C to Snyder Decl. ("CAA") § 2, ECF No. 735-3. Litco also represented and warranted to Arcanum that "[n]o potential witness which Litco identifies and produces to Arcanum in connection with assistance to be provided under this Agreement shall have any ownership interest in Litco." CAA § 6(e). Sater was not a signatory to, nor was he mentioned anywhere in, the CAA. Pltfs. 56.1 ¶ 43. Instead, Sater's associate, Karlson Kam, signed the CAA on Litco's behalf. Id.

On July 8, 2025, Litco and Arcanum entered into a non-disclosure agreement (the "Arcanum NDA"). Id. ¶ 44; Ex. CC to Schwartz Decl. ("Arcanum NDA"), ECF No. 747-23. The Arcanum NDA prohibited Arcanum from disclosing to the plaintiffs or the plaintiffs' counsel "the identities of Litco's members, or other persons having ownership interests in Litco," to the extent that this information was disclosed to Arcanum; and from proffering Sater "as a potential witness in any action contemplated by the [CAA]." Arcanum NDA ¶¶ 1-2. According to Wolf, the purpose of hiding Sater's name from the plaintiffs was to "keep Mr. Sater

7

out of it" and to ensure that Sater "would not be produced as a witness to Arcanum or anyone." Pltfs. 56.1 ¶ 45.

After Arcanum signed the NDA, at which point Arcanum was bound not to disclose Sater's identity to the plaintiffs, Sater met with Wolf and Garske from Arcanum (the "Garske meeting").[4] Id. ¶ 46. The plaintiffs claim that this meeting took place on July 8, 2015, while Sater asserts that it occurred in early June 2015. Id.; Defs. 56.1 ¶ 21. The defendants claim that, at this meeting, Sater told Garske about the circumstances surrounding Sater's diversion of the Tri-County Mall proceeds, as well as the fact that Sater ultimately retained some of these proceeds. Defs. 56.1 ¶¶ 25-26. In the defendants' view, the audio recording of the Garske meeting establishes that Garske was in communications with Bourg, the sole director of Triadou, and that Garske had discussed the Tri-County Mall deal—including who received proceeds from the deal—with Bourg. See id. ¶¶ 15, 27-28. According to the defendants, at that meeting, Sater also suggested to Garske that certain information about the Tri-County Mall deal would be better disclosed by Bourg because Sater had signed a confidentiality agreement with Ilyas, while Bourg had not. Id. ¶ 30.

---

[4] The plaintiffs have moved in limine to preclude any evidence regarding this meeting, including the audio recording and transcript of this meeting. See ECF No. 727. The Court will address that motion in a separate ruling.

The plaintiffs have a different view of the evidence of the Garske meeting. By the plaintiffs' telling, Sater and Garske primarily discussed transactions that are not at issue in this case. Pltfs. 56.1 ¶ 46.

### D.

In October 2015, the plaintiffs filed an answer, counterclaims, and crossclaims (the "Crossclaims") in the Triadou Action. No. 15-cv-5345, ECF No. 49. At issue in the Crossclaims was an investment involving the Flatotel property located in New York City—a transaction that is not at issue in this case. See Pltfs. 56.1 ¶¶ 51-53. The Crossclaims alleged that Ablyazov and Khrapunov, through Triadou, partnered with Ilyas and real estate developer Joseph Chetrit to launder funds stolen from the plaintiffs through the Flatotel investment. See Crossclaims ¶¶ 19, 101-07; Pltfs. 56.1 ¶¶ 51-53.

The Crossclaims do not mention Sater, his entities, MeM, or any of the transactions at issue in this case. Id. ¶ 54; see generally Crossclaims. The plaintiffs have never alleged that Sater received any of the Flatotel funds. Pltfs. 56.1 ¶ 54. But the Crossclaims do mention Bourg 41 times in connection with Bourg's activities with Triadou. See generally Crossclaims; see also Defs. 56.1 ¶ 32. And in May 2016, Bourg filed a declaration in support of the plaintiffs' motion for attachment of Triadou's assets in the Triadou Action. No. 15-cv-5345, ECF No. 142

9

("Bourg Decl."). In that declaration, Bourgh stated that, in April 2013, Triadou invested approximately $29 million in the Tri-County Mall and resold that interest three months later for approximately $340 million, but that "those funds did not flow to Triadou, but were instead moved to other Ablyazov-Khrapunov entities and then out of the United States." Id. ¶ 44; see also Pltfs. 56.1 ¶ 55. The declaration makes no mention of Sater. See generally Bourg Decl.

The defendants assert that "Sater and his personal attorney worked with Arcanum to research and draft the factual allegations of the Crossclaims . . . filed by Boies Schiller on behalf of the Plaintiffs." Defs. 56.1 ¶ 31. The plaintiffs dispute this assertion insofar as it suggests that any assistance Litco may have provided in connection with the Crossclaims concerned Sater's participation in the money laundering scheme or that Sater gave information directly to Boies Schiller. Pltfs. 56.1 ¶ 31.

### E.

The plaintiffs commenced this action on March 25, 2019. ECF No. 1. On June 10, 2024, the parties proceeded to a jury trial on three claims: conversion against Sater; unjust enrichment against Sater, Bayrock, GHS, and MeM; and money had and received against Sater, Bayrock, GHS, and MeM. See Joint Pretrial Order, ECF No. 586; Trial Transcript ("Tr."), ECF Nos. 649-72. The jury

10

returned a verdict in favor of the plaintiffs and against each
of the defendants on the claims in which they were named. Tr. at
1777-97. The jury also found that the earliest ascertainable
dates that the plaintiffs had claims for conversion and for
unjust enrichment against the defendants were in 2013. See id.
at 1732, 1734, 1778-82. In other words, the jury found that the
plaintiffs' claims accrued in 2013. See id. at 1778-84.

With respect to the conversion and unjust enrichment
claims, the jury found that the defendants had failed to prove
the affirmative defense of a statute of limitations. Id. at
1777-81. Having answered each statute of limitations question on
the special verdict form in the negative, the jury did not reach
the additional question whether the plaintiffs had proved that
equitable estoppel applies to the plaintiffs' claims for
conversion and unjust enrichment. See id. at 1777-84.

On January 15, 2025, this Court granted the defendants'
motion pursuant to Rule 59 for a new trial on the plaintiffs'
claims for conversion and unjust enrichment. ECF No. 702. The
Court concluded that jury was erroneously instructed on accrual
of those claims for purposes of the statute of limitations. Id.
at 12. The Court observed that, had the jury been given the
correct instruction, the jury would have found that the
limitations period to bring those claims expired in 2016—three
years before the plaintiffs brought this action in 2019. Id. at

11

14. However, because the jury had found that the defendants had failed to prove the affirmative defense of a statute of limitations on those claims, the jury did not decide whether any of the defendants should be equitably estopped from asserting the statute of limitations for those claims. See id.

The defendants have now moved for summary judgment dismissing the plaintiffs' claims for conversion and unjust enrichment. ECF No. 733. The defendants contend that the undisputed facts establish that equitable estoppel is inapplicable to the claims, which would otherwise be time-barred. If summary judgment is denied and the case proceeds to a jury trial, the defendants have moved to disqualify Boies Schiller as trial counsel. See id.

## II.

### A.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in

short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

**B.**

Motions to disqualify are "viewed with disfavor in this Circuit because they are often interposed for tactical reasons and result in unnecessary delay." Bennett Silvershein Assocs. v.

13

Furman, 776 F. Supp. 800, 802 (S.D.N.Y. 1991); see also Finkel
Frattarelli Bros., Inc., 740 F. Supp. 2d 368, 372 (E.D.N.Y.
2010). In exercising the discretionary power to disqualify
counsel, courts look to the American Bar Association and state
disciplinary rules for guidance. Finkel, 740 F. Supp. 2d at 372.

The advocate-witness rule can serve as grounds for
disqualification. See id.; N.Y. Rules of Professional Conduct R.
3.7(a). That rule provides that "[a] lawyer shall not act as
advocate before a tribunal in a matter in which the lawyer is
likely to be a witness on a significant issue of fact." Finkel,
740 F. Supp. 2d at 372-73. Disqualification pursuant to Rule
3.7(a) is warranted only where: (1) the testimony given by
counsel is "necessary"; and (2) "there is a substantial
likelihood that the testimony would be prejudicial to the
witness-advocate's client." Id.; see also Capponi v. Murphy, 772
F. Supp. 2d 457, 471-72 (S.D.N.Y. 2009).

**III.**

The parties share some common ground. It is undisputed that
the statute of limitations for the conversion and unjust
enrichment claims is three years, that the claims accrued in
2013, and that the plaintiffs have the burden of proving that
equitable estoppel prevented the running of the statute of
limitations. In moving for summary judgment, the defendants

14

argue that equitable estoppel does not apply in this case as a matter of law.

"Under the doctrine of equitable estoppel, 'a defendant is estopped from pleading a statute of limitations defense if the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.'" City of Almaty v. Sater, 503 F. Supp. 3d 51, 66 (S.D.N.Y. 2020) (quoting Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189, 198 (N.Y. 2007)). Equitable estoppel covers "the circumstances where the defendant conceals from the plaintiff the fact that [the plaintiff] has a cause of action." Pearl v. City of Long Beach, 296 F.3d 76, 82 (2d Cir. 2002). In invoking equitable estoppel, the plaintiff "may not rely on the same act that forms the basis for the claim" and must instead point to a distinct act of deception or concealment. Ross, 868 N.E.2d at 198.

The New York Court of Appeals has allowed the application of equitable estoppel where, for example, a defendant's fraudulent accounting practices concealed the plaintiff's losses resulting from the defendant's theft. See Gen. Stencils, Inc. v. Chiappa, 219 N.E.2d 169, 170-71 (N.Y. 1966) (finding that a plaintiff who alleged that the defendant bookkeeper stole petty cash and concealed the theft with forged entries could litigate the issue of equitable estoppel at trial).

However, "[t]he doctrine of equitable estoppel will not apply if the plaintiff possesses timely knowledge sufficient to place [the plaintiff] under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations." McIvor v. Di Benedetto, 503 N.Y.S.2d 836, 837 (App. Div. 1986); see also, e.g., Gleason v. Spota, 599 N.Y.S.2d 297, 299 (App. Div. 1993). The plaintiff must "demonstrate [the plaintiff's] due diligence in ascertaining the facts and in commencing the action in order to seek shelter" under the doctrine. MBI Int'l Holdings Inc. v. Barclays Bank PLC, 57 N.Y.S.3d 119, 126 (App. Div. 2017).

The key question is whether the plaintiff's delay in bringing the claim was the result of the defendant's affirmative wrongdoing rather than the plaintiff's own negligence. See Gen. Stencils, 219 N.E.2d at 171.[5]

### A.

As an initial matter, the defendants in this case fault the plaintiffs for relying on Judge Nathan's 2020 decision on the defendants' motion to dismiss. See City of Almaty, 503 F. Supp. 3d at 67 (finding the plaintiffs' allegations "enough at the pleading stage to plausibly support the application of equitable estoppel"). The defendants argue that Judge Nathan's decision

---

[5] The requirements for equitable estoppel in this case are governed by New York law rather than federal law.

16

was only on a motion to dismiss, and that the decision observed that the plaintiffs "w[ould] need to adduce evidence showing the [defendants'] deceptive conduct and their justifiable reliance on that conduct in significantly greater detail to meet their burdens of production and of proof as the case progresses." Id. at 68. It is true that a motion to dismiss is different from a motion for summary judgment. But that has no bearing on whether there is evidence now to support the application of equitable estoppel.

In addition, the defendants have made no specific arguments regarding MeM and, even as to the Sater entities, have attempted to challenge the application of equitable estoppel only with respect to the funds that the Sater entities received from the Tri-County Mall project—and not the four other investments from which they allegedly benefited, namely the World Health Networks, the Trump SoHo Hotel, the Syracuse Center, and Creacard S.A. On that basis alone, the motion for summary judgment should be denied.

**B.**

The defendants do not appear to dispute that Sater actively concealed his role in the money laundering scheme and his receipt of stolen funds. Rather, the defendants provide three reasons why the plaintiffs nonetheless cannot assert equitable estoppel as a matter of law, contending that the plaintiffs

17

would have become aware of Sater's role if the plaintiffs had
exercised diligence because: (1) the facts underlying the
plaintiffs' claims were allegedly matters of public record in
the 2013 Lawsuit regarding the Tri-County Mall project; (2)
Sater allegedly told Arcanum about the Tri-County Mall scheme
during the 2015 Garske meeting; and (3) Sater purportedly
assisted the plaintiffs with drafting the October 2015
Crossclaims, and the circumstances surrounding the preparation
of the Crossclaims should have put the plaintiffs on notice of
Sater's wrongdoing.

With respect to the three bases offered by the defendants
for why equitable estoppel should not apply, there is at least a
dispute of fact as to what the plaintiffs should have known—and
when—about their claims against the defendants in connection
with the Tri-County Mall scheme.

**1.**

First, the defendants claim that the existence of and the
public filings in the 2013 Lawsuit were sufficient to put the
plaintiffs on notice of the facts underlying the claims for
conversion and unjust enrichment against Sater.

However, the evidence pertaining to the 2013 Lawsuit is
insufficient to preclude the defendants' reliance on equitable
estoppel as a matter of law. To begin, the defendants fail to
explain why, when the lawsuit was filed in 2013, the plaintiffs

18

would have had reason to know about the existence of the lawsuit
and that the dispute may have been related to the funds stolen
from the plaintiffs. See St. John's Univ. v. Bolton, 757 F.
Supp. 2d 144, 191 (E.D.N.Y. 2010) ("A defendant who
intentionally conceals facts forming the basis of a plaintiff's
claims is no less wrong for having done so, and a plaintiff is
no less diligent in protecting his rights, if the plaintiff
remains wholly ignorant of evidence of wrongdoing he had no
reason to detect—even where that evidence exists in a public
record open to all."). The defendants have adduced no evidence
that, in 2013, the plaintiffs knew that the proceeds at issue in
the 2013 Lawsuit were the stolen funds or that the Tri-County
Mall investment was part of the broader money laundering scheme
such that the plaintiffs should have been on alert about the
existence of lawsuits against Sater or involving the Tri-County
Mall. And even if the plaintiffs had discovered the 2013 Lawsuit
at the time, it is undisputed that the 2013 Lawsuit's caption—
"Tri-County Mall Investors, LLC v. Felix Sater et al."—and
associated public filings make no mention of Ilyas, Ablyazov, or
even Triadou. See Pltfs. 56.1 ¶ 14; Ex. A to Snyder Decl.

As for the settlement agreement between Sater and TCMI
pursuant to which Sater agreed to return $20 million of the
diverted proceeds, that does not help the defendants. The
settlement agreement was confidential, and it is undisputed that

the publicly available filings on the 2013 Lawsuit's docket provided no indication that there had been a settlement, let alone what the terms of the settlement were. Pltfs. 56.1 ¶ 14.

The defendants contend that the plaintiffs could have followed up on the 2013 Lawsuit subsequently, in 2014 and 2015, after the plaintiffs might have had reason to do research on Sater, and learned of the bases for the claims against Sater before 2016, when the statute of limitations expired. See Defs. Reply at 7, ECF No. 753. But the fact that the settlement agreement resolving the 2013 Lawsuit was confidential raises a question of fact as to whether the plaintiffs should have known about their claims against the defendants before the end of the limitations period, or whether the existence of the confidential settlement agreement was part of a deceptive scheme by Sater to prevent the plaintiffs from becoming aware of their claims against him.

## 2.

Second, the defendants claim that, in a 2015 meeting, Sater told Garske of Arcanum, which had been engaged by the plaintiffs to locate and recover the stolen funds, about Sater's diversion of funds from the Tri-County Mall project. The defendants further assert that, at the Garske meeting, Sater acknowledged that he had signed a confidentiality agreement with Ilyas, but suggested that Garske speak with Bourg, who was not covered by

any such agreement. According to the defendants, the audio recording of the Garske meeting establishes that Arcanum knew in 2015 about Sater's taking proceeds from the Tri-County Mall investment and that, because Arcanum was an agent of the plaintiffs, that knowledge should be imputed to the plaintiffs.

However, what was said at the Garske meeting is very much in dispute. See Pltfs. 56.1 ¶¶ 21, 25-30; Defs. 56.1 ¶¶ 21, 25-30. Moreover, the plaintiffs argue that any knowledge that Arcanum learned about Sater from this meeting is excepted from the general rule that an agent's knowledge be imputed to the principal, see, e.g., Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994), because the Arcanum NDA imposed a duty on Arcanum not to disclose Sater's identity and not to proffer Sater as a witness to the plaintiffs. That said, whether Arcanum's contractual duty not to disclose Sater's identity to the plaintiffs is enough to prove that any knowledge properly imputed from Arcanum to the plaintiffs did not give the plaintiffs notice of their claims against Sater in 2015 will turn on what exactly Sater disclosed to Garske in the Garske meeting—which is currently disputed. The Arcanum NDA prohibited Arcanum from disclosing "the identities of Litco's members, or other persons having ownership interests in Litco," to the plaintiffs. Arcanum NDA ¶¶ 1-2 (emphasis added). If Sater did in fact disclose information about the Tri-County Mall scheme to Arcanum during the Garske meeting, there

21

is at least a question of fact about whether Arcanum would have followed up on the information Sater disclosed and whether any subsequent knowledge developed by Arcanum—and imputed to the plaintiffs—would have been sufficient to put the plaintiffs on notice of their claims against Sater, even if, pursuant to the Arcanum NDA, Arcanum could not disclose Sater's identity to the plaintiffs.

Accordingly, whether the plaintiffs could have uncovered their claims against the defendants based on the 2015 Garske meeting is a disputed question of fact.

**3.**

Third, the defendants argue that the Crossclaims asserted by the plaintiffs in October 2015 in the Triadou Action demonstrated the plaintiffs' knowledge of their claims against the defendants.

The defendants claim that Sater and Wolf "worked with Arcanum to research and draft the factual allegations of the Crossclaims . . . filed by Boies Schiller on behalf of the Plaintiffs." Defs. 56.1 ¶ 31. But this fact is disputed, especially to the extent that it can be interpreted to suggest that Sater at some point provided information directly to Boies Schiller. See Pltfs. 56.1 ¶ 31 (pointing to evidence that Sater did not provide input on the Crossclaims directly to the

plaintiffs and that any information provided to Arcanum regarding the Crossclaims went through Wolf).

More importantly, nothing in the Crossclaims was related to the claims in this case. The Crossclaims focused on the Flatotel investment—a transaction that is not at issue in this case—and did not mention the Tri-County Mall or any of the four other projects relevant to the claims against Sater. Therefore, the Crossclaims cannot establish as a matter of law that, as of October 2015, the plaintiffs should have had knowledge of the facts underlying the claims in this case.

In sum, none of the three events cited by the defendants precludes the application of equitable estoppel as a matter of law. Accordingly, the defendants' motion for summary judgment is **denied.**

### IV.

The defendants have also moved to disqualify Boies Schiller as trial counsel based on the alleged "personal involvement of Matthew Schwartz in the underlying facts" in this case, citing the advocate-witness rule. Defs. Br. at 17. Schwartz represents the plaintiffs in this case and also represented the plaintiffs in the Triadou Action.

### A.

The plaintiffs contend that the defendants have waived the right to seek disqualification because the defendants failed to

disclose Schwartz as a potential witness under Federal Rule of
Civil Procedure 26 and because the motion is untimely.

Rule 26 requires each party to "provide to the other
parties . . . the name and . . . the address and telephone
number of each individual likely to have discoverable
information—along with the subjects of that information—that the
disclosing party may use to support its claims or defenses."
Fed. R. Civ. P. 26(a)(1)(A)(i). Each party is also required to
supplement its Rule 26(a) disclosures "in a timely manner." Fed.
R. Civ. P. 26(e)(1).

"If a party fails to . . . identify a witness as required
by Rule 26(a) or (e), the party is not allowed to use that . . .
witness to supply evidence on a motion, at a hearing, or at a
trial, unless the failure was substantially justified or is
harmless." Fed. R. Civ. P. 37(c)(1). "Substantial justification"
means "justification to a degree that could satisfy a reasonable
person that parties could differ as to whether the party was
required to comply with the disclosure request." Preuss v.
Kolmar Laboratories, Inc., 970 F. Supp. 2d 171, 175 (S.D.N.Y.
2013). A party's failure to comply with Rule 26(a) or (e) "is
harmless when there is no prejudice to the party entitled to the
disclosure." Am. Stock Exch., LLC v. Mopex, Inc., 215 F.R.D. 87,
93 (S.D.N.Y. 2002).

In this case, the defendants have failed to provide any justification at all—let alone a substantial one—for their failure to identify Schwartz as a witness in a timely manner. See id. at 95-96 (finding that the defendant "failed to sustain its burden of demonstrating substantial justification because it offers no viable explanation for why it waited until one month after the close of discovery" to supplement its discovery responses). The defendants had ample opportunity to disclose Schwartz as a witness: they have known about Schwartz's representation of the plaintiffs since 2015 at the latest, when Sater allegedly assisted with the drafting of the Crossclaims filed by Boies Schiller on behalf of the plaintiffs in the Triadou Action. Moreover, equitable estoppel has been an issue in this case from the outset. See City of Almaty, 503 F. Supp. 3d at 66-68.

Furthermore, the defendants have failed to show that this late-breaking identification of Schwartz as a witness would be harmless. In fact, the opposite is true: the plaintiffs would plainly be prejudiced if the defendants were to call Schwartz as a witness on the eve of trial in this long-running suit, especially when the defendants could have disclosed their intent to seek his testimony years ago.

Therefore, as a sanction under Rule 37(c)(1), the defendants are precluded from calling Schwartz as a witness at trial, obviating any need to disqualify him or Boies Schiller.

On a related note, the defendants' extreme delay in seeking disqualification smacks of tactical maneuvering, which further supports denying the motion. See Universal City Studios, Inc. v. Reimerdes, 98 F. Supp. 2d 449, 455–56 (S.D.N.Y. 2000) (denying motion because, among other things, the motion was "motivated at least partly by tactical considerations"). As explained above, for at least a decade, the defendants have been aware of Schwartz's and Boies Schiller's representation of the plaintiffs and Schwartz's alleged knowledge of the facts underlying this action. This litigation has been underway for six years, and only now—on the eve of the second trial—have the defendants moved to disqualify Schwartz and Boies Schiller.

**B.**

Moreover, the defendants have failed to demonstrate that disqualification is required. The party seeking disqualification "carries the burden to show both the necessity of the testimony and the substantial likelihood of prejudice." United States v. Tate & Lyle N. Am. Sugars, Inc., 184 F. Supp. 2d 344, 346 (S.D.N.Y. 2002).

The defendants have not shown that Schwartz's testimony is necessary. It is not enough that the testimony "may be relevant

and even highly useful"; it must be "strictly necessary."
Stratavest Ltd. v. Rogers, 903 F. Supp. 663, 667 (S.D.N.Y.
1995). Accordingly, a lawyer's testimony is "necessary only if
there are no other witnesses to the circumstances at issue."
Solow v. Conseco, Inc., No. 06-cv-5988, 2007 WL 1599151, at *4
(S.D.N.Y. June 4, 2007); see also Shabbir v. Pakistan Int'l
Airlines, 443 F. Supp. 2d 299, 308 (E.D.N.Y. 2005) ("[A] lawyer
who could provide only cumulative testimony may act as trial
counsel.").

Schwartz's testimony regarding what the plaintiffs may or
may not have known about Sater's involvement in the five schemes
at issue in this case would likely be relevant. However, there
is no showing that this information is solely in Schwartz's
possession: the defendants represent that they intend to call
four other witnesses to testify on the same issues. See Defs.
Br. at 17 n.5. Therefore, the defendants have failed to meet
their burden to demonstrate necessity. See Capponi, 772 F. Supp.
2d at 472 (finding the witness's testimony not strictly
necessary where the information that the plaintiff intended to
solicit from the witness "may be readily available from other
sources").

Nor have the defendants established that Schwartz's
testimony would prejudice the plaintiffs. To be prejudicial, an
attorney's testimony must be "sufficiently adverse to the

27

factual assertions or account of events offered on behalf of the client, such that the client might have an interest in the lawyer's independence in discrediting that testimony." Paramount Commc'ns, Inc. v. Donaghy, 858 F. Supp. 391, 395 (S.D.N.Y. 1994). "The more speculative the potential prejudice, the less likely a court will be to grant a motion to disqualify." Shabbir, 443 F. Supp. 2d at 308. In this case, the defendants claim that Schwartz's testimony would establish that Schwartz "worked closely" with Sater and Arcanum in preparing the October 2015 Crossclaims, and that Schwartz, Boies Schiller, and the plaintiffs had every opportunity to learn about the 2013 Lawsuit and other key facts before the statute of limitations had run. Defs. Br. at 17. But the plaintiffs dispute the defendants' account, and in any event the defendants' proffer of what Schwartz's testimony would show is speculative at this point. "Speculation as to the testimony that counsel would give is not sufficient to support a motion to disqualify." Finkel, 740 F. Supp. 2d at 376; see also Paramount Commc'ns, 858 F. Supp. at 398 ("The conjuring of 'perhaps possible' scenarios is inadequate grounds for a demonstration . . . that such testimony would be prejudicial.").

For these reasons, the defendants' motion to disqualify Schwartz and Boies Schiller as trial counsel is **denied**.[6]

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the reasons explained above, the defendants' motion for summary judgment is **denied**. The defendants' motion to disqualify Boies Schiller as trial counsel is also **denied**.

The Clerk is respectfully directed to close ECF No. 733.

**SO ORDERED.**

Dated:    New York, New York
          August 6, 2025

                John G. Koeltl
          United States District Judge

---

[6] To the extent that the defendants seek to disqualify the entire firm of Boies Schiller, that request is also without merit. "A law firm can be disqualified by imputation only if the movant proves by clear and convincing evidence that [A] the witness will provide testimony prejudicial to the client, and [B] the integrity of the judicial system will suffer as a result." Murray v. Metro. Life Ins. Co., 583 F.3d 173, 178–79 (2d Cir. 2009). As explained above, the defendants have failed to show that Schwartz's testimony would be prejudicial to the plaintiffs. Moreover, the defendants have made no attempt to demonstrate that "the integrity of the judicial system" would be compromised if Schwartz were to testify and Boies Schiller were to continue to represent the plaintiffs. Id. at 179.